UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X   Docket No.:

KEVIN CAMPBELL,

                             Plaintiff,        **COMPLAINT**

      -against-

                                      **PLAINTIFF DEMANDS**

FEDERAL EXPRESS CORPORATION A/K/A FEDEX  **A TRIAL BY JURY**
EXPRESS, AND ERIC WANDERS, *INDIVIDUALLY,*

                             Defendants.

----------------------------------------------------------------------X

       Plaintiff, KEVIN CAMPBELL, by his attorney, JESSICA MASSIMI, hereby complains

of the Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to <u>Title VII of the Civil Rights Act of 1964</u>, as codified, 42
   U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991,
   Pub. L. No. 102-166) ("Title VII"), the <u>New York State Human Rights Law</u>, New York State
   Executive Law § 296, *et seq.* ("NYSHRL"); and the <u>New York City Human Rights Law</u>, New
   York City Administrative Code § 8-502(a), *et seq.* ("NYCHRL"); and seeks damages to
   redress the injuries Plaintiff has suffered as a result of being **discriminated against** on the
   basis of his **race**, and **retaliated against** and **terminated** by the Defendants solely for
   objecting to this discrimination.

## JURISDICTION AND VENUE

2. Jurisdiction of this Court is proper under 29 U.S.C. § 2617 and 28 U.S.C. §§ 1331 and 1343.

3. The Court has supplemental jurisdiction over Plaintiff's claims brought under state law
   pursuant to 28 U.S.C. §§ 1367.

4. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §§ 1391(b), as the

acts complained of occurred in that district and the corporate Defendant resides in that district.

## PROCEDURAL PREREQUISITES

5.  Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC") on June 23, 2021.

6.  Plaintiff received a Notice of Right to Sue from the EEOC, dated November 22, 2022, with respect to the herein charges of discrimination.

7.  This action is commenced within 90 days of receipt of said Right to Sue.

## PARTIES

8.  At all times material, Defendant FEDERAL EXPRESS CORPORATION A/K/A FEDEX EXPRESS ("FEDEX") was and is a foreign business corporation authorized to and doing business in the State of New York, with its primary office located at 3620 Hacks Cross Road, Memphis, TN 38125.

9.  At all times material, Plaintiff worked as a full-time non-driver at the LGA Station in Queens, New York.

10. At all times material, Defendant FEDEX has and had more than 15 employees.

11. From April 2, 2017 to June 15, 2020, Henry Nunez was Plaintiff's supervisor.

12. From June 16, 2020 until Plaintiff's termination on May 25, 2021, Monty Bovell was Plaintiff's direct supervisor.

13. At all times material, Frank Ontaneda, Michael Bradley, Steve Pasqualicchio, and Robert Mejia were LGA Station managers.

14. At all times material, Eric Wanders was the LGA Station senior manager.

15. Bovell, Ontaneda, Bradely, Pasqualicchio, Mejia, and Wanders had supervisory authority

over Plaintiff, and had the authority to change the terms and conditions of Plaintiff's employment up to and including terminating Plaintiff's employment. Eric Wanders had final decision-making authority over decisions to terminate employees and upon information and belief, made the final decision to terminate Plaintiff's employment.

16. FedEx and Wanders are collectively referred to herein as "Defendants."

## MATERIAL FACTS

17. Campbell is a Black man.

18. On April 1, 2017, Campbell began working for DEFENDANT, FEDERAL EXPRESS CORPORATION, as courier at a pay rate of $19.00 per hour. Campbell was hired as a full-time worker.

19. At the time FedEx wrongfully terminated Campbell's employment, Campbell was making $22.50 per hour.

20. A few months after Campbell began working for FedEx, Henry Nunez became Campbell's direct manager.

21. Nunez had supervisory authority over Campbell and had the ability to alter the terms and conditions of Campbell's employment.

22. In 2018, Nunez began cutting Campbell's hours without legitimate explanation, to the detriment of Campbell and other workers, since there was a great deal of work to complete.

23. In the summer of 2018, Campbell had a discussion with Nunez about workload and stated, in sum and substance, that the amount of work assigned to the couriers and drivers was perhaps too much to complete before the management-imposed deadlines.

24. Nunez responded to Campbell by stating "Black people are always making excuses about why they can't do things. This is why I hate working with Black people."

25. Campbell complained of this blatantly racist statement from Nunez to his senior manager, Eric Wanders.

26. However, Wanders continued requiring Campbell to work as Nunez's direct report, despite the blatantly racist, harassing, and discriminatory comments from Nunez to Campbell.

27. In the summer of 2020, many of Campbell's white and Latino co-workers began coming to work expressing blatantly racist views in the wake of George Floyd's murder and the protests that followed, thereby creating a racially hostile work environment for Campbell.

28. For example, on June 1, 2020, Peter Lorenzi, Campbell's co-worker, loudly yelled out to Campbell calling him "Trayvon."

29. This was a blatantly racist and threatening reference to Trayvon Martin, the Black teenager shot and killed by George Zimmerman.

30. Exercising self-control, Campbell ignored this racist comment from Lorenzi, and walked into the kitchen to wash his hands.

31. Lorenzi, did not stop his harassment there, however. Instead, Lorenzi, recognizing that he was not going to get a rise out of or a reaction from Campbell even in the face of such racist and abhorrent comments, followed Campbell into the kitchen.

32. When Lorenzi saw Campbell washing his hands, Lorenzi stated "Why are you washing your hands for so long? Is it because you're not used to having running water in the projects."

33. Continuing to exercise self-control and restraint, Campbell did not escalate the situation with Lorenzi and did not retaliate against him. Instead, Campbell immediately went on break and complained of Lorenzi's discrimination to his manager Ontaneda.

34. Campbell asked Ontaneda if he could write a statement about what Lorenzi had just said to him and Ontaneda refused, stating instead "Let's not escalate this. Let's just talk to Peter and

figure it out."

35. Campbell was surprised and disheartened by Ontaneda's response since Campbell was not "estalat[ing]" the situation and in fact had professionally made Ontaneda aware of Lorenzi's discriminatory and harassing comments and conduct.

36. Campbell had to ask Wanders and Ontaneda several times to file a written statement regarding the incident described above involving Lorenzi before Defendants actually permitted him to do so.

37. However, after Campbell submitted his written statement regarding Lorenzi's threating discrimination and harassment, Defendants continued to discriminate and retaliate against Campbell.

38. For example, Defendant, without Campbell's permission or knowledge, informed other workers that Campbell had filed a complaint of racial discrimination against Lorenzi, further contributing to the racially hostile work environment in which Campbell was forced to work.

39. After Campbell filed the discrimination complaint against Lorenzi, other workers began openly referring to Campbell as a "snitch."

40. Lorenzi's wife, Angela, worked in the office at Defendant. She personally retaliated against Plaintiff by giving him broken package scanners and by ignoring him when he needed work related information. When Campbell called the office to provide work-related information to Angela, she often hung up the phone on him.

41. Defendant's discrimination of and retaliation against Campbell continued to escalate.

42. For example, at or around the time of Lorenzi's suspension, during the summer of 2020 and in the wake of protests following George Floyd's murder, Rob, a mechanic for Defendants and whose last name is currently unknown to Campbell, said to Campbell "Kevin, how is

your new TV?"

43. Campbell asked Rob to explain what he meant by this comment, and Rob explained "I am talking about the TV you and your sister stole from Radio Shack this weekend during the riots."

44. Rob's comment was clearly racially discriminatory and harassing since Campbell was not involved in any riots or stealing. Rather, Rob was accusing Campbell of being a "rioter" or "looter" because he is a Black man. Rob's comment was also intended to be inflammatory as he made it against the larger national backdrop of widespread protests against police violence, which many people wrongfully interpreted or attempted to characterize as "looting."

45. Rob made this statement in front of Henry Nunez, Campbell's manager.

46. In light of Rob's racially discriminatory accusations of "looting" against Campbell, Campbell looked at Nunez and asked "Do I have to write a statement about this also? Am I going to have to write a statement every day when these things happen here?"

47. Nunez made no effort to reprimand Rob nor to protect Campbell, and instead just looked at Campbell and said "I don't know."

48. Defendant, despite their knowledge of Rob's blatantly discriminatory conduct towards Campbell, did nothing to discipline or reprimand Rob.

49. Defendant's discrimination of and retaliation against Campbell continued.

50. For example, in or around July of 2020, "JC" and Jeffrey Durante, Plaintiff's co-workers, walked over to Campbell who was standing near a cage where packages are stored. Durante said to Campbell "How about I put you in that cage like the gorilla you are." Jeffrey then laughed and walked away. Campbell does not currently know "JC's" full name.

51. A few days after this incident, David Almeda, another courier for Defendant, walked over to where Campbell was standing with two managers, Michael Bradley and Pasqualicchio. In front of these two managers, Almeda said of Campbell "Doesn't this guy look like someone who would steal your car radio and then try to sell it back to you." Almeda's comment was an abhorrent use of the long-standing racially discriminatory and false characterization of Black people as criminals.

52. Campbell immediately turned to Bradley and Pasqualicchio, two managers, and said "See – this is what I'm dealing with. You just heard David come up to me and say that." This comment from Plaintiff to Bradley and Pasqualicchio constituted yet another complaint of racial discrimination from Campbell to Defendant. Yet, Defendants took no action to protect Campbell from the blatant discrimination and retaliation.

53. Instead, Bradley and Pasqualicchio ignored Campbell's complaint of racial discrimination and did nothing.

54. A few days later, in about July 2020, Bradley confronted Campbell in his office about Campbell's prior complaint of racial discrimination against Lorenzi, demanding of Campbell "Do you and Peter normally joke like this?" and "Peter has a dark sense of humor."

55. In fact, Campbell did not "joke like this" with Lorenzi, and Lorenzi's racially discriminatory comments to Campbell do not fit into the definition of "dark humor" which is not synonymous with "racially discriminatory."

56. During this conversation alone in Bradley's office, Bradley weirdly began to confront Campbell about certain parts of Campbell's complaints against Lorenzi as if Bradley were cross-examining Campbell or trying to get him to say that certain parts of his discrimination complaint were not true.

57. But, Bradley was not successful in this endeavor since Campbell's complaints of racial discrimination were all factually accurate.

58. In further discrimination of Campbell and retaliation against him for his complaints of racial discrimination, Bradley continued to single-out and harass Campbell.

59. For example, Bradley immediately began taking the unusual step of reprimanding and disciplining Campbell for not labeling packages, something that is common practice to not do and something for which other employees were not reprimanded for, since there is a clear job position which labels packages at night.

60. Despite the fact that it was common for employees in Campbell's position to not label packages, Bradley suddenly began regularly screaming at Campbell for failing to do so, and even began reporting Campbell to the other managers.

61. Bradley did this in an effort to lay the pre-textual groundwork for Campbell's termination, and it constituted further discrimination against Campbell for being a Black man, and further retaliation against Campbell for his complaints of racial discrimination.

62. The discrimination and retaliation from other employees of Defendants continued.

63. For example, in February 2021, Arietti, a co-worker who was training to be a manager and whose last name is currently unknown to Campbell, saw Campbell with his car, a BMW.

64. Upon this observation, Arietti stating to Campbell, "Wow you really are a black person who buys a BMW." A few weeks later, without any grounds or justification, Arietti informed Campbell "When I become a manager, I am going to fire you."

65. At or about this same time, James, whose last name is currently unknown to Campbell and who is one of Lorenzi's friends, began asking Campbell questions about his BMW, and memorizing Campbell's license plate number.

66. Hoping to deter James from doing anything to his car, Campbell began parking his car away from the job and informed James that he purchased a dashboard camera for his car. James, in turn, began asking cryptic questions about the angles the camera was able to capture.

67. A few weeks later, Campbell noticed that someone had scratched or keyed his car.

68. Defendant and the other workers continued to isolate Campbell, asking him weird and cryptic questions, and giving him the cold shoulder.

69. Then, on May 18, 2021, Augusto Alzate, a worker at Defendant, approached Campbell unprovoked and began aggressively cursing and swearing at him. This was common conduct by Alzate against Campbell.

70. Campbell ignored Alzate's abusive behavior.

71. Alzate then pushed boxes toward Campbell the wrong way up the conveyor belt, hitting Campbell with the boxes.

72. Campbell asked Alzate why he had pushed boxes at him, hitting him with the boxes.

73. Alzate responded by pulling out a boxcutter and brandishing it at Campbell, swinging his arm back and forth and making a motion towards Campbell as if he was going to slash Campbell with the boxcutter, though Campbell had not threatened or acted violently in any way.

74. Alzate tried to cut Campbell with the boxcutter and, in an effort to protect himself from getting slashed, Campbell grabbed Alzate's arm and pushed it away from him. Campbell also repeatedly asked Alzate to drop the boxcutter which he refused to do.

75. Upon information and belief, Defendant is in possession of a security tape which would prove that Campbell never intentionally bumped into Alzate as Alzate described, and that Campbell only acted in restrained self-defense after Alzate pulled a box cutter on Campbell

and threatened him.

76. In sum, Campbell had endured years of racially aggressive, threatening, and repugnant discrimination which culminated in a violent incident where another worker attempted to cut him with a box cutter. Following this incident, Defendants engaged in further discrimination by attempting to falsely paint Campbell as "aggressive," a common racist tactic used to villainize and dehumanize innocent Black men.

77. On May 25, 2021, despite the fact that Campbell was and is the clear victim of Defendants, Defendants further discriminated against Campbell and retaliated against him for his previous complaints of racial discrimination by terminating his employment following the incident where Alzate attacked him with a box cutter.

78. Campbell has attempted to avail himself of the Defendants' internal grievance procedure, but Defendants have continued discriminating and retaliating against Campbell by upholding the wrongful and discriminatory termination of his employment.

79. Defendants and their managers manufactured a pre-textual basis for Campbell's termination because Campbell is Black and had complained of racial discrimination.

80. In retaliation for Campbell's complaints of discrimination, Defendants terminated Campbell.

81. Thus, Defendants subjected Campbell to retaliation in the form of adverse employment actions for his complaints of discrimination and harassment against them.

82. Defendants' stated reasons for terminating Campbell were pre-textual and were nothing more than further discrimination and retaliation for Campbell's complaints of discrimination.

83. Defendant's termination of Campbell constitutes discrimination on the basis of his race.

84. Defendant's termination of Campbell constituted retaliation for his complaints of discrimination.

85. Upon information and belief, Campbell's performance was above average during the course of his employment with Defendant.

86. Upon information and belief, Defendants terminated Campbell's employment solely because of his race, and because of his complaints of discrimination.

87. Thus, in addition to discrimination against Campbell, Defendants also subjected Campbell to illegal and ongoing retaliation involving all of the above-described conduct up to and including his termination.

88. Plaintiff felt offended, disturbed, and humiliated by the blatantly unlawful and discriminatory and retaliatory termination.

89. But for the fact that Campbell's race, Defendants would not have treated Campbell differently and would not have terminated his employment.

90. Campbell has been unlawfully discriminated and retaliated against, and as a result, suffers loss of rights, emotional distress, loss of income and earnings.

91. Defendants' actions and conduct were intentional and intended to harm Campbell.

92. As a result of the acts and conduct complained of herein, Campbell has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Campbell has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Campbell further experienced emotional and physical distress.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII
(Against Defendant FedEx)

1. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

2. This claim is authorized and instituted pursuant to the provisions of <u>Title VII</u> of the Civil Rights Act of 1964, <u>42 U.S.C.</u> Section 2000e et seq., for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiff complains of Defendants' violation of <u>Title VII</u>'s prohibition against discrimination in employment based, in whole or in part, upon an employee's race.

3. Defendants engaged in unlawful employment practices prohibited by <u>42 U.S.C.</u> Section 2000e et seq. by discriminating against Plaintiff because of his race..

4. As such, Plaintiff has been damaged as set forth herein.

**AS A THIRD CAUSE OF ACTION
FOR RETALIATION
<u>UNDER TITLE VII</u>
(Against FEDEX)**

93. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

94. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e-3(a) provides it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.:

95. Defendants retaliated against Plaintiff as described above by terminating his employment.

96. Defendants baselessly subjected Plaintiff to adverse employment actions prohibited by this statute.

97. Defendants had no valid business justification for the retaliatory and abusive action taken against Plaintiff following his engagement in protected activity.

98. Defendants' conduct was malicious, willful, outrageous, and conducted with fill knowledge of the law.

99. As such, Plaintiff has been damaged as set forth herein.

**AS A FOURTH CAUSE OF ACTION**
**FOR RACE DISCRIMINATION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**(Against all Defendants)**

100. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

101. The New York City Administrative Code § 8-107(1) provides that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

102. Defendants violated the section cited herein as set forth.

103. Plaintiff is entitled to the maximum amount allowed under this ordinance.

**AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**(Against Eric Wanders)**

104. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

105. The New York City Administrative Code § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

106. Defendant WANDERS violated the section cited herein as set forth.

107. Plaintiff is entitled to the maximum amount allowed under this ordinance.

## AS A SIXTH CAUSE OF ACTION FOR RETALIATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### (Against all Defendants)

108. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

109. The New York City Administrative Code § 8-107(7) provides that it shall be unlawful

discriminatory practice: "For an employer . . . to discriminate against any person because

such person has opposed any practices forbidden under this chapter."

110. Defendants violated the section cited herein as set forth for Plaintiff's complaint of and

objection to race discrimination as described above.

111. Plaintiff is entitled to the maximum amount allowed under this ordinance.

## AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION
## VICARIOUS LIABILITY UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### (Against FedEX)

112. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

113. NYCHRL § 8-107(13) is entitled "Employer liability for discriminatory conduct by

employee, agent or independent contractor." It provides

> a. An employer shall be liable for an unlawful discriminatory
> practice based upon the conduct of an employee or agent which is
> in violation of any provision of this section other than subdivisions
> one and two of this section.
> b. An employer shall be liable for an unlawful discriminatory
> practice based upon the conduct of an employee or agent which is
> in violation of subdivision one or two of this section only where:
> (1) the employee or agent exercised managerial or supervisory
> responsibility; or (2) the employer knew of the employee's or
> agent's discriminatory conduct, and acquiesced in such conduct or

14

failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

c. An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

114. Defendant FEDEX violated the section cited herein as set forth.

115. Plaintiff is entitled to the maximum amount allowed under this ordinance.

## AS AN EIGHTH CAUSE OF ACTION
## FOR RACE AND DISABILITY DISCRIMINATION
## UNDER THE NEW YORK STATE EXECUTIVE LAW
### (Against all Defendants)

116. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

117. New York State Executive Law § 296 provides that, "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's . . . age, race, creed, color, national origin, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

118. Defendants violated the section cited herein as set forth.

119. Plaintiff is entitled to the maximum amount allowed under this statute.

### AS A NINTH CAUSE OF ACTION FOR RETALIATION
### UNDER THE NEW YORK STATE EXECUTIVE LAW
#### (Against all Defendants)

120.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

121.    New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

122.    Defendants violated the section cited herein as set forth.

123.    Plaintiff is entitled to the maximum amount allowed under this statute.

### AS A TENTH CAUSE OF ACTION FOR DISCRIMINATION
### UNDER NEW YORK STATE EXECUTIVE LAW
#### (Against Eric Wanders)

124.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

125.    New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

126.    Defendant Wanders violated this statute as set forth.

127.    Plaintiff is entitled to the maximum amount allowed under this statute.

### JURY DEMAND

128.    Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.      Declaring that Defendants engaged in unlawful employment practices prohibited by Title

VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"), New York State Human Rights Law, New York State Executive Law § 296, *et seq.*, and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107, *et seq.*, in that Defendants discriminated against Plaintiff based on his race and disability/perceived disability and retaliated against Plaintiff for objecting to and complaining of discrimination;

B.     Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination, retaliation, and conduct and to otherwise make him whole for any losses suffered because of such unlawful employment practices and conduct;

C.     Awarding Plaintiff compensatory damages for mental, emotional, and physical injury, distress, pain and suffering and injury to his reputation in an amount to be proven;

D.     Awarding Plaintiff punitive damages;

E.     Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F.     Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
          December 16, 2022

JESSICA MASSIMI

By: _____

99 Wall Street, Suite 1264
New York, NY 10005
jessica.massimi@gmail.com
646-241-9800