# EXHIBIT 3
# MALEBRANCHE TRANSCRIPT

February 9, 2024

UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF NEW YORK
----------------------------------------x
KEVIN CAMPBELL,


              Plaintiff,


        -against-



FEDERAL EXPRESS CORPORATION A/K/A FEDEX EXPRESS
and ERIC WANDERS, Individually,
              Defendants.
----------------------------------------x


                    Online Deposition
                    Zoom Meeting
                    February 9, 2024
                    10:10 a.m.


     EXAMINATION BEFORE TRIAL of NANETTE
MALEBRANCHE, a DEFENSE WITNESS in the
above-entitled action, held at the above time and
place, pursuant to Order, taken before SEAN
SAFFERSON, a shorthand reporter and Notary Public
within and for the State of New York.

(1)  **A P P E A R A N C E S:**

(2)  **JESSICA MASSIMI, ESQ.**
         **Attorney for Plaintiff**
(3)      **99 Wall Street, Suite 1264**
         **New York, New York 10005**

(4)

(5)      FEDEX EXPRESS CORPORATION
         In-House Counsel
(6)      3620 Hacks Cross Road, Building B, 3rd
         Floor
(7)      Memphis, Tennessee 38125
(8)      BY:GABRIEL MCGAHA, ESQ.

(9)

(10)  **ALSO PRESENT:**
(11)  **Sharon Daniel, Paralegal, FedEx**

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)                    S T I P U L A T I O N S

(3)

(4)        IT IS HEREBY STIPULATED AND AGREED by

(5)    and between counsel for the respective

(6)    parties herein, that filing and sealing be

(7)    and the same are hereby waived;

(8)

(9)        IT IS FURTHER STIPULATED AND AGREED

(10)   that all objections, except as to form of

(11)   the question, shall be reserved to the

(12)   time of the trial;

(13)

(14)       IT IS FURTHER STIPULATED AND AGREED

(15)   that the within deposition may be sworn to

(16)   and signed before any officer authorized

(17)   to administer an oath, with the same force

(18)   and effect as if signed and sworn to

(19)   before the Court.

(20)                        *  *  *

(21)

(22)

(23)

(24)

(25)

```
(1)                    VIDEOCONFERENCE STIPS
(2)    It is hereby stipulated and agreed by and between
       counsel for all parties
(3)    Present that Pursuant to CPLR section 3113 (d)
       this deposition is to be
(4)    Conducted by video conference, that the court
       reporter, all counsel, and
(5)    The witness are all in separate remote locations
       and participating via
(6)    Videoconference (LegalView/Zoom/Webex) meeting
       under the control of
(7)    Lexitas Court Reporting Service, that the officer
       administering the oath to
(8)    The witness need not be in the place of the
       deposition and the witness shall
(9)    Be sworn in remotely by the court reporter after
       confirming the witnesses
(10)   Identity, that this video conference will not be
       recorded in any manner and
(11)   That any recording without the express written
       consent of all parties shall
(12)   Be considered unauthorized, in violation of law,
       and shall not be used for
(13)   Any purpose in this litigation or otherwise.
(14)   It is further stipulated that exhibits may be
       marked by the attorney
(15)   Presenting the exhibit to the witness, and that a
       copy of any exhibit
(16)   Presented to a witness shall be emailed to or
       otherwise in possession of
(17)   All counsel prior to any questioning of a witness
       regarding the exhibit in
(18)   Question.  All parties shall bear their own costs
       the conduct of this
(19)   Deposition by video conference.
(20)                         *  *  *
(21)
(22)
(23)
(24)
(25)
```

(1)    N A N E T T E    M A L E B R A N C H E, the witness

(2)    herein, having been first duly sworn by a Notary

(3)    Public of the State of New York, was examined and

(4)    testified as follows:

(5)    EXAMINATION BY

(6)    **MS. MASSIMI:**

(7)        Q    State your name for the record, please.

(8)        **A    Nanette Malebranche.**

(9)        Q    State your address for the record, please.

(10)       **A    1954 Herbert Court, Bellmore, New York**

(11)    **11710.**

(12)            **MS. MASSIMI: All right.  Good morning,**

(13)        **Ms. Malebranche.  My -- (cross talk) -- my**

(14)        **name is Jessica Massimi.  I'm an attorney.**

(15)        **I represent the plaintiff, Kevin Campbell,**

(16)        **in the case that we are here to discuss**

(17)        **today.  The purpose of this deposition is**

(18)        **for me to ask you questions about the**

(19)        **accidents giving rise to this lawsuit.  I**

(20)        **will ask a series of questions, and the**

(21)        **court reporter will take down my questions,**

(22)        **your answers, and anything else that gets**

(23)        **said on the record.  Because the court**

(24)        **reporter has to take down everything that**

(25)        **is being said, it is not like a normal**

(1)                N. MALEBRANCHE

(2)        conversation.  So, there cannot be any

(3)        cross talk.  You have to let me finish my

(4)        complete question before you begin your

(5)        answer, and I will let you finish your

(6)        complete answer before I ask my next

(7)        question so that the court reporter can

(8)        take down my complete question and your

(9)        complete answer.  Does that make sense?

(10)           THE WITNESS:  Yes.

(11)           MS. MASSIMI:  You also need to keep

(12)        your voice up so that the court reporter

(13)        can hear you.  You need to speak clearly.

(14)        You cannot answer questions using nods,

(15)        shakes of the head, gestures, or say

(16)        "uh-uh" or "uh-huh."  Do you understand?

(17)           THE WITNESS:  Yes.

(18)           MS. MASSIMI:  The reason is because the

(19)        court reporter cannot interpret that for

(20)        the record.  If you don't understand a

(21)        question that I ask, let me know, and I

(22)        will attempt to rephrase the question.  If

(23)        you don't hear part of a question, let me

(24)        know; I will restate the question or I will

(25)        have the court reporter read it back.  If

(1)              N. MALEBRANCHE

(2)      you realize during the deposition that an

(3)      earlier answer you gave was inaccurate or

(4)      incomplete, please let me know.  We can

(5)      revisit the question and answer.  Do you

(6)      understand those instructions so far?

(7)           THE WITNESS:  Yes.

(8)           MS. MASSIMI:  If you need -- like, you

(9)      need a break at any point during the

(10)     deposition, you can take a break.  I just

(11)     ask that you answer any pending question

(12)     before you step out -- meaning, if I asked

(13)     a question, I ask that you answer it before

(14)     we step out.  Do you understand?

(15)          THE WITNESS:  Yes.

(16)  Q  Is there any reason you cannot testify

(17)  truthfully, fully, and accurately here today?

(18)  A  No.

(19)  Q  Do you understand that you have taken an

(20)  oath to tell the truth?

(21)  A  Yes.

(22)  Q  Do you understand that, even though we are

(23)  here in a conference room and we are here over

(24)  Zoom and you are here in a conference room, the

(25)  oath you have taken here today is the same as if

(1)          N. MALEBRANCHE

(2)   you were taking an oath in a courtroom in front of

(3)   a judge?

(4)       **A   Yes.**

(5)       Q   Do you have any physical or mental

(6)   condition that may prevent you from testifying

(7)   completely, truthfully, and accurately?

(8)       **A   No.**

(9)       Q   Have you taken any medication that could

(10)  impact your ability to testify?

(11)      **A   No.**

(12)      Q   Have you consumed any alcohol, drugs, or

(13)  marijuana in the last 24 hours?

(14)      **A   No.**

(15)      Q   Have you consumed -- have you failed to

(16)  take any medication that you normally take?

(17)      **A   No.**

(18)      Q   Are you represented by an attorney today?

(19)      **A   Yes.**

(20)      Q   What is your attorney's name?

(21)      **A   Gabriel McGaha -- say that right?**

(22)      Q   What is your first name?

(23)      **A   Nanette.**

(24)      Q   Do you have any nicknames?

(25)      **A   Yes.**

(1)               **N. MALEBRANCHE**

(2)      Q  What are your nicknames?

(3)      **A  Nan.**

(4)      Q  Do you ever go by Nancy?

(5)      **A  No.**

(6)      Q  Have you ever been known by any names other

(7)   than Nan or Nanette?

(8)      **A  No.**

(9)      Q  Where were you born?

(10)     **A  New York.**

(11)     Q  Where in New York?

(12)     **A  Queens.**

(13)     Q  Where in Queens?

(14)     **A  Elmhurst.**

(15)     Q  What is your race?

(16)     **A  Spanish, Irish, and German.**

(17)     Q  Some of your descendents are from Spain or

(18)   something else?

(19)     **A  Spain.**

(20)     Q  Do you have any disabilities of which FedEx

(21)   is aware?

(22)     **A  No.**

(23)     Q  Has FedEx ever made any disability or

(24)   religious accommodations for you?

(25)     **A  No.**

(1)              **N. MALEBRANCHE**

(2)      Q   Have you ever complained of any type of

(3)  discrimination at any job, either formally or

(4)  informally?

(5)      **A   No.**

(6)      Q   Have you ever complained of any type of

(7)  discrimination at FedEx, either formally or

(8)  informally?

(9)      **A   No.**

(10)     Q   Where do you currently reside?  What area?

(11)     **A   Nassau County.**

(12)     Q   Do you have children?

(13)     **A   Yes.**

(14)     Q   How many?

(15)     **A   Three.**

(16)     Q   What are their ages?

(17)     **A   45, 31, 28.**

(18)     Q   Are you married?

(19)     **A   Yes.**

(20)     Q   How long have you been married?

(21)     **A   33 fabulous years.**

(22)     Q   Congratulations.  Have you ever been

(23)  divorced before?

(24)     **A   Yes.**

(25)     Q   How many times?

(1)              N. MALEBRANCHE

(2)      **A  Once.**

(3)      Q  I'm assuming you don't owe child support?

(4)      **A  No.**

(5)      Q  Have you ever been arrested?

(6)      **A  No.**

(7)      Q  So, I'm assuming you have never been

(8)  convicted of a felony?

(9)      **A  No.**

(10)     Q  Have you ever been on probation or parole

(11) for any reason?

(12)     **A  No.**

(13)     Q  Have you ever sued anyone?

(14)     **A  No.**

(15)     Q  Have you ever been sued?

(16)     **A  Yes.**

(17)     Q  How many times?

(18)     **A  Once.**

(19)     Q  What was the nature of that lawsuit?

(20)     **A  A complaint by a former employee of FedEx.**

(21)     Q  A complaint by a former FedEx employee?

(22)     **A  Yes.**

(23)     Q  What was the out come of that case?

(24)     **A  It was dismissed.**

(25)     Q  Where was that lawsuit filed?

                    N. MALEBRANCHE

(1)
(2)    **A   I don't remember.**
(3)    Q   Do you know how it was dismissed?  Was it
(4)  dismissed on a motion or something else?
(5)    **A   I don't.**
(6)    Q   Okay.  When was that lawsuit filed?  Do you
(7)  know?
(8)    **A   I don't remember.**
(9)    Q   What were the allegations in that lawsuit?
(10)   **A   I don't recall, exactly.**
(11)   Q   Okay.  Was it a discrimination lawsuit, a
(12) personal injury lawsuit, something else?
(13)   **A   Something else.**
(14)   Q   Is it your understanding that that lawsuit
(15) was dismissed without any settlement?
(16)   **A   It was dismissed with no settlement.**
(17)   Q   Had you ever settled any claims out of
(18) court, short of filing a lawsuit?
(19)   **A   No.**
(20)   Q   What is your highest level of education?
(21)   **A   College.**
(22)   Q   Do you have any degrees from college?
(23)   **A   Business.**
(24)   Q   Do you have a bachelor's degree?
(25)   **A   Yes.**

(1)                    **N. MALEBRANCHE**

(2)       Q   From which institution?

(3)       **A   Adelphi University.**

(4)       Q   Do you have any other college degrees?

(5)       **A   No.**

(6)       Q   Do you have any graduate degrees?

(7)       **A   No.**

(8)       Q   In what area of study is your bachelor's

(9)   degree?

(10)      **A   Business.**

(11)      Q   Business?  Okay.  Are you currently

(12)  employed?

(13)      **A   Yes.**

(14)      Q   By whom?

(15)      **A   FedEx Express.**

(16)      Q   How long have you been employed by FedEx

(17)  Express?

(18)      **A   36 years.**

(19)      Q   What is your job title?

(20)      **A   Managing director.**

(21)      Q   How long have you held that job title?

(22)      **A   27 years.**

(23)      Q   Prior to becoming a managing director, did

(24)  you hold any other job titles with FedEx?

(25)      **A   Yes.**

(1)                    **N. MALEBRANCHE**

(2)      Q   What were those job titles?

(3)      **A   Senior manager and operations manager.**

(4)      Q   Were you an operations manager first?

(5)      **A   Yes.**

(6)      Q   Were you hired as an operations manager?

(7)      **A   No.**

(8)      Q   What were you hired as at FedEx Express?

(9)      **A   I was hired as a senior manager.**

(10)     Q   So, have you held four positions at FedEx

(11)  Express?

(12)     **A   Yes.**

(13)     Q   You mentioned -- sorry.  Did you mention

(14)  senior manager twice?

(15)     **A   Yes.**

(16)     Q   Okay.  Can you just explain that to me?

(17)     **A   I came from an acquisition; FedEx purchased**

(18)  **the company that I worked for.  I came on as a**

(19)  **senior manager, but in order to learn the**

(20)  **business, I downgraded myself to an operations**

(21)  **manager.  I made that decision.  I stayed in that**

(22)  **position until I felt comfortable to go back into**

(23)  **a senior manager position.**

(24)     Q   Okay.  I see.  What year did you become a

(25)  managing director?

(1)                    N. MALEBRANCHE

(2)        **A   1997.**

(3)        Q   Have you received any promotions since

(4)    1997?

(5)        **A   No.**

(6)        Q   Have you applied for any promotions or

(7)    requested any promotions since 1997?

(8)        **A   Yes.**

(9)        Q   What promotions have you requested or

(10)   provided for?

(11)       **A   Vice president.**

(12)       Q   Vice president of what, specifically?

(13)       **A   Operations.**

(14)       Q   When did you apply for or request that

(15)   position?

(16)       **A   Looking for another opportunity.**

(17)       Q   When did you do that?

(18)       **A   When?   I don't recall.**

(19)       Q   Do you recall the year, approximately?

(20)       **A   Possibly nine years ago.**

(21)       Q   Do you know why you did not receive that

(22)   promotion?

(23)       **A   I was not the successful candidate.**

(24)       Q   Do you know who was the successful

(25)   candidate?

N. MALEBRANCHE

(2)    **A  Yes.**

(3)    Q  Who?

(4)    **A  Ken Wilson.**

(5)    Q  All right.  And is he currently the vice
(6) president of operations?

(7)    **A  Not -- not now, no.**

(8)    Q  When did Ken Wilson stop being the vice
(9) president of operations?

(10)   **A  18 months ago.**

(11)   Q  Do you know the name of the person who took
(12) his place, if anyone?

(13)   **A  Brian Sheer (phonetic.)**

(14)   Q  Did you request a promotion or have you
(15) requested another promotion in the last 9 years?

(16)   **A  No.**

(17)   Q  Why not?

(18)   **A  Not interested.**

(19)        **MS. MASSIMI: Mr. McGaha, can you -- I**
(20)        **don't know if you are trying to signal to**
(21)        **your client, but it is twice now that you**
(22)        **have shaked your head while I have asked a**
(23)        **question. Can you please not do that?**

(24)        **MR. MCGAHA:  Not looking at you; I'm**
(25)        **looking at a computer screen.**

(1)                    N. MALEBRANCHE

(2)            MS. MASSIMI:  (Cross talk) -- I don't

(3)       see you looking at me.

(4)            MR. MCGAHA:  Asking me if I am

(5)       signalling to my client?

(6)            MS. MASSIMI:  You're shaking your head,

(7)       can you please not do that?

(8)            MR. MCGAHA:  I'm not shaking my head

(9)       (inaudible) -- you can continue with your

(10)      question.  Thank you.

(11)  Q  I'm sorry.  Why have you not requested any

(12)  other promotions in the last nine years?

(13)  A  Not interested.

(14)  Q  Okay.  What was your or did you have a

(15)  working relationship with Ken Wilson when he was

(16)  the vice president?

(17)  A  Yes.

(18)  Q  Did you report to him?

(19)  A  Yes.

(20)  Q  In 2021, was Ken Wilson your supervisor?

(21)  A  Yes.

(22)  Q  Did you supervise anyone in 2021?

(23)  A  I'm sorry.  Can you repeat the question?

(24)  Q  Yes.  In the year 2021, were you

(25)  responsible for supervising anyone?

(1)              N. MALEBRANCHE

(2)      **A   Yes.**

(3)      Q   What are the names of the people you were

(4)  responsible for supervising?

(5)      **A   As managing director, in 2021, over two**

(6)  **thousand employees rolled up to me.   Direct**

(7)  **supervision would have been the senior managers,**

(8)  **but the ops managers also.   So, it's a lot of**

(9)  **people for me to name off.**

(10)     Q   Okay.   Were you responsible for supervising

(11) Eric Wanders in 2021?

(12)     **A   Yes.**

(13)     Q   What was his title in 2021?

(14)     **A   Senior manager.**

(15)     Q   Are you currently in a union?

(16)     **A   No.**

(17)     Q   Have you ever been in a union?

(18)     **A   No.**

(19)     Q   Have you ever severed in any branch of the

(20) military?

(21)     **A   No.**

(22)     Q   Have you ever served in law enforcement?

(23)     **A   I apologize.   You broke up.**

(24)     Q   Sorry.   Have you ever served in law

(25) enforcement?   Have you ever been a part of law

(1)              N. MALEBRANCHE

(2)    enforcement?

(3)      **A   No.**

(4)      Q   During your time in FedEx, have you had any

(5)    other employers?

(6)      **A   No.**

(7)      Q   During your time working for FedEx, have

(8)    you ever received any training regarding

(9)    employment discrimination?

(10)     **A   Yes.**

(11)     Q   Can you please describe the training you

(12)   have received as a managing director for FedEx?

(13)     **A   We have a -- online training, and also, I**

(14)   **have received in-person training.**

(15)     Q   Can you describe the in-person training you

(16)   have received regarding discrimination?

(17)     **A   It was held at the direction of our legal**

(18)   **department, and it, you know, walked us through**

(19)   **our responsibilities and FedEx policy and the**

(20)   **standards that we have for discrimination,**

(21)   **retaliation, you know -- our responsibility to**

(22)   **uphold that.**

(23)     Q   What is your understanding of your

(24)   responsibilities regarding discrimination and

(25)   retaliation?

N. MALEBRANCHE

(1)

(2)     **A   Absolutely not allowed.**

(3)     Q   When you say it is "absolutely not

(4)     allowed," do you believe that discrimination does

(5)     take place at FedEx or has ever taken place at

(6)     FedEx?

(7)     **A   I am sure discrimination takes place that**

(8)     **we are not aware of.**

(9)     Q   Why are you sure that it takes place?  Why

(10)    are you sure discrimination that you are not aware

(11)    of takes place?

(12)    **A   It is -- it is a very unfortunate reality.**

(13)    Q   Can you define discrimination?

(14)    **A   Unfair treatment of a person based on age,**

(15)    **race, disability, religious belief.**

(16)    Q   Can you define retaliation?

(17)    **A   Hurtful actions against a person in**

(18)    **response to maybe something they said or did.**

(19)    Q   Okay.  FedEx has a policy against race

(20)    discrimination; correct?

(21)    **A   Yes.**

(22)    Q   Is that policy located anywhere in writing?

(23)    **A   We have multiple policies that it would be**

(24)    **in writing.**

(25)    Q   What is the name of the publication or the

(1)              N. MALEBRANCHE

(2)    name of the collection of information where this

(3)    policy is located?

(4)       **A  People Manual.**

(5)       Q  The "People Manual?"  Is that -- did you

(6)    say the "People Manual?"

(7)       **A  Yes.**

(8)       Q  How long has the People Manual been in

(9)    place?

(10)      **A  I can only state from my time with the**

(11)   **company, but during the time with my company, it**

(12)   **has always been in place.**

(13)      Q  Is the People Manual the same thing as the

(14)   employee handbook?

(15)      **A  No.**

(16)      Q  What is the difference between the two?

(17)      **A  The employee handbook is made available to**

(18)   **all employees.  That highlights our key policies**

(19)   **and procedures and other types of information that**

(20)   **they need to know as an employee.**

(21)      Q  As the managing director, what are your job

(22)   responsibilities?

(23)      **A  I am responsible for the pickup and**

(24)   **delivery operations for those employees that are**

(25)   **in the tri-state district.**

```
(1)              N. MALEBRANCHE

(2)      Q   What does that mean?

(3)      A   So, delivering packages every morning,

(4)  picking up packages every night, making sure those

(5)  operations run well and we meet our service

(6)  commitments to our customers.

(7)      Q   As the managing director, do you have any

(8)  other job responsibilities?

(9)      A   Yes.

(10)     Q   What are they?

(11)     A   Meeting with employees, safety of our

(12) employees, upholding our safety policies,

(13) maintaining, you know, personnel.

(14)     Q   Are you responsible for investigating

(15) allegations of discrimination?

(16)     A   Yes.

(17)     Q   Can you please give me some details as to

(18) your specific responsibilities regarding

(19) discrimination investigations?

(20)     A   Currently, our human resource department

(21) handles all cases of discrimination.

(22)     Q   What do you mean by that?

(23)     A   So, if there is a complaint, they take --

(24) there is a specific person or people that do it to

(25) keep it independent.  They do the investigation
```

(1)                  **N. MALEBRANCHE**

(2)  **independently.**

(3)      Q  Was that the case in 2021?

(4)      **A  No.**

(5)      Q  How is the process now different than what

(6)  it was in 2021?

(7)      **A  The local HR advisor would be responsible**

(8)  **for the preparation and investigation.  I would**

(9)  **sit in on the meetings.**

(10)     Q  You are saying that is the case now?  Or is

(11) that is the case in 2021?

(12)     **A  2021.**

(13)     Q  Why did that process change?

(14)     **A  I do not know.**

(15)     Q  Do you know when it changed?

(16)     **A  I don't recall.**

(17)     Q  But you are saying it changed since 2021?

(18)     **A  Yes.**

(19)     Q  What was the purpose of that change from

(20) having the local HR advisor lead the investigation

(21) to having the current process?

(22)              **MR. MCGAHA:  Object to form.**

(23)              **MS. MASSIMI:  You can answer.**

(24)     **A  I don't know.  I didn't make the decision.**

(25)     Q  What is the current -- describe for me

                    N. MALEBRANCHE

(1)

(2)   again what the current investigation process is.

(3)   I believe you said currently the process is HR

(4)   handles all cases of discrimination independently;

(5)   is that correct?

(6)       **A  Correct.**

(7)       Q  You said in 2021, it was the local HR

(8)   advisor; correct?

(9)       **A  That is correct.**

(10)      Q  So, I guess I am not understanding:  When

(11)  you say HR currently handles it, I don't know how

(12)  that is different than the local HR advisor.  Is

(13)  there a different branch of HR that handles it now

(14)  as opposed to 2021?

(15)      **A  It is a person or parties that have been**

(16)  **selected, and that is what they do.**

(17)      Q  Are they local HR advisors that --

(18)      **A  No.**

(19)      Q  Conduct the information now?

(20)      **A  Sorry.**

(21)      Q  It's okay.  So, before, it was the local HR

(22)  advisor that would conduct investigations into

(23)  discrimination, it is now what?

(24)      **A  It is a HR person that has been selected to**

(25)  **do this and represent multiple districts on any**

(1)                    **N. MALEBRANCHE**

(2)    **type of a discrimination issue.**

(3)    Q   Understood.  What is the name of that

(4)    person?

(5)    **A   Currently?  In my area?  Bernice.**

(6)    Q   Do you know Bernice's last name?

(7)    **A   It just escaped me, but if I remember, I**

(8)    **will let you know.**

(9)    Q   That's fine.  No worries.  Do you remember

(10)   when Bernice started working for FedEx?

(11)   **A   I don't know.**

(12)   Q   But Bernice is a FedEx employee; correct?

(13)   **A   Yes.**

(14)   Q   Okay.  How did you become aware of that

(15)   change in the process for discrimination

(16)   investigations?

(17)   **A   I don't recall.**

(18)   Q   Do you know if that change in process had

(19)   anything to do with how to handle complaints of

(20)   discrimination?

(21)   **A   No.**

(22)   Q   No, you don't know?  Or no, it didn't?

(23)   **A   No, it didn't.**

(24)   Q   How do you know that?

(25)   **A   Because this was done corporate-wide, not**

(1)                **N. MALEBRANCHE**

(2)    **just in my local area.**

(3)    Q   But you don't know what the impetus was for

(4)    this corporate-wide change; correct?

(5)    **A   No.**

(6)    Q   In 2021, part of your job responsibilities

(7)    entailed investigating complaints of

(8)    discrimination; is that correct?

(9)    **A   Correct.**

(10)   Q   That is no longer one of your job

(11)   responsibilities; am I understanding that correct

(12)   sick sick?

(13)   **A   I review them after the investigation is**

(14)   **done.**

(15)   Q   Understood.  Okay.  In 2021, you were part

(16)   of the -- you would be part of the investigation

(17)   process; is that correct?

(18)   **A   Yes.**

(19)   Q   In 2021, how did you conduct investigations

(20)   into complaints of discriminations?

(21)   **A   It was led by HR.  HR would prepare and**

(22)   **conduct the meeting.  I would sit in on the**

(23)   **meeting.**

(24)   Q   When you say the meeting, are you referring

(25)   to a EEO meeting, a GFT, or both?  Or something

(1)                N. MALEBRANCHE

(2)  else?

(3)      A   EEO.

(4)      Q   You are saying you would sit in on the

(5)  meeting and conduct the meeting?

(6)      A   That is not what I said.

(7)      Q   Correct me.  What did you say?

(8)      A   I said that HR prepared -- conducted the

(9)  meeting, and I sat in on the meeting.

(10)     Q   What was the purpose of you sitting in on

(11) meetings regarding EEO complaints?

(12)     A   That was the process.

(13)     Q   Right.  Was there a particular purpose to

(14) your presence in those meetings?

(15)     A   No.  I -- I was -- I was taking notes and

(16) listening in on what the issues were.

(17)     Q   This was generally speaking in 2021;

(18) correct?

(19)     A   Correct.

(20)     Q   What was the purpose of you taking notes in

(21) those meetings?

(22)     A   For myself.

(23)     Q   Did you have an understanding of anything

(24) that would be done with those notes?  Would they

(25) be put in a file?  Were they going to be forwarded

```
(1)                 N. MALEBRANCHE
(2)   to anyone?  Anything else?
(3)      A  They were filed.
(4)      Q  As part of the file into whatever
(5)   investigation was being conducted; is that
(6)   correct?
(7)      A  Correct.
(8)      Q  What was the purpose of those files that
(9)   were generated as part of discrimination
(10)  investigations?
(11)     A  We maintain the records.
(12)     Q  What was the purpose of maintaining those
(13)  records?
(14)     A  We file the -- we file them had to have
(15)  them be -- we just file them.
(16)     Q  Did you ever (cross talk) --
(17)     A  I can't answer the purpose.
(18)     Q  Okay.  Was it your understanding that the
(19)  notes you were taking in those meetings would be
(20)  used as part of the official record regarding the
(21)  investigation?
(22)     A  Yes.
(23)     Q  Was it ever your understanding that that
(24)  information contained in the record could then be
(25)  used by someone else at FedEx to possibly review
```

[Page 29]
February 9, 2024

(1)                N. MALEBRANCHE
(2)  the process or make further determinations?
(3)     **A  No.**
(4)     Q  When you sat in on meetings related to
(5)  investigations into complaints of discrimination
(6)  and took notes for the file, it was never your
(7)  understanding that the information contained in
(8)  those files could then be used by another manager
(9)  or director at FedEx?
(10)    **A  No one has access to those files.**
(11)    Q  Well, were you ever responsible for
(12)  forwarding information to, let's say, Ken Wilson?
(13)    **A  No.**
(14)    Q  Were you ever responsible for speaking to
(15)  Ken Wilson as part of any investigation into
(16)  discrimination?
(17)    **A  No.**
(18)    Q  Did you ever use your notes to then
(19)  generate letters of termination to employees?
(20)    **A  No.**
(21)    Q  You never used the information contained in
(22)  your notes from meetings to then generate official
(23)  letters or findings?
(24)    **A  That is a general question.  You are asking**
(25)  **me about meetings.**

(1)              **N. MALEBRANCHE**

(2)      Q   I am asking about the investigation process

(3)   in general.

(4)      **A   For?**

(5)      Q   The investigation process into complaints

(6)   of discrimination.  You said that as part of your

(7)   role as a managing director in 2021, you would sit

(8)   in on EEO meetings and take notes; correct?

(9)      **A   That is correct.**

(10)     Q   What I am asking you is: What was the

(11)  official purpose of those notes that you were

(12)  taking?

(13)             **MR. MCGAHA:  Object to form.  You can**

(14)         **answer if you can.**

(15)     **A   Okay.  I take the notes, the HR person**

(16)  **takes notes as well; the HR person does the write**

(17)  **up and the conclusion.  I then review it.  I have**

(18)  **my notes to make sure that everything is accurate.**

(19)  **Once it is accurate, that is what I take my notes**

(20)  **for.**

(21)     Q   Okay.  Do you then use those notes to form

(22)  late an official conclusion or official finding

(23)  following an EEO meeting?

(24)     **A   HR.**

(25)     Q   What do you mean, HR?

(1)                N. MALEBRANCHE

(2)     **A   HR makes the conclusion.**

(3)     Q   Understood.  But your notes are used in

(4)  your process of reviewing this conclusion from HR;

(5)  correct?

(6)     **A   That is correct.**

(7)     Q   You use your notes to confirm the accuracy

(8)  of whatever HR is memorializing following an EEO

(9)  meeting?

(10)    **A   Correct.**

(11)    Q   What is that document that HR renders

(12) following the EEO meeting?  Does it have a name?

(13)    **A   Not that I am aware of.**

(14)    Q   Should we just call it the HR report for

(15) now?  Is that okay?

(16)    **A   That's fine.**

(17)    Q   Okay.  That HR report that is generated

(18) after an EEO meeting, is that report forwarded to

(19) anyone?

(20)    **A   To the best of my knowledge, it is uploaded**

(21) **into our system.**

(22)    Q   What does that mean, "uploaded into your

(23) system?"

(24)    **A   Into the FedEx system.  But I don't do it.**

(25) **So, I can't, you know, tell you exactly what is**

Case 1:22-cv-07662-DLI-MMH    Document 50-3    Filed 02/20/25    Page 33 of 155 PageID #: 1099

(1)                    N. MALEBRANCHE

(2)    done with the document.

(3)        Q   In 2021 or when you still had the

(4)    responsibility for performing or assisting in EEO

(5)    investigations, did there ever come a time when

(6)    your decision or your review related to EEO would

(7)    be reviewed by Ken Wilson?

(8)            MR. MCGAHA:   Object to form.

(9)        A   No.

(10)        Q   Were your findings or -- was there part of

(11)    the process where your findings could be called

(12)    into question or appealed?

(13)        A   I will -- I can't answer the question.

(14)    Sorry.

(15)        Q   In 2021, did Ken Wilson have any role in

(16)    approving or reviewing your conclusion regarding

(17)    EEO investigations?

(18)        A   No.

(19)        Q   Did anyone have any authority to review or

(20)    approve or correct your findings regarding EEO

(21)    investigations?

(22)        A   As far as I am aware, human resources.

(23)        Q   In 2021, what is the name of the individual

(24)    who had that authority?

(25)        A   The local HR person is the one who

(1)                    **N. MALEBRANCHE**

(2)    **conducted the investigation, and that was Lance**

(3)    **Reyes.**

(4)        Q  Following EEO investigations -- okay,

(5)    actually, forget that.  In 2021, did you have any

(6)    role or GFT meetings or the GFT process?

(7)        **A  I did.**

(8)        Q  Do you still have that responsibility?

(9)        **A  Yes.  I do.**

(10)       Q  What was your -- what were your job

(11)   responsibilities in 2021 regarding the GFT

(12)   process?

(13)       **A  To review all of the information for any**

(14)   **type of discipline that an employee may have**

(15)   **received that they disagreed with, meet with the**

(16)   **employee, hear what they have to say; the HR**

(17)   **advisor is also present, as well as the senior**

(18)   **manager and the manager of the employee.**

(19)            **MS. MASSIMI:  Can you read that back,**

(20)        **please?**

(21)            **THE WITNESS:  I meet with the**

(22)        **employee --**

(23)            **MS. MASSIMI:  That's okay.  I was**

(24)        **asking the court reporter to read back, but**

(25)        **never mind, I got it.**

(1)            **N. MALEBRANCHE**

(2)      Q   When you say you meet with the employee, I

(3)   am asking about the GFT process in 2021.  When you

(4)   say you would meet with the employee, what was the

(5)   purpose of you meeting with the employee?  Was it

(6)   to interview them?  Was it to take notes about

(7)   someone else conducting an interview?  Or

(8)   something else?

(9)      **A   No.   I want to hear what the employee has**

(10)  **to say.   I want to know why they were treated**

(11)  **unfairly.   That is important.**

(12)     Q   In 2021, that was part of your job

(13)  responsibility; correct?

(14)     **A   Yes.**

(15)     Q   Okay.   In 2021, when you -- you essentially

(16)  would interview the employee as part of the GFT

(17)  process; right?

(18)     **A   I would not use the term "interview."**

(19)     Q   What term would you use?

(20)     **A   I meet with the employee.**

(21)          **MS. MASSIMI: Okay.   Just give me one**

(22)      **second.**

(23)          **THE WITNESS:  I am going to have to go**

(24)      **to the bathroom.**

(25)          **MR. MCGAHA:   (Inaudible) --**

(1)          **N. MALEBRANCHE**

(2)          **(Whereupon, a discussion was held off**

(3)      **the record.)**

(4)      Q   In 2021, part of your job responsibilities

(5)   entailed meeting with an employee as part of the

(6)   GFT process; correct?

(7)      **A   Correct.**

(8)      Q   What was the purpose of meeting with the

(9)   employee as part of the GFT process?

(10)     **A   I want to hear from the employee.  I asked**

(11)  **them why do they think they were treated unfairly,**

(12)  **and I asked them what they think would be fair for**

(13)  **their actions or behavior or performance --**

(14)  **whatever, you know, the discipline may have been**

(15)  **for; but I want to hear what they have to say to**

(16)  **me.  So, that is important to me.**

(17)     Q   Are you involved -- in 2021, were you

(18)  involved in the -- in the investigation process

(19)  for GFTs?  No?

(20)     **A   Can you clarify what you mean by the**

(21)  **"investigation process?"**

(22)     Q   Does the GFT process involve an

(23)  investigation?

(24)     **A   The process involves me meeting with the**

(25)  **employee and hearing from the employee.  If the**

(1)          **N. MALEBRANCHE**

(2) **employee brings something to my attention that I**

(3) **think warrants further investigation, that --**

(4) **normally, it is whatever the employee tells me.**

(5)     Q   In 2021, following your meeting with an

(6) employee relative to a particular GFT, did you

(7) render any conclusions or findings?

(8)     **A   At the end of every GFT, there needs to be**

(9) **a conclusion or finding.**

(10)    Q   Would you memorialize those conclusions or

(11) findings in 2021 in any particular place?

(12)    **A   All of the GFTP files are filed.**

(13)    Q   So, just to be clear: In 2021, as part of

(14) your responsibility for meeting with employees as

(15) part of GFT processes in general, you would always

(16) render a conclusion or a finding; correct?

(17)    **A   Correct.**

(18)    Q   That conclusion or finding would be

(19) memorialized where, specifically?

(20)    **A   When you say "memorialized," are you**

(21) **meaning filed or kept?**

(22)    Q   Written down.  What is the name of the --

(23) would you write that conclusion or finding down

(24) somewhere?

(25)    **A   I send the employee a letter.**

(1)                    **N. MALEBRANCHE**

(2)      Q   Okay.  Is that the case now, as well?

(3)      **A   Yes.**

(4)      Q   Has the process changed at all from 2021?

(5)      **A   No.**

(6)      Q   What happens to that letter?  You send it

(7)   to the employee, and then do you keep a copy

(8)   somewhere?

(9)      **A   Yes.**

(10)     Q   Where do you keep a copy of it?

(11)     **A   It is uploaded into the FedEx system.**

(12)     Q   What is your understanding of what can be

(13)  done with that document?  Can it be viewed by

(14)  other people?  Reviewed?  Something else?

(15)     **A   I don't -- I -- I don't think I could**

(16)  **answer that.**

(17)     Q   Why?

(18)     **A   My understanding would be -- it would only**

(19)  **be those that have approved access to those files.**

(20)     Q   So, in 2021, who had approved access to

(21)  those files where you would upload the letter,

(22)  memorializing your conclusions or findings?

(23)     **A   It goes to a FedEx online system.   Human**

(24)  **resources.**

(25)     Q   In 2021, did Ken Wilson have access to

(1)           N. MALEBRANCHE

(2)    those letters?

(3)       **A   No.**

(4)       Q   In 2021, was Ken Wilson responsible for

(5)    reviewing any aspect of GFT processes?

(6)       **A   If the GFT went to step two.**

(7)       Q   What, if -- what is GFT step two based

(8)    upon?  Is it based upon the findings and

(9)    conclusions based in the first step?

(10)      **A   It is based on the employee filing to go to**

(11)   **the next step.**

(12)      Q   And at the next step, what happens?

(13)      **A   It is reviewed at that step again, based**

(14)   **upon what the employee has presented.**

(15)      Q   But as part of that next step, Ken Wilson

(16)   would review your decision at the first step;

(17)   correct?

(18)      **A   He would review the information that the**

(19)   **employee provided.  The employee would only go to**

(20)   **the second step if they were not satisfied with**

(21)   **the first step.  So, that is a given.**

(22)      Q   I understand that.  I understand that it is

(23)   part of the second step, Ken Wilson would review

(24)   what the complainant is alleging; correct?

(25)      **A   Correct.**

```
(1)                    N. MALEBRANCHE
(2)       Q  But as part of the second step in 2021, Ken
(3)   Wilson would have also reviewed the findings that
(4)   were made by you at the first step; right?
(5)       A  Yes.
(6)       Q  In other words, he would review the letter
(7)   that you would have uploaded as part of the first
(8)   step; correct?
(9)       A  Only if the employee goes to step two.
(10)      Q  No.  I understand that.  I understand
(11)  that --
(12)      A  You asked about the process, right?
(13)      Q  Yes.
(14)      A  The process is, he does not get it.  Only
(15)  if the employee goes to step two.  I want to make
(16)  sure that is clear.
(17)      Q  Yeah --
(18)      A  Does not go to step two -- he does not look
(19)  at the letter that was sent to any employee that
(20)  was involved in the GFT process unless it is at
(21)  that level.
(22)      Q  But it is your understanding that when you
(23)  file a letter as part of the GFT step one that it
(24)  could be reviewed by your supervisor; correct?
(25)      A  Correct.
```

(1)                    **N. MALEBRANCHE**

(2)      Q  If the employee goes to step two; correct?

(3)      **A  Correct.**

(4)      Q  (Cross talk) -- so, at step 2, in 2021, it

(5)  would have been Ken Wilson that would have

(6)  reviewed your findings if the employee went to

(7)  step two?

(8)      **A  Correct.**

(9)      Q  So, as part of that step two process, do

(10)  you know what Ken Wilson would have reviewed?

(11)      **A  I do not.**

(12)      Q  As part of the step one process in 2021,

(13)  what information did you up employed to this

(14)  system that you mentioned?

(15)      **A  Part of the process is to complete our**

(16)  **decision and our rationale, and that is uploaded**

(17)  **into the system.**

(18)      Q  What is the names of the documents that are

(19)  uploaded to the system as part of the process?

(20)      **A  GFTP process -- I'm at step one.  So, it is**

(21)  **the step one process.**

(22)      Q  Right.  Is it the letter or is it something

(23)  else that gets uploaded?

(24)      **A  It is a form that includes my rationale and**

(25)  **the letter.**

(1)          **N. MALEBRANCHE**

(2)      Q   And the letter is sent to the employee; is

(3)   that correct?

(4)      **A   That is correct.**

(5)      Q   Is the form sent to the employee?

(6)      **A   No.**

(7)      Q   But as part of step one, the letter with

(8)   the form would be uploaded into the system?

(9)      **A   Correct.**

(10)     Q   Tell me, again, the name of that system.

(11)     **A   GFTP.**

(12)     Q   As part of that process, would you have

(13)  uploaded any other documents to the GFT system

(14)  other than the form and the letter?

(15)     **A   The file.  The investigative file is**

(16)  **uploaded.**

(17)     Q   What is contained in the investigative

(18)  file?

(19)     **A   Any documents pertaining to the incident.**

(20)  **So, if an employee got disciplined for attendance,**

(21)  **it would be their employee calendar, any previous**

(22)  **documentation regarding their attendance.**

(23)     Q   What about video surveillance and

(24)  photographs -- things like that?  Are they part of

(25)  the investigative file if they exist?

(1)                N. MALEBRANCHE

(2)    **A  If it is related to the specific case.  At**

(3)  **times, it could be; yes.**

(4)    Q  But it is possible to uploaded videos and

(5)  photographs to the GFT system?  Am I saying that

(6)  right?  Is it the GFT system?

(7)    **A  Yes.**

(8)    Q  So, in 2021, as part of the step one

(9)  process, was it possible to uploaded videos or

(10)  photograph to the GFT system?

(11)    **A  Videos are not uploaded.  It would be just**

(12)  **pictures.**

(13)    Q  Okay.  Do you know, in 2021, if a GFT step

(14)  one involved your review of a video, how would you

(15)  make the video part of the file if you could not

(16)  uploaded it to the GFT system?

(17)    **A  I would have a -- have them download it to**

(18)  **a hard drive memory stick so that I could view it.**

(19)    Q  Would it be possible for Ken Wilson to

(20)  review videos as part of the GFT step two process

(21)  in 2020 -- yeah, 2021?

(22)    **A  If requested.**

(23)    Q  In drafting the form and the letter that

(24)  you would uploaded in 2021 as part of the GFT1

(25)  process, did you understand the importance of

(1)                    N. MALEBRANCHE

(2)    putting truthful information into those documents?

(3)      **A  Yes.**

(4)      Q  In 2021, well, that form that you

(5)    mentioned, does that form have a name?  Is that

(6)    just the GFT form?

(7)      **A  Yes.**

(8)      Q  GFT1 form?

(9)      **A  Step 1.**

(10)     Q  GFT step 1 form?  Okay.  What information

(11)   were you responsible for inputting into the GFT

(12)   step 1 form in 2021?

(13)     **A  A recap of my meeting with the employee.**

(14)     Q  What was the purpose of that information?

(15)     **A  My rationale.**

(16)     Q  Was there a larger purpose to putting your

(17)   recap of your meeting with the employee into that

(18)   form?

(19)     **A  No.**

(20)     Q  It was simply to record your rationale?

(21)     **A  Correct.**

(22)     Q  Did you ever receive training regarding the

(23)   importance of accurately memorializing your

(24)   rationale in a GFT step 1 form?

(25)     **A  Yes.**

(1)                    **N. MALEBRANCHE**

(2)     Q   What is the training you received regarding

(3)  that?

(4)     **A   It was in person training.**

(5)     Q   What did you learn or what information did

(6)  you receive during that in-person training?

(7)     **A   How to properly conduct the meeting, ensure**

(8)  **that we, you know, hear from the employee why they**

(9)  **were treated unfairly; review all of the**

(10) **information that is available in order to make the**

(11) **best decision.**

(12)    Q   In order to make the best decision for who?

(13)    **A   For the employee.**

(14)    Q   Did you ever receive training regarding the

(15) importance of the GFT step 1 form?

(16)    **A   That is all included in the training that I**

(17) **received.**

(18)    Q   What is your understanding of anything,

(19) based on the training, about the importance of the

(20) GFT step 1 form?

(21)           **MR. MCGAHA:   Object to form.**

(22)    **A   Could you ask that again?   I'm not sure**

(23) **where you are going -- what you are looking for.**

(24)    Q   You received training regarding the

(25) importance of the GFT step 1 form; correct?

(1)                    N. MALEBRANCHE

(2)      **A   Correct.**

(3)      Q    What --

(4)              **MR. MCGAHA:   What --**

(5)      Q    What is the importance of that form, based

(6)      on your training?

(7)      **A   I think I said before it is to record my**

(8)      **meeting with the employee.**

(9)      Q    What is the purpose of you recording your

(10)     meeting with the employee?

(11)     **A   For future reference if the employee goes**

(12)     **to the next step.**

(13)     Q    Okay.  Have you ever received any training

(14)     about representing the interests of FedEx as part

(15)     of the GFT step 1 process?

(16)     **A   Can you clarify that question, please?**

(17)     Q    Whose interests are you representing as

(18)     part of the GFT step 1 process?

(19)              **MR. MCGAHA:   Object to form.**

(20)     **A   The employee.**

(21)     Q    So, it is your understanding that, as part

(22)     of the GFT step 1 process, your responsibility is

(23)     to represent the interests of the employee who is

(24)     making the complaint?

(25)     **A   The employee has their HR adviser who**

(1)                 **N. MALEBRANCHE**

(2)    **represents them, and the purpose of me meeting**

(3)    **with them is to make sure that they have been**

(4)    **treated fairly.  So, yes, my interest is in the**

(5)    **employee and the fairness of the decision that was**

(6)    **made.**

(7)       Q   Who is representing FedEx interests?

(8)       **A   No one.  Me, I guess.**

(9)       Q   Do you understand the importance of or is

(10)   the purpose of the GFT form to accurately record

(11)   what the employee is complaining of?

(12)      **A   The employee is asked, as I mentioned**

(13)   **before, why they think they were treated unfairly**

(14)   **and what is it that they think would be fair.**

(15)   **There is a discussion, and I then record those**

(16)   **notes as my rationale for the final decision at my**

(17)   **level.**

(18)      Q   Are those notes required to be accurate?

(19)      **A   Yes.**

(20)      Q   Are those notes required to be complete?

(21)      **A   Yes.**

(22)      Q   Are those notes required to be truthful?

(23)      **A   Yes.**

(24)      Q   Are those -- are those notes required to be

(25)   neutral?

(1)                    N. MALEBRANCHE

(2)                    **MR. MCGAHA:  Object to form.**

(3)     **A  No.**

(4)     Q  Can you please explain what you mean by

(5)  that?

(6)     **A  Not neutral.  They have to be truthful.**

(7)  **You can't be neutral and truthful at the same**

(8)  **time.  You have to be truthful as to everything**

(9)  **that was said.  And my interest in the employee --**

(10)  **and you ask me who represents FedEx.  My role is**

(11)  **to make sure that we follow policy and procedure.**

(12)  **That is where I come in representing FedEx.**

(13)     Q  Okay.  And you said you sent a letter to

(14)  the employee following the GFT step 1 process;

(15)  correct?

(16)     **A  Yes.**

(17)     Q  That was the case in 2021, and that was the

(18)  case -- and that is the case now; is that correct?

(19)     **A  Yes.**

(20)     Q  When you draft those letters, following the

(21)  GFT step 1 process, do you put an account of the

(22)  facts giving rise to the incident?

(23)     **A  I put a -- a -- I guess, an explanation of**

(24)  **why the decision was made.**

(25)     Q  And the contents of those letters that you

```
(1)                N. MALEBRANCHE
(2)   draft have to be truthful; correct?
(3)      A  Correct.
(4)      Q  They have to be accurate; correct?
(5)      A  Correct.
(6)      Q  They have to be complete; correct?
(7)      A  Correct.
(8)      Q  What is the purpose of those letters that
(9)   you draft and sent to the employee following the
(10)  GFT step 1 process?
(11)          MR. MCGAHA:  Object to form.  You
(12)      can --
(13)     A  I think I have been asked that a couple of
(14)  times already.  It is to give the employee their
(15)  decision, and then we file that -- if needed, at
(16)  the step two process.
(17)     Q  It is your understanding that if the GFT
(18)  processes to the step 2 process, that in 2021, Ken
(19)  Wilson would have reviewed this letter as part of
(20)  this review; correct?
(21)     A  As stated previously, correct.
(22)     Q  To be clear, the contents of those letters
(23)  must be accurate, complete, and truthful; correct?
(24)     A  Correct.
(25)     Q  In 2021, in some circumstances, the
```

(1)                N. MALEBRANCHE

(2)   information that you put into the file at the GFT

(3)   step 1 process could be used to uphold the

(4)   decision to terminate someone; correct?

(5)        **MR. MCGAHA:  Objection to form.**

(6)   **A   No.**

(7)   Q   Why do you say that?

(8)   **A   I'm after that decision was already made.**

(9)   Q   But you -- as part of the GFT step 1

(10)  process, you are at times assessing when the

(11)  termination was accurate or permissible; correct?

(12)  **A   That is not the question you asked me.**

(13)  Q   Okay.  Well, then, let's take it step by

(14)  step.  In 2021, an employee is terminated and

(15)  could file a GFT step 1 process; correct?

(16)  **A   Correct.**

(17)  Q   The purpose of that GTT step one process in

(18)  2021 would be for you to review the priority of

(19)  that termination; correct?

(20)  **A   Correct.**

(21)  Q   You then uploaded your findings to the

(22)  terminal or to the system; correct?

(23)  **A   Correct.**

(24)  Q   In 2021, your findings regarding that

(25)  termination would be used, should the GFT process

(1)                    N. MALEBRANCHE

(2)    proceed, to step 2; correct?

(3)        **A  Correct.**

(4)        Q  That was my question.  So, in other words,

(5)    in 2021, if you were to be involved in a GFT step

(6)    1 process and uploaded a letter that you sent to

(7)    an employee to the system, it was your

(8)    understanding, in 2021, that those letters would

(9)    be reviewed as part of the GFT step 2 process;

(10)   right?

(11)       **A  Correct.**

(12)       Q  Those letters that you would draft, sent to

(13)   the employee, and uploaded to the system could be

(14)   used to uphold a employee's termination; correct?

(15)       **A  Correct.**

(16)           **MS. MASSIMI: We could take a break now**

(17)       **if you need to take a break, or we could**

(18)       **keep going; it is up to you.**

(19)           **MR. MCGAHA:  How much longer do you**

(20)       **have.**

(21)           **MS. MASSIMI:  I am not going to take**

(22)       **the entire day, but if you want a break**

(23)       **now, we could take a break now -- hour --**

(24)           **MR. MCGAHA:  We can take a break now.**

(25)           **(Whereupon, a discussion was held off**

```
(1)                N. MALEBRANCHE

(2)          the record.)

(3)     Q  Do you know the name of the plaintiff in

(4)  this case?

(5)     A  Kevin Campbell.

(6)     Q  Sure.  How -- when did you first meet Kevin

(7)  or how do you know him?

(8)     A  I don't know him, and my first meeting with

(9)  him was in the GFT meeting.

(10)    Q  Okay.  Had you ever heard anything about

(11) him before the first GFT meeting?

(12)    A  No.

(13)    Q  Do you recall the date of the first GFT

(14) meeting?

(15)    A  June 8th.

(16)    Q  Prior to the first GFT meeting, did you

(17) speak to anyone about the incident that was the

(18) subject of the GFT meeting?

(19)    A  Yes.

(20)    Q  Who did you speak to?

(21)    A  Eric Wanders.

(22)    Q  Did you and Eric speak over the phone or in

(23) person or something else?

(24)    A  Over the phone.

(25)    Q  What was said during that telephone
```

N. MALEBRANCHE

(1)

(2)     conversation between you and Eric Wanders prior to

(3)     the GFT meeting?

(4)         A  He just called to advise me that there was

(5)     an altercation on the sort with two employees and

(6)     that he had to stop the belt, which would impact

(7)     his sort operations and our ability to make

(8)     services to our customers.  So, he had to notify

(9)     me.

(10)        Q  Did he tell you anything else about this

(11)    incident?

(12)        A  He did tell me that it was a serious

(13)    altercation.

(14)        Q  Did he give you any other specifics?

(15)        A  That one employee did have a weapon.

(16)        Q  Did he tell you which employee did have a

(17)    weapon?

(18)        A  I do not recall.

(19)        Q  Prior to the GFT meeting, did you have any

(20)    conversations with Eric Wanders?

(21)        A  I do not recall.

(22)        Q  Do you recall if Eric Wanders provided you

(23)    with any other information prior to the GFT

(24)    meeting?

(25)        A  It would be any information that would be

(1)                    **N. MALEBRANCHE**

(2)    **a -- needed for the step one meeting.  As**

(3)    **mentioned before, we put together a packet for my**

(4)    **review so I could review everything.  So, that**

(5)    **would be what he would send me.  If you have any**

(6)    **documents you want to show me, that's fine.**

(7)        Q  Prior to the GFT meeting, did Eric

(8)    Wanders -- prior to the GFT meeting, did you

(9)    review any video regarding the altercation?

(10)       **A  Yes.**

(11)       Q  Prior to reviewing that video, did Eric

(12)   Wanders give you any specifics about that

(13)   altercation?

(14)       **A  I do not recall.**

(15)       Q  Did he tell you which of the individuals

(16)   involved in the altercation made contact with the

(17)   other one first?

(18)       **A  I do not recall.**

(19)       Q  Did you review any documents in preparation

(20)   for today's deposition?

(21)       **A  Yes.**

(22)       Q  What documents did you review in

(23)   preparation for today's deposition?

(24)       **A  The GFTP file.**

(25)       Q  What documents, specifically within the

[Page 54]
February 9, 2024

N. MALEBRANCHE

(1)
(2) GFTP file, did you review in preparation for
(3) today?
(4)     **A   The file contains the -- my rationale, the**
(5) **letter that went to the employee, the employees'**
(6) **calendars are in there, and the witness**
(7) **statements.   That is all contained in the file.**
(8)     Q   Okay.  Did you review any other documents
(9) in preparation for the today's deposition?
(10)    **A   No.**
(11)    Q   Did your review of that file and the
(12) documents contained therein at all refresh your
(13) recollection about the events that we are here to
(14) discuss today?
(15)    **A   Yes.**
(16)    Q   In what way did your review refresh your
(17) recollection?
(18)    **A   It was three years ago.   So, truthfully, it**
(19) **gave me some, you know, memory of what took place.**
(20)    Q   So, what is your memory of what took place?
(21)    **A   That I -- I did hold the meeting, what we**
(22) **discussed, and pretty much what I have in those**
(23) **documents is what I recall.**
(24)    Q   Did your review of your file refresh your
(25) recollection as to who instigated the altercation?

[Page 55]
February 9, 2024

(1)                     N. MALEBRANCHE

(2)      **A  Based on witness statements?**

(3)      Q  Well, did your review of the file in

(4)  preparation for today refresh your recollection as

(5)  to who instigated the altercation?

(6)      **A  Well, I wasn't there.  So, can't refresh my**

(7)  **memory, because I wasn't there.  But a review of**

(8)  **the security recap and the employee statements,**

(9)  **yes, it did.**

(10)     Q  Based on that review, what is your

(11)  understanding of who instigated the altercation?

(12)          **MR. MCGAHA:  Object -- object to form.**

(13)      **You can answer.**

(14)     **A  Based on the review of the documents, it**

(15)  **was incited by Kevin Campbell.**

(16)     Q  Can you tell me if there was any document

(17)  that uses the word "incited" in that file?

(18)     **A  No.  I cannot.  If you have one, I would be**

(19)  **glad to look at it.**

(20)     Q  Well, you used the word "incited."  I am

(21)  asking if that is information that was given to

(22)  you by someone or you saw that information in your

(23)  review of the file or something else?

(24)     **A  Just the word I used.**

(25)     Q  That is a word you used?

[Page 56]
February 9, 2024

N. MALEBRANCHE

(1)

(2)    **A   Right now, that is just a word I used in**

(3)    **speaking with you.  I don't recall if it is in**

(4)    **that file, but if you have it, show it to me.**

(5)    Q   I am just asking where you got that word

(6)    from.  You said it was incited by Kevin Campbell.

(7)    I am asking where you got the word "incite" from.

(8)    **A   From me.**

(9)    Q   Did you get that from Eric Wanders?

(10)   **A   No.**

(11)   Q   Did Eric Wanders ever tell you that Kevin

(12)   Campbell incited the altercation?

(13)   **A   I don't recall.**

(14)   Q   Did Eric Wanders ever send you an email and

(15)   tell you that Kevin Campbell incited the

(16)   altercation?

(17)   **A   I do not recall.**

(18)   Q   Okay.  I guess it just must be coincidence,

(19)   then; right?

(20)   **A   Could be.**

(21)   Q   Did you include the word "incite" in any of

(22)   the information you put in the GFT file?

(23)   **A   I don't recall.**

(24)   Q   But you did understand that when you were

(25)   putting those documents in the file that the words

(1)                N. MALEBRANCHE

(2)    you were using were important; correct?

(3)        **A  Yes.**

(4)        Q  Did your review of the file at all refresh

(5)    your recollection about who, if anyone, had a

(6)    weapon during the altercation?

(7)        **A  Yes.**

(8)        Q  What is your understanding of that?

(9)        **A  The other employee, Augusto, had a box**

(10)    **cutter.**

(11)            **MS. MASSIMI:  Give me a second.  I**

(12)            **apologize.**

(13)        Q  Can you describe for me how you believe

(14)    Kevin Campbell incited the altercation?

(15)            **MR. MCGAHA:  Object to form.**

(16)        **A  Kevin stated that the box had hit him, and**

(17)    **that he was upset; and that he turned around to**

(18)    **Augusto and got into -- you know, got in front of**

(19)    **him.  If I remember correctly, I do believe that**

(20)    **he agreed that he could have been intimidating,**

(21)    **based on his size and that of Augusto, that he was**

(22)    **much bigger than he was.  All of our employees**

(23)    **receive workplace violence training, and at that**

(24)    **point, Kevin should have walked away and gotten a**

(25)    **manager.  He should have never engaged with**

(1)          **N. MALEBRANCHE**

(2)    Augusto, but he should have gotten a manager.  So,

(3)    you know, when I asked him what he should have

(4)    done after thinking about it, he did say that he

(5)    should have walked away.  He did agree that he

(6)    should have walked away from the situation.  He

(7)    didn't.  If my memory serves me correctly, he was

(8)    upset, and he wanted management to see how upset

(9)    Augusto gets.  So, that is why he stayed and did

(10)   not walk away.  But he should have walked away to

(11)   prevent any type of an issue that could have

(12)   occurred and leave that on the other employee.

(13)   Had he walked away, we wouldn't be having this

(14)   call today.  So, the out come would have been much

(15)   different.

(16)      Q   Is that what Kevin told you, just that he

(17)   was hit with a box?

(18)      A   On the day in question, okay?  On the day

(19)   in question, he said that Augusto was upset that

(20)   freight -- I am going off the best of my memory

(21)   here -- that freight was passing, and Augusto was

(22)   upset and pushed a few boxes, I think two boxes up

(23)   the belt.  One missed him, one hit him.  He didn't

(24)   tell security that it almost hit him, but he said

(25)   that it hit him; and that is when he turned around

(1)                 **N. MALEBRANCHE**

(2)     **and --**

(3)     Q   And based on that, you believe that he

(4)   incited the altercation where Augusto pulled a box

(5)   cutter on him?

(6)     **A   Also based on security's recap, and based**

(7)   **on an employee as well.**

(8)     Q   Did security ever say that Kevin Campbell

(9)   incited the altercation?

(10)    **A   I don't recall what is in their writing.**

(11)  **If you would like to share it with me, that's**

(12)  **fine.**

(13)    Q   You are the one who mentioned that you drew

(14)  this conclusion based on security's recap.  I am

(15)  asking where, what you saw that led you to reach

(16)  that conclusion.

(17)    **A   The statement from Jose Moreno.**

(18)    Q   I am referring from the security recap.

(19)    **A   It is in the security recap.**

(20)    Q   Did you ever read an email from James

(21)  Cahill determining what the video showed?

(22)    **A   I do not recall.**

(23)    Q   Did James Cahill ever tell you that he

(24)  believe Kevin Campbell incited this incident?

(25)    **A   I do not recall.**

(1)          **N. MALEBRANCHE**

(2)     Q  In fact, didn't James Cahill say that the

(3)  video started with Alzate approaching Campbell's

(4)  work area in a clearly agitated state, flailing

(5)  his arms and pushing several packages in

(6)  Campbell's direction?  Do you recall hearing that

(7)  at any point?

(8)     **A  Yes.  As I said before, that is what led up**

(9)  **to this.  I did say that he pushed boxes up the**

(10) **belt.**

(11)    Q  Who is "he?"

(12)    **A  Augusto --**

(13)    Q  Right?

(14)    **A  Pushed the boxes up the belt, first one**

(15) **missed him, second one hit his -- somewhere on his**

(16) **arm; I don't remember where, but it did hit his**

(17) **arm.**

(18)    Q  But the incident started when Alzate

(19) approached Campbell's work area in a clearly

(20) agitated state; is that correct?

(21)    **A  Augusto approached Kevin -- going off the**

(22) **best of my memory here -- because he was not**

(23) **pulling the freight and pushing it down the belt,**

(24) **and it kept passing.  And that was Augusto's**

(25) **responsibility.  So, yes, he came back up to tell**

(1)           **N. MALEBRANCHE**

(2)     **him he wasn't pulling the freight.  The incident**

(3)     **itself with Augusto pulling the box cutter did not**

(4)     **happen until Kevin turned around and was right up**

(5)     **on him; and according to Jose Moreno, he did**

(6)     **shoulder bump him, and that is when he stepped**

(7)     **back a few; Augusto stepped back and pulled out**

(8)     **the box cutter.  The box cutter -- the box cutter**

(9)     **did not come out until after Kevin turned around**

(10)    **and was right on him.  And as Kevin admitted, he**

(11)    **definitely could have been intimidating, because**

(12)    **of his size and that of Augusto; but when Kevin**

(13)    **turned around, Augusto did not have the box cutter**

(14)    **out.  That was after.  And that is why it was**

(15)    **important to understand whether or not Kevin was**

(16)    **intimidating.**

(17)        Q   Was it important to understood that Alzate

(18)    approached Campbell's work area first in a clearly

(19)    agitated state?

(20)        **A   I believe they work in a very close area.**

(21)    **So, saying that he was in his work area, it's**

(22)    **their work area.  If --**

(23)        Q   I didn't say he was in his work area.

(24)    Isn't it correct that security found that Alzate

(25)    approached Campbell's work area in a clearly

[Page 62]
February 9, 2024

```
(1)                    N. MALEBRANCHE
(2)    agitated state; isn't that correct?
(3)        A  You did say work area.  Yes.
(4)        Q  Yes.  I did say work area.  I said Alzate
(5)    approached Campbell's work area in a clearly
(6)    agitated state.  Isn't that how this started?
(7)        A  Yes.
(8)        Q  Do you know James Cahill?
(9)        A  I -- I met him a few times.
(10)       Q  Do you find him to be an honest and
(11)   professional person?
(12)       A  I can't make that judgment.
(13)       Q  Does he still work for FedEx?
(14)       A  Yes.
(15)       Q  Do you find Eric Wanders to be a truthful
(16)   and professional person?
(17)       A  Yes.
(18)       Q  Why are you able to make that assessment
(19)   about Eric Wanders, but not James Cahill?
(20)       A  Eric Wanders works for me, directly.
(21)   James --
(22)       Q  Okay.  What is James Cahill's job?  What
(23)   was his job in 2021?
(24)       A  Security specialist.
(25)       Q  Ask you are the district manager; is that
```

(1)              N. MALEBRANCHE

(2)   correct?

(3)      **A   Correct.**

(4)      Q   You don't know whether the security

(5)   specialists working in your district is a truthful

(6)   person and professional person; is that what you

(7)   are saying?

(8)      **A   I can say he does not report to me**

(9)   **directly.  I don't have any leadership over him.**

(10)  **I have had inter actions, you know, with him, like**

(11)  **I said, a few times.  Of my interactions with him,**

(12)  **I do believe him to a be a true employee.**

(13)     Q   Did you review Mr. Cahill's assessment and

(14)  notes about the video prior to conducting the GFT

(15)  and EEO?

(16)     **A   The EEO was after the GFT, and it is in the**

(17)  **GFT packet.  So, yes, I did.**

(18)     Q   What is in the GFT packet?

(19)     **A   His write up, his security write up, is in**

(20)  **the GFT packet.**

(21)     Q   Did his write up say that the incident

(22)  started when Alzate approached Campbell's work

(23)  area in a clearly agitated state?

(24)     **A   I don't recall, but if you would like to**

(25)  **share a document with me, I can confirm.**

(1)                    **N. MALEBRANCHE**

(2)      Q   I am asking if you can recall that.

(3)      **A   I don't recall.**

(4)      Q   You don't recall that?  Okay.  Do you know

(5)   if you included that detail in your letter or in

(6)   the report that you put in the GFT file?

(7)      **A   I don't recall if I used that verbiage.**

(8)      Q   Do you think that that would have been an

(9)   important detail to include in the letter and the

(10)  report that you placed in the GFT file?

(11)     **A   Sorry.  Can you go back and repeat what you**

(12)  **were asking me about the statement?**

(13)     Q   You have you said that you understand that

(14)  the incident started when Alzate approached

(15)  Campbell's work area in a clearly agitated state;

(16)  correct?

(17)     **A   Correct.**

(18)     Q   Do you believe that that detail is an

(19)  important detail to include in the letter and the

(20)  report that you put in the GFT file?

(21)     **A   Not necessarily.**

(22)     Q   Why is that?

(23)     **A   The altercation itself is what was being**

(24)  **addressed.  But I don't remember what I have in**

(25)  **there; but I --**

(1)                    N. MALEBRANCHE

(2)      Q   Sorry.  Is it your testimony -- (cross

(3)   talk) -- altercation?

(4)          MR. MCGAHA:  Excuse me.  Let the

(5)      witness finish her answer --

(6)          MS. MASSIMI: I am letting her finish

(7)      her answer, and she is not giving yes or

(8)      no.  She is not giving answers to yes or no

(9)      questions; so, I am letting her respond,

(10)     Mr. McGaha.

(11)     Q   Is it your testimony that that description

(12)  of Alzate approaching Campbell's work area in a

(13)  clearly agitated state is not part of the

(14)  altercation?

(15)         MR. MCGAHA:  Finish your answer to the

(16)     last question.

(17)     A   No.

(18)         MR. MCGAHA:  Mr. Court Reporter, will

(19)     you please read the last question that was

(20)     asked, please?  Before the -- before the --

(21)     miss -- Ms. Massimi interrupted my client.

(22)         MS. MASSIMI:  I didn't interrupt your

(23)     client.

(24)         MR. MCGAHA:  Would you please read it,

(25)     Mr. Court Reporter?

(1)            N. MALEBRANCHE

(2)            (Whereupon, the record was read by the

(3)        reporter.)

(4)            MR. MCGAHA:  You can answer that.

(5)            THE WITNESS:  Okay --

(6)            MS. MASSIMI:  It's a yes or no

(7)        question.

(8)            MR. MCGAHA:  If a yes or no answers the

(9)        question.

(10)           MS. MASSIMI:  No, Mr. McGaha.  As you

(11)       are aware, yes or no questions should be

(12)       met with appropriate answers.  So, do you

(13)       believe that that is an important detail to

(14)       include in the letter and report that you

(15)       placed in the GFT file?

(16)           MR. MCGAHA:  Answer your question

(17)       fully.

(18)           THE WITNESS:  Not necessarily, based on

(19)       my meeting with the employee.

(20)   Q  And what about your meeting with the

(21)  employee led you to believe that that was not an

(22)  important detail to include in the letter and

(23)  report?

(24)   A  I'm not avoiding you.

(25)   Q  I understand it is a difficult question,

(1)           N. MALEBRANCHE

(2) because in fact, the employee was very cooperative

(3) with you.  And really, said things to you that

(4) demonstrated reflection and thoughtfulness.

(5)           **MR. MCGAHA:  Objection.**

(6)    Q  So, now, you are kind of stuck, right?

(7) Because you said that based on your meeting with

(8) him, you did not think think that was an important

(9) detail to include as if he had done something

(10) during the meeting rendering that detail

(11) irrelevant.  So, I would like to know:  What was

(12) it about your meeting with Kevin Campbell that led

(13) you to conclude that the detail of Alzate

(14) approaching his work area in a clearly agitated

(15) state was not worthy of inclusion in your official

(16) documentation regarding this incident?

(17)           **MR. MCGAHA:  Object to form.**

(18)    **A  Because someone approaches someone in an**

(19) **agitated state does not mean that there needs to**

(20) **be an altercation.**

(21)    Q  Okay.  Does that mean you leave that detail

(22) out of the report?

(23)           **MR. MCGAHA:  Object to form.**

(24)    **A  I don't recall what is in my report at all.**

(25) **Like I said, if you have the document, let me know**

(1)                N. MALEBRANCHE

(2)    that.  But if it is in security's report, then

(3)    that is included in the GFTP process.

(4)       Q   The detail, Alzate approaching Campbell's

(5)    work area in a clearly agitated state, did you put

(6)    that in your letter to Kevin Campbell?

(7)            MR. MCGAHA:  Object to form.

(8)    A  Do you have my letter?

(9)       Q   Do you recall what you put in your letter?

(10)   A  No.  I do not.

(11)           MS. MASSIMI:  Mr. McGaha, stop coaching

(12)       the witness by shaking your head.

(13)           MR. MCGAHA:  I can move my head

(14)       whatever way --

(15)           MS. MASSIMI:  You actually cannot nod

(16)       your head yes or no to coach the witness.

(17)           MR. MCGAHA:  Not coaching the witness.

(18)           MS. MASSIMI:  You are absolutely

(19)       coaching the witness.  Please don't though

(20)       that.  This is the third or fourth time you

(21)       have done that degree this deposition.

(22)           THE WITNESS: Ms. Massimi, I will let

(23)       you know that I am focused on you and you

(24)       only.  I can't see him at all right now.  I

(25)       see your square and nothing else.  I

(1)          N. MALEBRANCHE

(2)     promise you.

(3)          THE WITNESS:  I appreciate that, ma'am,

(4)     be your attorney is sitting inches from

(5)     you, and even if you are claiming that you

(6)     can't see him, his behavior is improper.

(7)          MR. MCGAHA:  I understand that you are

(8)     very frustrated with my witness because she

(9)     is not helping your case very much.  But we

(10)    proceed; we'll proceed and get out of here

(11)    and get to lunch sometime soon.  Thank you.

(12)         MS. MASSIMI:  Mr. McGaha, I am not

(13)    frustrated with your witness at all.  I

(14)    think her testimony speaks for itself

(15)    (cross talk) -- case since plaintiff's

(16)    deposition, you are very frustrated with

(17)    the facts of this case and the fact that

(18)    you can't change what has been said and

(19)    what has been done.  So, I am going to

(20)    continue asking the witness questions.

(21)    Please stop nodding and shaking your head.

(22)    It's improper.  It's not permitted.  You

(23)    know you are doing it.  By denying that you

(24)    are doing it, you are lying.  So, stop.

(25)         MR. MCGAHA:  You are calling me a liar?

(1)          N. MALEBRANCHE

(2)          MS. MASSIMI:  If you are saying that

(3)    you are not nodding and shaking your, yes,

(4)    you are lying.

(5)          MR. MCGAHA:  I am (cross talk) --

(6)          MS. MASSIMI:  Then you are admitting

(7)    that when I am asking the witness

(8)    questions, you are nodding and shaking your

(9)    head?

(10)          MR. MCGAHA:  Yes.

(11)          MS. MASSIMI:  Don't do that, Mr.

(12)    McGaha.  That is not permitted.

(13)          MR. MCGAHA:  Not looking at her.  I'm

(14)    not --

(15)          MS. MASSIMI:  Mr. McGaha, do you agree

(16)    to stop doing that?  Can you please stop

(17)    doing that?  I will have to call the court

(18)    you about this, Mr. McGaha.

(19)          MR. MCGAHA:  I agree we shouldn't have

(20)    to call the court about this, and I am also

(21)    not nodding and shaking my head with

(22)    respect to trying to coach my witness into

(23)    saying anything.  I think her answers have

(24)    been cogent, consistent, and she is -- can

(25)    handle herself.  I think that is pretty

(1)            N. MALEBRANCHE

(2)    evident so far.  So, you can continue with

(3)    your deposition, thank you.

(4)        MS. MASSIMI:  Mr. McGaha, the point is,

(5)    you should not be nodding or shaking your

(6)    head when I am asking the witness

(7)    questions.  Do you agree to stop doing

(8)    that?

(9)        MR. MCGAHA:  Not.  Not shaking my head

(10)   when you --

(11)       MS. MASSIMI:  You just admitted that

(12)   you were.

(13)       MR. MCGAHA:  I am nodding and shaking

(14)   me head, but not when you ask a question.

(15)   I am not shaking my head -- looking at

(16)   something else.

(17)       MS. MASSIMI:  Mr. McGaha, what you are

(18)   doing is childish.  This should be beneath

(19)   you.  I don't know why you are acting this

(20)   way.  I am asking you to stop nodding and

(21)   shaking your head while I am asking

(22)   questions.  You should be embarrassed in

(23)   front of your client.  Stop it.

(24)       MR. MCGAHA:  I am not embarrassed at

(25)   all.

(1)          **N. MALEBRANCHE**

(2)          **MS. MASSIMI:  You should be.  Please**

(3)     **stop.**

(4)          **MR. MCGAHA:  You can continue.  Thank**

(5)     **you.**

(6)     Q  Ms. Malebranche, please explain to me why

(7)  you believe it was not a -- please explain to me

(8)  why or how your meeting with Mr. Campbell at the

(9)  GFT influenced your decision to include or exclude

(10)  the detail of Alzate approaching Campbell's work

(11)  area in a clearly agitated state.

(12)     **A  There was no influence.  My recap is a**

(13)  **recap of the meeting.  It is not a recap of the**

(14)  **security notes.  Those notes are in colluded in**

(15)  **the GFT packet already.  My notes are a recap of**

(16)  **exactly what Kevin had to say, why he thought he**

(17)  **was treated unfairly, what he thought would be**

(18)  **fair.  That is what we discussed.  That is what my**

(19)  **recap includes.**

(20)     Q  Did you find Kevin Campbell -- sorry?

(21)     **A  There is no influence.**

(22)     Q  Did you find Kevin Campbell to be truthful

(23)  during the GFT process?

(24)     **A  Yes.**

(25)     Q  The purpose of Kevin commencing the GFT

(1)          N. MALEBRANCHE

(2)   process was for him to try to get his job back;

(3)   correct?

(4)      **A   Correct.**

(5)      Q   One of the outcomes of the GFT process or

(6)   GFT process in general could be for employees to

(7)   get their jobs back; right?

(8)      **A   Correct.**

(9)      Q   Who was tasked with the authority to decide

(10)  whether Kevin Campbell would get his job back

(11)  during the GFT process?

(12)     **A   Myself, as well as those in attendance in**

(13)  **the meeting.**

(14)     Q   What are their names?

(15)     **A   Senior manager Eric Wanders.**

(16)     Q   And who else?

(17)     **A   HR advisor Lance Reyes, and the manager.**

(18)     Q   Who was the manager?

(19)     **A   The best of my memory, I believe it was**

(20)  **Monte Bovel.**

(21)     Q   Why -- at the end of that process, you

(22)  choose to not give Kevin Campbell his job back;

(23)  correct?

(24)     **A   Correct.**

(25)     Q   Why did you make that decision?

(1)                 N. MALEBRANCHE

(2)      A   Because of his responsibility for, you

(3)   know, as I said before: He should have walked

(4)   away.  He should not have approached Augusto at

(5)   all.  He should not have been intimidating.  And

(6)   as I mentioned to you, a statement from one of the

(7)   employees did state that he shoulder bumped him.

(8)   To make sure, and in fairness to Kevin, after that

(9)   GFT, I asked for Jose Moreno to provide another

(10)  followup statement to exactly what he saw and he

(11)  heard, which he did produce; and it was consistent

(12)  with what the first statement was.  So, that was a

(13)  key factor as well.  So, based on his statement,

(14)  Kevin did make contact, physical contact with

(15)  Augusto.  He should not have.  He should not have

(16)  been intimidating, and he should have walked away.

(17)  Kevin agreed to that.  He agreed that he could

(18)  have been intimidating.  He was much taller than

(19)  him, much larger than the other employee, Augusto,

(20)  and in hindsight, looking back, he stated that he

(21)  should have walked away.  He took his workplace

(22)  violence training on April 15 of 2021, one month

(23)  prior to this incident happening.  So, he was well

(24)  aware of what his responsibility was to avoid this

(25)  situation, and he should have.  And as I mentioned

(1)                  **N. MALEBRANCHE**

(2)   **before, had he done that, there -- there wouldn't**

(3)   **be an issue right now.  There would be nothing.**

(4)   **He would still be working at FedEx.  But he did**

(5)   **not walk away from the incident.  He should have**

(6)   **walked away from that incident.  He also said that**

(7)   **he wanted management to see how upset Augusto**

(8)   **gets.  So, he didn't leave.  He just let it go**

(9)   **until it got to a point that it should not have**

(10)  **gotten to.  So, that is why.**

(11)      Q   Did you -- is it clear on the video that

(12)  Kevin made physical contact with Augusto?

(13)      **A   As I just said, it was based on the**

(14)  **employee's statement that he made contact.**

(15)      Q   Is it clear on the video to you that Kevin

(16)  made physical contact with Augusto?

(17)      **A   No.**

(18)      Q   Did you ask any other witnesses to provide

(19)  supplemental statements?  Or was it just Moreno?

(20)      **A   No.  There were several witnesses that**

(21)  **provided statements, including Kevin and Augusto.**

(22)      Q   Sorry.  But didn't you say that you asked

(23)  Moreno to provide a followup statement?

(24)      **A   Yes.**

(25)      Q   Did you request followup statements from

[Page 76]
February 9, 2024

(1)              N. MALEBRANCHE

(2)    anyone else?  Or just Moreno?

(3)       **A   No, because Moreno was right in the view of**

(4)    **what was taking place.  He was the one that**

(5)    **provided the original statement of what took**

(6)    **place.**

(7)       Q   Well, Moreno is the only one that said that

(8)    Kevin made physical contact with Augusto; correct?

(9)       **A   Correct.**

(10)      Q   He is the only person you sought a followup

(11)   statement from; correct?

(12)      **A   That is correct.  Other employees did not**

(13)   **have his viewpoint to see that.  One employee was**

(14)   **behind Kevin.  So, his statement wouldn't tell me**

(15)   **if any contact was made.  So, that is why I wanted**

(16)   **to make sure.**

(17)      Q   Well, Moreno's statement also didn't

(18)   include the detail that Alzate approached

(19)   Campbell's work area first; correct?

(20)      **A   No.  It starts at the altercation itself.**

(21)      Q   What starts at the altercation itself?

(22)      **A   I believe, his statement.**

(23)      Q   Moreno's statement starts at the

(24)   altercation itself?

(25)      **A   I don't want to misspeak.  If you have a**

(1)                    N. MALEBRANCHE

(2)    **statement, I would be more than happy to look at**

(3)    **it.**

(4)       Q   Well, you are the one who said that.   You

(5)    are the one that said his statement starts at the

(6)    altercation itself.

(7)       **A   I may have misspoke.   So, I will withdraw**

(8)    **that.**

(9)       Q   Where does the altercation start, according

(10)   to you?   Because again, as we have been

(11)   discussing, is it not true that security said the

(12)   first thing that is seen is Alzate approaching

(13)   Campbell's work area in a clearly agitated state;

(14)   that is correct. Right?

(15)      **A   That is not an altercation.**

(16)      Q   You don't believe that is an altercation?

(17)      **A   No.**

(18)      Q   What --

(19)      **A   No.   Because somebody is upset and yelling**

(20)   **at someone or saying something to them, that is**

(21)   **not a verbal, two way altercation.**

(22)      Q   Got it.   Okay.   So, it's only an

(23)   altercation once there is physical contact?

(24)      **A   No.   I didn't say --**

(25)      Q   What are you saying?

(1)            N. MALEBRANCHE

(2)    **A  A verbal altercation would be both of them.**

(3)  **Both of them engaging in that argument.**

(4)    Q  So, an altercation doesn't include the

(5)  first person who becomes agitated?

(6)            **MR. MCGAHA:  Object to form.**

(7)    **A  Anyone could be upset.  Anyone, and start**

(8)  **yelling at someone.  That does not necessarily**

(9)  **define that there is an altercation taking place.**

(10)    Q  But Kevin Campbell should have walked away

(11)  at that point?

(12)            **MR. MCGAHA:  You can answer.**

(13)    **A  Yes.  He should have.**

(14)    Q  Why would he have walked away if there was

(15)  no altercation?

(16)    **A  Because Kevin said that he was hit with the**

(17)  **box.  So, at that point, he was upset and should**

(18)  **have walked away and got a manager.**

(19)    Q  Right. Isn't it true that security said

(20)  that the video shows Alzate approaching Campbell's

(21)  work area in a clearly agitated state, flailing

(22)  his arms and pushing several packages in

(23)  Campbell's direction?

(24)    **A  You are reading it to me?  I don't have it**

(25)  **in front of me.  If you are telling me that is**

(1)                    **N. MALEBRANCHE**

(2)    **what the statement says, then --**

(3)         Q   You don't recall that?   You don't recall

(4)    ever hearing or reading that, ma'am?

(5)         **A   I don't remember everything word for word.**

(6)    **That was three years ago.**

(7)         Q   You don't recall security ever saying or

(8)    writing that the video showed Alzate approaching

(9)    Campbell's work area in a clearly agitated state,

(10)   flailing his arms and pushing several packages in

(11)   Campbell's direction?

(12)        **A   If you would like to sure the document with**

(13)   **me, thank you.**

(14)        Q   Well, your attorney has the document.   I am

(15)   asking you.

(16)              **MR. MCGAHA:   Can we pull it up?**

(17)              **MS. MASSIMI:   You have the document,**

(18)        **Mr. McGaha.**

(19)              **MR. MCGAHA:   Can I show it to her?**

(20)              **MS. MASSIMI:   This is not a document**

(21)        **that I didn't have that I didn't disclose**

(22)        **for the record -- no, I am questioning the**

(23)        **witness.**

(24)              **MR. MCGAHA:   So, I can't show it to**

(25)        **her?**

(1)          N. MALEBRANCHE

(2)          MS. MASSIMI:  You have the document --

(3)     you should have prepped your witness, and

(4)     your witness (cross talk) -- please, I

(5)     don't know what you are -- referring to.

(6)     Sorry?  Can you please stop interrupting my

(7)     deposition?  I understand that you.

(8)          MR. MCGAHA:  Just asking -- asking --

(9)          MS. MASSIMI:  Frustrated, Mr. McGaha.

(10)    Please let me finish my questions.

(11)         MR. MCGAHA:  Just wanted to know

(12)    whether or not you wanted me to pull out

(13)    the document.

(14)         MS. MASSIMI:  If I wanted to show the

(15)    document, I will show the document.  Right

(16)    now, I am asking the witness about things

(17)    that are contained in her mind and her head

(18)    and her memory.  Okay?  So, please stop

(19)    interrupting.

(20)         MR. MCGAHA:  All right.

(21)         MS. MASSIMI:  I understand you are

(22)    upset, but this is your own document

(23)    production.  None of this is a surprise or

(24)    it shouldn't be your surprise, had you

(25)    prepped your witness, which you obviously

(1)                 **N. MALEBRANCHE**

(2)        **didn't.**

(3)     Q   Ms. Malebranche, do you recall ever seeing

(4)   or reading any communication from security that

(5)   says that the video shows Alzate approaching

(6)   Campbell's work area in a clearly agitated state,

(7)   flailing his arms and pushing several packages in

(8)   Campbell's direction?

(9)     **A   I don't recall the exact wording of any**

(10)  **document that you may be looking at.**

(11)    Q   I am asking if you if you ever recall

(12)  receiving that information.

(13)              MR. MCGAHA:  Object to form.

(14)    **A   I received a document from security, but I**

(15)  **cannot tell you word for word, as you are asking**

(16)  **me, if I recall that being written.  I do not.**

(17)  **The answer is no.**

(18)    Q   In sum and substance, do you recall ever

(19)  receiving that information?

(20)              MR. MCGAHA:  Object to form.

(21)    **A   I received a statement from security.**

(22)    Q   What statement -- what information was

(23)  contained in this statement from security?

(24)    **A   A recap of the events, and their interviews**

(25)  **with anyone that they met with.**

(1)            **N. MALEBRANCHE**

(2)      Q    And in that recap events, of events, do you

(3)    recall learning that Alzate approaching Campbell's

(4)    work area in a clearly agitated state, flailing

(5)    his arms and pushing several packages in

(6)    Campbell's direction?

(7)            **MR. MCGAHA: Object to form.**

(8)      **A    I do not recall the exact words, as I**

(9)    **repeated several times now.  I recall a document,**

(10)   **but I cannot, in all honesty, tell you I recall**

(11)   **the exact words that were in that document.**

(12)     Q    The question was not whether you recall the

(13)   exact words.  Do you understand that?

(14)     **A    Yes.  I do.**

(15)     Q    Did you testify earlier about the contents

(16)   of Moreno's witness statement?

(17)     **A    Yes.  I did.**

(18)     Q    Were you quoting that statement verbatim

(19)   from your memory?

(20)     **A    Oh, no.**

(21)     Q    Right.  Similarly, I am not asking you for

(22)   a verbatim quote or to assess a verbatim quote.  I

(23)   am asking you if you ever learned, if did you

(24)   recall learning at any point during this

(25)   investigation that Alzate approached Campbell's

(1)           N. MALEBRANCHE

(2)   work area in a clearly agitated state, flailing

(3)   his arms and pushing several boxes in Campbell's

(4)   direction.

(5)      **A  What you are asking me is a very specific**

(6)   **statement.  Okay?  What I will tell you is I was**

(7)   **aware that Augusto did approach Kevin, and as I**

(8)   **mentioned before, I was aware that he pushed two**

(9)   **boxes towards him; one that missed him and one**

(10)  **that hit him in the arm.  And as I said earlier,**

(11)  **Kevin told security that it missed him.  It almost**

(12)  **hit him.**

(13)     Q  But you were aware that one of the boxes

(14)  hit him in the arm; correct?

(15)     **A  Yes.**

(16)     Q  And it is your testimony that that was not

(17)  the start of the altercation; correct?

(18)     **A  I didn't say that.**

(19)     Q  Well, do you believe that that was the

(20)  start of the altercation?

(21)     **A  So, I asked if whether or not Augusto**

(22)  **pushing the boxes back up to belt, where they had**

(23)  **to go to the split, was intentional or could it**

(24)  **have been by accident, because I needed to**

(25)  **determine that.  I don't know that answer.  I**

(1)            N. MALEBRANCHE

(2)    wasn't there.  There is a difference.  If somebody

(3)    is pushing the boxes up and accidentally hits

(4)    someone, or was it in an intentional shove -- I

(5)    wasn't there.  I can't make that determination.

(6)    So, I did ask Kevin that question what he thought.

(7)    Q  The question was: Do you believe Augusto

(8)    hitting Kevin with part of the box was the start

(9)    of the altercation?

(10)    A  Again, my response is, it's going to depend

(11)    on whether or not it was accidental or

(12)    intentional.  If it was -- even if it was, either

(13)    which way, Kevin should not have turned around,

(14)    gotten in Augusto's face or whatever, which he

(15)    agreed was intimidating.  As mentioned before, he

(16)    should have walked away.  Even if it was just a

(17)    box hitting his arm and he thought it was

(18)    intentional, walk away.

(19)    Q  Do you believe that that would have been

(20)    considered the start of the altercation if it was,

(21)    in fact, an intentional contact?

(22)            MR. MCGAHA:  Object to form.

(23)    A  Could you repeat that question?

(24)    Q  You said, even if it was intentional, Kevin

(25)    should have walked away; is that correct?

(1)                    N. MALEBRANCHE

(2)        **A   That is correct.**

(3)        Q   Do you believe that if Augusto's actions in

(4)    pushing the boxes into Kevin were intentional that

(5)    that was the start of the altercation?

(6)        **A   That was unacceptable behavior, and would**

(7)    **have been dealt with that way, had Kevin walked**

(8)    **away at that point in time --  which he did not**

(9)    **do.**

(10)       Q   Do you believe that Alzate intentionally

(11)   making contact with Kevin Campbell was the start

(12)   of the altercation?

(13)               **MR. MCGAHA:  Object to form.**

(14)       **A   My answer to that question, the way you**

(15)   **worded it with "intentional," I would have to say**

(16)   **no, because I don't know if it was intentional or**

(17)   **accidental.**

(18)       Q   What is it about what you have seen that

(19)   leaves you to have that question?

(20)       **A   On our sort belts, every single day, we**

(21)   **push packages forward or back.  Every day on our**

(22)   **operation.  If it passes around, if it passes a**

(23)   **split, we push it back.  Augusto's job is to make**

(24)   **sure that nothing passes the split.  He was**

(25)   **pushing packages back to the proper split.  If it**

(1)                N. MALEBRANCHE

(2)    was intentional or accidental, I cannot respond to

(3)    that.  I am not Augusto, and I don't know what he

(4)    was thinking of.

(5)       Q  Well, you are the district manager;

(6)    correct?

(7)       A  Correct.

(8)       Q  Are you unable, as you sit here now, to

(9)    tell me that it is an attempt to start an

(10)   alteration when someone pushes -- intentionally

(11)   pushes a box into another employee?

(12)               MR. MCGAHA:  Object to form.

(13)      A  Keep using the word "intentional."  I don't

(14)   know if it was intentional or not.  So, I can't

(15)   answer that question for you.  I don't know if it

(16)   was intentional or not.  I don't know why he did

(17)   that.  I don't know if Kevin was too close to the

(18)   area.  I can't tell you.  I don't know if -- just

(19)   out of being upset, when Augusto pushed it, it hit

(20)   him.  Was that --

(21)      Q  Would that have been inappropriate?

(22)      A  It -- if Kevin thought it was intentional,

(23)   then Kevin should have went and got a manager

(24)   immediately or asked another employee to get a

(25)   manager.

(1)              **N. MALEBRANCHE**

(2)    Q  But you are a manager; correct?

(3)    **A  I am a managing director.**

(4)    Q  Aren't you telling me that you can't even

(5)    determine right now whether what Augusto did with

(6)    the box was wrong?

(7)              MR. MCGAHA:  Object to form.

(8)    **A  I am telling you -- and the same question**

(9)    **that I asked Kevin: Was it intentional, or was it**

(10)   **accidental?  I don't know that answer.**

(11)   Q  But it is your testimony that Kevin should

(12)   have complained to a manager?

(13)   **A  If he thought that it was intentional on**

(14)   **Augusto's part, yes, he should have.  What --**

(15)   **(cross talk) -- all employees should -- sorry,**

(16)   **Sean, do you need me to repeat that?**

(17)              (Whereupon, a discussion was held off

(18)         the record.)

(19)              THE WITNESS:  If Kevin thought that it

(20)         was intentional, he should have gotten a

(21)         manager.  Our employees are always taught

(22)         and always asked to make sure that -- if

(23)         they feel that anything is, you know, going

(24)         to escalate to something, we do workplace

(25)         violence training with them.  You know, we

(1)                    N. MALEBRANCHE

(2)          **want them to prevent the workplace**

(3)          **violence.  Prevention is walking away.**

(4)     Q   If Kevin thought that Augusto intentionally

(5)  pushed the boxes into him, your testimony is that

(6)  Kevin should have went and complained to a

(7)  manager?

(8)     **A   Yes.**

(9)     Q   What would a manager have done?

(10)                MR. MCGAHA:  Object to form.

(11)    **A   A manager would have then addressed Augusto**

(12) **for his behavior.**

(13)    Q   But didn't you just say that there is not

(14) anything inherently wrong with that behavior?

(15)    **A   I did not say that.**

(16)    Q   Ma'am, didn't you say that there is very

(17) likely an innocent explanation for Alzate pushing

(18) the boxes up the belt to Campbell?

(19)    **A   I never used those words.**

(20)    Q   Didn't you just say that if it is not

(21) intentional and that it might not be intentional

(22) because everyone is working in close quarters?

(23) Isn't that what you just testified to at length a

(24) moment ago, ma'am?

(25)    **A   No.  That is not what I said.**

(1)              **N. MALEBRANCHE**

(2)     Q  So, let's go over it again.  So, do you

(3)  believe that when an employee pushes a box into

(4)  another employee intentionally, that that can be

(5)  considered the start of an altercation?

(6)          **MR. MCGAHA:  Object to form.**

(7)     **A  It's a hypothetical question.**

(8)     Q  Are you, as the district manager, unable to

(9)  answer whether it is inappropriate or workplace

(10)  violence?

(11)    **A  No.**

(12)    Q  Ma'am, if yo would please let me finish.

(13)  You are the district manager; correct?  You have a

(14)  bachelor's degree; correct?  Correct?

(15)    **A  Yes.  Yes.  I was letting you finish.**

(16)    Q  Okay.  Well, I am waiting for you to

(17)  answer.  You are the district manager; correct?

(18)    **A  Yes.**

(19)    Q  Okay.  Are you unable to tell me whether it

(20)  is workplace violence for a employee to push a box

(21)  into another employee?

(22)    **A  There are about, I don't know, seven, ten**

(23)  **thousand boxes a day that go through that sort**

(24)  **operation.  A box could hit multiple employees**

(25)  **throughout that sort.  Somebody could be pushing a**

(1)                    **N. MALEBRANCHE**

(2)  **box and hit anyone.  I can't define, every time, a**

(3)  **box hits an individual that it was an intentional**

(4)  **act.  That is what I am telling you.**

(5)       Q   And my question was: Isn't it an instance

(6)   of workplace violence for one employee to angrily

(7)   push a box into another employee?

(8)              **MR. MCGAHA:  Object to form.**

(9)       **A   Again, I do not know if that is accidental**

(10)  **or intentional.**

(11)      Q   You don't know whether an employee pushing

(12)  a box angrily into another employee would be

(13)  accidental or intentional?

(14)             **MR. MCGAHA:  Object to form.**

(15)      **A   I would have to know more about the**

(16)  **circumstances.**

(17)      Q   And it is your testimony that Kevin

(18)  Campbell should have complained to a manager about

(19)  what, specifically?

(20)      **A   If he felt that Augusto, in his opinion,**

(21)  **that Augusto intentionally hit him with that box,**

(22)  **and Augusto was that upset, he should have gone to**

(23)  **get a manager to avoid anything escalating.**

(24)      Q   Would his report of that incident, as you

(25)  just described it, be considered the start of an

(1)                N. MALEBRANCHE

(2) altercation?

(3)            **MR. MCGAHA:  Object to form.**

(4)    **A  There was no altercation.**

(5)    Q  Had Kevin reported what you just described,

(6) would that have been considered an altercation?

(7)    **A  Not between two individuals, no.**

(8)    Q  Had Kevin reported what you just described,

(9) would that have been considered workplace

(10) violence?

(11)            **MR. MCGAHA:  Object to form.**

(12)    **A  He would have to file a workplace violence**

(13) **report.  I don't know if, necessarily, that would**

(14) **be considered.  There would have to be an**

(15) **investigation in order to determine that.**

(16)    Q  All right.  So, it's not that he just

(17) should have gone and complained to a manager;

(18) correct?

(19)            **MR. MCGAHA:  Objection.**

(20)    Q  You are saying that he had to file a

(21) workplace violence report, and then there would

(22) have been an investigation?

(23)    **A  No.  That is not what I said (cross**

(24) **talk) -- he should have immediately gone to a**

(25) **manager to report the incident so the manager**

(1)                    N. MALEBRANCHE

(2)    could have addressed it immediately.  If Kevin

(3)    felt that it was that intentional, then he could

(4)    file a workplace violence report, which he never

(5)    did.

(6)        Q  And (cross talk) -- would the incident then

(7)    have been considered workplace violence?

(8)                MR. MCGAHA:  Object to form.

(9)        A  He was offered the opportunity to file a

(10)   workplace violence report, and he did not.

(11)       Q  Had he filed a workplace violence report,

(12)   would his description of events have been

(13)   considered an instance of workplace violence?

(14)       A  It would.

(15)                MR. MCGAHA:  Objection to form.

(16)       A  It would have been handled under the

(17)   workplace violence policy to determine the out

(18)   come.

(19)       Q  So, you don't know --

(20)                MR. MCGAHA:  Excuse me.  Finish --

(21)                MS. MASSIMI:  Go ahead.

(22)       A  It was not automatically workplace

(23)   violence.

(24)       Q  Right.  So, Kevin's description of what

(25)   happened, and this assessment from security about

(1)            N. MALEBRANCHE

(2)    Alzate approaching Campbell's work area in a

(3)    clearly agitated state, flailing his arms, and

(4)    pushing several boxes Campbell's direction would

(5)    not have necessarily been considered workplace

(6)    violence by FedEx; correct?

(7)            **MR. MCGAHA:  Object to form.**

(8)        **A  Is not what I said.**

(9)        Q  Didn't security determine that they found

(10)   Alzate approached Campbell's work area in a

(11)   clearly agitated state, flailing his arms and

(12)   pushing several boxes in Campbell's direction?

(13)       **A  If that is what is in their statement, that**

(14)   **is what is in their statement.  I keep asking if**

(15)   **you want to share it with me.  I don't remember**

(16)   **the verbiage.  I can't say -- to something I can't**

(17)   **recall.**

(18)       Q  That description that I just provided to

(19)   you, would that be considered workplace violence?

(20)           **MR. MCGAHA:  Object to form.**

(21)       **A  That somebody approached someone with their**

(22)   **arms up in the air?**

(23)       Q  I will read it again.  I want you to tell

(24)   me if it would be considered workplace violence

(25)   under FedEx standards.  An individual approaching

(1)                N. MALEBRANCHE

(2)  another individual's work area in a clearly

(3)  agitated state, flailing his arms and pushing

(4)  several packages in the other individual's

(5)  direction.  Would that be considered workplace

(6)  violence?

(7)              MR. MCGAHA:  Object to form.

(8)     A  So, someone is waving their arms, they are

(9)  agitated, and they are just pushing boxes in

(10) someone's direction, that would have to be

(11) investigated to see if it was workplace violence

(12) after interviewing everyone.  But pushing boxes in

(13) someone's direction and --

(14)    Q  No --

(15)    A  Agitated -- that is exactly what you asked

(16) me.

(17)             MS. MASSIMI: I will state it again.  A

(18)         individual approaching -- ma'am, you can

(19)         laugh.  I hope you laugh like this on

(20)         stand.  I truly do.

(21)             MR. MCGAHA:  You are laughing.

(22)             MS. MASSIMI:  I'm smiling.  I'm

(23)         smiling.

(24)    Q  So, the statement was: An individual

(25) approaching another individual's work area in a

(1)              N. MALEBRANCHE

(2)     clearly agitated state flailing his arms pushing

(3)     several packages in the other individual's

(4)     direction, would that be considered workplace

(5)     violence under FedEx standards?

(6)          MR. MCGAHA:  Object to form.  You can

(7)          answer again.

(8)      A  Again, nothing of what you are reading me

(9)     was any type of violence or -- somebody is upset

(10)    and they are waving their arms and just pushing

(11)    boxes in someone's direction, not touching them,

(12)    not ~~hitting~~ them.  Those are your words.

(13)     Q  No.  Not (cross talk) -- not what I said.

(14)    I'll do it again.  Ma'am, I will do it again.  I

(15)    will do it again.  An individual approaching

(16)    another individual's work area in a clearly

(17)    agitated state, flailing his arms and pushing

(18)    several packages in that individual's direction,

(19)    could that be considered workplace violence under

(20)    FedEx's standards?  It's yes or no.  I mean, what

(21)    is the answer?

(22)          MR. MCGAHA:  Object to form.  You can

(23)          answer again.

(24)     A  Need to have an investigation.

(25)     Q  Okay.  So, if someone were to complain

(1)                    N. MALEBRANCHE

(2)    about that, there wouldn't be immediate action

(3)    with regard to those allegations; correct?

(4)           **MR. MCGAHA:  Object to form.  You can**

(5)           **answer.**

(6)       **A  If somebody was to complain about the**

(7)    **action or what was written?**

(8)       Q  We are still talking about the scenario

(9)    where someone approaches another person's work

(10)   area in a clearly agitated state, flailing his

(11)   arms and pushing several packages in the other

(12)   person's direction.  There would be an

(13)   investigation into that; correct?

(14)      **A  Walk away from the accident and report it.**

(15)      Q  And then, what happens?

(16)          **MR. MCGAHA:  Object to form.**

(17)      **A  The manager?  I don't know.  It's all**

(18)   **subjective.  It depends on the actual situation.**

(19)   **Manager could remove the other employee from the**

(20)   **sort function and then do an investigation.  Both**

(21)   **employees could be removed, and asked of their**

(22)   **statements about what took place.  Lot of**

(23)   **different scenarios, but the bottom line is Kevin**

(24)   **should have walked away from this incident to**

(25)   **avoid anything going further.**

N. MALEBRANCHE

(2)    Q   Walked away and done what?

(3)    **A   Got a manager.**

(4)    Q   So, not just walked away; correct?

(5)    **A   Could have walked away.**

(6)    Q   Just walked away and not notify the

(7)    manager?

(8)    **A   Walk away and let a manager know whatever**

(9)    **just took place.**

(10)   Q   Okay.  And then what would that employee

(11)   expect to happen?  What could that employee expect

(12)   to happen after reporting such a thing?

(13)   **A   For the manager to follow up on the**

(14)   **incident and if necessary, involve security.**

(15)   Q   And then what?

(16)   **A   And then what?**

(17)   Q   What happens next?

(18)   **A   They would follow the process based on what**

(19)   **was the outcome.**

(20)   Q   Ma'am, you are saying that Kevin Campbell

(21)   should have walked way way and told the manager;

(22)   correct?

(23)   **A   That is correct.**

(24)   Q   What could Kevin Campbell have expected to

(25)   happen?  What is the process you wanted him to

(1)                N. MALEBRANCHE

(2)   follow?  What would he have expected to be the

(3)   outcome?  As the district manager, surely, you are

(4)   able to explain this.

(5)      **A  The manager then to handle the situation,**

(6)   **most likely remove the other employee from the**

(7)   **sort, interview both employees.  If anyone felt**

(8)   **there should be a workplace violence report filed,**

(9)   **file it.  To continue the investigation at the**

(10)  **outcome of the investigation, then the proper**

(11)  **followup would take place.**

(12)     Q  Okay.  Sure.  Could Mr. Campbell have said

(13)  anything to you during the GFT meeting that would

(14)  have led you to reconsider his termination?

(15)     **A  He presented to me his recount of what took**

(16)  **place.  So, yes.  That is important for me to**

(17)  **understand if the right decision was made.**

(18)     Q  Could Kevin Campbell have said anything to

(19)  you during the GFT meeting that would have led you

(20)  to reconsider FedEx's decision to terminate his

(21)  employment?

(22)     **A  Very hypothetical.  I mean, if he said,**

(23)  **prior to the sort, that he was threatened by**

(24)  **Augusto or prior to the sort, Augusto, you know,**

(25)  **did something else to him?  Then that would**

(1)                **N. MALEBRANCHE**

(2)    **definitely, you know, on that day, if you know,**

(3)    **something else happened where he felt that, you**

(4)    **know, he was threatened, which he should have**

(5)    **reported to management, there is a possibility;**

(6)    **but I don't know what you are looking for.**

(7)    Q   Ma'am, I am not looking for anything other

(8)    than for you to provide truthful answers to my

(9)    questions.  So, my questions are not meant to

(10)   suggest any type of answer.  Do you understand

(11)   that?

(12)   **A   Sure.**

(13)   Q   Okay.  When you spoke to Kevin, did you --

(14)   you found him to be truthful; correct?

(15)   **A   Yes.  I did.**

(16)   Q   Did you find him to be threatening or

(17)   aggressive?

(18)   **A   No.**

(19)   Q   Did you find him to be professional when

(20)   you were speaking to him?

(21)   **A   To the best of my memory, yes.**

(22)   Q   Did you find him to be respectful of you

(23)   and your authority?

(24)   **A   Of course.**

(25)   Q   Was he cooperative?

N. MALEBRANCHE

(1)

(2)     **A  Yes.**

(3)     Q   Okay.   Did he appear to be emotional during

(4)  your GFT meeting?

(5)     **A  Not that I recall.**

(6)     Q   What about -- you also met with him as part

(7)  of the EEO; correct?  Am I correct about that?

(8)     **A  Met with him prior to?**

(9)     Q   Did you meet with him more than once?

(10)    **A  I met with him at the GFT and the EEO**

(11) **meeting itself.**

(12)    Q   Right.   Yeah.   So, I was just asking about

(13) the GFT.   Now, I am going to be asking you about

(14) the EEO.   Did you find his behavior and demeanor

(15) to be the same at the EEO as it had been at the

(16) GFT?

(17)    **A  Yes.**

(18)    Q   He was respectful and cooperative and

(19) professional; correct?

(20)    **A  To the best that I recall, yes.**

(21)    Q   Okay.   Aside from -- well, there -- is

(22) there any level of remorse that Mr. Campbell could

(23) have expressed for the way this situation unfolded

(24) that would have led you to reconsider his

(25) termination?

[Page 101]
February 9, 2024

(1)                     N. MALEBRANCHE

(2)                **MR. MCGAHA:  Object to form.**

(3)      **A   Because an employee is remorseful cannot**

(4)  **sometimes dismiss the actions that took place.**

(5)      Q   My -- I mean, I understand human nature in

(6)  general; that is not what I am asking you.  I am

(7)  asking you, specifically, regarding this

(8)  situation.  Is there any level of remorse that

(9)  Kevin Campbell could have expressed for the way

(10) this situation unfolded that would have led you to

(11) reconsider his termination?

(12)               **MR. MCGAHA:  Same question, same**

(13)        **objection.**

(14)     **A   I do not recall Kevin expressing any**

(15) **remorse.**

(16)     Q   You believe that he should have expressed

(17) remorse?

(18)     **A   That is a personal decision.  You just**

(19) **asked me a question, and I responded.  I don't**

(20) **recall him expressing remorse.**

(21)     Q   My question is, had he expressed remorse,

(22) would that have impacted your decision to uphold

(23) his termination?

(24)     **A   Not based on the actions.**

(25)     Q   Okay.  Are you able to provide any other

[Page 102]
February 9, 2024

(1)              N. MALEBRANCHE

(2)   information that would have possibly led you to

(3)   reconsider his termination?

(4)       **A  No.**

(5)       Q  Did anyone witness or did security ever

(6)   tell you that Kevin Campbell incited this

(7)   altercation with Augusto?

(8)          **MR. MCGAHA:  Object to form.**

(9)       **A  I think you asked me that earlier.  I don't**

(10)  **recall.**

(11)      Q  Okay.  I just want to ask some questions.

(12)  I believe you have the exhibits that I sent you,

(13)  sir?  And actually, it might be easier if I

(14)  just -- do you -- if you want to mark Exhibit 1,

(15)  and Gabe, I will email you exhibit?  Is that okay?

(16)         **MR. MCGAHA:  That is fine.**

(17)         **(Whereupon, a discussion was held off**

(18)      **the record.)**

(19)      Q  Ms. Malebranche, I am going to ask you

(20)  questions about a document we have deemed marked

(21)  as Plaintiff's Exhibit 1 for purposes of today,

(22)  bearing stamps ESI25 through 26.  I have emailed

(23)  this document to your attorney, and I believe you

(24)  have it in front of you.  Do you see this

(25)  document?

```
(1)                N. MALEBRANCHE

(2)      A  Yes.

(3)      Q  Do you know what this document is?

(4)      A  It is from security James Cahill, in

(5)  regards to the incident -- saying that he attached

(6)  the videos of the incident as well as two still

(7)  photos.

(8)      Q  It's an email chain; is that accurate?

(9)      A  It's accurate.

(10)     Q  It's dated May 18, 2021?

(11)     A  Yes.

(12)     Q  The email chain starts with James Cahill

(13)  sending information to Eric; correct?

(14)     A  Correct.

(15)     Q  Then, Eric then forwards that information

(16)  to you; correct?

(17)     A  Correct.

(18)     Q  When you -- the initial email from James

(19)  Cahill to Eric Wanders includes security's details

(20)  of what happened on the video -- security's

(21)  interpretation of what happened on the video.  Is

(22)  that correct?

(23)     A  I am looking at it right now.  So --

(24)     Q  Take your time.

(25)     A  Okay --
```

(1)                **N. MALEBRANCHE**

(2)     Q   You can take your time if you need to read

(3)   through this.  Do you need some more time to read

(4)   through this?

(5)          **MR. MCGAHA:  Yeah.  Give us a couple of**

(6)          **minutes.**

(7)              **(Whereupon, a discussion was held off**

(8)          **the record.)**

(9)     Q   Okay.  Ms. Malebranche, have you now had an

(10)   opportunity to review the disclosed email

(11)   contained in this email chain in ES125 through 26?

(12)     **A   The email from James Cahill?**

(13)     Q   Yes.

(14)     **A   Yes.**

(15)     Q   Have you seen this email before?

(16)     **A   Yes.**

(17)     Q   To your knowledge, is the information

(18)   contained in James Cahill's email accurate?

(19)     **A   It is his report of the incident.**

(20)     Q   Have you just reread this email as you sit

(21)   here now?

(22)     **A   Yes.  I did.**

(23)     Q   Is the information contained in this email

(24)   accurate?

(25)     **A   James Cahill wrote it.  I can't answer if**

(1)                **N. MALEBRANCHE**

(2)    **it is accurate or not.  You would have to ask**

(3)    **James.**

(4)        Q   Will -- I will ask James when I depose him.

(5)    I am asking you if the information contained in

(6)    this document, to the best of your knowledge, is

(7)    accurate.

(8)                **MR. MCGAHA:  Object to form.**

(9)        **A   I didn't write it.  So, I can't say if it**

(10)   **is accurate or not.**

(11)       Q   Ma'am --

(12)       **A   It is his account of what took place.**

(13)       Q   Ma'am, ma'am, I am not asking you if you

(14)   wrote this email.  It is clear that you didn't

(15)   write this email; right?  Is that correct?

(16)       **A   Correct.**

(17)       Q   This email is from James Cahill; correct?

(18)       **A   Correct.**

(19)       Q   I'm asking you, based on your understanding

(20)   of the incident, if you believe the information

(21)   contained in this email is accurate or if you

(22)   disagree with any aspect of it.

(23)               **MR. MCGAHA:  Object to form.**

(24)       **A   As far as a recap of what James is**

(25)   **reporting on the incident, I would say it's**

(1)                    N. MALEBRANCHE

(2)    accurate.

(3)        Q   Okay.  Please take a look at the first

(4)    bullet point, which appears at the top of ESI26.

(5)    Do you see that?

(6)        A   Yes.  I do.

(7)        Q   Okay.  Do you see the bullet point under

(8)    that bullet point?

(9)        A   Zero eight two three semicolon 40 shows?

(10)   Starts with that?

(11)       Q   Yes.  "Shows Alzate approaching Campbell's

(12)   work area in a clearly agitated state, flailing

(13)   his arms and pushing several packages in

(14)   Campbell's direction."  Do you see that there?

(15)       A   Yes.  I do.

(16)       Q   Do you believe that that is accurate?

(17)       A   That is an accurate description of what

(18)   James saw.

(19)       Q   Well, do you believe that that is an

(20)   accurate description of what appears on the video?

(21)           MR. MCGAHA:  Object to form.

(22)       A   That is his verbiage.  Was he agitated?

(23)   Was he moving his arms?  Was he pushing several

(24)   packages?  Yes.

(25)       Q   Who?

(1)                    N. MALEBRANCHE

(2)      **A  Augusto.**

(3)      Q  Okay.  Did you review this portion of the

(4)  video as part of the GFT process?

(5)      **A  Yes.  I did watch the video.**

(6)      Q  Did you review this portion that we are

(7)  discussing?  Did you review that portion of the

(8)  video as part of the GFT process?

(9)      **A  Yes.  I did.  As reviewing that, I also**

(10) **reviewed that Campbell aggressively approached**

(11) **Augusto as well as noted in Jimmy Cahill's notes.**

(12)      Q  Ma'am, I understand what your refrain is in

(13) this case.  And when this is all entered into

(14) evidence, the jury will see it as well.  What I am

(15) asking you about is the part above that.  Did you

(16) review that portion of the video as part of the

(17) GFT process?  I understand you think Kevin

(18) Campbell is aggressive and I understand you think

(19) Kevin Campbell did something wrong, and I

(20) understand you think Kevin Campbell is scary and

(21) all of that, ma'am; but that is not what I am

(22) asking you.  Okay?  I am asking you about the part

(23) above that that says "82340 shows Alzate

(24) approaching Campbell's work area in a clearly

(25) agitated state, flailing his arms and pushing

```
(1)            N. MALEBRANCHE
(2)    several boxes in Campbell's direction."  Did you,
(3)    as the managing director, review that part of the
(4)    video as part of the GFT?
(5)            MR. MCGAHA:  Object to form.
(6)        A  I will answer your question, but please do
(7)    not put words in my mouth.  I never said that
(8)    Kevin was scary.  Those words did not leave my
(9)    mouth, and you just quoted me as saying that.  I
(10)   never said he was scarily.  So, please, don't put
(11)   words in my mouth. (Cross talk) -- I'll answer
(12)   your question.
(13)       Q  Okay.  Ma'am, I would also appreciate if
(14)   you didn't fabricate and omit material facts that
(15)   are clearly visible on the video.  Okay?  So, why
(16)   don't we both proceed with one hundred percent
(17)   sincerity; okay?  Did you, during the GFT, review
(18)   the part of the video that shows Alzate
(19)   approaching Campbell's work area in a clearly
(20)   agitated state, flailing his arms and pushing
(21)   several packages in Campbell's direction?
(22)       A  I did review the video.
(23)       Q  Did you review that part of the video?
(24)       A  I reviewed the whole video.
(25)       Q  Did you review that part of the video?
```

(1)                    N. MALEBRANCHE

(2)      **A   That would have been part of the video.**

(3)      Q   Did you review that part of the video?

(4)          **MR. MCGAHA:  Object to form.**

(5)      **A   Yes.**

(6)      Q   Great.  The next part of the email chain is

(7)   Eric Wanders forwarding you James Cahill's email;

(8)   correct?

(9)      **A   Correct.**

(10)     Q   When Eric forwarded it to you, did that

(11)  include the attachments?

(12)     **A   I don't recall.  I don't.  Yeah.**

(13)         **MS. MASSIMI: Okay.  I am going to send**

(14)         **you another email.**

(15)         **(Whereupon, a discussion was held off**

(16)         **the record.)**

(17)     Q   Ms. Malebranche, I am showing you a

(18)  document we are deeming marked as Plaintiff's

(19)  Exhibit 2 for purpose of today, bearing stamps

(20)  ESI49.  Do you recognize this document?

(21)     **A   Yes.  It was in the GFT packet.**

(22)         **MS. MASSIMI: Can you please just read**

(23)         **this through and let me know when you are**

(24)         **done?  You can read it yourself.  Just let**

(25)         **me know when you are done.**

(1)                **N. MALEBRANCHE**

(2)              **THE WITNESS:  Okay.**

(3)     Q   Have you now had a chance to review the

(4)   document we marked for purposes of today as

(5)   Plaintiff's Exhibit 2?

(6)     **A   Yes.**

(7)     Q   Is the information contained in this

(8)   document accurate?

(9)     **A   Yes.**

(10)     Q   This document was generated prior to the

(11)   GFT; correct?

(12)     **A   That is correct.**

(13)     Q   Okay.  Can you show Exhibit 3, please?

(14)   Wait.  I'm sorry.  Who wrote this document?  It

(15)   says it is from -- from Monte Bovel; correct?

(16)     **A   Yes.**

(17)     Q   Do you think -- Monte probably wrote this

(18)   document.  That is what I am asking; correct?

(19)     **A   I didn't write it.  So I would assume Monte**

(20)   **wrote the letter.**

(21)     Q   Okay.  What -- does Monte Bovel still work

(22)   at FedEx?

(23)     **A   No.  He does not.**

(24)     Q   Do you know why?

(25)     **A   Yes.**

N. MALEBRANCHE

(1)

(2)     Q   Why doesn't he work there anymore?

(3)     **A   He was terminated.**

(4)     Q   Do you know why?

(5)     **A   Falsification.**

(6)     Q   Falsification of what?

(7)     **A   Company documents.**

(8)     Q   How long had Monte Bovel worked at FedEx?

(9)     **A   I do not recall.**

(10)    Q   Do you see the top left where it says

(11)    warning letter termination?

(12)    **A   Yes.**

(13)    Q   Under that, it says zero six dash three

(14)    five dash T, disruptive behavior?

(15)    **A   Yes.**

(16)    Q   What does that refer to?

(17)    **A   It's a code that was used for letters.**

(18)    **That's all.**

(19)    Q   Sorry.  I don't understand.  What is that?

(20)    **A   It's a code.**

(21)    Q   A code representing what?

(22)    **A   That it was for a termination, and that it**

(23)    **was for disruptive behavior.  So, if it was a**

(24)    **letter for attendance, it would have a different**

(25)    **code.  If it was a letter for a vehicle accident,**

(1)                    **N. MALEBRANCHE**

(2)    **it would have a different code.**

(3)    Q  If it was a letter for workplace violence,

(4)    would it have a different code?

(5)    **A  I don't know.**

(6)    Q  What do the numbers zero six dash three

(7)    five represent?

(8)    **A  I don't know.**

(9)        **MS. MASSIMI: Okay.  I am done with that**

(10)       **exhibit.  Can you show 3, please?**

(11)       **(Whereupon, a discussion was held off**

(12)       **the record.)**

(13)   Q  Ms. Malebranche, have you now had an

(14)   opportunity to review the document we marked for

(15)   purposes of today's Plaintiff's Exhibit 2 (sic?)

(16)   **A  Yes.**

(17)   Q  What is this document?

(18)   **A  This is the complainant, being Kevin, his**

(19)   **statement that he included in step one of the GFT**

(20)   **process.**

(21)   Q  Did you review this statement?

(22)   **A  Yes.**

(23)   Q  Did you speak to Kevin about the

(24)   allegations contained in this document?

(25)   **A  Specifically, which allegations?**

[Page 113]
February 9, 2024

(1)        **N. MALEBRANCHE**

(2)    Q  Are there any allegations contained in this

(3)  document that you did not speak to him about

(4)  during the GFT?  Let me ask it differently.  Did

(5)  you review this document prior to meeting with

(6)  him?

(7)    **A  I reviewed the document prior to meeting**

(8)  **with him.**

(9)    Q  Did you talk to him about all of the

(10)  allegations contained in this document?

(11)    **A  In the GFTP meeting, understanding what he**

(12)  **wrote in here, and that he was noting**

(13)  **discrimination and retaliation, I requested HR to**

(14)  **open up an EEO to keep those issues independent of**

(15)  **what actually had happened.  So, we did address**

(16)  **those in the EEO that we created on Kevin's**

(17)  **behalf.**

(18)    Q  So, just to be clear: You did not speak to

(19)  him about the allegations at the GFT, other than

(20)  the incident with Augusto?

(21)    **A  No.  I do believe, to the best of my**

(22)  **memory, that he may have brought up that Augusto**

(23)  **had been very, you know, had always been yelling**

(24)  **at him about the freight missing and telling him**

(25)  **he is not doing his job.  And he did bring that up**

(1)                    **N. MALEBRANCHE**

(2)     **in the GFT meeting.**

(3)        Q   Did you ever speak to him about the other

(4)     allegations, aside from the incident with Augusto?

(5)        **A   The other allegations, like I said, we made**

(6)     **those separate and addressed them in the EEO**

(7)     **meeting.**

(8)        Q   What I am asking you is: Did you ever speak

(9)     to him about those allegations?

(10)       **A   In the EEO meeting.**

(11)       Q   Did you find him in the EEO meeting to be

(12)    truthful and sincere when talking about these

(13)    other allegations?

(14)       **A   I found him to be truthful and sincere**

(15)    **about what he believed his perception of what took**

(16)    **place.**

(17)              **MS. MASSIMI: Okay.  You can take that**

(18)         **down.**

(19)              **(Whereupon, a discussion was held off**

(20)         **the record.)**

(21)       Q   Ms. Malebranche, I am showing you a

(22)    document that we have deemed marked for purposes

(23)    of today as Plaintiff's Exhibit 4, bearing stamps

(24)    ESI481. Do you recognize that document?

(25)       **A   Yes.**

[Page 115]
February 9, 2024

**N. MALEBRANCHE**

(1)

(2)    Q    What is this document?

(3)    **A    It's an email.  Eric has an email from**

(4)    **James Cahill.  Who is -- (inaudible) -- okay.  I**

(5)    **think the initial email.  Sorry.  It didn't go all**

(6)    **the way down.  But the initial emails from Eric to**

(7)    **James Cahill.  And then he sent me the email.**

(8)    **This was dated June 1st; so, that was in**

(9)    **preparation for the GFT.  You can see the initial**

(10)   **contact.  So, I believe this is the first time**

(11)   **that I got the video -- was on June 1st in**

(12)   **preparation for the GFT.  Obviously, for**

(13)   **preparation, I asked him if they had any witness**

(14)   **statements, and he responded yes.  And that was**

(15)   **it.  Is that it?**

(16)   Q    Do you know what witness he was referring

(17)   to?

(18)   **A    I just asked if he had witness statements.**

(19)   **I would see them in the packet then when I was**

(20)   **preparing.**

(21)           **MS. MASSIMI:  Okay.  I see.  You can**

(22)       **take this down, please; thank you.**

(23)           **(Whereupon, a discussion was held off**

(24)       **the record.)**

(25)   Q    Ms. Malebranche, I am showing you a

(1)              N. MALEBRANCHE

(2)    document that we have deemed marked for purposes

(3)    of today as Plaintiff's Exhibit 5, bearing stamp

(4)    ESI46.  Do you recognize this document?

(5)        **A  Yes.**

(6)        Q  You did not write this document; correct?

(7)        **A  Monte Bovel.**

(8)        Q  Right.  You didn't write it; right?

(9)    Correct?

(10)       **A  No.**

(11)       Q  Okay.  Have you ever seen this document

(12)   before?

(13)       **A  It was in the GFTP packet.**

(14)       Q  Did you see it as part of the GFTP packet?

(15)       **A  Yes.**

(16)       Q  Can you please review this document, read

(17)   it to yourself, and let me know when you are done?

(18)       **A  Okay.**

(19)       Q  Have you now had a chance to review the

(20)   contents of the document that we have deemed

(21)   marked for purposes of today as Plaintiff's

(22)   Exhibit 5?

(23)       **A  I just read them.  Yes.**

(24)       Q  To your knowledge, is the information

(25)   contained in this document accurate?

```
(1)              N. MALEBRANCHE
(2)      A   This is accurate, based on management's
(3)   account of what took place.
(4)           MS. MASSIMI:  Okay.  Can you please show
(5)      6?
(6)           (Whereupon, a discussion was held off
(7)      the record.)
(8)      Q   Ms. Malebranche, I am showing you a
(9)   document that we are marking for purposes of today
(10)  as Plaintiff's Exhibit 6.  It was previously
(11)  marked as Defendant's Exhibit 15 at plaintiff's
(12)  deposition, but we are just going to mark over
(13)  that.  Do you see this document?
(14)     A   Yes.
(15)     Q   Can you please read this document to
(16)  yourself and let me know when you are done?
(17)     A   Okay.
(18)     Q   Have you had ha chance to review this
(19)  document?
(20)     A   Yes.
(21)     Q   Is this information contained in this
(22)  document accurate?
(23)     A   That is my account.  Yes.
(24)     Q   You drafted this document; correct?
(25)     A   Yes.  I did.
```

(1)                    **N. MALEBRANCHE**

(2)        Q   What was the purpose of this document?

(3)        **A   This is the letter that goes to the**

(4)   **employee to advise them of the decision.**

(5)        Q   What decision?

(6)        **A   The decision from the step 1 GFTP meeting.**

(7)        Q   And this is the letter that you were

(8)   referring to at the beginning of the deposition

(9)   that goes in the system that can then be accessed

(10)  by Ken Wilson, should the complainant go to GFT

(11)  step 2?

(12)       **A   Correct.**

(13)            **MS. MASSIMI: Okay.  I am done with this**

(14)       **document.**

(15)            **(Whereupon, a discussion was held off**

(16)       **the record.)**

(17)       Q   Ms. Malebranche, I am showing you a

(18)  document that we have deemed marked for purposes

(19)  of today as Plaintiff's Exhibit 7, bearing stamps

(20)  ESI246.  Can you please read this document to

(21)  yourself and let me know when you are done?

(22)       **A   Okay.**

(23)       Q   Have you now had a chance to review this

(24)  document?

(25)       **A   I reviewed it.**

(1)                 **N. MALEBRANCHE**

(2)    Q   You did not draft this document; correct?

(3)    **A   I did not.**

(4)    Q   Who drafted this document?  Or who signed

(5)   this document?

(6)    **A   Ken Wilson.**

(7)    Q   What is this document?

(8)    **A   It's Ken's letter to the employee for step**

(9)   **2.**

(10)   Q   Okay.  What is the purpose of this

(11)  document?

(12)   **A   To advise the complainant, Kevin, of the**

(13)  **decision at the step two level.**

(14)   Q   Did you review any video in preparation for

(15)  today's deposition?

(16)        **MS. MASSIMI: You can take that down,**

(17)      **please?**

(18)        **(Whereupon, a discussion was held off**

(19)      **the record.)**

(20)   Q   Okay.  So I will just repeat the question.

(21)  Did you review any video in preparation for

(22)  today's deposition?

(23)   **A   I -- was just adjusting the screen.**

(24)        **MS. MASSIMI: Okay.  I can hear you**

(25)      **guys.**

(1)          **N. MALEBRANCHE**

(2)          **MR. MCGAHA:  Hello?**

(3)          **MS. MASSIMI:  Can you hear me?**

(4)          **MR. MCGAHA:  Hello?  Can you hear us?**

(5)          **MS. MASSIMI:  I can hear you.**

(6)          **(Whereupon, a discussion was held off**

(7)      **the record.)**

(8)      Q  Ms. Malebranche, did you review any video

(9)  in preparation for today's deposition?

(10)     **A  I don't remember the last time that I**

(11)  **viewed the video, but I did view it in recent**

(12)  **times, yes.  But I don't recall the last time.**

(13)     Q  Okay.  Did you review the entire video?

(14)     **A  Yes.**

(15)     Q  For this incident?  Okay.  Did you review

(16)  any photographs or did you review any other video

(17)  in preparation for today?

(18)     **A  Any other video?  No.**

(19)     Q  Did you provide Kevin Campbell with a copy

(20)  of the video?  Or did you otherwise show him the

(21)  video as part of the GFT process?

(22)     **A  No.**

(23)     Q  Why not?

(24)     **A  We don't -- I don't show it at the GFT**

(25)  **process.**

(1)              **N. MALEBRANCHE**

(2)      Q   Why is that?

(3)      **A   Well, it's FedEx property.**

(4)      Q   Okay --

(5)      **A   I don't know if part of the process with**

(6)  **security if he is showing the video or not, but at**

(7)  **my level, I do not show the video.**

(8)      Q   Is that a blanket policy that you have?  Or

(9)  are there instances where you may show a video at

(10) a GFT?

(11)     **A   I do not recall showing a video in my 27**

(12) **years in a GFT.**

(13)     Q   Is there -- can you point to a specific

(14) reason or rationale for that?

(15)     **A   No.**

(16)     Q   There is no reason?

(17)     **A   No.**

(18)     Q   Kevin Campbell asked to see the video;

(19) correct?

(20)     **A   Did he ask to see the video?**

(21)     Q   Yes.

(22)     **A   Not that I recall.**

(23)     Q   You don't recall --

(24)     **A   He may have asked someone else.  But in the**

(25) **GFTP meeting itself?  I do not recall him asking.**

(1)                **N. MALEBRANCHE**

(2)     Q  Do you consider the video of this incident

(3)  to be evidence?

(4)     **A  Evidence in what way?**

(5)     Q  Evidence of what happened that day between

(6)  Mr. Campbell and Augusto.

(7)     **A  Let me answer that the right way.  The fact**

(8)  **that you can't see much of what transpired, and**

(9)  **that is what you asked me earlier in this**

(10) **deposition, it really doesn't have much; but you**

(11) **know, it is a -- it is a video of what took place,**

(12) **yes.**

(13)    Q  When you say you can't see much of what

(14) transpired, what do you believe is not viewable on

(15) the video?

(16)    **A  You asked me earlier in the deposition if I**

(17) **could see Kevin actually hitting Augusto.  My**

(18) **response to you was no.**

(19)    Q  Okay --

(20)    **A  That is my -- that is what I am saying.**

(21)    Q  Based on that, you believe that the video

(22) is not evidence?

(23)    **A  I didn't say that.  I never said that.**

(24)    Q  Do you believe that the video is evidence?

(25)    **A  Yes.**

[Page 123]
February 9, 2024

(1)          **N. MALEBRANCHE**

(2)     Q   And as you sit here, you can't provide any

(3)   explanation as to why it was not shown to Mr.

(4)   Campbell or provided to him as part of the GFT

(5)   process?

(6)     **A   I can't tell you if we had shown it to him**

(7)   **prior to, during the investigation, or during his**

(8)   **termination, but I don't show the videos in my GFT**

(9)   **meetings.**

(10)    Q   Again, you are unable to provide a reason

(11)  for that; correct?

(12)    **A   I haven't done it in 27 years.**

(13)    Q   Do you know whether there was an EEO

(14)  complaint filed or an EEO charge filed with regard

(15)  to Mr. Campbell?

(16)    **A   Against Mr. Campbell?  Or he filed it?**

(17)    Q   No.  Are you aware as to whether Mr.

(18)  Campbell filed an EEOC charge?

(19)    **A   No.  The only EEO with Kevin Campbell is**

(20)  **what I initiated.**

(21)    Q   You don't know if he filed an EEO or EEOC

(22)  charge?  No?  Okay.

(23)    **A   No.**

(24)    Q   Do you know whether anyone at FedEx agreed

(25)  to provide the video to Kevin Campbell or his

[Page 124]
February 9, 2024

(1)              N. MALEBRANCHE

(2)     attorney, myself, prior to the commencement of

(3)     this lawsuit?

(4)        **A   I do not.**

(5)        Q   The -- do you -- do you -- the GFT process

(6)     is supposed to be fair.  That word is in the name

(7)     of the process; correct?

(8)        **A   Correct.**

(9)        Q   Do you believe it served Mr. Campbell's

(10)    interests to not provide or not show him the video

(11)    in this incident as part of the GFT process?

(12)       **A   I don't think it was necessary.**

(13)       Q   Why is that?

(14)       **A   He was part of a situation, number one.**

(15)    **So, that is there.  Like I said before, it wasn't**

(16)    **going to really show much of his, you know,**

(17)    **interaction at first; but all I can tell you is:**

(18)    **I don't show the videos.  I don't know if security**

(19)    **showed it to him.  You can ask James Cahill that**

(20)    **question.  I don't know if Monte Bovel showed him**

(21)    **the video.  I don't know if he saw it or not.  He**

(22)    **did not, to my recollection, ask me to see the**

(23)    **video.**

(24)             MS. MASSIMI: Okay.  I don't have any

(25)          other questions.

[Page 125]
February 9, 2024

(1)                    **N. MALEBRANCHE**

(2)           **MR. MCGAHA:  I have a few.  Ms.**

(3)      **Malebranche --**

(4)           **MS. MASSIMI:  Hold on.  I can't hear**

(5)      **you.  Just give me a second.**

(6)

(7)    EXAMINATION BY

(8)    **MR. MCGAHA:**

(9)

(10)    Q  Ms. Malebranche, did you know Kevin

(11)   Campbell prior to him being terminated?

(12)    **A  No.  No.**

(13)    Q  Did you know Kevin Campbell's race prior to

(14)   him being terminated?

(15)    **A  No.**

(16)           **MS. MASSIMI:  Wait.  Sorry.  I missed**

(17)      **that.  Can you please say that again?**

(18)           **(Whereupon, a discussion was held off**

(19)      **the record.)**

(20)    Q  Did you know Kevin Campbell's race?  The

(21)   plaintiff in this case, Kevin Campbell, did you

(22)   know his race prior to him being terminated?

(23)    **A  No.**

(24)    Q  When did you first become aware of Kevin

(25)   Campbell's race?

(1)              N. MALEBRANCHE

(2)      A  To the best of my recollection, probably

(3)  the video or when I -- when I met him at the GFT

(4)  meeting; but not before his termination.

(5)  Absolutely not.

(6)      Q  What are the general demographics of the

(7)  LGA station where Kevin Campbell worked?

(8)      A  It's a very diverse -- it's located in

(9)  Queens, New York.  I would say 70, 75 percent of

(10) the station is Hispanic and black.  The minority

(11) in the station, probably at 15, 16 percent would

(12) be white -- then, Asian.  It's a very, very

(13) diverse area.  But yeah.  Minority of the

(14) employees, probably at about 75 percent (sic,)

(15) especially back in 2021, would be Hispanic and

(16) black.

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

```
(1)                    N. MALEBRANCHE
(2)           MR. MCGAHA:  No more questions.
(3)           MS. MASSIMI:  Okay.
(4)           (Time Noted: 1:20 p.m.)
(5)
(6)               _____
(7)                    NANETTE MALEBRANCHE
(8)
(9)      Subscribed and sworn to before me
(10)     this       day of           2024.
(11)
(12)     _____
(13)            Notary Public
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

```
(1)                     N. MALEBRANCHE

(2)                         I N D E X

(3)

(4)   WITNESS                 EXAMINATION BY          PAGE

(5)   N. MALEBRANCHE     MS. MASSIMI             5

(6)   N. MALEBRANCHE     MR. MCGAHA             125

(7)

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)
```

```
(1)              N. MALEBRANCHE

(2)                 E X H I B I T S

(3)

(4)   PLAINTIFF'S

(5)   1 - Emails

(6)   2 - Letter

(7)   3 - GFT

(8)   4 - Email

(9)   5 through 7 - Letters

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)
```

```
(1)                N. MALEBRANCHE

(2)              C E R T I F I C A T E

(3)

(4)      I, SEAN SAFFERSON,  a Court Reporter and

(5)  Notary Public within and for the State of New

(6)  York, do hereby certify:

(7)      That the witness whose deposition is herein

(8)  before set forth, was duly sworn by me, and that

(9)  the within transcript is a true record of the

(10)  testimony given by such witness.

(11)      I further certify that I am not related to

(12)  any of the parties to this action by blood or

(13)  marriage, and that I am in no way interested in

(14)  the outcome of this matter.

(15)      IN WITNESS WHEREOF, I have hereunto set my

(16)  hand this 22nd day of February, 2024.

(17)

(18)      _____

(19)      SEAN SAFFERSON

(20)

(21)

(22)

(23)

(24)

(25)
```

```
(1)    ERRATA SHEET FOR: NANETTE MALEBRANCHE

          NANETTE MALEBRANCHE, being duly sworn, deposes and
(2)       says: I have reviewed the transcript of my
          proceeding taken on 02/09/2024. The following
(3)       changes are necessary to correct my testimony.
(4)    _____

(5)    PAGE LINE      CHANGE                    REASON
(6)    ----|----|---------------------|--------------
(7)    ----|----|---------------------|--------------
(8)    ----|----|---------------------|--------------
(9)    ----|----|---------------------|--------------
(10)   ----|----|---------------------|--------------
(11)   ----|----|---------------------|--------------
(12)   ----|----|---------------------|--------------
(13)   ----|----|---------------------|--------------
(14)   ----|----|---------------------|--------------
(15)   ----|----|---------------------|--------------
(16)   ----|----|---------------------|--------------
(17)   ----|----|---------------------|--------------
(18)   ----|----|---------------------|--------------
(19)   ----|----|---------------------|--------------
(20)   ----|----|---------------------|--------------
(21)   ----|----|---------------------|--------------
(22)   ----|----|---------------------|--------------
(23)        Witness Signature:_____
       Subscribed and sworn to, before me
(24)   this ___ day of _____, 20 ___.

       _____      _____
(25)   (NOTARY PUBLIC)            MY COMMISSION EXPIRES
```

February 9, 2024

[Page 132]

**A**

**a.m (1)**
1:12
**A/K/A (1)**
1:7
**ability (2)**
8:10 52:7
**able (3)**
62:18 98:4
101:25
**above-entitle...**
1:16
**absolutely (4)**
20:2,3 68:18
126:5
**access (4)**
29:10 37:19,20
37:25
**accessed (1)**
118:9
**accident (3)**
83:24 96:14
111:25
**accidental (6)**
84:11 85:17
86:2 87:10
90:9,13
**accidentally ...**
84:3
**accidents (1)**
5:19
**accommodat...**
9:24
**account (4)**
47:21 105:12
117:3,23
**accuracy (1)**
31:7
**accurate (22)**
30:18,19 46:18
48:4,23 49:11
103:8,9
104:18,24
105:2,7,10,21

106:2,16,17
106:20 110:8
116:25 117:2
117:22
**accurately (4)**
7:17 8:7 43:23
46:10
**acquisition (1)**
14:17
**act (1)**
90:4
**acting (1)**
71:19
**action (4)**
1:16 96:2,7
130:12
**actions (6)**
20:17 35:13
63:10 85:3
101:4,24
**actual (1)**
96:18
**address (2)**
5:9 113:15
**addressed (4)**
64:24 88:11
92:2 114:6
**Adelphi (1)**
13:3
**adjusting (1)**
119:23
**administer (1)**
3:17
**administerin...**
4:7
**admitted (2)**
61:10 71:11
**admitting (1)**
70:6
**advise (3)**
52:4 118:4
119:12
**adviser (1)**
45:25

**advisor (7)**
23:7,20 24:8
24:12,22
33:17 73:17
**advisors (1)**
24:17
**against- (1)**
1:5
**age (1)**
20:14
**ages (1)**
10:16
**aggressive (2)**
99:17 107:18
**aggressively ...**
107:10
**agitated (31)**
60:4,20 61:19
62:2,6 63:23
64:15 65:13
67:14,19 68:5
72:11 77:13
78:5,21 79:9
81:6 82:4
83:2 93:3,11
94:3,9,15
95:2,17 96:10
106:12,22
107:25
108:20
**ago (5)**
15:20 16:10
54:18 79:6
88:24
**agree (4)**
58:5 70:15,19
71:7
**agreed (9)**
3:4,9,14 4:2
57:20 74:17
74:17 84:15
123:24
**ahead (1)**
92:21

**air (1)**
93:22
**alcohol (1)**
8:12
**allegations (...**
12:9 22:15
96:3 112:24
112:25 113:2
113:10,19
114:4,5,9,13
**alleging (1)**
38:24
**allowed (2)**
20:2,4
**altercation (...**
52:5,13 53:9
53:13,16
54:25 55:5,11
56:12,16 57:6
57:14 59:4,9
64:23 65:3,14
67:20 76:20
76:21,24 77:6
77:9,15,16,21
77:23 78:2,4
78:9,15 83:17
83:20 84:9,20
85:5,12 86:10
89:5 91:2,4,6
102:7
**Alzate (25)**
60:3,18 61:17
61:24 62:4
63:22 64:14
65:12 67:13
68:4 72:10
76:18 77:12
78:20 79:8
81:5 82:3,25
85:10 88:17
93:2,10
106:11
107:23
108:18

**angrily (2)**
90:6,12
**answer (36)**
6:5,6,9,14 7:3
7:5,11,13
23:23 28:17
30:14 32:13
37:16 55:13
65:5,7,15
66:4,16 78:12
81:17 83:25
85:14 86:15
87:10 89:9,17
95:7,21,23
96:5 99:10
104:25 108:6
108:11 122:7
**answers (6)**
5:22 65:8 66:8
66:12 70:23
99:8
**anymore (1)**
111:2
**apologize (2)**
18:23 57:12
**appealed (1)**
32:12
**appear (1)**
100:3
**appears (2)**
106:4,20
**applied (1)**
15:6
**apply (1)**
15:14
**appreciate (2)**
69:3 108:13
**approach (1)**
83:7
**approached ...**
60:19,21 61:18
61:25 62:5
63:22 64:14
74:4 76:18

February 9, 2024

[Page 133]

82:25 93:10
93:21 107:10
**approaches (2)**
67:18 96:9
**approaching...**
60:3 65:12
67:14 68:4
72:10 77:12
78:20 79:8
81:5 82:3
93:2,25 94:18
94:25 95:15
106:11
107:24
108:19
**appropriate ...**
66:12
**approve (1)**
32:20
**approved (2)**
37:19,20
**approving (1)**
32:16
**approximate...**
15:19
**April (1)**
74:22
**area (39)**
10:10 13:8
25:5 26:2
60:4,19 61:18
61:20,21,22
61:23,25 62:3
62:4,5 63:23
64:15 65:12
67:14 68:5
72:11 76:19
77:13 78:21
79:9 81:6
82:4 83:2
86:18 93:2,10
94:2,25 95:16
96:10 106:12
107:24

108:19
126:13
**argument (1)**
78:3
**arm (5)**
60:16,17 83:10
83:14 84:17
**arms (19)**
60:5 78:22
79:10 81:7
82:5 83:3
93:3,11,22
94:3,8 95:2
95:10,17
96:11 106:13
106:23
107:25
108:20
**arrested (1)**
11:5
**Asian (1)**
126:12
**aside (2)**
100:21 114:4
**asked (26)**
7:12 16:22
35:10,12
39:12 46:12
48:13 49:12
58:3 65:20
74:9 75:22
83:21 86:24
87:9,22 94:15
96:21 101:19
102:9 115:13
115:18
121:18,24
122:9,16
**asking (40)**
17:4 29:24
30:2,10 33:24
34:3 55:21
56:5,7 59:15
64:2,12 69:20

70:7 71:6,20
71:21 79:15
80:8,8,16
81:11,15
82:21,23 83:5
93:14 100:12
100:13 101:6
101:7 105:5
105:13,19
107:15,22,22
110:18 114:8
121:25
**aspect (2)**
38:5 105:22
**assess (1)**
82:22
**assessing (1)**
49:10
**assessment (3)**
62:18 63:13
92:25
**assisting (1)**
32:4
**assume (1)**
110:19
**assuming (2)**
11:3,7
**attached (1)**
103:5
**attachments ...**
109:11
**attempt (2)**
6:22 86:9
**attendance (4)**
41:20,22 73:12
111:24
**attention (1)**
36:2
**attorney (8)**
2:2 4:14 5:14
8:18 69:4
79:14 102:23
124:2
**attorney's (1)**

8:20
**Augusto (43)**
57:9,18,21
58:2,9,19,21
59:4 60:12,21
61:3,7,12,13
74:4,15,19
75:7,12,16,21
76:8 83:7,21
84:7 86:3,19
87:5 88:4,11
90:20,21,22
98:24,24
102:7 107:2
107:11
113:20,22
114:4 122:6
122:17
**Augusto's (5)**
60:24 84:14
85:3,23 87:14
**authority (4)**
32:19,24 73:9
99:23
**authorized (1)**
3:16
**automaticall...**
92:22
**available (2)**
21:17 44:10
**avoid (3)**
74:24 90:23
96:25
**avoiding (1)**
66:24
**aware (13)**
9:21 20:8,10
25:14 31:13
32:22 66:11
74:24 83:7,8
83:13 123:17
125:24

――――――― **B** ―――――――

**B (3)**
2:6 5:1 129:2
**bachelor's (3)**
12:24 13:8
89:14
**back (18)**
6:25 14:22
33:19,24
60:25 61:7,7
64:11 73:2,7
73:10,22
74:20 83:22
85:21,23,25
126:15
**based (25)**
20:14 38:7,8,9
38:10,13
44:19 45:5
55:2,10,14
57:21 59:3,6
59:6,14 66:18
67:7 74:13
75:13 97:18
101:24
105:19 117:2
122:21
**bathroom (1)**
34:24
**bear (1)**
4:18
**bearing (5)**
102:22 109:19
114:23 116:3
118:19
**becoming (1)**
13:23
**beginning (1)**
118:8
**behalf (1)**
113:17
**behavior (8)**
35:13 69:6
85:6 88:12,14
100:14

February 9, 2024

[Page 134]

111:14,23
**belief (1)**
20:15
**believe (33)**
20:4 24:3
  57:13,19 59:3
  59:24 61:20
  63:12 64:18
  66:13,21 72:7
  73:19 76:22
  77:16 83:19
  84:7,19 85:3
  85:10 89:3
  101:16
  102:12,23
  105:20
  106:16,19
  113:21
  115:10
  122:14,21,24
  124:9
**believed (1)**
114:15
**Bellmore (1)**
5:10
**belt (7)**
52:6 58:23
  60:10,14,23
  83:22 88:18
**belts (1)**
85:20
**beneath (1)**
71:18
**Bernice (3)**
25:5,10,12
**Bernice's (1)**
25:6
**best (11)**
31:20 44:11,12
  58:20 60:22
  73:19 99:21
  100:20 105:6
  113:21 126:2
**bigger (1)**

57:22
**black (2)**
126:10,16
**blanket (1)**
121:8
**blood (1)**
130:12
**born (1)**
9:9
**bottom (1)**
96:23
**Bovel (6)**
73:20 110:15
  110:21 111:8
  116:7 124:20
**box (22)**
57:9,16 58:17
  59:4 61:3,8,8
  61:8,13 78:17
  84:8,17 86:11
  87:6 89:3,20
  89:24 90:2,3
  90:7,12,21
**boxes (19)**
58:22,22 60:9
  60:14 83:3,9
  83:13,22 84:3
  85:4 88:5,18
  89:23 93:4,12
  94:9,12 95:11
  108:2
**branch (2)**
18:19 24:13
**break (7)**
7:9,10 50:16
  50:17,22,23
  50:24
**Brian (1)**
16:13
**bring (1)**
113:25
**brings (1)**
36:2
**broke (1)**

18:23
**brought (1)**
113:22
**Building (1)**
2:6
**bullet (3)**
106:4,7,8
**bump (1)**
61:6
**bumped (1)**
74:7
**business (4)**
12:23 13:10,11
  14:20
**BY:GABRI...**
2:8

─────────
**C**
─────────

**C (4)**
2:1 5:1 130:2,2
**Cahill (14)**
59:21,23 60:2
  62:8,19 103:4
  103:12,19
  104:12,25
  105:17 115:4
  115:7 124:19
**Cahill's (5)**
62:22 63:13
  104:18
  107:11 109:7
**calendar (1)**
41:21
**calendars (1)**
54:6
**call (4)**
31:14 58:14
  70:17,20
**called (2)**
32:11 52:4
**calling (1)**
69:25
**Campbell (44)**
1:2 5:15 51:5

55:15 56:6,12
56:15 57:14
59:8,24 67:12
68:6 72:8,20
72:22 73:10
73:22 78:10
85:11 88:18
90:18 97:20
97:24 98:12
98:18 100:22
101:9 102:6
107:10,18,19
107:20
120:19
121:18 122:6
123:4,15,16
123:18,19,25
125:11,21
126:7
**Campbell's (...**
60:3,6,19
61:18,25 62:5
63:22 64:15
65:12 68:4
72:10 76:19
77:13 78:20
78:23 79:9,11
81:6,8 82:3,6
82:25 83:3
93:2,4,10,12
106:11,14
107:24 108:2
108:19,21
124:9 125:13
125:20,25
**candidate (2)**
15:23,25
**case (16)**
5:16 11:23
23:3,10,11
37:2 42:2
47:17,18,18
51:4 69:9,15
69:17 107:13

125:21
**cases (2)**
22:21 24:4
**certify (2)**
130:6,11
**chain (4)**
103:8,12
  104:11 109:6
**chance (4)**
110:3 116:19
  117:18
  118:23
**change (7)**
23:13,19 25:15
  25:18 26:4
  69:18 131:5
**changed (3)**
23:15,17 37:4
**changes (1)**
131:3
**charge (3)**
123:14,18,22
**child (1)**
11:3
**childish (1)**
71:18
**children (1)**
10:12
**choose (1)**
73:22
**circumstanc...**
48:25 90:16
**claiming (1)**
69:5
**claims (1)**
12:17
**clarify (2)**
35:20 45:16
**clear (7)**
36:13 39:16
  48:22 75:11
  75:15 105:14
  113:18
**clearly (28)**

February 9, 2024

[Page 135]

6:13 60:4,19
61:18,25 62:5
63:23 64:15
65:13 67:14
68:5 72:11
77:13 78:21
79:9 81:6
82:4 83:2
93:3,11 94:2
95:2,16 96:10
106:12
107:24
108:15,19
**client (5)**
16:21 17:5
65:21,23
71:23
**close (3)**
61:20 86:17
88:22
**coach (2)**
68:16 70:22
**coaching (3)**
68:11,17,19
**code (6)**
111:17,20,21
111:25 112:2
112:4
**cogent (1)**
70:24
**coincidence (1)**
56:18
**collection (1)**
21:2
**college (3)**
12:21,22 13:4
**colluded (1)**
72:14
**come (6)**
11:23 32:5
47:12 58:14
61:9 92:18
**comfortable ...**
14:22

**commencem...**
124:2
**commencing...**
72:25
**COMMISSI...**
131:25
**commitment...**
22:6
**communicati...**
81:4
**company (4)**
14:18 21:11,11
111:7
**complain (2)**
95:25 96:6
**complainant ...**
38:24 112:18
118:10
119:12
**complained (6)**
10:2,6 87:12
88:6 90:18
91:17
**complaining ...**
46:11
**complaint (5)**
11:20,21 22:23
45:24 123:14
**complaints (6)**
25:19 26:7,20
27:11 29:5
30:5
**complete (8)**
6:4,6,8,9 40:15
46:20 48:6,23
**completely (1)**
8:7
**computer (1)**
16:25
**conclude (1)**
67:13
**conclusion (1...**
30:17,22 31:2
31:4 32:16

36:9,16,18,23
59:14,16
**conclusions (4)**
36:7,10 37:22
38:9
**condition (1)**
8:6
**conduct (7)**
4:18 24:19,22
26:19,22 27:5
44:7
**conducted (4)**
4:4 27:8 28:5
33:2
**conducting (2)**
34:7 63:14
**conference (5)**
4:4,10,19 7:23
7:24
**confirm (2)**
31:7 63:25
**confirming (1)**
4:9
**Congratulati...**
10:22
**consent (1)**
4:11
**consider (1)**
122:2
**considered (...**
4:12 84:20
89:5 90:25
91:6,9,14
92:7,13 93:5
93:19,24 94:5
95:4,19
**consistent (2)**
70:24 74:11
**consumed (2)**
8:12,15
**contact (12)**
53:16 74:14,14
75:12,14,16
76:8,15 77:23

84:21 85:11
115:10
**contained (19)**
28:24 29:7,21
41:17 54:7,12
80:17 81:23
104:11,18,23
105:5,21
110:7 112:24
113:2,10
116:25
117:21
**contains (1)**
54:4
**contents (4)**
47:25 48:22
82:15 116:20
**continue (5)**
17:9 69:20
71:2 72:4
98:9
**control (1)**
4:6
**conversation...**
6:2 52:2
**conversation...**
52:20
**convicted (1)**
11:8
**cooperative (3)**
67:2 99:25
100:18
**copy (4)**
4:15 37:7,10
120:19
**corporate-wi...**
25:25 26:4
**CORPORA...**
1:7 2:5
**correct (133)**
20:20 24:5,6,8
24:9 25:12
26:4,8,9,11
26:17 27:7,18

27:19 28:6,7
30:8,9 31:5,6
31:10 32:20
34:13 35:6,7
36:16,17
38:17,24,25
39:8,24,25
40:2,3,8 41:3
41:4,9 43:21
44:25 45:2
47:15,18 48:2
48:3,4,5,6,7
48:20,21,23
48:24 49:4,11
49:15,16,19
49:20,22,23
50:2,3,11,14
50:15 57:2
60:20 61:24
62:2 63:2,3
64:16,17 73:3
73:4,8,23,24
76:8,9,11,12
76:19 77:14
83:14,17
84:25 85:2
86:6,7 87:2
89:13,14,14
89:17 91:18
93:6 96:3,13
97:4,22,23
99:14 100:7,7
100:19
103:13,14,16
103:17,22
105:15,16,17
105:18 109:8
109:9 110:11
110:12,15,18
116:6,9
117:24
118:12 119:2
121:19
123:11 124:7

February 9, 2024

[Page 136]

124:8 131:3
**correctly (2)**
57:19 58:7
**costs (1)**
4:18
**counsel (5)**
2:5 3:5 4:2,4
4:17
**County (1)**
10:11
**couple (2)**
48:13 104:5
**course (1)**
99:24
**court (19)**
1:1 3:19 4:4,7
4:9 5:10,21
5:23 6:7,12
6:19,25 12:18
33:24 65:18
65:25 70:17
70:20 130:4
**courtroom (1)**
8:2
**CPLR (1)**
4:3
**created (1)**
113:16
**cross (15)**
2:6 5:13 6:3
17:2 28:16
40:4 65:2
69:15 70:5
80:4 87:15
91:23 92:6
95:13 108:11
**current (3)**
23:21,25 24:2
**currently (8)**
10:10 13:11
16:5 18:15
22:20 24:3,11
25:5
**customers (2)**

22:6 52:8
**cutter (7)**
57:10 59:5
61:3,8,8,8,13

_____
**D**

**d (2)**
4:3 128:2
**Daniel (1)**
2:11
**dash (3)**
111:13,14
112:6
**date (1)**
51:13
**dated (2)**
103:10 115:8
**day (11)**
50:22 58:18,18
85:20,21
89:23 99:2
122:5 127:10
130:16
131:24
**dealt (1)**
85:7
**decide (1)**
73:9
**decision (23)**
14:21 23:24
32:6 38:16
40:16 44:11
44:12 46:5,16
47:24 48:15
49:4,8 72:9
73:25 98:17
98:20 101:18
101:22 118:4
118:5,6
119:13
**deemed (5)**
102:20 114:22
116:2,20
118:18

**deeming (1)**
109:18
**Defendant's ...**
117:11
**Defendants (1)**
1:9
**DEFENSE (1)**
1:15
**define (4)**
20:13,16 78:9
90:2
**definitely (2)**
61:11 99:2
**degree (4)**
12:24 13:9
68:21 89:14
**degrees (3)**
13:22 13:4,6
**delivering (1)**
22:3
**delivery (1)**
21:24
**demeanor (1)**
100:14
**demographic...**
126:6
**demonstrate...**
67:4
**denying (1)**
69:23
**department (...**
19:18 22:20
**depend (1)**
84:10
**depends (1)**
96:18
**depose (1)**
105:4
**deposes (1)**
131:1
**deposition (23)**
1:11 3:15 4:3,8
4:19 5:17 7:2
7:10 53:20,23

54:9 68:21
69:16 71:3
80:7 117:12
118:8 119:15
119:22 120:9
122:10,16
130:7
**descendents ...**
9:17
**describe (4)**
19:11,15 23:25
57:13
**described (3)**
90:25 91:5,8
**description (6)**
65:11 92:12,24
93:18 106:17
106:20
**detail (13)**
64:5,9,18,19
66:13,22 67:9
67:10,13,21
68:4 72:10
76:18
**details (2)**
22:17 103:19
**determinatio...**
84:5
**determinatio...**
29:2
**determine (5)**
83:25 87:5
91:15 92:17
93:9
**determining ...**
59:21
**difference (2)**
21:16 84:2
**different (8)**
23:5 24:12,13
58:15 96:23
111:24 112:2
112:4
**differently (1)**

113:4
**difficult (1)**
66:25
**Direct (1)**
18:6
**direction (19)**
19:17 60:6
78:23 79:11
81:8 82:6
83:4 93:4,12
94:5,10,13
95:4,11,18
96:12 106:14
108:2,21
**directly (2)**
62:20 63:9
**director (11)**
13:20,23 14:25
18:5 19:12
21:21 22:7
29:9 30:7
87:3 108:3
**disabilities (1)**
9:20
**disability (2)**
9:23 20:15
**disagree (1)**
105:22
**disagreed (1)**
33:15
**discipline (2)**
33:14 35:14
**disciplined (1)**
41:20
**disclose (1)**
79:21
**disclosed (1)**
104:10
**discriminati...**
10:3,7 12:11
19:9,16,20,24
20:4,7,10,13
20:20 22:15
22:19,21 24:4

February 9, 2024

[Page 137]

24:23 25:2,15
25:20 26:8
28:9 29:5,16
30:6 113:13
**discriminati...**
26:20
**discuss (2)**
5:16 54:14
**discussed (2)**
54:22 72:18
**discussing (2)**
77:11 107:7
**discussion (15)**
35:2 46:15
 50:25 87:17
 102:17 104:7
 109:15
 112:11
 114:19
 115:23 117:6
 118:15
 119:18 120:6
 125:18
**dismiss (1)**
101:4
**dismissed (5)**
11:24 12:3,4
 12:15,16
**disruptive (2)**
111:14,23
**district (10)**
1:1,1 21:25
 62:25 63:5
 86:5 89:8,13
 89:17 98:3
**districts (1)**
24:25
**diverse (2)**
126:8,13
**divorced (1)**
10:23
**document (64)**
31:11 32:2
 37:13 55:16

63:25 67:25
79:12,14,17
79:20 80:2,13
80:15,15,22
81:10,14 82:9
82:11 102:20
102:23,25
103:3 105:6
109:18,20
110:4,8,10,14
110:18
112:14,17,24
113:3,5,7,10
114:22,24
115:2 116:2,4
116:6,11,16
116:20,25
117:9,13,15
117:19,22,24
118:2,14,18
118:20,24
119:2,4,5,7
119:11
**documentati...**
41:22 67:16
**documents (...**
40:18 41:13,19
43:2 53:6,19
53:22,25 54:8
54:12,23
55:14 56:25
111:7
**doing (7)**
69:23,24 70:16
70:17 71:7,18
113:25
**downgraded ...**
14:20
**download (1)**
42:17
**draft (5)**
47:20 48:2,9
50:12 119:2
**drafted (2)**

117:24 119:4
**drafting (1)**
42:23
**drew (1)**
59:13
**drive (1)**
42:18
**drugs (1)**
8:12
**duly (3)**
5:2 130:8
 131:1

──────────
E
──────────

**E (10)**
2:1,1 5:1,1,1,1
 128:2 129:2
 130:2,2
**earlier (6)**
7:3 82:15
 83:10 102:9
 122:9,16
**easier (1)**
102:13
**EASTERN (1)**
1:1
**education (1)**
12:20
**EEO (28)**
26:25 27:3,11
 30:8,23 31:8
 31:12,18 32:4
 32:6,17,20
 33:4 63:15,16
 100:7,10,14
 100:15
 113:14,16
 114:6,10,11
 123:13,14,19
 123:21
**EEOC (2)**
123:18,21
**effect (1)**
3:18

**eight (1)**
106:9
**either (3)**
10:3,7 84:12
**Elmhurst (1)**
9:14
**email (25)**
56:14 59:20
 102:15 103:8
 103:12,18
 104:10,11,12
 104:15,18,20
 104:23
 105:14,15,17
 105:21 109:6
 109:7,14
 115:3,3,5,7
 129:8
**emailed (2)**
4:16 102:22
**emails (2)**
115:6 129:5
**embarrassed...**
71:22,24
**emotional (1)**
100:3
**employed (3)**
13:12,16 40:13
**employee (89)**
11:20,21 21:14
 21:17,20
 25:12 33:14
 33:16,18,22
 34:2,4,5,9,16
 34:20 35:5,9
 35:10,25,25
 36:2,4,6,25
 37:7 38:10,14
 38:19,19 39:9
 39:15,19 40:2
 40:6 41:2,5
 41:20,21
 43:13,17 44:8
 44:13 45:8,10

45:11,20,23
45:25 46:5,11
46:12 47:9,14
48:9,14 49:14
50:7,13 52:15
52:16 54:5
55:8 57:9
58:12 59:7
63:12 66:19
66:21 67:2
74:19 76:13
86:11,24 89:3
89:4,20,21
90:6,7,11,12
96:19 97:10
97:11 98:6
101:3 118:4
119:8
**employee's (2)**
50:14 75:14
**employees (18)**
18:6 21:18,24
 22:11,12
 29:19 36:14
 52:5 57:22
 73:6 74:7
 76:12 87:15
 87:21 89:24
 96:21 98:7
 126:14
**employees' (1)**
54:5
**employers (1)**
19:5
**employment ...**
19:9 98:21
**enforcement ...**
18:22,25 19:2
**engaged (1)**
57:25
**engaging (1)**
78:3
**ensure (1)**
44:7

February 9, 2024

[Page 138]

entailed (2)
26:7 35:5
entered (1)
107:13
entire (2)
50:22 120:13
Eric (23)
1:8 18:11
51:21,22 52:2
52:20,22 53:7
53:11 56:9,11
56:14 62:15
62:19,20
73:15 103:13
103:15,19
109:7,10
115:3,6
ERRATA (1)
131:1
ES125 (1)
104:11
escalate (1)
87:24
escalating (1)
90:23
escaped (1)
25:7
ESI246 (1)
118:20
ESI25 (1)
102:22
ESI26 (1)
106:4
ESI46 (1)
116:4
ESI481 (1)
114:24
ESI49 (1)
109:20
especially (1)
126:15
ESQ (2)
2:2,8
essentially (1)

34:15
events (5)
54:13 81:24
82:2,2 92:12
evidence (6)
107:14 122:3,4
122:5,22,24
evident (1)
71:2
exact (4)
81:9 82:8,11
82:13
exactly (5)
12:10 31:25
72:16 74:10
94:15
EXAMINAT...
1:14 5:5 125:7
128:4
examined (1)
5:3
exclude (1)
72:9
Excuse (2)
65:4 92:20
exhibit (17)
4:15,15,17
102:14,15,21
109:19 110:5
110:13
112:10,15
114:23 116:3
116:22
117:10,11
118:19
exhibits (2)
4:14 102:12
exist (1)
41:25
expect (2)
97:11,11
expected (2)
97:24 98:2
EXPIRES (1)

131:25
explain (5)
14:16 47:4
72:6,7 98:4
explanation (...
47:23 88:17
123:3
express (8)
1:7,7 2:5 4:11
13:15,17 14:8
14:11
expressed (4)
100:23 101:9
101:16,21
expressing (2)
101:14,20

—————

F

F (1)
130:2
fabricate (1)
108:14
fabulous (1)
10:21
face (1)
84:14
fact (5)
60:2 67:2
69:17 84:21
122:7
factor (1)
74:13
facts (3)
47:22 69:17
108:14
failed (1)
8:15
fair (4)
35:12 46:14
72:18 124:6
fairly (1)
46:4
fairness (2)
46:5 74:8

Falsification ...
111:5,6
far (4)
7:6 32:22 71:2
105:24
February (2)
1:12 130:16
FEDERAL (1)
1:7
FedEx (41)
1:7 2:5,11 9:20
9:23 10:7
11:20,21
13:15,16,24
14:8,10,17
19:4,7,12,19
20:5,6,19
25:10,12
28:25 29:9
31:24 37:11
37:23 45:14
46:7 47:10,12
62:13 75:4
93:6,25 95:5
110:22 111:8
121:3 123:24
FedEx's (2)
95:20 98:20
feel (1)
87:23
felony (1)
11:8
felt (5)
14:22 90:20
92:3 98:7
99:3
file (37)
27:25 28:4,14
28:14,15 29:6
39:23 41:15
41:15,18,25
42:15 48:15
49:2,15 53:24
54:2,4,7,11

54:24 55:3,17
55:23 56:4,22
56:25 57:4
64:6,10,20
66:15 91:12
91:20 92:4,9
98:9
filed (12)
11:25 12:6
28:3 36:12,21
92:11 98:8
123:14,14,16
123:18,21
files (6)
28:8 29:8,10
36:12 37:19
37:21
filing (3)
3:6 12:18
38:10
final (1)
46:16
find (9)
62:10,15 72:20
72:22 99:16
99:19,22
100:14
114:11
finding (5)
30:22 36:9,16
36:18,23
findings (12)
29:23 32:10,11
32:20 36:7,11
37:22 38:8
39:3 40:6
49:21,24
fine (5)
25:9 31:16
53:6 59:12
102:16
finish (9)
6:3,5 65:5,6,15
80:10 89:12

February 9, 2024

[Page 139]

89:15 92:20
**first (24)**
5:2 8:22 14:4
38:9,16,21
39:4,7 51:6,8
51:11,13,16
53:17 60:14
61:18 74:12
76:19 77:12
78:5 106:3
115:10
124:17
125:24
**five (2)**
111:14 112:7
**flailing (15)**
60:4 78:21
79:10 81:7
82:4 83:2
93:3,11 94:3
95:2,17 96:10
106:12
107:25
108:20
**Floor (1)**
2:6
**focused (1)**
68:23
**follow (4)**
47:11 97:13,18
98:2
**following (9)**
30:23 31:8,12
33:4 36:5
47:14,20 48:9
131:2
**follows (1)**
5:4
**followup (5)**
74:10 75:23,25
76:10 98:11
**force (1)**
3:17
**forget (1)**

33:5
**form (63)**
3:10 23:22
30:13,21 32:8
40:24 41:5,8
41:14 42:23
43:4,5,6,8,10
43:12,18,24
44:15,20,21
44:25 45:5,19
46:10 47:2
48:11 49:5
55:12 57:15
67:17,23 68:7
78:6 81:13,20
82:7 84:22
85:13 86:12
87:7 88:10
89:6 90:8,14
91:3,11 92:8
92:15 93:7,20
94:7 95:6,22
96:4,16 101:2
102:8 105:8
105:23
106:21 108:5
109:4
**formally (2)**
10:3,7
**former (2)**
11:20,21
**forth (1)**
130:8
**forward (1)**
85:21
**forwarded (3)**
27:25 31:18
109:10
**forwarding (2)**
29:12 109:7
**forwards (1)**
103:15
**found (4)**
61:24 93:9

99:14 114:14
**four (1)**
14:10
**fourth (1)**
68:20
**freight (5)**
58:20,21 60:23
61:2 113:24
**front (5)**
8:2 57:18
71:23 78:25
102:24
**frustrated (4)**
69:8,13,16
80:9
**fully (2)**
7:17 66:17
**function (1)**
96:20
**further (7)**
3:9,14 4:14
29:2 36:3
96:25 130:11
**future (1)**
45:11

_____

**G**

**Gabe (1)**
102:15
**Gabriel (1)**
8:21
**general (6)**
29:24 30:3
36:15 73:6
101:6 126:6
**generally (1)**
27:17
**generate (2)**
29:19,22
**generated (3)**
28:9 31:17
110:10
**German (1)**
9:16

**gestures (1)**
6:15
**GFT (103)**
26:25 33:6,6
33:11 34:3,16
35:6,9,22
36:6,8,15
38:5,6,7
39:20,23
41:13 42:5,6
42:10,13,16
42:20 43:6,10
43:11,24
44:15,20,25
45:15,18,22
46:10 47:14
47:21 48:10
48:17 49:2,9
49:15,25 50:5
50:9 51:9,11
51:13,16,18
52:3,19,23
53:7,8 56:22
63:14,16,17
63:18,20 64:6
64:10,20
66:15 72:9,15
72:23,25 73:5
73:6,11 74:9
98:13,19
100:4,10,13
100:16 107:4
107:8,17
108:4,17
109:21
110:11
112:19 113:4
113:19 114:2
115:9,12
118:10
120:21,24
121:10,12
123:4,8 124:5
124:11 126:3

129:7
**GFT1 (2)**
42:24 43:8
**GFTP (11)**
36:12 40:20
41:11 53:24
54:2 68:3
113:11
116:13,14
118:6 121:25
**GFTs (1)**
35:19
**give (9)**
22:17 34:21
48:14 52:14
53:12 57:11
73:22 104:5
125:5
**given (3)**
38:21 55:21
130:10
**giving (4)**
5:19 47:22
65:7,8
**glad (1)**
55:19
**go (14)**
9:4 14:22
34:23 38:10
38:19 39:18
64:11 75:8
83:23 89:2,23
92:21 115:5
118:10
**goes (7)**
37:23 39:9,15
40:2 45:11
92:21 115:5
**going (16)**
27:25 34:23
44:23 50:18
50:21 58:20
60:21 69:19
84:10 87:23

February 9, 2024

[Page 140]

96:25 100:13
102:19
109:13
117:12
124:16
**Good (1)**
5:12
**gotten (5)**
57:24 58:2
75:10 84:14
87:20
**graduate (1)**
13:6
**Great (1)**
109:6
**GTT (1)**
49:17
**guess (4)**
24:10 46:8
47:23 56:18
**guys (1)**
119:25

----

**H**

**H (2)**
5:1 129:2
**ha (1)**
117:18
**Hacks (1)**
2:6
**hand (1)**
130:16
**handbook (2)**
21:14,17
**handle (3)**
25:19 70:25
98:5
**handled (1)**
92:16
**handles (4)**
22:21 24:4,11
24:13
**happen (4)**
61:4 97:11,12

97:25
**happened (6)**
92:25 99:3
103:20,21
113:15 122:5
**happening (1)**
74:23
**happens (4)**
37:6 38:12
96:15 97:17
**happy (1)**
77:2
**hard (1)**
42:18
**head (16)**
6:15 16:22
17:6,8 68:12
68:13,16
69:21 70:9,21
71:6,9,14,15
71:21 80:17
**hear (12)**
6:13,23 33:16
34:9 35:10,15
44:8 119:24
120:3,4,5
125:4
**heard (2)**
51:10 74:11
**hearing (3)**
35:25 60:6
79:4
**held (18)**
1:16 13:21
14:10 19:17
35:2 50:25
87:17 102:17
104:7 109:15
112:11
114:19
115:23 117:6
118:15
119:18 120:6
125:18

**Hello (2)**
120:2,4
**helping (1)**
69:9
**Herbert (1)**
5:10
**hereunto (1)**
130:15
**highest (1)**
12:20
**highlights (1)**
21:18
**hindsight (1)**
74:20
**hired (3)**
14:6,8,9
**Hispanic (2)**
126:10,15
**hit (15)**
57:16 58:17,23
58:24,25
60:15,16
78:16 83:10
83:12,14
86:19 89:24
90:2,21
**hits (2)**
84:3 90:3
**hitting (4)**
84:8,17 95:12
122:17
**hold (3)**
13:24 54:21
125:4
**honest (1)**
62:10
**honesty (1)**
82:10
**hope (1)**
94:19
**hour (1)**
50:23
**hours (1)**
8:13

**HR (28)**
23:7,20 24:3,7
24:11,12,13
24:17,21,24
26:21,21 27:8
30:15,16,24
30:25 31:2,4
31:8,11,14,17
32:25 33:16
45:25 73:17
113:13
**human (4)**
22:20 32:22
37:23 101:5
**hundred (1)**
108:16
**Hurtful (1)**
20:17
**hypothetical ...**
89:7 98:22

----

**I**

**Identity (1)**
4:10
**immediate (1)**
96:2
**immediately ...**
86:24 91:24
92:2
**impact (2)**
8:10 52:6
**impacted (1)**
101:22
**impetus (1)**
26:3
**importance (7)**
42:25 43:23
44:15,19,25
45:5 46:9
**important (11)**
34:11 35:16
57:2 61:15,17
64:9,19 66:13
66:22 67:8

98:16
**improper (2)**
69:6,22
**In-House (1)**
2:5
**in-person (3)**
19:14,15 44:6
**inaccurate (1)**
7:3
**inappropriat...**
86:21 89:9
**inaudible (3)**
17:9 34:25
115:4
**inches (1)**
69:4
**incident (28)**
41:19 47:22
51:17 52:11
59:24 60:18
61:2 63:21
64:14 67:16
74:23 75:5,6
90:24 91:25
92:6 96:24
97:14 103:5,6
104:19
105:20,25
113:20 114:4
120:15 122:2
124:11
**incite (2)**
56:7,21
**incited (11)**
55:15,17,20
56:6,12,15
57:14 59:4,9
59:24 102:6
**include (10)**
56:21 64:9,19
66:14,22 67:9
72:9 76:18
78:4 109:11
**included (4)**

February 9, 2024

[Page 141]

44:16 64:5
68:3 112:19
**includes (3)**
40:24 72:19
103:19
**including (1)**
75:21
**inclusion (1)**
67:15
**incomplete (1)**
7:4
**independent ...**
22:25 113:14
**independentl...**
23:2 24:4
**individual (6)**
32:23 90:3
93:25 94:18
94:24 95:15
**individual's (...**
94:2,4,25 95:3
95:16,18
**Individually ...**
1:8
**individuals (2)**
53:15 91:7
**influence (2)**
72:12,21
**influenced (1)**
72:9
**informally (2)**
10:4,8
**information ...**
21:2,19 24:19
28:24 29:7,12
29:21 33:13
38:18 40:13
43:2,10,14
44:5,10 49:2
52:23,25
55:21,22
56:22 81:12
81:19,22
102:2 103:13

103:15
104:17,23
105:5,20
110:7 116:24
117:21
**inherently (1)**
88:14
**initial (4)**
103:18 115:5,6
115:9
**initiated (1)**
123:20
**injury (1)**
12:12
**innocent (1)**
88:17
**inputting (1)**
43:11
**instance (2)**
90:5 92:13
**instances (1)**
121:9
**instigated (3)**
54:25 55:5,11
**institution (1)**
13:2
**instructions ...**
7:6
**intentional (...**
83:23 84:4,12
84:18,21,24
85:4,15,16
86:2,13,14,16
86:22 87:9,13
87:20 88:21
88:21 90:3,10
90:13 92:3
**intentionally...**
85:10 86:10
88:4 89:4
90:21
**inter (1)**
63:10
**interaction (1)**

124:17
**interactions ...**
63:11
**interest (2)**
46:4 47:9
**interested (3)**
16:18 17:13
130:13
**interests (5)**
45:14,17,23
46:7 124:10
**interpret (1)**
6:19
**interpretatio...**
103:21
**interrupt (1)**
65:22
**interrupted (1)**
65:21
**interrupting ...**
80:6,19
**interview (5)**
34:6,7,16,18
98:7
**interviewing ...**
94:12
**interviews (1)**
81:24
**intimidating ...**
57:20 61:11,16
74:5,16,18
84:15
**investigated ...**
94:11
**investigating...**
22:14 26:7
**investigation...**
22:25 23:8,20
24:2 26:13,16
28:5,21 29:15
30:2,5 33:2
35:18,21,23
36:3 82:25
91:15,22

95:24 96:13
96:20 98:9,10
123:7
**investigation...**
22:19 24:22
25:16 26:19
28:10 29:5
32:5,17,21
33:4
**investigative ...**
41:15,17,25
**involve (2)**
35:22 97:14
**involved (6)**
35:17,18 39:20
42:14 50:5
53:16
**involves (1)**
35:24
**Irish (1)**
9:16
**irrelevant (1)**
67:11
**issue (3)**
25:2 58:11
75:3
**issues (2)**
27:16 113:14

_____
**J**

**James (22)**
59:20,23 60:2
62:8,19,21,22
103:4,12,18
104:12,18,25
105:3,4,17,24
106:18 109:7
115:4,7
124:19
**Jessica (2)**
2:2 5:14
**Jimmy (1)**
107:11
**job (19)**

10:3 13:19,21
13:24 14:2
21:21 22:8
26:6,10 33:10
34:12 35:4
62:22,23 73:2
73:10,22
85:23 113:25
**jobs (1)**
73:7
**Jose (3)**
59:17 61:5
74:9
**judge (1)**
8:3
**judgment (1)**
62:12
**June (3)**
51:15 115:8,11
**jury (1)**
107:14

_____
**K**

**keep (8)**
6:11 22:25
37:7,10 50:18
86:13 93:14
113:14
**Ken (19)**
16:4,8 17:15
17:20 29:12
29:15 32:7,15
37:25 38:4,15
38:23 39:2
40:5,10 42:19
48:18 118:10
119:6
**Ken's (1)**
119:8
**kept (2)**
36:21 60:24
**Kevin (85)**
1:2 5:15 51:5,6
55:15 56:6,11

February 9, 2024

[Page 142]

56:15 57:14
57:16,24
58:16 59:8,24
60:21 61:4,9
61:10,12,15
67:12 68:6
72:16,20,22
72:25 73:10
73:22 74:8,14
74:17 75:12
75:15,21 76:8
76:14 78:10
78:16 83:7,11
84:6,8,13,24
85:4,7,11
86:17,22,23
87:9,11,19
88:4,6 90:17
91:5,8 92:2
96:23 97:20
97:24 98:18
99:13 101:9
101:14 102:6
107:17,19,20
108:8 112:18
112:23
119:12
120:19
121:18
122:17
123:19,25
125:10,13,20
125:21,24
126:7
**Kevin's (2)**
92:24 113:16
**key (2)**
21:18 74:13
**kind (1)**
67:6
**know (97)**
6:21,24 7:4
12:3,7 15:21
15:24 16:11

16:20 19:18
19:21 21:20
22:13 23:14
23:15,24
24:11 25:6,8
25:11,18,22
25:24 26:3
31:25 34:10
35:14 40:10
42:13 44:8
51:3,7,8
54:19 57:18
58:3 62:8
63:4,10 64:4
67:11,25
68:23 69:23
71:19 74:3
80:5,11 83:25
85:16 86:3,14
86:15,16,17
86:18 87:10
87:23,25
89:22 90:9,11
90:15 91:13
92:19 96:17
97:8 98:24
99:2,2,4,6
103:3 109:23
109:25
110:24 111:4
112:5,8
113:23
115:16
116:17
117:16
118:21 121:5
122:11
123:13,21,24
124:16,18,20
124:21
125:10,13,20
125:22
**knowledge (4)**
31:20 104:17

105:6 116:24
**known (1)**
9:6

—————
**L**
—————
**L (2)**
3:2 5:1
**Lance (2)**
33:2 73:17
**larger (2)**
43:16 74:19
**late (1)**
30:22
**laugh (2)**
94:19,19
**laughing (1)**
94:21
**law (4)**
4:12 18:22,24
18:25
**lawsuit (10)**
5:19 11:19,25
12:6,9,11,12
12:14,18
124:3
**lead (1)**
23:20
**leadership (1)**
63:9
**learn (2)**
14:19 44:5
**learned (1)**
82:23
**learning (2)**
82:3,24
**leave (4)**
58:12 67:21
75:8 108:8
**leaves (1)**
85:19
**led (10)**
26:21 59:15
60:8 66:21
67:12 98:14

98:19 100:24
101:10 102:2
**left (1)**
111:10
**legal (1)**
19:17
**LegalView/Z...**
4:6
**length (1)**
88:23
**let's (3)**
29:12 49:13
89:2
**letter (33)**
36:25 37:6,21
39:6,19,23
40:22,25 41:2
41:7,14 42:23
47:13 48:19
50:6 54:5
64:5,9,19
66:14,22 68:6
68:8,9 110:20
111:11,24,25
112:3 118:3,7
119:8 129:6
**letters (11)**
29:19,23 38:2
47:20,25 48:8
48:22 50:8,12
111:17 129:9
**letting (3)**
65:6,9 89:15
**level (7)**
12:20 39:21
46:17 100:22
101:8 119:13
121:7
**Lexitas (1)**
4:7
**LGA (1)**
126:7
**liar (1)**
69:25

**line (2)**
96:23 131:5
**listening (1)**
27:16
**litigation (1)**
4:13
**local (8)**
23:7,20 24:7
24:12,17,21
26:2 32:25
**located (3)**
20:22 21:3
126:8
**locations (1)**
4:5
**long (5)**
10:20 13:16,21
21:8 111:8
**longer (2)**
26:10 50:19
**look (4)**
39:18 55:19
77:2 106:3
**looking (12)**
15:16 16:24,25
17:3 44:23
70:13 71:15
74:20 81:10
99:6,7 103:23
**lot (2)**
18:8 96:22
**lunch (1)**
69:11
**lying (2)**
69:24 70:4

—————
**M**
—————
**M (1)**
5:1
**ma'am (15)**
69:3 79:4
88:16,24
89:12 94:18
95:14 97:20

February 9, 2024

[Page 143]

| | | | | |
|---|---|---|---|---|
| 99:7 105:11 | 70:1 71:1 | 57:25 58:2 | 2:2 5:6,12,14 | 70:5,10,12,13 |
| 105:13,13 | 72:1,6 73:1 | 62:25 73:15 | 6:11,18 7:8 | 70:15,18,19 |
| 107:12,21 | 74:1 75:1 | 73:17,18 | 16:19 17:2,6 | 71:4,9,13,17 |
| 108:13 | 76:1 77:1 | 78:18 86:5,23 | 23:23 33:19 | 71:24 72:4 |
| **maintain (1)** | 78:1 79:1 | 86:25 87:2,12 | 33:23 34:21 | 78:6,12 79:16 |
| 28:11 | 80:1 81:1,3 | 87:21 88:7,9 | 50:16,21 | 79:18,19,24 |
| **maintaining ...** | 82:1 83:1 | 88:11 89:8,13 | 57:11 65:6,21 | 80:8,9,11,20 |
| 22:13 28:12 | 84:1 85:1 | 89:17 90:18 | 65:22 66:6,10 | 81:13,20 82:7 |
| **making (3)** | 86:1 87:1 | 90:23 91:17 | 68:11,15,18 | 84:22 85:13 |
| 22:4 45:24 | 88:1 89:1 | 91:25,25 | 68:22 69:12 | 86:12 87:7 |
| 85:11 | 90:1 91:1 | 96:17,19 97:3 | 70:2,6,11,15 | 88:10 89:6 |
| **Malebranch...** | 92:1 93:1 | 97:7,8,13,21 | 71:4,11,17 | 90:8,14 91:3 |
| 1:15 5:8,13 6:1 | 94:1 95:1 | 98:3,5 | 72:2 79:17,20 | 91:11,19 92:8 |
| 7:1 8:1 9:1 | 96:1 97:1 | **managers (2)** | 80:2,9,14,21 | 92:15,20 93:7 |
| 10:1 11:1 | 98:1 99:1 | 18:7,8 | 92:21 94:17 | 93:20 94:7,21 |
| 12:1 13:1 | 100:1 101:1 | **managing (10)** | 94:22 109:13 | 95:6,22 96:4 |
| 14:1 15:1 | 102:1,19 | 13:20,23 14:25 | 109:22 112:9 | 96:16 101:2 |
| 16:1 17:1 | 103:1 104:1,9 | 18:5 19:12 | 114:17 | 101:12 102:8 |
| 18:1 19:1 | 105:1 106:1 | 21:21 22:7 | 115:21 117:4 | 102:16 104:5 |
| 20:1 21:1 | 107:1 108:1 | 30:7 87:3 | 118:13 | 105:8,23 |
| 22:1 23:1 | 109:1,17 | 108:3 | 119:16,24 | 106:21 108:5 |
| 24:1 25:1 | 110:1 111:1 | **manner (1)** | 120:3,5 | 109:4 120:2,4 |
| 26:1 27:1 | 112:1,13 | 4:10 | 124:24 125:4 | 125:2,8 127:2 |
| 28:1 29:1 | 113:1 114:1 | **Manual (5)** | 125:16 127:3 | 128:6 |
| 30:1 31:1 | 114:21 115:1 | 21:4,5,6,8,13 | 128:5 | **mean (11)** |
| 32:1 33:1 | 115:25 116:1 | **marijuana (1)** | **material (1)** | 22:2,22 30:25 |
| 34:1 35:1 | 117:1,8 118:1 | 8:13 | 108:14 | 31:22 35:20 |
| 36:1 37:1 | 118:17 119:1 | **mark (2)** | **matter (1)** | 47:4 67:19,21 |
| 38:1 39:1 | 120:1,8 121:1 | 102:14 117:12 | 130:14 | 95:20 98:22 |
| 40:1 41:1 | 122:1 123:1 | **marked (10)** | **McGaha (103)** | 101:5 |
| 42:1 43:1 | 124:1 125:1,3 | 4:14 102:20 | 2:8 8:21 16:19 | **meaning (2)** |
| 44:1 45:1 | 125:10 126:1 | 109:18 110:4 | 16:24 17:4,8 | 7:12 36:21 |
| 46:1 47:1 | 127:1,7 128:1 | 112:14 | 23:22 30:13 | **meant (1)** |
| 48:1 49:1 | 128:5,6 129:1 | 114:22 116:2 | 32:8 34:25 | 99:9 |
| 50:1 51:1 | 130:1 131:1,1 | 116:21 | 44:21 45:4,19 | **medication (2)** |
| 52:1 53:1 | **management...** | 117:11 | 47:2 48:11 | 8:9,16 |
| 54:1 55:1 | 58:8 75:7 99:5 | 118:18 | 49:5 50:19,24 | **meet (8)** |
| 56:1 57:1 | **management...** | **marking (1)** | 55:12 57:15 | 22:5 33:15,21 |
| 58:1 59:1 | 117:2 | 117:9 | 65:4,10,15,18 | 34:2,4,20 |
| 60:1 61:1 | **manager (46)** | **marriage (1)** | 65:24 66:4,8 | 51:6 100:9 |
| 62:1 63:1 | 14:3,3,4,6,9,14 | 130:13 | 66:10,16 67:5 | **meeting (62)** |
| 64:1 65:1 | 14:19,21,23 | **married (2)** | 67:17,23 68:7 | 1:11 4:6 22:11 |
| 66:1 67:1 | 18:14 29:8 | 10:18,20 | 68:11,13,17 | 26:22,23,24 |
| 68:1 69:1 | 33:18,18 | **Massimi (60)** | 69:7,12,25 | 26:25 27:5,5 |

February 9, 2024

[Page 144]

27:9,9 30:23
31:9,12,18
34:5 35:5,8
35:24 36:5,14
43:13,17 44:7
45:8,10 46:2
51:8,9,11,14
51:16,18 52:3
52:19,24 53:2
53:7,8 54:21
66:19,20 67:7
67:10,12 72:8
72:13 73:13
98:13,19
100:4,11
113:5,7,11
114:2,7,10,11
118:6 121:25
126:4
**meetings (11)**
23:9 27:11,14
27:21 28:19
29:4,22,25
30:8 33:6
123:9
**memorialize ...**
36:10
**memorialize...**
36:19,20
**memorializi...**
31:8 37:22
43:23
**memory (12)**
42:18 54:19,20
55:7 58:7,20
60:22 73:19
80:18 82:19
99:21 113:22
**Memphis (1)**
2:7
**mental (1)**
8:5
**mention (1)**
14:13

**mentioned (1...**
14:13 40:14
43:5 46:12
53:3 59:13
74:6,25 83:8
84:15
**met (7)**
62:9 66:12
81:25 100:6,8
100:10 126:3
**military (1)**
18:20
**mind (2)**
33:25 80:17
**minority (2)**
126:10,13
**minutes (1)**
104:6
**missed (5)**
58:23 60:15
83:9,11
125:16
**missing (1)**
113:24
**misspeak (1)**
76:25
**misspoke (1)**
77:7
**moment (1)**
88:24
**Monte (8)**
73:20 110:15
110:17,19,21
111:8 116:7
124:20
**month (1)**
74:22
**months (1)**
16:10
**Moreno (8)**
59:17 61:5
74:9 75:19,23
76:2,3,7
**Moreno's (3)**

76:17,23 82:16
**morning (2)**
5:12 22:3
**motion (1)**
12:4
**mouth (3)**
108:7,9,11
**move (1)**
68:13
**moving (1)**
106:23
**multiple (3)**
20:23 24:25
89:24

———————
**N**
———————
**N (133)**
2:1 3:2 5:1,1,1
6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1

60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1,2,5,6
129:1 130:1
**name (17)**
5:7,14 8:20,22
16:11 18:9
20:25 21:2
25:3,6 31:12
32:23 36:22
41:10 43:5
51:3 124:6

**names (4)**
9:6 18:3 40:18
73:14
**Nan (2)**
9:3,7
**Nancy (1)**
9:4
**Nanette (7)**
1:14 5:8 8:23
9:7 127:7
131:1,1
**Nassau (1)**
10:11
**nature (2)**
11:19 101:5
**necessarily (5)**
64:21 66:18
78:8 91:13
93:5
**necessary (3)**
97:14 124:12
131:3
**need (11)**
4:8 6:11,13 7:8
7:9 21:20
50:17 87:16
95:24 104:2,3
**needed (3)**
48:15 53:2
83:24
**needs (2)**
36:8 67:19
**neutral (3)**
46:25 47:6,7
**never (10)**
11:7 29:6,21
33:25 57:25
88:19 92:4
108:7,10
122:23
**New (10)**
1:1,19 2:3,3
5:3,10 9:10
9:11 126:9

February 9, 2024

[Page 145]

130:5
**nicknames (2)**
8:24 9:2
**night (1)**
22:4
**nine (2)**
15:20 17:12
**nod (1)**
68:15
**nodding (7)**
69:21 70:3,8
  70:21 71:5,13
  71:20
**nods (1)**
6:14
**normal (1)**
5:25
**normally (2)**
8:16 36:4
**Notary (5)**
1:18 5:2
  127:13 130:5
  131:25
**noted (2)**
107:11 127:4
**notes (27)**
27:15,20,24
  28:19 29:6,18
  29:22 30:8,11
  30:15,16,18
  30:19,21 31:3
  31:7 34:6
  46:16,18,20
  46:22,24
  63:14 72:14
  72:14,15
  107:11
**notify (2)**
52:8 97:6
**noting (1)**
113:12
**number (1)**
124:14
**numbers (1)**

112:6
_____
**O**
**O (1)**
3:2
**oath (5)**
3:17 4:7 7:20
  7:25 8:2
**object (42)**
23:22 30:13
  32:8 44:21
  45:19 47:2
  48:11 55:12
  55:12 57:15
  67:17,23 68:7
  78:6 81:13,20
  82:7 84:22
  85:13 86:12
  87:7 88:10
  89:6 90:8,14
  91:3,11 92:8
  93:7,20 94:7
  95:6,22 96:4
  96:16 101:2
  102:8 105:8
  105:23
  106:21 108:5
  109:4
**objection (5)**
49:5 67:5
  91:19 92:15
  101:13
**objections (1)**
3:10
**obviously (2)**
80:25 115:12
**occurred (1)**
58:12
**offered (1)**
92:9
**officer (2)**
3:16 4:7
**official (6)**
28:20 29:22

30:11,22,22
67:15
**Oh (1)**
82:20
**okay (81)**
12:6,11 13:11
  14:16,24
  17:14 18:10
  20:19 24:21
  25:14 26:15
  28:18 30:15
  30:21 31:15
  31:17 33:4,23
  34:15,21 37:2
  42:13 43:10
  45:13 47:13
  49:13 51:10
  54:8 56:18
  58:18 62:22
  64:4 66:5
  67:21 77:22
  80:18 83:6
  89:16,19
  95:25 97:10
  98:12 99:13
  100:3,21
  101:25
  102:11,15
  103:25 104:9
  106:3,7 107:3
  107:22
  108:13,15,17
  109:13 110:2
  110:13,21
  112:9 114:17
  115:4,21
  116:11,18
  117:4,17
  118:13,22
  119:10,20,24
  120:13,15
  121:4 122:19
  123:22
  124:24 127:3

**omit (1)**
108:14
**once (5)**
11:2,18 30:19
  77:23 100:9
**online (3)**
1:11 19:13
  37:23
**open (1)**
113:14
**operation (2)**
85:22 89:24
**operations (1...**
14:3,4,6,20
  15:13 16:6,9
  21:24 22:5
  52:7
**opinion (1)**
90:20
**opportunity ...**
15:16 92:9
  104:10
  112:14
**opposed (1)**
24:14
**ops (1)**
18:8
**order (5)**
1:17 14:19
  44:10,12
  91:15
**original (1)**
76:5
**outcome (4)**
97:19 98:3,10
  130:14
**outcomes (1)**
73:5
**owe (1)**
11:3
_____
**P**
**P (3)**
2:1,1 3:2

**p.m (1)**
127:4
**packages (16)**
22:3,4 60:5
  78:22 79:10
  81:7 82:5
  85:21,25 94:4
  95:3,18 96:11
  106:13,24
  108:21
**packet (9)**
53:3 63:17,18
  63:20 72:15
  109:21
  115:19
  116:13,14
**PAGE (2)**
128:4 131:5
**Paralegal (1)**
2:11
**parole (1)**
11:10
**part (63)**
6:23 18:25
  26:6,15,16
  28:4,9,20
  29:15 30:6
  32:10 34:12
  34:16 35:4,5
  35:9 36:13,15
  38:15,23 39:2
  39:7,23 40:9
  40:12,15,19
  41:7,12,24
  42:8,15,20,24
  45:14,18,21
  48:19 49:9
  50:9 65:13
  84:8 87:14
  100:6 107:4,8
  107:15,16,22
  108:3,4,18,23
  108:25 109:2
  109:3,6

February 9, 2024

[Page 146]

116:14
120:21 121:5
123:4 124:11
124:14
**participating...**
4:5
**particular (3)**
27:13 36:6,11
**parties (6)**
3:6 4:2,11,18
24:15 130:12
**passes (3)**
85:22,22,24
**passing (2)**
58:21 60:24
**pending (1)**
7:11
**people (9)**
18:3,9 21:4,5,6
21:8,13 22:24
37:14
**percent (4)**
108:16 126:9
126:11,14
**perception (1)**
114:15
**performance...**
35:13
**performing (1)**
32:4
**permissible (1)**
49:11
**permitted (2)**
69:22 70:12
**person (18)**
16:11 20:14,17
22:24 24:15
24:24 25:4
30:15,16
32:25 44:4
51:23 62:11
62:16 63:6,6
76:10 78:5
**person's (2)**

96:9,12
**personal (2)**
12:12 101:18
**personnel (1)**
22:13
**pertaining (1)**
41:19
**phone (2)**
51:22,24
**phonetic (1)**
16:13
**photograph (...**
42:10
**photographs...**
41:24 42:5
120:16
**photos (1)**
103:7
**physical (6)**
8:5 74:14
75:12,16 76:8
77:23
**picking (1)**
22:4
**pickup (1)**
21:23
**pictures (1)**
42:12
**place (25)**
1:17 4:8 16:12
20:5,5,7,9,11
21:9,12 36:11
54:19,20 76:4
76:6 78:9
96:22 97:9
98:11,16
101:4 105:12
114:16 117:3
122:11
**placed (2)**
64:10 66:15
**plaintiff (5)**
1:3 2:2 5:15
51:3 125:21

**plaintiff's (12)**
69:15 102:21
109:18 110:5
112:15
114:23 116:3
116:21
117:10,11
118:19 129:4
**please (37)**
5:7,9 7:4 16:23
17:7 19:11
22:17 33:20
45:16 47:4
65:19,20,24
68:19 69:21
70:16 72:2,6
72:7 80:4,6
80:10,18
89:12 106:3
108:6,10
109:22
110:13
112:10
115:22
116:16 117:4
117:15
118:20
119:17
125:17
**point (13)**
7:9 57:24 60:7
71:4 75:9
78:11,17
82:24 85:8
106:4,7,8
121:13
**policies (3)**
20:23 21:18
22:12
**policy (7)**
19:19 20:19,22
21:3 47:11
92:17 121:8
**portion (4)**

107:3,6,7,16
**position (3)**
14:22,23 15:15
**positions (1)**
14:10
**possession (1)**
4:16
**possibility (1)**
99:5
**possible (3)**
42:4,9,19
**possibly (3)**
15:20 28:25
102:2
**preparation ...**
23:8 53:19,23
54:2,9 55:4
115:9,12,13
119:14,21
120:9,17
**prepare (1)**
26:21
**prepared (1)**
27:8
**preparing (1)**
115:20
**prepped (2)**
80:3,25
**presence (1)**
27:14
**present (3)**
2:10 4:3 33:17
**presented (3)**
4:16 38:14
98:15
**Presenting (1)**
4:15
**president (5)**
15:11,12 16:6
16:9 17:16
**pretty (2)**
54:22 70:25
**prevent (3)**
8:6 58:11 88:2

**Prevention (1)**
88:3
**previous (1)**
41:21
**previously (2)**
48:21 117:10
**prior (22)**
4:17 13:23
51:16 52:2,19
52:23 53:7,8
53:11 63:14
74:23 98:23
98:24 100:8
110:10 113:5
113:7 123:7
124:2 125:11
125:13,22
**priority (1)**
49:18
**probably (4)**
110:17 126:2
126:11,14
**probation (1)**
11:10
**procedure (1)**
47:11
**procedures (1)**
21:19
**proceed (4)**
50:2 69:10,10
108:16
**proceeding (1)**
131:2
**process (73)**
23:5,13,21
24:2,3 25:15
25:18 26:17
27:12 29:2
30:2,5 31:4
32:11 33:6,12
34:3,17 35:6
35:9,18,21,22
35:24 37:4
39:12,14,20

February 9, 2024

[Page 147]

40:9,12,15,19
40:20,21
41:12 42:9,20
42:25 45:15
45:18,22
47:14,21
48:10,16,18
49:3,10,15,17
49:25 50:6,9
68:3 72:23
73:2,5,6,11
73:21 97:18
97:25 107:4,8
107:17
112:20
120:21,25
121:5 123:5
124:5,7,11
**processes (3)**
36:15 38:5
48:18
**produce (1)**
74:11
**production (1)**
80:23
**professional ...**
62:11,16 63:6
99:19 100:19
**promise (1)**
69:2
**promotion (3)**
15:22 16:14,15
**promotions (5)**
15:3,6,7,9
17:12
**proper (2)**
85:25 98:10
**properly (1)**
44:7
**property (1)**
121:3
**provide (10)**
74:9 75:18,23
99:8 101:25

120:19 123:2
123:10,25
124:10
**provided (7)**
15:10 38:19
52:22 75:21
76:5 93:18
123:4
**Public (5)**
1:18 5:3
127:13 130:5
131:25
**publication (1)**
20:25
**pull (2)**
79:16 80:12
**pulled (2)**
59:4 61:7
**pulling (3)**
60:23 61:2,3
**purchased (1)**
14:17
**purpose (23)**
4:13 5:17
23:19 27:10
27:13,20 28:8
28:12,17
30:11 34:5
35:8 43:14,16
45:9 46:2,10
48:8 49:17
72:25 109:19
118:2 119:10
**purposes (8)**
102:21 110:4
112:15
114:22 116:2
116:21 117:9
118:18
**pursuant (2)**
1:17 4:3
**push (4)**
85:21,23 89:20
90:7

**pushed (6)**
58:22 60:9,14
83:8 86:19
88:5
**pushes (3)**
86:10,11 89:3
**pushing (27)**
60:5,23 78:22
79:10 81:7
82:3 83:3,22
84:3 85:4,25
88:17 89:25
90:11 93:4,12
94:3,9,12
95:2,10,17
96:11 106:13
106:23
107:25
108:20
**put (12)**
27:25 47:21,23
49:2 53:3
56:22 64:6,20
68:5,9 108:7
108:10
**putting (3)**
43:2,16 56:25

_____
**Q**
**quarters (1)**
88:22
**Queens (3)**
9:12,13 126:9
**question (47)**
3:11 4:18 6:4,7
6:8,21,22,23
6:24 7:5,11
7:13 16:23
17:10,23
29:24 32:12
32:13 45:16
49:12 50:4
58:18,19
65:16,19 66:7

66:9,16,25
71:14 82:12
84:6,7,23
85:14,19
86:15 87:8
89:7 90:5
101:12,19,21
108:6,12
119:20
124:20
**questioning (2)**
4:17 79:22
**questions (17)**
5:18,20,21
6:14 65:9
66:11 69:20
70:8 71:7,22
80:10 99:9,9
102:11,20
124:25 127:2
**quote (2)**
82:22,22
**quoted (1)**
108:9
**quoting (1)**
82:18

_____
**R**
**R (3)**
2:1 5:1 130:2
**race (7)**
9:15 20:15,19
125:13,20,22
125:25
**rationale (8)**
40:16,24 43:15
43:20,24
46:16 54:4
121:14
**reach (1)**
59:15
**read (16)**
6:25 33:19,24
59:20 65:19

65:24 66:2
93:23 104:2,3
109:22,24
116:16,23
117:15
118:20
**reading (4)**
78:24 79:4
81:4 95:8
**reality (1)**
20:12
**realize (1)**
7:2
**really (3)**
67:3 122:10
124:16
**reason (7)**
6:18 7:16
11:11 121:14
121:16
123:10 131:5
**recall (54)**
12:10 15:18,19
23:16 25:17
51:13 52:18
52:21,22
53:14,18
54:23 56:3,13
56:17,23
59:10,22,25
60:6 63:24
64:2,3,4,7
67:24 68:9
79:3,3,7 81:3
81:9,11,16,18
82:3,8,9,10
82:12,24
93:17 100:5
100:20
101:14,20
102:10
109:12 111:9
120:12
121:11,22,23

February 9, 2024

[Page 148]

121:25
**recap (15)**
43:13,17 55:8
59:6,14,18,19
72:12,13,13
72:15,19
81:24 82:2
105:24
**receive (5)**
15:21 43:22
44:6,14 57:23
**received (12)**
15:3 19:8,12
19:14,16
33:15 44:2,17
44:24 45:13
81:14,21
**receiving (2)**
81:12,19
**recognize (3)**
109:20 114:24
116:4
**recollection (...**
54:13,17,25
55:4 57:5
124:22 126:2
**reconsider (5)**
98:14,20
100:24
101:11 102:3
**record (27)**
5:7,9,23 6:20
28:20,24 35:3
43:20 45:7
46:10,15 51:2
66:2 79:22
87:18 102:18
104:8 109:16
112:12
114:20
115:24 117:7
118:16
119:19 120:7
125:19 130:9

**recorded (1)**
4:10
**recording (2)**
4:11 45:9
**records (2)**
28:11,13
**recount (1)**
98:15
**refer (1)**
111:16
**reference (1)**
45:11
**referring (5)**
26:24 59:18
80:5 115:16
118:8
**reflection (1)**
67:4
**refrain (1)**
107:12
**refresh (6)**
54:12,16,24
55:4,6 57:4
**regard (2)**
96:3 123:14
**regarding (19)**
4:17 19:8,16
19:24 22:18
27:11 28:20
32:16,20
33:11 41:22
43:22 44:2,14
44:24 49:24
53:9 67:16
101:7
**regards (1)**
103:5
**related (4)**
29:4 32:6 42:2
130:11
**relationship ...**
17:15
**relative (1)**
36:6

**religious (2)**
9:24 20:15
**remember (10)**
12:2,8 25:7,9
57:19 60:16
64:24 79:5
93:15 120:10
**remorse (6)**
100:22 101:8
101:15,17,20
101:21
**remorseful (1)**
101:3
**remote (1)**
4:5
**remotely (1)**
4:9
**remove (2)**
96:19 98:6
**removed (1)**
96:21
**render (2)**
36:7,16
**rendering (1)**
67:10
**renders (1)**
31:11
**repeat (5)**
17:23 64:11
84:23 87:16
119:20
**repeated (1)**
82:9
**rephrase (1)**
6:22
**report (23)**
17:18 31:14,17
31:18 63:8
64:6,10,20
66:14,23
67:22,24 68:2
90:24 91:13
91:21,25 92:4
92:10,11

96:14 98:8
104:19
**reported (3)**
91:5,8 99:5
**reporter (14)**
1:18 4:4,9 5:21
5:24 6:7,12
6:19,25 33:24
65:18,25 66:3
130:4
**reporting (3)**
4:7 97:12
105:25
**represent (4)**
5:15 24:25
45:23 112:7
**represented ...**
8:18
**representing...**
45:14,17 46:7
47:12 111:21
**represents (2)**
46:2 47:10
**request (3)**
15:14 16:14
75:25
**requested (6)**
15:7,9 16:15
17:11 42:22
113:13
**required (4)**
46:18,20,22,24
**reread (1)**
104:20
**reserved (1)**
3:11
**reside (1)**
10:10
**resource (1)**
22:20
**resources (2)**
32:22 37:24
**respect (1)**
70:22

**respectful (2)**
99:22 100:18
**respective (1)**
3:5
**respond (2)**
65:9 86:2
**responded (2)**
101:19 115:14
**response (3)**
20:18 84:10
122:18
**responsibiliti...**
19:19,24 21:22
22:8,18 26:6
26:11 33:11
35:4
**responsibilit...**
19:21 32:4
33:8 34:13
36:14 45:22
60:25 74:2,24
**responsible (...**
17:25 18:4,10
21:23 22:14
23:7 29:11,14
38:4 43:11
**restate (1)**
6:24
**retaliation (4)**
19:21,25 20:16
113:13
**review (57)**
26:13 28:25
30:17 32:6,19
33:13 38:16
38:18,23 39:6
42:14,20 44:9
48:20 49:18
53:4,4,9,19
53:22 54:2,8
54:11,16,24
55:3,7,10,14
55:23 57:4
63:13 104:10

February 9, 2024

[Page 149]

107:3,6,7,16
108:3,17,22
108:23,25
109:3 110:3
112:14,21
113:5 116:16
116:19
117:18
118:23
119:14,21
120:8,13,15
120:16
**reviewed (14)**
32:7 37:14
38:13 39:3,24
40:6,10 48:19
50:9 107:10
108:24 113:7
118:25 131:2
**reviewing (5)**
31:4 32:16
38:5 53:11
107:9
**revisit (1)**
7:5
**Reyes (2)**
33:3 73:17
**right (35)**
5:12 8:21 16:5
27:13 34:17
39:4,12 40:22
42:6 50:10
56:2,19 60:13
61:4,10 67:6
68:24 73:7
75:3 76:3
77:14 78:19
80:15,20
82:21 87:5
91:16 92:24
98:17 100:12
103:23
105:15 116:8
116:8 122:7

**rise (2)**
5:19 47:22
**Road (1)**
2:6
**role (4)**
30:7 32:15
33:6 47:10
**rolled (1)**
18:6
**room (2)**
7:23,24
**run (1)**
22:5

―――――――
**S**
―――――――
**S (4)**
2:1 3:2,2 129:2
**safety (2)**
22:11,12
**SAFFERSO...**
1:18 130:4,19
**sat (2)**
27:9 29:4
**satisfied (1)**
38:20
**saw (5)**
55:22 59:15
74:10 106:18
124:21
**saying (16)**
23:10,17 27:4
42:5 61:21
63:7 70:2,23
77:20,25 79:7
91:20 97:20
103:5 108:9
122:20
**says (7)**
79:2 81:5
107:23
110:15
111:10,13
131:2
**scarily (1)**

108:10
**scary (2)**
107:20 108:8
**scenario (1)**
96:8
**scenarios (1)**
96:23
**screen (2)**
16:25 119:23
**sealing (1)**
3:6
**Sean (4)**
1:17 87:16
130:4,19
**second (7)**
34:22 38:20,23
39:2 57:11
60:15 125:5
**section (1)**
4:3
**security (25)**
55:8 58:24
59:8,18,19
61:24 62:24
63:4,19 72:14
77:11 78:19
79:7 81:4,14
81:21,23
83:11 92:25
93:9 97:14
102:5 103:4
121:6 124:18
**security's (5)**
59:6,14 68:2
103:19,20
**see (26)**
14:24 17:3
58:8 68:24,25
69:6 75:7
76:13 94:11
102:24 106:5
106:7,14
107:14
111:10 115:9

115:19,21
116:14
117:13
121:18,20
122:8,13,17
124:22
**seeing (1)**
81:3
**seen (4)**
77:12 85:18
104:15
116:11
**selected (2)**
24:16,24
**semicolon (1)**
106:9
**send (5)**
36:25 37:6
53:5 56:14
109:13
**sending (1)**
103:13
**senior (9)**
14:3,9,14,19
14:23 18:7,14
33:17 73:15
**sense (1)**
6:9
**sent (9)**
39:19 41:2,5
47:13 48:9
50:6,12
102:12 115:7
**separate (2)**
4:5 114:6
**series (1)**
5:20
**serious (1)**
52:12
**served (3)**
18:22,24 124:9
**serves (1)**
58:7
**service (2)**

4:7 22:5
**services (1)**
52:8
**set (2)**
130:8,15
**settled (1)**
12:17
**settlement (2)**
12:15,16
**seven (1)**
89:22
**severed (1)**
18:19
**shaked (1)**
16:22
**shakes (1)**
6:15
**shaking (12)**
17:6,8 68:12
69:21 70:3,8
70:21 71:5,9
71:13,15,21
**share (3)**
59:11 63:25
93:15
**Sharon (1)**
2:11
**Sheer (1)**
16:13
**SHEET (1)**
131:1
**short (1)**
12:18
**shorthand (1)**
1:18
**shoulder (2)**
61:6 74:7
**shove (1)**
84:4
**show (17)**
53:6 56:4
79:19,24
80:14,15
110:13

February 9, 2024

[Page 150]

112:10 117:4
120:20,24
121:7,9 123:8
124:10,16,18
**showed (4)**
59:21 79:8
124:19,20
**showing (7)**
109:17 114:21
115:25 117:8
118:17 121:6
121:11
**shown (2)**
123:3,6
**shows (6)**
78:20 81:5
106:9,11
107:23
108:18
**sic (2)**
112:15 126:14
**sick (2)**
26:12,12
**signal (1)**
16:20
**signalling (1)**
17:5
**Signature (1)**
131:23
**signed (3)**
3:16,18 119:4
**Similarly (1)**
82:21
**simply (1)**
43:20
**sincere (2)**
114:12,14
**sincerity (1)**
108:17
**single (1)**
85:20
**sir (1)**
102:13
**sit (7)**

23:9 26:22
27:4 30:7
86:8 104:20
123:2
**sitting (2)**
27:10 69:4
**situation (8)**
58:6 74:25
96:18 98:5
100:23 101:8
101:10
124:14
**six (2)**
111:13 112:6
**size (2)**
57:21 61:12
**smiling (2)**
94:22,23
**somebody (6)**
77:19 84:2
89:25 93:21
95:9 96:6
**someone's (3)**
94:10,13 95:11
**soon (1)**
69:11
**sorry (16)**
14:13 17:11,23
18:24 24:20
32:14 64:11
65:2 72:20
75:22 80:6
87:15 110:14
111:19 115:5
125:16
**sort (9)**
52:5,7 85:20
89:23,25
96:20 98:7,23
98:24
**sought (1)**
76:10
**Spain (2)**
9:17,19

**Spanish (1)**
9:16
**speak (9)**
6:13 51:17,20
51:22 112:23
113:3,18
114:3,8
**speaking (4)**
27:17 29:14
56:3 99:20
**speaks (1)**
69:14
**specialist (1)**
62:24
**specialists (1)**
63:5
**specific (5)**
22:18,24 42:2
83:5 121:13
**specifically (6)**
15:12 36:19
53:25 90:19
101:7 112:25
**specifics (2)**
52:14 53:12
**split (4)**
83:23 85:23,24
85:25
**spoke (1)**
99:13
**square (1)**
68:25
**stamp (1)**
116:3
**stamps (4)**
102:22 109:19
114:23
118:19
**stand (1)**
94:20
**standards (4)**
19:20 93:25
95:5,20
**start (11)**

77:9 78:7
83:17,20 84:8
84:20 85:5,11
86:9 89:5
90:25
**started (6)**
25:10 60:3,18
62:6 63:22
64:14
**starts (6)**
76:20,21,23
77:5 103:12
106:10
**state (35)**
1:19 5:3,7,9
21:10 60:4,20
61:19 62:2,6
63:23 64:15
65:13 67:15
67:19 68:5
72:11 74:7
77:13 78:21
79:9 81:6
82:4 83:2
93:3,11 94:3
94:17 95:2,17
96:10 106:12
107:25
108:20 130:5
**stated (3)**
48:21 57:16
74:20
**statement (28)**
59:17 64:12
74:6,10,12,13
75:14,23 76:5
76:11,14,17
76:22,23 77:2
77:5 79:2
81:21,22,23
82:16,18 83:6
93:13,14
94:24 112:19
112:21

**statements (9)**
54:7 55:2,8
75:19,21,25
96:22 115:14
115:18
**STATES (1)**
1:1
**station (3)**
126:7,10,11
**stayed (2)**
14:21 58:9
**step (62)**
7:12,14 38:6,7
38:9,11,12,13
38:15,16,20
38:21,23 39:2
39:4,8,9,15
39:18,23 40:2
40:4,7,9,12
40:20,21 41:7
42:8,13,20
43:9,10,12,24
44:15,20,25
45:12,15,18
45:22 47:14
47:21 48:10
48:16,18 49:3
49:9,13,14,15
49:17 50:2,5
50:9 53:2
112:19 118:6
118:11 119:8
119:13
**stepped (2)**
61:6,7
**stick (1)**
42:18
**STIPS (1)**
4:1
**stipulated (5)**
3:4,9,14 4:2,14
**stop (13)**
16:8 52:6
68:11 69:21

69:24 70:16
70:16 71:7,20
71:23 72:3
80:6,18
**Street (1)**
2:3
**stuck (1)**
67:6
**study (1)**
13:8
**subject (1)**
51:18
**subjective (1)**
96:18
**Subscribed (2)**
127:9 131:23
**substance (1)**
81:18
**successful (2)**
15:23,24
**sued (2)**
11:13,15
**suggest (1)**
99:10
**Suite (1)**
2:3
**sum (1)**
81:18
**supervise (1)**
17:22
**supervising (3)**
17:25 18:4,10
**supervision (1)**
18:7
**supervisor (2)**
17:20 39:24
**supplementa...**
75:19
**support (1)**
11:3
**supposed (1)**
124:6
**sure (17)**
20:7,9,10 22:4

30:18 39:16
44:22 46:3
47:11 51:6
74:8 76:16
79:12 85:24
87:22 98:12
99:12
**surely (1)**
98:3
**surprise (2)**
80:23,24
**surveillance ...**
41:23
**sworn (8)**
3:15,18 4:9 5:2
127:9 130:8
131:1,23
**system (19)**
31:21,23,24
37:11,23
40:14,17,19
41:8,10,13
42:5,6,10,16
49:22 50:7,13
118:9

**T**

**T (8)**
3:2,2 5:1,1
111:14 129:2
130:2,2
**take (25)**
5:21,24 6:8
7:10 8:16,16
20:5 22:23
30:8,15,19
34:6 49:13
50:16,17,21
50:23,24
98:11 103:24
104:2 106:3
114:17
115:22
119:16

**taken (6)**
1:17 7:19,25
8:9 20:5
131:2
**takes (4)**
20:7,9,11
30:16
**talk (15)**
5:13 6:3 17:2
28:16 40:4
65:3 69:15
70:5 80:4
87:15 91:24
92:6 95:13
108:11 113:9
**talking (2)**
96:8 114:12
**taller (1)**
74:18
**tasked (1)**
73:9
**taught (1)**
87:21
**telephone (1)**
51:25
**tell (24)**
7:20 31:25
41:10 52:10
52:12,16
53:15 55:16
56:11,15
58:24 59:23
60:25 76:14
81:15 82:10
83:6 86:9,18
89:19 93:23
102:6 123:6
124:17
**telling (5)**
78:25 87:4,8
90:4 113:24
**tells (1)**
36:4
**ten (1)**

89:22
**Tennessee (1)**
2:7
**term (2)**
34:18,19
**terminal (1)**
49:22
**terminate (2)**
49:4 98:20
**terminated (5)**
49:14 111:3
125:11,14,22
**termination ...**
29:19 49:11,19
49:25 50:14
98:14 100:25
101:11,23
102:3 111:11
111:22 123:8
126:4
**testified (2)**
5:4 88:23
**testify (3)**
7:16 8:10
82:15
**testifying (1)**
8:6
**testimony (9)**
65:2,11 69:14
83:16 87:11
88:5 90:17
130:10 131:3
**thank (6)**
17:10 69:11
71:3 72:4
79:13 115:22
**thing (3)**
21:13 77:12
97:12
**things (3)**
41:24 67:3
80:16
**think (22)**
35:11,12 36:3

37:15 45:7
46:13,14
48:13 58:22
64:8 67:8,8
69:14 70:23
70:25 102:9
107:17,18,20
110:17 115:5
124:12
**thinking (2)**
58:4 86:4
**third (1)**
68:20
**thought (8)**
72:16,17 84:6
84:17 86:22
87:13,19 88:4
**thoughtfulne...**
67:4
**thousand (2)**
18:6 89:23
**threatened (2)**
98:23 99:4
**threatening (1)**
99:16
**three (6)**
10:15 54:18
79:6 106:9
111:13 112:6
**time (18)**
1:16 3:12 19:4
19:7 21:10,11
32:5 47:8
68:20 85:8
90:2 103:24
104:2,3
115:10
120:10,12
127:4
**times (9)**
10:25 11:17
42:3 48:14
49:10 62:9
63:11 82:9

February 9, 2024

[Page 152]

120:12
**title (3)**
13:19,21 18:13
**titles (2)**
13:24 14:2
**today (17)**
5:17 7:17,25
8:18 54:3,14
55:4 58:14
102:21
109:19 110:4
114:23 116:3
116:21 117:9
118:19
120:17
**today's (7)**
53:20,23 54:9
112:15
119:15,22
120:9
**told (3)**
58:16 83:11
97:21
**top (2)**
106:4 111:10
**touching (1)**
95:11
**training (18)**
19:8,11,13,14
19:15 43:22
44:2,4,6,14
44:16,19,24
45:6,13 57:23
74:22 87:25
**transcript (2)**
130:9 131:2
**transpired (2)**
122:8,14
**treated (6)**
34:10 35:11
44:9 46:4,13
72:17
**treatment (1)**
20:14

**tri-state (1)**
21:25
**trial (2)**
1:14 3:12
**true (4)**
63:12 77:11
78:19 130:9
**truly (1)**
94:20
**truth (1)**
7:20
**truthful (14)**
43:2 46:22
47:6,7,8 48:2
48:23 62:15
63:5 72:22
99:8,14
114:12,14
**truthfully (3)**
7:17 8:7 54:18
**try (1)**
73:2
**trying (2)**
16:20 70:22
**turned (6)**
57:17 58:25
61:4,9,13
84:13
**twice (2)**
14:14 16:21
**two (20)**
18:5 21:16
38:6,7 39:9
39:15,18 40:2
40:7,9 42:20
48:16 52:5
58:22 77:21
83:8 91:7
103:6 106:9
119:13
**type (7)**
10:2,6 25:2
33:14 58:11
95:9 99:10

**types (1)**
21:19

———————
**U**

**U (1)**
3:2
**uh-huh (1)**
6:16
**uh-uh (1)**
6:16
**unable (4)**
86:8 89:8,19
123:10
**unacceptable...**
85:6
**unauthorize...**
4:12
**understand (...**
6:16,20 7:6,14
7:19,22 38:22
38:22 39:10
39:10 42:25
46:9 56:24
61:15 64:13
66:25 69:7
80:7,21 82:13
98:17 99:10
101:5 107:12
107:17,18,20
111:19
**understandi...**
12:14 19:23
24:10 26:11
27:23 28:18
28:23 29:7
37:12,18
39:22 44:18
45:21 48:17
50:8 55:11
57:8 105:19
113:11
**understood (4)**
25:3 26:15
31:3 61:17

**Unfair (1)**
20:14
**unfairly (5)**
34:11 35:11
44:9 46:13
72:17
**unfolded (2)**
100:23 101:10
**unfortunate ...**
20:12
**union (2)**
18:15,17
**UNITED (1)**
1:1
**University (1)**
13:3
**uphold (4)**
19:22 49:3
50:14 101:22
**upholding (1)**
22:12
**upload (1)**
37:21
**uploaded (18)**
31:20,22 37:11
39:7 40:16,19
40:23 41:8,13
41:16 42:4,9
42:11,16,24
49:21 50:6,13
**upset (13)**
57:17 58:8,8
58:19,22 75:7
77:19 78:7,17
80:22 86:19
90:22 95:9
**use (5)**
29:18 30:21
31:7 34:18,19
**uses (1)**
55:17

———————
**V**

**vehicle (1)**

111:25
**verbal (2)**
77:21 78:2
**verbatim (3)**
82:18,22,22
**verbiage (3)**
64:7 93:16
106:22
**vice (5)**
15:11,12 16:5
16:8 17:16
**video (58)**
4:4,10,19
41:23 42:14
42:15 53:9,11
59:21 60:3
63:14 75:11
75:15 78:20
79:8 81:5
103:20,21
106:20 107:4
107:5,8,16
108:4,15,18
108:22,23,24
108:25 109:2
109:3 115:11
119:14,21
120:8,11,13
120:16,18,20
120:21 121:6
121:7,9,11,18
121:20 122:2
122:11,15,21
122:24
123:25
124:10,21,23
126:3
**Videoconfer...**
4:1,6
**videos (7)**
42:4,9,11,20
103:6 123:8
124:18
**view (3)**

February 9, 2024

[Page 153]

42:18 76:3
120:11
**viewable (1)**
122:14
**viewed (2)**
37:13 120:11
**viewpoint (1)**
76:13
**violation (1)**
4:12
**violence (27)**
57:23 74:22
87:25 88:3
89:10,20 90:6
91:10,12,21
92:4,7,10,11
92:13,17,23
93:6,19,24
94:6,11 95:5
95:9,19 98:8
112:3
**visible (1)**
108:15
**voice (1)**
6:12

—————
**W**
**Wait (2)**
110:14 125:16
**waiting (1)**
89:16
**waived (1)**
3:7
**walk (5)**
58:10 75:5
84:18 96:14
97:8
**walked (22)**
19:18 57:24
58:5,6,10,13
74:3,16,21
75:6 78:10,14
78:18 84:16
84:25 85:7

96:24 97:2,4
97:5,6,21
**walking (1)**
88:3
**Wall (1)**
2:3
**Wanders (17)**
1:8 18:11
51:21 52:2,20
52:22 53:8,12
56:9,11,14
62:15,19,20
73:15 103:19
109:7
**want (13)**
34:9,10 35:10
35:15 39:15
50:22 53:6
76:25 88:2
93:15,23
102:11,14
**wanted (7)**
58:8 75:7
76:15 80:11
80:12,14
97:25
**warning (1)**
111:11
**warrants (1)**
36:3
**wasn't (6)**
55:6,7 61:2
84:2,5 124:15
**watch (1)**
107:5
**waving (2)**
94:8 95:10
**way (15)**
54:16 68:14
71:20 77:21
84:13 85:7,14
97:21,21
100:23 101:9
115:6 122:4,7

130:13
**we'll (1)**
69:10
**weapon (3)**
52:15,17 57:6
**went (5)**
38:6 40:6 54:5
86:23 88:6
**WHEREOF ...**
130:15
**white (1)**
126:12
**Wilson (19)**
16:4,8 17:15
17:20 29:12
29:15 32:7,15
37:25 38:4,15
38:23 39:3
40:5,10 42:19
48:19 118:10
119:6
**withdraw (1)**
77:7
**witness (48)**
1:15 4:5,8,8,15
4:16,17 5:1
6:10,17 7:7
7:15 33:21
34:23 54:6
55:2 65:5
66:5,18 68:12
68:16,17,19
68:22 69:3,8
69:13,20 70:7
70:22 71:6
79:23 80:3,4
80:16,25
82:16 87:19
102:5 110:2
115:13,16,18
128:4 130:7
130:10,15
131:23
**witnesses (3)**

4:9 75:18,20
**word (14)**
55:17,20,24,25
56:2,5,7,21
79:5,5 81:15
81:15 86:13
124:6
**worded (1)**
85:15
**wording (1)**
81:9
**words (11)**
39:6 50:4
56:25 82:8,11
82:13 88:19
95:12 108:7,8
108:11
**work (36)**
60:4,19 61:18
61:20,21,22
61:23,25 62:3
62:4,5,13
63:22 64:15
65:12 67:14
68:5 72:10
76:19 77:13
78:21 79:9
81:6 82:4
83:2 93:2,10
94:2,25 95:16
96:9 106:12
107:24
108:19
110:21 111:2
**worked (3)**
14:18 111:8
126:7
**working (6)**
17:15 19:7
25:10 63:5
75:4 88:22
**workplace (26)**
57:23 74:21
87:24 88:2

89:9,20 90:6
91:9,12,21
92:4,7,10,11
92:13,17,22
93:5,19,24
94:5,11 95:4
95:19 98:8
112:3
**works (1)**
62:20
**worries (1)**
25:9
**worthy (1)**
67:15
**wouldn't (4)**
58:13 75:2
76:14 96:2
**write (10)**
30:16 36:23
63:19,19,21
105:9,15
110:19 116:6
116:8
**writing (4)**
20:22,24 59:10
79:8
**written (4)**
4:11 36:22
81:16 96:7
**wrong (3)**
87:6 88:14
107:19
**wrote (6)**
104:25 105:14
110:14,17,20
113:12

—————
**X**
**x (4)**
1:2,9 128:2
129:2

—————
**Y**
**yeah (6)**
39:17 42:21

February 9, 2024

[Page 154]

100:12 104:5
109:12
126:13
**year (3)**
14:24 15:19
17:24
**years (10)**
10:21 13:18,22
15:20 16:15
17:12 54:18
79:6 121:12
123:12
**yelling (3)**
77:19 78:8
113:23
**yo (1)**
89:12
**York (10)**
1:1,19 2:3,3
5:3,10 9:10
9:11 126:9
130:6

―――― **Z** ――――
**zero (3)**
106:9 111:13
112:6
**Zoom (2)**
1:11 7:24

―――― **0** ――――
**02/09/2024 (1)**
131:2

―――― **1** ――――
**1 (21)**
43:9,10,12,24
44:15,20,25
45:15,18,22
47:14,21
48:10 49:3,9
49:15 50:6
102:14,21
118:6 129:5
**1:20 (1)**

127:4
**10:10 (1)**
1:12
**10005 (1)**
2:3
**11710 (1)**
5:11
**125 (1)**
128:6
**1264 (1)**
2:3
**15 (3)**
74:22 117:11
126:11
**16 (1)**
126:11
**18 (2)**
16:10 103:10
**1954 (1)**
5:10
**1997 (3)**
15:2,4,7
**1st (2)**
115:8,11

―――― **2** ――――
**2 (10)**
40:4 48:18
50:2,9 109:19
110:5 112:15
118:11 119:9
129:6
**20 (1)**
131:24
**2020 (1)**
42:21
**2021 (56)**
17:20,22,24
18:5,11,13
23:3,6,11,12
23:17 24:7,14
26:6,15,19
27:17 30:7
32:3,15,23

33:5,11 34:3
34:12,15 35:4
35:17 36:5,11
36:13 37:4,20
37:25 38:4
39:2 40:4,12
42:8,13,21,24
43:4,12 47:17
48:18,25
49:14,18,24
50:5,8 62:23
74:22 103:10
126:15
**2024 (3)**
1:12 127:10
130:16
**22nd (1)**
130:16
**24 (1)**
8:13
**26 (2)**
102:22 104:11
**27 (3)**
13:22 121:11
123:12
**28 (1)**
10:17

―――― **3** ――――
**3 (3)**
110:13 112:10
129:7
**31 (1)**
10:17
**3113 (1)**
4:3
**33 (1)**
10:21
**36 (1)**
13:18
**3620 (1)**
2:6
**38125 (1)**
2:7

**3rd (1)**
2:6

―――― **4** ――――
**4 (2)**
114:23 129:8
**40 (1)**
106:9
**45 (1)**
10:17

―――― **5** ――――
**5 (4)**
116:3,22 128:5
129:9

―――― **6** ――――
**6 (2)**
117:5,10

―――― **7** ――――
**7 (2)**
118:19 129:9
**70 (1)**
126:9
**75 (2)**
126:9,14

―――― **8** ――――
**82340 (1)**
107:23
**8th (1)**
51:15

―――― **9** ――――
**9 (2)**
1:12 16:15
**99 (1)**
2:3