# EXHIBIT 4
# CAHILL TRANSCRIPT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------X

KEVIN CAMPBELL,

                          PLAINTIFF,


        -against-          Case No.:
                           22-CV-7662


FEDERAL EXPRESS CORPORATION A/K/A FEDEX

EXPRESS, AND ERIC WANDERS, INDIVIDUALLY,


                          DEFENDANTS.

----------------------------------------X


                  DATE: February 22nd, 2024
                  TIME: 10:09 A.M.



             EXAMINATION BEFORE TRIAL of the

Defendant, FEDERAL EXPRESS CORPORATION

A/K/A FEDEX EXPRESS, by a witness, JAMES G.

CAHILL, taken by the Plaintiff, pursuant

to a Court Order and to the Federal Rules

of Civil Procedure, held virtually via Zoom

videoconferencing, before Kevin Haghnazari,

a Notary Public of the State of New York.

```
(1)
(2)      A P P E A R A N C E S:
(3)
(4)      JESSICA S. MASSIMI, ESQ.
            Attorney for the Plaintiff
(5)         99 Wall Street, Suite 1264
            New York, New York 10005
(6)         Jessica.massimi@gmail.com
(7)
(8)      FEDERAL EXPRESS CORPORATION
            Attorneys for the Defendants
(9)         3620 Hacks Cross Road
            Building B, 3rd Floor
(10)        Memphis, Tennesee 38125
            BY: GABRIEL MCGAHA, ESQ.
(11)            SHARON DANIEL, PARALEGAL
            File #: N/A
(12)        gabriel.Mcgaha@fedex.com
            sfdaniel@fedex.com
(13)
(14)
(15)              *          *          *
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

(1)

(2)    F E D E R A L   S T I P U L A T I O N S

(3)

(4)

(5)    IT IS HEREBY STIPULATED AND AGREED, by

(6)  And among counsel for the respective

(7)  parties hereto, that the filing, sealing

(8)  and certification of the within deposition

(9)  shall be and the same are hereby waived;

(10)

(11)   IT IS FURTHER STIPULATED AND AGREED that

(12)  all objections, except as to form of the

(13)  question, shall be reserved to the time of

(14)  the trial;

(15)

(16)   IT IS FURTHER STIPULATED AND AGREED

(17)  That the within deposition may be signed

(18)  before any Notary Public with the same

(19)  force and effect as if signed and sworn to

(20)  before the Court.

(21)

(22)

(23)

(24)

(25)

(1)

(2)                    VIDEO STIPS

(3)

(4)    IT IS HEREBY STIPULATED AND AGREED by and

(5)    Between counsel for all parties present

(6)    that this deposition is being conducted by

(7)    Videoconference, that the Court Reporter,

(8)    all counsel, and the witness are all in

(9)    separate remote locations and participating

(10)   via Videoconference (LegalView/Zoom/WebEx)

(11)   meeting under the control of Lexitas Court

(12)   Reporting Service, that the officer

(13)   administering the oath to the witness need

(14)   witness shall be sworn in remotely by the

(15)   Court Reporter after confirming the

(16)   witness's identity, that this

(17)   Videoconference will not be recorded in any

(18)   manner, and that any recording without the

(19)   express written consent of all parties

(20)   shall be considered unauthorized, in

(21)   violation of law, and shall not be used for

(22)   any purpose in this litigation or

(23)   otherwise.

(24)

(25)

(1)

(2)     IT IS FURTHER STIPULATED that exhibits may

(3)     be marked by the attorney presenting the

(4)     exhibit to the witness, and that a copy of

(5)     any exhibit presented to a witness shall be

(6)     e-mailed to or otherwise in possession of

(7)     all counsel prior to any questioning of a

(8)     witness regarding the exhibit in question.

(9)     All parties shall bear their own costs in

(10)    the conduct of this deposition by

(11)    Videoconference, not withstanding the

(12)    obligation by the CPLR to supply a copy of

(13)    the transcript to the deposed party by the

(14)    taking party in Civil Litigation matters.

(15)

(16)              *     *     *     *

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)              J. CAHILL

(2)     J A M E S   G.   C A H I L L, called as a

(3)     witness, having been first duly sworn by a

(4)     Notary Public of the State of New York, was

(5)     examined and testified as follows:

(6)     EXAMINATION BY

(7)     **MS. MASSIMI:**

(8)         Q.    Please state your name for the

(9)     record.

(10)        **A.    James G. Cahill.**

(11)        Q.    What is your full work address?

(12)        **A.    270 South Service Road,**

(13)     **Melville, New York 11747.**

(14)        Q.    Good morning, Mr. Cahill.

(15)        **A.    Good morning, ma'am.**

(16)        Q.    My name is Jessica Massimi.

(17)     I'm an attorney.  I represent the

(18)     Plaintiff, Kevin Campbell, in the case that

(19)     we're here to discuss today.  The purpose

(20)     of this deposition is for me to ask you

(21)     questions about the incidents giving rise

(22)     to this lawsuit.  I'll ask a series of

(23)     questions and the Court Reporter will take

(24)     down my questions, your answers, and

(25)     anything else that gets said on the record.

```
(1)                    J. CAHILL
(2)            Because the Court Reporter has
(3)    to take down everything that gets said,
(4)    this is not like a normal conversation.  So
(5)    there can't be any cross-talk.  So I need
(6)    you to let me finish my complete question,
(7)    before you begin your answer, even if you
(8)    can anticipate what my question is going to
(9)    be.  For that same reason, I will let you
(10)   finish your complete answer, before I ask
(11)   my next question.
(12)           Do you understand?
(13)      A.    Understood, ma'am.  Thank you.
(14)      Q.    Because the Court Reporter has
(15)   to take down everything that gets said,
(16)   your answers have to be verbal.  You can't
(17)   answer a question saying uh-huh, uh-uh, by
(18)   nodding or shaking your head or by using
(19)   gestures, because the Court Reporter cannot
(20)   interpret that for the record.
(21)           Do you understand?
(22)      A.    Yes, ma'am.
(23)      Q.    You also have to keep your
(24)   voice up and speak clearly, which the
(25)   volume you're speaking at seems fine.  So
```

(1)                    J. CAHILL

(2)     if you could just keep that level of volume

(3)     throughout the course of this deposition,

(4)     that should speed things along.

(5)              Is that okay?

(6)        **A.       Yes, ma'am.**

(7)        Q.    If you don't understand a

(8)     question that I've asked during the course

(9)     of this deposition, let me know.  I will

(10)    attempt to rephrase the question.  If you

(11)    don't hear part of a question that I've

(12)    asked, let me know.  I'll restate the

(13)    question, or I'll ask the Court Reporter to

(14)    read it back.  If you realize during the

(15)    deposition that an earlier answer you gave

(16)    is incomplete or you wish to revisit any of

(17)    your answers for any reason, that's fine.

(18)    We can go on the record and correct it.

(19)    Just let me know.

(20)             Do you understand those

(21)    instructions so far?

(22)        **A.       Yes, ma'am.   Thank you.**

(23)        Q.    If you feel like you need a

(24)    break at any point, that is also fine.  I

(25)    just ask that you answer any pending

(1)                    J. CAHILL

(2)    question, before you step out, meaning, if

(3)    I've asked a question, I expect that you

(4)    will answer it, before we take the break.

(5)             Does that make sense?

(6)        **A.    Understood, ma'am.  Thank you.**

(7)        Q.    Is there any reason you cannot

(8)    testify truthfully, fully, and accurately,

(9)    here, today?

(10)       **A.    No.**

(11)       Q.    Do you understand that you've

(12)   taken an oath to tell the truth, here,

(13)   today?

(14)       **A.    Yes.**

(15)       Q.    Do you understand that even

(16)   though we are here over Zoom and you are in

(17)   a conference room with an attorney and no

(18)   judge is present, that the oath you've

(19)   taken to take the truth, here, today, is

(20)   the same oath that you would take as if we

(21)   were in a courtroom, in front of a judge?

(22)       **A.    Yes.**

(23)       Q.    You understand that, okay.

(24)            Have you ever testified in

(25)   Court before?

(1)                          J. CAHILL

(2)          **A.      Yes, ma'am.**

(3)          Q.      Have you ever been deposed?

(4)          **A.      Yes, ma'am.**

(5)          Q.      Do you have any physical or

(6)    mental condition that might keep you from

(7)    testifying fully, truthfully, and

(8)    accurately here?

(9)          **A.      No, to the to the best of my**

(10)   **knowledge.**

(11)         Q.      Have you taken any medication

(12)   that could impact your ability to testify?

(13)         **A.      No, I have not.**

(14)         Q.      Have you failed to take any

(15)   medication that you normally take?

(16)         **A.      No, I have not.**

(17)         Q.      Have you consumed any alcohol,

(18)   drugs, or marijuana in the last 24 hours?

(19)         **A.      No, I have not.**

(20)         Q.      Okay.

(21)              **MR. MCGAHA:  I'm going to**

(22)        **object for a second.  We've got an**

(23)        **automatic light in this room that**

(24)        **will go off, unless we move,**

(25)        **periodically, so every now and then**

(1)                    **J. CAHILL**

(2)        **you might see me go off, just to make**

(3)        **sure the light doesn't go off.**

(4)              **MS. MASSIMI:  Okay.  Okay.**

(5)        **Thank you.**

(6)        Q.    Are you represented by an

(7)    attorney today?

(8)        **A.    Yes.**

(9)        Q.    What's your attorney's name?

(10)       **A.    Gabe.  I --**

(11)             **MR. MCGAHA:  McGaha.**

(12)             **THE WITNESS:  McGaha.  I**

(13)       **apologize about the name.  Gabe**

(14)       **McGaha.**

(15)       Q.    A lot of times, people don't

(16)   know their attorney's name, it happens all

(17)   the time.  So how many times have you

(18)   testified in Court?

(19)       **A.    I can't give you an -- I was a**

(20)   **police officer prior to this.  So it was**

(21)   **several times.  Several hundred times,**

(22)   **probably, in that area.  I can't give you**

(23)   **an exact number, ma'am.**

(24)       Q.    Have you ever testified in

(25)   Court, aside from your testimony in your

[Page 12]
February 22, 2024

(1)                    J. CAHILL

(2)   capacity as a member of law enforcement?

(3)        **A.    I don't believe so, no.**

(4)        Q.    Do you understand my question?

(5)        **A.    Yes, I do.**

(6)        Q.    Okay.  So each time you've

(7)   testified in Court, that has been in your

(8)   capacity as a member of law enforcement?

(9)        **A.    To the best of my knowledge, to**

(10)  **the best of my recollection, yes.**

(11)       Q.    Is that the same for the

(12)  depositions you've testified in?

(13)       **A.    Is that the same -- the only**

(14)  **depositions I've ever testified for was for**

(15)  **my previous employment?**

(16)       Q.    When you've testified in the

(17)  past, at depositions, has that been in your

(18)  capacity as a member of law enforcement?

(19)       **A.    Oh, yes, ma'am.  I apologize.**

(20)  **I didn't understand the question.  Yes.**

(21)       Q.    It's okay.  Have you ever

(22)  testified at a deposition, in any other

(23)  capacity, other than in that capacity as

(24)  being a member of law enforcement?

(25)       **A.    Not that I recall.**

(1)                      **J. CAHILL**

(2)          Q.     In other words, have you ever

(3)     testified at a deposition related to your

(4)     employment with FedEx?

(5)          **A.     No, I have not.**

(6)          Q.     How long have you been employed

(7)     by FedEx?

(8)          **A.     13 years, 4 months, roughly.**

(9)          Q.     Have you ever been sued?

(10)         **A.     Not to the best of my**

(11)    **knowledge, personally, no.**

(12)         Q.     Have you ever been sued as a

(13)    member of law enforcement?

(14)         **A.     Not to the best of my**

(15)    **knowledge.**

(16)         Q.     In each of those instances

(17)    where you testified at a deposition, were

(18)    you a defendant, a plaintiff, or a

(19)    non-party?

(20)         **A.     To the best of my knowledge, I**

(21)    **believe a non-party.**

(22)         Q.     Who is your employer when you

(23)    worked as a member of law enforcement?

(24)         **A.     The New York City Police**

(25)    **Department.**

(1)                        **J. CAHILL**

(2)        Q.    Are you retired from the NYPD?

(3)        **A.    Yes, ma'am.**

(4)        Q.    As of when?

(5)        **A.    I retired, approximately,**

(6)   **15 years.  So I believe it was September of**

(7)   **2008.**

(8)        Q.    When did you join the NYPD?

(9)        **A.    January of 1988.**

(10)       Q.    Is that when you joined the

(11)  academy, or was that after the academy?

(12)       **A.    No, that's when I went to the**

(13)  **academy, January of '88.**

(14)       Q.    How long were you at the

(15)  academy?

(16)       **A.    6 months.**

(17)       Q.    You graduated on time?

(18)       **A.    Yes, ma'am.**

(19)       Q.    Other than the NYPD, have you

(20)  ever been a member of any other law

(21)  enforcement agency?

(22)       **A.    No.**

(23)       Q.    Have you ever served in the

(24)  military?

(25)       **A.    No, I have not.**

(1)                          **J. CAHILL**

(2)          Q.     Are you currently in any

(3)     unions?

(4)          **A.     No.**

(5)          Q.     And --

(6)          **A.     Actually, I'm a member of the**

(7)     **Lieutenant's Benevolent Association.  It's**

(8)     **not technically a union, but --**

(9)          Q.     Okay.  Got it.  The NYPD

(10)    Lieutenant's Benevolent Association.

(11)         **A.     Yes.**

(12)         Q.     Were you ever suspended from

(13)    your work, while you were a member of the

(14)    NYPD?

(15)         **A.     No.**

(16)         Q.     When you began working at the

(17)    NYPD, after the academy, did you have the

(18)    rank of officer?

(19)         **A.     Yes.**

(20)         Q.     How long did you hold that

(21)    rank?

(22)         **A.     Till June of 1996.**

(23)         Q.     From January 1988 to June 1996,

(24)    what was your assignment or assignments?

(25)         **A.     I was assigned to patrol,**

(1)                         **J. CAHILL**

(2)    **narcotics.  That's pretty much it.  I was**

(3)    **assigned to patrol, and then I was assigned**

(4)    **to narcotics, which is the organized crime**

(5)    **control bureau.**

(6)         Q.    Have you ever worked as an

(7)    undercover officer?

(8)         **A.    No.**

(9)         Q.    During that period, from 1988

(10)   to 1996, what precinct or precincts were

(11)   you assigned to?

(12)        **A.    I was in the 4-0, the 40th**

(13)   **Precinct in the Bronx.**

(14)        Q.    During that entire time?

(15)        **A.    Yes, until I went to -- into**

(16)   **narcotics, and then I was assigned to the**

(17)   **Narcotics Bureau of Brooklyn North.**

(18)        Q.    What year did you begin working

(19)   at Narcotics Bureau, Brooklyn North?

(20)        **A.    I believe it was the latter**

(21)   **half of '94, possibly '95, but I can't -- I**

(22)   **don't remember.  I apologize.**

(23)        Q.    No, that's okay.  From 1988 to

(24)   1994, you worked exclusively, or you were

(25)   assigned, exclusively to the 40th Precinct;

                          J. CAHILL

(1)

(2)   is that correct?

(3)       **A.     Yes.**

(4)       Q.    Did you receive any promotions

(5)   during that time?

(6)       **A.     During the time I was assigned**

(7)   **to the 40th Precinct?**

(8)       Q.    Yes.

(9)       **A.     No.**

(10)      Q.    You were an officer that entire

(11)  time?

(12)      **A.     Police officer, yes.**

(13)      Q.    When you began working out of

(14)  Narcotic Bureau, Brooklyn North, did that

(15)  transition come with any promotion or

(16)  change in title, or did you go there as an

(17)  officer?

(18)      **A.     I went there as a police**

(19)  **officer.**

(20)      Q.    And, I'm sorry, how long did

(21)  you say you were at Narcotics Bureau of

(22)  Brooklyn North?

(23)      **A.     I would say, approximately --**

(24)  **again, it's been a while.  Approximately, a**

(25)  **year or so.**

(1)                    **J. CAHILL**

(2)        Q.    1 year.

(3)        **A.    Approximately, yes.**

(4)        Q.    During that entire time, were

(5)   you an officer?

(6)        **A.    Yes, ma'am.**

(7)        Q.    Did you apply for any

(8)   promotions during that time?

(9)        **A.    No, I had taken a civil service**

(10)  **exam, prior to -- prior to that.  But, no,**

(11)  **I did not apply for anything.**

(12)       Q.    A civil service exam for what?

(13)       **A.    For the rank of sergeant.**

(14)       Q.    Did you pass that test?

(15)       **A.    Yes.**

(16)       Q.    When did you pass that test?

(17)       **A.    I don't know when I actually**

(18)  **passed it.  I can tell you when I got**

(19)  **promoted.**

(20)       Q.    Did you pass it the first time?

(21)       **A.    Yes.**

(22)       Q.    When did you receive the

(23)  promotion?

(24)       **A.    June of '96.  The summer, yes.**

(25)       Q.    Okay.  When you received that

```
(1)                    J. CAHILL
(2)   promotion, did that come with a change in
(3)   command?
(4)         A.    Yes.
(5)         Q.    What was the change?
(6)         A.    I was assigned to the 83rd
(7)   Precinct in Brooklyn.
(8)         Q.    Beginning in '96, you think; is
(9)   that correct?
(10)        A.    Yes, it was June or July of
(11)  '96.  Yes.
(12)        Q.    You went there as a sergeant;
(13)  is that correct?
(14)        A.    Yes, ma'am.
(15)        Q.    How long were you at the 83rd
(16)  Precinct?
(17)        A.    Till March of 2002.
(18)        Q.    During your time at the 83rd
(19)  Precinct, from 1996 to 2002, were you a
(20)  Sergeant?
(21)        A.    Yes.
(22)        Q.    Did you receive any promotion
(23)  or change in command in 2002?
(24)        A.    Yes, I was promoted in 2002.
(25)        Q.    Promoted to what?
```

(1)                    J. CAHILL

(2)        **A.    Lieutenant.**

(3)        Q.    Did you remain at the 83rd

(4)  precinct when you received that promotion,

(5)  or were you assigned somewhere else?

(6)        **A.    No, I was reassigned.**

(7)        Q.    To where?

(8)        **A.    The 110th Precinct in New York**

(9)  **City.**

(10)       Q.    Where's that?

(11)       **A.    Elmhurst, Queens.**

(12)       Q.    How long were you assigned to

(13)  the 110th Precinct?

(14)       **A.    Approximately, 8 months.**

(15)       Q.    At the end of that 8 months,

(16)  were you reassigned somewhere or something

(17)  else?

(18)       **A.    Yes, I was.**

(19)       Q.    Where were you reassigned to?

(20)       **A.    The Internal Affairs Bureau.**

(21)       Q.    And did that come with a change

(22)  in title?

(23)       **A.    No.**

(24)       Q.    So you remained a lieutenant,

(25)  and you were no longer working out of the

(1)                    J. CAHILL

(2)    110th, you were working for IAB?

(3)         A.    Yes, ma'am.

(4)         Q.    What was the year that that

(5)    happened again?

(6)         A.    I would say the end of 2003,

(7)    early 2004.  I don't remember the exact

(8)    date.

(9)         Q.    How long did you remain

(10)    assigned to IAB?

(11)         A.    2 years and 2 months.

(12)         Q.    Did you leave that position at

(13)    any point?

(14)         A.    No, I was there for -- I was

(15)    assigned there for 2 years and 2 months.

(16)         Q.    What happened at the end of

(17)    that 2 years and 2 months?  Did you get a

(18)    new assignment; did you retire, or

(19)    something else?

(20)         A.    No, I was reassigned to the

(21)    Narcotics Bureau of Brooklyn North, in

(22)    organized crime, in OCCB.

(23)         Q.    Was that back to the same

(24)    assignment you had had years previous?

(25)         A.    Not the same borough, but, no,

(1)                    **J. CAHILL**

(2)    **not the same sign.  It's the same**

(3)    **geographical area, but, no, it wasn't.**

(4)        Q.    What was different about the

(5)    assignment?

(6)        **A.    At that point, I was**

(7)    **lieutenant.  I was actually known as a**

(8)    **module commander.  So I was in charge of,**

(9)    **you know, people underneath me, who covered**

(10)   **different commands.  I had a supervisory**

(11)   **role at that point.**

(12)       Q.    Understood.  How long were you

(13)   in that position as a lieutenant at

(14)   Narcotics Bureau of Brooklyn North?

(15)       **A.    Until I retired in September of**

(16)   **2008.**

(17)       Q.    Did you receive any promotions

(18)   from lieutenant, at any point?

(19)       **A.    Nope, that was it.**

(20)       Q.    Did you apply for any

(21)   promotions?

(22)       **A.    No, I did not.**

(23)       Q.    Why were you reassigned from

(24)   IAB?

(25)       **A.    I had been assigned there for**

(1)                          J. CAHILL

(2)    2 years.  That was the timeframe, when you

(3)    could be reassigned into another unit, and

(4)    I took the opportunity to be reassigned.  I

(5)    applied.  I applied to be reassigned and I

(6)    was.

(7)         Q.    Understood.  You applied to be

(8)    reassigned.

(9)         A.    Yes, ma'am.

(10)        Q.    Did you request, initially, to

(11)   be assigned to IAB?

(12)        A.    No, I did not.

(13)        Q.    Why were you assigned to IAB?

(14)        A.    When you apply for an

(15)   investigatory unit, as a supervisor in the

(16)   NYPD; I don't know if its changed, but term

(17)   was a supervisor assignment board, and

(18)   there were three members of -- there was a

(19)   member of Internal Affairs, a member of

(20)   OCCB, organized crime, and members of the

(21)   detective's bureau, and he went in front of

(22)   all of them, and they can -- which ever one

(23)   wants you, can pick you.  IAB has

(24)   preference.

(25)                    So Internal Affairs has the

(1)                          **J. CAHILL**

(2)    **first pick of who they would want to take.**

(3)         Q.    So you requested to be

(4)    reassigned to an investigatory division,

(5)    and you were assigned as a result of that,

(6)    to IAB?

(7)         **A.    Yes.**

(8)         Q.    How would you describe your

(9)    time with IAB?

(10)        **A.    It was informative.**

(11)        Q.    What's --

(12)        **A.    I learned a lot.**

(13)        Q.    What did you learn?

(14)        **A.    Without getting into specifics,**

(15)   **it's investigatory skills to a different**

(16)   **level.  Enhanced investigatory skills.**

(17)   **Things of that nature.**

(18)        Q.    What are the enhanced

(19)   investigatory skills that you learned at

(20)   IAB?

(21)        **A.    Different interviewing skills,**

(22)   **surveillance.  Besides the legal**

(23)   **requirements, pretty much, that's -- that's**

(24)   **generally it in a nutshell.**

(25)        Q.    What are the interviewing

February 22, 2024

```
(1)                     J. CAHILL
(2)    skills you learned?
(3)         A.     That's a very difficult
(4)    question.  I don't understand.
(5)                Can you elaborate?
(6)         Q.     You said that during your time
(7)    with IAB, you learned enhanced
(8)    investigatory skills; is that correct?
(9)         A.     Yes.
(10)        Q.     You said that as part of your
(11)   enhanced investigatory skills, you learned
(12)   interviewing skills; is that correct?
(13)        A.     Yes.
(14)        Q.     I'm asking you to describe,
(15)   specifically, those interviewing skills
(16)   that you learned at that time?
(17)        A.     The necessity to listen to
(18)   people when they speak because it's very
(19)   important, I would think, conduct, to the
(20)   best of your ability, a thorough
(21)   investigation, so when you do speak with
(22)   someone, you have a good working knowledge
(23)   of what you're speaking about.
(24)        Q.     What is the purpose that you
(25)   learned, during your time with IAB, of the
```

(1)                    J. CAHILL

(2)    necessity to listen to people?

(3)        **A.    So you can make a fair**

(4)    **assessment of what you're trying to**

(5)    **investigate.**

(6)        Q.    Anything else?

(7)        **A.    And, obviously -- obviously, to**

(8)    **listen for specifics -- specific references**

(9)    **to what you're investigating, yes.  I guess**

(10)   **that would be the way to put it.**

(11)       Q.    During your time with IAB, as

(12)   part of learning enhanced investigatory

(13)   skills, did you also learn how to assess

(14)   the credibility of people that you are

(15)   interviewing?

(16)       **A.    The credit -- I would say the**

(17)   **only way to assess the credibility of**

(18)   **someone you are interviewing is by looking**

(19)   **over the entire investigation and taking it**

(20)   **from -- getting -- making an assessment**

(21)   **from all the facts you have, not just a**

(22)   **simple interview.  And I don't mean simple,**

(23)   **not just -- just the interview, if you know**

(24)   **-- if you know what I mean.**

(25)       Q.    During your time with the NYPD,

(1)                    J. CAHILL

(2)    would you say you gained skills on how to

(3)    read people?

(4)        **A.     In what -- in what capacity,**

(5)    **ma'am?  I don't --**

(6)        Q.     During your time with the

(7)    Internal Affairs Bureau, did you have

(8)    incidents where you would have to interview

(9)    people?

(10)       **A.     Yes.**

(11)       Q.     As part of that, did you gain

(12)    skills on assessing whether someone is

(13)    being truthful or not?

(14)       **A.     Not that I recall,**

(15)    **specifically.  Again, I would have to go**

(16)    **back to the only way to make a fair**

(17)    **assessment is to -- would be to look at**

(18)    **everything that's presented to you, not**

(19)    **just the interview.**

(20)       Q.     Is it fair to say that the

(21)    interview and interacting with the

(22)    interviewee, face-to-face, is an important

(23)    component of assessing credibility?

(24)       **A.     Absolutely, yes.**

(25)       Q.     Why is that?

(1)                    J. CAHILL

(2)        A.    It -- it's a dialogue between

(3)    the two of -- between the two or three, how

(4)    many people are speaking.  And you can get

(5)    both -- I would say you can get both sides.

(6)    You can get the interviewee's side and move

(7)    forward from there.

(8)        Q.    During your time with the NYPD,

(9)    in general, did you ever receive training

(10)   on the importance of making observations?

(11)       A.    Can you expand on that?  That's

(12)   kind of a general question.

(13)                Observations as to what?

(14)       Q.    As to anything.  I mean, you

(15)   worked for, you said Narcotics Bureau of

(16)   Brooklyn North, correct?

(17)       A.    Yes.

(18)       Q.    Is part of your role in that

(19)   capacity, for instance, where you were

(20)   required to make observations?

(21)       A.    Yes.

(22)       Q.    Did the NYPD ever provide you

(23)   with training on the importance of making

(24)   observations?

(25)       A.    In different -- different

(1)                    **J. CAHILL**

(2)    **facets, yes.**

(3)         Q.    Based on that training, did you

(4)    have an understanding of the importance of

(5)    making observations?

(6)         **A.    Yes.**

(7)         Q.    What was your understanding,

(8)    during your time with the NYPD, as to your

(9)    -- as to the importance of making

(10)   observations?

(11)        **A.    Observations can be --**

(12)   **observation skills can do anything from**

(13)   **lead you to an answer to a question that**

(14)   **you're looking for, as far as the subject,**

(15)   **and it can also keep you alive.  I'm going**

(16)   **off of a very broad spectrum.  There's**

(17)   **people on the --**

(18)        Q.    Do you --

(19)        **A.    I'm sorry, go ahead.**

(20)        Q.    No, please go ahead.  I did not

(21)   intend to cut you off.  Please proceed.

(22)        **A.    So it's two different -- I**

(23)   **don't mean to -- it's just two different**

(24)   **answers to that.  Observations skills are**

(25)   **very important in many different facets.**

(1)                    **J. CAHILL**

(2)        Q.     Observation skills are

(3)    important to protect your safety as a cop,

(4)    right?

(5)        **A.     That's one of them, yes.   It's**

(6)    **one of them, yes.**

(7)        Q.     Observation skills are also

(8)    important to take in information and make

(9)    assessments; is that correct?

(10)       **A.     Yes.**

(11)       Q.     During your time with the NYPD,

(12)   did you ever receive training on the

(13)   importance of recording your observations?

(14)       **A.     Yes.**

(15)       Q.     What was the training you

(16)   received on recording your observations?

(17)       **A.     There were different forms,**

(18)   **different forms you had to maintain,**

(19)   **depending on what your assignment is, and**

(20)   **then you need to report the pertinent**

(21)   **information as you see it.**

(22)       Q.     What is the purpose of

(23)   recording that pertinent information, as

(24)   you see it?

(25)       **A.     So it can be accurately**

(1)                    **J. CAHILL**

(2)   **recalled at a later date, I would think.**

(3)        Q.    What's the importance of

(4)   accurate recalling information at a later

(5)   date?

(6)        **A.    The fairness of whatever**

(7)   **proceeding is coming up, to give a fair and**

(8)   **accurate testimony.**

(9)        Q.    Did you take those skills that

(10)  you learned with the NYPD, into your

(11)  employment with FedEx?

(12)       **A.    To the best of my ability, yes.**

(13)       Q.    Is that part of the reason you

(14)  think that FedEx hired you?

(15)       **A.    I can't speak to as to why they**

(16)  **hired me.  I can't answer that.**

(17)       Q.    Fair enough, okay.  During the

(18)  time with -- oh, during your time with the

(19)  NYPD, did you ever receive training on the

(20)  importance of -- and, by the way, these are

(21)  not trick questions.

(22)            I'm just --

(23)       **A.    No worries.**

(24)       Q.    -- clearly asking you

(25)  questions.

(1)                    J. CAHILL

(2)              So during your time with the

(3)    NYPD, did you ever receive training on the

(4)    importance of telling the truth?

(5)         **A.    Absolutely, yes.**

(6)         Q.    What is the training that you

(7)    received as to the importance of telling

(8)    the truth?

(9)         **A.    To summarize it, you tell the**

(10)   **truth the best that you can -- the best**

(11)   **that you can remember it, you be honest,**

(12)   **and you tell the truth, no matter what the**

(13)   **outcome is.**

(14)        Q.    And that truth-telling is also

(15)   integral to the accurate recording in forms

(16)   and documents that you just testified to,

(17)   correct?

(18)        **A.    They should -- yes, they should**

(19)   **work hand-in-hand, yes.**

(20)        Q.    In other words, understand the

(21)   importance of accurately reporting

(22)   observations in documents, correct?

(23)        **A.    Yes.**

(24)        Q.    And part of that understanding,

(25)   you received during your time with the

```
(1)                    J. CAHILL
(2)    NYPD, correct?
(3)         A.    That's fair to say, yes.
(4)         Q.    And you've carried that in your
(5)    employment with FedEx, correct?
(6)         A.    To the best of my ability, yes.
(7)         Q.    Has the CCRB ever substantiated
(8)    any charges against you?
(9)         A.    Yes.
(10)        Q.    How many times?
(11)        A.    Once.
(12)        Q.    Do you recall when that was?
(13)        A.    I would say 2004, 2005.
(14)        Q.    Do you recall what those
(15)    charges were?
(16)        A.    They were related to the
(17)    search, to a search.
(18)        Q.    And do you recall what was
(19)    being claimed you did or didn't do?
(20)        A.    I believe -- I believe, to the
(21)    best of my recollection, we were placing an
(22)    individual under arrest.  They attempted to
(23)    go into a basement.  We went into the
(24)    basement.  There was a door to an office or
(25)    a bathroom.  I don't remember what it was.
```

(1)                    **J. CAHILL**

(2)    **It was closed.  As I passed it, I opened to**

(3)    **make sure nobody was in there and proceeded**

(4)    **through.  And they felt that that search**

(5)    **was -- it wasn't necessary, to open that**

(6)    **door.  That was pretty much the gist of it.**

(7)         Q.    You followed someone into their

(8)    home or into their building?

(9)         **A.    It was a bodega.**

(10)        Q.    Do you recall whether -- well,

(11)   did you claim to find any contraband or

(12)   weapons or narcotics as a result of that

(13)   search?

(14)        **A.    I don't remember it.  We placed**

(15)   **an individual under arrest, but I do not**

(16)   **remember exactly what we recovered or**

(17)   **anything to that effect.**

(18)        Q.    Who filed or made those CCRB

(19)   allegations?  Was it the person you

(20)   arrested or something else?

(21)        **A.    That, I can't -- I -- I don't**

(22)   **know who.  I don't know.  It was a long**

(23)   **time ago.  I don't recall.**

(24)        Q.    Do you recall whether you

(25)   received any penalty as a result of that

(1)                    J. CAHILL

(2)    CCRB substantiation?

(3)        **A.    Yes, I had the option to appeal**

(4)    **it or take -- or lose a couple of vacation**

(5)    **hours.  And I -- and I just decided to take**

(6)    **the vacation hours and move on.**

(7)        Q.    In other words, I mean, did you

(8)    have the choice of proceeding to an

(9)    administrative trial or taking the vacation

(10)   days?

(11)       **A.    Yes.**

(12)       Q.    And you opted to not go to the

(13)   administrative trial; is that correct?

(14)       **A.    Right.**

(15)       Q.    Have you ever been the subject

(16)   of an administrative trial during your time

(17)   at the NYPD?

(18)       **A.    No.**

(19)       Q.    How many vacation days were you

(20)   docked?

(21)       **A.    It was 6 hours.**

(22)       Q.    6 hours, okay.  Did you receive

(23)   a command discipline with regard to that

(24)   same incident?

(25)       **A.    Yes, I believe.  Yes, I did.**

(1)                     **J. CAHILL**

(2)        Q.    Was that discipline separate

(3)    and apart from the vacation days that you

(4)    opted to docked for?

(5)        **A.    No, it was one in the same.**

(6)        Q.    So, in other words, you

(7)    accepted a command discipline, instead of

(8)    proceeding to an administrative trial?

(9)        **A.    Yes.**

(10)       Q.    And that command discipline was

(11)   to be docked 6 hours of vacation?

(12)       **A.    Yes.**

(13)       Q.    Do you know if the IAB also

(14)   investigated to that incident?

(15)       **A.    I was assigned to IAB.**

(16)       Q.    You were assigned to IAB at

(17)   that time?

(18)       **A.    Yes.**

(19)       Q.    So was that a no, IAB did not

(20)   investigate that incident?

(21)       **A.    Yes, they did.  I didn't,**

(22)   **obviously, but, yes, they did.**

(23)       Q.    Right.  Understood.  And do you

(24)   know if IAB made any findings with regard

(25)   to that incident?

(1)                    J. CAHILL

(2)        **A.      From what I remember, the NYPD**

(3)    **felt that I justified my actions for safety**

(4)    **reasons, for the safety of everyone,**

(5)    **anybody involved, however, CCRB had a**

(6)    **different opinion and that's just the way**

(7)    **it kind of played out.**

(8)        Q.      Understood, yeah.  Other than

(9)    that incident, have you ever, to your

(10)   knowledge, been the subject of any other

(11)   CCRB investigation?

(12)       **A.      Not that I can recall.**

(13)       Q.      Other than that incident, has

(14)   the CCRB ever substantiated any other

(15)   charges against you?

(16)       **A.      No.**

(17)       Q.      Has IAB ever substantiated any

(18)   charges against you?

(19)       **A.      No.**

(20)       Q.      Other than what you just

(21)   described, did you ever receive any other

(22)   command disciplines?

(23)       **A.      I don't believe so.  I do not**

(24)   **believe so.  I -- not that I recall.**

(25)       Q.      Have you ever had to pay any --

```
(1)                    J. CAHILL
(2)    or do you know whether the NYPD has ever
(3)    had to pay any settlements or verdicts
(4)    related to lawsuits where you've been named
(5)    as a defendant?
(6)         A.    Not that I'm aware of.
(7)         Q.    Have you personally ever had to
(8)    pay anything out-of-pocket, related to any
(9)    lawsuits during your employment with the
(10)   NYPD?
(11)        A.    No, no, ma'am.
(12)        Q.    Have you ever testified at any
(13)   civil trial?
(14)        A.    Not that I recall.
(15)        Q.    Have you ever testified in
(16)   federal court?
(17)        A.    I believe so, yes.  I can't be
(18)   specific, but I believe so, yes.
(19)        Q.    Related to what, criminal
(20)   charges against someone else or something
(21)   else?
(22)        A.    It would have had to have been,
(23)   yeah.  It would have had to have been.
(24)        Q.    Other than what you've
(25)   described, to your knowledge, have you ever
```

(1)                         J. CAHILL

(2)     received any other reprimand or discipline

(3)     during your time with the NYPD?

(4)         A.     Not that I recall.  If I did,

(5)     it was minor to the point where I don't

(6)     recall.

(7)             MS. MASSIMI:  Can we just take

(8)         a 5-minute break or a 2-minute break?

(9)             MR. MCGAHA:  Sure.

(10)            (Whereupon, a short recess was

(11)        taken.)

(12)            MS. MASSIMI:  What was the last

(13)        question and answer?

(14)            (Whereupon, the referred to

(15)        question and answer was read back by

(16)        the Reporter.)

(17)            MS. MASSIMI:  Okay.

(18)        Q.     During your time with the NYPD,

(19)    were you a member of any unions?

(20)        A.     Each rank has a benevolent

(21)    association.  So when I was an officer, it

(22)    was a Patrolman's Benevolent Association,

(23)    and then when I was a sergeant, the

(24)    Sergeant's Benevolent association, and when

(25)    I was Lieutenant, it was the Lieutenant's

(1)                    **J. CAHILL**

(2)    **Benevolent association.**

(3)         Q.    Other than those unions, have

(4)    you ever been a member of any other union?

(5)         **A.    No.**

(6)         Q.    Were you ever seriously injured

(7)    during your time with the NYPD?

(8)         **A.    I ended up retiring on a**

(9)    **disability pension, yes.**

(10)        Q.    Just generally speaking, what

(11)   was the cause of that disability?  Was it

(12)   just stuff over time; was it a result of a

(13)   traumatic injury, or something else?

(14)              **MR. MCGAHA:  I object to form.**

(15)    **You could answer it.**

(16)        **A.    It was the result of a police**

(17)   **action.**

(18)        Q.    Of a police -- okay.  Right, I

(19)   understand that.  Was it a result of being

(20)   injured from a civilian on the job, I

(21)   guess, is what I'm saying?

(22)        **A.    Was the result, I'm sorry, from**

(23)   **a civilian on the job?**

(24)        Q.    Was it that you got shot and

(25)   you had to retired, attacked by a civilian

(1)                         J. CAHILL

(2)      and had to retire, anything like that?

(3)           **A.     I suffered an injury, where I**

(4)      **was forced to retire, yes.**

(5)           Q.     What caused the injury?

(6)           **A.     I was injured during the**

(7)      **execution of a search warrant.**

(8)           Q.     Was it as a result of -- were

(9)      you shot during that incident?

(10)          **A.     No, I was not.**

(11)          Q.     Just give me one second.

(12)                 During your time with the NYPD,

(13)     did you ever arrest a civilian for

(14)     assaulting an officer?

(15)          **A.     Yes.**

(16)          Q.     Did you ever arrest a civilian

(17)     for attempting to assault an officer?

(18)          **A.     Generally, when someone is**

(19)     **arrested for assaulting a police officer or**

(20)     **anyone, the lesser included charge is,**

(21)     **sequentially, attempted assault.**

(22)          Q.     Have you ever arrested anyone,

(23)     specifically, for attempted assault?

(24)          **A.     I don't recall.**

(25)          Q.     What is attempted assault?

(1)                    J. CAHILL

(2)        **A.      For layman's terms, I would**

(3)    **imagine someone who attempts, tries to**

(4)    **cause someone physical injury, and they're**

(5)    **not able to do that, but their intent was**

(6)    **to.**

(7)        Q.    Have you ever arrested a

(8)    civilian for attempted harassment?  Have

(9)    you ever arrested a civilian for harassment

(10)   of a police officer?

(11)       **A.      I -- I don't recall.**

(12)       Q.    You don't know if you've ever

(13)   made an arrest on a civilian, for

(14)   harassment of a police officer?

(15)       **A.      Generally, generally, back when**

(16)   **I was a police officer, remember, it was**

(17)   **quite a long time ago, police -- we didn't**

(18)   **arrest people for harassment of a police**

(19)   **officer.  It's generally an assault,**

(20)   **attempted assault.  I don't -- I -- I feel**

(21)   **confident saying I don't believe I've ever**

(22)   **arrested someone, specifically, for**

(23)   **harassing a police officer.  Just, that as**

(24)   **a sole-standing charge.  I don't recall if**

(25)   **I did.**

(1)                    **J. CAHILL**

(2)        Q.    Okay.  During your time as a

(3)    member of the NYPD, did any civilian ever

(4)    throw anything in your direction?

(5)        **A.    Yes.**

(6)        Q.    How many times?

(7)        **A.    I can't answer that accurately.**

(8)    **I've been to what you've considered civil**

(9)    **disturbance, in many occasions, in**

(10)   **different ranks, as well as incidents on**

(11)   **the street, things tend to happen**

(12)   **sometimes, people throw things.  I can't**

(13)   **give you an accurate time of a specific**

(14)   **incident.**

(15)       Q.    Sure, and, again, these are not

(16)   trick questions or anything.  I'm just

(17)   trying to gather information.  Can you

(18)   remember any specific incident, you know,

(19)   you don't have to give me the date or the

(20)   exact location or the names of the people

(21)   involved, but can you remember, as you sit

(22)   here today, any incident during your time

(23)   with the NYPD, where a civilian threw

(24)   something at you?

(25)       **A.    Yes.**

(1)                    **J. CAHILL**

(2)        Q.    Give me one second.  I'm sorry,

(3)    give me one second.

(4)        **A.    No, go ahead.**

(5)        Q.    Okay.  And can you describe,

(6)    just in sum and substance, the

(7)    circumstances of any of those incidents

(8)    that you recall?

(9)        **A.    We had a toilet bowl dropped on**

(10)   **our police car from a 6-storey building.**

(11)   **At one point, in the Bronx, a brick thrown**

(12)   **from a 3-storey building.  I believe it hit**

(13)   **driver's door directly under my hand.  It**

(14)   **did not hit me.  Bottles on different**

(15)   **occasions.  Various things.  The toilet**

(16)   **bowl's what I kind of remember.**

(17)            **It rings a little.**

(18)       Q.    No, that sounds very memorable.

(19)   When you say you've had bottles thrown at

(20)   you, are those things that you have made

(21)   arrests for, of people throwing various

(22)   items of debris in your direction?

(23)       **A.    Yes, I'm sure.  Some, yes.**

(24)       Q.    Even though those items, like

(25)   the bottles, haven't hit you, you probably

(1)                    J. CAHILL

(2)     arrested people for throwing things in your

(3)     direction, right?

(4)          **A.    Yes.**

(5)          Q.    For what purpose did you make

(6)     those arrests?

(7)          **A.    Besides the public safety as**

(8)     **well, it's not just a bottle or a brick**

(9)     **could not just hit us.  It could hit a**

(10)    **civilian on the street.  It's reckless**

(11)    **conduct.  It's -- there could be intent to**

(12)    **-- the intent to assault.  But I would say,**

(13)    **generally, what we use is the term reckless**

(14)    **endangerment, would be one of the charges.**

(15)    **But, again, I -- criminal mischief, if it**

(16)    **broke something.  There's a variety.  You**

(17)    **know better than me.  There's a variety of**

(18)    **things you could charge.**

(19)         Q.    I mean, no, you're

(20)    knowledgeable.  I'm just, you know, asking

(21)    questions.  That's all.  What about the

(22)    disrespect that you dealt with as a member

(23)    of NYPD?  Is that something that happened?

(24)         **A.    It happens, of course.  Of**

(25)    **course, it happens, yeah.  There's nothing**

February 22, 2024

J. CAHILL

(1)

(2) **you could go about that.**

(3)      Q.     Right.  I mean, I'm assuming

(4) during your time with the NYPD, you would

(5) receive disrespect in various forms, from;

(6) I don't know, people in the community or

(7) people that you had to interact with; is

(8) that correct?

(9)      **A.     That's fair to say.**

(10)      Q.     And how -- what are some

(11) examples of the way you would address that

(12) disrespect or deal with that disrespect, if

(13) at all?  I mean, maybe you -- maybe you,

(14) for 20 years, you just brushed it off and

(15) let it roll off your back.  I don't know.

(16) You tell me.

(17)      **A.     Generally, I believe it goes**

(18) **back to your previous question about**

(19) **somebody being specifically arrested for**

(20) **harassment.  The general theory that I was**

(21) **taught, again, a long time ago, was police**

(22) **officers need a thicker skin.  If there's**

(23) **certain things you have to tolerate, just**

(24) **in your -- just for your position.  And if**

(25) **people have something to say and they're**

(1)                    **J. CAHILL**

(2) **not interfering with what you're trying to**

(3) **do, they're not interfering with your**

(4) **official duties, they're not physically**

(5) **interfering with you from performing your**

(6) **job.  There are certain things you have to**

(7) **tolerate.**

(8)        Q.    No, I respect that for sure.  I

(9) get it.  But would you agree that during

(10) your time with the NYPD, and I'm just

(11) assuming, you know, you'll tell me that I'm

(12) right or wrong, that there were instances

(13) where the disrespect maybe reached another

(14) level, and you might have had occasion to

(15) say to someone, hey, take a step back, or,

(16) hey, you're crossing the line?

(17)        Have you ever had an occasion

(18) to say that to someone during your time

(19) with the NYPD?

(20)        **A.    Yes.**

(21)        Q.    Right.  And you're a human

(22) being, right?  So it's within your personal

(23) right to say to someone, who would have

(24) been encroaching on your space, back up,

(25) you're too close, right?

(1)                    J. CAHILL

(2)      **A.    Yes, if someone gets too close**

(3)   **to the point where they could inhibit your**

(4)   **ability to do your job or your personal**

(5)   **safety, yes, that would be one of the first**

(6)   **things that I would do, personally, is tell**

(7)   **them to step back, take a step back, and**

(8)   **give us some space.**

(9)      Q.    Right.  And you don't -- I

(10)  mean, would you agree that if someone was

(11)  encroaching on your space or about to

(12)  encroach on your space, it's not

(13)  necessarily safe for you to become, so to

(14)  speak, a shrinking violet, right?  You kind

(15)  of want to say to that person, back up,

(16)  you're crossing a line, correct?

(17)           **MR. MCGAHA:  I object to form.**

(18)     **A.    Basically, that's -- that's**

(19)  **kind of it.  It takes more.  That's an**

(20)  **elaborate response.**

(21)     Q.    Feel free to give me your

(22)  response, it's fine.

(23)     **A.    One of -- one of the things in**

(24)  **a situation you're describing, it sounds**

(25)  **like you're describing something that's**

(1)                    J. CAHILL

(2) becoming volatile and somebody is

(3) aggregated and -- somebody is aggravated

(4) with the police and approach willing them.

(5) One of the things you have to do as a

(6) police officer is create safety.

(7)               That means if I tell you to

(8) back up while I'm taking a step back, at

(9) least 7 feet, because there are things that

(10) a police officer brings to something like

(11) that, you have weapons, you have a night

(12) stick.  There are things that you don't

(13) want people to get that close to.  So you

(14) need to maintain what we used to call a

(15) zone of safety.  I don't know what it's

(16) called now, but that's what it used to be.

(17)               So there have been times where

(18) you're telling people to back up, back off.

(19) The more prudent thing to do, the tactical

(20) thing to do is to step back as you're doing

(21) that.  If they continue to proceed, then

(22) you need to address that.  But, generally,

(23) creating distances is the safest thing to

(24) do as -- as you assess the situation.

(25) That's the best way to describe it.

(1)                    **J. CAHILL**

(2)        Q.    What you're describing is

(3)   essentially drawing boundaries with people

(4)   that you encountered on the job, correct?

(5)        **A.    That's a good way to put it,**

(6)   **yes.**

(7)        Q.    As part of that, did you ever

(8)   have an occasion to place your hands on

(9)   someone?

(10)       **A.    Yes.**

(11)       Q.    In other words, where backing

(12)  up would not be prudent, but it would be

(13)  more effective to kind of place your hand

(14)  on someone and say, hey, take a step back.

(15)  You've done that, right?

(16)            **MR. MCGAHA:   I object to form.**

(17)       **A.    Again, it's the -- you have to**

(18)  **assess the situation, but if someone is**

(19)  **advancing quickly, yes, you need to do what**

(20)  **you need -- yes, there have been times**

(21)  **where someone needs to be arrested.**

(22)       Q.    All right.  Understood.  I

(23)  don't know if I asked this before.  Have

(24)  you ever served in any branch of the

(25)  military?

```
(1)                    J. CAHILL

(2)        A.    I have not, ma'am.

(3)        Q.    Have you ever served -- I may

(4)   have asked you this, but just for my own

(5)   clarity.  Have you ever served as a member

(6)   of any other law enforcement agency, other

(7)   than the NYPD?

(8)        A.    No, I have not.

(9)        Q.    Do you have any nicknames?

(10)       A.    Not that I'm aware of.

(11)       Q.    To your knowledge, have you

(12)  been known by any other names?

(13)       A.    Not that I'm aware of.

(14)       Q.    Do you have a middle name?

(15)       A.    Yes.  Gerrard.

(16)       Q.    Gerrard, okay.  Where were you

(17)  born?

(18)       A.    Queens, New York.

(19)       Q.    Where are your parents from?

(20)       A.    Queens.  Both -- yeah, both

(21)  from Queens.

(22)       Q.    What is your race?

(23)       A.    A male white.

(24)       Q.    White.

(25)       A.    Yes.
```

[Page 52]
February 22, 2024

(1)                          **J. CAHILL**

(2)        Q.    Okay.  Are you married?

(3)        **A.    Yes.**

(4)        Q.    What is your wife's race?

(5)        **A.    White.**

(6)        Q.    Do you have any disabilities of

(7)   which FedEx is aware?

(8)        **A.    No.**

(9)        Q.    Have you ever requested a

(10)  reasonable accommodation from FedEx?

(11)       **A.    No, I have not.**

(12)       Q.    Have you ever complained of

(13)  discrimination at any job, FedEx, the NYPD,

(14)  or anything else?

(15)       **A.    No, I have not.**

(16)       Q.    Where do you currently reside?

(17)       **A.    Long Island, New York.**

(18)       Q.    Do you have children?

(19)       **A.    Yes.**

(20)       Q.    How many?

(21)       **A.    Two.**

(22)       Q.    What are the races of your

(23)  children?

(24)       **A.    White.**

(25)       Q.    Have you ever been divorced?

```
(1)                    J. CAHILL
(2)        A.      No.
(3)        Q.      How long have you been married?
(4)        A.      A little over 31 years.  My
(5)   wife would kill me for the slow response.
(6)        Q.      I was just going to say, no one
(7)   is going to tell her, don't worry.
(8)                 Well, congratulations.
(9)        A.      Thank you.
(10)       Q.      Have you ever been arrested
(11)  before?
(12)       A.      No.
(13)       Q.      I'm assuming you have no felony
(14)  convictions; is that correct?
(15)       A.      No.
(16)                MR. MCGAHA:  Wait, to make it
(17)          clear, the question is, do you have
(18)          any felony convictions?  The question
(19)          was, I'm assuming you don't have any
(20)          felony convictions and you said no.
(21)          So just to be clear.
(22)                THE WITNESS:  I do not have any
(23)          felony convictions.
(24)                MS. MASSIMI:  Right.  That's
(25)          what I understood you to be saying.
```

(1)                    **J. CAHILL**

(2)              **THE WITNESS:  Thank you.**

(3)        Q.    Have you ever sued anyone

(4)    before?

(5)        **A.    No.**

(6)        Q.    What's your highest level of

(7)    education?

(8)        **A.    I believe I have 110, 100**

(9)    **credits of college.  That's pretty much it.**

(10)       Q.    From which institution?

(11)       **A.    I went to Nassau Community**

(12)   **College, and then I went to Empire State**

(13)   **College.**

(14)       Q.    And are those credits towards

(15)   any particular area of study or towards any

(16)   particular degree?

(17)       **A.    Majority of them are in**

(18)   **criminal justice, in that related**

(19)   **background.**

(20)       Q.    Were they towards a bachelor's

(21)   in criminal justice?

(22)       **A.    Yeah, I guess.  Yeah, that's**

(23)   **pretty safe to say.  Yeah.**

(24)       Q.    Do you intend to complete that

(25)   degree?

(1)                    J. CAHILL

(2)        **A.        No.**

(3)        Q.        Did you graduate from high

(4)   school?

(5)        **A.        Yes.**

(6)        Q.        Which high school?

(7)        **A.        Division Avenue in Levittown,**

(8)   **New York.**

(9)        Q.        What is your current employer?

(10)       **A.        FedEx.**

(11)       Q.        Do you have any other

(12)  employers?

(13)       **A.        No.**

(14)       Q.        How long have you worked for

(15)  FedEx?

(16)       **A.        13 years and 4 months, I**

(17)  **believe.**

(18)       Q.        During your time with FedEx,

(19)  have you had any other employers?

(20)       **A.        No.**

(21)       Q.        What is your job title?

(22)       **A.        Senior Security Specialist.**

(23)       Q.        How long have you held that

(24)  title?

(25)       **A.        10.   10 years, 11 years.   11, I**

(1)                          **J. CAHILL**

(2)    **believe.  I believe it's 11.  Between 10**

(3)    **and 11.**

(4)         Q.    Prior to becoming the Senior

(5)    Security Specialist, prior to becoming a

(6)    Senior Security Specialist, what was your

(7)    job title?

(8)         **A.    Security Specialist.**

(9)         Q.    In 2021, were you the senior

(10)   security specialist?

(11)        **A.    Yes.**

(12)        Q.    At that time, were you

(13)   responsible for any specific area within

(14)   FedEx?

(15)        **A.    Yes.**

(16)        Q.    What area?

(17)        **A.    I had -- I was responsible for**

(18)   **6 different buildings, LGA, FRG, ISP, LNGI**

(19)   **117, QBOH 3118, and WSHA.**

(20)             **That's a separate building.**

(21)        Q.    Are all of those buildings

(22)   located in New York City?

(23)        **A.    Yes, ma'am.**

(24)        Q.    And do you still have

(25)   responsibility for that same area -- or,

(1)                    J. CAHILL
(2)  I'm sorry.
(3)         **A.    I --**
(4)         Q.    Do you still have
(5)  responsibility for that same areas?
(6)         **A.    I'm no longer responsible for**
(7)  **LGA.  The other buildings, yes.**
(8)         Q.    Why are you no longer
(9)  responsible to LGA?
(10)        **A.    They gave that building to a**
(11) **newly hired person.  I was covering an**
(12) **expensive number of buildings, and ones**
(13) **they hired someone, they took that one away**
(14) **from me, to -- just for the fairness of the**
(15) **workload.**
(16)        Q.    When did that, so to speak,
(17) take that away from you?
(18)        **A.    I would say about a year.  A**
(19) **year ago, but, roughly, a year.**
(20)        Q.    Did that impact your pay or
(21) seniority in any way?
(22)        **A.    Not at all.**
(23)        Q.    Was that then taken -- quote,
(24) unquote, taken, LGA from you, was that, in
(25) any way, related to the incident we're here

(1)                    J. CAHILL

(2)  to discuss today?

(3)       **A.    Absolutely not.**

(4)       Q.    Currently, who is your

(5)  supervisor?

(6)       **A.    My direct manager is Richard**

(7)  **Monto and --**

(8)       Q.    Who is your supervisor -- I'm

(9)  sorry, what was that?

(10)      **A.    I was spelling that.  I'm sorry**

(11)  **about that.**

(12)      Q.    No, go ahead.  Spell it.

(13)      **A.    M-O-N-T-O.**

(14)      Q.    Was Richard Monto your

(15)  supervisor in 2021?

(16)      **A.    No, he was not.**

(17)      Q.    Who was your supervisor in

(18)  2021?

(19)      **A.    Christopher Borka.**

(20)      Q.    Was Chris Borka your supervisor

(21)  for the entire year of 2021?

(22)      **A.    I believe so, yes.**

(23)      Q.    Is Chris Borka still employed

(24)  with FedEx?

(25)      **A.    No, he is not.**

(1)                    **J. CAHILL**

(2)        Q.    Do you know why he's no longer

(3)    employed with FedEx?  Did he retire,

(4)    something else?

(5)        **A.    I can't.  I don't know why he**

(6)    **left.**

(7)        Q.    Sure, okay.  During your time

(8)    with FedEx, have you received any training?

(9)        **A.    Yes.**

(10)       Q.    Can you please describe for me

(11)   the training that you've received?

(12)               **MR. MCGAHA:  I object to form.**

(13)       **A.    Everything from investigatory**

(14)   **training, video training, the use of the**

(15)   **video equipment, computer training,**

(16)   **workplace violence training, EEO training,**

(17)   **active shooter training, as far as -- it's**

(18)   **-- it's a yearly continue -- continuous**

(19)   **training cycle (indicating).  And it's**

(20)   **every year.  So it's -- there's no --**

(21)   **there's quite a few -- extensive training**

(22)   **library.**

(23)       Q.    Right.  Related to the -- can

(24)   you describe, in more detail, the

(25)   investigatory training that you've received

```
(1)                   J. CAHILL
(2)    at FedEx?
(3)         A.    We went -- we were -- as a
(4)    specialist, you go to Memphis, that's for a
(5)    training period, where they discuss -- I'm
(6)    sorry, they discuss the aspect of the job,
(7)    the responsibilities, as well as they try
(8)    and give you training to help with that, to
(9)    try and let you succeed, basically.
(10)        Q.    Did they give you training on
(11)   the importance of truthfulness and
(12)   recordkeeping?
(13)        A.    Yes.
(14)        Q.    Would you say that the training
(15)   you received at FedEx, the investigatory
(16)   training is similar, in some ways, to the
(17)   training you received at the NYPD?
(18)        A.    Yes, it's similar.
(19)        Q.    I'm sorry, I saw you shaking
(20)   your head, and I saw you give an answer,
(21)   but I didn't hear it.
(22)        A.    Yes, it's similar.  It's a
(23)   little more restrictive, but it's similar,
(24)   yes.
(25)        Q.    Okay, that was gonna be my next
```

February 22, 2024

```
(1)                    J. CAHILL
(2)   question.  Can you explain the ways in
(3)   which it's different?  You just said it's
(4)   more restrictive, but can you explain what
(5)   you mean by that?
(6)        A.     In NYPD law enforcement, there
(7)   are things that you are allowed to do when
(8)   you're interviewing people.  You can lie,
(9)   you can use props, you can tell them things
(10)  that didn't really happen and it's okay.
(11)  In FedEx, we do not do that.  We do not
(12)  lie; we do not tell you -- we do not tell
(13)  you we have some type of evidence, where we
(14)  do not.  There -- any -- any one of our
(15)  employees are free to leave at any time
(16)  during an interview with security, they're
(17)  not bound to stay.
(18)            They can go at any given point.
(19)  I'm sure there are other differences, but
(20)  those are the ones that kind of stand out
(21)  to me.
(22)       Q.     I really appreciate your
(23)  candor.  Thank you.  Okay.  Anything else
(24)  that sticks out in your head, as to the
(25)  difference between FedEx investigative
```

```
(1)                      J. CAHILL
(2)    tactics and NYPD investigative tactics?
(3)    I'm not asking you to give an exhaustive
(4)    list, just anything else that sticks out in
(5)    your head.
(6)         A.    Mainly, that really sticks out
(7)    is the FedEx interviewing technique is
(8)    cordial.  It's not designed to be, nor is
(9)    it combative.  It's not argumentive.  It's
(10)   just you try to keep it as a conversation,
(11)   and that's pretty much the best way I can
(12)   describe it.
(13)        Q.    Do you find that to be an
(14)   effective method of getting truthful
(15)   information from people?
(16)        A.    Yes.
(17)        Q.    To your knowledge, does FedEx
(18)   have a policy against race discrimination?
(19)        A.    Yes.
(20)        Q.    What is your understanding of
(21)   what that policy is?
(22)        A.    Any type of disrespect,
(23)   disparaging treatment towards anyone due to
(24)   their race, there's sexual orientation,
(25)   creed, anything at all is not tolerated.
```

(1)                    **J. CAHILL**

(2)    **There's zero tolerance for it.**

(3)        Q.    Has anyone ever accused you, at

(4)    FedEx, of any type of discrimination?

(5)        **A.    No.**

(6)        Q.    Either formally or informally.

(7)        **A.    No.**

(8)        Q.    Is there a handbook in place at

(9)    FedEx, to your knowledge, for security

(10)    personnel such as yourself?

(11)        **A.    Yes, we have documents for**

(12)    **security-related purposes.  Yes.**

(13)        Q.    What is the name of those

(14)    collective documents, if there is one?

(15)        **A.    I'm not aware if there is a**

(16)    **specific name for -- for, like, a group of**

(17)    **the policy.  But there's a group of**

(18)    **policies, security-related.  You know,**

(19)    **there are specific, different policies that**

(20)    **pertain to security.  I'm not aware of one**

(21)    **title for the group of them.**

(22)        Q.    Have you ever heard anyone

(23)    engage in racial jokes in FedEx?

(24)        **A.    I have not, no.**

(25)        Q.    In 2021, did you have a

```
          (1)              J. CAHILL
          (2)   specific office where you worked out of;
          (3)   were you in different locations every day
          (4)   or worked from home or something else?
          (5)        A.    I did not work from home, but I
          (6)   had -- like I said, I had 6 buildings.  So
          (7)   I was in and out of different -- different
          (8)   buildings underneath, depending on, you
          (9)   know.
         (10)        Q.    Right.  Was that -- I'm sorry,
         (11)   yep.
         (12)        A.    No, whatever the necessity
         (13)   called for.
         (14)        Q.    Was that on a daily basis?  On
         (15)   a daily basis, in 2021, were you at
         (16)   different locations?
         (17)        A.    I rotated, yes.
         (18)        Q.    Did you have a specific office
         (19)   that was kind of your home base, so to
         (20)   speak, or, no?
         (21)        A.    I had -- I had an office at
         (22)   LGA.  I have an office in FRG as well.  I
         (23)   used to go, pretty much, regularly, one of
         (24)   those two during the week or something like
         (25)   that.  I also have an office out east at
```

(1)                    **J. CAHILL**

(2)    **117.  So it depends.  Whatever was going**

(3)    **on, I would go to that building.  There was**

(4)    **no place that I had to be there every day,**

(5)    **unless I had to.  I don't know if that**

(6)    **makes sense.**

(7)         Q.    It does makes sense, yes.  Do

(8)    you know the name of the Plaintiff in this

(9)    case?

(10)        **A.    I've learned it's Kevin**

(11)   **Campbell.**

(12)        Q.    Do you know Kevin Campbell?

(13)        **A.    Just from FedEx.**

(14)        Q.    When did you first become aware

(15)   of who Kevin Campbell was?

(16)        **A.    I had, from walking into the**

(17)   **facility, I had seen Kevin and other**

(18)   **people, but I did not specifically know who**

(19)   **he was until the incident.  I -- that was**

(20)   **the first interaction I had with him,**

(21)   **security-related.**

(22)        Q.    Do you recall ever receiving

(23)   any complaints about Kevin Campbell?

(24)        **A.    The -- no, with the exception**

(25)   **that this is the only security-related**

(1)                    **J. CAHILL**

(2)    **incident I've ever had with Kevin.**

(3)       Q.    Did you ever hear anyone say

(4)    anything about Kevin Campbell, prior to

(5)    this incident?

(6)       **A.    No.**

(7)       Q.    Did you know Kevin Campbell's

(8)    name, prior to this incident?

(9)       **A.    Probably not.  I just knew him**

(10)   **by face.  I don't -- I don't believe I did.**

(11)   **I just knew him by face.  There's 200**

(12)   **people in that building.  You know, I don't**

(13)   **know.**

(14)      Q.    Right.  Prior to this incident,

(15)   did you ever have any interactions with

(16)   Kevin Campbell, such as just saying hello

(17)   or small talk, anything like that, that you

(18)   recall?

(19)      **A.    I can't recall a specific**

(20)   **instance, but probably, you know**

(21)   **(indicating).**

(22)      Q.    Can you describe Mr. Campbell's

(23)   physical appearance?

(24)      **A.    From what I might have seen, I**

(25)   **haven't seen Mr. Campbell in quite some**

(1)                    **J. CAHILL**

(2)  **time.  He's probably about 5'10", probably**

(3)  **about 210, 215 at that time, dark hair.**

(4)  **That's about -- not heavy, not -- not, the**

(5)  **space, that's the best that I can do.**

(6)       Q.    Can you just tell me, to your

(7)  understanding, what race that he appears to

(8)  you?

(9)       **A.    Oh, he's a male Black.  I'm**

(10) **sorry.**

(11)      Q.    No, it's okay.  Did you ever --

(12) prior to this incident, did you ever have

(13) an occasion to make any observation of

(14) Kevin Campbell or see his work or see him

(15) at work or anything like that?

(16)      **A.    As I said, as I walked through**

(17) **the building, I -- I say hello to many**

(18) **people.  My position doesn't -- doesn't**

(19) **require, nor do I have anything to do with**

(20) **their work performance, as far as**

(21) **operationally.  So I would have no -- no**

(22) **knowledge of his work performance or**

(23) **anything like that.**

(24)      Q.    Do you have any recollection of

(25) Kevin Campbell ever being rude or

```
(1)                    J. CAHILL
(2)    unprofessional to you?
(3)         A.    No, not at all.
(4)         Q.    Have you ever witnessed Kevin
(5)    Campbell being rude or unprofessional to
(6)    anyone?
(7)         A.    Not to the best of my
(8)    knowledge, no.
(9)         Q.    Do you have an understanding of
(10)   Kevin Campbell's allegations against the
(11)   Defendants in this case?
(12)        A.    The specific allegations, no.
(13)   I just know it's race-related.  I do not
(14)   know the exact -- I couldn't tell you the
(15)   exact complaint.
(16)        Q.    Okay, one second.  Did you meet
(17)   with an attorney in preparation for today?
(18)        A.    Yes.
(19)        Q.    How many times?
(20)        A.    Prior to today, once in person
(21)   and two or three -- three times on Zoom, I
(22)   believe.  So I would say four all together,
(23)   prior to today, obviously.
(24)        Q.    Right, okay.  Do you know,
(25)   approximately, how long each of those
```

```
(1)                    J. CAHILL
(2)  meetings lasted, prior to today?
(3)       A.    I don't recall.  It wasn't a
(4)  full workday.  I don't -- a couple of
(5)  hours.  It wasn't -- it wasn't long.
(6)       Q.    You said -- I'm sorry, prior to
(7)  today, when is the most recent time that
(8)  you met with your attorney, in preparation
(9)  for today?
(10)      A.    Yesterday.
(11)      Q.    Was that in person?
(12)      A.    Yes.
(13)      Q.    How long did that meeting last?
(14)      A.    An hour-and-a-half, maybe,
(15) 90 minutes.  I really wasn't keeping time.
(16) I would say between 90 minutes and 2 hours.
(17)      Q.    Who was present for that
(18) meeting?
(19)      A.    Just me and Gabe.
(20)      Q.    Did you review any documents in
(21) preparation for today?
(22)      A.    Yes.
(23)      Q.    Did you review any video
(24) recordings in preparation for today?
(25)      A.    Yes.
```

(1)                    **J. CAHILL**

(2)        Q.    Did you review any audio

(3)    recordings in preparation for today?

(4)        **A.    Yes.**

(5)        Q.    What audio recordings did you

(6)    review in preparation for today?

(7)        **A.    I know I've listened to Kevin's**

(8)    **testimony -- or interview, I'm sorry.  Two**

(9)    **other -- I can't remember the names off the**

(10)   **top of my head.  Two other witnesses.  I**

(11)   **believe that's it.  I think, yeah, those**

(12)   **are the only three I've listened to, I**

(13)   **believe.**

(14)       Q.    The names of those witnesses,

(15)   was one of them Jose Moreno?

(16)       **A.    Yes, Jose was one of them.**

(17)       Q.    Was one of them Adamel Spencer?

(18)       **A.    Yes, Adamel, yes, I did listen**

(19)   **to Adamel's as well.**

(20)       Q.    Did your listening to any of

(21)   those recordings, at all, refresh your

(22)   recollection about the incident that we're

(23)   here to discuss today?

(24)       **A.    Honestly, I really -- I was**

(25)   **pretty well versed on this, so it really**

(1)                    J. CAHILL

(2)  didn't -- I don't remember learning

(3)  anything or remembering anything new from

(4)  listening to those.  I kind of didn't

(5)  remember already.  I'm sure there was some

(6)  nuance, but as far as the facts and

(7)  circumstances, I don't think there was

(8)  anything new.

(9)       Q.    Do you recall what Adamel

(10) Spencer said in his interview?

(11)           MR. MCGAHA:  I object to form.

(12)      A.    Yeah.  I can't recite it

(13) verbatim, but, pretty much, yeah.

(14)      Q.    So in sum and substance, what

(15) do you recall Adamel Spencer saying during

(16) his interview?

(17)      A.    Adamel said he was splitting,

(18) which means he was working the belt.  He

(19) noticed a commotion.  He went over to

(20) separate it.  He saw -- he saw Kevin and

(21) Alzate in a struggle.  He saw Alzate with

(22) the raiser blade, and him and other people

(23) -- and him and other employees broke them

(24) up, and he walked Kevin away.

(25)      Q.    Do you recall whether Spencer

(1)                     J. CAHILL

(2)    gave any indication in his interview, as to

(3)    how the incident began?

(4)         **A.    I believe he said he heard an**

(5)    **argument, and then he saw Alzate push --**

(6)    **push a box -- push something, a box.  And**

(7)    **then he saw the two -- him and Kevin get**

(8)    **together, and then he, at that point, he**

(9)    **walked over and saw the raiser blade come**

(10)   **out, and then he helped separate everybody,**

(11)   **and he walked Kevin away.**

(12)        Q.    Do you recall hearing on the

(13)   audio recording that you reviewed

(14)   yesterday, of Spencer's interview, whether

(15)   Spencer said that he saw the box hit Kevin?

(16)        **A.    I believe he did, yes.**

(17)        Q.    Do you recall interviewing

(18)   Spencer?

(19)        **A.    Yes.**

(20)        Q.    Did you find Spencer to be

(21)   truthful?

(22)        **A.    Yes, there was no reason for me**

(23)   **to believe he wasn't.**

(24)        Q.    And do you recall the sum and

(25)   substance of your interview with Kevin

```
(1)                    J. CAHILL
(2)    Campbell?  And, again, it's my
(3)    understanding that you listened to his
(4)    audio recording yesterday; is that correct?
(5)         A.    I believe -- I might have -- I
(6)    don't know if I listened.  I listened to
(7)    Kevin's recently.  I don't believe I
(8)    listened to the whole thing, yesterday, at
(9)    all.
(10)         Q.    Understood, okay.  In sum and
(11)    substance, what did Kevin say during his
(12)    interview?
(13)         A.    That he was splitting the belt
(14)    and Alzate approached him, cursing at him,
(15)    as was normal, according to Kevin, he said
(16)    something happened.  They argued over
(17)    splitting the belt.  Alzate pushed the box
(18)    at him.  Excuse me, he was -- he became
(19)    angry.  He stepped towards Alzate.  He
(20)    denied making contact with him.  He did
(21)    admit that the age difference and the size
(22)    might have been intimidating.  They were,
(23)    as he described, face-to-face, and then he
(24)    thought Alzate pulls what he believes --
(25)    initially what he thought was a carrot out
```

```
(1)                    J. CAHILL
(2)     of his utility belt, and then he realized
(3)     it was a razor.  I asked him, did you see
(4)     him extend the blade, he said, yes, he did.
(5)     At that point, Alzate came up, brought the
(6)     weapon up, and his intention was to,
(7)     obviously, make, gain control of the weapon
(8)     and he did not.  He just wanted to stop it.
(9)     He did not want to hurt him.
(10)                    He said because he was
(11)    concerned about his job and he's an older
(12)    gentleman.  And then everybody came over
(13)    and broke it up.  And he was walked away by
(14)    Adamel, and then he was suspended.  I don't
(15)    know who suspended him.
(16)                    He was suspended, and he said
(17)    -- he believed he was kind of shocked that
(18)    he was suspended, because he didn't
(19)    physically -- he didn't feel he physically
(20)    hurt the other individual, Alzate.  In sum
(21)    and substance, that was about it.
(22)         Q.    Did Kevin ever tell you that
(23)    the box hit him?
(24)         A.    I believe he did, yes.
(25)         Q.    Other than those three audio
```

(1)                    J. CAHILL

(2)    recordings, do you recall whether you

(3)    listened to any other audio recordings in

(4)    preparation for today?

(5)         **A.    I don't believe I did, no.**

(6)         Q.    Did you review the -- did you

(7)    review -- you said you reviewed video

(8)    recordings in preparation for today,

(9)    correct?

(10)        **A.    Yes.**

(11)        Q.    What video recordings did you

(12)   review in preparation for today?

(13)        **A.    Actually, can I go back?**

(14)        Q.    Yes, please.

(15)        **A.    I believe I listened to**

(16)   **Anthony.  I cannot remember.  I don't have**

(17)   **the document in front of me.**

(18)        Q.    Okay.

(19)        **A.    I do not remember his last**

(20)   **name.  He was the individual on the phone.**

(21)   **I believe I listened to that one, too.**

(22)        Q.    He was -- I'm sorry, he was the

(23)   individual on the what?

(24)        **A.    He was -- he was described as**

(25)   **the one on the phone.  I believe his name**

(1)                    **J. CAHILL**

(2)    **is Anthony.  I'm sorry, I don't have the**

(3)    **document in front of me.**

(4)                    **I don't want to --**

(5)    Q.    No, it's okay.  I'm missing

(6)    apart of what you're saying.  He was an

(7)    individual on the floor?

(8)        **A.    No, the phone.  He was the**

(9)    **individual describing he was on his phone.**

(10)   **I can't remember his last name, I**

(11)   **apologize.**

(12)   Q.    No, it's okay.  So as to the

(13)   video, how many videos did you review in

(14)   preparation for today?

(15)       **A.    Two.  There was only two, that**

(16)   **I'm aware of.**

(17)   Q.    And those are different angles

(18)   of the same interaction, correct?

(19)       **A.    Yes, ma'am.**

(20)   Q.    What do you recall seeing on

(21)   this video or videos?

(22)       **A.    One of the videos, you can see**

(23)   **Alzate approaching Kevin, in what I**

(24)   **described as agitated space, flailing his**

(25)   **arms, he was pushing boxes.  At some point,**

(1)                    J. CAHILL

(2)   you see Kevin approach Alzate, he closes

(3)   the distance, kind of leans over him, and

(4)   as he's leaning over him, he can kind of

(5)   see Alzate kind of tilt toward the side and

(6)   take a couple of steps back, as Kevin was

(7)   standing over him.

(8)             And Alzate takes what it turns

(9)   out to be the razor blade with his right

(10)  hand from his utility pouch, extend s the

(11)  blade, and raises it up towards Kevin's

(12)  chest, neck area, in the area of his head.

(13)  They -- they both, at that point, they're

(14)  struggling for control of it, from what it

(15)  appeared to be, obviously, they were

(16)  struggling for the control of it.

(17)             Other employees realized what

(18)  was going on, they were yelling, and then

(19)  they jumped, they stopped the belt, they

(20)  came over, and Kevin and Alzate was

(21)  separated.  It took -- it took, I would

(22)  say, 20 to 30 second to separate them, and

(23)  then another one -- after it was done, one

(24)  of our employees was able to take -- took

(25)  the razor blade away from Alzate.

(1)                    **J. CAHILL**

(2)            **Kevin was walked, I guess, that**

(3)    **would be westbound, away, and Alzate was**

(4)    **walked the other way.  That was the only**

(5)    **way, that was it.  That was the only camera**

(6)    **angle we had there.**

(7)         Q.    And just for the Court

(8)    Reporter, I think this is the witness's

(9)    lifelong New Yorker accent, but he's saying

(10)   Alzete, A-L-Z-E-T-E?

(11)        **A.    I believe it's Alzate.**

(12)        Q.    Is it Alzate?  Okay.

(13)        **A.    I believe so, I think it's**

(14)   **spelled -- I think it's Alzate.  I don't**

(15)   **have it in front of me.**

(16)        Q.    I would just assume that was

(17)   just your accent.  I can go back and look,

(18)   perhaps, I'm incorrect about that.

(19)        **A.    It could very well be my**

(20)   **accent, zero.**

(21)             **MR. MCGAHA:  It's A-L-Z-A-T-E.**

(22)             **THE WITNESS:  Okay.  So it's**

(23)        **Alzate.**

(24)             **THE COURT REPORTER:  Off the**

(25)        **record.**

(1)                          **J. CAHILL**

(2)                    **(Whereupon, an off-the-record**

(3)              **discussion was held.)**

(4)          Q.     Did the video show Kevin

(5)      Campbell making physical contact with

(6)      Mr. Alzate?

(7)          **A.     From the angles, it appears**

(8)      **that as Kevin was leaning over, it appeared**

(9)      **he made contact, causing Alzate to turn, to**

(10)     **kind of lean away, but the angle, there was**

(11)     **no side angle that could actually show the**

(12)     **two together.  In other words, from what I**

(13)     **saw on the video, it appeared, to me that,**

(14)     **yes, he did make contact, but the camera**

(15)     **angle wasn't closer on that.**

(16)         Q.     Understood.

(17)         **A.     It appeared to be that he did.**

(18)         Q.     Kevin, in his interview with

(19)     you denied that he made physical contact

(20)     with Alzate; is that correct?

(21)         **A.     Yes.**

(22)         Q.     And you found Kevin's testimony

(23)     to be -- or his statement, to you, to be

(24)     truthful.

(25)                  **MR. MCGAHA:  I object to form.**

```
                         J. CAHILL
(1)
(2)       A.      There was no indication of any
(3)  -- I didn't see any indication that he
(4)  wasn't.  His -- his testimony was
(5)  consistent with what I saw from the video.
(6)  Again, he did deny that he made contact.
(7)  The video appeared to be that he did, but,
(8)  otherwise, his accounting was consistent
(9)  with what I had -- with what I had learned
(10) up to that.
(11)      Q.      Okay, got it.  And did you
(12) review any documents in preparation for
(13) today?
(14)      A.      I just read the investigate --
(15) my report.  That's about it.  That's pretty
(16) much.  That's it.  I don't really have any
(17) other documents to review.
(18)      Q.      Right, yeah.  The report you're
(19) referring to, well, what report are you
(20) referring to?  Can you describe that report
(21) for me?
(22)      A.      It's -- it's an interoffice
(23) memorandum.  It's call an investigative --
(24) I'm sorry, an investigative report.
(25)      Q.      Did you review the final
```

(1)                    J. CAHILL

(2)     version of that report?

(3)          A.    Yes.

(4)          Q.    What is the date of that final

(5)     version?

(6)              MR. MCGAHA:  I object to the

(7)         form.  Do you have it?  I mean.

(8)              MS. MASSIMI:  Well, this is --

(9)         I don't -- I mean, this is what I

(10)        e-mailed.  I don't know why you're

(11)        giving me that look.  This is what I

(12)        e-mailed you about yesterday.  There

(13)        were several copies.

(14)             MR. MCGAHA:  Because you're

(15)        asking him to tell you the date of

(16)        the report that was drafted 3 years

(17)        ago.

(18)             MS. MASSIMI:  But he just

(19)        reviewed it in preparation for today.

(20)             MR. MCGAHA:  I understand that.

(21)        But if you're asking about a

(22)        report --

(23)             MS. MASSIMI:  I can't -- I

(24)        can't actually hear you that well,

(25)        because you're not -- I can't see you

(1)                    J. CAHILL

(2)       and you're speaking lowly, low.  So

(3)       what's the issue?

(4)            MR. MCGAHA:  My objection is to

(5)       the form, because you're asking him

(6)       to recall a date of a document that

(7)       he can't see.

(8)            MS. MASSIMI:  I'm just asking

(9)       from his memory.  I don't know why

(10)      you're shaking your head.

(11)           MR. MCGAHA:  I'm shaking my

(12)      head, the same way you're shaking

(13)      your head.

(14)           MS. MASSIMI:  I'm not shaking

(15)      my head.

(16)           MR. MCGAHA:  And you realized

(17)      and laugh and do all sorts of things.

(18)      So I'm shaking my head cause I can do

(19)      that.  What were you saying?

(20)           Would you like some water?

(21)           THE WITNESS:  Yes.  Thank you,

(22)      yes.

(23)           MS. MASSIMI:  I think that

(24)      everyone, here, including the Court

(25)      Reporter and the witness would agree

(1)                    J. CAHILL

(2)        that I have not been rolling my eyes

(3)        or laughing or shaking my head.

(4)            MR. MCGAHA:  Okay, well there's

(5)        a video, so we can see it.

(6)            MS. MASSIMI:  I'm sorry.

(7)            MR. MCGAHA:  There's a video,

(8)        so --

(9)            MS. MASSIMI:  Oh, okay.  I

(10)       mean, I'm not aware that there's a

(11)       video of this.

(12)           MR. MCGAHA:  This is not being

(13)       recorded.

(14)           MS. MASSIMI:  Not as far as I

(15)       know.

(16)           MR. MCGAHA:  Okay.

(17)           MS. MASSIMI:  I mean, if it is,

(18)       it doesn't matter, because I've not

(19)       been rolling my eyes at the witness.

(20)           MR. MCGAHA:  I'm not here to

(21)       argue with you.

(22)           MS. MASSIMI:  I'm sorry.  I

(23)       can't hear you, what?

(24)           MR. MCGAHA:  I'm not hear to

(25)       argue with you about that.  I made an

(1)                    J. CAHILL

(2)    objection.  You can move on or ask

(3)    the question again.

(4)         MS. MASSIMI:  Let's take a

(5)    two-minute break.

(6)         MR. MCGAHA:  Sure.

(7)         (Whereupon, a short recess was

(8)    taken.)

(9)         THE COURT REPORTER:  The depo

(10)   is not being recorded.  It's being

(11)   taken down stenographically.

(12)        MS. MASSIMI:  Right, nothing is

(13)   being recorded video-wise.  If the

(14)   witness and Mr. McGaha would like to

(15)   have this video recorded, we can do

(16)   that.  Is that something you want to

(17)   have happen?

(18)        MR. MCGAHA:  Yes.

(19)        MS. MASSIMI:  Okay.

(20)        THE COURT REPORTER:  Off the

(21)   record.  I have to make a phone call

(22)   and take a break to do that.

(23)        (Whereupon, an off-the-record

(24)   discussion was held.)

(25)        THE COURT REPORTER:  We're back

(1)                     J. CAHILL

(2)          on the record.

(3)              MS. MASSIMI:  Sure.  So I just

(4)          want to respond to Counselor's

(5)          statements from a few moments ago,

(6)          where he accused me of rolling my

(7)          eyes, laughing, and shaking my head.

(8)          I have not done any of those things.

(9)          And I just want to ask the witness,

(10)         do you feel as though I have been

(11)         disrespecting to you, here, today?

(12)             THE WITNESS:  Up to this point,

(13)         no, no.  I'm in the interest of

(14)         moving forward.  I have no problem

(15)         moving forward.  No, not at all.  I'm

(16)         okay.

(17)             MS. MASSIMI:  Okay.

(18)     Q.    The question that I was asking

(19) was if you recall the date of the report

(20) that you reviewed in preparation for today.

(21)     A.    I do not recall the date,

(22) offhand, no.

(23)     Q.    Were there multiple drafts of

(24) this report, before it was finalized?

(25)     A.    Just an e-mail chain.  An

(1)                    J. CAHILL

(2)    e-mail, but, no, once I type it out, I send

(3)    it away and it comes back and I finalize

(4)    it.  That's it.  There was no other draft,

(5)    that I'm aware of.

(6)        Q.    The security investigative

(7)    report that you reviewed in preparation for

(8)    today, was that the final version of the

(9)    report?

(10)        A.    Yes, I believe so.

(11)        Q.    Do you happen to recall the

(12)    bates stamp numbers of that report?

(13)        A.    I'm sorry, the what, ma'am?  I

(14)    don't understand the question.

(15)        Q.    Do you recall that the report

(16)    that you reviewed had bates stamp numbers

(17)    on the lower-right?

(18)        A.    I don't know what a bates stamp

(19)    number is to be honest with you.

(20)        Q.    If I showed you a copy of one

(21)    of the reports that I have, would you be

(22)    able to tell me if that was the final

(23)    version of the report?

(24)        A.    I would -- I would try.  I

(25)    would do my best.  I -- I --

(1)                        **J. CAHILL**

(2)        Q.    Okay.  Did you fine the final

(3)    version of the report?

(4)        **A.    No.**

(5)        Q.    Did the report refresh your

(6)    recollection of the incident that we're

(7)    here to discuss today?

(8)        **A.    I would imagine in some aspect,**

(9)    **it did, but I have a pretty good memory of**

(10)   **this.  This specific incident was more of**

(11)   **the more volatile ones I've had to deal**

(12)   **with.  So if not the most volatile one that**

(13)   **I've had to deal with it.  So I have a**

(14)   **pretty good knowledge of it.**

(15)       Q.    Am I correct that you did not

(16)   personally witness the incident?

(17)       **A.    I did not personally witness,**

(18)   **no.**

(19)       Q.    I'm gonna show you a document.

(20)            **MS. MASSIMI:  Can I just drop**

(21)      **it in the chat?**

(22)            **THE COURT REPORTER:  Yes.**

(23)       Q.    Sir, are you able to open up

(24)   the document that I just put in the chat?

(25)            **THE COURT REPORTER:  Yes, I**

(1)                  J. CAHILL

(2)        just downloaded it and opened it up.

(3)        Plaintiff 1?

(4)              MS. MASSIMI:  Yes, plaintiff.

(5)              MR. MCGAHA:  Can you just share

(6)        it up on the screen, Mr. Court

(7)        Reporter?  I can't pull it up.

(8)              THE COURT REPORTER:  I'll share

(9)        my screen.

(10)             MS. MASSIMI:  I'll just e-mail

(11)       it to you.

(12)             MR. MCGAHA:  Okay.

(13)             THE COURT REPORTER:  Off the

(14)       record.  I have to get another device

(15)       in order to present the exhibit and

(16)       take a break.

(17)             (Whereupon, an off-the-record

(18)       discussion was held.)

(19)             MS. MASSIMI:  So can we just go

(20)       on the record?  Given the witness's

(21)       prior acknowledgment that I have not

(22)       been disrespectful to him during the

(23)       course of this deposition, I don't

(24)       think there's any reason to record

(25)       this, unless, of course, the

(1)                    J. CAHILL

(2)    Defendants would like to adjourn this

(3)    deposition and hire a videographer,

(4)    in case you want to do that.

(5)         Is that something you all want

(6)    to do?

(7)         MR. MCGAHA:  I'm not sure I

(8)    understand the difference between --

(9)         MS. MASSIMI:  I can't -- I'm

(10)   having trouble hearing you.

(11)        MR. MCGAHA:  I'm not sure I

(12)   understand the difference, the

(13)   practical difference between having a

(14)   videographer and you recording the

(15)   Zoom call.

(16)        MS. MASSIMI:  One is a

(17)   recording of the entire screen and

(18)   one is a recording of the witness.

(19)   So, again, given the witness's

(20)   acknowledgment that I have not been

(21)   disrespectful to him, I don't see a

(22)   reason to record this.  I also

(23)   believe that the witness has been

(24)   testifying fine.  I don't personally

(25)   see a reason to record him.  If you

(1)                    J. CAHILL

(2)       want to do that, I am saying we can

(3)       adjourn this, and you can hire a

(4)       videographer.   I -- what's that?

(5)            MR. MCGAHA:  I have no reason

(6)       to record him, either.  I wanted to

(7)       record you, but.

(8)            MS. MASSIMI:  I'm sorry, why is

(9)       it that you want to record me?

(10)           MR. MCGAHA:  Because in my

(11)      opinion, you have been disrespectful,

(12)      not just to the witness, but to me.

(13)           MS. MASSIMI:  How have I been

(14)      disrespectful to you?

(15)           MR. MCGAHA:  That's not

(16)      important.  I would really like to

(17)      move on with the deposition.

(18)           MS. MASSIMI:  Well, we're on

(19)      the record and you're accusing my to

(20)      be disrespectful.

(21)           MR. MCGAHA:  My primary goal is

(22)      to get on with the deposition.  If it

(23)      becomes a problem, we can address it

(24)      later.

(25)           MS. MASSIMI:  Well, I'm having

```
(1)              J. CAHILL

(2)      trouble hear you, so if you can speak

(3)      louder and closer.  I have not really

(4)      interacted with you during the course

(5)      of this deposition.  So I don't know

(6)      what you're referring to when you say

(7)      that I have been disrespectful to

(8)      you.

(9)          MR. MCGAHA:  I'm not interested

(10)     in getting into that right now.  It's

(11)     not that important at this point.  If

(12)     it becomes more important, we can

(13)     address it, but we can move on.  I

(14)     just received the document, so it's

(15)     up on my screen and the witness can

(16)     see it.

(17)         MS. MASSIMI:  Well, it is

(18)     actually important to me because

(19)     you're making accusations on the

(20)     record.  And I would like to know

(21)     what it is that you believe I've done

(22)     to be disrespectful to you.

(23)         MR. MCGAHA:  I've said it

(24)     already.  I'm not going to answer it

(25)     again.
```

(1)                    J. CAHILL

(2)          MS. MASSIMI:  You haven't,

(3)     though.

(4)          MR. MCGAHA:  I did.

(5)          MS. MASSIMI:  What is it?

(6)          MR. MCGAHA:  I'm not

(7)     testifying.

(8)          MS. MASSIMI:  We're not asking

(9)     you to testify.  You said that you

(10)    believe --

(11)         MR. MCGAHA:  I'm ready to move

(12)    on, Ms. Massimi.

(13)         MS. MASSIMI:  I understand that

(14)    you want to move on.  I am asking you

(15)    to substantiate your accusation.

(16)         THE WITNESS:  I believe what I

(17)    said in the interest of moving

(18)    forward, I didn't -- I didn't answer

(19)    anything, specifically, regarding

(20)    anybody's actions.  In the interest

(21)    of moving forward, I would -- I would

(22)    -- that's what I would prefer to you.

(23)    Q.    Well, do you believe that I've

(24)    been disrespectful towards you, sir?

(25)         A.    Ma'am, like I said, in the

(1)                     J. CAHILL

(2)    interest -- that is not my venue to -- to

(3)    see who is -- how this is being conducted.

(4)    I'm just here to answer questions, and

(5)    that's just what I'd like to do.

(6)            MS. MASSIMI:  Sir, this is for

(7)        Mr. Court Reporter.  Are you able to

(8)        see when I last asked the witness,

(9)        when he believed that I was being

(10)       disrespectful to him?

(11)           THE COURT REPORTER:  Yes.

(12)           MS. MASSIMI:  Can you get that?

(13)       I just want to get his response?

(14)       That will settle this.

(15)           (Whereupon, the referred to

(16)       testimony was read back by the

(17)       Reporter.)

(18)           MS. MASSIMI:  And just to be

(19)       clear to both the witness and

(20)       Mr. McGaha, if you, in fact, believe

(21)       that I'm being disrespectful to you

(22)       at any point, I would ask that you

(23)       tell me, so that we can resolve it.

(24)           MR. MCGAHA:  Clear.

(25)           MS. MASSIMI:  And Mr. McGaha, I

(1)                J. CAHILL

(2)        invite you, again, to please specify,

(3)        on the record, what you believe I

(4)        have done, today --

(5)            MR. MCGAHA:  I'm not

(6)        testifying.

(7)            MS. MASSIMI:  -- to disrespect

(8)        you.

(9)            Right, but public accusations

(10)       merit public substantiations.  So

(11)       making an accusation on the record,

(12)       and then say you're not going to

(13)       substantiate it, does not seem fair.

(14)       And I think if we're all being

(15)       truthful here, we will admit that I

(16)       have not rolled my eyes, I have not

(17)       laughed at anyone, and I have not

(18)       shaked my head.  I, in fact, thanked

(19)       the witness, earlier, for his candor.

(20)       I appreciate his testimony, and if

(21)       anyone here feels disrespected,

(22)       please tell me in the moment, so we

(23)       can address it.

(24)            Do you agree to that, sir?

(25)            MR. MCGAHA:  Sure.  We will.

(1)                    J. CAHILL

(2)          MS. MASSIMI:  And can you agree

(3)      to that, Mr. Cahill?

(4)          THE WITNESS:  Yes, absolutely.

(5)          MS. MASSIMI:  Thank you.  Okay.

(6)      So I believe Mr. McGaha has said that

(7)      he has the document; is that correct?

(8)      Is that -- am I correct?

(9)          MR. MCGAHA:  Yes, that's

(10)     correct.

(11)     Q.    Mr. Cahill, I'm showing you a

(12)     document, for purposes of today, as

(13)     Plaintiff's Exhibit 1, bearing stamps

(14)     ESI962 through 966.

(15)          Do you see this?

(16)     A.    Yes, I see those numbers.  Yes.

(17)     Q.    What is this document?

(18)     A.    The document itself is the

(19)     investigatory -- security investigatory

(20)     report that I've prepared in regards to

(21)     this incident.

(22)     Q.    Is this the document that

(23)     you've reviewed in preparation for today?

(24)     A.    I believe so.

(25)     Q.    Is this the final version of

```
(1)                    J. CAHILL
(2)   the document?
(3)        A.     Yes.
(4)        Q.     What or who drafted this
(5)   document?
(6)        A.     I -- I'm sorry (indicating).  I
(7)   did.  I apologize.
(8)        Q.     Does this document include the
(9)   statement from Adamel Spencer, where he
(10)  told you that Alzate snapped the box and
(11)  the box hit Kevin?
(12)       A.     No, I don't believe I put
(13)  anything in there about the box hitting
(14)  Kevin.  This is, again, this is a synopses
(15)  of the interview.  It's not a transcript.
(16)  So I don't believe -- I do not believe it
(17)  is not.
(18)       Q.     Is there a particular reason
(19)  you did or did not include that statement
(20)  in this report?
(21)       A.     Yes, again, it's not -- as I
(22)  said, it's not a transcript.  It's a
(23)  synopses of the interview, and whether or
(24)  not you look at the incident in its
(25)  entirety, whether or not it's the box that
```

(1)                    J. CAHILL

(2)    hit Kevin or did not, Kevin's response

(3)    after that, in my opinion, was a violation

(4)    of policy.

(5)              So although I understand it

(6)    probably was upsetting to Kevin, if he was

(7)    actually hit with the box, but when you

(8)    look at the overall picture, the policy

(9)    violation takes precedence to the actual

(10)   box, if it actually did hit Kevin.  So it

(11)   was not -- it just wasn't -- I didn't put

(12)   it in there.  Like I said, again, it's not

(13)   a transcript.  I don't -- it's not

(14)   verbatim.  Everything they said is just the

(15)   sum and substance of it.  The box hitting

(16)   Kevin was -- was part of the picture.  But

(17)   the bigger picture, when you look at it, it

(18)   was really -- it wasn't really pertinent to

(19)   the entire interaction between the two.

(20)        Q.    Why do you believe it was not

(21)   pertinent to the entire interaction between

(22)   the two?

(23)        A.    Because as per policy, at that

(24)   point, if the box hit Kevin or did not hit

(25)   Kevin, Kevin's responsibility as to the

(1)                         J. CAHILL

(2)    policy is to step away and notify

(3)    management.  Notify a manager, security,

(4)    anyone, preferably a manager and tell him

(5)    what transpired.  The policy does not say

(6)    that you can act in a way that Kevin did.

(7)              If he would've followed policy,

(8)    in my opinion, we wouldn't be here today.

(9)    If he would've followed policy and walked

(10)   away and notified management of what had

(11)   just transpired, that would have been dealt

(12)   with -- dealt with -- with Alzate.  Forgive

(13)   me if I didn't pronounce his name, again,

(14)   right.  Alzate.  I apologize.

(15)        Q.    What does Kevin not following

(16)   policy have to do with your decision to

(17)   omit the detail of the box hitting him?

(18)        A.    It was not -- as I said, it was

(19)   not an intentional omission.  It's not a

(20)   transcript of the exact -- of verbatim,

(21)   everything that's asked.  The box hitting

(22)   Kevin or Adamel's statement as the box

(23)   hitting Kevin, although it's part of it,

(24)   when I looked at the entire incident on its

(25)   totality, I had to look at Kevin's response

(1)                          **J. CAHILL**

(2)     **if the box did hit him, what was his**

(3)     **response in that situation.  His response**

(4)     **as per policy, should have been to walk**

(5)     **away.  It should have been to step away,**

(6)     **disengage, we call it, defuse it.**

(7)                **He did not do it.  So although**

(8)     **the box might or might not have hit him,**

(9)     **really, if you look at the totality of the**

(10)    **incident and look at the policy and how it**

(11)    **was adhered to, in this case, in my**

(12)    **opinion, it was not adhered to by him per**

(13)    **perpetuating him and hitting Alzate.  He**

(14)    **should have stepped away.**

(15)         Q.    But you have an obligation to

(16)    draft your reports completely and

(17)    truthfully, correct?

(18)         **A.    Absolutely.**

(19)         Q.    Are you permitted to omit facts

(20)    from your report, based on what you believe

(21)    the outcome of an investigation should be?

(22)              **MR. MCGAHA:  I object to form.**

(23)         **A.    An intentional omission?  No.**

(24)    **An omission as to the necessity to**

(25)    **consolidate and summarize and interview, to**

[Page 100]
February 22, 2024

J. CAHILL

(1)

(2)     be read, in my opinion, I left -- I did not

(3)     intentionally leave it out.  It was not

(4)     leading towards Kevin's actions.  If you

(5)     also look, when I did clearly say I believe

(6)     it was in Kevin's deposition, I mean, not

(7)     Kevin's deposition.  Kevin's interview that

(8)     he told Adamel that the box hit him.  I was

(9)     not trying to hide anything.

(10)              At that point, when I was

(11)    talking to Adamel, I was -- when I

(12)    summarized our interview together, it was

(13)    looking at the totality of the entire

(14)    incident.  And in my opinion, getting hit

(15)    with a position does not justify a

(16)    violation policy.

(17)    Q.    If you had included the detail

(18)    of Alzate hitting the box and the box

(19)    hitting Kevin, is it your belief that that

(20)    would have somehow justified Kevin's

(21)    actions?

(22)    A.    No.  No.

(23)    Q.    Right.  That's kind of my

(24)    question.

(25)    A.    Maybe I -- can you just re --

(1)                    J. CAHILL

(2)    I'm sorry, could you just say the question

(3)    again?

(4)               MS. MASSIMI:  Can you read the

(5)         question back, sir?

(6)               (Whereupon, the referred to

(7)         question was read back by the

(8)         Reporter.)

(9)         A.    No.  Kevin's actions would not

(10)   have been justified.

(11)        Q.    But do you believe that you

(12)   would have seen as justifying Kevin's

(13)   actions but including the detail of --

(14)        A.    No.

(15)        Q.    -- Alzate hitting the box and

(16)   the box hitting Kevin?

(17)        A.    I apologize.  I know where this

(18)   question is going.  Absolutely not.  I have

(19)   nothing.  My job, and I'm -- my integrity

(20)   has never been questioned, honestly.  My

(21)   job is not to fact the hides or not to try

(22)   and push forward in some type of an

(23)   objective.  My job is to, out of the

(24)   fairness to everyone involved, to report

(25)   and investigate something to the best of my

(1)                    **J. CAHILL**

(2)    **ability.**

(3)              **There was no way that that was**

(4)    **an intentional omission.**

(5)         Q.    Well, when you say it wasn't an

(6)    intentional omission, do you believe that

(7)    you -- maybe if you had to do this again,

(8)    you would've included that detail?

(9)         **A.    No, cause it, again, as I**

(10)   **believe I've said, we can have it read**

(11)   **back.  When you look at the totality of the**

(12)   **entire incident, not just the facts that**

(13)   **Alzate did or did not hit Kevin with a box.**

(14)   **If you look at the totality of that**

(15)   **incident and Kevin's response to that**

(16)   **incident, it violated policy.**

(17)        Q.    Why did you choose to omit the

(18)   fact of Alzate hitting the box and the box

(19)   hitting Kevin?

(20)             **MR. MCGAHA:  I object to form.**

(21)        **A.    I believe it's been asked and**

(22)   **answered, but, again, it was not an**

(23)   **intentional omission when I summarize these**

(24)   **interviews, that's what I do.  We summarize**

(25)   **them for interest of reading them.  In my**

(1)                    J. CAHILL

(2)    opinion, the fact that Adamel said that

(3)    Kevin, he saw Kevin get hit with the box,

(4)    was not -- it did not -- would not have

(5)    changed Kevin's actions.  It would not

(6)    changed the policy violation.

(7)            Also, if you look at the video,

(8)    from where Adamel was and from where Adamel

(9)    -- and where Kevin was, I don't see how

(10)   that could -- he could have seen something

(11)   like that.  He very well could have, I'm

(12)   not saying he did not, but I did not see

(13)   that, either way, even if -- even if it was

(14)   clear as day on video that Alzate hit Kevin

(15)   with a box, Kevin's response was not in

(16)   accordance with policy.  Again, if Kevin

(17)   would've walked away, we would not be here

(18)   today.

(19)            If Kevin followed policy, we

(20)   would not be here today.

(21)    Q.    When you draft reports or when

(22)   you -- I'm sorry.  When you perform

(23)   investigations, what is the purpose of

(24)   that?

(25)    A.    To gather as much information

(1)                    J. CAHILL

(2)    properly and submit it to operations, for

(3)    them to make a decision on what, if

(4)    anything, should be done about the

(5)    incident.

(6)            MS. MASSIMI:  Now is probably a

(7)        good time to take a break.  So what

(8)        time do you need to come back?

(9)            MR. MCGAHA:  1 o'clock.

(10)            (Whereupon, a short recess was

(11)        taken.)

(12)            (Whereupon, Security

(13)        Investigative Report was marked as

(14)        Plaintiff's Exhibit 1 for

(15)        identification as of this date by the

(16)        Reporter.)

(17)            MS. MASSIMI:  Can you read back

(18)        the last question and answer, if you

(19)        have it?

(20)            (Whereupon, the referred to

(21)        question and answer was read back by

(22)        the Reporter.)

(23)        Q.    Do you know whether

(24)    Mr. Campbell still works at FedEx?

(25)        A.    I believe -- I'm sorry

[Page 105]
February 22, 2024

(1)                        J. CAHILL

(2)      (indicating).  I believe he does not.

(3)          Q.    Do you know why not?

(4)          A.    I believe he was terminated as

(5)      a result of this incident.

(6)          Q.    Do you know who made the

(7)      decision to terminate him?

(8)          A.    Specifically, no.  That would

(9)      be -- that decision is made by operations.

(10)     I have no input into that.  I had no part

(11)     in that.

(12)         Q.    Were you involved in any aspect

(13)     of the decision to terminate Kevin

(14)     Campbell's employment?

(15)         A.    No.

(16)         Q.    Do you know whether Kevin

(17)     Campbell was experiencing any form of

(18)     discrimination, prior to this incident?

(19)         A.    Not that I'm aware of.

(20)         Q.    When I've been saying this

(21)     incident, you understand that I'm referring

(22)     to the incident that's captured on video,

(23)     that occurred on May 18th, 2021, correct?

(24)         A.    Yes, ma'am.  No, we're good.

(25)     We're good.  I gotcha.

(1)                    **J. CAHILL**

(2)        Q.    Yeah, but you've understood

(3)    that throughout the course of this

(4)    deposition, right?

(5)        **A.    To the -- yes, I didn't think,**

(6)    **otherwise.**

(7)        Q.    Okay, I just wanted to make

(8)    sure the record's clear, okay.

(9)              Have you ever had a member of

(10)    or an employee of FedEx complain to you

(11)    about discrimination?

(12)        **A.    No, and that's actually -- if**

(13)    **they did, I would have to refer them to HR**

(14)    **or management, because that's out of our**

(15)    **pure view.  We don't have any -- we don't**

(16)    **have anything to do with discrimination**

(17)    **complaints.  That's handled by HR,**

(18)    **specifically.**

(19)        Q.    In 2021, what department were

(20)    you working in?

(21)        **A.    Security.**

(22)        Q.    How many employees did security

(23)    have at the time?

(24)        **A.    In -- that's a tough -- that's**

(25)    **a difficult question to ask.  In my work**

(1)                    **J. CAHILL**

(2)    group or?

(3)         Q.    What's a work group?

(4)         **A.    The direct reports to my**

(5)    **manager.  So the other individuals who**

(6)    **report to my manager.**

(7)         Q.    And your manager was -- remind

(8)    me of his name again, the first?

(9)         **A.    At the time, it was Chris**

(10)   **Borka.**

(11)        Q.    Chris Borka, okay.  And what

(12)   was his title in 2021?

(13)        **A.    It was either Zone Manager**

(14)   **Security, or Manager Security.  They**

(15)   **changed titles.  What date, I'm not sure,**

(16)   **but it was the same job.  He was -- he was**

(17)   **the Security Manager.**

(18)        Q.    How many people reported to him

(19)   in 2021; do you know?

(20)        **A.    I would have to -- I don't know**

(21)   **the exact number, no.**

(22)        Q.    Were you in a particular

(23)   division in 2021?

(24)        **A.    Eastern region security.**

(25)   **That's what we're called.**

(1)                    **J. CAHILL**

(2)        Q.    Right.  And do you know how

(3)   many security employees FedEx had in the

(4)   eastern region, in 2021?

(5)        **A.    No, I would have no idea.  That**

(6)   **would cover a large area.  I would -- I**

(7)   **would have no idea.  Multiple managers, I**

(8)   **couldn't give you the answer for that.**

(9)        Q.    What was your title in 2021?

(10)       **A.    Senior Security Specialist.**

(11)       Q.    How many senior security

(12)  specialists were there in the eastern

(13)  region, for FedEx, in 2021?

(14)       **A.    The entire eastern region, I**

(15)  **could not give you an answer on that.  I do**

(16)  **not know.  There are multiple work groups.**

(17)       Q.    Did you have any peers who were

(18)  responsible for the same geographic area as

(19)  you in 2021; in other words, other senior

(20)  security specialists that you worked along

(21)  side, relative to the same area?

(22)       **A.    No, no, my building -- the**

(23)  **buildings that was just assigned to me.**

(24)  **There are people that work in my -- in my**

(25)  **area, but my six building were mine at the**

(1)                          **J. CAHILL**

(2)     **time.**

(3)         Q.    Of those 6 building, did any

(4)     security employees report to you?

(5)         **A.    No, I'm not a manager.**

(6)         Q.    You weren't a manager at the

(7)     time?

(8)         **A.    No, I was not.  I'm still not.**

(9)         Q.    But are you responsible for

(10)    overseeing other employees with less

(11)    seniority than you?

(12)        **A.    No, I am not.**

(13)        Q.    I believe I asked you this

(14)    before, but following this incident that

(15)    we're discussing, did you complete any

(16)    documents or paperwork, other than the

(17)    Security Investigative Report?

(18)        **A.    With the exception of an**

(19)    **e-mail, no.  There was -- there was an**

(20)    **e-mail prepared as well, but, no.  An**

(21)    **e-mail, nothing else that I'm aware of.**

(22)        Q.    Which e-mail are you referring

(23)    to?

(24)        **A.    There was an e-mail sent to**

(25)    **Eric Wanders, with my manager at the time,**

(1)                          J. CAHILL

(2)     **Chris Borka, copied.  Actually, it might of**

(3)     **-- back -- it was probably address,**

(4)     **specifically, to Chris, with Eric Wanders**

(5)     **copied in.  But those are the two**

(6)     **individuals who are recipients.**

(7)         Q.    Did you send that e-mail to

(8)     them, prior to finalizing your report?

(9)         **A.    Yes.**

(10)        Q.    Why did you send that e-mail to

(11)    them?

(12)        **A.    An incident of that magnitude,**

(13)    **they want consistent updates, they want to**

(14)    **know exactly what's going on.  So they**

(15)    **won't -- there's -- the e-mail is a**

(16)    **necessity at that time.**

(17)        Q.    When you say an incident of

(18)    this magnitude, what, specifically, are you

(19)    referring to?

(20)        **A.    It was the incident involving**

(21)    **Alzate and Campbell, a workplace violence**

(22)    **incident, where there was a weapon**

(23)    **involved.**

(24)        Q.    To be clear, the weapon you're

(25)    referring to is the box cutter that Alzate

(1)                    J. CAHILL

(2)    pulled.

(3)         **A.     Yes, ma'am.**

(4)         Q.     Okay.  Following this incident,

(5)    when did you become aware of the -- when

(6)    did you become aware of this lawsuit?

(7)         **A.     I don't recall.  I was notified**

(8)    **on what we call a legal hold, not to**

(9)    **dispose of the computer or documents or**

(10)   **anything.  When I got that, I don't recall.**

(11)   **I don't remember.**

(12)        Q.     Prior to receiving that legal

(13)   hold, had you disposed of any documents

(14)   related to this incidental?

(15)        **A.     No, absolutely not.**

(16)        Q.     Do you know whether any

(17)   documents related to this incident have

(18)   been did I see posed of?

(19)        **A.     Not to the best of my**

(20)   **knowledge.  That notification is based --**

(21)   **our laptops are on a lifecycle program, and**

(22)   **they don't want that laptop -- if there's**

(23)   **an incident where there's a hold, they**

(24)   **don't want to laptop disposed of.**

(25)                **That's what it is.**

[Page 112]
February 22, 2024

(1)                          **J. CAHILL**

(2)        Q.     When you say they don't want

(3)    the laptop disposed of, do you mean that

(4)    they don't want the information contained

(5)    on the laptop disposed of?

(6)        **A.     I'm not sure of the exact**

(7)    **reason of it.  From my understanding, it's**

(8)    **that they want the laptop to remain in my**

(9)    **custody.**

(10)       Q.     And what information was on the

(11)   laptop, related to this incident?

(12)       **A.     Just the -- everything we have**

(13)   **here, the video, the report, the e-mail I**

(14)   **sent.  Nothing else.**

(15)       Q.     Got it.  Did Mr. Campbell have

(16)   a weapon him, related to this incident?

(17)       **A.     Not to the best of my**

(18)   **knowledge, no.**

(19)       Q.     And, again, you were not

(20)   involved in the decision to terminate his

(21)   employment, correct?

(22)       **A.     No, ma'am.**

(23)       Q.     Is that a decision that you

(24)   would be responsible for or no?

(25)       **A.     No, I have no input on that at**

(1)                    **J. CAHILL**

(2)    **all.**

(3)         Q.    The information that you gather

(4)    as part of the investigation is used to

(5)    determine whether to uphold his

(6)    termination; is that correct?

(7)         **A.    I mean, the purpose of the**

(8)    **investigation is just to submit a report**

(9)    **for operations to make a decision on.  Even**

(10)   **if I find, in my opinion, that the**

(11)   **investigation shows policy's been violated,**

(12)   **that does not automatically mean**

(13)   **determination.  Many times, it does not.**

(14)   **They decide, operations decides if they're**

(15)   **going to take any type of -- if and when**

(16)   **they do take any type of disciplinary**

(17)   **action, I had nothing -- I have no input in**

(18)   **that at all.**

(19)              **By design, I had no input in**

(20)   **that at all.**

(21)        Q.    But you do understand that the

(22)   findings from your security investigations

(23)   and what you put in your security report

(24)   could be used to -- it could be used by

(25)   other members of management to make various

(1)                      J. CAHILL

(2)    decisions, correct?

(3)        **A.    Yes, absolutely.**

(4)        Q.    Have you had any contact with

(5)    Kevin Campbell since he was terminated?

(6)        **A.    No, not at all.**

(7)        Q.    Other than the recorded

(8)    interview that you did with him, did you

(9)    have any contact with him?

(10)        **A.    Not that I'm aware of, no.  I**

(11)    **have -- I have not seen Kevin since the day**

(12)    **of the interview, I believe.**

(13)        Q.    Did you conduct your interview

(14)    of Kevin Campbell, prior to his official

(15)    determination?

(16)        **A.    Yes.**

(17)        Q.    You interviewed him during your

(18)    suspension, correct?

(19)        **A.    Yes, he was on paid suspension**

(20)    **when I interviewed him, yes.**

(21)        Q.    Did you know whether he was

(22)    going to be terminated, while he was on

(23)    suspension?

(24)        **A.    No.**

(25)        Q.    When you interviewed him, did

(1)                    J. CAHILL

(2)    you expect that he was eventually going to

(3)    be terminated?

(4)        **A.    I couldn't make an assumption.**

(5)    **Again, I don't -- in the interest of**

(6)    **fairness, I just do an investigation, I**

(7)    **prepare a report, and I send it to**

(8)    **operations.  That's done out of fairness.**

(9)    **I don't lean on either direction.  I just**

(10)   **try to be as objective and fair as**

(11)   **possible.  So I don't assume or anticipate**

(12)   **an outcome.  It's not my job.  It's not**

(13)   **something I do.**

(14)       Q.    There had never been any other

(15)   security incidents involving Kevin

(16)   Campbell, correct?

(17)       **A.    Not that I'm aware, no.**

(18)       Q.    Had there been any security

(19)   incidents involving Alzate?

(20)       **A.    Not that I'm aware of, no.**

(21)       Q.    How did you first hear about

(22)   the incident?

(23)       **A.    I believe I was called by a**

(24)   **member of management.  Who that was; I**

(25)   **don't remember.  I was not at the facility**

(1)                    **J. CAHILL**

(2)    **when it occurred.**

(3)        Q.    Someone called you on your

(4)    cellphone or something else?

(5)        **A.    No, my cellphone, I believe.**

(6)        Q.    Were you working, you were just

(7)    not at that location?

(8)        **A.    Yes, I was working, I just**

(9)    **wasn't at LGA.  I don't remember what**

(10)   **building I was in.**

(11)       Q.    Do you recall if it was a man

(12)   or a woman who called you?

(13)       **A.    I'm sorry, I do not.**

(14)       Q.    That's okay, you don't have to

(15)   apologize.  I'm just asking what you

(16)   remember.  Do you recall, in sum and

(17)   substance, what this person said to you?

(18)       **A.    Just that there was -- there**

(19)   **was a workplace violence incident and there**

(20)   **was probably -- there was, possibly, a**

(21)   **weapon involved.**

(22)       Q.    Do you recall how you

(23)   responded, if you said anything in

(24)   response?

(25)       **A.    I don't recall.  I probably**

(1)                    **J. CAHILL**

(2)     **said something to the effect of I'll be**

(3)     **there, I'm on my way, but I don't remember**

(4)     **exactly what I said.**

(5)          Q.     Is that what happened, they

(6)     notified you that same day and you went to

(7)     the LGA station that same day?

(8)          **A.     I believe so, yes.**

(9)          Q.     Do you recall, approximately,

(10)    what time you arrived at the LGA station on

(11)    May 18th, 2021?

(12)         **A.     No, I'm sorry, I do not.**

(13)         Q.     What is the next thing you

(14)    recall happening, with regard to your

(15)    interaction with these events?

(16)         **A.     Initially, I would probably**

(17)    **review employee statements that were given**

(18)    **to management, and then go to the cameras.**

(19)    **I don't know which -- I might have one done**

(20)    **first in the -- I don't remember what order**

(21)    **I did it, but just knowing it might, the**

(22)    **way I do things, it would be one of those**

(23)    **two.  I would do cameras or interviews or**

(24)    **vice versa, whatever I feel necessary at**

(25)    **the time.**

[Page 118]
February 22, 2024

(1)                      **J. CAHILL**
(2)        Q.    There are cameras, interviews,
(3)    and written statements, correct?
(4)        **A.    Yes.**
(5)        Q.    Are there any other components
(6)    of the investigation?
(7)        **A.    From a security standpoint, not**
(8)    **that I'm aware of.  Again, I can't say what**
(9)    **operations does.**
(10)       Q.    So you received a phone call on
(11)   your cellphone on May 18th, 2021, and went
(12)   to the LGA station, right?
(13)       **A.    Yes.**
(14)       Q.    Upon arriving at the LGA
(15)   station, do you recall what you did?
(16)       **A.    Specifically, no, I do not.**
(17)   **I'm just making reference to what I believe**
(18)   **I would have or what my normal practice is,**
(19)   **but I cannot tell you exactly what I did as**
(20)   **the --**
(21)       Q.    And just -- just for clarity,
(22)   would your normal practice have been to
(23)   review written statements, conduct an
(24)   interview, or review a video, first?
(25)       **A.    It would not be -- the**

(1)                    **J. CAHILL**

(2)    **interview would not be last.  That's not --**

(3)    **the inter-- I would, as we said before, to**

(4)    **try and gather as much information before**

(5)    **you interview be somebody.  I would like to**

(6)    **have as much as I can.  So my normal**

(7)    **practice, again, I can't say exactly what I**

(8)    **did here.  My normal practice is to review**

(9)    **statements and video.  It could be video**

(10)   **first, statements second, or statements**

(11)   **second, video first.**

(12)              **I don't remember exactly what I**

(13)   **did, but that's my normal practice.**

(14)        Q.    When you say statements, you're

(15)   referring to the written statements, the

(16)   witness statements.

(17)        **A.    Yes.**

(18)        Q.    When you arrived to the LGA

(19)   station, do you know if the witness

(20)   statements were completed?

(21)        **A.    I do not recall when they were**

(22)   **all completed.  I believe --**

(23)        Q.    Do you recall -- I'm sorry, go

(24)   ahead.

(25)        **A.    Yeah, I do not recall when they**

[Page 120]
February 22, 2024

(1)                    **J. CAHILL**

(2)  **were done.  I don't know.  I apologize.**

(3)       Q.    That's okay.  I guess what I'm

(4)  saying is, do you recall when you first

(5)  started reviewing them?  Was it that day?

(6)       **A.    I don't recall.  When they were**

(7)  **made available to me, I don't really**

(8)  **recall.  I don't know.**

(9)       Q.    Is it typically -- I'm sorry,

(10)  I'm so sorry.  I'm not trying to interrupt

(11)  you.

(12)       **A.    It was a long time ago.  I**

(13)  **don't recall.**

(14)       Q.    Sure, okay.  So Did you speak

(15)  to anyone that day, at the LGA station,

(16)  regarding this incident?

(17)       **A.    Informally, just -- do you mean**

(18)  **-- do you mean interviewed them or just had**

(19)  **a conversation with people?**

(20)       Q.    No, so I -- so I -- well, did

(21)  you conduct any interviews regarding this

(22)  incident, that were not recorded?

(23)       **A.    Absolutely not, no.**

(24)       Q.    And there are recorded

(25)  interviews related to this incident,

(1)                    J. CAHILL

(2)    correct?

(3)        **A.    Yes.**

(4)        Q.    And did you conduct those

(5)    recorded interviews?

(6)        **A.    Yes.**

(7)        Q.    You were the one who was asking

(8)    questions on those recordings, correct?

(9)        **A.    Yes, with the exception -- I --**

(10)   **I needed -- through a potential language**

(11)   **barrier, they were my questions.  But with**

(12)   **Alzate, with his interview, I asked a**

(13)   **member of management, who's -- who's fluent**

(14)   **in Spanish, just to give me a hand in case**

(15)   **there's a language barrier.  I would be**

(16)   **wanting to fully understand what he was**

(17)   **saying.**

(18)       Q.    Aside from those interviews,

(19)   and to be clear, those questions are not

(20)   referring to those interviews.  On May

(21)   18th, 2021, did you speak to anyone about

(22)   this incident?  In other words, did you

(23)   speak to Eric wonderers, did you speak to

(24)   medical, do you recall speak to anyone on

(25)   May 18th, 2021, at the LGA station,

[Page 122]
February 22, 2024

(1)                    J. CAHILL
(2)    regarding this incident?
(3)         A.    Specifically, I'm sure I did
(4)    speak with who -- I don't remember exactly
(5)    who.  I can't tell you it was not a man.
(6)    If I can tell you, it was probably Eric.
(7)    Again, that's speculation.  I don't have a
(8)    specific memory of who exactly I spoke to
(9)    at the time.
(10)        Q.    Would you have taken notes of
(11)   those conversations?
(12)        A.    No.
(13)        Q.    Did you keep notes as part of
(14)   your security investigation?
(15)        A.    Just what's -- just the e-mail
(16)   and the -- I'm sorry, just the e-mail and
(17)   the written report, but, no, I don't take
(18)   handheld -- handwritten notes.  It's just
(19)   not my practice.
(20)        Q.    So do you think that you might
(21)   have spoken to Eric Wanders that day, but
(22)   you don't recall what you two -- you don't
(23)   recall anything specific that you two would
(24)   have spoken about?
(25)        A.    I can't specifically say that I

(1)                    **J. CAHILL**

(2)    **did speak to Eric.  I'm just assuming that**

(3)    **would have been logical person to speak to,**

(4)    **but I do not have any -- I did -- again, it**

(5)    **was a long time ago and everything was**

(6)    **fluid, so I don't remember.  If I did speak**

(7)    **to him, I don't remember what the substance**

(8)    **of that conversation is.  It's just not**

(9)    **something that I remember.**

(10)        Q.    And to be clear, I'm not asking

(11)   you to give me a verbatim recitation of

(12)   what that conversation would have been,

(13)   just sum and substance.  To be clear,

(14)   you're not able to tell me that, right?

(15)        **A.    I am not able to tell you**

(16)   **exactly what -- what -- if I spoke to Eric**

(17)   **or what we spoke about at the time.**

(18)        Q.    Do you recall ever speaking to

(19)   Eric Wanders about this incident?

(20)        **A.    Yes, he's the senior member of**

(21)   **management.  Yes.**

(22)        Q.    At what point in time do you

(23)   recall first speaking to him about this

(24)   incident?

(25)        **A.    It would be more than likely,**

(1)                    **J. CAHILL**

(2)  **prior to when I spoke to him when leaving**

(3)  **the facility, prior to the 18th.  That's,**

(4)  **again, normal practice.**

(5)       Q.    So, right.  I understand that

(6)  you're saying normal practice, probably

(7)  would have dictated that you spoke to him

(8)  at some point that day.  What I'm asking

(9)  is, do you have a memory of any actual

(10) conversations that you had with him, about

(11) this incident?

(12)      **A.    A specific memory, no.  Maybe**

(13) **just --**

(14)      Q.    But do you recall ever talking

(15) to him at some point, and then saying

(16) things to him about this?

(17)      **A.    Probably the facts and**

(18) **circumstances of what I learned up to that**

(19) **point, but, again, I can't tell you exactly**

(20) **what he and I spoke about, you know?**

(21)      Q.    So, for instance, there came a

(22) point in time you sent him an e-mail with

(23) information that eventually became your

(24) report, correct?

(25)      **A.    Yes, ma'am.**

(1)                    **J. CAHILL**

(2)        Q.    Do you recall speaking to him,

(3)    prior to that e-mail?

(4)        **A.    Not, specifically, no.**

(5)        Q.    Do you recall speaking to

(6)    anyone, other than the people you

(7)    interviewed, about this incident, prior to

(8)    sending that e-mail?

(9)        **A.    I'm sure I spoke to people to**

(10)   **get an idea exactly, you know, to see who I**

(11)   **want to interview, who wants to be**

(12)   **interviewed, to get a working knowledge of**

(13)   **what actually transpired, besides a**

(14)   **telephone call.  Nothing factual or**

(15)   **evidentiary that I can remember off the top**

(16)   **of my head.  But I'm sure I spoke to**

(17)   **people.  That happened.  That would be the**

(18)   **gist of it, but nothing that I specifically**

(19)   **included in a report or anything, no, not**

(20)   **to the best of my knowledge.**

(21)       Q.    Did you issue any findings as a

(22)   result of your security investigation?

(23)       **A.    I believe the report states**

(24)   **that in my opinion, it's clear that both**

(25)   **Alzate and Campbell were in clear violation**

[Page 126]
February 22, 2024

(1)                          **J. CAHILL**

(2)  **of the applicable workplace violence**

(3)  **policy.**

(4)       Q.    What is the applicable

(5)  workplace violence policy?

(6)       **A.    Workplace violence is generally**

(7)  **covered in what we call policy 2-5,**

(8)  **acceptable conduct.**

(9)       Q.    What does that policy say,

(10) essentially?

(11)      **A.    It states that no employee can**

(12) **-- can conduct him or herself, engage in**

(13) **activity, not limited to the forceable**

(14) **touching or abuse, sexual abuse, something**

(15) **like that.  Workplace violence can also be**

(16) **done in three different ways, physically,**

(17) **verbally, and emotionally.**

(18)           **It comes systemically.  It's**

(19) **any conduct, which would create the -- any**

(20) **specific employee or other team members to**

(21) **fear for their safety and fear for their**

(22) **well-being.**

(23)      Q.    Did you ever become aware --

(24) well, you became aware, at some point, that

(25) FedEx was going to terminate Kevin

[Page 127]
February 22, 2024

(1)                J. CAHILL

(2)    Campbell, correct?

(3)        **A.    Yes.**

(4)        Q.    Did you ever then become aware

(5)    that Kevin Campbell was going to GFT his

(6)    termination?

(7)        **A.    I don't recall.**

(8)        Q.    So, I'm sorry, can you hear --

(9)    I'm sorry, off the record.

(10)            (Whereupon, an off-the-record

(11)        discussion was held.)

(12)        **MS. MASSIMI:  Can you please**

(13)        **read back my question?**

(14)        **(Whereupon, the referred to**

(15)        **question and answer was read back by**

(16)        **the Reporter.)**

(17)        Q.    Did Eric Wanders ever tell you

(18)    that he was preparing for a GFT with Kevin

(19)    Campbell?

(20)        **A.    I mean, my mindset was a**

(21)    **possibility.  I don't know if the GFT went**

(22)    **through.  I do not have -- my**

(23)    **responsibility, at that point, is done.  I**

(24)    **don't mean to put it -- but I have no**

(25)    **further responsibility.  So if Kevin or**

[Page 128]
February 22, 2024

(1)                    J. CAHILL
(2)    **Alzate, GFted anything, I would have to**
(3)    **involvement.  So if I heard it, somebody**
(4)    **mention the it, I would've heard about it.**
(5)    **It wouldn't register, it means -- it has**
(6)    **nothing to do with me.**
(7)         Q.    Right, that was going to me my
(8)    next question, as to whether you were
(9)    present for any GFT regarding Kevin
(10)   Campbell?
(11)        **A.    Absolutely not.**
(12)        Q.    Do you know whether there was
(13)   an EEO related to Kevin Campbell, an IEEO?
(14)        **A.    In regarding to -- in regarding**
(15)   **this incident?**
(16)        Q.    Related to Kevin Campbell.
(17)        **A.    No, I wouldn't have -- it was**
(18)   **just structurally EEO, I wouldn't have any**
(19)   **-- it wouldn't have come to me.  The only**
(20)   **EEO I was aware of was this incident.**
(21)        Q.    Did you ever speak to or e-mail
(22)   with Nan Malebranch, related to the
(23)   May 18th incident?
(24)        **A.    I don't recall, specifically,**
(25)   **sending anything to Nan Malebranch or**

(1)                    **J. CAHILL**

(2)    **having a conversation with her regarding**

(3)    **this.**

(4)        Q.    Would who have been your main

(5)    contact from management, related to this?

(6)    Is it Eric Wanders?

(7)        **A.    It's LGA, it has to be Eric**

(8)    **Wanders, my boss, my manager, yes.**

(9)            **MS. MASSIMI:  I'm sorry, can**

(10)        **you read back the last question an**

(11)        **answer?**

(12)            **(Whereupon, the referred to**

(13)        **question and answer was read back by**

(14)        **the Reporter.)**

(15)        Q.    You're referring to Chris --

(16)    what's his name, Chris?

(17)        **A.    Borka, yes.**

(18)        Q.    Chris Borka.  In other words,

(19)    you wouldn't have necessarily had

(20)    conversations with Nan Malebranch about

(21)    this, right?

(22)        **A.    Not that I recall, no.**

(23)        Q.    You were mainly communicating

(24)    with your manager and Eric Wanders, and

(25)    then Eric Wanders was -- if anyone was

```
(1)                   J. CAHILL
(2)   communicated with Nan Malebranch, it would
(3)   have been Eric Wanders, is that accurate
(4)   it?
(5)        A.     It wouldn't be me --
(6)             MR. MCGAHA:  I object to the
(7)         form.
(8)             THE WITNESS:  I'm sorry.  It
(9)         wouldn't be me.  I don't know if -- I
(10)        wouldn't know who was notified,
(11)        ma'am.  I can't attest to that.
(12)       Q.    Have you ever had interactions
(13)   with Eric Wanders?
(14)       A.    Yes.
(15)       Q.    How would you describe him as a
(16)   professional?
(17)       A.    Eric is -- he's just, in my
(18)   opinion, he's a very hard worker, he's --
(19)   he runs his building very well.  As far as
(20)   operation, I really can't comment on that,
(21)   because I don't know exactly -- I have no
(22)   -- no dealings with management, with the
(23)   exception of security-related.  I've never
(24)   had an issue with Eric at all.
(25)       Q.     I'm sorry, what do you mean
```

```
(1)                    J. CAHILL
(2)    when you say operationally, you said you
(3)    can't speak to, operationally, what do you
(4)    mean by that?
(5)         A.    I -- I don't know how well Eric
(6)    runs his building.  My opinion runs well,
(7)    but I wouldn't be able to tell you if it's,
(8)    you know, statistically, if it runs well or
(9)    things like that, I can't answer that well.
(10)        Q.    Are you able to offer any
(11)   characterization and/or assessment as to
(12)   how Eric treats the individuals who work in
(13)   his building?
(14)        A.    As far as his employees?
(15)        Q.    Yes.
(16)        A.    In my opinion, he treats them
(17)   well.
(18)        Q.    What does that --
(19)        A.    I don't --
(20)        Q.    Go ahead.
(21)        A.    He -- he has just an open-door
(22)   policy for holidays.  They have food and
(23)   stuff like that for the employees.  Again,
(24)   I don't -- as far as -- as far as I know,
(25)   he treats them well.
```

**J. CAHILL**

(1)

(2)    Q.    Do you know whether he curses

(3)    or swears at employees or has ever done

(4)    that?

(5)    **A.    Not to the best of my**

(6)    **knowledge.**

(7)    Q.    What was your role in this

(8)    investigation?

(9)    **A.    I was the investigating officer**

(10)    **for the security department.**

(11)    Q.    Were you in charge of the

(12)    investigation?

(13)    **A.    Yes, you could say that.  Yes.**

(14)    Q.    How was this investigation

(15)    supposed to be conducted?

(16)    **A.    The -- the way I conducted it.**

(17)    **I reviewed video, reviewed all information**

(18)    **I had, conducted interviews, and I did a**

(19)    **written report and submitted it to**

(20)    **management.**

(21)    Q.    Is your purpose in conducting

(22)    this investigation to be neutral?

(23)    **A.    That's my policy, yes.  I think**

(24)    **fairly --**

(25)    Q.    Go ahead, yup.

[Page 133]
February 22, 2024

J. CAHILL

(1)

(2)    **A.    I think fairly is an important**

(3)    **word as well.  I try to do that all the**

(4)    **time.**

(5)    Q.    At some point, you completed

(6)    your investigation and all of the findings

(7)    were put into your report, correct?

(8)    **A.    The final report, yes, it was**

(9)    **summarized.  Yes.**

(10)    Q.    Did you forward that report to

(11)    anyone?

(12)    **A.    Yes, it would go to Chris**

(13)    **Borka.  The final report would go to Chris**

(14)    **Borka.  And it's -- I don't distribute it.**

(15)    **I send it to Chris, but it will get**

(16)    **distributed to my senior manager, as well**

(17)    **as the managing director at the time.**

(18)    Q.    Who was the managing director

(19)    at the time?

(20)    **A.    Steve Rork.**

(21)    Q.    He was the Managing Director of

(22)    Security?

(23)    **A.    For the eastern region, yes.**

(24)    Q.    Does the report, or did the

(25)    report get forwarded to Eric Wanders?

(1)                    J. CAHILL

(2)        **A.    At some point, I would -- I do**

(3)    **not -- I'm sure -- I don't forward it to**

(4)    **him.  I forward it to Chris.  I forward it**

(5)    **to my manager and they distribute it.**

(6)        Q.    But you did forward the

(7)    substance of what would eventually become

(8)    your report to Eric Wanders, correct?

(9)        **A.    Yes.**

(10)        Q.    In an e-mail, correct?

(11)        **A.    Yes, mm-hmm.**

(12)        Q.    What was the purpose of you

(13)    providing that information to Eric Wanders?

(14)        **A.    It's -- it was a work -- it was**

(15)    **a significant workplace violence incident**

(16)    **-- incident.  And the company needs to know**

(17)    **what's transpiring.  And it's updates,**

(18)    **basically, is what it is, so people know**

(19)    **where -- where the investigation stands,**

(20)    **what's left, needs to be done.  That type**

(21)    **of -- that type of information.  It's like**

(22)    **an -- it's an update, pretty much, the best**

(23)    **way to put it.**

(24)        Q.    When you recorded the

(25)    interviews, how did you do that?

(1)                    J. CAHILL

(2)        **A.      On a digit, written -- on a**

(3)    **FedEx-issued digital recorder.**

(4)        Q.     Do you keep those recordings on

(5)    separate tapes or separate files?

(6)        **A.      Yes, each recording is a**

(7)    **separate file.   It's not one continuous**

(8)    **recording.   It's a separate file.**

(9)        Q.     What type of file is it, do you

(10)   know?

(11)       **A.      You're getting a little techie**

(12)   **for me now.   It's a digital recorder.   I**

(13)   **record --**

(14)       Q.     Just what you know?

(15)       **A.      Yeah, that's -- I'm not sure**

(16)   **exactly.   It's a digital recorder.   That's**

(17)   **the best that I can do.**

(18)       Q.     So you personally record the

(19)   interviews on a FedEx digital recorder, and

(20)   then you do what, upload the interviews to

(21)   a computer or a system or something else?

(22)       **A.      Yes, it's uploaded to my**

(23)   **computer.**

(24)       Q.     Is that where the recordings

(25)   are maintained?

[Page 136]
February 22, 2024

(1)                    J. CAHILL

(2)        A.    They're uploaded to the

(3)    computer, as well as the security report

(4)    that we prepare.  It's all uploaded into

(5)    the system and that goes as what we call a

(6)    case, that gets sent to security.

(7)        Q.    Who has access to that digital

(8)    security file that includes the recorded

(9)    interviews?

(10)        A.    Do you mean the actual recorder

(11)    itself or the system I uploaded the

(12)    recordings to?

(13)        Q.    The system you uploaded the

(14)    recordings to.

(15)        A.    My security -- my security

(16)    management.  If there's somebody outside of

(17)    that, I'm not that familiar.  I know

(18)    security management does, but I don't know

(19)    who else would have it.  Operations doesn't

(20)    have access to that.

(21)        Q.    Did you ever forward the

(22)    recorded interviews to Eric Wanders?

(23)        A.    I don't think so, no.

(24)        Q.    Did he have access to those

(25)    recordings?

(1)                    J. CAHILL

(2)        **A.     No.**

(3)        Q.     Why not?

(4)        **A.     It's policy.  Nobody has access**

(5)   **to it except security.**

(6)        Q.     Do you know whether Eric

(7)   Wanders or Nan Malebranch ever asked to

(8)   listen to those recordings?

(9)        **A.     I was never asked.  I don't**

(10)  **know if they asked.  Moving forward, they**

(11)  **never asked me about it.**

(12)       Q.     Would it have been a violation

(13)  of policy for Chris Borka to forward the

(14)  recorded interviews to Nan Malebranch and

(15)  Eric Wanders, as part of the GFT process?

(16)       **A.     No.**

(17)       Q.     I'm sorry, it would not have

(18)  been against policy?

(19)       **A.     No, it would not have been**

(20)  **against policy.**

(21)       Q.     Okay.  So when you say that no

(22)  one else is supposed to have access to

(23)  them, you're not saying that other members

(24)  of management aren't permitted to listen to

(25)  them, they just need to make a request; is

[Page 138]
February 22, 2024

(1)                    J. CAHILL

(2)     that correct?

(3)          **A.    I think the best way to put it**

(4)     **is, I'm not permitted to allow anyone to**

(5)     **listen to any recording.  Any request like**

(6)     **that is made through security management**

(7)     **and it's taken from there.  I am not**

(8)     **permitted to let anyone record, listen to**

(9)     **-- listen to recordings.  I apologize.**

(10)         Q.    Right, got it.  Did you ever

(11)    discuss the contents of your report with

(12)    Eric Wanders, either verbally or in

(13)    writing?

(14)         **A.    Well, he -- he receives the**

(15)    **e-mails.  So he would obviously have access**

(16)    **to it.**

(17)         Q.    Did he ever provide you with

(18)    any commentary on the e-mails that you were

(19)    sending him, related to this investigation?

(20)         **A.    Commentary as far as -- can you**

(21)    **expound on that?**

(22)         Q.    Anything.  So you sent him the

(23)    e-mails with the information that would

(24)    eventually become part of your report,

(25)    correct?

(1)                    J. CAHILL

(2)        **A.    Yes.**

(3)        Q.    Did he ever comment on those

(4)    e-mails by picking up the phone and talking

(5)    to you, coming to your office, sending you

(6)    a responsive e-mail, anything like that?

(7)        **A.    I don't recall.**

(8)        Q.    Did anyone ever -- go ahead.

(9)        **A.    I don't recall.  Sorry.**

(10)        Q.    Okay.  I just want to take a

(11)    look at Exhibit 1, if you're able to do

(12)    that, sir.  Can you take -- do you have --

(13)    is it still up?

(14)              **THE WITNESS:  That's Exhibit 1?**

(15)              **MR. MCGAHA:  No.**

(16)              **MS. MASSIMI:  Page ESI963.**

(17)              **MR. MCGAHA:  Yes.**

(18)              **THE WITNESS:  Yes, ma'am.  It's**

(19)         **up.**

(20)              **MS. MASSIMI:  Okay.**

(21)        Q.    Can you please take a look?

(22)    And, again, this is your Security

(23)    Investigative Report, correct?

(24)        **A.    Yes.**

(25)        Q.    Can you please scroll to page

(1)                    J. CAHILL

(2)    ESI963, at the first bullet point?

(3)            Do you see that there?

(4)        **A.    Yes, I see the heading on the**

(5)    **page, yes.**

(6)        Q.    Yes, so, like, right below the

(7)    heading or a couple of lines down, where it

(8)    says 8:23 and 40 seconds, do you see that?

(9)        **A.    Yes.**

(10)       Q.    The statement there, it says

(11)   that, "At that time, the video showed

(12)   Alzate approaching Campbell's work area in

(13)   a clearly agitated state, flailing his

(14)   arms, while pushing several packages in

(15)   Campbell's direction."

(16)           Do you see that?

(17)       **A.    Yes.**

(18)       Q.    Did you write that information?

(19)       **A.    Yup?**

(20)           **MR. MCGAHA:  Can you --**

(21)       Q.    Is that information -- I'm

(22)   sorry.

(23)       **A.    Yes.**

(24)       Q.    Is that information correct?

(25)       **A.    I believe it to be when I wrote**

(1)                          **J. CAHILL**

(2)     **it, yes.**

(3)          Q.    I mean, do you have any reason

(4)     to doubt the accuracy of this information,

(5)     as you sit here now?

(6)          **A.    No, I do not.**

(7)          Q.    What was the purpose of you

(8)     including that information in this report?

(9)          **A.    The fact that -- what do you**

(10)    **mean at that whole -- the 8:23:40 sentence?**

(11)         Q.    Yes.

(12)         **A.    That -- that's an explanation**

(13)    **of what I observed on video, and I think I**

(14)    **stated it was Alzate, I apologize,**

(15)    **approached Campbell in a clearly agitated**

(16)    **state.  That's trying to explain what I --**

(17)    **what I actually saw on video.**

(18)         Q.    And by the way, I was not

(19)    trying to say anything derogatory about

(20)    your pronunciation of his last name,

(21)    earlier.

(22)         **A.    No, not at all.**

(23)         Q.    I thought we were just joking

(24)    about that, so, okay.

(25)         **A.    No, I just mispronounced it.**

[Page 142]
February 22, 2024

```
(1)                    J. CAHILL
(2)        Q.    Yeah, no, it's totally fine.
(3)   No worries.  So from your prospective, is
(4)   that where the incident begins?
(5)        A.    Yes, yes.  That's the start.
(6)        Q.    I would like to take a few
(7)   moments, and this is gonna take, you know,
(8)   5 minutes, maybe or more or less and just
(9)   ask you to silently read through this
(10)  document and let me know when you're done.
(11)       A.    Okay.
(12)       Q.    As you're reading through it,
(13)  at the end, I'm going ask you if everything
(14)  in this document is accurate and correct.
(15)  So just your time and read through it and
(16)  just let us know when you're done.  You can
(17)  read through it to yourself, you don't have
(18)  to read out loud.  Take your time.
(19)       A.    I'm sorry.
(20)       Q.    It's okay.
(21)       A.    Okay.  Thank you.
(22)       Q.    Mr. Cahill, have you now had an
(23)  opportunity to review the document, bearing
(24)  -- that we've marked for purposes of today,
(25)  as Plaintiff's Exhibit 1?
```

```
(1)                     J. CAHILL
(2)        A.      Yes.
(3)        Q.      Did you draft this document?
(4)        A.      Yes, ma'am.
(5)        Q.      Did anyone tell you what to put
(6)    in this document?
(7)        A.      No.
(8)        Q.      Is the information contained in
(9)    this document accurate?
(10)       A.      To the best of my knowledge,
(11)   yes, to the best -- to the best of the
(12)   information I had at the time, yes.
(13)       Q.      Do you believe there's any
(14)   information missing from this document?
(15)       A.      Not that I -- nothing
(16)   pertinent, no, I did not.
(17)       Q.      The bottom of this document is
(18)   not signed, correct?
(19)       A.      Yes, it's not.
(20)       Q.      Or, at least, it's not signed
(21)   with an ink signature, correct?
(22)       A.      No, it's not.
(23)       Q.      Is there any particular reason
(24)   why it's not signed, or do consider your
(25)   information, here, to be a signature?
```

(1)                      J. CAHILL

(2)      **A.    We send it, it's a Word**

(3)   **document, and as it gets sent, it's pretty**

(4)   **much a signature.**

(5)      Q.    So is there any other document,

(6)   any other version of this document that

(7)   includes your signature at the bottom?

(8)      **A.    If it was formatted, there very**

(9)   **well might be one with an electronic**

(10)  **signature for it, that's sent out.  I don't**

(11)  **do that.  There might be one with a**

(12)  **computer.  I don't do that.  There very**

(13)  **well might -- that might have been applied.**

(14)  **The report wouldn't have changed.  There's**

(15)  **nothing -- it's not -- it's just something**

(16)  **that they put a, I guess, an electronic**

(17)  **signature that it would determine it,**

(18)  **before it gets sent out.**

(19)     Q.    So your back of signature in

(20)  this document is not meant to indicate

(21)  anything about the contents of the

(22)  document?

(23)     **A.    No, no, no.**

(24)     Q.    Okay.  Did anyone ever tell you

(25)  that Mr. Campbell was claiming racial

(1)                    J. CAHILL

(2)    discriminatory?

(3)         **A.    With regards to this incident?**

(4)    **No.**

(5)         Q.    In regards to anything.

(6)         **A.    No.  Me, personally, like I**

(7)    **said, I would not have -- that would not**

(8)    **have been in my purview.**

(9)         Q.    Did you speak to Monty Bavel or

(10)   Boval about this incident?

(11)        **A.    He's Kevin's direct -- he was**

(12)   **Kevin's direct manager, I believe.  I don't**

(13)   **recall.  I would imagine I did, but I don't**

(14)   **recall, specifically, when I did.**

(15)        Q.    You didn't interview him

(16)   related to this, did you?

(17)        **A.    No, I did not.**

(18)        Q.    Did you make any record of the

(19)   conversations that you two might have had

(20)   regarding this incident?

(21)        **A.    No, I did not.**

(22)        Q.    Do you recall the sum and

(23)   substance of what was said during the

(24)   conversation with you and Mr. Boval,

(25)   regarding this incident?

(1)                    J. CAHILL

(2)        **A.    No, I don't, but as I stated,**

(3)  **most of my communication goes through the**

(4)  **highest rank, which would be Eric Wanders.**

(5)  **So I don't -- if I did speak to Monty, it**

(6)  **wouldn't be all that detailed.  I know he**

(7)  **was not interviewed.  I did not interview**

(8)  **him.**

(9)        Q.    Do you know if anyone was

(10)  advocating for Kevin as part of this

(11)  investigation, and then the subsequent to

(12)  the GFT process?

(13)       **A.    Advocating -- I don't know what**

(14)  **you mean.  I know what the word means, I**

(15)  **gist don't know the context of the**

(16)  **question.**

(17)       Q.    Sure.  Do you know if you know

(18)  anyone that was on Kevin's side, related to

(19)  this investigation, like, saying he was hit

(20)  first, he shouldn't be terminated, anything

(21)  like that?

(22)            **MR. MCGAHA:  I object to form.**

(23)       **A.    He -- not that I recall.  The**

(24)  **only -- the only information I -- I have**

(25)  **would be during the interview.  Nobody -- I**

(1)                    J. CAHILL

(2)    wasn't made aware that anyone was

(3)    advocating for any type of disposition in

(4)    this case.  Again, it's not -- again, I

(5)    just write a report and submit it.

(6)         Q.    And that includes Adamel

(7)    Spencer, correct?  He was not advocating

(8)    for Kevin?

(9)              MR. MCGAHA:  I object to the

(10)        form.

(11)        A.    His state -- no, his statement

(12)    was -- and he was interviewed.  That -- as

(13)    we said before, he saw the commotion, he

(14)    went over there, and he separated it.  He

(15)    tried to separate and he walked Kevin away.

(16)    I -- I didn't -- I didn't know anything

(17)    about him advocating.  He didn't tell me

(18)    that he was advocating, that I'm aware of.

(19)    He didn't tell me anything.

(20)        Q.    Had Kevin walked away to get a

(21)    manager, following the incident with the

(22)    box, would you have investigated that

(23)    incident?

(24)              MR. MCGAHA:  I object to form.

(25)        A.    If it was filed as a workplace

(1)                    **J. CAHILL**

(2)    **violence, yes.  If Kevin would have filed**

(3)    **it as -- as a victim of a workplace**

(4)    **violence, yes.  So I would do -- it would**

(5)    **basically be the same type of investigation**

(6)    **as Kevin would've reported.  There's be no**

(7)    **difference, video interview is the same**

(8)    **thing.**

(9)         Q.    Are you responsible in 2021, or

(10)   were you responsible for investigating all

(11)   complaints of workplace violence?

(12)        **A.    In the facilities I'm assigned,**

(13)   **yes.**

(14)        Q.    Do you believe that what Adamel

(15)   Spencer described in terms of Alzate

(16)   smacking the box, and then the box hitting

(17)   Kevin is workplace violence?

(18)        **A.    It -- one of the -- one of the**

(19)   **parts -- or if that was the case, if Kevin**

(20)   **filed a workplace violence report on that,**

(21)   **I would -- yes, I would investigate that as**

(22)   **workplace violence.**

(23)        Q.    Do you believe that that type

(24)   of workplace violence would have warranted

(25)   termination by Alzate or termination --

(1)                     J. CAHILL

(2)        **A.      I can't.**

(3)        Q.      -- of Alzate?

(4)        **A.      As far as -- I don't mean to**

(5)    **assume a question.  As far as just the**

(6)    **simple pushing of the box into.**

(7)        Q.      And it hitting him?

(8)        **A.      Again, I don't -- I can't speak**

(9)    **to what management would deem a discipline**

(10)   **for that.  I can't.  I don't -- I have no**

(11)   **input on that.**

(12)       Q.      You believed that Mr. Campbell

(13)   and Mr. Alzate violated the workplace

(14)   violence policy, correct?

(15)       **A.      Yes.**

(16)       Q.      In every instance or in any

(17)   instance where you find that someone has

(18)   violated the workplace violence policy, is

(19)   that automatic termination, or are there

(20)   circumstances where another penalty or

(21)   level of discipline can be administered?

(22)             **MR. MCGAHA:  I object to form.**

(23)       **A.      Again, that's -- that's**

(24)   **something that management looks at and they**

(25)   **decide whether it was terminable or not.**

(1)                    **J. CAHILL**

(2)    **The general policy is we -- is FedEx has a**

(3)    **policy of workplace violence, we have zero**

(4)    **tolerance for that.  So, however that's**

(5)    **termed, however that's interpreted by**

(6)    **management, that would be -- I would have**

(7)    **no -- I would have no input on that.**

(8)         Q.    If a FedEx worker pushes a box

(9)    into another worker and it hits that person

(10)   without causing a serious physical injury,

(11)   is that considered workplace violence?

(12)                    **MR. MCGAHA:  I object to form.**

(13)         **A.    The individual who was hit with**

(14)   **the box would have to file a complaint**

(15)   **saying that he or she was intimidated, it**

(16)   **was done to create a -- they put him or her**

(17)   **in physical injury or some type of**

(18)   **harassment.  If they did not feel that,**

(19)   **that wouldn't -- that would not have been a**

(20)   **workplace violence filed without that**

(21)   **person saying that conduct created a**

(22)   **volatile or a threatening -- I'm sorry,**

(23)   **threatening is a better way to put it,**

(24)   **atmosphere.**

(25)         Q.    Is it your testimony that in

(1)                    J. CAHILL

(2)    order for something to be termed workplace

(3)    violence, the punitive victim must alleged

(4)    that they were intimidated or threatened or

(5)    felt intimidated or threatened?

(6)              **MR. MCGAHA:  I object to form.**

(7)              **A.    No, FedEx operations**

(8)    **management, security, other employees that**

(9)    **are not directly involved, they can file**

(10)   **workplace violence.  If something egregious**

(11)   **like this happens, management would file is**

(12)   **it, I would file it.  In something like**

(13)   **this, Kevin or Alzate would not have to**

(14)   **file it themselves.  This is something that**

(15)   **would be automatically filed by management**

(16)   **or me.**

(17)             Q.    I'm sorry, that's not,

(18)   actually, what I'm getting at.  What I said

(19)   was earlier, a moment ago, I believe you

(20)   testified that if a worker pushes a box

(21)   into another worker and a complaint is

(22)   filed, in order for that to be determined

(23)   workplace violence, the target of the

(24)   violence needs to claim that they were

(25)   intimidated or threatened; is that correct?

(1)                    J. CAHILL

(2)            MR. MCGAHA:  I object to form.

(3)        A.     Something like that, if someone

(4)    pushes a box at somebody and the employee

(5)    feels that that person did it to threaten

(6)    them, to not even hurt them, to threaten

(7)    them, to make them feel uncomfortable, to

(8)    make them feel for their safety in any way,

(9)    that employee would have the right to file

(10)    a workplace violence.  And it would be

(11)    investigated -- it would be investigated as

(12)    workplace violence, so that's how it would

(13)    be classified.

(14)        Q.     I guess what I'm saying is

(15)    something could be classified as workplace

(16)    violence or can't -- what I'm saying is,

(17)    can something be classified a workplace

(18)    violence, where the target of the violence

(19)    does not feel threatened, does not feel

(20)    uncomfortable and is not injured?

(21)            MR. MCGAHA:  I object to form.

(22)        A.     Can a case be filed for someone

(23)    who is the victim or lack of a better, if

(24)    someone was hit by a box?  Just to make

(25)    sure I'm answering everything correctly.

(1)                    **J. CAHILL**

(2)        Q.    Correct, yeah.  So say someone

(3)   gets hit by a box at work and it's

(4)   obviously disrespectful, but it's not

(5)   threatening, it's not intimidating, it

(6)   doesn't cause an injury.  Can that still be

(7)   considered workplace violence?

(8)        **A.    Yes.**

(9)        Q.    So something doesn't have to

(10)  necessarily threatening or intimidating or

(11)  injurious to be considered workplace

(12)  violence?

(13)            **MR. MCGAHA:  I object to the**

(14)         **form.**

(15)       **A.    In the policy itself, it says**

(16)  **that it has to be -- someone has to feel**

(17)  **threatened or harassed, however, that**

(18)  **policy also states that if you and I are**

(19)  **involved in an incident and Gabe is**

(20)  **threatened by our behavior, that can be**

(21)  **filed as a workplace violence as well.**

(22)  **It's not just a specific individual or the**

(23)  **who individuals or however many**

(24)  **individuals.  It's the employees, as we**

(25)  **term them team members, if they feel**

(1)                    J. CAHILL

(2)     **threatened or alarmed or if they feel their**

(3)     **safety is in danger, they have a right, and**

(4)     **we encourage them to file a workplace**

(5)     **incident.**

(6)         Q.    Right.  What I'm referring to

(7)     is, and correct me if I'm wrong, what I'm

(8)     referring to is, I believe you testified a

(9)     moment ago that if Kevin Campbell were to

(10)    simply report Alzate hitting a box and

(11)    pushing the box into him, that you would

(12)    not necessarily have considered that

(13)    workplace violence, without Kevin's

(14)    claiming that he felt intimidated or

(15)    threatened; is that correct, or am I not

(16)    correct that that was your testimony?

(17)             **MR. MCGAHA:  I object to the**

(18)          **form.**

(19)        A.    In that incident, if Kevin did

(20)    **not feel threatened or alarmed, or if he --**

(21)    **and no other employee complained about it,**

(22)    **if they felt threatened or alarmed, it**

(23)    **could have been dealt with by management,**

(24)    **through an acceptable conduct on Alzate's**

(25)    **part, however, if someone else around them,**

J. CAHILL

(1)

(2)        like I said, I don't mean to be repetitive,

(3)        I just want to be clear.  If someone else

(4)        around them felt threatened by it, which is

(5)        entirely possible, it does has been, then

(6)        it would be classified, that incident would

(7)        be classified, investigated as a workplace

(8)        violence.

(9)            Q.    What I'm asking is, and I think

(10)       you're being repetitive.  But what I'm

(11)       asking is, in a situation such as this one,

(12)       where Alzate hit a box and the box hit

(13)       Kevin, if no other employee complained

(14)       about it and Kevin complained about it, but

(15)       said he wasn't threatened, he wasn't

(16)       intimidated, and he wasn't really injured,

(17)       would that be treated as workplace

(18)       violence, or could it be treated as

(19)       something else without a termination?

(20)            MR. MCGAHA:  I object to the

(21)        form.

(22)            A.    Without a determination for

(23)       Alzate?

(24)            Q.    Yes.

(25)            A.    Again, it could be investigated

[Page 156]
February 22, 2024

(1)                          **J. CAHILL**

(2)     **as misconduct, inappropriate conduct.  As**

(3)     **far as the discipline level, if any, that**

(4)     **would be management.  I can't -- I couldn't**

(5)     **say whether that he would be -- he would be**

(6)     **terminated for something like that.**

(7)          Q.    People don't always get

(8)     terminated for misconduct or inappropriate

(9)     conduct; is that correct?

(10)                **MR. MCGAHA:  I object to form.**

(11)          **A.    As far as I know, no.**

(12)          Q.    But for workplace violence, it

(13)    is, to your knowledge, a person will be

(14)    terminated if they're found to be in

(15)    violation of the workplace violence policy,

(16)    correct?

(17)                **MR. MCGAHA:  I object to form.**

(18)          **A.    Again, the policy states zero**

(19)    **-- zero tolerance is the term.  But that**

(20)    **decision for any discipline, what level of**

(21)    **discipline, if any, is made by management.**

(22)          Q.    Why was Kevin not, for lack of

(23)    a better word, charged with misconduct and

(24)    inappropriate behavior, as opposed to

(25)    workplace violence?

```
(1)                  J. CAHILL
(2)              MR. MCGAHA:   I object to form.
(3)       A.      Because when he approached
(4)   Alzate, he, first of all, as we covered
(5)   before, the policy stated he should have
(6)   stepped away.   He should have notified
(7)   management.   He should have notified
(8)   someone there was an incident, and like I
(9)   said, we wouldn't be here right now.   He --
(10)  he -- instead of doing that, he stepped
(11)  towards Alzate.   He leaned over him.   I
(12)  managed over him.   Alzate took a step to
(13)  the side, as if he was -- you've seen the
(14)  video.
(15)              And then, at that point, after
(16)  Kevin engaged, when he should have walked
(17)  away, Alzate -- and I'm not saying what
(18)  Alzate did was right.   He are moved the
(19)  razor, and then the situation escalated to
(20)  the point where it was literally a fight
(21)  with a cutting instrument, where several
(22)  employees had to physically get involved in
(23)  Kevin's --
(24)       Q.    When you say -- I'm sorry, go
(25)  ahead.
```

(1)                J. CAHILL

(2)        **A.    Again, Kevin's actions, by**

(3)    **approaching Alzate, in what can be termed**

(4)    **as a menacing manner.  Even though he got**

(5)    **hit with a box, that doesn't justify the**

(6)    **next course of action that Kevin took.  And**

(7)    **what he did in that situation does rise to**

(8)    **the level of workplace violence.**

(9)        Q.    You said if Kevin walked away,

(10)    we wouldn't be here.

(11)        **A.    Yes.**

(12)        Q.    What do you mean by that?

(13)        **A.    If Kevin would've walked away**

(14)    **from Alzate and told management that this**

(15)    **guy just threw a box at me, he's cursing at**

(16)    **me, I don't want to deal with this, he's,**

(17)    **excuse me for saying it, P-ing me off, you**

(18)    **guys need to deal with this, it would have**

(19)    **been dealt with.  Alzate would have been**

(20)    **dealt with.  With Kevin, it would have been**

(21)    **have been an issue.**

(22)        Q.    But is it your understanding

(23)    that Kevin would have had no reason to file

(24)    a lawsuit in those circumstances?

(25)        **MR. MCGAHA:  I object to form.**

J. CAHILL

(1)

(2)     **A.     I can't speak to Kevin's**
(3) **rational for filing a lawsuit.   That's way**
(4) **beyond my scope of knowledge.**

(5)     Q.     Fair enough.  I'm just asking,
(6) because you've said that if he had walked
(7) away, we wouldn't be here.  Do you know
(8) whether Kevin is suing for things -- well,
(9) you said if Kevin had walked away, we
(10) wouldn't be here.  But you don't know how
(11) management would have handled Alzate
(12) pushing the box and hitting Kevin with the
(13) box, correct?  You couldn't speculate about
(14) that.

(15)     **A.     No, I don't know what they**
(16) **would do, if anything.  I don't know.**

(17)     Q.     Is there anything else that you
(18) think is important to say here, anything
(19) that has been left out, or do you feel like
(20) you've not been heard on?

(21)     **A.     No, I would think we covered,**
(22) **you know, the whole pertinent information,**
(23) **to the best of my -- to the best of my**
(24) **knowledge.**

(25)     Q.     Yeah, I understand.  I don't

(1)                          J. CAHILL

(2)      have any other questions.

(3)                     MR. MCGAHA:  No questions from

(4)           me.

(5)                     (Whereupon, at 2:08 P.M., the

(6)           Examination of this witness was

(7)           concluded.)

(8)

(9)                    o            o           o           o

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

```
(1)                      J. CAHILL
(2)               D E C L A R A T I O N
(3)
(4)          I hereby certify that having been
(5)    first duly sworn to testify to the truth, I
(6)    gave the above testimony.
(7)
(8)          I FURTHER CERTIFY that the foregoing
(9)    transcript is a true and correct transcript
(10)   of the testimony given by me at the time
(11)   and place specified hereinbefore.
(12)
(13)
(14)
                 _____
(15)                  JAMES G. CAHILL
(16)
(17)
(18)   Subscribed and sworn to before me
(19)   this _____ day of _____ 20___.
(20)
(21)
       _____
(22)       NOTARY PUBLIC
(23)
(24)
(25)
```

```
(1)                    J. CAHILL

(2)             E X H I B I T S

(3)

(4)    PLAINTIFF EXHIBITS

(5)

(6)    EXHIBIT   EXHIBIT                    PAGE

(7)    NUMBER    DESCRIPTION

(8)    1         Security Investigative

(9)              Report                     104

(10)

(11)      (Exhibits retained by Court Reporter.)

(12)

(13)                I N D E X

(14)

(15)   EXAMINATION BY                       PAGE

(16)   MS. MASSIMI                          6

(17)

(18)      INFORMATION AND/OR DOCUMENTS REQUESTED

(19)   INFORMATION AND/OR DOCUMENTS        PAGE

(20)   (None)

(21)

(22)

(23)         QUESTIONS MARKED FOR RULINGS

(24)   PAGE LINE QUESTION

(25)   (None)
```

```
(1)                    J. CAHILL

(2)          C E R T I F I C A T E

(3)

(4)   STATE OF NEW YORK         )

                                :  SS.:

(5)   COUNTY OF NASSAU          )

(6)

(7)         I, KEVIN HAGHNAZARI, a Notary Public

(8)   for and within the State of New York, do

(9)   hereby certify:

(10)        That the witness whose examination is

(11)  hereinbefore set forth was duly sworn and

(12)  that such examination is a true record of

(13)  the testimony given by that witness.

(14)        I further certify that I am not

(15)  related to any of the parties to this

(16)  action by blood or by marriage and that I

(17)  am in no way interested in the outcome of

(18)  this matter.

(19)        IN WITNESS WHEREOF, I have hereunto

(20)  set my hand this 23rd day of February 2024.

(21)

(22)

(23)        _____

                 KEVIN HAGHNAZARI

(24)

(25)
```

(1)    **ERRATA SHEET FOR: JAMES G. CAHILL**

(2)        JAMES G. CAHILL, being duly sworn, deposes and
       says: I have reviewed the transcript of my
(3)        proceeding taken on 02/22/2024. The following
       changes are necessary to correct my testimony.

(4)    _____

(5)    **PAGE LINE    CHANGE              REASON**

(6)    ----|----|---------------------|--------------

(7)    ----|----|---------------------|--------------

(8)    ----|----|---------------------|--------------

(9)    ----|----|---------------------|--------------

(10)   ----|----|---------------------|--------------

(11)   ----|----|---------------------|--------------

(12)   ----|----|---------------------|--------------

(13)   ----|----|---------------------|--------------

(14)   ----|----|---------------------|--------------

(15)   ----|----|---------------------|--------------

(16)   ----|----|---------------------|--------------

(17)   ----|----|---------------------|--------------

(18)   ----|----|---------------------|--------------

(19)   ----|----|---------------------|--------------

(20)   ----|----|---------------------|--------------

(21)   ----|----|---------------------|--------------

(22)   ----|----|---------------------|--------------

(23)        Witness Signature:_____

       Subscribed and sworn to, before me
(24)   this ___ day of _____, 20 ___.

       _____    _____
(25)   **(NOTARY PUBLIC)**         **MY COMMISSION EXPIRES**

February 22, 2024

[Page 165]

**A**

**A-L-Z-A-T-...**
78:21

**A-L-Z-E-T-...**
78:10

**A.M (1)**
1:13

**A/K/A (2)**
1:8,18

**ability (6)**
10:12 25:20
31:12 33:6
48:4 102:2

**able (10)**
42:5 77:24
86:22 87:23
93:7 123:14
123:15 131:7
131:10
139:11

**absolutely (10)**
27:24 32:5
58:3 95:4
99:18 101:18
111:15 114:3
120:23
128:11

**abuse (2)**
126:14,14

**academy (5)**
14:11,11,13,15
15:17

**accent (3)**
78:9,17,20

**acceptable (2)**
126:8 154:24

**accepted (1)**
36:7

**access (6)**
136:7,20,24
137:4,22
138:15

**accommodat...**
52:10

**accounting (1)**
80:8

**accuracy (1)**
141:4

**accurate (7)**
31:4,8 32:15
43:13 130:3
142:14 143:9

**accurately (5)**
9:8 10:8 30:25
32:21 43:7

**accusation (2)**
92:15 94:11

**accusations (2)**
91:19 94:9

**accused (2)**
63:3 85:6

**accusing (1)**
90:19

**acknowledg...**
88:21 89:20

**act (1)**
98:6

**action (4)**
40:17 113:17
158:6 163:16

**actions (8)**
37:3 92:20
100:4,21
101:9,13
103:5 158:2

**active (1)**
59:17

**activity (1)**
126:13

**actual (3)**
97:9 124:9
136:10

**Adamel (14)**
70:17,18 71:9
71:15,17
74:14 96:9
100:8,11
103:2,8,8

**147:6 148:14**

**Adamel's (2)**
70:19 98:22

**address (7)**
6:11 46:11
49:22 90:23
91:13 94:23
110:3

**adhered (2)**
99:11,12

**adjourn (2)**
89:2 90:3

**administered...**
149:21

**administerin...**
4:13

**administrati...**
35:9,13,16
36:8

**admit (2)**
73:21 94:15

**advancing (1)**
50:19

**advocating (6)**
146:10,13
147:3,7,17,18

**Affairs (4)**
20:20 23:19,25
27:7

**against- (1)**
1:6

**age (1)**
73:21

**agency (2)**
14:21 51:6

**aggravated (1)**
49:3

**aggregated (1)**
49:3

**agitated (3)**
76:24 140:13
141:15

**ago (10)**
34:23 42:17

**46:21 57:19**
81:17 85:5
120:12 123:5
151:19 154:9

**agree (5)**
47:9 48:10
82:25 94:24
95:2

**AGREED (4)**
3:5,11,16 4:4

**ahead (9)**
29:19,20 44:4
58:12 119:24
131:20
132:25 139:8
157:25

**alarmed (3)**
154:2,20,22

**alcohol (1)**
10:17

**alive (1)**
29:15

**allegations (3)**
34:19 68:10,12

**alleged (1)**
151:3

**allow (1)**
138:4

**allowed (1)**
61:7

**Alzate (57)**
71:21,21 72:5
73:14,17,19
73:24 74:5,20
76:23 77:2,5
77:8,20,25
78:3,11,12,14
78:23 79:6,9
79:20 96:10
98:12,14
99:13 100:18
101:15
102:13,18
103:14

**110:21,25**
115:19
121:12
125:25 128:2
140:12
141:14
148:15,25
149:3,13
151:13
154:10
155:12,23
157:4,11,12
157:17,18
158:3,14,19
159:11

**Alzate's (1)**
154:24

**Alzete (1)**
78:10

**and/or (3)**
131:11 162:18
162:19

**angle (4)**
78:6 79:10,11
79:15

**angles (2)**
76:17 79:7

**angry (1)**
73:19

**answer (24)**
7:7,10,17 8:15
8:25 9:4
29:13 31:16
39:13,15
40:15 43:7
60:20 91:24
92:18 93:4
104:18,21
108:8,15
127:15
129:11,13
131:9

**answered (1)**
102:22

answering (1)
152:25
answers (4)
6:24 7:16 8:17
29:24
Anthony (2)
75:16 76:2
anticipate (2)
7:8 115:11
anybody (1)
37:5
anybody's (1)
92:20
apart (2)
36:3 76:6
apologize (11)
11:13 12:19
16:22 76:11
96:7 98:14
101:17
116:15 120:2
138:9 141:14
appeal (1)
35:3
appearance (1)
66:23
appeared (5)
77:15 79:8,13
79:17 80:7
appears (2)
67:7 79:7
applicable (2)
126:2,4
applied (4)
23:5,5,7
144:13
apply (4)
18:7,11 22:20
23:14
appreciate (2)
61:22 94:20
approach (2)
49:4 77:2
approached ...

73:14 141:15
157:3
approaching...
76:23 140:12
158:3
approximate...
14:5 17:23,24
18:3 20:14
68:25 117:9
area (13)
11:22 22:3
54:15 56:13
56:16,25
77:12,12
108:6,18,21
108:25
140:12
areas (1)
57:5
argue (2)
83:21,25
argued (1)
73:16
argument (1)
72:5
argumentive...
62:9
arms (2)
76:25 140:14
arrest (6)
33:22 34:15
41:13,16
42:13,18
arrested (10)
34:20 41:19,22
42:7,9,22
45:2 46:19
50:21 53:10
arrests (2)
44:21 45:6
arrived (2)
117:10 119:18
arriving (1)
118:14

aside (2)
11:25 121:18
asked (15)
8:8,12 9:3
50:23 51:4
74:3 93:8
98:21 102:21
109:13
121:12 137:7
137:9,10,11
asking (18)
25:14 31:24
45:20 62:3
81:15,21 82:5
82:8 85:18
92:8,14
116:15 121:7
123:10 124:8
155:9,11
159:5
aspect (3)
60:6 87:8
105:12
assault (7)
41:17,21,23,25
42:19,20
45:12
assaulting (2)
41:14,19
assess (4)
26:13,17 49:24
50:18
assessing (2)
27:12,23
assessment (4)
26:4,20 27:17
131:11
assessments ...
30:9
assigned (20)
15:25 16:3,3
16:11,16,25
17:6 19:6
20:5,12 21:10

21:15 22:25
23:11,13 24:5
36:15,16
108:23
148:12
assignment (6)
15:24 21:18,24
22:5 23:17
30:19
assignments ...
15:24
association (6)
15:7,10 39:21
39:22,24 40:2
assume (3)
78:16 115:11
149:5
assuming (5)
46:3 47:11
53:13,19
123:2
assumption (1)
115:4
atmosphere (...
150:24
attacked (1)
40:25
attempt (1)
8:10
attempted (6)
33:22 41:21,23
41:25 42:8,20
attempting (1)
41:17
attempts (1)
42:3
attest (1)
130:11
attorney (7)
2:4 5:3 6:17
9:17 11:7
68:17 69:8
attorney's (2)
11:9,16

Attorneys (1)
2:8
audio (6)
70:2,5 72:13
73:4 74:25
75:3
automatic (2)
10:23 149:19
automaticall...
113:12 151:15
available (1)
120:7
Avenue (1)
55:7
aware (24)
38:6 51:10,13
52:7 63:15,20
65:14 76:16
83:10 86:5
105:19
109:21 111:5
111:6 114:10
115:17,20
118:8 126:23
126:24 127:4
128:20 147:2
147:18

———————
B

B (2)
2:9 162:2
bachelor's (1)
54:20
back (36)
8:14 21:23
27:16 39:15
42:15 46:15
46:18 47:15
47:24 48:7,7
48:15 49:8,8
49:18,18,20
50:14 75:13
77:6 78:17
84:25 86:3

February 22, 2024

93:16 101:5,7
102:11 104:8
104:17,21
110:3 127:13
127:15
129:10,13
144:19
**background ...**
54:19
**backing (1)**
50:11
**barrier (2)**
121:11,15
**base (1)**
64:19
**based (3)**
29:3 99:20
111:20
**basement (2)**
33:23,24
**basically (4)**
48:18 60:9
134:18 148:5
**basis (2)**
64:14,15
**bates (3)**
86:12,16,18
**bathroom (1)**
33:25
**Bavel (1)**
145:9
**bear (1)**
5:9
**bearing (2)**
95:13 142:23
**becoming (3)**
49:2 56:4,5
**began (3)**
15:16 17:13
72:3
**Beginning (1)**
19:8
**begins (1)**
142:4

**behavior (2)**
153:20 156:24
**belief (1)**
100:19
**believe (73)**
12:3 13:21
14:6 16:20
33:20,20
35:25 37:23
37:24 38:17
38:18 42:21
44:12 46:17
54:8 55:17
56:2,2 58:22
66:10 68:22
70:11,13 72:4
72:16,23 73:5
73:7 74:24
75:5,15,21,25
78:11,13
86:10 89:23
91:21 92:10
92:16,23
93:20 94:3
95:6,24 96:12
96:16,16
97:20 99:20
100:5 101:11
102:6,10,21
104:25 105:2
105:4 109:13
114:12
115:23 116:5
117:8 118:17
119:22
125:23
140:25
143:13
145:12
148:14,23
151:19 154:8
**believed (3)**
74:17 93:9
149:12

**believes (1)**
73:24
**belt (5)**
71:18 73:13,17
74:2 77:19
**benevolent (6)**
15:7,10 39:20
39:22,24 40:2
**best (30)**
10:9 12:9,10
13:10,14,20
25:20 31:12
32:10,10 33:6
33:21 49:25
62:11 67:5
68:7 86:25
101:25
111:19
112:17
125:20 132:5
134:22
135:17 138:3
143:10,11,11
159:23,23
**better (4)**
45:1 150:23
152:23
156:23
**beyond (1)**
159:4
**bigger (1)**
97:17
**Black (1)**
67:9
**blade (6)**
71:22 72:9
74:4 77:9,11
77:25
**blood (1)**
163:16
**board (1)**
23:17
**bodega (1)**
34:9

**Borka (11)**
58:19,20,23
107:10,11
110:2 129:17
129:18
133:13,14
137:13
**born (1)**
51:17
**borough (1)**
21:25
**boss (1)**
129:8
**bottle (1)**
45:8
**bottles (3)**
44:14,19,25
**bottom (2)**
143:17 144:7
**bound (1)**
61:17
**boundaries (1)**
50:3
**Boval (2)**
145:10,24
**bowl (1)**
44:9
**bowl's (1)**
44:16
**box (47)**
72:6,6,15
73:17 74:23
96:10,11,13
96:25 97:7,10
97:15,24
98:17,21,22
99:2,8 100:8
100:18,18
101:15,16
102:13,18,18
103:3,15
110:25
147:22
148:16,16

149:6 150:8
150:14
151:20 152:4
152:24 153:3
154:10,11
155:12,12
158:5,15
159:12,13
**boxes (1)**
76:25
**branch (1)**
50:24
**break (8)**
8:24 9:4 39:8,8
84:5,22 88:16
104:7
**brick (2)**
44:11 45:8
**brings (1)**
49:10
**broad (1)**
29:16
**broke (3)**
45:16 71:23
74:13
**Bronx (2)**
16:13 44:11
**Brooklyn (8)**
16:17,19 17:14
17:22 19:7
21:21 22:14
28:16
**brought (1)**
74:5
**brushed (1)**
46:14
**building (16)**
2:9 34:8 44:10
44:12 56:20
57:10 65:3
66:12 67:17
108:22,25
109:3 116:10
130:19 131:6

February 22, 2024

[Page 168]

131:13
**buildings (7)**
56:18,21 57:7
57:12 64:6,8
108:23
**bullet (1)**
140:2
**bureau (11)**
16:5,17,19
17:14,21
20:20 21:21
22:14 23:21
27:7 28:15

**C**

**C (5)**
2:2 6:2 161:2
163:2,2
**Cahill (167)**
1:19 6:1,10,14
7:1 8:1 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1

56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1,3
95:11 96:1
97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1

142:22 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
161:15 162:1
163:1 164:1,1
**call (10)**
49:14 80:23
84:21 89:15
99:6 111:8
118:10
125:14 126:7
136:5
**called (7)**
6:2 49:16
64:13 107:25
115:23 116:3
116:12
**camera (2)**
78:5 79:14
**cameras (3)**
117:18,23
118:2
**Campbell (32)**
1:3 6:18 65:11
65:12,15,23
66:4,16,25
67:14,25 68:5
73:2 79:5
104:24
105:17
110:21
112:15 114:5
114:14
115:16
125:25 127:2
127:5,19
128:10,13,16

141:15
144:25
149:12 154:9
**Campbell's (6)**
66:7,22 68:10
105:14
140:12,15
**candor (2)**
61:23 94:19
**capacity (7)**
12:2,8,18,23
12:23 27:4
28:19
**captured (1)**
105:22
**car (1)**
44:10
**carried (1)**
33:4
**carrot (1)**
73:25
**case (11)**
1:6 6:18 65:9
68:11 89:4
99:11 121:14
136:6 147:4
148:19
152:22
**cause (5)**
40:11 42:4
82:18 102:9
153:6
**caused (1)**
41:5
**causing (2)**
79:9 150:10
**CCRB (6)**
33:7 34:18
35:2 37:5,11
37:14
**cellphone (3)**
116:4,5 118:11
**certain (2)**
46:23 47:6

**certification ...**
3:8
**certify (4)**
161:4,8 163:9
163:14
**chain (1)**
85:25
**change (6)**
17:16 19:2,5
19:23 20:21
164:5
**changed (5)**
23:16 103:5,6
107:15
144:14
**changes (1)**
164:3
**characteriza...**
131:11
**charge (5)**
22:8 41:20
42:24 45:18
132:11
**charged (1)**
156:23
**charges (6)**
33:8,15 37:15
37:18 38:20
45:14
**chat (2)**
87:21,24
**chest (1)**
77:12
**children (2)**
52:18,23
**choice (1)**
35:8
**choose (1)**
102:17
**Chris (14)**
58:20,23 107:9
107:11 110:2
110:4 129:15
129:16,18

February 22, 2024

[Page 169]

133:12,13,15
134:4 137:13
**Christopher ...**
58:19
**circumstanc...**
44:7 71:7
124:18
149:20
158:24
**City (3)**
13:24 20:9
56:22
**civil (6)**
1:21 5:14 18:9
18:12 38:13
43:8
**civilian (11)**
40:20,23,25
41:13,16 42:8
42:9,13 43:3
43:23 45:10
**claim (2)**
34:11 151:24
**claimed (1)**
33:19
**claiming (2)**
144:25 154:14
**clarity (2)**
51:5 118:21
**classified (5)**
152:13,15,17
155:6,7
**clear (13)**
53:17,21 93:19
93:24 103:14
106:8 110:24
121:19
123:10,13
125:24,25
155:3
**clearly (5)**
7:24 31:24
100:5 140:13
141:15

**close (3)**
47:25 48:2
49:13
**closed (1)**
34:2
**closer (2)**
79:15 91:3
**closes (1)**
77:2
**collective (1)**
63:14
**college (3)**
54:9,12,13
**combative (1)**
62:9
**come (6)**
17:15 19:2
20:21 72:9
104:8 128:19
**comes (2)**
86:3 126:18
**coming (2)**
31:7 139:5
**command (6)**
19:3,23 35:23
36:7,10 37:22
**commander ...**
22:8
**commands (1)**
22:10
**comment (2)**
130:20 139:3
**commentary...**
138:18,20
**COMMISSI...**
164:25
**commotion (2)**
71:19 147:13
**communicat...**
130:2
**communicati...**
129:23
**communicati...**
146:3

**community (2)**
46:6 54:11
**company (1)**
134:16
**complain (1)**
106:10
**complained (4)**
52:12 154:21
155:13,14
**complaint (3)**
68:15 150:14
151:21
**complaints (3)**
65:23 106:17
148:11
**complete (4)**
7:6,10 54:24
109:15
**completed (3)**
119:20,22
133:5
**completely (1)**
99:16
**component (1)**
27:23
**components ...**
118:5
**computer (6)**
59:15 111:9
135:21,23
136:3 144:12
**concerned (1)**
74:11
**concluded (1)**
160:7
**condition (1)**
10:6
**conduct (14)**
5:10 25:19
45:11 114:13
118:23
120:21 121:4
126:8,12,19
150:21

154:24 156:2
156:9
**conducted (5)**
4:6 93:3
132:15,16,18
**conducting (1)**
132:21
**conference (1)**
9:17
**confident (1)**
42:21
**confirming (1)**
4:15
**congratulati...**
53:8
**consent (1)**
4:19
**consider (1)**
143:24
**considered (6)**
4:20 43:8
150:11 153:7
153:11
154:12
**consistent (3)**
80:5,8 110:13
**consolidate (1)**
99:25
**consumed (1)**
10:17
**contact (9)**
73:20 79:5,9
79:14,19 80:6
114:4,9 129:5
**contained (2)**
112:4 143:8
**contents (2)**
138:11 144:21
**context (1)**
146:15
**continue (2)**
49:21 59:18
**continuous (2)**
59:18 135:7

**contraband (1)**
34:11
**control (5)**
4:11 16:5 74:7
77:14,16
**conversation...**
7:4 62:10
120:19 123:8
123:12 129:2
145:24
**conversation...**
122:11 124:10
129:20
145:19
**convictions (4)**
53:14,18,20,23
**cop (1)**
30:3
**copied (2)**
110:2,5
**copies (1)**
81:13
**copy (3)**
5:4,12 86:20
**cordial (1)**
62:8
**CORPORA...**
1:8,17 2:8
**correct (59)**
8:18 17:2 19:9
19:13 25:8,12
28:16 30:9
32:17,22 33:2
33:5 35:13
46:8 48:16
50:4 53:14
73:4 75:9
76:18 79:20
87:15 95:7,8
95:10 99:17
105:23
112:21 113:6
114:2,18
115:16 118:3

February 22, 2024

[Page 170]

121:2,8
124:24 127:2
133:7 134:8
134:10 138:2
138:25
139:23
140:24
142:14
143:18,21
147:7 149:14
151:25 153:2
154:7,15,16
156:9,16
159:13 161:9
164:3
**correctly (1)**
152:25
**costs (1)**
5:9
**counsel (4)**
3:6 4:5,8 5:7
**Counselor's ...**
85:4
**COUNTY (1)**
163:5
**couple (4)**
35:4 69:4 77:6
140:7
**course (9)**
8:3,8 45:24,25
88:23,25 91:4
106:3 158:6
**court (30)**
1:2,20 3:20 4:7
4:11,15 6:23
7:2,14,19
8:13 9:25
11:18,25 12:7
38:16 78:7,24
82:24 84:9,20
84:25 87:22
87:25 88:6,8
88:13 93:7,11
162:11

**courtroom (1)**
9:21
**cover (1)**
108:6
**covered (4)**
22:9 126:7
157:4 159:21
**covering (1)**
57:11
**CPLR (1)**
5:12
**create (3)**
49:6 126:19
150:16
**created (1)**
150:21
**creating (1)**
49:23
**credibility (3)**
26:14,17 27:23
**credit (1)**
26:16
**credits (2)**
54:9,14
**creed (1)**
62:25
**crime (3)**
16:4 21:22
23:20
**criminal (4)**
38:19 45:15
54:18,21
**Cross (1)**
2:9
**cross-talk (1)**
7:5
**crossing (2)**
47:16 48:16
**current (1)**
55:9
**currently (3)**
15:2 52:16
58:4
**curses (1)**

132:2
**cursing (2)**
73:14 158:15
**custody (1)**
112:9
**cut (1)**
29:21
**cutter (1)**
110:25
**cutting (1)**
157:21
**cycle (1)**
59:19

---

**D**

**D (3)**
3:2 161:2
162:13
**daily (2)**
64:14,15
**danger (1)**
154:3
**DANIEL (1)**
2:11
**dark (1)**
67:3
**date (12)**
1:12 21:8 31:2
31:5 43:19
81:4,15 82:6
85:19,21
104:15
107:15
**day (13)**
64:3 65:4
103:14
114:11 117:6
117:7 120:5
120:15
122:21 124:8
161:19
163:20
164:24
**days (3)**

35:10,19 36:3
**deal (5)**
46:12 87:11,13
158:16,18
**dealings (1)**
130:22
**dealt (6)**
45:22 98:11,12
154:23
158:19,20
**debris (1)**
44:22
**decide (2)**
113:14 149:25
**decided (1)**
35:5
**decides (1)**
113:14
**decision (9)**
98:16 104:3
105:7,9,13
112:20,23
113:9 156:20
**decisions (1)**
114:2
**deem (1)**
149:9
**defendant (3)**
1:17 13:18
38:5
**Defendants (4)**
1:9 2:8 68:11
89:2
**defuse (1)**
99:6
**degree (2)**
54:16,25
**denied (2)**
73:20 79:19
**deny (1)**
80:6
**department (...**
13:25 106:19
132:10

**depending (2)**
30:19 64:8
**depends (1)**
65:2
**depo (1)**
84:9
**deposed (2)**
5:13 10:3
**deposes (1)**
164:1
**deposition (19)**
3:8,17 4:6 5:10
6:20 8:3,9,15
12:22 13:3,17
88:23 89:3
90:17,22 91:5
100:6,7 106:4
**depositions (3)**
12:12,14,17
**derogatory (1)**
141:19
**describe (10)**
24:8 25:14
44:5 49:25
59:10,24
62:12 66:22
80:20 130:15
**described (6)**
37:21 38:25
73:23 75:24
76:24 148:15
**describing (4)**
48:24,25 50:2
76:9
**DESCRIPTI...**
162:7
**design (1)**
113:19
**designed (1)**
62:8
**detail (5)**
59:24 98:17
100:17
101:13 102:8

February 22, 2024

[Page 171]

detailed (1)
146:6
detective's (1)
23:21
determinatio...
113:13 114:15
155:22
determine (2)
113:5 144:17
determined (1)
151:22
device (1)
88:14
dialogue (1)
28:2
dictated (1)
124:7
difference (6)
61:25 73:21
89:8,12,13
148:7
differences (1)
61:19
different (23)
22:4,10 24:15
24:21 28:25
28:25 29:22
29:23,25
30:17,18 37:6
43:10 44:14
56:18 61:3
63:19 64:3,7
64:7,16 76:17
126:16
difficult (2)
25:3 106:25
digit (1)
135:2
digital (5)
135:3,12,16,19
136:7
direct (4)
58:6 107:4
145:11,12

direction (5)
43:4 44:22
45:3 115:9
140:15
directly (2)
44:13 151:9
director (3)
133:17,18,21
disabilities (1)
52:6
disability (2)
40:9,11
disciplinary ...
113:16
discipline (10)
35:23 36:2,7
36:10 39:2
149:9,21
156:3,20,21
disciplines (1)
37:22
discriminati...
52:13 62:18
63:4 105:18
106:11,16
discriminato...
145:2
discuss (7)
6:19 58:2 60:5
60:6 70:23
87:7 138:11
discussing (1)
109:15
discussion (4)
79:3 84:24
88:18 127:11
disengage (1)
99:6
disparaging ...
62:23
dispose (1)
111:9
disposed (4)
111:13,24

112:3,5
disposition (1)
147:3
disrespect (7)
45:22 46:5,12
46:12 47:13
62:22 94:7
disrespected ...
94:21
disrespectful...
88:22 89:21
90:11,14,20
91:7,22 92:24
93:10,21
153:4
disrespecting...
85:11
distance (1)
77:3
distances (1)
49:23
distribute (2)
133:14 134:5
distributed (1)
133:16
DISTRICT (2)
1:2,2
disturbance ...
43:9
division (3)
24:4 55:7
107:23
divorced (1)
52:25
docked (3)
35:20 36:4,11
document (27)
75:17 76:3
82:6 87:19,24
91:14 95:7,12
95:17,18,22
96:2,5,8
142:10,14,23
143:3,6,9,14

143:17 144:3
144:5,6,20,22
documents (...
32:16,22 63:11
63:14 69:20
80:12,17
109:16 111:9
111:13,17
162:18,19
doing (2)
49:20 157:10
door (3)
33:24 34:6
44:13
doubt (1)
141:4
downloaded ...
88:2
draft (4)
86:4 99:16
103:21 143:3
drafted (2)
81:16 96:4
drafts (1)
85:23
drawing (1)
50:3
driver's (1)
44:13
drop (1)
87:20
dropped (1)
44:9
drugs (1)
10:18
due (1)
62:23
duly (4)
6:3 161:5
163:11 164:1
duties (1)
47:4

_____ E _____

E (10)
2:2,2 3:2,2 6:2
161:2 162:2
162:13 163:2
163:2
e-mail (20)
85:25 86:2
88:10 109:19
109:20,21,22
109:24 110:7
110:10,15
112:13
122:15,16
124:22 125:3
125:8 128:21
134:10 139:6
e-mailed (3)
5:6 81:10,12
e-mails (4)
138:15,18,23
139:4
earlier (4)
8:15 94:19
141:21
151:19
early (1)
21:7
east (1)
64:25
eastern (6)
1:2 107:24
108:4,12,14
133:23
education (1)
54:7
EEO (4)
59:16 128:13
128:18,20
effect (3)
3:19 34:17
117:2
effective (2)
50:13 62:14
egregious (1)

February 22, 2024

[Page 172]

151:10
**either (6)**
63:6 90:6
103:13
107:13 115:9
138:12
**elaborate (2)**
25:5 48:20
**electronic (2)**
144:9,16
**Elmhurst (1)**
20:11
**emotionally (...**
126:17
**Empire (1)**
54:12
**employed (3)**
13:6 58:23
59:3
**employee (8)**
106:10 117:17
126:11,20
152:4,9
154:21
155:13
**employees (14)**
61:15 71:23
77:17,24
106:22 108:3
109:4,10
131:14,23
132:3 151:8
153:24
157:22
**employer (2)**
13:22 55:9
**employers (2)**
55:12,19
**employment ...**
12:15 13:4
31:11 33:5
38:9 105:14
112:21
**encountered ...**

50:4
**encourage (1)**
154:4
**encroach (1)**
48:12
**encroaching ...**
47:24 48:11
**endangerme...**
45:14
**ended (1)**
40:8
**enforcement ...**
12:2,8,18,24
13:13,23
14:21 51:6
61:6
**engage (2)**
63:23 126:12
**engaged (1)**
157:16
**enhanced (5)**
24:16,18 25:7
25:11 26:12
**entire (12)**
16:14 17:10
18:4 26:19
58:21 89:17
97:19,21
98:24 100:13
102:12
108:14
**entirely (1)**
155:5
**entirety (1)**
96:25
**equipment (1)**
59:15
**Eric (28)**
1:8 109:25
110:4 121:23
122:6,21
123:2,16,19
127:17 129:6
129:7,24,25

130:3,13,17
130:24 131:5
131:12
133:25 134:8
134:13
136:22 137:6
137:15
138:12 146:4
**ERRATA (1)**
164:1
**escalated (1)**
157:19
**ESI962 (1)**
95:14
**ESI963 (2)**
139:16 140:2
**ESQ (2)**
2:4,10
**essentially (2)**
50:3 126:10
**events (1)**
117:15
**eventually (4)**
115:2 124:23
134:7 138:24
**everybody (3)**
72:10 74:12
**evidence (1)**
61:13
**evidentiary (1)**
125:15
**exact (8)**
11:23 21:7
43:20 68:14
68:15 98:20
107:21 112:6
**exactly (13)**
34:16 110:14
117:4 118:19
119:7,12
122:4,8
123:16
124:19
125:10

130:21
135:16
**exam (2)**
18:10,12
**examination ...**
1:16 6:6 160:6
162:15
163:10,12
**examined (1)**
6:5
**examples (1)**
46:11
**exception (4)**
65:24 109:18
121:9 130:23
**exclusively (2)**
16:24,25
**excuse (2)**
73:18 158:17
**execution (1)**
41:7
**exhaustive (1)**
62:3
**exhibit (11)**
5:4,5,8 88:15
95:13 104:14
139:11,14
142:25 162:6
162:6
**exhibits (3)**
5:2 162:4,11
**expand (1)**
28:11
**expect (2)**
9:3 115:2
**expensive (1)**
57:12
**experiencing...**
105:17
**EXPIRES (1)**
164:25
**explain (3)**
61:2,4 141:16
**explanation (...**

141:12
**expound (1)**
138:21
**express (6)**
1:8,8,17,18 2:8
4:19
**extend (2)**
74:4 77:10
**extensive (1)**
59:21
**eyes (4)**
83:2,19 85:7
94:16

**F**

**F (2)**
3:2 163:2
**face (2)**
66:10,11
**face-to-face (...**
27:22 73:23
**facets (2)**
29:2,25
**facilities (1)**
148:12
**facility (3)**
65:17 115:25
124:3
**fact (6)**
93:20 94:18
101:21
102:18 103:2
141:9
**facts (5)**
26:21 71:6
99:19 102:12
124:17
**factual (1)**
125:14
**failed (1)**
10:14
**fair (10)**
26:3 27:16,20
31:7,17 33:3

February 22, 2024

[Page 173]

46:9 94:13
115:10 159:5
**fairly (2)**
132:24 133:2
**fairness (5)**
31:6 57:14
101:24 115:6
115:8
**familiar (1)**
136:17
**far (15)**
8:21 29:14
59:17 67:20
71:6 83:14
130:19
131:14,24,24
138:20 149:4
149:5 156:3
156:11
**fear (2)**
126:21,21
**February (2)**
1:12 163:20
**federal (5)**
1:8,17,20 2:8
38:16
**FedEx (36)**
1:8,18 13:4,7
31:11,14 33:5
52:7,10,13
55:10,15,18
56:14 58:24
59:3,8 60:2
60:15 61:11
61:25 62:7,17
63:4,9,23
65:13 104:24
106:10 108:3
108:13
126:25
135:19 150:2
150:8 151:7
**FedEx-issue...**
135:3

**feel (16)**
8:23 42:20
48:21 74:19
85:10 117:24
150:18 152:7
152:8,19,19
153:16,25
154:2,20
159:19
**feels (2)**
94:21 152:5
**feet (1)**
49:9
**felony (4)**
53:13,18,20,23
**felt (6)**
34:4 37:3
151:5 154:14
154:22 155:4
**fight (1)**
157:20
**file (13)**
2:11 135:7,8,9
136:8 150:14
151:9,11,12
151:14 152:9
154:4 158:23
**filed (9)**
34:18 147:25
148:2,20
150:20
151:15,22
152:22
153:21
**files (1)**
135:5
**filing (2)**
3:7 159:3
**final (8)**
80:25 81:4
86:8,22 87:2
95:25 133:8
133:13
**finalize (1)**

86:3
**finalized (1)**
85:24
**finalizing (1)**
110:8
**find (5)**
34:11 62:13
72:20 113:10
149:17
**findings (4)**
36:24 113:22
125:21 133:6
**fine (7)**
7:25 8:17,24
48:22 87:2
89:24 142:2
**finish (2)**
7:6,10
**first (18)**
6:3 18:20 24:2
48:5 65:14,20
107:8 115:21
117:20
118:24
119:10,11
120:4 123:23
140:2 146:20
157:4 161:5
**flailing (2)**
76:24 140:13
**floor (2)**
2:9 76:7
**fluent (1)**
121:13
**fluid (1)**
123:6
**followed (4)**
34:7 98:7,9
103:19
**following (5)**
98:15 109:14
111:4 147:21
164:2
**follows (1)**

6:5
**food (1)**
131:22
**force (1)**
3:19
**forceable (1)**
126:13
**forced (1)**
41:4
**foregoing (1)**
161:8
**Forgive (1)**
98:12
**form (28)**
3:12 40:14
48:17 50:16
59:12 71:11
79:25 81:7
82:5 99:22
102:20
105:17 130:7
146:22
147:10,24
149:22
150:12 151:6
152:2,21
153:14
154:18
155:21
156:10,17
157:2 158:25
**formally (1)**
63:6
**formatted (1)**
144:8
**forms (4)**
30:17,18 32:15
46:5
**forth (1)**
163:11
**forward (14)**
28:7 85:14,15
92:18,21
101:22

133:10 134:3
134:4,4,6
136:21
137:10,13
**forwarded (1)**
133:25
**found (2)**
79:22 156:14
**four (1)**
68:22
**free (2)**
48:21 61:15
**FRG (2)**
56:18 64:22
**front (5)**
9:21 23:21
75:17 76:3
78:15
**full (2)**
6:11 69:4
**fully (3)**
9:8 10:7
121:16
**further (6)**
3:11,16 5:2
127:25 161:8
163:14

―――――――――
**G**

**G (6)**
1:18 6:2,10
161:15 164:1
164:1
**Gabe (4)**
11:10,13 69:19
153:19
**GABRIEL (1)**
2:10
**gabriel.Mcg...**
2:12
**gain (2)**
27:11 74:7
**gained (1)**
27:2

February 22, 2024

[Page 174]

**gather (4)**
43:17 103:25
113:3 119:4
**general (4)**
28:9,12 46:20
150:2
**generally (10)**
24:24 40:10
41:18 42:15
42:15,19
45:13 46:17
49:22 126:6
**gentleman (1)**
74:12
**geographic (1)**
108:18
**geographical...**
22:3
**Gerrard (2)**
51:15,16
**gestures (1)**
7:19
**getting (7)**
24:14 26:20
62:14 91:10
100:14
135:11
151:18
**GFT (6)**
127:5,18,21
128:9 137:15
146:12
**GFted (1)**
128:2
**gist (3)**
34:6 125:18
146:15
**give (18)**
11:19,22 31:7
41:11 43:13
43:19 44:2,3
48:8,21 60:8
60:10,20 62:3
108:8,15

121:14
123:11
**given (6)**
61:18 88:20
89:19 117:17
161:10
163:13
**giving (2)**
6:21 81:11
**go (28)**
8:18 10:24
11:2,3 17:16
27:15 29:19
29:20 33:23
35:12 44:4
46:2 58:12
60:4 61:18
64:23 65:3
75:13 78:17
88:19 117:18
119:23
131:20
132:25
133:12,13
139:8 157:24
**goal (1)**
90:21
**goes (3)**
46:17 136:5
146:3
**going (18)**
7:8 10:21
29:15 53:6,7
65:2 77:18
91:24 94:12
101:18
110:14
113:15
114:22 115:2
126:25 127:5
128:7 142:13
**gonna (3)**
60:25 87:19
142:7

**good (9)**
6:14,15 25:22
50:5 87:9,14
104:7 105:24
105:25
**gotcha (1)**
105:25
**graduate (1)**
55:3
**graduated (1)**
14:17
**group (5)**
63:16,17,21
107:2,3
**groups (1)**
108:16
**guess (7)**
26:9 40:21
54:22 78:2
120:3 144:16
152:14
**guy (1)**
158:15
**guys (1)**
158:18

_____

**H**

**H (2)**
6:2 162:2
**Hacks (1)**
2:9
**Haghnazari ...**
1:22 163:7,23
**hair (1)**
67:3
**half (1)**
16:21
**hand (5)**
44:13 50:13
77:10 121:14
163:20
**hand-in-han...**
32:19
**handbook (1)**

63:8
**handheld (1)**
122:18
**handled (2)**
106:17 159:11
**hands (1)**
50:8
**handwritten ...**
122:18
**happen (4)**
43:11 61:10
84:17 86:11
**happened (6)**
21:5,16 45:23
73:16 117:5
125:17
**happening (1)**
117:14
**happens (4)**
11:16 45:24,25
151:11
**harassed (1)**
153:17
**harassing (1)**
42:23
**harassment (6)**
42:8,9,14,18
46:20 150:18
**hard (1)**
130:18
**head (15)**
7:18 60:20
61:24 62:5
70:10 77:12
82:10,12,13
82:15,18 83:3
85:7 94:18
125:16
**heading (2)**
140:4,7
**hear (9)**
8:11 60:21
66:3 81:24
83:23,24 91:2

115:21 127:8
**heard (5)**
63:22 72:4
128:3,4
159:20
**hearing (2)**
72:12 89:10
**heavy (1)**
67:4
**held (6)**
1:21 55:23
79:3 84:24
88:18 127:11
**hello (2)**
66:16 67:17
**help (1)**
60:8
**helped (1)**
72:10
**hereinbefore...**
161:11 163:11
**hereto (1)**
3:7
**hereunto (1)**
163:19
**hey (3)**
47:15,16 50:14
**hide (1)**
100:9
**hides (1)**
101:21
**high (2)**
55:3,6
**highest (2)**
54:6 146:4
**hire (2)**
89:3 90:3
**hired (4)**
31:14,16 57:11
57:13
**hit (27)**
44:12,14,25
45:9,9 72:15
74:23 96:11

97:2,7,10,24
97:24 99:2,8
100:8,14
102:13 103:3
103:14
146:19
150:13
152:24 153:3
155:12,12
158:5
**hits (1)**
150:9
**hitting (16)**
96:13 97:15
98:17,21,23
99:13 100:18
100:19
101:15,16
102:18,19
148:16 149:7
154:10
159:12
**hold (4)**
15:20 111:8,13
111:23
**holidays (1)**
131:22
**home (4)**
34:8 64:4,5,19
**honest (2)**
32:11 86:19
**honestly (2)**
70:24 101:20
**hour-and-a-...**
69:14
**hours (8)**
10:18 35:5,6
35:21,22
36:11 69:5,16
**HR (2)**
106:13,17
**human (1)**
47:21
**hundred (1)**

11:21
**hurt (3)**
74:9,20 152:6

_____

**I**

**IAB (18)**
21:2,10 22:24
23:11,13,23
24:6,9,20
25:7,25 26:11
36:13,15,16
36:19,24
37:17
**idea (3)**
108:5,7 125:10
**identificatio...**
104:15
**identity (1)**
4:16
**IEEO (1)**
128:13
**imagine (3)**
42:3 87:8
145:13
**impact (2)**
10:12 57:20
**importance (...**
28:10,23 29:4
29:9 30:13
31:3,20 32:4
32:7,21 60:11
**important (11)**
25:19 27:22
29:25 30:3,8
90:16 91:11
91:12,18
133:2 159:18
**inappropriat...**
156:2,8,24
**incident (73)**
35:24 36:14,20
36:25 37:9,13
41:9 43:14,18
43:22 57:25

65:19 66:2,5
66:8,14 67:12
70:22 72:3
87:6,10,16
95:21 96:24
98:24 99:10
100:14
102:12,15,16
104:5 105:5
105:18,21,22
109:14
110:12,17,20
110:22 111:4
111:17,23
112:11,16
115:22
116:19
120:16,22,25
121:22 122:2
123:19,24
124:11 125:7
128:15,20,23
134:15,16
142:4 145:3
145:10,20,25
147:21,23
153:19 154:5
154:19 155:6
157:8
**incidental (1)**
111:14
**incidents (6)**
6:21 27:8
43:10 44:7
115:15,19
**include (2)**
96:8,19
**included (4)**
41:20 100:17
102:8 125:19
**includes (3)**
136:8 144:7
147:6
**including (3)**

82:24 101:13
141:8
**incomplete (1)**
8:16
**incorrect (1)**
78:18
**indicate (1)**
144:20
**indicating (4)**
59:19 66:21
96:6 105:2
**indication (3)**
72:2 80:2,3
**individual (9)**
33:22 34:15
74:20 75:20
75:23 76:7,9
150:13
153:22
**INDIVIDUA...**
1:8
**individuals (5)**
107:5 110:6
131:12
153:23,24
**informally (2)**
63:6 120:17
**information ...**
30:8,21,23
31:4 43:17
62:15 103:25
112:4,10
113:3 119:4
124:23
132:17
134:13,21
138:23
140:18,21,24
141:4,8 143:8
143:12,14,25
146:24
159:22
162:18,19
**informative (...**

24:10
**inhibit (1)**
48:3
**initially (3)**
23:10 73:25
117:16
**injured (5)**
40:6,20 41:6
152:20
155:16
**injurious (1)**
153:11
**injury (7)**
40:13 41:3,5
42:4 150:10
150:17 153:6
**ink (1)**
143:21
**input (6)**
105:10 112:25
113:17,19
149:11 150:7
**instance (5)**
28:19 66:20
124:21
149:16,17
**instances (2)**
13:16 47:12
**institution (1)**
54:10
**instructions ...**
8:21
**instrument (1)**
157:21
**integral (1)**
32:15
**integrity (1)**
101:19
**intend (2)**
29:21 54:24
**intent (3)**
42:5 45:11,12
**intention (1)**
74:6

February 22, 2024

[Page 176]

| | | | | |
|---|---|---|---|---|
| **intentional (5)** | 73:12 79:18 | 148:21 | 153:19 | 56:1 57:1 |
| 98:19 99:23 | 96:15,23 | **investigated ...** | 157:22 | 58:1 59:1 |
| 102:4,6,23 | 99:25 100:7 | 36:14 147:22 | **involvement ...** | 60:1 61:1 |
| **intentionally...** | 100:12 114:8 | 152:11,11 | 128:3 | 62:1 63:1 |
| 100:3 | 114:12,13 | 155:7,25 | **involving (3)** | 64:1 65:1 |
| **inter-- (1)** | 118:24 119:2 | **investigating...** | 110:20 115:15 | 66:1 67:1 |
| 119:3 | 119:5 121:12 | 26:9 132:9 | 115:19 | 68:1 69:1 |
| **interact (1)** | 125:11 | 148:10 | **Island (1)** | 70:1 71:1 |
| 46:7 | 145:15 146:7 | **investigation...** | 52:17 | 72:1 73:1 |
| **interacted (1)** | 146:25 148:7 | 25:21 26:19 | **ISP (1)** | 74:1 75:1 |
| 91:4 | **interviewed (...** | 37:11 99:21 | 56:18 | 76:1 77:1 |
| **interacting (1)** | 114:17,20,25 | 113:4,8,11 | **issue (4)** | 78:1 79:1 |
| 27:21 | 120:18 125:7 | 115:6 118:6 | 82:3 125:21 | 80:1 81:1 |
| **interaction (5)** | 125:12 146:7 | 122:14 | 130:24 | 82:1 83:1 |
| 65:20 76:18 | 147:12 | 125:22 132:8 | 158:21 | 84:1 85:1 |
| 97:19,21 | **interviewee (1)** | 132:12,14,22 | **items (2)** | 86:1 87:1 |
| 117:15 | 27:22 | 133:6 134:19 | 44:22,24 | 88:1 89:1 |
| **interactions ...** | **interviewee's...** | 138:19 | | 90:1 91:1 |
| 66:15 130:12 | 28:6 | 146:11,19 | _____ | 92:1 93:1 |
| **interest (6)** | **interviewing ...** | 148:5 | **J** | 94:1 95:1 |
| 85:13 92:17,20 | 24:21,25 25:12 | **investigation...** | **J (159)** | 96:1 97:1 |
| 93:2 102:25 | 25:15 26:15 | 103:23 113:22 | 6:1,2 7:1 8:1 | 98:1 99:1 |
| 115:5 | 26:18 61:8 | **investigative ...** | 9:1 10:1 11:1 | 100:1 101:1 |
| **interested (2)** | 62:7 72:17 | 61:25 62:2 | 12:1 13:1 | 102:1 103:1 |
| 91:9 163:17 | **interviews (15)** | 80:23,24 86:6 | 14:1 15:1 | 104:1 105:1 |
| **interfering (3)** | 102:24 117:23 | 104:13 | 16:1 17:1 | 106:1 107:1 |
| 47:2,3,5 | 118:2 120:21 | 109:17 | 18:1 19:1 | 108:1 109:1 |
| **Internal (4)** | 120:25 121:5 | 139:23 162:8 | 20:1 21:1 | 110:1 111:1 |
| 20:20 23:19,25 | 121:18,20 | **investigatory...** | 22:1 23:1 | 112:1 113:1 |
| 27:7 | 132:18 | 23:15 24:4,15 | 24:1 25:1 | 114:1 115:1 |
| **interoffice (1)** | 134:25 | 24:16,19 25:8 | 26:1 27:1 | 116:1 117:1 |
| 80:22 | 135:19,20 | 25:11 26:12 | 28:1 29:1 | 118:1 119:1 |
| **interpret (1)** | 136:9,22 | 59:13,25 | 30:1 31:1 | 120:1 121:1 |
| 7:20 | 137:14 | 60:15 95:19 | 32:1 33:1 | 122:1 123:1 |
| **interpreted (1)** | **intimidated (...** | 95:19 | 34:1 35:1 | 124:1 125:1 |
| 150:5 | 150:15 151:4,5 | **invite (1)** | 36:1 37:1 | 126:1 127:1 |
| **interrupt (1)** | 151:25 | 94:2 | 38:1 39:1 | 128:1 129:1 |
| 120:10 | 154:14 | **involved (10)** | 40:1 41:1 | 130:1 131:1 |
| **interview (31)** | 155:16 | 37:5 43:21 | 42:1 43:1 | 132:1 133:1 |
| 26:22,23 27:8 | **intimidating ...** | 101:24 | 44:1 45:1 | 134:1 135:1 |
| 27:19,21 | 73:22 153:5,10 | 105:12 | 46:1 47:1 | 136:1 137:1 |
| 61:16 70:8 | **investigate (5)** | 110:23 | 48:1 49:1 | 138:1 139:1 |
| 71:10,16 72:2 | 26:5 36:20 | 112:20 | 50:1 51:1 | 140:1 141:1 |
| 72:14,25 | 80:14 101:25 | 116:21 151:9 | 52:1 53:1 | 142:1 143:1 |
| | | | 54:1 55:1 | |

February 22, 2024

[Page 177]

144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
**James (5)**
1:18 6:10
161:15 164:1
164:1
**January (3)**
14:9,13 15:23
**Jessica (2)**
2:4 6:16
**Jessica.massi...**
2:6
**job (15)**
40:20,23 47:6
48:4 50:4
52:13 55:21
56:7 60:6
74:11 101:19
101:21,23
107:16
115:12
**join (1)**
14:8
**joined (1)**
14:10
**jokes (1)**
63:23
**joking (1)**
141:23
**Jose (2)**
70:15,16
**judge (2)**
9:18,21
**July (1)**
19:10
**jumped (1)**

77:19
**June (4)**
15:22,23 18:24
19:10
**justice (2)**
54:18,21
**justified (3)**
37:3 100:20
101:10
**justify (2)**
100:15 158:5
**justifying (1)**
101:12

_____

**K**
**keep (7)**
7:23 8:2 10:6
29:15 62:10
122:13 135:4
**keeping (1)**
69:15
**Kevin (93)**
1:3,22 6:18
65:10,12,15
65:17,23 66:2
66:4,7,16
67:14,25 68:4
68:10 71:20
71:24 72:7,11
72:15,25
73:11,15
74:22 76:23
77:2,6,20
78:2 79:4,8
79:18 96:11
96:14 97:2,6
97:10,16,24
97:25 98:6,15
98:22,23
100:19
101:16
102:13,19
103:3,3,9,14
103:16,19

105:13,16
114:5,11,14
115:15
126:25 127:5
127:18,25
128:9,13,16
146:10 147:8
147:15,20
148:2,6,17,19
151:13 154:9
154:19
155:13,14
156:22
157:16 158:6
158:9,13,20
158:23 159:8
159:9,12
163:7,23
**Kevin's (24)**
70:7 73:7
77:11 79:22
97:2,25 98:25
100:4,6,7,7
100:20 101:9
101:12
102:15 103:5
103:15
145:11,12
146:18
154:13
157:23 158:2
159:2
**kill (1)**
53:5
**kind (15)**
28:12 37:7
44:16 48:14
48:19 50:13
61:20 64:19
71:4 74:17
77:3,4,5
79:10 100:23
**knew (2)**
66:9,11

**know (99)**
8:9,12,19
11:16 18:17
22:9 23:16
26:23,24
34:22,22
36:13,24 38:2
42:12 43:18
45:17,20 46:6
46:15 47:11
49:15 50:23
59:2,5 63:18
64:9 65:5,8
65:12,18 66:7
66:12,13,20
68:13,14,24
70:7 73:6
74:15 81:10
82:9 83:15
86:18 91:5,20
101:17
104:23 105:3
105:6,16
107:19,20
108:2,16
110:14
111:16
114:21
117:19
119:19 120:2
120:8 124:20
125:10
127:21
128:12 130:9
130:10,21
131:5,8,24
132:2 134:16
134:18
135:10,14
136:17,18
137:6,10
142:7,10,16
146:6,9,13,14
146:15,17,17

147:16
156:11 159:7
159:10,15,16
159:22
**knowing (1)**
117:21
**knowledge (...**
10:10 12:9
13:11,15,20
25:22 37:10
38:25 51:11
62:17 63:9
67:22 68:8
87:14 111:20
112:18
125:12,20
132:6 143:10
156:13 159:4
159:24
**knowledgeab...**
45:20
**known (2)**
22:7 51:12

_____

**L**
**L (5)**
3:2,2 6:2,2
161:2
**lack (2)**
152:23 156:22
**language (2)**
121:10,15
**laptop (6)**
111:22,24
112:3,5,8,11
**laptops (1)**
111:21
**large (1)**
108:6
**lasted (1)**
69:2
**laugh (1)**
82:17
**laughed (1)**

February 22, 2024

[Page 178]

94:17
**laughing (2)**
83:3 85:7
**law (10)**
4:21 12:2,8,18
  12:24 13:13
  13:23 14:20
  51:6 61:6
**lawsuit (4)**
6:22 111:6
  158:24 159:3
**lawsuits (2)**
38:4,9
**layman's (1)**
42:2
**lead (1)**
29:13
**leading (1)**
100:4
**lean (2)**
79:10 115:9
**leaned (1)**
157:11
**leaning (2)**
77:4 79:8
**leans (1)**
77:3
**learn (2)**
24:13 26:13
**learned (11)**
24:12,19 25:2
  25:7,11,16,25
  31:10 65:10
  80:9 124:18
**learning (2)**
26:12 71:2
**leave (3)**
21:12 61:15
  100:3
**leaving (1)**
124:2
**left (4)**
59:6 100:2
  134:20

159:19
**legal (3)**
24:22 111:8,12
**LegalView/Z...**
4:10
**lesser (1)**
41:20
**Let's (1)**
84:4
**level (8)**
8:2 24:16
  47:14 54:6
  149:21 156:3
  156:20 158:8
**Levittown (1)**
55:7
**Lexitas (1)**
4:11
**LGA (14)**
56:18 57:7,9
  57:24 64:22
  116:9 117:7
  117:10
  118:12,14
  119:18
  120:15
  121:25 129:7
**library (1)**
59:22
**lie (2)**
61:8,12
**lieutenant (6)**
20:2,24 22:7
  22:13,18
  39:25
**Lieutenant's ...**
15:7,10 39:25
**lifecycle (1)**
111:21
**lifelong (1)**
78:9
**light (2)**
10:23 11:3
**limited (1)**

126:13
**line (4)**
47:16 48:16
  162:24 164:5
**lines (1)**
140:7
**list (1)**
62:4
**listen (9)**
25:17 26:2,8
  70:18 137:8
  137:24 138:5
  138:8,9
**listened (9)**
70:7,12 73:3,6
  73:6,8 75:3
  75:15,21
**listening (2)**
70:20 71:4
**literally (1)**
157:20
**litigation (2)**
4:22 5:14
**little (4)**
44:17 53:4
  60:23 135:11
**LNGI (1)**
56:18
**located (1)**
56:22
**location (2)**
43:20 116:7
**locations (3)**
4:9 64:3,16
**logical (1)**
123:3
**long (20)**
13:6 14:14
  15:20 17:20
  19:15 20:12
  21:9 22:12
  34:22 42:17
  46:21 52:17
  53:3 55:14,23

68:25 69:5,13
  120:12 123:5
**longer (4)**
20:25 57:6,8
  59:2
**look (15)**
27:17 78:17
  81:11 96:24
  97:8,17 98:25
  99:9,10 100:5
  102:11,14
  103:7 139:11
  139:21
**looked (1)**
98:24
**looking (3)**
26:18 29:14
  100:13
**looks (1)**
149:24
**lose (1)**
35:4
**lot (2)**
11:15 24:12
**loud (1)**
142:18
**louder (1)**
91:3
**low (1)**
82:2
**lower-right (1)**
86:17
**lowly (1)**
82:2

_____
          **M**
_____
**M (1)**
6:2
**M-O-N-T-O ...**
58:13
**ma'am (30)**
6:15 7:13,22
  8:6,22 9:6
  10:2,4 11:23

12:19 14:3,18
  18:6 19:14
  21:3 23:9
  27:5 38:11
  51:2 56:23
  76:19 86:13
  92:25 105:24
  111:3 112:22
  124:25
  130:11
  139:18 143:4
**magnitude (2)**
110:12,18
**main (1)**
129:4
**maintain (2)**
30:18 49:14
**maintained (1)**
135:25
**Majority (1)**
54:17
**making (10)**
26:20 28:10,23
  29:5,9 73:20
  79:5 91:19
  94:11 118:17
**male (2)**
51:23 67:9
**Malebranch ...**
128:22,25
  129:20 130:2
  137:7,14
**man (2)**
116:11 122:5
**managed (1)**
157:12
**management...**
98:3,10 106:14
  113:25
  115:24
  117:18
  121:13
  123:21 129:5
  130:22

February 22, 2024

[Page 179]

132:20
136:16,18
137:24 138:6
149:9,24
150:6 151:8
151:11,15
154:23 156:4
156:21 157:7
158:14
159:11
**manager (18)**
58:6 98:3,4
107:5,6,7,13
107:14,17
109:5,6,25
129:8,24
133:16 134:5
145:12
147:21
**managers (1)**
108:7
**managing (3)**
133:17,18,21
**manner (2)**
4:18 158:4
**March (1)**
19:17
**marijuana (1)**
10:18
**marked (4)**
5:3 104:13
142:24
162:23
**marriage (1)**
163:16
**married (2)**
52:2 53:3
**Massimi (55)**
2:4 6:7,16 11:4
39:7,12,17
53:24 81:8,18
81:23 82:8,14
82:23 83:6,9
83:14,17,22

84:4,12,19
85:3,17 87:20
88:4,10,19
89:9,16 90:8
90:13,18,25
91:17 92:2,5
92:8,12,13
93:6,12,18,25
94:7 95:2,5
101:4 104:6
104:17
127:12 129:9
139:16,20
162:16
**matter (3)**
32:12 83:18
163:18
**matters (1)**
5:14
**McGaha (73)**
2:10 10:21
11:11,11,12
11:14 39:9
40:14 48:17
50:16 53:16
59:12 71:11
78:21 79:25
81:6,14,20
82:4,11,16
83:4,7,12,16
83:20,24 84:6
84:14,18 88:5
88:12 89:7,11
90:5,10,15,21
91:9,23 92:4
92:6,11 93:20
93:24,25 94:5
94:25 95:6,9
99:22 102:20
104:9 130:6
139:15,17
140:20
146:22 147:9
147:24

149:22
150:12 151:6
152:2,21
153:13
154:17
155:20
156:10,17
157:2 158:25
160:3
**mean (31)**
26:22,24 28:14
29:23 35:7
45:19 46:3,13
48:10 61:5
81:7,9 83:10
83:17 100:6
112:3 113:7
113:12
120:17,18
127:20,24
130:25 131:4
136:10 141:3
141:10
146:14 149:4
155:2 158:12
**meaning (1)**
9:2
**means (4)**
49:7 71:18
128:5 146:14
**meant (1)**
144:20
**medical (1)**
121:24
**medication (2)**
10:11,15
**meet (1)**
68:16
**meeting (3)**
4:11 69:13,18
**meetings (1)**
69:2
**Melville (1)**
6:13

**member (20)**
12:2,8,18,24
13:13,23
14:20 15:6,13
23:19,19
39:19 40:4
43:3 45:22
51:5 106:9
115:24
121:13
123:20
**members (6)**
23:18,20
113:25
126:20
137:23
153:25
**memorable (1)**
44:18
**memorandu...**
80:23
**memory (5)**
82:9 87:9
122:8 124:9
124:12
**Memphis (2)**
2:10 60:4
**menacing (1)**
158:4
**mental (1)**
10:6
**mention (1)**
128:4
**merit (1)**
94:10
**met (1)**
69:8
**method (1)**
62:14
**middle (1)**
51:14
**military (2)**
14:24 50:25
**mindset (1)**

127:20
**mine (1)**
108:25
**minor (1)**
39:5
**minutes (3)**
69:15,16 142:8
**mischief (1)**
45:15
**misconduct (3)**
156:2,8,23
**mispronounc...**
141:25
**missing (2)**
76:5 143:14
**mm-hmm (1)**
134:11
**module (1)**
22:8
**moment (3)**
94:22 151:19
154:9
**moments (2)**
85:5 142:7
**months (8)**
13:8 14:16
20:14,15
21:11,15,17
55:16
**Monto (2)**
58:7,14
**Monty (2)**
145:9 146:5
**Moreno (1)**
70:15
**morning (2)**
6:14,15
**move (8)**
10:24 28:6
35:6 84:2
90:17 91:13
92:11,14
**moved (1)**
157:18

**moving (5)**
85:14,15 92:17
92:21 137:10
**multiple (3)**
85:23 108:7,16

**N**

**N (4)**
2:2 3:2 161:2
162:13
**N/A (1)**
2:11
**name (17)**
6:8,16 11:9,13
11:16 51:14
63:13,16 65:8
66:8 75:20,25
76:10 98:13
107:8 129:16
141:20
**named (1)**
38:4
**names (4)**
43:20 51:12
70:9,14
**Nan (6)**
128:22,25
129:20 130:2
137:7,14
**Narcotic (1)**
17:14
**narcotics (10)**
16:2,4,16,17
16:19 17:21
21:21 22:14
28:15 34:12
**Nassau (2)**
54:11 163:5
**nature (1)**
24:17
**necessarily (4)**
48:13 129:19
153:10
154:12

**necessary (3)**
34:5 117:24
164:3
**necessity (5)**
25:17 26:2
64:12 99:24
110:16
**neck (1)**
77:12
**need (12)**
4:13 7:5 8:23
30:20 46:22
49:14,22
50:19,20
104:8 137:25
158:18
**needed (1)**
121:10
**needs (4)**
50:21 134:16
134:20
151:24
**neutral (1)**
132:22
**never (5)**
101:20 115:14
130:23 137:9
137:11
**new (18)**
1:2,23 2:5,5
6:4,13 13:24
20:8 21:18
51:18 52:17
55:8 56:22
71:3,8 78:9
163:4,8
**newly (1)**
57:11
**nicknames (1)**
51:9
**night (1)**
49:11
**nodding (1)**
7:18

**non-party (2)**
13:19,21
**Nope (1)**
22:19
**normal (9)**
7:4 73:15
118:18,22
119:6,8,13
124:4,6
**normally (1)**
10:15
**North (7)**
16:17,19 17:14
17:22 21:21
22:14 28:16
**Notary (6)**
1:23 3:18 6:4
161:22 163:7
164:25
**notes (3)**
122:10,13,18
**noticed (1)**
71:19
**notification (1)**
111:20
**notified (6)**
98:10 111:7
117:6 130:10
157:6,7
**notify (2)**
98:2,3
**nuance (1)**
71:6
**number (5)**
11:23 57:12
86:19 107:21
162:7
**numbers (3)**
86:12,16 95:16
**nutshell (1)**
24:24
**NYPD (35)**
14:2,8,19 15:9
15:14,17

23:16 26:25
28:8,22 29:8
30:11 31:10
31:19 32:3
33:2 35:17
37:2 38:2,10
39:3,18 40:7
41:12 43:3,23
45:23 46:4
47:10,19 51:7
52:13 60:17
61:6 62:2

**O**

**O (2)**
3:2 161:2
**o'clock (1)**
104:9
**oath (4)**
4:13 9:12,18
9:20
**object (26)**
10:22 40:14
48:17 50:16
59:12 71:11
79:25 81:6
99:22 102:20
130:6 146:22
147:9,24
149:22
150:12 151:6
152:2,21
153:13
154:17
155:20
156:10,17
157:2 158:25
**objection (2)**
82:4 84:2
**objections (1)**
3:12
**objective (2)**
101:23 115:10
**obligation (2)**

5:12 99:15
**observation (...**
29:12 30:2,7
67:13
**observations...**
28:10,13,20,24
29:5,10,11,24
30:13,16
32:22
**observed (1)**
141:13
**obviously (8)**
26:7,7 36:22
68:23 74:7
77:15 138:15
153:4
**occasion (4)**
47:14,17 50:8
67:13
**occasions (2)**
43:9 44:15
**OCCB (2)**
21:22 23:20
**occurred (2)**
105:23 116:2
**off-the-recor...**
79:2 84:23
88:17 127:10
**offer (1)**
131:10
**offhand (1)**
85:22
**office (7)**
33:24 64:2,18
64:21,22,25
139:5
**officer (21)**
4:12 11:20
15:18 16:7
17:10,12,17
17:19 18:5
39:21 41:14
41:17,19
42:10,14,16

42:19,23 49:6
49:10 132:9
**officers (1)**
46:22
**official (2)**
47:4 114:14
**oh (4)**
12:19 31:18
67:9 83:9
**okay (56)**
8:5 9:23 10:20
11:4,4 12:6
12:21 15:9
16:23 18:25
31:17 35:22
39:17 40:18
43:2 44:5
51:16 52:2
59:7 60:25
61:10,23
67:11 68:16
68:24 73:10
75:18 76:5,12
78:12,22
80:11 83:4,9
83:16 84:19
85:16,17 87:2
88:12 95:5
106:7,8
107:11 111:4
116:14 120:3
120:14
137:21
139:10,20
141:24
142:11,20,21
144:24
**older (1)**
74:11
**omission (6)**
98:19 99:23,24
102:4,6,23
**omit (3)**
98:17 99:19

102:17
**once (3)**
33:11 68:20
86:2
**ones (3)**
57:12 61:20
87:11
**open (2)**
34:5 87:23
**open-door (1)**
131:21
**opened (2)**
34:2 88:2
**operation (1)**
130:20
**operationall...**
67:21 131:2,3
**operations (8)**
104:2 105:9
113:9,14
115:8 118:9
136:19 151:7
**opinion (13)**
37:6 90:11
97:3 98:8
99:12 100:2
100:14 103:2
113:10
125:24
130:18 131:6
131:16
**opportunity ...**
23:4 142:23
**opposed (1)**
156:24
**opted (2)**
35:12 36:4
**option (1)**
35:3
**order (5)**
1:20 88:15
117:20 151:2
151:22
**organized (3)**

16:4 21:22
23:20
**orientation (1)**
62:24
**out-of-pocke...**
38:8
**outcome (4)**
32:13 99:21
115:12
163:17
**outside (1)**
136:16
**overall (1)**
97:8
**overseeing (1)**
109:10

_____

**P**

**P (3)**
2:2,2 3:2
**P-ing (1)**
158:17
**P.M (1)**
160:5
**packages (1)**
140:14
**page (8)**
139:16,25
140:5 162:6
162:15,19,24
164:5
**paid (1)**
114:19
**paperwork (1)**
109:16
**PARALEGA...**
2:11
**parents (1)**
51:19
**part (17)**
8:11 25:10
26:12 27:11
28:18 31:13
32:24 50:7

97:16 98:23
105:10 113:4
122:13
137:15
138:24
146:10
154:25
**participating...**
4:9
**particular (5)**
54:15,16 96:18
107:22
143:23
**parties (5)**
3:7 4:5,19 5:9
163:15
**parts (1)**
148:19
**party (2)**
5:13,14
**pass (3)**
18:14,16,20
**passed (2)**
18:18 34:2
**patrol (2)**
15:25 16:3
**Patrolman's ...**
39:22
**pay (4)**
37:25 38:3,8
57:20
**peers (1)**
108:17
**penalty (2)**
34:25 149:20
**pending (1)**
8:25
**pension (1)**
40:9
**people (34)**
11:15 22:9
25:18 26:2,14
27:3,9 28:4
29:17 42:18

43:12,20
44:21 45:2
46:6,7,25
49:13,18 50:3
61:8 62:15
65:18 66:12
67:18 71:22
107:18
108:24
120:19 125:6
125:9,17
134:18 156:7
**perform (1)**
103:22
**performance...**
67:20,22
**performing (1)**
47:5
**period (2)**
16:9 60:5
**periodically ...**
10:25
**permitted (4)**
99:19 137:24
138:4,8
**perpetuating...**
99:13
**person (11)**
34:19 48:15
57:11 68:20
69:11 116:17
123:3 150:9
150:21 152:5
156:13
**personal (2)**
47:22 48:4
**personally (8)**
13:11 38:7
48:6 87:16,17
89:24 135:18
145:6
**personnel (1)**
63:10
**pertain (1)**

February 22, 2024

63:20
**pertinent (6)**
30:20,23 97:18
97:21 143:16
159:22
**phone (7)**
75:20,25 76:8
76:9 84:21
118:10 139:4
**physical (7)**
10:5 42:4
66:23 79:5,19
150:10,17
**physically (5)**
47:4 74:19,19
126:16
157:22
**pick (2)**
23:23 24:2
**picking (1)**
139:4
**picture (3)**
97:8,16,17
**place (5)**
50:8,13 63:8
65:4 161:11
**placed (1)**
34:14
**placing (1)**
33:21
**plaintiff (9)**
1:4,19 2:4 6:18
13:18 65:8
88:3,4 162:4
**Plaintiff's (3)**
95:13 104:14
142:25
**played (1)**
37:7
**please (10)**
6:8 29:20,21
59:10 75:14
94:2,22
127:12

139:21,25
**point (30)**
8:24 21:13
22:6,11,18
39:5 44:11
48:3 61:18
72:8 74:5
76:25 77:13
85:12 91:11
93:22 97:24
100:10
123:22 124:8
124:15,19,22
126:24
127:23 133:5
134:2 140:2
157:15,20
**police (18)**
11:20 13:24
17:12,18
40:16,18
41:19 42:10
42:14,16,17
42:18,23
44:10 46:21
49:4,6,10
**policies (2)**
63:18,19
**policy (37)**
62:18,21 63:17
97:4,8,23
98:2,5,7,9,16
99:4,10
100:16
102:16 103:6
103:16,19
126:3,5,7,9
131:22
132:23 137:4
137:13,18,20
149:14,18
150:2,3
153:15,18
156:15,18

157:5
**policy's (1)**
113:11
**posed (1)**
111:18
**position (5)**
21:12 22:13
46:24 67:18
100:15
**possession (1)**
5:6
**possibility (1)**
127:21
**possible (2)**
115:11 155:5
**possibly (2)**
16:21 116:20
**potential (1)**
121:10
**pouch (1)**
77:10
**practical (1)**
89:13
**practice (8)**
118:18,22
119:7,8,13
122:19 124:4
124:6
**precedence (1)**
97:9
**precinct (10)**
16:10,13,25
17:7 19:7,16
19:19 20:4,8
20:13
**precincts (1)**
16:10
**prefer (1)**
92:22
**preferably (1)**
98:4
**preference (1)**
23:24
**preparation ...**

68:17 69:8,21
69:24 70:3,6
75:4,8,12
76:14 80:12
81:19 85:20
86:7 95:23
**prepare (2)**
115:7 136:4
**prepared (2)**
95:20 109:20
**preparing (1)**
127:18
**present (5)**
4:5 9:18 69:17
88:15 128:9
**presented (2)**
5:5 27:18
**presenting (1)**
5:3
**pretty (14)**
16:2 24:23
34:6 54:9,23
62:11 64:23
70:25 71:13
80:15 87:9,14
134:22 144:3
**previous (3)**
12:15 21:24
46:18
**primary (1)**
90:21
**prior (23)**
5:7 11:20
18:10,10 56:4
56:5 66:4,8
66:14 67:12
68:20,23 69:2
69:6 88:21
105:18 110:8
111:12
114:14 124:2
124:3 125:3,7
**probably (15)**
11:22 44:25

66:9,20 67:2
67:2 97:6
104:6 110:3
116:20,25
117:16 122:6
124:6,17
**problem (2)**
85:14 90:23
**Procedure (1)**
1:21
**proceed (2)**
29:21 49:21
**proceeded (1)**
34:3
**proceeding (4)**
31:7 35:8 36:8
164:2
**process (2)**
137:15 146:12
**professional ...**
130:16
**program (1)**
111:21
**promoted (3)**
18:19 19:24,25
**promotion (5)**
17:15 18:23
19:2,22 20:4
**promotions (4)**
17:4 18:8
22:17,21
**pronounce (1)**
98:13
**pronunciatio...**
141:20
**properly (1)**
104:2
**props (1)**
61:9
**prospective (1)**
142:3
**protect (1)**
30:3
**provide (2)**

February 22, 2024

[Page 183]

**provide (2)**
28:22 138:17
**providing (1)**
134:13
**prudent (2)**
49:19 50:12
**public (9)**
1:23 3:18 6:4
45:7 94:9,10
161:22 163:7
164:25
**pull (1)**
88:7
**pulled (1)**
111:2
**pulls (1)**
73:24
**punitive (1)**
151:3
**pure (1)**
106:15
**purpose (10)**
4:22 6:19
25:24 30:22
45:5 103:23
113:7 132:21
134:12 141:7
**purposes (3)**
63:12 95:12
142:24
**pursuant (1)**
1:19
**purview (1)**
145:8
**push (4)**
72:5,6,6
101:22
**pushed (1)**
73:17
**pushes (3)**
150:8 151:20
152:4
**pushing (5)**
76:25 140:14

149:6 154:11
159:12
**put (14)**
26:10 50:5
87:24 96:12
97:11 113:23
127:24 133:7
134:23 138:3
143:5 144:16
150:16,23

——————
**Q**
**QBOH (1)**
56:19
**Queens (4)**
20:11 51:18,20
51:21
**question (42)**
3:13 5:8 7:6,8
7:11,17 8:8
8:10,11,13
9:2,3 12:4,20
25:4 28:12
29:13 39:13
39:15 46:18
53:17,18 61:2
84:3 85:18
86:14 100:24
101:2,5,7,18
104:18,21
106:25
127:13,15
128:8 129:10
129:13
146:16 149:5
162:24
**questioned (1)**
101:20
**questioning (1)**
5:7
**questions (14)**
6:21,23,24
31:21,25
43:16 45:21

93:4 121:8,11
121:19 160:2
160:3 162:23
**quickly (1)**
50:19
**quite (3)**
42:17 59:21
66:25
**quote (1)**
57:23

——————
**R**
**R (4)**
2:2 3:2 161:2
163:2
**race (5)**
51:22 52:4
62:18,24 67:7
**race-related ...**
68:13
**races (1)**
52:22
**racial (2)**
63:23 144:25
**raiser (2)**
71:22 72:9
**raises (1)**
77:11
**rank (5)**
15:18,21 18:13
39:20 146:4
**ranks (1)**
43:10
**rational (1)**
159:3
**razor (4)**
74:3 77:9,25
157:19
**reached (1)**
47:13
**read (19)**
8:14 27:3
39:15 80:14
93:16 100:2

101:4,7
102:10
104:17,21
127:13,15
129:10,13
142:9,15,17
142:18
**reading (2)**
102:25 142:12
**ready (1)**
92:11
**realize (1)**
8:14
**realized (3)**
74:2 77:17
82:16
**really (15)**
61:10,22 62:6
69:15 70:24
70:25 80:16
90:16 91:3
97:18,18 99:9
120:7 130:20
155:16
**reason (15)**
7:9 8:17 9:7
31:13 72:22
88:24 89:22
89:25 90:5
96:18 112:7
141:3 143:23
158:23 164:5
**reasonable (1)**
52:10
**reasons (1)**
37:4
**reassigned (1...**
20:6,16,19
21:20 22:23
23:3,4,5,8
24:4
**recall (67)**
12:25 27:14
33:12,14,18

34:10,23,24
37:12,24
38:14 39:4,6
41:24 42:11
42:24 44:8
65:22 66:18
66:19 69:3
71:9,15,25
72:12,17,24
75:2 76:20
82:6 85:19,21
86:11,15
111:7,10
116:11,16,22
116:25 117:9
117:14
118:15
119:21,23,25
120:4,6,8,13
121:24
122:22,23
123:18,23
124:14 125:2
125:5 127:7
128:24
129:22 139:7
139:9 145:13
145:14,22
146:23
**recalled (1)**
31:2
**recalling (1)**
31:4
**receive (11)**
17:4 18:22
19:22 22:17
28:9 30:12
31:19 32:3
35:22 37:21
46:5
**received (14)**
18:25 20:4
30:16 32:7,25
34:25 39:2

February 22, 2024

[Page 184]

59:8,11,25
60:15,17
91:14 118:10
**receives (1)**
138:14
**receiving (2)**
65:22 111:12
**recess (3)**
39:10 84:7
104:10
**recipients (1)**
110:6
**recitation (1)**
123:11
**recite (1)**
71:12
**reckless (2)**
45:10,13
**recollection (...**
12:10 33:21
67:24 70:22
87:6
**record (25)**
6:9,25 7:20
8:18 78:25
84:21 85:2
88:14,20,24
89:22,25 90:6
90:7,9,19
91:20 94:3,11
127:9 135:13
135:18 138:8
145:18
163:12
**record's (1)**
106:8
**recorded (13)**
4:17 83:13
84:10,13,15
114:7 120:22
120:24 121:5
134:24 136:8
136:22
137:14

**recorder (5)**
135:3,12,16,19
136:10
**recording (13)**
4:18 30:13,16
30:23 32:15
72:13 73:4
89:14,17,18
135:6,8 138:5
**recordings (...**
69:24 70:3,5
70:21 75:2,3
75:8,11 121:8
135:4,24
136:12,14,25
137:8 138:9
**recordkeepi...**
60:12
**recovered (1)**
34:16
**refer (1)**
106:13
**reference (1)**
118:17
**references (1)**
26:8
**referred (6)**
39:14 93:15
101:6 104:20
127:14
129:12
**referring (12)**
80:19,20 91:6
105:21
109:22
110:19,25
119:15
121:20
129:15 154:6
154:8
**refresh (2)**
70:21 87:5
**regard (3)**
35:23 36:24

117:14
**regarding (11)**
5:8 92:19
120:16,21
122:2 128:9
128:14,14
129:2 145:20
145:25
**regards (3)**
95:20 145:3,5
**region (5)**
107:24 108:4
108:13,14
133:23
**register (1)**
128:5
**regularly (1)**
64:23
**related (21)**
13:3 33:16
38:4,8,19
54:18 57:25
59:23 111:14
111:17
112:11,16
120:25
128:13,16,22
129:5 138:19
145:16
146:18
163:15
**relative (1)**
108:21
**remain (3)**
20:3 21:9
112:8
**remained (1)**
20:24
**remember (29)**
16:22 21:7
32:11 33:25
34:14,16 37:2
42:16 43:18
43:21 44:16

70:9 71:2,5
75:16,19
76:10 111:11
115:25 116:9
116:16 117:3
117:20
119:12 122:4
123:6,7,9
125:15
**rememberin...**
71:3
**remind (1)**
107:7
**remote (1)**
4:9
**remotely (1)**
4:14
**repetitive (2)**
155:2,10
**rephrase (1)**
8:10
**report (53)**
30:20 80:15,18
80:19,20,24
81:2,16,22
85:19,24 86:7
86:9,12,15,23
87:3,5 95:20
96:20 99:20
101:24
104:13 107:6
109:4,17
110:8 112:13
113:8,23
115:7 122:17
124:24
125:19,23
132:19 133:7
133:8,10,13
133:24,25
134:8 136:3
138:11,24
139:23 141:8
144:14 147:5

148:20
154:10 162:9
**reported (2)**
107:18 148:6
**Reporter (28)**
4:7,15 6:23 7:2
7:14,19 8:13
39:16 78:8,24
82:25 84:9,20
84:25 87:22
87:25 88:7,8
88:13 93:7,11
93:17 101:8
104:16,22
127:16
129:14
162:11
**reporting (2)**
4:12 32:21
**reports (4)**
86:21 99:16
103:21 107:4
**represent (1)**
6:17
**represented ...**
11:6
**reprimand (1)**
39:2
**request (3)**
23:10 137:25
138:5
**requested (3)**
24:3 52:9
162:18
**require (1)**
67:19
**required (1)**
28:20
**requirement...**
24:23
**reserved (1)**
3:13
**reside (1)**
52:16

February 22, 2024

[Page 185]

resolve (1)
93:23
respect (1)
47:8
respective (1)
3:6
respond (1)
85:4
responded (1)
116:23
response (11)
48:20,22 53:5
93:13 97:2
98:25 99:3,3
102:15
103:15
116:24
responsibiliti...
60:7
responsibilit...
56:25 57:5
97:25 127:23
127:25
responsible (9)
56:13,17 57:6
57:9 108:18
109:9 112:24
148:9,10
responsive (1)
139:6
restate (1)
8:12
restrictive (2)
60:23 61:4
result (10)
24:5 34:12,25
40:12,16,19
40:22 41:8
105:5 125:22
retained (1)
162:11
retire (4)
21:18 41:2,4
59:3

retired (4)
14:2,5 22:15
40:25
retiring (1)
40:8
review (16)
69:20,23 70:2
70:6 75:6,7
75:12 76:13
80:12,17,25
117:17
118:23,24
119:8 142:23
reviewed (10)
72:13 75:7
81:19 85:20
86:7,16 95:23
132:17,17
164:2
reviewing (1)
120:5
revisit (1)
8:16
Richard (2)
58:6,14
right (41)
30:4 35:14
36:23 40:18
45:3 46:3
47:12,21,22
47:23,25 48:9
48:14 50:15
50:22 53:24
59:23 64:10
66:14 68:24
77:9 80:18
84:12 91:10
94:9 98:14
100:23 106:4
108:2 118:12
123:14 124:5
128:7 129:21
138:10 140:6
152:9 154:3,6

157:9,18
rings (1)
44:17
rise (2)
6:21 158:7
Road (2)
2:9 6:12
role (3)
22:11 28:18
132:7
roll (1)
46:15
rolled (1)
94:16
rolling (3)
83:2,19 85:6
room (2)
9:17 10:23
Rork (1)
133:20
rotated (1)
64:17
roughly (2)
13:8 57:19
rude (2)
67:25 68:5
Rules (1)
1:20
RULINGS (1)
162:23
runs (4)
130:19 131:6,6
131:8

_____
S
_____

s (7)
2:2,4 3:2,2 6:2
77:10 162:2
safe (2)
48:13 54:23
safest (1)
49:23
safety (10)
30:3 37:3,4

45:7 48:5
49:6,15
126:21 152:8
154:3
saw (14)
60:19,20 71:20
71:20,21 72:5
72:7,9,15
79:13 80:5
103:3 141:17
147:13
saying (24)
7:17 40:21
42:21 53:25
66:16 71:15
76:6 78:9
82:19 90:2
103:12
105:20 120:4
121:17 124:6
124:15
137:23
146:19
150:15,21
152:14,16
157:17
158:17
says (4)
140:8,10
153:15 164:2
school (2)
55:4,6
scope (1)
159:4
screen (4)
88:6,9 89:17
91:15
scroll (1)
139:25
sealing (1)
3:7
search (5)
33:17,17 34:4
34:13 41:7

second (8)
10:22 41:11
44:2,3 68:16
77:22 119:10
119:11
seconds (1)
140:8
security (44)
55:22 56:5,6,8
56:10 61:16
63:9,20 86:6
95:19 98:3
104:12
106:21,22
107:14,14,17
107:24 108:3
108:10,11,20
109:4,17
113:22,23
115:15,18
118:7 122:14
125:22
132:10
133:22 136:3
136:6,8,15,15
136:18 137:5
138:6 139:22
151:8 162:8
security-rela...
63:12,18 65:21
65:25 130:23
see (28)
11:2 30:21,24
67:14,14 74:3
76:22 77:2,5
80:3 81:25
82:7 83:5
89:21,25
91:16 93:3,8
95:15,16
103:9,12
111:18
125:10 140:3
140:4,8,16

February 22, 2024

[Page 186]

**seeing (1)**
76:20
**seen (7)**
65:17 66:24,25
101:12
103:10
114:11
157:13
**send (6)**
86:2 110:7,10
115:7 133:15
144:2
**sending (4)**
125:8 128:25
138:19 139:5
**senior (9)**
55:22 56:4,6,9
108:10,11,19
123:20
133:16
**seniority (2)**
57:21 109:11
**sense (3)**
9:5 65:6,7
**sent (8)**
109:24 112:14
124:22 136:6
138:22 144:3
144:10,18
**sentence (1)**
141:10
**separate (11)**
4:9 36:2 56:20
71:20 72:10
77:22 135:5,5
135:7,8
147:15
**separated (2)**
77:21 147:14
**September (2)**
14:6 22:15
**sequentially ...**
41:21
**sergeant (4)**

18:13 19:12,20
39:23
**Sergeant's (1)**
39:24
**series (1)**
6:22
**serious (1)**
150:10
**seriously (1)**
40:6
**served (4)**
14:23 50:24
51:3,5
**service (4)**
4:12 6:12 18:9
18:12
**set (2)**
163:11,20
**settle (1)**
93:14
**settlements (1)**
38:3
**sexual (2)**
62:24 126:14
**sfdaniel@fed...**
2:12
**shaked (1)**
94:18
**shaking (9)**
7:18 60:19
82:10,11,12
82:14,18 83:3
85:7
**share (2)**
88:5,8
**SHARON (1)**
2:11
**SHEET (1)**
164:1
**shocked (1)**
74:17
**shooter (1)**
59:17
**short (3)**

39:10 84:7
104:10
**shot (2)**
40:24 41:9
**show (3)**
79:4,11 87:19
**showed (2)**
86:20 140:11
**showing (1)**
95:11
**shows (1)**
113:11
**shrinking (1)**
48:14
**side (6)**
28:6 77:5
79:11 108:21
146:18
157:13
**sides (1)**
28:5
**sign (1)**
22:2
**signature (8)**
143:21,25
144:4,7,10,17
144:19
164:23
**signed (5)**
3:17,19 143:18
143:20,24
**significant (1)**
134:15
**silently (1)**
142:9
**similar (4)**
60:16,18,22,23
**simple (3)**
26:22,22 149:6
**simply (1)**
154:10
**sir (6)**
87:23 92:24
93:6 94:24

101:5 139:12
**sit (2)**
43:21 141:5
**situation (7)**
48:24 49:24
50:18 99:3
155:11
157:19 158:7
**six (1)**
108:25
**size (1)**
73:21
**skills (17)**
24:15,16,19,21
25:2,8,11,12
25:15 26:13
27:2,12 29:12
29:24 30:2,7
31:9
**skin (1)**
46:22
**slow (1)**
53:5
**smacking (1)**
148:16
**small (1)**
66:17
**snapped (1)**
96:10
**sole-standing...**
42:24
**somebody (7)**
46:19 49:2,3
119:5 128:3
136:16 152:4
**sorry (42)**
17:20 29:19
40:22 44:2
57:2 58:9,10
60:6,19 64:10
67:10 69:6
70:8 75:22
76:2 80:24
83:6,22 86:13

90:8 96:6
101:2 103:22
104:25
116:13
117:12
119:23 120:9
120:10
122:16 127:8
127:9 129:9
130:8,25
137:17 139:9
140:22
142:19
150:22
151:17
157:24
**sorts (1)**
82:17
**sounds (2)**
44:18 48:24
**South (1)**
6:12
**space (6)**
47:24 48:8,11
48:12 67:5
76:24
**Spanish (1)**
121:14
**speak (23)**
7:24 25:18,21
31:15 48:14
57:16 64:20
91:2 120:14
121:21,23,23
121:24 122:4
123:2,3,6
128:21 131:3
145:9 146:5
149:8 159:2
**speaking (9)**
7:25 25:23
28:4 40:10
82:2 123:18
123:23 125:2

125:5
**specialist (7)**
55:22 56:5,6,8
56:10 60:4
108:10
**specialists (2)**
108:12,20
**specific (17)**
26:8 38:18
43:13,18
56:13 63:16
63:19 64:2,18
66:19 68:12
87:10 122:8
122:23
124:12
126:20
153:22
**specifically (...**
25:15 27:15
41:23 42:22
46:19 65:18
92:19 105:8
106:18 110:4
110:18
118:16 122:3
122:25 125:4
125:18
128:24
145:14
**specifics (2)**
24:14 26:8
**specified (1)**
161:11
**specify (1)**
94:2
**spectrum (1)**
29:16
**speculate (1)**
159:13
**speculation (1)**
122:7
**speed (1)**
8:4

**Spell (1)**
58:12
**spelled (1)**
78:14
**spelling (1)**
58:10
**Spencer (10)**
70:17 71:10,15
71:25 72:15
72:18,20 96:9
147:7 148:15
**Spencer's (1)**
72:14
**splitting (3)**
71:17 73:13,17
**spoke (8)**
122:8 123:16
123:17 124:2
124:7,20
125:9,16
**spoken (2)**
122:21,24
**SS (1)**
163:4
**stamp (3)**
86:12,16,18
**stamps (1)**
95:13
**stand (1)**
61:20
**standing (1)**
77:7
**standpoint (1)**
118:7
**stands (1)**
134:19
**start (1)**
142:5
**started (1)**
120:5
**state (9)**
1:23 6:4,8
54:12 140:13
141:16

147:11 163:4
163:8
**stated (3)**
141:14 146:2
157:5
**statement (6)**
79:23 96:9,19
98:22 140:10
147:11
**statements (...**
85:5 117:17
118:3,23
119:9,10,10
119:14,15,16
119:20
**states (5)**
1:2 125:23
126:11
153:18
156:18
**station (7)**
117:7,10
118:12,15
119:19
120:15
121:25
**statistically (1)**
131:8
**stay (1)**
61:17
**stenographic...**
84:11
**step (10)**
9:2 47:15 48:7
48:7 49:8,20
50:14 98:2
99:5 157:12
**stepped (4)**
73:19 99:14
157:6,10
**steps (1)**
77:6
**Steve (1)**
133:20

**stick (1)**
49:12
**sticks (3)**
61:24 62:4,6
**STIPS (1)**
4:2
**STIPULAT...**
3:5,11,16 4:4
5:2
**stop (1)**
74:8
**stopped (1)**
77:19
**street (3)**
2:5 43:11
45:10
**structurally ...**
128:18
**struggle (1)**
71:21
**struggling (2)**
77:14,16
**study (1)**
54:15
**stuff (2)**
40:12 131:23
**subject (3)**
29:14 35:15
37:10
**submit (3)**
104:2 113:8
147:5
**submitted (1)**
132:19
**Subscribed (2)**
161:18 164:23
**subsequent (1)**
146:11
**substance (11)**
44:6 71:14
72:25 73:11
74:21 97:15
116:17 123:7
123:13 134:7

145:23
**substantiate ...**
92:15 94:13
**substantiate...**
33:7 37:14,17
**substantiatio...**
35:2
**substantiatio...**
94:10
**succeed (1)**
60:9
**sued (3)**
13:9,12 54:3
**suffered (1)**
41:3
**suing (1)**
159:8
**Suite (1)**
2:5
**sum (9)**
44:6 71:14
72:24 73:10
74:20 97:15
116:16
123:13
145:22
**summarize (4)**
32:9 99:25
102:23,24
**summarized ...**
100:12 133:9
**summer (1)**
18:24
**supervisor (7)**
23:15,17 58:5
58:8,15,17,20
**supervisory (...**
22:10
**supply (1)**
5:12
**supposed (2)**
132:15 137:22
**sure (25)**
11:3 34:3 39:9

February 22, 2024

[Page 188]

43:15 44:23
47:8 59:7
61:19 71:5
84:6 85:3
89:7,11 94:25
106:8 107:15
112:6 120:14
122:3 125:9
125:16 134:3
135:15
146:17
152:25
**surveillance ...**
24:22
**suspended (5)**
15:12 74:14,15
74:16,18
**suspension (3)**
114:18,19,23
**swears (1)**
132:3
**sworn (8)**
3:19 4:14 6:3
161:5,18
163:11 164:1
164:23
**synopses (2)**
96:14,23
**system (4)**
135:21 136:5
136:11,13
**systemically ...**
126:18

_____
**T**
**T (6)**
3:2,2 161:2
162:2 163:2,2
**tactical (1)**
49:19
**tactics (2)**
62:2,2
**take (33)**
6:23 7:3,15 9:4

9:19,20 10:14
10:15 24:2
30:8 31:9
35:4,5 39:7
47:15 48:7
50:14 57:17
77:6,24 84:4
84:22 88:16
104:7 113:15
113:16
122:17
139:10,12,21
142:6,7,18
**taken (14)**
1:19 9:12,19
10:11 18:9
39:11 57:23
57:24 84:8,11
104:11
122:10 138:7
164:2
**takes (3)**
48:19 77:8
97:9
**talk (1)**
66:17
**talking (3)**
100:11 124:14
139:4
**tapes (1)**
135:5
**target (2)**
151:23 152:18
**taught (1)**
46:21
**team (2)**
126:20 153:25
**techie (1)**
135:11
**technically (1)**
15:8
**technique (1)**
62:7
**telephone (1)**

125:14
**tell (32)**
9:12 18:18
32:9,12 46:16
47:11 48:6
49:7 53:7
61:9,12,12
67:6 68:14
74:22 81:15
86:22 93:23
94:22 98:4
118:19 122:5
122:6 123:14
123:15
124:19
127:17 131:7
143:5 144:24
147:17,19
**telling (3)**
32:4,7 49:18
**tend (1)**
43:11
**Tennesee (1)**
2:10
**term (4)**
23:16 45:13
153:25
156:19
**termed (3)**
150:5 151:2
158:3
**terminable (1)**
149:25
**terminate (4)**
105:7,13
112:20
126:25
**terminated (8)**
105:4 114:5,22
115:3 146:20
156:6,8,14
**termination ...**
113:6 127:6
148:25,25

149:19
155:19
**terms (2)**
42:2 148:15
**test (2)**
18:14,16
**testified (16)**
6:5 9:24 11:18
11:24 12:7,12
12:14,16,22
13:3,17 32:16
38:12,15
151:20 154:8
**testify (4)**
9:8 10:12 92:9
161:5
**testifying (4)**
10:7 89:24
92:7 94:6
**testimony (13)**
11:25 31:8
70:8 79:22
80:4 93:16
94:20 150:25
154:16 161:6
161:10
163:13 164:3
**Thank (10)**
7:13 8:22 9:6
11:5 53:9
54:2 61:23
82:21 95:5
142:21
**thanked (1)**
94:18
**theory (1)**
46:20
**thicker (1)**
46:22
**thing (6)**
49:19,20,23
73:8 117:13
148:8
**things (23)**

8:4 24:17
43:11,12
44:15,20 45:2
45:18 46:23
47:6 48:6,23
49:5,9,12
61:7,9 82:17
85:8 117:22
124:16 131:9
159:8
**think (22)**
19:8 25:19
31:2,14 70:11
71:7 78:8,13
78:14 82:23
88:24 94:14
106:5 122:20
132:23 133:2
136:23 138:3
141:13 155:9
159:18,21
**thorough (1)**
25:20
**thought (3)**
73:24,25
141:23
**threaten (2)**
152:5,6
**threatened (...**
151:4,5,25
152:19
153:17,20
154:2,15,20
154:22 155:4
155:15
**threatening (4)**
150:22,23
153:5,10
**three (7)**
23:18 28:3
68:21,21
70:12 74:25
126:16
**threw (2)**

43:23 158:15
**throw (2)**
43:4,12
**throwing (2)**
44:21 45:2
**thrown (2)**
44:11,19
**Till (2)**
15:22 19:17
**tilt (1)**
77:5
**time (75)**
1:13 3:13
  11:17 12:6
  14:17 16:14
  17:5,6,11
  18:4,8,20
  19:18 24:9
  25:6,16,25
  26:11,25 27:6
  28:8 29:8
  30:11 31:18
  31:18 32:2,25
  34:23 35:16
  36:17 39:3,18
  40:7,12 41:12
  42:17 43:2,13
  43:22 46:4,21
  47:10,18
  55:18 56:12
  59:7 61:15
  67:2,3 69:7
  69:15 104:7,8
  106:23 107:9
  109:2,7,25
  110:16
  117:10,25
  120:12 122:9
  123:5,17,22
  124:22 133:4
  133:17,19
  140:11
  142:15,18
  143:12

161:10
**timeframe (1)**
23:2
**times (11)**
11:15,17,21,21
  33:10 43:6
  49:17 50:20
  68:19,21
  113:13
**title (8)**
17:16 20:22
  55:21,24 56:7
  63:21 107:12
  108:9
**titles (1)**
107:15
**today (35)**
6:19 9:9,13,19
  11:7 43:22
  58:2 68:17,20
  68:23 69:2,7
  69:9,21,24
  70:3,6,23
  75:4,8,12
  76:14 80:13
  81:19 85:11
  85:20 86:8
  87:7 94:4
  95:12,23 98:8
  103:18,20
  142:24
**toilet (2)**
44:9,15
**told (3)**
96:10 100:8
  158:14
**tolerance (3)**
63:2 150:4
  156:19
**tolerate (2)**
46:23 47:7
**tolerated (1)**
62:25
**top (2)**

70:10 125:15
**totality (5)**
98:25 99:9
  100:13
  102:11,14
**totally (1)**
142:2
**touching (1)**
126:14
**tough (1)**
106:24
**training (25)**
28:9,23 29:3
  30:12,15
  31:19 32:3,6
  59:8,11,14,14
  59:15,16,16
  59:17,19,21
  59:25 60:5,8
  60:10,14,16
  60:17
**transcript (8)**
5:13 96:15,22
  97:13 98:20
  161:9,9 164:2
**transition (1)**
17:15
**transpired (3)**
98:5,11 125:13
**transpiring (1)**
134:17
**traumatic (1)**
40:13
**treated (2)**
155:17,18
**treatment (1)**
62:23
**treats (3)**
131:12,16,25
**trial (7)**
1:16 3:14 35:9
  35:13,16 36:8
  38:13
**trick (2)**

31:21 43:16
**tried (1)**
147:15
**tries (1)**
42:3
**trouble (2)**
89:10 91:2
**true (2)**
161:9 163:12
**truth (7)**
9:12,19 32:4,8
  32:10,12
  161:5
**truth-telling ...**
32:14
**truthful (5)**
27:13 62:14
  72:21 79:24
  94:15
**truthfully (3)**
9:8 10:7 99:17
**truthfulness ...**
60:11
**try (8)**
60:7,9 62:10
  86:24 101:21
  115:10 119:4
  133:3
**trying (7)**
26:4 43:17
  47:2 100:9
  120:10
  141:16,19
**turn (1)**
79:9
**turns (1)**
77:8
**two (20)**
28:3,3 29:22
  29:23 52:21
  64:24 68:21
  70:8,10 72:7
  76:15,15
  79:12 97:19

97:22 110:5
  117:23
  122:22,23
  145:19
**two-minute (1)**
84:5
**type (14)**
61:13 62:22
  63:4 86:2
  101:22
  113:15,16
  134:20,21
  135:9 147:3
  148:5,23
  150:17
**typically (1)**
120:9

---

**U**

**U (1)**
3:2
**uh-huh (1)**
7:17
**uh-uh (1)**
7:17
**unauthorize...**
4:20
**uncomfortab...**
152:7,20
**undercover (1)**
16:7
**underneath (2)**
22:9 64:8
**understand (...**
7:12,21 8:7,20
  9:11,15,23
  12:4,20 25:4
  32:20 40:19
  81:20 86:14
  89:8,12 92:13
  97:5 105:21
  113:21
  121:16 124:5
  159:25

February 22, 2024

[Page 190]

**understandi...**
29:4,7 32:24
62:20 67:7
68:9 73:3
112:7 158:22
**understood (...**
7:13 9:6 22:12
23:7 36:23
37:8 50:22
53:25 73:10
79:16 106:2
**union (2)**
15:8 40:4
**unions (3)**
15:3 39:19
40:3
**unit (2)**
23:3,15
**UNITED (1)**
1:2
**unprofession...**
68:2,5
**unquote (1)**
57:24
**update (1)**
134:22
**updates (2)**
110:13 134:17
**uphold (1)**
113:5
**upload (1)**
135:20
**uploaded (5)**
135:22 136:2,4
136:11,13
**upsetting (1)**
97:6
**use (3)**
45:13 59:14
61:9
**utility (2)**
74:2 77:10

---
**V**
---

**vacation (6)**
35:4,6,9,19
36:3,11
**variety (2)**
45:16,17
**various (4)**
44:15,21 46:5
113:25
**venue (1)**
93:2
**verbal (1)**
7:16
**verbally (2)**
126:17 138:12
**verbatim (4)**
71:13 97:14
98:20 123:11
**verdicts (1)**
38:3
**versa (1)**
117:24
**versed (1)**
70:25
**version (7)**
81:2,5 86:8,23
87:3 95:25
144:6
**vice (1)**
117:24
**victim (3)**
148:3 151:3
152:23
**video (30)**
4:2 59:14,15
69:23 75:7,11
76:13,21 79:4
79:13 80:5,7
83:5,7,11
84:15 103:7
103:14
105:22
112:13
118:24 119:9
119:9,11

132:17
140:11
141:13,17
148:7 157:14
**video-wise (1)**
84:13
**Videoconfer...**
4:7,10,17 5:11
**videoconfere...**
1:22
**videographe...**
89:3,14 90:4
**videos (3)**
76:13,21,22
**view (1)**
106:15
**violated (4)**
102:16 113:11
149:13,18
**violation (8)**
4:21 97:3,9
100:16 103:6
125:25
137:12
156:15
**violence (39)**
59:16 110:21
116:19 126:2
126:5,6,15
134:15 148:2
148:4,11,17
148:20,22,24
149:14,18
150:3,11,20
151:3,10,23
151:24
152:10,12,16
152:18,18
153:7,12,21
154:13 155:8
155:18
156:12,15,25
158:8
**violet (1)**

48:14
**virtually (1)**
1:21
**voice (1)**
7:24
**volatile (4)**
49:2 87:11,12
150:22
**volume (2)**
7:25 8:2

---
**W**
---

**Wait (1)**
53:16
**waived (1)**
3:9
**walk (1)**
99:4
**walked (16)**
67:16 71:24
72:9,11 74:13
78:2,4 98:9
103:17
147:15,20
157:16 158:9
158:13 159:6
159:9
**walking (1)**
65:16
**Wall (1)**
2:5
**Wanders (20)**
1:8 109:25
110:4 122:21
123:19
127:17 129:6
129:8,24,25
130:3,13
133:25 134:8
134:13
136:22 137:7
137:15
138:12 146:4
**want (25)**

24:2 48:15
49:13 74:9
76:4 84:16
85:4,9 89:4,5
90:2,9 92:14
93:13 110:13
110:13
111:22,24
112:2,4,8
125:11
139:10 155:3
158:16
**wanted (3)**
74:8 90:6
106:7
**wanting (1)**
121:16
**wants (2)**
23:23 125:11
**warrant (1)**
41:7
**warranted (1)**
148:24
**wasn't (17)**
22:3 34:5 69:3
69:5,5,15
72:23 79:15
80:4 97:11,18
102:5 116:9
147:2 155:15
155:15,16
**water (1)**
82:20
**way (27)**
26:10,17 27:16
31:20 37:6
46:11 49:25
50:5 57:21,25
62:11 78:4,5
82:12 98:6
102:3 103:13
117:3,22
132:16
134:23 138:3

February 22, 2024

[Page 191]

141:18
150:23 152:8
159:3 163:17
**ways (3)**
60:16 61:2
126:16
**we're (12)**
6:19 57:25
70:22 84:25
87:6 90:18
92:8 94:14
105:24,25
107:25
109:15
**we've (2)**
10:22 142:24
**weapon (6)**
74:6,7 110:22
110:24
112:16
116:21
**weapons (2)**
34:12 49:11
**week (1)**
64:24
**well-being (1)**
126:22
**went (14)**
14:12 16:15
17:18 19:12
23:21 33:23
54:11,12 60:3
71:19 117:6
118:11
127:21
147:14
**weren't (1)**
109:6
**westbound (1)**
78:3
**WHEREOF ...**
163:19
**white (4)**
51:23,24 52:5

52:24
**wife (1)**
53:5
**wife's (1)**
52:4
**willing (1)**
49:4
**wish (1)**
8:16
**withstanding...**
5:11
**witness (39)**
1:18 4:8,13,14
5:4,5,8 6:3
11:12 53:22
54:2 78:22
82:21,25
83:19 84:14
85:9,12 87:16
87:17 89:18
89:23 90:12
91:15 92:16
93:8,19 94:19
95:4 119:16
119:19 130:8
139:14,18
160:6 163:10
163:13,19
164:23
**witness's (4)**
4:16 78:8
88:20 89:19
**witnessed (1)**
68:4
**witnesses (2)**
70:10,14
**woman (1)**
116:12
**wonderers (1)**
121:23
**word (4)**
133:3 144:2
146:14
156:23

**words (9)**
13:2 32:20
35:7 36:6
50:11 79:12
108:19
121:22
129:18
**work (16)**
6:11 15:13
32:19 64:5
67:14,15,20
67:22 106:25
107:3 108:16
108:24
131:12
134:14
140:12 153:3
**workday (1)**
69:4
**worked (8)**
13:23 16:6,24
28:15 55:14
64:2,4 108:20
**worker (5)**
130:18 150:8,9
151:20,21
**working (11)**
15:16 16:18
17:13 20:25
21:2 25:22
71:18 106:20
116:6,8
125:12
**workload (1)**
57:15
**workplace (38)**
59:16 110:21
116:19 126:2
126:5,6,15
134:15
147:25 148:3
148:11,17,20
148:22,24
149:13,18

150:3,11,20
151:2,10,23
152:10,12,15
152:17 153:7
153:11,21
154:4,13
155:7,17
156:12,15,25
158:8
**works (1)**
104:24
**worries (2)**
31:23 142:3
**worry (1)**
53:7
**would've (7)**
98:7,9 102:8
103:17 128:4
148:6 158:13
**wouldn't (17)**
98:8 128:5,17
128:18,19
129:19 130:5
130:9,10
131:7 144:14
146:6 150:19
157:9 158:10
159:7,10
**write (2)**
140:18 147:5
**writing (1)**
138:13
**written (7)**
4:19 118:3,23
119:15
122:17
132:19 135:2
**wrong (2)**
47:12 154:7
**wrote (1)**
140:25
**WSHA (1)**
56:19

| X |
| --- |
**X (4)**
1:3,10 162:2
162:13

| Y |
| --- |
**yeah (17)**
37:8 38:23
45:25 51:20
54:22,22,23
70:11 71:12
71:13 80:18
106:2 119:25
135:15 142:2
153:2 159:25
**year (9)**
16:18 17:25
18:2 21:4
57:18,19,19
58:21 59:20
**yearly (1)**
59:18
**years (13)**
13:8 14:6
21:11,15,17
21:24 23:2
46:14 53:4
55:16,25,25
81:16
**yelling (1)**
77:18
**yep (1)**
64:11
**yesterday (5)**
69:10 72:14
73:4,8 81:12
**York (14)**
1:2,23 2:5,5
6:4,13 13:24
20:8 51:18
52:17 55:8
56:22 163:4,8
**Yorker (1)**
78:9

February 22, 2024

[Page 192]

**yup (2)**
132:25 140:19

---
**Z**
**zero (5)**
63:2 78:20
  150:3 156:18
  156:19
**zone (2)**
49:15 107:13
**Zoom (4)**
1:21 9:16
  68:21 89:15

---
**0**
**02/22/2024 (1)**
164:2

---
**1**
**1 (9)**
18:2 88:3
  95:13 104:9
  104:14
  139:11,14
  142:25 162:8
**10 (3)**
55:25,25 56:2
**10:09 (1)**
1:13
**100 (1)**
54:8
**10005 (1)**
2:5
**104 (1)**
162:9
**11 (4)**
55:25,25 56:2
  56:3
**110 (1)**
54:8
**110th (3)**
20:8,13 21:2
**117 (2)**
56:19 65:2
**11747 (1)**

6:13
**1264 (1)**
2:5
**13 (2)**
13:8 55:16
**15 (1)**
14:6
**18th (7)**
105:23 117:11
  118:11
  121:21,25
  124:3 128:23
**1988 (4)**
14:9 15:23
  16:9,23
**1994 (1)**
16:24
**1996 (4)**
15:22,23 16:10
  19:19

---
**2**
**2 (8)**
21:11,11,15,15
  21:17,17 23:2
  69:16
**2-5 (1)**
126:7
**2-minute (1)**
39:8
**2:08 (1)**
160:5
**20 (4)**
46:14 77:22
  161:19
  164:24
**200 (1)**
66:11
**2002 (4)**
19:17,19,23,24
**2003 (1)**
21:6
**2004 (2)**
21:7 33:13

**2005 (1)**
33:13
**2008 (2)**
14:7 22:16
**2021 (20)**
56:9 58:15,18
  58:21 63:25
  64:15 105:23
  106:19
  107:12,19,23
  108:4,9,13,19
  117:11
  118:11
  121:21,25
  148:9
**2024 (2)**
1:12 163:20
**210 (1)**
67:3
**215 (1)**
67:3
**22-CV-7662 ...**
1:6
**22nd (1)**
1:12
**23rd (1)**
163:20
**24 (1)**
10:18
**270 (1)**
6:12

---
**3**
**3 (1)**
81:16
**3-storey (1)**
44:12
**30 (1)**
77:22
**31 (1)**
53:4
**3118 (1)**
56:19
**3620 (1)**

2:9
**38125 (1)**
2:10
**3rd (1)**
2:9

---
**4**
**4 (2)**
13:8 55:16
**4-0 (1)**
16:12
**40 (1)**
140:8
**40th (3)**
16:12,25 17:7

---
**5**
**5 (1)**
142:8
**5'10 (1)**
67:2
**5-minute (1)**
39:8

---
**6**
**6 (8)**
14:16 35:21,22
  36:11 56:18
  64:6 109:3
  162:16
**6-storey (1)**
44:10

---
**7**
**7 (1)**
49:9

---
**8**
**8 (2)**
20:14,15
**8:23 (1)**
140:8
**8:23:40 (1)**
141:10
**83rd (4)**

19:6,15,18
  20:3
**88 (1)**
14:13

---
**9**
**90 (2)**
69:15,16
**94 (1)**
16:21
**95 (1)**
16:21
**96 (3)**
18:24 19:8,11
**966 (1)**
95:14
**99 (1)**
2:5