# EXHIBIT 8
# BOVELL TRANSCRIPT

**UNITED STATES DISTRICT COURT**
**for the**
**Eastern District of New York**


Kevin Campbell

      Plaintiff

v.             Civil Action No. 22 CV 7662(DLI)(MMH)

Federal Express Corporation A/K/A FedEx Express,
and Eric Wanders, Individually

      Defendant

_____

NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

*Nationwide*

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

*Powerful*
LITIGATION SUPPORT

**REMOTE STREAMING DEPOSITION OF**

**MONTY BOVELL**


**TAKEN ON**
**MONDAY, MARCH 11, 2024**
**10:11 A.M.**


**305 BAUGHMANS LANE**
**FREDERICK, MARYLAND 21702**

1                     **REMOTE APPEARANCES**

2

3    **Appearing on behalf of the Plaintiff:**

4    JESSICA S. MASSIMI, ESQUIRE

5    **Massimi Law Offices, PLLC**

6    99 Wall Street, Suite 1264

7    New York, NY 10005

8    (646) 241-9800

9    (212) 202-4779 (Fax)

10   jessica.massimi@gmail.com

11

12   **Appearing on behalf of the Defendants:**

13   GABRIEL P. MCGAHA, ESQUIRE

14   **Federal Express Corporation**

15   3620 Hacks Cross Road, Bldg. B, 3rd Floor

16   Memphis, TN 38125

17   (901) 434-8383

18   (901) 434-8338 (Fax)

19   gabriel.mcgaha@fedex.com

20

21   **Also Present:**

22   Sharon Daniel, Sr. Litigation Paralegal,

23   Federal Express Corporation

24   Jess Bryan, Naegeli Technician

25

Monty Bovell     March 11, 2024     NDT Assgn # 72926     Page 3

```
 1                            INDEX

 2                                               Page

 3

 4   EXAMINATION BY MS. MASSIMI                    6

 5

 6   EXAMINATION BY MR. MCGAHA                    90

 7

 8   FURTHER EXAMINATION BY MS. MASSIMI          100

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          EXHIBITS

 2   Exhibit                                       Page

 3

 4      1        INTER-OFFICE MEMORANDUM DATED        35

 5               5-18-2021

 6

 7      2        INTER-OFFICE MEMORANDUM DATED        38

 8               5-25-2021

 9

10      3        SECURITY INVESTIGATIVE REPORT DATED  43

11               5-25-2021

12

13      5        LETTER TO KEVIN CAMPBELL DATED       56

14               6-4-2021

15

16

17

18

19

20

21

22

23

24

25
```



**REMOTE STREAMING DEPOSITION OF**

**MONTY BOVELL**

**TAKEN ON**

**MONDAY, MARCH 11, 2024**

**10:11 A.M.**

1

2

3

4

5

6

7    **THE REPORTER:**  It is 10:11 a.m.  We are on

8 the record.

9    Mr. Bovell, please raise your right hand.

10    Do you affirm under penalty of perjury the

11 testimony you're about to give will be the truth,

12 the whole truth, and nothing but the truth?

13    **THE DEPONENT:**  Yes, I do.

14    **THE REPORTER:**  Thank you.

15    Will each attorney please state their name

16 and whom they represent.

17    **MS. MASSIMI:**  Jessica Massimi, for the

18 plaintiff, Kevin Campbell.

19    **MR. MCGAHA:**  Gabriel McGaha, here for the

20 defendants, FedEx and Eric Warnders.

21    **THE REPORTER:**  Thank you.  Please proceed.

22    **MS. MASSIMI:**  Federal stips, right?  Did

23 we say?

24    **MR. MCGAHA:**  Yes.

25    **MS. MASSIMI:**  Okay.  Great.



**NAEGELI** DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

1    **MONTY BOVELL,** having been first duly affirmed to

2    tell the truth, was examined, and testified as

3    follows:

4    **EXAMINATION**

5    **BY MS. MASSIMI:**

6        Q.    Good morning, Mr. Bovell.

7              Can you please pronounce your last name

8    for me.

9        A.    No.  You said it right.

10       Q.    Okay.  Great.  Bovell.

11       A.    Yeah.

12       Q.    I am actually feeling very under the

13   weather today.  Nonetheless, I -- we're going to try

14   to get through this quickly and efficiently.

15       A.    Okay.

16       Q.    So I'm just going to mention some basic

17   ground rules.

18             The court reporter is taking down

19   everything that's been said -- or everything that's

20   being said, so we have to keep our voices up.  We

21   cannot speak over one another, and we can't use

22   gestures.  You can't use gestures to answer

23   questions because the court reporter has to take

24   down everything that's being said.

25             Does that make sense?

```
 1        A.    Understood.

 2        Q.    Okay.  Have you ever been deposed before?

 3        A.    No, I haven't.

 4        Q.    Have you ever testified in court?

 5        A.    No, I haven't.

 6        Q.    If you need a break at any point, that's

 7   fine. Let me know.  You can step out.  I just ask

 8   that you answer any pending question before you step

 9   out, meaning, if I've asked a question, I ask that

10   you answer it before you step out.

11        A.    Yes.  Understood.

12        Q.    Thank you.  If you need to revisit any

13   portion of this deposition while the deposition is

14   ongoing, that is fine with me, just let me know.  We

15   can go back and revisit it.  Meaning, if you need to

16   add information or change an answer, that's fine.

17   Just let me know.

18        A.    Understood.

19        Q.    Do you have any physical or mental

20   condition that might keep you from testifying

21   truthfully, fully, and accurately here today?

22        A.    No, I do not.

23        Q.    Have you taken any medication that could

24   affect your ability to testify?

25        A.    No, I have not.
```

Monty Bovell    March 11, 2024    NDT Assgn # 72926    Page 8

```
 1        Q.    Have you consumed any alcohol or drugs in

 2   the last 24 hours?

 3        A.    No, I have not.

 4        Q.    Have you failed to take any medication

 5   that you normally take?

 6        A.    No.  I'm not on any type of medication.

 7        Q.    Okay.  Do you have any nicknames?

 8        A.    No.

 9        Q.    Where were you born?

10        A.    I was born in Guyana, South America.

11        Q.    Okay.  What is your race?

12        A.    Black.

13        Q.    Where do you currently live?

14        A.    I live at 302 Baughmans Lane, Frederick,

15   Maryland.

16        Q.    Is that the address -- well, did you ever

17   provide an address to Mr. McGaha in connection with

18   this lawsuit?

19        A.    I believe I did.

20        Q.    Do you know if that's the address that you

21   gave to him?

22        A.    I'm not sure.  It's either this address or

23   the address I just moved from shortly.

24        Q.    What was the address you just moved from?

25        A.    2505 Coachmen -- Coach House Way.
```



1    Q.   Okay.  How long do you plan to reside at

2  your current address?

3    A.   I'm not sure.  Can't answer that.

4    Q.   Do you have any plans to move from your

5  current address as of right now?

6    A.   No.

7    Q.   Are you married?

8    A.   No, I'm not.

9    Q.   Have you ever been married?

10    A.   No.  I've never been married.

11    Q.   Do you have any children?

12    A.   No children.

13    Q.   Have you ever been convicted of a felony?

14    A.   No.

15    Q.   Have you ever been convicted of a

16  misdemeanor?

17    A.   I have.

18    Q.   I'm sorry?

19    A.   Yes, I have.

20    Q.   Okay.  What -- how many times have you

21  been convicted of a misdemeanor?

22    A.   Maybe twice, I believe.

23    Q.   Okay.  When were each of those

24  convictions?

25    A.   It was years ago.  I can't even -- well,

```
 1   one of them -- I'm sorry.  One of them was, I want

 2   to say 2019.

 3        Q.   Okay.  And what -- what were the -- what

 4   were you convicted of?

 5        A.   A suspended license.

 6        Q.   Driving with a suspended license?

 7        A.   Yes.

 8        Q.   Did you --

 9        A.   On both occasions.

10        Q.   I'm sorry, sir?

11        A.   On both occasions, it was -- it was the

12   same thing.

13        Q.   Okay.  Were you working for FedEx at the

14   time?

15        A.   Yes, I was.

16        Q.   As a driver?

17        A.   No.  As a manager.

18        Q.   Did you have to report to FedEx that you

19   had a suspended license?

20        A.   Yes, I did.

21        Q.   You did report it to FedEx?

22        A.   I did.

23        Q.   Why was your license suspended?

24        A.   It was something to do with my address and

25   me not getting something that the DMV had sent to
```

1  me.  That's how it got suspended.

2      Q.  Understood.  Okay.  Is your license

3  currently suspended?

4      A.  No.

5      Q.  Do you have a driver's license?

6      A.  I do.

7      Q.  And you said the other misdemeanor was

8  also for a suspended license, correct?

9      A.  Yes.

10     Q.  Okay.  Were each of those convictions --

11 each of those misdemeanors in New York State?

12     A.  Yes.

13     Q.  Are you currently on probation or parole?

14     A.  No, I'm not.

15     Q.  Have you ever sued anyone?

16     A.  No.  I have never sued anyone.

17     Q.  Have you ever been sued before?

18     A.  No.  I have not been sued before.

19     Q.  What is your highest level of education?

20     A.  Some college.

21     Q.  How many semesters?

22     A.  Two and a half.

23     Q.  Okay.  From which institution?

24     A.  Queensborough Community College and the

25 Borough of Manhattan Community College.

1    Q.    In what area of study did you complete

2  those credits?

3    A.    Music, and if I'm not mistaken, it was --

4  I believe it was IT.

5    Q.    Okay.

6    A.    Yeah.

7    Q.    Do you have any plans to obtain further

8  college credits?

9    A.    Yes, I do.

10    Q.    Are you currently enrolled in school?

11    A.    No, I'm not.

12    Q.    Okay.  Best of luck to you with that, by

13  the way.

14    A.    Thank -- thank you.

15    Q.    Yeah.  Are you currently employed?

16    A.    I am -- I'm -- I'm currently employed.

17    Q.    Who are you currently employed by?

18    A.    I'm currently employed by Penske

19  Logistics.

20    Q.    What is Penske Logistics?

21    A.    This is a -- it's a trucking -- a trucking

22  company that delivers groceries for ALDI

23  Supermarket.

24    Q.    Okay.  Do they do anything else?

25    A.    No.

```
 1        Q.    When did you obtain that job?

 2        A.    September of 2023.

 3        Q.    Prior to working for Penske Logistics,

 4   were you employed?

 5        A.    Yes.

 6        Q.    By who?

 7        A.    UPS, and prior to UPS, a company called

 8   Gotham Greens.

 9        Q.    Prior to Gotham Greens, by whom were you?

10        A.    Oh, I'm sorry.  Before Gotham Greens,

11   there was Yellow YRC Freight.

12        Q.    Okay.  So did you work for Yellow

13   immediately after working for FedEx?

14        A.    No.

15        Q.    Who did you work for after FedEx?

16        A.    After FedEx, I had a position with a

17   company called Facility Solution in Long Island and

18   --

19        Q.    Can you repeat that?

20        A.    Facility Solution in Long Island.  And

21   then prior to that, it was a company called CNK

22   Logistics.

23        Q.    You worked for FedEx at some point,

24   correct?

25        A.    Yes.
```

1    Q.    When did you stop working for FedEx?

2    A.    In June of 2021.

3    Q.    In June of 2021, did you begin working for

4    CNPK Logistics?

5    A.    No.  In August of that year, I started

6    working with a Facility Solution.

7    Q.    How long did you work for Facility

8    Solutions?

9    A.    I want to say maybe six or seven months.

10    Q.    Did you then obtain different employment?

11    A.    Yes.

12    Q.    Where?

13    A.    That was the CNK Logistics.

14    Q.    CNK or CNPK?

15    A.    C-N-K.

16    Q.    CNK?

17    A.    Yes.

18    Q.    Okay.  Thank you.

19    A.    Sorry about that.

20    Q.    That's okay.

21    Q.    No need to apologize.  After CNK, how long

22    did you work at CNK Logistics?

23    A.    Maybe four to five months.

24    Q.    After CNK Logistics, where did you work?

25    A.    UPS.

1      Q.   How long were you at UPS?

2      A.   I was at UPS, I believe, for seven months.

3      Q.   At the end of that seven months, where did

4  you go?

5      A.   It was followed by Gotham Greens for --

6  for a time period of about three months or four

7  months.  And following that, I moved to Maryland.

8      Q.   Okay.  And then when you moved to

9  Maryland, where did you work?

10      A.   That was the YRC Yellow -- Yellow YRC

11  Freight.

12      Q.   How long did you work there?

13      A.   Five months, I believe.  And then the

14  company went bankrupt.

15      Q.   Okay.  And then at the end of that -- when

16  the company went bankrupt, did you obtain different

17  employment?

18      A.   Yes.  I went back to UPS.

19      Q.   Are you currently employed at UPS?

20      A.   No, I'm not.

21      Q.   Are you currently employed?

22      A.   Yes --

23      Q.   By whom?

24      A.   -- I am.  Penske Logistics.

25      Q.   Understood.  Okay.  Did you work for

1  anyone between UPS and Penske Logistics?

2       A.   No.

3       Q.   **How did you obtain your job at CNK?**

4       A.   I believe through -- through one of these

5  -- I believe it was Indeed.  One of those online --

6  the online apps that -- that you search -- that

7  helps you find jobs.

8       Q.   **Did CNK ask for any job references during**

9  **your application process?**

10      A.   I don't think so.  They just wanted to

11  make sure that I was a driver before.

12      Q.   **Did any of the jobs that you held**

13  **subsequent to working at FedEx ask for any job**

14  **references?**

15      A.   No.

16      Q.   **Since leaving FedEx, has any member or**

17  **employee of FedEx provided you with any job**

18  **reference or recommendation?**

19      A.   No.

20      Q.   **Why did you leave CNK?**

21      A.   For a position with UPS.

22      Q.   **Did you voluntarily leave CNK?**

23      A.   Yes.  I did.

24      Q.   **Why did you leave UPS?**

25      A.   For a -- well, UPS, the first time, it was



1    seasonal.

2        Q.    Okay.  So at the end of the seven months

3    --

4        A.    Yes.

5        Q.    When you started working at UPS, you knew

6    that your position would end seven months later?

7        A.    Yes.

8        Q.    Okay.  Why did you leave Gotham Greens?

9        A.    For a position with Yellow YRC Freight in

10   Maryland.

11       Q.    And you said you left Yellow because it

12   went bankrupt, correct?

13       A.    Yes.

14       Q.    Do you know if Yellow was bought by

15   another company --

16       A.    No.  They weren't bought out.

17       Q.    -- as part of the bankruptcy?

18       A.    No.

19       Q.    Okay.  Okay.  And I'm sorry, you said

20   after Yellow you went back to UPS, correct?

21       A.    Yes.

22       Q.    Why did you leave UPS the second time?

23       A.    It was also seasonal.

24       Q.    Did you tell all of your employers after

25   FedEx that you had previously worked for FedEx?

1      A.    Yes.

2      Q.    Did you ever disclose to your subsequent

3  employers the reason for you separating your

4  employment with FedEx?

5      A.    No.  It was never -- it was never asked.

6      Q.    When did you begin working at FedEx?

7      A.    I began working at FedEx, I want to say,

8  June of 2013.

9      Q.    When did you stop working at FedEx?

10     A.    In June of 2021.

11     Q.    Why?

12     A.    I was -- I was terminated.

13     Q.    Why were you terminated?

14     A.    Ethical reasons.  Broke a --

15     Q.    You said --

16     A.    -- code of ethic.

17     Q.    You broke a code of ethics?

18     A.    Yes.

19     Q.    What are you referring to?

20     A.    It was a -- it was a case of -- where I --

21  I recorded something in -- in doing my work that I

22  shouldn't have -- that I shouldn't have done.

23     Q.    Was it the first time you had done that?

24     A.    No.

25     Q.    How many times prior had you done that?

1      A.   A few times.  I can't -- I can't give you

2  an exact number.

3      Q.   **Are you the only person who ever did that**

4  **at FedEx?**

5      A.   I'm not sure.

6      Q.   **Okay.  Specifically, what --**

7      A.   I can't --

8      Q.   **Go ahead.**

9      A.   Go ahead.  No, no.

10     Q.   **Okay.  Specifically, what -- what did you**

11  **do? Can you provide more detail?**

12     A.   I can't provide any more detail.  All I

13  could give you is that it was a -- broke code of

14  ethics.  That's why I was terminated.

15     Q.   **What specifically did you do?**

16     A.   I feel like that's the same question you

17  just asked.  But, again, I broke a code of ethics

18  per FedEx policy, and that's why I was terminated.

19     Q.   **I'm asking specifically what you did to**

20  **break this code of ethics.**

21          **MR. MCGAHA:**  Object to form.  You can

22  answer, Mr. Bovell.

23          **THE DEPONENT:**  Oh, it was -- what is the

24  word I'm looking for?  I can't remember the exact

25  verbiage, but it - - it had to do with putting a --

1  a certain kind of scan on -- on -- on the packages

2  that weren't allowed unless it was an actual

3  holiday.  So I -- I believe it was called -- it - -

4  it some type of -- some type of fraudulent scan.

5  That's the best way I can remember it.

6  **BY MS. MASSIMI:**

7       Q.    **Why did you do that?**

8       A.    It was -- it was a means of us avoiding --

9  well, training new employees came -- came with a lot

10 of -- with a lot of -- a lot of issues, and that was

11 a means of if these guys were messing up, it was

12 kind of -- it's a -- it's a way of hiding it.

13      Q.    **How is it -- what are you hiding --**

14      A.    It was just --

15      Q.    **-- when you do that?**

16      A.    You're hiding an actual scan.  So if a

17 package is late, you're really saying that it's not

18 late.

19      Q.    **You did that to cover for someone else?**

20      A.    Yes, for -- for newer employees that

21 didn't know the job yet.

22      Q.    **So what did this newer employee do that**

23 **you had to cover --**

24      A.    No.

25      Q.    **-- for?**

1       A.    Newer.  Newer employees.  Multiple

2  employees.

3       Q.    Right.  So I -- my understanding is that

4  you did something with one scan.  Is that incorrect?

5       A.    Yes.

6       Q.    Was it multiple scans?

7       A.    No.  It -- it's one scan with multiple

8  packages.

9       Q.    Right.  So can you please explain that to

10  me how that works?

11      A.    It's -- you have a certain -- certain time

12  to deliver your packages by.  If you are going

13  beyond that time, it shows up on a report as late.

14  So what I did was use a scan not authorized to be

15  used, unless it was a holiday, to scan those

16  packages so that they won't show up late.

17      Q.    And to be clear, you did that to cover for

18  a group of newer employees?

19      A.    Newer employees, yes, because they had

20  trouble delivering.  They had -- they were -- they

21  had a lack of area knowledge.  So it took them

22  longer times to deliver these packages.

23      Q.    When did that scan happen?

24      A.    I'm not -- I don't -- I'm not -- I can't

25  remember that.

```
 1      Q.    Was it -- what month was it?  May?  June?
 2 Something else?
 3      A.    I know it -- I want to say maybe March.
 4      Q.    March?
 5      A.    March -- March, April, something like
 6 that.
 7      Q.    Of 2021?
 8      A.    Of 2021, yes.  That's when we got the
 9 newer -- there was about -- I want to say, about 30-
10 something new, brand-new employees.
11      Q.    When did you first learn that you were
12 going to be reprimanded for this or that this was an
13 issue, this specific incident that you're describing
14 to me?
15      A.    When did I -- I -- I really can't recall.
16 I just know it -- my boss called me into his office
17 and said that something was seen with my name and ID
18 number on it.  A scan was seen with my name and ID
19 on it.  It was investigated.  It was -- it was shown
20 that I've done it a couple of times prior, and for
21 that reason is why I was terminated.
22      Q.    When you say your boss called you into his
23 office, are you referring to Eric Warnders?
24      A.    Yes.
25      Q.    Do you recall approximately when Eric
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1    Warnders called you into his office to deliver that

2    information to you?

3        A.    As -- I'm not sure the time, but I'm

4    guessing as soon as he got an email from whoever let

5    him know that that was going on.

6        Q.    When you say he -- when "that that was

7    going on," is this something that you were doing on

8    a daily basis, or is this something that you did a

9    few times during the course of your employment with

10   FedEx?

11       A.    This is something I did a few times over

12   the time span I just gave you.

13       Q.    You were not the only person who -- who

14   did this --

15           MR. MCGAHA:    Object --

16   BY MS. MASSIMI:

17       Q.    -- correct, Mr. Bovell?

18           MR. MCGAHA:    Object to form.

19           THE DEPONENT:    I'm not sure about that.    I

20   can't answer that.

21   BY MS. MASSIMI:

22       Q.    Are you represented by an attorney today?

23       A.    No, I'm not.

24       Q.    You're not represented by an attorney

25   today?

1    A.    No.

2    Q.    Okay.  Have you met with an attorney in

3    connection with this deposition?

4    A.    No, I have not.

5    Q.    Have you spoken with an attorney in

6    connection with this deposition?

7    A.    No, I have not.

8    Q.    When you parted ways with FedEx, did you

9    sign anything?

10    A.    Yeah.  I remember signing that -- the

11    reason why I was being terminated.

12    Q.    Did FedEx provide you with any severance?

13    A.    No.

14    Q.    Did FedEx agree to provide you any neutral

15    reference or recommendation, positive or neutral, I

16    should say?

17    A.    No.  No.

18    Q.    Okay.  How did you know to do this scan

19    that you've described?  How did you know about that

20    to even do it?

21    A.    I learned it when I was a courier before I

22    became a manager.  And we would put those scans on

23    holidays when - - actual holidays.

24    Q.    Prior to you doing this, as you've just

25    described as a manager, did you ever -- did anyone

1    ever do that for you?

2        A.    No.

3        Q.    No one ever did that for you when you were

4    a courier or a new employee with FedEx?

5        A.    No.

6        Q.    And your testimony is that you don't know

7    whether any other FedEx employee has ever done what

8    you were terminated for?

9        A.    No.   I don't -- I wouldn't know.

10       Q.    Uh-huh.   Do you know the name of the

11    plaintiff in this case?

12       A.    Kevin Campbell.   Yes, I do.

13       Q.    How do you know Kevin?

14       A.    He was a -- he was a peer of mine, I

15    believe, and then -- as couriers, and then I became

16    his manager.   I can't -- I can't even -- I don't

17    even remember the exact time that I became his

18    manager.

19       Q.    What was your working relationship like

20    with Kevin?

21       A.    It was a great relationship.   We never had

22    any issues.   We spoke -- we spoke every morning.   If

23    he -- if he -- if he was running late, I covered his

24    position until he got there.   We said, "Hi.   Hello.

25    How you doing?" Probably talk basketball or

1  something of the sort, and then just continue

2  working.

3      Q.    Is he a hard worker?

4      A.    Yes.  Kevin was definitely a hard worker.

5      Q.    Did you find him to be -- how was his

6  disposition?  Aggressive, personable, how would you

7  describe his manner of being when he was at work?

8      A.    Personable.  He was not -- he wasn't

9  aggressive - - he wasn't an aggressive person.  Very

10 nice.  Cordial. Just a, yeah, standard nice guy.

11     Q.    Uh-huh.

12     A.    Yeah.

13     Q.    Do you know whether -- or did any other

14 employees ever complain to you about Kevin?

15     A.    No.

16     Q.    Do you know who Augusto Alzate is?

17     A.    Yes, I do.

18     Q.    Did Augusto ever complain about Kevin as

19 far as you know?

20     A.    No.  They -- he's never complained to me

21 about Kevin, no.

22     Q.    Do you know whether he's complained to

23 anyone about Kevin?

24     A.    No.  I wouldn't -- I'm not aware of that.

25     Q.    When were you Kevin's manager?

```
 1       A.   I became Kevin -- Kevin's manager, I want
 2  to say, maybe August of -- August of 2020, if I'm
 3  not mistaken.
 4       Q.   Okay.  And you and Kevin had previously
 5  worked as peers, I think you said; is that correct?
 6       A.   Yes.  If I remembered right.  Because he
 7  came from a company that FedEx bought out called
 8  TNT.  And I believe shortly -- that was shortly
 9  before I became a manager.  I could be mistaken, but
10  I do believe that we were peers together.
11       Q.   And, eventually, you were promoted to an
12  employment level above him, correct?
13       A.   Yes.
14       Q.   Did you find Kevin to be respectful of
15  your authority?
16       A.   Yeah, absolutely, yes.
17       Q.   Did you ever witness Kevin behaving
18  disrespectful to any of the supervisors or managers?
19       A.   No.  I've never witnessed that.
20       Q.   Did you ever observe any unprofessional
21  behavior from Kevin?
22       A.   No.
23       Q.   Did you ever observe any unprofessional
24  behavior from Augusto Alzate?
25       A.   No.
```

 1                 **THE REPORTER:**  I didn't hear anything --

 2                 **THE DEPONENT:**  I'm sorry.  Did you --

 3                 **THE REPORTER:**  -- for that question.  Can

 4     you --

 5                 **THE DEPONENT:**  Yeah.

 6                 **THE REPORTER:**  -- please repeat that?  We

 7     cannot hear you.

 8                 **MR. MCGAHA:**  Monty, are you speaking?

 9                 **THE DEPONENT:**  Yeah.  I'm -- I'm here.  I

10     just can't hear her.

11                 **THE REPORTER:**  Okay.

12                 **THE DEPONENT:**  I can't hear --

13                 **MR. MCGAHA:**  Yeah.

14                 **THE REPORTER:**  Let's go off the record for

15     a minute.  It is 10:40 a.m.  We are going off the

16     record.

17                 **(WHEREUPON, a recess was taken.)**

18                 **THE REPORTER:**  Okay.  It is 10:40 a.m.  We

19     are back on the record.

20                 **MS. MASSIMI:**  Okay.  I'm sorry?  What was

21     the last question?

22                 **THE REPORTER:**  The last question was

23     whether the deponent ever observed any

24     unprofessional behavior from Augusto Alzate.

25                 **MS. MASSIMI:**  Oh, okay.  So I guess --

1  well, no, then I think what I asked was -- maybe

2  this probably was not heard.

3  **BY MS. MASSIMI:**

4      **Q.    Do you know what Kevin Campbell is**

5  **alleging in this lawsuit?**

6      A.    Yes, I do.

7      **Q.    What is Kevin Campbell alleging?**

8      A.    If I'm not -- if I'm not mistaken, it's

9  termination for -- he's being discriminated against,

10  and that's why he was terminated.

11      **Q.    How do you know that?**

12      A.    I was told that.

13      **Q.    By who?**

14      A.    When I got the -- the deposition.  I had

15  to show up for a deposition.

16      **Q.    Right.  But who -- who told you that**

17  **that's what this lawsuit was about?  Was it what you**

18  **read on a subpoena -- the subpoena?  Or did someone**

19  **else tell you --**

20      A.    No.

21      **Q.    -- or something --**

22      A.    I read it on -- it was read on a subpoena

23  --

24      **Q.    Have you ever spoken --**

25      A.    -- in an email.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1    Q.    Sorry.  Right.  Has -- have you ever

2   spoken with Mr. McGaha about this lawsuit?

3        A.    I've spoken with Gabriel, yes.

4    Q.    What did -- what conversations did you

5   have with Mr. McGaha about this lawsuit?

6        A.    It was just concerning what the lawsuit

7   was about.  And he wanted to ensure that I showed up

8   for whatever -- for this deposition at whatever time

9   it was going to happen because I had a problem.  I

10  think it was supposed to be in New York, but I

11  couldn't come to New York.  So that's -- that's

12  about the extent of our conversation.

13   Q.    Okay.  I don't recall -- I don't know that

14  your deposition was ever supposed to be in New York,

15  but I suppose it's neither -- it's not an issue at

16  the moment.

17        How many times have you spoken with Mr.

18  McGaha about this case?

19       A.    Maybe three times.  But it -- it's really

20  based off the fact that whenever he calls, he never

21  got me because I work overnight.  And he would

22  contact me, like, during the day, so I wouldn't hear

23  the phone or answer.  So that's really the reason

24  why we spoke a couple of times.

25   Q.    Right.  Okay.  Do you understand that you

```
 1  are not a defendant in this lawsuit?
 2       A.   I understand that.
 3       Q.   Were you at work on May 18th, 2021?
 4       A.   Is that the day of the incident?
 5       Q.   When you say, "Is that the" -- well, do
 6  you mean -- are you asking me if that was the date
 7  of the encounter between Augusto Alzate and Kevin
 8  Campbell?  Is that what you're asking?
 9       A.   Yes.
10       Q.   Well, were you at work on that day?
11       A.   Yes, I was.
12       Q.   Do you recall whether there was a GFT
13  related to this incident?
14       A.   Yes.  There was a GFT.
15       Q.   Do you know why?
16       A.   Because Kevin filed a GFT because he
17  believed that he was wrongfully terminated.
18       Q.   Who conducted the GFT investigation?
19       A.   Nan Malebranche and her team.
20       Q.   What race is Nan Malebranche?
21       A.   She is a white female.
22       Q.   When you say "Nan Malebranche and her
23  team," what are you -- who's her team?
24       A.   I'm guessing she -- she has an assistant
25  that would gather all the information that she
```

1  needed.  So that's what I'm calling the team.

2      **Q.   Her assistant.**

3      A.   Yes.

4      **Q.   Do you know, is it a man or a woman, or do**

5  **you know this person's gender?**

6      A.   It's a -- it's a woman.

7      **Q.   Nan has -- okay.  Nan has an assistant**

8  **that you believe assisted in the GFT process?**

9      A.   Not assisted.  She just gathered

10  information from me.  Because how it works is that

11  he -- he files a GFT and I gather all my information

12  needed, be -- be statement, termination letter from

13  HR, all that stuff, and I send it to them.

14      **Q.   What information did you send to them?**

15      A.   It would be his statement, the termination

16  letter.  Whatever was involved in -- whatever

17  information was taken after the incident happened.

18      **Q.   You're referring to your interoffice**

19  **memorandum, correct?**

20      A.   Yes.

21      **Q.   You wrote two interoffice memorandums,**

22  **correct?**

23      A.   I'm not sure.

24      **Q.   Have you reviewed any documents in**

25  **preparation for today's deposition?**

 1      A.   No.  I don't have any document at my

 2  disclosure.

 3          MS. MASSIMI:  Sorry.  This is from my

 4  kid's school.  Just give me a second.

 5  BY MS. MASSIMI:

 6      Q.   You said you didn't review any documents

 7  in preparation for this deposition?

 8      A.   No.

 9      Q.   Did you provide Nan Malebranche with any

10  information other than the information contained in

11  your interoffice memorandums?

12      A.   No, I did not.  It was just that

13  information.

14      Q.   Did you ever tell Nan Malebranche that

15  Kevin Campbell incited the incident with Augusto

16  Alzate?

17      A.   No.  I never spoke to Nan about it one-on-

18  one, no.

19      Q.   Did you ever tell anyone that Kevin

20  Campbell incited the incident with Augusto Alzate?

21      A.   No.

22      Q.   Did you ever tell -- actually, did you

23  ever determine that Kevin Campbell behaved

24  aggressively related to this incident with Augusto

25  Alzate?

1          **MR. MCGAHA:**  Object to form.

2          **MS. MASSIMI:**  You can -- you can answer.

3          **THE DEPONENT:**  Oh, I'm sorry.  Repeat the

4    question again.

5    **BY MS. MASSIMI:**

6          **Q.   Well, did you ever tell anyone that Kevin**

7    **Campbell behaved aggressively towards Augusto**

8    **Alzate?**

9          A.   No.  I never told that to anyone.

10         **Q.   Do you believe that Kevin Campbell behaved**

11   **aggressively towards Augusto?**

12         **MR. MCGAHA:**  Object to form.

13         **MS. MASSIMI:**  You can answer.

14         **THE DEPONENT:**  After -- after reviewing --

15   reviewing the video with security, yes, I believe

16   that he was aggressive.

17   **BY MS. MASSIMI:**

18         **Q.   After reviewing the video with security?**

19         A.   Yes.

20         **Q.   When was that?**

21         A.   After they -- after they were suspended

22   because of the incident.  Later on that day,

23   security came, we reviewed the footage of the

24   incident as it happened, and I determined that Kevin

25   was aggressive.

1    Q.    You didn't make that determination until

2  after Kevin filed his GFT step one, correct?

3            MR. MCGAHA:  Object to form.

4            THE DEPONENT:  No.  I made that -- I made

5  that -- that observation when I reviewed the video,

6  like I just said.

7  BY MS. MASSIMI:

8    Q.    Which was when?

9    A.    That was the same day the incident

10  happened.

11    Q.    You reviewed the video the same day the

12  incident happened --

13    A.    Yes.

14    Q.    -- is that what you're saying?

15    A.    Yes.

16    Q.    And then is that when you then drafted

17  your first interoffice memorandum after reviewing

18  the video?

19    A.    Yes.

20    Q.    Did you review the video prior to

21  suspending Kevin Campbell?

22    A.    No.  When the incident happened, they were

23  -- because of the incident, they were both

24  suspended.

25            MS. MASSIMI:  Can you please show Exhibit

1    1, Ms. Zavodny?  Is that how we should do this?  You

2    -- you show the exhibit, I guess, or do you want me

3    to show it?

4              **THE REPORTER:**  You are actually able to

5    share the screen, yes.

6              **MS. MASSIMI:**  Okay.  No problem.  Let me

7    just pull this up.

8    **BY MS. MASSIMI:**

9         **Q.   Okay.  Mr. -- I'm sorry.  It's Bovell,**

10   **correct?**

11        A.   Yes.

12        **Q.   Okay.  Mr. Bovell, are you able to see the**

13   **document that I think --**

14        A.   Yes, ma'am.

15        **Q.   -- that I think I'm sharing.  It's -- has**

16   **a stamp --**

17        A.   Yes.

18        **Q.   Okay.  It has -- it's a one-page document.**

19   **It has a stamp at the bottom bearing ESI 48.  Do you**

20   **see that?**

21        A.   Yes.

22             **(WHEREUPON, Exhibit 1 was marked for**

23   **identification.)**

24   **BY MS. MASSIMI:**

25        **Q.   We're -- we're marking this document for**

1  purposes of today as Plaintiff's Exhibit 1.  Do you

2  recognize this document?

3       A.   Yes.

4       Q.   Can you please read this document to --

5  oh, what is this document?

6       A.   This is the suspension -- the suspension

7  letter.

8       Q.   So to be clear, did you write -- did you

9  draft this document prior to viewing the video?

10      A.   Yes.

11      Q.   Can you please review this document to

12  yourself? Read it to yourself silently and let me

13  know when you're done?

14      A.   Yeah.  I'm done.

15      Q.   Have you now had a chance to read the

16  entirety of the document bearing stamp ESI 48 that

17  we've marked for purposes of today's Plaintiff's

18  Exhibit 1?

19      A.   Yes.

20      Q.   Is the information contained in this

21  document accurate?

22      A.   Yes.

23      Q.   Does this document state that Kevin

24  Campbell was aggressive?

25      A.   No.  It doesn't state that.

```
 1        Q.   Okay.  I'm going to show you another

 2   document.

 3             Okay.  Mr. Bovell, I think I'm showing you

 4   another document now.  Do you see it --

 5        A.   Yeah.

 6        Q.   -- bearing stamp ESI 49?

 7             MS. MASSIMI:  We're going to mark it for

 8   purposes of today as Plaintiff's Exhibit 2.

 9             (WHEREUPON, Exhibit 2 was marked for

10   identification.)

11   BY MS. MASSIMI:

12        Q.   Do you recognize this document?

13        A.   Yes.

14        Q.   What is this document?

15        A.   That is the termination letter.

16        Q.   When you drafted this document, had you

17   reviewed the video that you're referring to?

18        A.   Yes.

19        Q.   Had Kevin Campbell filed his GFT step one

20   at this point?

21        A.   No.

22        Q.   Can you please read this document to

23   yourself and let me know when you're done?

24        A.   I'm done.

25        Q.   Mr. Bovell, have you now had -- now had an
```



1    opportunity to read the entire contents of the

2    document in front of you bearing stamp ESI 49 that

3    we've marked for purposes of today as Plaintiff's

4    Exhibit 2?

5         A.    Yes.

6         Q.    Is the information contained in this

7    document accurate?

8         A.    Yes.

9         Q.    Does this document state that Kevin

10   Campbell was aggressive?

11        A.    No.  It -- it doesn't.  It doesn't state

12   that he was aggressive.

13        Q.    That word was added later, right?

14            MR. MCGAHA:   Object to form.

15            THE DEPONENT:   Added by whom?

16   BY MS. MASSIMI:

17        Q.    Well, you tell me.  Where did that word

18   come from?

19        A.    That's just the word that I use based on

20   the -- the interaction between him and Augusto.

21        Q.    Well, it's -- it's not in this document

22   that you're looking at right now, correct?

23        A.    Right.  That -- that -- that behavior --

24   that behavior -- that's -- it's -- it's in there

25   with the disruptive behavior.

1    Q.    What do you mean it's in there with the

2    disruptive behavior?

3    A.    That's what the -- I'm using the word

4    "aggressive," but it was the disruptive behavior.

5    Q.    You did not use the word aggressive in

6    your May 25th termination memo, correct?

7    A.    No.

8    Q.    You did not choose to use that word until

9    later, correct?

10        MR. MCGAHA:    Object to form.

11        THE DEPONENT:    Later when?

12    BY MS. MASSIMI:

13    Q.    You tell me.  Did there come a point in

14    time when you chose to use that word "aggressive"?

15    A.    No.  I said to -- I'm speaking to you this

16    morning.  I said his behavior was aggressive towards

17    Augusto.  But --

18    Q.    You --

19    A.    -- in this -- in this termination letter,

20    he was terminated for disruptive behavior --

21    Q.    Why --

22    A.    -- according to FedEx policy.

23    Q.    Why are you now, three years later,

24    choosing to use the word "aggressive"?

25    A.    Again, if you want me to take the word

1  "aggressive" back, I can say "disruptive behavior."

2  It's - - I'm not saying --

3     Q.   Sir, you are free --

4     A.   I just use the word "aggressive."

5     Q.   Sir, you are free to take the word

6  aggressive back if you believe --

7     A.   Okay.

8     Q.   -- that that word should not have been

9  used. That's your choice.

10    A.   I'm looking at -- fair enough.

11    Q.   I mean, what I'm asking you is this

12 document that you're looking at, the termination

13 memo, at the time you wrote this termination

14 interoffice memorandum, Kevin Campbell had not filed

15 his GFT step one yet, correct?

16    A.   Right.

17    Q.   And you did not use the word "aggressive"

18 in this interoffice memorandum, correct?

19    A.   No.

20    Q.   Did anyone tell you to use the word

21 aggressive in this memo?

22    A.   No.  No one told me that -- to use the

23 word "aggressive."

24    Q.   Do you know whether there was a security

25 investigation conducted related to this incident?

1      A.   Yes, there was.

2      Q.   **Do you know who conducted that**

3  **investigation?**

4      A.   Yes.  FedEx Security Officer James Cahill.

5      Q.   **Do you believe that that investigation was**

6  **thorough and fair?**

7      A.   Yes, I do.

8      Q.   **Do you believe that Mr. Cahill's**

9  **conclusions were correct?**

10         **MR. MCGAHA:**  Object to form.

11         **MS. MASSIMI:**  You can answer, sir.

12         **THE DEPONENT:**  Yeah.  Mr. Cahill didn't

13  have a conclusion.  He just provided me the evidence

14  after --

15  **BY MS. MASSIMI:**

16     Q.   **He provided you -- I'm sorry.**

17     A.   Sorry.  Go ahead.

18     Q.   **No.  I'm sorry.  Go ahead.**

19     A.   Said he provided me the evidence of --

20  well, the footage of what happened.

21     Q.   **What did you do with that evidence?**

22     A.   I reviewed it and determined that Kevin

23  was -- his -- his behavior was disruptive.

24     Q.   **Did you review James Cahill's security**

25  **investigative report prior to terminating Kevin?**

1    A.    Yes.

2    Q.    Did you review the final copy of the

3  security investigative report prior to terminating

4  Kevin?

5    A.    Yes.

6          (WHEREUPON, Exhibit 3 was marked for

7  identification.)

8  BY MS. MASSIMI:

9    Q.    Okay.  I'm going to show you Exhibit 3.

10          Okay.  Again, I think I'm showing you a

11  document, but you'll let me know if it's not there.

12  I think you see it, right?

13    A.    Yeah, it's there.

14    Q.    Okay.  It's a document bearing stamps ESI

15  962 to 966 that we're marking for purposes of today

16  as Plaintiff's Exhibit 3.  Do you see this document,

17  Mr. Bovell?

18    A.    Yes, I do.

19    Q.    What is this document?

20    A.    This is security's investigative report.

21    Q.    Is this the document you reviewed prior to

22  issuing Kevin Campbell his termination letter?

23    A.    Yes.

24    Q.    Okay.  I'm just going to --

25    A.    This was -- this was along with the video

1  footage.

2      Q.   Right.  Can you just -- I'm going to

3  scroll down to the last page.  Do you see this here?

4      A.   Yes.

5      Q.   You see the last line where it says, "On

6  May 25th, 2021, both Alzate and Campbell were

7  terminated at the direction of Warnders for

8  violation" --

9      A.   Yes.

10     Q.   -- "of FedEx Express Policy 2-5"?  Do you

11  see that?

12     A.   Yes.

13     Q.   Is this accurate?

14         MR. MCGAHA:   Object to form.

15         THE DEPONENT:   I'm sorry.  Say that again.

16  BY MS. MASSIMI:

17     Q.   Is that portion of Mr. Cahill's security

18  investigative report accurate?

19     A.   Yes.  It's accurate.  But this

20  determination was made from -- by me, and I believe

21  whoever was Augusto's -- Augusto's manager at -- at

22  the time.

23     Q.   Where does it say that in this report?

24     A.   It doesn't say that in this report.  I

25  don't know why, but that's what -- that's how it

 1  works.

 2       Q.    That's how what works?

 3       A.    That's -- that's how FedEx policy works.

 4  The manager reviews whatever it is that happened

 5  based on security's -- security's investigative

 6  report.  And then we go over policy.  If it

 7  determines that the employee has violated FedEx

 8  policy, then we -- we deal -- we deal out the

 9  termination, and we send it to our boss who is Eric

10  Warnders.

11       Q.    Sorry.  I'm not understanding the

12  timeline.  I thought you said that you had not made

13  the decision to terminate Kevin Campbell until after

14  you reviewed the security investigative report.

15       A.    That's -- that's exactly what I said.

16       Q.    Okay.

17       A.    I -- we'd review -- we'd review.  Upon

18  completion of reviewing that report from security,

19  we went over policy.  And if it's determined that an

20  employee violated FedEx policy that is up to our

21  equal in termination, then that's a step that we

22  took.

23            After we did the termination letter.  Then

24  we would send it to our boss, who was Eric, and the

25  HR department.

1    Q.    But you didn't draft the termination

2    letter until you read this security investigative

3    report, correct?

4        A.    Right.

5        Q.    And you read the security investigative

6    report, and it said that Campbell was terminated at

7    the direction of Eric Warnders, correct?

8        A.    That -- that's what they said, but that

9    wasn't the case.

10       Q.    Oh, okay.  So the security investigative

11   report is not accurate?

12       A.    I can't say that that part of it is.

13       Q.    And you're saying it's not accurate

14   because Warnders, according to you, had in fact not

15   directed the termination?

16       A.    No.  He did not direct the termination.

17   What he does is -- if -- if it's -- if he -- we --

18   we justify the termination, then we send it up to

19   himself and HR, and if they determine that it's --

20   it's -- it's warranted, then they -- it -- it moves

21   forward.

22           If not, then they send it back to me.  And

23   if it's determined, oh, it's just a warning letter

24   instead of termination, something to that effect,

25   then that's the step that we take.

1    Q.   So Eric Warnders, to your knowledge,

2    determined that Kevin Campbell's termination was

3    warranted, correct?

4    A.   Yeah.  Along with HR, yes.

5    Q.   When -- did he make that determination

6    prior to this security investigative report being

7    written?

8    A.   No.

9    Q.   Then why does the security investigative

10   report state that Campbell was terminated at the

11   direction of Eric Warnders?  I'm not --

12   A.   I don't know.

13   Q.   -- understanding that.

14   A.   Maybe that's just a summary.  I'm not --

15   I'm not sure.

16   Q.   Is it a summary of something that didn't

17   happen?

18        MR. MCGAHA:  Object to form.

19        THE DEPONENT:  I can't say.  What I'm

20   saying, it's a summary based on after determination.

21   Maybe security just put that in his report.

22   BY MS. MASSIMI:

23   Q.   Why would security put that in his report

24   if it hadn't happened?

25   A.   I don't know.  My name should be on there

```
 1  along with Erics' and --

 2       Q.    Why --

 3       A.    -- and the HR department.

 4       Q.    Why isn't it on there?

 5            MR. MCGAHA:  Object to form.

 6            THE DEPONENT:  Again, I'm not sure.

 7  That's -- you'd have to take that up with security.

 8  BY MS. MASSIMI:

 9       Q.    Well, I'm asking you if you ever took it

10  up with security?

11       A.    No.

12       Q.    Did you ever tell security, "Hey, this

13  report is wrong"?

14       A.    No.  I didn't --

15            MR. MCGAHA:  Object to form.

16            THE DEPONENT:  I did not review this part

17  of the security report.  I wasn't even attentive to

18  that part.

19  BY MS. MASSIMI:

20       Q.    Sir, I believe I asked you before if you

21  reviewed this security report prior to issuing the

22  termination letter.  Do you recall me asking you

23  that?

24       A.    Yeah.  Yes, I do.

25       Q.    I believe you said that you reviewed this
```



```
 1   security investigative report prior to issuing your

 2   termination letter.  Do you recall --

 3       A.   Yes.

 4       Q.   Okay.  Did you mean that you reviewed only

 5   part of this document?

 6       A.   I reviewed the -- the part of the document

 7   that - - that was needed for the -- the actual

 8   incident that happened.

 9       Q.   So what part of the document did you

10   review?

11       A.   Which was getting the footage and whatever

12   -- whatever that was -- whatever is in there that

13   actually happened.  When it came to the -- the part

14   that you're addressing, I don't know.  I just -- I

15   probably just read past that.  But I'm giving you

16   how the system at FedEx works when it comes to

17   termination.

18       Q.   I'm not asking you how the system at FedEx

19   works. I do appreciate what you're saying.  I

20   understand what you're saying, which is that,

21   essentially, you had to run it by Eric Warnders for

22   approval, correct?

23           MR. MCGAHA:  Object to form.

24           THE DEPONENT:  Correct.

25           MR. MCGAHA:  Object to form.
```

1          **MS. MASSIMI:**  I'm sorry, sir?

2          **MR. MCGAHA:**  Object to form.

3          **THE DEPONENT:**  Correct.

4          **MS. MASSIMI:**  I'm sorry, sir?  Correct?

5          **MR. MCGAHA:**  Object to form.

6          **THE DEPONENT:**  Yes.

7          **MS. MASSIMI:**  Mr. McGaha, I can't hear the

8  witness.

9  **BY MS. MASSIMI:**

10     **Q.    Is that correct, sir?**

11          **MR. MCGAHA:**  I'm objecting to form.

12          **MS. MASSIMI:**  We -- we -- we got the

13  objection, Mr. McGaha.  I can't hear the --

14          **MR. MCGAHA:**  I understand that, but --

15  slow down. You're asking the questions.  I get --

16          **MS. MASSIMI:**  Mr. McGaha, that's -- Mr.

17  McGaha, I'm not going too fast.  I can't hear what

18  the witness is saying because you're repeatedly

19  saying "objection."  You just need to say

20  "objection" once.

21          **MR. MCGAHA:**  No, I don't.  I'm going to

22  object --

23          **MS. MASSIMI:**  Mr. McGaha --

24          **MR. MCGAHA:**  -- every time that the

25  question is asked.

```
 1              MS. MASSIMI:  I -- I didn't re-ask it.  I
 2    said I couldn't hear him.
 3              MR. MCGAHA:  All right.  Well --
 4              MS. MASSIMI:  So did you get the witness's
 5    response, ma'am?
 6              THE REPORTER:  I have the witness's
 7    response as, "Correct."
 8              MS. MASSIMI:  Great.  Thank you.
 9              MR. MCGAHA:  And I haven't -- do you have
10    my objection in there, ma'am?
11              THE REPORTER:  Yes, sir, I have your
12    objection.
13              MR. MCGAHA:  Thank you.
14    BY MS. MASSIMI:
15        Q.   I'm going to go through this document
16    piece by piece still.  You can still -- you can see
17    this document, correct, Mr. Bovell?
18        A.   Yes, I can.
19        Q.   Okay.  So you -- did you review the
20    investigative summary portion of this document prior
21    to issuing the termination letter?
22        A.   Yes, I did.
23        Q.   Did you review the entirety of the portion
24    of the document under this heading prior to issuing
25    your termination letter?
```

1      A.    Yes, I did.

2      **Q.    The part where it says investigative**

3   **details and factual findings.  Did you review the --**

4   **the entire portion of this document prior to issuing**

5   **your termination letter?**

6      A.    Yes, that's correct.

7      **Q.    I guess what I'm not understanding is the**

8   **-- the rest of this document is contained under that**

9   **heading.  So where are you claiming that you**

10  **possibly stopped reading prior to issuing your**

11  **termination letter?**

12          **MR. MCGAHA:**  Object to form.

13          **THE DEPONENT:**  I never -- I never claimed

14  to stop reading.  I said I wasn't attentive towards

15  the -- the bottom, the end of the statement that

16  starts with, "On May 25th 2021."

17  **BY MS. MASSIMI:**

18     **Q.    When you say you were not attentive to**

19  **that sentence, what do you mean by that?**

20     A.    Like I said, if -- if -- if James Cahill

21  wrote this statement correctly, then it should've

22  been my name along with Eric's name and HR that

23  determined that the employee's going to be

24  terminated.

25     **Q.    Well, this doesn't say that there was a --**

1    **this says that Campbell was terminated at the**

2    **direction of Warnders, correct?**

3        A.    Right.  Yes, that's what it said.

4        **Q.    Do you believe that this statement is**

5    **incorrect or incomplete?**

6        A.    I believe --

7            **MR. MCGAHA:**  Object to form.

8            **THE DEPONENT:**  I believe the statement is

9    -- it is not incomplete.  See, once again, I don't -

10    - I'm thinking that that last sentence has to do

11    with a summary of everything that happened.  It's

12    just under Eric's name.

13    **BY MS. MASSIMI:**

14        **Q.    So this sentence is correct?**

15            **MR. MCGAHA:**  Object to form.

16            **THE DEPONENT:**  Yeah.  Once, again, I would

17    say it's correct if you're summarizing everything

18    that happened.

19    **BY MS. MASSIMI:**

20        **Q.    Why would one need to summarize this**

21    **simply to omit your name?**

22            **MR. MCGAHA:**  Object to form.

23            **THE DEPONENT:**  I'm not sure what -- all

24    I'm saying to you is I gave you the steps in which

25    FedEx -- which we're -- we're trained to -- on how

1  the policy behind terminating an employee, right,

2  which is through me, the manager.  After the

3  termination is completed, I send it up to HR and

4  Eric, my boss at the time, and they determine the

5  direction it goes from there.

6  BY MS. MASSIMI:

7      Q.    This statement that begins May 25th, 2021,

8  that doesn't reflect those steps that you just

9  described, correct?

10     A.    Right.

11         MR. MCGAHA:  Object to form.

12         THE DEPONENT:  Right.  And I'm not sure

13  that that's supposed to be in Cahill's report, but

14  I'm telling you what FedEx policy is.

15  BY MS. MASSIMI:

16     Q.    Okay.  But this is not necessarily

17  reflective of FedEx policy, correct?

18         MR. MCGAHA:  Object to form.

19         THE DEPONENT:  No.

20         MS. MASSIMI:  Right.

21         THE DEPONENT:  Not in detail it's not.

22  BY MS. MASSIMI:

23     Q.    Did you ever tell anyone that there were

24  any issues with this report?

25     A.    No.

1    Q.   Did you ever tell anyone, "Hey, this

2  report is missing information"?

3          MR. MCGAHA:  Object to form.

4          THE DEPONENT:  No.

5  BY MS. MASSIMI:

6    Q.   Did you ever tell anyone, "Hey, you need

7  to fix something that's in this report; it's

8  incorrect"?

9          MR. MCGAHA:  Object to form.

10          THE DEPONENT:  No.

11  BY MS. MASSIMI:

12    Q.   Did you ever write that down to anyone?

13  Did you ever send anyone an email saying this report

14  is missing information?  You have to put something

15  else in there?

16          MR. MCGAHA:  Object to form.

17          THE DEPONENT:  No.  I've -- I've never

18  said that to anyone in any -- by any means.

19  BY MS. MASSIMI:

20    Q.   If you had believed that there was

21  something incorrect with this report, would you have

22  told someone?

23    A.   I would have.

24    Q.   Did you speak to Augusto Alzate about this

25  incident?

```
 1        A.    No.  No, I don't -- I don't recall
 2   speaking to Augusto about the incident.
 3        Q.    Did you listen to Augusto's -- any
 4   interviews from Augusto about this incident?
 5        A.    No.
 6        Q.    Did you read any written statements from
 7   Augusto about this incident?
 8        A.    No.
 9        Q.    Did you ever determine that Kevin's
10   actions placed Augusto in imminent fear for his
11   personal safety?
12        A.    No.
13        Q.    Did you ever write that in any of your
14   memos related to this incident?
15        A.    No.
16        Q.    Did you ever determine that Kevin's
17   actions placed any employee in imminent fear for
18   their personal safety?
19        A.    No.  I've never written that.
20        Q.    Okay.  Okay.  I'm showing you a document.
21        MS. MASSIMI:  I'm sorry, ma'am.  It looks
22   like I've skipped an exhibit, but I'm showing him
23   Exhibit 5. I'm showing him a document that I emailed
24   to you as Exhibit 5.  You can mark it as Exhibit 4
25   when you're doing this, if you want, but it's
```

```
 1  bearing stamp ESI 46.
 2           (WHEREUPON, Exhibit 5 was marked for
 3  identification.)
 4  BY MS. MASSIMI:
 5      Q.   Do you see this document in front of you,
 6  Mr. Bovell?
 7      A.   I do.
 8      Q.   I'm sorry?
 9           MR. MCGAHA:  Can -- can you --
10           THE DEPONENT:  Yes, I do.
11           MR. MCGAHA:  Can you email me a copy of
12  all of these exhibits, please?
13           MS. MASSIMI:  Right now?
14           MR. MCGAHA:  When you finish your
15  questioning, yes.  You can do it on a break, at the
16  next break.
17           MS. MASSIMI:  Yeah.  That's fine.
18           MR. MCGAHA:  All right.
19           MS. MASSIMI:  I mean, can you -- you can
20  also see the document, though, right, Mr. McGaha?
21           MR. MCGAHA:  I see it.
22           MS. MASSIMI:  Okay.
23  BY MS. MASSIMI:
24      Q.   Do you recognize this document, Mr.
25  Bovell?
```

1      A.    Yes.

2      Q.    **What is this document?**

3      A.    This was a decision we made to -- to

4  terminate -- to terminate Kevin, if I'm not

5  mistaken.

6      Q.    **This was the decision -- well, this**

7  **document -- what's the date on this document?**

8      A.    It shows June 4th, 2021.

9      Q.    **Kevin had already been terminated at this**

10 **point, had he not?**

11     A.    Yeah.  I believe so, yes.

12     Q.    **So -- so what was the purpose of this**

13 **document?**

14     A.    I don't fully recall it.

15     Q.    **Did you draft this document?**

16     A.    Yeah, I believe so.

17     Q.    **Did you speak to anyone about the contents**

18 **of this document as you were putting it together?**

19     A.    No.  I don't think so.

20     Q.    **Can you please read this document silently**

21 **to yourself and let me know when you're done?**

22     A.    Yeah, no problem.

23           Yeah, I'm done.

24     Q.    **Have you now had an opportunity to review**

25 **the entire contents of the document bearing stamp**

1  **ESI 46?**

2      A.   Yes.

3      **Q.   Why does this document state -- well, is**

4  **the information contained in this document accurate?**

5      A.   Yeah.  Yes, it is.

6      **Q.   Did you previously testify a few moments**

7  **ago that you did not determine that Kevin's actions**

8  **placed another employee in imminent fear for his**

9  **personal safety?**

10     A.   Yes, I did.  But this is all stuff that's

11 coming back to me.  Like, as I'm reading it, I'm

12 like, "Okay. Yeah, I remember that," that we did

13 review -- we did review it with security, me and the

14 other manager.  I believe it was, if I'm not

15 mistaken, it's either Mike or Steve, one of them.

16 We reviewed it, and that's when we determined what

17 the document says.

18     **Q.   When you reviewed what?**

19     A.   The security -- security investigation.

20     **Q.   Did you ever speak to Augusto?**

21     A.   No.  I never spoke to Augusto one-on-one -

22 -

23     **Q.   Did anyone ever tell --**

24     A.   That was security, though.

25     **Q.   Did anyone ever tell you that Augusto was**

1    placed in imminent fear for his personal safety?

2        A.    His manager, possibly.  That's why --

3        Q.    What --

4        A.    -- we reviewed it.

5        Q.    What was his manager's name?

6        A.    I'm not sure who was his manager.  It's

7    either Mike, I don't remember his last name, or

8    Steven Pasqualicchio.  One of them.

9        Q.    What is Michael Bradley's -- are you

10    referring to Michael --

11        A.    Bradley.

12        Q.    -- Bradley?

13        A.    Yes, yes.  Mike Bradley.  Yes.

14        Q.    What is his race?

15        A.    He is a white male.

16        Q.    What is James Cahill's race?

17        A.    White male.

18        Q.    What is Steve Pasqualicchio's race?

19        A.    White male.

20        Q.    And one of them told you that Augusto was

21    in fear for his personal safety?

22            MR. MCGAHA:  Object to form.

23            THE DEPONENT:  Yes, I believe so.  Yes.

24    BY MS. MASSIMI:

25        Q.    Is that where you got that?

1          MR. MCGAHA:  Object to form.

2          THE DEPONENT:  Yeah.  Yes.  That all came

3    from security's investigation.

4    BY MS. MASSIMI:

5      Q.   Well, security's investigation also said -

6    - didn't security's investigation also say that

7    Augusto was seen pushing a box towards Kevin?

8      A.   I don't recall that.  What --

9      Q.   You don't know anything about that?

10     A.   No.  I -- I'm pretty sure -- I don't

11   recall it.

12     Q.   This letter that you're looking at does

13   not include all of the pertinent information that

14   was included in the --

15     A.   Exactly.

16     Q.   -- security -- let me finish the question,

17   sir, just so the court reporter can get it down.

18          This letter that you drafted, dated June

19   4th, 2021, does not include all of the information

20   that's contained in the security investigative

21   report, correct?

22     A.   Correct.

23     Q.   Why not?

24     A.   I -- I -- I'm not sure why that is.

25     Q.   Well, you drafted it --

```
 1        A.    This is just -- yeah.  This is just a
 2   letter we draft to send -- to send to Kevin --
 3        Q.    Who drafted this --
 4        A.    -- based on the --
 5        Q.    -- letter?
 6        A.    I did.  Based on if he's taking the next
 7   step to GFT determination.
 8        Q.    Okay.  So you draft this letter based on
 9   whether he's taking the next step to the GFT
10   process?
11        A.    Yes.
12        Q.    Do you have plans to reapply for
13   employment at FedEx?
14        A.    No.  I don't have plans to.
15        Q.    I'm sorry.  I think I asked you this.  I
16   can't recall the answer.  Did FedEx provide you with
17   any severance following your termination?
18        A.    No.
19        Q.    Did they provide you with health insurance
20   for any period of time following your termination?
21        A.    No.
22        Q.    Did you sign any nondisclosure or
23   confidentiality agreement with FedEx related to your
24   termination?
25        A.    No.
```

1     Q.   What is your current address again?  I'm

2  sorry. Can you please tell me?

3     A.   It's 302 Bowman's Lane, Frederick,

4  Maryland.  ZIP code 21702.

5     Q.   I believe that I was provided with a 305

6  address for you.

7     A.   Yeah.  That -- yeah.  I'm sorry.  That was

8  my mistake.  I had the address incorrect.  Yeah.

9  Sorry about that.

10     Q.   Okay.  Okay.  No problem.  Do you -- do

11  you own your home?

12     A.   No.  It's a -- rent an apartment.

13     Q.   Have you ever -- have you ever owned a

14  home before?

15     A.   No.

16     Q.   Did you have any mortgage applications

17  pending during 2021?

18     A.   No.

19     Q.   You said that sometime in, I believe,

20  June, Eric Warnders asked you into his office and --

21  and terminated you; is that accurate?

22     A.   Yes.

23     Q.   Can you please describe for me how that

24  happened? Did he approach you at work on the floor?

25  Did he --

```
 1        A.    He --
 2        Q.    -- call you in from home or something
 3   else?
 4        A.    In the -- the termination of -- of itself?
 5        Q.    Yeah.
 6        A.    In the termination of itself, I was
 7   suspended. Same -- same system as Kevin.  And then I
 8   was called in from -- at home to come in.  And
 9   that's when I --
10        Q.    When --
11        A.    -- I was terminated.
12        Q.    When were you suspended?
13        A.    I was suspended -- I'm not sure. I want to
14   say whatever that week was, the Monday of that week,
15   or the Tuesday of that week.
16        Q.    In June?
17        A.    In June, yes.
18        Q.    How were you suspended, or how did you
19   receive that news?
20        A.    I was made aware of that.  They had
21   evidence of what I did with what I explained
22   earlier, and ultimately, I was put under suspension
23   --
24        Q.    What I'm --
25        A.    -- pending investigation.
```



Monty Bovell    March 11, 2024    NDT Assgn # 72926    Page 65

```
 1        Q.   What I'm saying is, who explained that to
 2   you and how did they explain it to you?  Was it in
 3   writing?  Was it verbally, over the phone, in
 4   person, something else?
 5        A.   It was in -- verbally and in writing.
 6        Q.   Who --
 7        A.   And just like the suspension that Eric
 8   Warners issued at.
 9        Q.   Right.  So how did that happen initially?
10   Did he come up to you at work and say you're
11   suspended and hand you a document?  Did he call you
12   on the phone and mail you a document?  How did that
13   happen?
14        A.   No.  He called me while I was in my
15   office.  He explained what's happening, and he
16   showed me evidence of it, and he told me that I'm
17   going to be paid -- placed on a suspension pending
18   an investigation.
19        Q.   Did you respond to that?
20        A.   What do you mean "respond" to it?  Respond
21   how? Like --
22        Q.   Eric Warnders called you on the phone and
23   said that he had evidence of you doing something
24   wrong, correct?
25        A.   Right.
```

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

```
 1        Q.    And that you were being suspended,
 2   correct?
 3        A.    Yes.
 4        Q.    Did you say anything to Eric Warnders in
 5   response to that news?
 6        A.    Yes.  I said, "Yeah, you're right.  I did
 7   do what I was being accused of."
 8        Q.    Okay.
 9        A.    All right.
10        Q.    Did you say anything else to him?
11        A.    No.  The evidence was there, so all I did
12   was sign my -- my suspension paper.
13        Q.    Did you expect at that point that you were
14   going to be terminated?
15        A.    It was -- I knew it was -- there's a
16   possibility.
17        Q.    Did you GFT your termination?
18        A.    I did.
19        Q.    Do you believe your termination was
20   proper?
21        A.    Yes, I do.
22        Q.    Then why did you GFT it?
23        A.    Because, you know, it's a job that I gave
24   eight years of my life to.  And, ultimately, I
25   wanted to see if someone was -- like Nan, was going
```

```
 1  to have some type of different outcome, so --
 2      Q.   Well --
 3      A.   -- that was the reason.
 4      Q.   But you -- you believe you should have
 5  been terminated, correct?
 6      A.   Yeah.  Yeah.
 7      Q.   Okay.  But you still GFT-ed it?
 8      A.   Yes, I did.
 9      Q.   What is -- what is the purpose of a GFT?
10      A.   The purpose of the GFT is to hopefully
11  turn over a -- a termination or whatever
12  disciplinary actions being issued.
13      Q.   On what grounds do you believe that they
14  could have overturned your termination if what you
15  had done, in fact, was wrong?
16      A.   Oh, I was going off the grounds of, you
17  know, everything that I've given to the company, my
18  time.  You know, a big part of it in my GFT was just
19  talking about, you know, my -- my time during COVID
20  that I was the only manager at the station, so --
21  you know, in hopes that, you know, someone have a
22  change of heart.  But, you know, in the back of my
23  mind, I knew better.
24      Q.   I mean, it -- it does seem unfair what
25  happened to you because it does seem like you're
```

1  also indicating -- you had indicated earlier that

2  you were perhaps not the only person to have done

3  that; is that correct?

4            MR. MCGAHA:  Object to form.

5            THE DEPONENT:  I never --

6            MR. MCGAHA:  Object to form.

7            THE DEPONENT:  I never indicated that.  I

8  never indicated that.

9  BY MS. MASSIMI:

10      Q.   Okay.  But this is just something that you

11  knew about --

12      A.   This is something that I knew about.

13      Q.   -- as a way to -- as a way to cover for

14  new employees?

15      A.   Right.

16      Q.   But you never heard about this happening?

17      A.   No.  I'm telling you --

18      Q.   Okay.

19      A.   And I -- I stated to you earlier that I

20  learned it when I was a driver on holidays.  We

21  would put a certain type of scan on the packages

22  because it was a holiday.

23      Q.   I guess what I'm not understanding is

24  you're saying you learned this when you were a

25  driver.

```
 1        A.   Yes.  I was -- this is what they do on
 2   holidays as a driver.  If it's Christmas and we are
 3   not able to deliver the packages because of the
 4   holiday, we put a holiday scan on the packages.
 5        Q.   In that context, you're saying it's
 6   permissible?
 7        A.   In that context, it's permissible, yes.
 8        Q.   Okay.  But prior to you doing it, you had
 9   never heard about anyone else ever doing this?
10        A.   No.
11             MR. MCGAHA:  Object to form.
12   BY MS. MASSIMI:
13        Q.   Okay.  And based on that, you believed
14   that your termination was completely proper?
15        A.   Yes.
16        Q.   But you GFT-ed it?
17        A.   Yes.
18        Q.   And did Nan Malebranche give you a fair
19   GFT?
20        A.   Yeah, she did.
21        Q.   Okay.  Explain to me how that GFT went.
22        A.   It was -- it was a -- it was, basically,
23   they run down exactly the reason why you're being
24   terminated.  Why do you feel -- then she asked -- I
25   believe she asked, "Why do you feel you shouldn't be
```

1    terminated?"  And my response wasn't in regards to

2    why I was terminated.  My response was more so in

3    regards to everything that I've done for FedEx in my

4    time there.

5            And, yeah, that was -- that was pretty

6    much it. But she was very adamant about only talking

7    about the reason why I was terminated.

8        Q.    Right.  She didn't want to hear about what

9    you wanted to explain in terms of your past

10   dedication to the company, correct?

11           MR. MCGAHA:  Object to form.

12           THE DEPONENT:  No.  No.  I wouldn't say --

13   I wouldn't say in that -- because she listened to

14   me.  But, ultimately, you know, I understood that

15   based -- she had to -- she was operating based on

16   policy, and I violated a policy ultimately

17   warranting a termination.

18   BY MS. MASSIMI:

19       Q.    Did you ever ask them why it took them so

20   long to bring this to your attention?

21       A.    What -- what do you mean?  Took so long to

22   bring what to my attention?

23       Q.    In other words, you're talking about an

24   issue with scans that happened in March of 2021,

25   correct?

```
 1        A.    Yes.

 2        Q.    They didn't bring it to your attention

 3   until May of 2021 -- or until June of 2021, correct?

 4        A.    Yes.   That's because someone in Memphis, I

 5   believe it was, observed the scan being placed

 6   wrongfully that time in June.

 7        Q.    When you say someone -- when you -- when

 8   you say someone in Memphis observed the scan being

 9   placed improperly, who are -- what are you referring

10   to?

11        A.    It's -- it's a team that ultimately

12   investigates all scans coming from a terminal.   So

13   I'm guessing someone saw my scan, the scan there

14   with my name and ID number on it, and determined

15   that these scans were placed falsely.

16             That's what -- that's -- that's what it

17   was, it's falsification.   And through that, they

18   sent -- I'm guessing they sent Eric an email with --

19   with the -- with the information that they found.

20   And I guess they did some other digging that showed

21   that I did this scan a few times between then and

22   March, and that's what ultimately warranted the

23   termination.

24        Q.    Each time that you did this, was this to

25   cover for other employees?
```



1          A.    Yes.

2          Q.    **Do you know whether those other employees**

3    **were terminated?**

4          A.    No.   Those -- the employees weren't

5    terminated.

6          Q.    **Okay.  So I'm sorry.  I still don't feel**

7    **as though I've gotten an answer to my question, and**

8    **perhaps you don't know the reason, and that's fine,**

9    **but did anyone ever explain to you why, or did you**

10   **ever question why it took them that length of time**

11   **to approach you in June of 2021 about something that**

12   **had happened in March of 2021?**

13         A.    No.   It's -- once again, it's -- I had a -

14   - between the time period of March to June, that's

15   the time that you can see -- if you go back and do

16   an investigation, you will see that I was putting

17   these scans, particularly on Saturdays, or -- yeah,

18   I believe it was Saturday, on these packages with

19   these newer employees.

20              And like I said, ultimately, I don't know

21   the reasoning.  Someone from the head office in

22   Memphis noticed it and addressed it with Eric.

23         Q.    **When you say someone from the head office**

24   **in Memphis, who are you referring to?**

25         A.    I'm -- I'm not sure who that is, but I do

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1  know that Memphis is where they -- everything goes

2  through Memphis.  That's where the -- the

3  headquarters are.

4      Q.    Well, I guess, you know, I -- I did not

5  come up -- you're saying someone from the head

6  office in Memphis.

7      A.    Uh-huh.

8      Q.    I have no understanding of what you're --

9  what you're referring to, so I'm asking you to

10 explain that. What you mean when you say someone

11 from the head office in Memphis noticed this?

12     A.    Okay.

13     Q.    Are you -- what are you talking about?  If

14 you even are aware of what this process is or if

15 someone told you?

16     A.    Okay.

17     Q.    I mean, I just am not even clear on what

18 you're explaining right now, truthfully.

19     A.    Okay.  This is exactly how it works.

20 Saturdays, you have a very strict window to get

21 packages delivered by 12:00.  If, ultimately, prior

22 to 12:00 you have a report you send to the head

23 office in Memphis stating, "Hey, I might have 10

24 lates, or I might have no lates," my --

25     Q.    So -- I'm so sorry.  I'm so sorry, sir.

Monty Bovell    March 11, 2024    NDT Assgn # 72926    Page 74

```
 1   And I'm not trying to interrupt you.  I'm just --
 2   I'm just trying to understand this as you go step by
 3   step because it's just not within my knowledge.  So
 4   you're saying that if you are a manager working at
 5   the LGAA station --
 6        A.    Yes.
 7        Q.    -- and you're going to have late --
 8        A.    Lates.
 9        Q.    -- packages, you have to tell --
10        A.    Yes.  Packages delivered past --
11        Q.    -- you have to --
12        A.    Right.  You have to report that.
13        Q.    -- somehow notify --
14            THE REPORTER:  One person at a time,
15   please.
16            MS. MASSIMI:  Yeah, sorry.
17            THE DEPONENT:  I'm sorry.
18            MS. MASSIMI:  Just give me a second, sir.
19   BY MS. MASSIMI:
20        Q.    So that you have to notify Memphis in
21   advance. Is that -- am I correct about that?
22        A.    I'm not sure if it's Memphis.  I don't
23   recall exactly who it was.  But you have to send a
24   report in an email chain that you can -- you,
25   perhaps, have lates or no lates.
```

1      Q.    And when do you send that report?  Is it

2  when you first believe you're going to have lates,

3  or is it within a certain time period after you do

4  have lates or something else?

5      A.    It's before you -- the -- the report --

6  that report you send before the timeline of the

7  actual cut-off point.

8      Q.    So you, as a manager, if you were working

9  at the LGA station in March of 2021 on a Saturday,

10 and you were going to have lates --

11     A.    Yeah.

12     Q.    -- you would have to send in a report in

13 an email to someone in Memphis?

14     A.    Yeah, something like that.  That's how it

15 works. Again, I don't --

16     Q.    Have you ever --

17     A.    Go ahead.  I'm sorry.

18     Q.    No.  Have you ever followed that

19 procedure?

20     A.    Yes.  I followed the procedure before.

21     Q.    Did you follow that procedure related to

22 the March scans that they were complaining about to

23 you?

24     A.    Yes.

25     Q.    You did?

1    A.   Yes.

2    **Q.   So then I'm not understanding how -- why**

3    **did you get in trouble for that, then?  This is a**

4    **purely -- this is not a -- I'm not trying to be**

5    **annoying with this.  I'm trying to understand.**

6    A.   I understand.  And it's -- it -- the

7    breakdown of it -- the gist of it is that someone --

8    basically, on the particular Saturday that they did

9    -- that they did catch it, I sent a report saying

10   that I might have about 10 lates, and then it turns

11   out that I had no lates.  So that raised a red flag

12   with someone there, and they were like, "Why did he

13   report 10 possible lates and then had no lates?"

14        So they went -- whoever it is in Memphis

15   that is responsible for service, went and do their

16   due diligence and found that I had placed a scan ---

17   an improper scan on these packages.  And then they

18   did a thorough investigation going back up to March

19   that I've done this a few times.

20   **Q.   Wait, but I'm asking about March.**

21        **MS. MASSIMI:**  I'm sorry, Mr. McGaha, do

22   you mind not nodding and shaking your head while the

23   witness is testifying?  Do you mind terribly?

24        **MR. MCGAHA:**  What?  I can shake --

25        **MS. MASSIMI:**  I'm just --

1          **MR. MCGAHA:**  -- my head if I want to.

2     He's not my client.

3          **MS. MASSIMI:**  Okay.  I'm just asking to

4     just avoid any --

5          **MR. MCGAHA:**  Okay.

6          **MS. MASSIMI:**  If you could, please.

7          **MR. MCGAHA:**  All right.

8          **MS. MASSIMI:**  This has been a point of

9     contention throughout these depositions.

10          **MR. MCGAHA:**  Yes, it has.

11          **MS. MASSIMI:**  Okay.  We don't need to

12    rehash any of this, though.

13    **BY MS. MASSIMI:**

14        **Q.   Mr. Bovell, what I was asking about,**

15    **actually, was the March scans.  So did you -- the**

16    **March -- the March scan -- that -- well, was there**

17    **one March scan that they were complaining about, one**

18    **set of scans, or were there -- was this --**

19        A.   No.  There --

20        **Q.   -- multiple occasions in March that they**

21    **were -- you just have to let me finish my question.**

22        A.   There weren't -- oh, I'm sorry.

23        **Q.   You have to let me finish --**

24        A.   I'm sorry.

25        **Q.   It's okay.  It's only because the court**

1  reporter can't take down two people speaking at

2  once.

3       A.   Yeah.  I got you.

4       Q.   So were they complaining about one

5  instance of scans in March, or was it multiple

6  instances in March of 2021?

7       A.   It was -- they may -- there were multiple

8  in March.  There were some in May, April, and -- and

9  June. What I'm trying to explain to you is that they

10  caught it in June and did an investigation that

11  showed I did it all the way back up to March.

12       Q.   What I'm asking you, though, was about the

13  March scans.

14       A.   I don't --

15       Q.   My question was -- my question was the

16  March scans, did you send emails, the emails that

17  you described --

18       A.   Oh, yes.  Yes.

19       Q.   -- to Memphis?  You have to wait -- I'm

20  sorry, sir.  We're wrapping up.  You just have to

21  let me finish my question.  I know if this was a

22  normal conversation, crosstalk is normal.  We just

23  can't do it here because the court reporter can't

24  take both of us down at the same time. Otherwise, I

25  wouldn't care, truthfully.

1              The March scans that they ended up having

2     an issue with, did you send the required emails

3     related to those scans that you later got in trouble

4     for?

5          A.    Yes.

6          Q.    And so I think you were describing

7     earlier, you -- my understanding is that you said

8     you sent emails reporting that you would have

9     possible lates, correct?

10         A.    Correct.

11         Q.    And that you then never reported actual

12    lates, correct?

13         A.    Correct.

14         Q.    And so then they went and looked at the

15    scan and saw that you had put, what, a holiday scan?

16         A.    Yes.

17         Q.    And the first one that they took, was that

18    the case with regard to all of the scans that they

19    took issue with, that you had emailed reporting

20    possible lates?

21         A.    Yes.

22         Q.    And then never -- okay.  So if you have --

23    if you're reporting a late scan or a possible late

24    scan, what is the proper procedure that you are

25    supposed to follow? Do you use a holiday scan, or

1  no?

2      A.    No.   The proper procedures, if you're

3  going to have a late, you -- you let the late be

4  registered in the system.   That's it.

5      Q.    **And you did not do that, correct?**

6      A.    Exactly.

7      Q.    **Okay.  If someone were to say that that**

8  **was actually quite common at FedEx, would that**

9  **person be lying?**

10          **MR. MCGAHA:**  Object to form.

11          **THE DEPONENT:**  I don't -- I don't know it

12  to be common at FedEx.

13  **BY MS. MASSIMI:**

14      Q.    **You don't know it to be common at FedEx?**

15      A.    No.

16      Q.    **Do you -- can you explain why it was that**

17  **you personally felt constrained or compelled to do**

18  **this?**

19          **MR. MCGAHA:**  Object to form.

20  **BY MS. MASSIMI:**

21      Q.    **Or why this was -- why was this happening?**

22      A.    No.

23          **MR. MCGAHA:**  Object to form.

24          **THE DEPONENT:**  I explained that this

25  happened because I had a slew of new employees, a

1  lot of whom were very -- they didn't come from a

2  delivery background, or I should say delivery -- had

3  delivery -- package delivery experience, and we were

4  running into a lot of -- a lot of walls with

5  ensuring that they got their deliveries --

6  deliveries off on time.

7  **BY MS. MASSIMI:**

8  **Q.    Did the other managers get the same number**

9  **of new employees that you did?**

10  A.    Yes.  But on Saturdays, the operation was

11  a little bit different, where it's two managers

12  only.  And at the time, I was training a new -- a

13  new manager that was working alongside me, but he --

14  he was just -- you know, he was just learning the

15  ropes, basically.

16  **Q.    What's his name?**

17  A.    Kelvin Ricio.

18  **Q.    Okay.  So were you typically responsible**

19  **for the Saturdays?**

20  A.    Yes.

21  **Q.    Okay.  So that -- that's what you're**

22  **saying the issue was -- well, that is how this, you**

23  **know, more or less happened.  Is that less managers**

24  **-- fewer managers were assigned on Saturdays; is**

25  **that accurate?**

```
 1        A.   Yes, but it was fewer employees.
 2        Q.   But the employees that were there were new
 3   employees?
 4        A.   Right.  Correct.
 5        Q.   Did you ever complain to Eric or anyone
 6   prior to them reprimanding you for this?
 7        A.   No, I didn't.
 8        Q.   Is there a particular reason?
 9        A.   That's the same thing Nan asked in my GFT,
10   and I didn't have a good answer for it.
11        Q.   What answer -- what is your answer?
12        A.   I -- I just thought I found a means to
13   hide these lates, and so I went with it.
14        Q.   Well, was it your understanding that
15   management wanted you to find the means to hide the
16   lates, as you say?
17        A.   No.  No, no.  That wasn't the case, but
18   it's just something that I -- I knew that if I put
19   these scans on, this is what happens.
20        Q.   Okay.  Have you received any emails from
21   Mr. McGaha or anyone else at FedEx related to this
22   lawsuit or this -- related to this lawsuit?
23        A.   No.
24        Q.   Have you received any text messages from
25   anyone at FedEx, including Mr. McGaha, related to
```

1  this lawsuit?

2      A.   No.  I just got texts about ensuring that

3  I show up for meetings, or if I missed a call, you

4  would text me and tell me, "Hey, I called you."

5  That's it.

6      Q.   Okay.  Can you just save all of your

7  communications that you've had with Mr. McGaha and

8  anyone at FedEx related to this incident?

9      A.   Did I save it?

10     Q.   Well, yeah.  Did you, I guess, is the

11 first question?  Did you?

12     A.   No.

13     Q.   Okay.  Have you spoken to anyone at FedEx

14 other than Mr. McGaha about this lawsuit?

15     A.   No.  I have not.

16     Q.   Did you -- did you ever receive any

17 warnings at FedEx, verbal or written, for any of

18 your conduct other than the scans that you've

19 described?

20     A.   No, no.  If -- if -- if I recall, I was

21 issued a warning letter for that -- that my license

22 being suspended that I spoke about earlier, but that

23 was -- that was it.

24     Q.   Do you know if anyone ever had an issue --

25 would -- did you ever date anyone at work?

1    A.    Did I date anyone at work?  Yeah, when I
2  was a -- when I was a employee, a courier, yes.
3    **Q.    Okay.  What years?  What were those -- the**
4  **years that you -- or year that you dated that**
5  **person?**
6    A.    I want to say 2017, 2016, one of those.
7    **Q.    Did FedEx ever say anything to you about**
8  **that, about not doing that?**
9    A.    No.
10   **Q.    Do you know -- well, did -- did you ever**
11 **witness any discrimination at FedEx?**
12   A.    No.  Not that -- no.  I -- I never
13 witnessed any cases of discrimination.
14   **Q.    What is --**
15   A.    No.
16   **Q.    -- discrimination?**
17   A.    In -- in -- discrimination can be in
18 multiple -- multiple things.  Can be race
19 discrimination, someone with a handicap being
20 discriminated against.  I've never personally
21 witnessed any -- any of that stuff there.
22   **Q.    Did you ever hear about any**
23 **discrimination?**
24   A.    No.  As a -- I've heard issues of -- when
25 I was a -- when I was a courier that -- I can't -- I

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

 1  can't remember.  But as a manager, no.

 2       Q.   What -- what issues did you hear about

 3  when you were a courier?  What do you mean by that?

 4       A.   It -- just guys being, you know, like, I

 5  guess, like overweight.  An overweight courier being

 6  slow.  And the other employees will tell them,

 7  "You're -- like, you're too slow."  That's -- that's

 8  pretty much it.

 9       Q.   Okay.  You're -- you're talking about like

10  unprofessional --

11       A.   Right.  Like unprofessional --

12       Q.   -- language?

13       A.   Yeah.  Yeah.

14       Q.   Right.  Do you know whether Kevin Campbell

15  is alleging that he was the target of discriminatory

16  language prior to his termination?

17       A.   I heard that in the GFT, he brought that

18  up when Nan asked him -- asked him, I guess, in

19  regards to the reason why he was being terminated.

20  He started saying all these different incidents.

21            I personally had no idea of any of those

22  incidents.  I was -- I -- I was in shock across the

23  table. I really did not know what Kevin was talking

24  about at all.

25       Q.   What do you -- what are some of the things

1  that you remember him saying?

2      A.   God, man, I don't -- I don't even remember

3  them exactly.  It's been so long.  But it was

4  something to the effect of him and -- being -- being

5  called something by another employee, or --

6  something -- something along those lines.  That and

7  like other things.

8           But once again, like I said, as his

9  manager, none of those incidents were ever reported

10  to me.

11      Q.   If -- if those incidents had been reported

12  to you, would you have done anything?

13      A.   Oh, absolutely.  Absolutely.

14      Q.   The stuff that he complained of, did you

15  believe that it was discriminatory?

16      A.   It -- the way --

17           MR. MCGAHA:  Object to form.

18           THE DEPONENT:  Yeah.  It -- it definitely

19  would be under being discriminatory.  But, once

20  again, like I said, I don't know of any of those

21  incidents.

22  BY MS. MASSIMI:

23      Q.   Do you believe Kevin Campbell is a snitch?

24           MR. MCGAHA:  Object to form.

25           THE DEPONENT:  A snitch?  I don't -- I

1  don't -- no, I don't believe Kevin Campbell is a

2  snitch.  What exactly would he be snitching?

3  **BY MS. MASSIMI:**

4       **Q.   Did -- did anyone at FedEx ever warn you**

5  **or talk to you about personal relationships that you**

6  **had with other people at FedEx?**

7       A.   No.

8       **Q.   Okay.  Does -- does FedEx have a policy**

9  **against managers having sexual relations with**

10 **nonmanagers?**

11      A.   Yeah, I believe so.  I'm -- I'm not -- I'm

12 not entirely sure.  I believe so, yeah.

13      **Q.   Okay.**

14      A.   Like most jobs do.

15      **Q.   Okay.  Do you know if even, like,**

16 **consensual sexual relationships between managers and**

17 **subordinates at the LGA station are prohibited?**

18      A.   Yeah, that's prohibited.  Yeah.

19      **Q.   Have you ever -- has anyone ever spoken to**

20 **you about that policy at FedEx?**

21      A.   Maybe when I got hired as a manager, like

22 in training.

23      **Q.   Have you ever -- did you ever violate that**

24 **policy as a manager?**

25      A.   No.

1    Q.    Okay.  Do you believe Kevin Campbell was

2    telling the truth in the GFT?

3        A.    About what?

4            MR. MCGAHA:  Object to form.

5            MS. MASSIMI:  I'm sorry -- I'm sorry, sir?

6            THE DEPONENT:  About what?

7    BY MS. MASSIMI:

8        Q.    Well, do you believe he was lying or being

9    untruthful at any point in the GFT --

10           MR. MCGAHA:  Object to form.

11   BY MS. MASSIMI:

12       Q.    -- in the GFT process?

13           MR. MCGAHA:  Object to form.

14           THE DEPONENT:  I don't believe -- again,

15   like I just said, everything that Kevin alleged

16   after his GFT and the reason why he was being

17   terminated was discussed, was brand new to me.  None

18   of this was ever uttered to me verbally.  He never

19   wrote a statement to me concerning any of it.  So it

20   was just new to.  So it --

21       Q.    I --

22       A.    And once again, it wasn't -- I was in

23   shock, most of all, that he was saying these things

24   because Kevin knows me.  Like I told you earlier, we

25   -- we would spoke -- we were very cordial.  We

1  talked.  I -- we never had a bad report, ever.

2      **Q.   I understand -- I understand what you're**

3  **saying. You're saying that -- exactly what you just**

4  **said.  I don't even need to rephrase it.  I think**

5  **your testimony is clear.**

6      A.   Right.

7      **Q.   My question is, do you believe he was**

8  **lying with what he was saying?**

9      A.   I can't -- I can't -- I can't determine

10  that. Once again, if -- if it was something that I -

11  - I saw -- I witnessed, then I'd be -- I'd be more

12  clear in saying, "No, I don't believe he's lying."

13  But that wasn't the case.

14      **Q.   Okay.**

15          **MS. MASSIMI:**  I do not have any other

16  questions.

17          **MR. MCGAHA:**  I have some questions.

18          **MS. MASSIMI:**  Okay.  Should I -- how many

19  questions -- how long do you have?  Should I go to

20  this other deposition first and ask them -- I mean,

21  I don't even know if --

22          Let's go off the record.

23          I don't even know if he's going to --

24          **THE REPORTER:**  Do we need to go off the

25  record?

1          MS. MASSIMI:  Yeah.

2          THE REPORTER:  Okay.  It is 12:00 p.m.  We

3     are going off the record.

4          (WHEREUPON, a recess was taken.)

5          THE REPORTER:  All right.  It is 12:05

6     p.m.  We are back on the record.

7     EXAMINATION

8     BY MR. MCGAHA:

9          Q.   All right.  Mr. Bovell, thank you for

10    joining us today.  Again, my name is Gabe McGaha.  I

11    am here on behalf of FedEx and the named defendant,

12    Eric Warnders.

13         A.   Yes.

14         Q.   You said earlier you were shown a security

15    report.  Do you recall that?

16         A.   Yes.

17         Q.   I believe it was marked --

18         A.   Yes.

19         Q.   -- as Plaintiff's Exhibit 1.  All right.

20    And you stated that you reviewed that security

21    report prior to making the decision to terminate Mr.

22    -- Mr. Campbell, is that right?

23         A.   That's right.

24         Q.   Would it be more -- it has been a few

25    years that -- I believe this security report was

1   dated March the 25th, I believe, of 2021.  So that's

2   been almost three years ago.

3           Is it possible --

4       A.   Yes.

5       Q.   -- that you -- when you say that you

6   reviewed the security report, what you're saying is

7   that you reviewed security's findings and relied on

8   those findings to make your decision -- at least to

9   some degree you relied on those findings to make

10  your decision about what you would do with respect

11  to Mr. Campbell's termination?  Is that right?

12      A.   Yes.

13          MS. MASSIMI:  Objection.  Objection.

14          THE DEPONENT:  Absolutely.

15  BY MR. MCGAHA:

16      Q.   All right.  Let me see if I can restate it

17  -- say it a different way.

18          So the security report that you were shown

19  as Plaintiff's Exhibit 1 is not necessarily the

20  security report that you looked at prior to the

21  decision that you made to terminate Mr. Campbell.

22  Is that right?

23          MS. MASSIMI:  Objection.

24  BY MR. MCGAHA:

25      Q.   Is that right?

1          MS. MASSIMI:  Objection.

2          THE DEPONENT:  Yeah.  You're right.

3    BY MR. MCGAHA:

4      Q.   All right.  So what you saw then were

5    security's findings?

6      A.   Findings, yes.

7      Q.   Okay.  So that -- is that what you meant

8    when you said that you saw the security report

9    before and that -- and that you relied on that

10   security report?

11         MS. MASSIMI:  Objection.

12         THE DEPONENT:  Yes.

13   BY MR. MCGAHA:

14     Q.   Excuse me?

15     A.   Yes.

16     Q.   Okay.  All right.  There was a portion of

17   the security report towards the bottom that states

18   that Mr. Alzate and Mr. Campbell were terminated at

19   the direction of Eric Warnders.  Do you remember

20   being asked about that?

21     A.   Yes, I remember.

22     Q.   All right.  Do you know whether or not

23   that's just form language that is typical in

24   security reports?

25         MS. MASSIMI:  Objection.

```
 1              THE DEPONENT:  That is what I was trying

 2   to explain.  I might have not used those words, but

 3   that is what I was trying to say when I said that's

 4   possibly just how security summed it up.

 5   BY MR. MCGAHA:

 6        Q.   Gotcha.  But to be clear, who made the

 7   decision to terminate Mr. Campbell?

 8        A.   I did.

 9              MS. MASSIMI:  Objection.

10   BY MR. MCGAHA:

11        Q.   Okay.  All right.  And did anyone direct

12   you to terminate Kevin Campbell?

13        A.   No.

14        Q.   All right.  Did your rationale for

15   terminating Kevin Campbell ever change?

16        A.   No.

17        Q.   All right.  Did Kevin Campbell ever report

18   to you that he was being harassed or treated

19   unfairly because of his race?

20        A.   No.

21        Q.   All right.  If he had reported that to

22   you, what would you have done?

23        A.   Oh, we were headed to -- a -- a statement

24   was going to be written, and we were taking it

25   straight to HR.
```

1    Q.    All right.  Do you believe that Kevin

2    Campbell was terminated because of his race?

3    A.    No.  That is not why Kevin was terminated.

4    Q.    All right.  Why was Kevin Campbell

5    terminated, in your own words, as you recall it

6    today?

7    A.    Kevin was terminated because he had an

8    incident with Augusto, where there was some -- some

9    back-and-forth words.  And then per the video that I

10    -- I was given to review, it showed Kevin bumping

11    Augusto with his shoulder, which led to Augusto

12    pulling a knife on Kevin.

13    Q.    Okay.

14    A.    And that -- that -- that shoulder bump

15    that Kevin did, ultimately, initiated the -- the

16    verbal back and forth between him and Augusto that

17    caused it to escalate.

18    Q.    So when you say that he bumped Augusto, is

19    this something that you were told or something that

20    you witnessed yourself from the video?

21    A.    I witnessed this -- I witnessed this on

22    the video.

23    Q.    Okay.  So this is your conclusion, that

24    Kevin Campbell bumped Augusto; is that right?

25    A.    Yes.

1    Q.    All right.  And did you speak to anyone

2    else about what they saw to reach that conclusion

3    before you reached it yourself?

4    A.    No.

5    Q.    All right.  I believe you've made this

6    clear, but I just want to make sure it's abundantly

7    clear, that do you believe that your termination

8    from FedEx was justified?

9    A.    Yes, I do.

10    Q.    All right.  Have you ever known Eric

11    Warnders or Nan Malebranche to engage in any race

12    discrimination or retaliation?

13    A.    Absolutely not.

14    Q.    All right.  Do you believe that Eric

15    Warnders is a fair manager?

16    A.    100 percent.  That's what I believe, yes.

17    Q.    All right.  How often did you interact

18    with Eric?

19    A.    On a daily basis.

20    Q.    All right.  Have you ever heard Eric say

21    anything disparaging to anyone based on that

22    person's race?

23    A.    No.

24    Q.    Have you ever noticed or learned, you

25    know, from someone else that Eric mistreated someone

1  because of that person's race?

2      A.   No.

3      Q.   All right.  What about Nan Malebranche?

4  Do you believe that Nan Malebranche is a fair MD?

5      A.   Yes, I do.

6      Q.   Do you believe that Nan Malebranche

7  engages in race discrimination?

8      A.   Absolutely not.

9      Q.   All right.  And do you believe that Nan

10 Malebranche conducted a fair GFT with respect to Mr.

11 Kevin Campbell, the plaintiff in the case?

12     A.   Yes, I do.

13     Q.   All right.  Did Nan Malebranche give Mr.

14 Campbell an opportunity to speak during the GFT

15 about his termination?

16     A.   Yes, she did.

17     Q.   Do you believe that Mr. Campbell was

18 treated fairly from what you observed in the GFT?

19     A.   Yes, I do.

20     Q.   Right.  Do you believe that Eric Warnders

21 -- he participated in the GFT, too, correct?

22     A.   Yes, he did.

23     Q.   Did he treat Mr. Campbell fairly during

24 the GFT process?

25     A.   Yes, he did.

1    Q.   All right.  Let's see.  The other exhibit

2  that you were shown -- give me one second.  Going to

3  share my screen.  Well, I guess I can't share my

4  screen because I'm not the host.  Let me try.

5          MS. MASSIMI:  If -- if you have many more

6  questions, does it make sense to just --

7          MR. MCGAHA:  I don't have many more

8  questions.

9          MS. MASSIMI:  Okay.

10          MR. MCGAHA:  There are a couple more.

11          This document here --

12          MS. MASSIMI:  Did they freeze for you?  I

13  -- I don't know.  They -- I can see the court

14  reporter, but I can't see the -- the other two

15  froze.

16          THE REPORTER:  Okay.  Yes, it looks like

17  they froze.

18          MR. MCGAHA:  I'm frozen?

19          THE REPORTER:  Okay.

20          MS. MASSIMI:  No.  No.

21          THE REPORTER:  You're back.

22          MS. MASSIMI:  Yeah.

23          MR. MCGAHA:  Okay.

24  BY MR. MCGAHA:

25    Q.   This is -- this document is apparently



1 trying to load.  But in any case, Mr. -- Mr. Bovell,

2 can you hear me?

3     A.   Yes.  I can hear you.

4     Q.   All right.  Do you recall being shown a

5 letter, this letter right here?  Can you see my

6 screen?  Can --

7          MS. MASSIMI:  I don't see --

8          THE DEPONENT:  I don't see the letter.  I

9 see -- I see an email.

10          MS. MASSIMI:  Yeah.

11          MR. MCGAHA:  Okay.

12 BY MR. MCGAHA:

13     Q.   Do you recall seeing a letter?  I believe

14 it was marked as Exhibit -- initially, Exhibit 5,

15 but I believe it was the second document that you

16 were shown.  It was a letter from June the 4th with

17 the manager's rationale on it?

18     A.   Yeah.

19     Q.   All right.

20     A.   I remember that.

21     Q.   All right.  And you testified that that

22 letter was drafted because Mr. Bovell initiated a GF

23 -- excuse me, Mr. Campbell initiated a GFT; is that

24 right?

25     A.   Yes.

1       Q.    Is that a form letter, essentially, that

2   has to be -- has to be drafted after a GFT is

3   initiated?

4       A.    Yes.

5       Q.    Okay.  So is it common for there to be

6   additional information that you relied on in your

7   decision to terminate someone that is not

8   necessarily all in that letter?

9       A.    Yes.

10      Q.    So is this manager's rationale, then, a

11  summary of your decision, but not necessarily every

12  factor that you considered in your decision to

13  terminate someone?

14      A.    Exactly.  Yes.

15      Q.    Okay.  So if it says that you terminated

16  someone for disruptive -- disruptive behavior, could

17  it mean that the person bumped someone, perhaps, and

18  as a result --

19           MS. MASSIMI:  Objection.

20           THE DEPONENT:  Yeah.

21  BY MR. MCGAHA:

22      Q.    Okay.  So --

23           MS. MASSIMI:  Objection.

24  BY MR. MCGAHA:

25      Q.    -- is -- is disruptive behavior just a

1  general description?

2       A.   Yes.  It could --

3       Q.   Okay.  Let me finish.  Is disruptive

4  behavior just simply a general description of

5  conduct that violated the acceptable conduct policy?

6       A.   Yes.  Correct.

7       Q.   Okay.

8            MR. MCGAHA:  All right.  I don't have any

9  other questions.

10           MS. MASSIMI:  I have a question.

11  FURTHER EXAMINATION

12  BY MS. MASSIMI:

13      Q.   Well, did you say earlier that you decided

14  to terminate Kevin Campbell because he bumped

15  someone?

16      A.   No.  I told you I -- Kevin was terminated

17  based off behavioral -- whatever that -- that phrase

18  is. Disruption -- behavioral disruption, which --

19  which it, like, Mr. McGaha just explained, it's a

20  slew of different things that can determine

21  behavioral disruption.  And in --

22      Q.   Well, so -- go ahead.

23      A.    In Kevin's case, it was that he initiated

24  that first physical contact that escalated the

25  situation.

1    Q.    And you believe that Kevin initiated the

2    first physical contact based on the portion of the

3    video that you were shown?

4    A.    Yes.

5    Q.    Who showed you that video?

6    A.    That was security, James Cahill.

7    Q.    Okay.  And did you write in any of your

8    documents that Kevin bumped someone?

9    A.    No.  We didn't use that.  But it -- that

10   was the behavioral disruption.

11   Q.    What do you mean, "We didn't use that"?

12   A.    I didn't use that.  I used "per policy."

13   You have to word it a certain way, which is put it

14   under behavioral -- behavioral disruption.

15   Q.    Did you write anywhere that Kevin bumped

16   someone?

17   A.    No, I did not.

18   Q.    Did you write it down in a personal

19   notebook?

20   A.    No, I did not.

21   Q.    An email?

22   A.    No.

23   Q.    Is that a "No"?

24   A.    No.

25   Q.    Okay.  And do you know whether there is a

1  **witness in this case who says that he saw Augusto**

2  **hit Kevin with a box?**

3      A.   No.  I -- I do remember them saying

4  Augusto hit him with a box, but the evidence, the --

5  the video footage that we saw, he didn't hit him

6  with a box.  He pushed the box like he was pushing

7  the boxes prior.  It just so happened that they were

8  -- they were talking back and forth to each other,

9  and when he pushed the box, it got close to Kevin's

10  hands.

11      Q.   **Do you --**

12      A.   It wasn't -- I'm sorry.  Let me finish.

13          It wasn't a case where he picked up a box

14  and threw it at Kevin.  It was -- it's -- it's a

15  conveyor belt, if you can imagine it.  Augusto's job

16  was to ensure that packages come off of another

17  conveyor belt onto the main belt where Kevin was

18  working.  And then he would kind of slide it, the

19  boxes, towards Kevin.

20          Well, he would split the boxes depending

21  on where they were going on the belt that Kevin was

22  working on.  So it appeared that because of the back

23  and forth, he pushed the box and it hit Kevin.  It

24  looked as though it -- it -- it hit Kevin's hand.

25          But when -- upon review, I said that's

```
 1  just -- that's just typical -- that's just the

 2  typical work procedure.  When they -- when -- in the

 3  -- when I read the statement that all came in that

 4  day, somebody said Augusto threw a box at Kevin.

 5  There was no box being thrown at Kevin.

 6            MS. MASSIMI:  Okay.  I have no questions.

 7            MR. MCGAHA:  That's it for me.  Thank you.

 8            MS. MASSIMI:  Okay.

 9            THE DEPONENT:  All right.

10            THE REPORTER:  Okay.  And, Ms. Massimi,

11  would you like to order the original transcript?

12            MS. MASSIMI:  Yes, please.

13            THE REPORTER:  Okay.  And, Mr. McGaha,

14  would you like to order a copy of the transcript?

15            MR. MCGAHA:  Yes.

16            THE REPORTER:  Okay.  And with that, it is

17  12:21 p.m.  We are going off the record.

18            (WHEREUPON, the deposition of MONTY BOVELL

19  was concluded at 12:21 p.m.)

20

21

22

23

24

25
```

```
 1                        CERTIFICATE

 2

 3        I, Kendall Zavodny, do hereby certify that I

 4   reported all proceedings adduced in the foregoing matter

 5   and that the foregoing transcript pages constitutes a

 6   full, true and accurate record of said proceedings to the

 7   best of my ability.

 8

 9        I further certify that I am neither related to

10   counsel or any party to the proceedings nor have any

11   interest in the outcome of the proceedings.

12

13        IN WITNESS HEREOF, I have hereunto set my hand this

14   25th day of March, 2024.

15

16

17

18   _____

19                  Kendall Zavodny

20

21

22

23

24

25
```

```
 1                    CORRECTION SHEET

 2   Deposition of: Monty Bovell        Date: 03/11/24

 3   Regarding:    Campbell vs. Federal Express Corp.

 4   Reporter:     Zavodny/Hernandez

 5   _____

 6   Please make all corrections, changes or clarifications

 7   to your testimony on this sheet, showing page and line

 8   number.  If there are no changes, write "none" across

 9   the page.  Sign this sheet on the line provided.

10   Page    Line   Reason for Change

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24            Signature_____

25                    Monty Bovell
```



```
 1                     DECLARATION

 2  Deposition of: Monty Bovell        Date: 03/11/24

 3  Regarding:     Campbell vs. Federal Express Corp.

 4  Reporter:      Zavodny/Hernandez

 5  _____

 6

 7  I declare under penalty of perjury the following to

 8  be true:

 9

10  I have read my deposition and the same is true and

11  accurate save and except for any corrections as made

12  by me on the Correction Page herein.

13

14  Signed at _____, _____

15  on the _____ day of _____, 2024.

16

17

18

19

20

21

22

23

24            Signature_____

25                       Monty Bovell
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

**1**

**1** 36:1
36:22
37:1
37:18 90:19
91:19

**10** 73:23
76:10 76:13

**10:11** 5:5 5:7

**10:40** 28:15
28:18

**100** 95:16

**11** 5:4

**12:00** 73:21
73:22 90:2

**12:05** 90:5

**12:21**
103:17
103:19

**18th** 31:3

**2**

**2** 38:8 38:9
39:4

**2013** 18:8

**2016** 84:6

**2017** 84:6

**2019** 10:2

**2020** 27:2

**2021** 14:2
14:3
18:10
22:7 22:8
31:3 44:6
52:16
54:7 58:8
61:19 63:17

70:24
71:3 71:3
72:11 72:12
75:9 78:6
91:1

**2023** 13:2

**2024** 5:4

**21702** 63:4

**24** 8:2

**2-5** 44:10

**2505** 8:25

**25th** 40:6
44:6
52:16
54:7 91:1

**3**

**3** 43:6 43:9
43:16

**30** 22:9

**302** 8:14 63:3

**305** 63:5

**4**

**4** 56:24

**46** 57:1 59:1

**48** 36:19
37:16

**49** 38:6 39:2

**4th** 58:8
61:19 98:16

**5**

**5** 56:23 56:24
57:2 98:14

**9**

**962** 43:15

**966** 43:15

**A**

**a.m** 5:5 5:7
28:15 28:18

**ability** 7:24

**able** 36:4
36:12 69:3

**absolutely**
27:16 86:13
86:13 91:14
95:13 96:8

**abundantly**
95:6

**acceptable**
100:5

**according**
40:22 46:14

**accurate**
37:21
39:7
44:13 44:18
44:19 46:11
46:13
59:4
63:21 81:25

**accurately**
7:21

**accused** 66:7

**across** 85:22

**actions** 56:10
56:17
59:7 67:12

**actual** 20:2
20:16 24:23
49:7 75:7
79:11

**actually** 6:12
33:22
36:4
49:13 77:15
80:8

**adamant** 70:6

**add** 7:16

**added** 39:13
39:15

**additional**
99:6

**address**
8:16 8:17
8:20 8:22
8:23 8:24
9:2 9:5
10:24
63:1 63:6
63:8

**addressed**
72:22

**addressing**
49:14

**advance** 74:21

**affect** 7:24

**affirm** 5:10

**affirmed** 6:1

**against**
29:9
84:20 87:9

**aggressive**
26:6 26:9
26:9
34:16 34:25
37:24 39:10
39:12
40:4 40:5
40:14 40:16

40:24
41:1 41:4
41:6
41:17 41:21
41:23

**aggressively**
33:24
34:7 34:11

**ago** 9:25 59:7
91:2

**agreement**
62:23

**ahead** 19:8
19:9
42:17 42:18
75:17
100:22

**alcohol** 8:1

**ALDI** 12:22

**alleged** 88:15

**alleging** 29:5
29:7 85:15

**allowed** 20:2

**alongside**
81:13

**already** 58:9

**Alzate**
26:16 27:24
28:24
31:7
33:16 33:20
33:25
34:8 44:6
55:24 92:18

**am** 6:12 12:16
15:24 73:17
74:21 90:11

**America** 8:10

**annoying** 76:5

**answer** 6:22
7:8 7:10
7:16 9:3
19:22 23:20
30:23
34:2
34:13 42:11
62:16
72:7
82:10 82:11
82:11

**anyone**
11:15 11:16
16:1
24:25 26:23
33:19
34:6 34:9
41:20 54:23
55:1 55:6
55:12 55:13
55:18 58:17
59:23 59:25
69:9 72:9
82:5
82:21 82:25
83:8
83:13 83:24
83:25
84:1 87:4
87:19 93:11
95:1 95:21

**anything**
12:24
24:9 28:1
61:9 66:4
66:10
84:7
86:12 95:21

**anywhere**

101:15

**apartment**
63:12

**apologize**
14:21

**apparently**
97:25

**appeared**
102:22

**application**
16:9

**applications**
63:16

**appreciate**
49:19

**approach**
63:24 72:11

**approval**
49:22

**approximately**
22:25

**apps** 16:6

**April** 22:5
78:8

**area** 12:1
21:21

**assigned**
81:24

**assistant**
31:24
32:2 32:7

**assisted** 32:8
32:9

**attention**
70:20 70:22
71:2

**attentive**
48:17 52:14
52:18

**attorney** 5:15
23:22 23:24
24:2 24:5

**August** 14:5
27:2 27:2

**Augusto** 26:16
26:18 27:24
28:24
31:7
33:15 33:20
33:24
34:7
34:11 39:20
40:17 55:24
56:2 56:4
56:7
56:10 59:20
59:21 59:25
60:20
61:7 94:8
94:11 94:11
94:16 94:18
94:24 102:1
102:4 103:4

**Augusto's**
44:21 44:21
56:3 102:15

**authority**
27:15

**authorized**
21:14

**avoid** 77:4

**avoiding** 20:8

**aware** 26:24
64:20 73:14

B

**back-and-forth** 94:9

**background** 81:2

**bad** 89:1

**bankrupt** 15:14 15:16 17:12

**bankruptcy** 17:17

**based** 30:20 39:19 45:5 47:20 62:4 62:6 62:8 69:13 70:15 70:15 95:21 100:17 101:2

**basic** 6:16

**basically** 69:22 76:8 81:15

**basis** 23:8 95:19

**basketball** 25:25

**Baughmans** 8:14

**bearing** 36:19 37:16 38:6 39:2 43:14 57:1 58:25

**became** 24:22 25:15

25:17 27:1 27:9

**begin** 14:3 18:6

**begins** 54:7

**behalf** 90:11

**behaved** 33:23 34:7 34:10

**behaving** 27:17

**behavior** 27:21 27:24 28:24 39:23 39:24 39:25 40:2 40:4 40:16 40:20 41:1 42:23 99:16 99:25 100:4

**behavioral** 100:17 100:18 100:21 101:10 101:14 101:14

**behind** 54:1

**believe** 8:19 9:22 12:4 15:2 15:13 16:4 16:5 20:3 25:15 27:8 27:10 32:8 34:10 34:15 41:6 42:5 42:8

44:20 48:20 48:25 53:4 53:6 53:8 58:11 58:16 59:14 60:23 63:5 63:19 66:19 67:4 67:13 69:25 71:5 72:18 75:2 86:15 86:23 87:1 87:11 87:12 88:1 88:8 88:14 89:7 89:12 90:17 90:25 91:1 94:1 95:5 95:7 95:14 95:16 96:4 96:6 96:9 96:17 96:20 98:13 98:15 101:1

**believed** 31:17 55:20 69:13

**belt** 102:15 102:17 102:17 102:21

**best** 12:12 20:5

**better** 67:23

**beyond** 21:13

**bit** 81:11

**Black** 8:12

**born** 8:9 8:10

**Borough** 11:25

**boss** 22:16 22:22 45:9 45:24 54:4

**bottom** 36:19 52:15 92:17

**bought** 17:14 17:16 27:7

**Bovell** 5:2 5:9 6:1 6:6 6:10 19:22 23:17 36:9 36:12 38:3 38:25 43:17 51:17 57:6 57:25 77:14 90:9 98:1 98:22 103:18

**Bowman's** 63:3

**box** 61:7 102:2 102:4 102:6 102:6 102:9 102:13 102:23 103:4 103:5

**boxes** 102:7 102:19 102:20

**Bradley** 60:11
60:12 60:13

**Bradley's**
60:9

**brand** 88:17

**brand-new**
22:10

**break** 7:6
19:20 57:15
57:16

**breakdown**
76:7

**bring** 70:20
70:22 71:2

**broke** 18:14
18:17 19:13
19:17

**brought** 85:17

**bump** 94:14

**bumped**
94:18 94:24
99:17
100:14
101:8
101:15

**bumping** 94:10

───────────

C

**Cahill** 42:4
42:12 52:20
101:6

**Cahill's** 42:8
42:24 44:17
54:13 60:16

**Campbell** 5:18
25:12
29:4 29:7
31:8

33:15 33:20
33:23
34:7
34:10 35:21
37:24 38:19
39:10 41:14
43:22
44:6
45:13
46:6
47:10
53:1
85:14 86:23
87:1 88:1
90:22 91:21
92:18
93:7
93:12 93:15
93:17
94:2 94:4
94:24 96:11
96:14 96:17
96:23 98:23
100:14

**Campbell's**
47:2 91:11

**care** 78:25

**case** 18:20
25:11 30:18
46:9
79:18 82:17
89:13 96:11
98:1 100:23
102:1
102:13

**cases** 84:13

**catch** 76:9

**caught** 78:10

**caused** 94:17

**certain**

20:1
21:11 21:11
68:21
75:3 101:13

**chain** 74:24

**chance** 37:15

**change** 7:16
67:22 93:15

**children** 9:11
9:12

**choice** 41:9

**choose** 40:8

**choosing**
40:24

**chose** 40:14

**Christmas**
69:2

**claimed** 52:13

**claiming** 52:9

**clear** 21:17
37:8
73:17
89:5
89:12
93:6 95:6
95:7

**client** 77:2

**close** 102:9

**CNK** 13:21
14:13 14:14
14:16 14:21
14:22 14:24
16:3 16:8
16:20 16:22

**C-N-K** 14:15

**CNPK** 14:4

14:14

**Coach** 8:25

**Coachmen** 8:25

**code** 18:16
18:17 19:13
19:17 19:20
63:4

**college** 11:20
11:24 11:25
12:8

**comes** 49:16

**coming**
59:11 71:12

**common** 80:8
80:12 80:14
99:5

**communication
s** 83:7

**Community**
11:24 11:25

**company** 12:22
13:7
13:17 13:21
15:14 15:16
17:15
27:7
67:17 70:10

**compelled**
80:17

**complain**
26:14 26:18
82:5

**complained**
26:20 26:22
86:14

**complaining**
75:22 77:17

78:4

**complete** 12:1

**completed**
54:3

**completely**
69:14

**completion**
45:18

**concerning**
30:6 88:19

**concluded**
103:19

**conclusion**
42:13 94:23
95:2

**conclusions**
42:9

**condition**
7:20

**conduct** 83:18
100:5 100:5

**conducted**
31:18 41:25
42:2 96:10

**confidentiali
ty** 62:23

**connection**
8:17 24:3
24:6

**consensual**
87:16

**considered**
99:12

**constrained**
80:17

**consumed** 8:1

**contact** 30:22
100:24
101:2

**contained**
33:10 37:20
39:6 52:8
59:4 61:20

**contention**
77:9

**contents** 39:1
58:17 58:25

**context**
69:5 69:7

**continue** 26:1

**conversation**
30:12 78:22

**conversations**
30:4

**conveyor**
102:15
102:17

**convicted**
9:13 9:15
9:21 10:4

**convictions**
9:24 11:10

**copy** 43:2
57:11
103:14

**cordial** 26:10
88:25

**correct**
11:8
13:24 17:12
17:20 23:17
27:5
27:12 32:19
32:22

35:2
36:10 39:22
40:6 40:9
41:15 41:18
42:9 46:3
46:7 47:3
49:22 49:24
50:3 50:4
50:10
51:7
51:17
52:6 53:2
53:14 53:17
54:9
54:17 61:21
61:22 65:24
66:2 67:5
68:3
70:10 70:25
71:3
74:21
79:9
79:10 79:12
79:13
80:5 82:4
96:21 100:6

**correctly**
52:21

**couple**
22:20 30:24
97:10

**courier** 24:21
25:4 84:2
84:25
85:3 85:5

**couriers**
25:15

**course** 23:9

**court** 6:18
6:23 7:4
61:17 77:25

78:23 97:13

**cover** 20:19
20:23 21:17
68:13 71:25

**covered** 25:23

**COVID** 67:19

**credits**
12:2 12:8

**crosstalk**
78:22

**current** 9:2
9:5 63:1

**currently**
8:13 11:3
11:13 12:10
12:15 12:16
12:17 12:18
15:19 15:21

**cut-off** 75:7

————————

D

**daily** 23:8
95:19

**date** 31:6
58:7
83:25 84:1

**dated** 61:18
84:4 91:1

**day** 30:22
31:4
31:10 34:22
35:9
35:11 103:4

**deal** 45:8
45:8

**decided**
100:13

**decision**

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

45:13
58:3 58:6
90:21
91:8
91:10 91:21
93:7 99:7
99:11 99:12

**dedication**
70:10

**defendant**
31:1 90:11

**defendants**
5:20

**definitely**
26:4 86:18

**degree** 91:9

**deliver** 21:12
21:22
23:1 69:3

**delivered**
73:21 74:10

**deliveries**
81:5 81:6

**delivering**
21:20

**delivers**
12:22

**delivery** 81:2
81:2 81:3
81:3

**department**
45:25 48:3

**depending**
102:20

**deponent** 5:13
19:23 23:19
28:2 28:5
28:9

28:12 28:23
34:3
34:14
35:4
39:15 40:11
42:12 44:15
47:19
48:6
48:16 49:24
50:3 50:6
52:13
53:8
53:16 53:23
54:12 54:19
54:21
55:4
55:10 55:17
57:10 60:23
61:2 68:5
68:7
70:12 74:17
80:11 80:24
86:18 86:25
88:6
88:14 91:14
92:2
92:12
93:1 98:8
99:20 103:9

**deposed** 7:2

**deposition**
5:1 7:13
7:13 24:3
24:6
29:14 29:15
30:8
30:14 32:25
33:7
89:20
103:18

**depositions**

77:9

**describe** 26:7
63:23

**described**
24:19 24:25
54:9
78:17 83:19

**describing**
22:13 79:6

**description**
100:1 100:4

**detail**
19:11 19:12
54:21

**details** 52:3

**determination**
35:1
44:20
47:5
47:20 62:7

**determine**
33:23 46:19
54:4 56:9
56:16
59:7 89:9
100:20

**determined**
34:24 42:22
45:19 46:23
47:2
52:23 59:16
71:14

**determines**
45:7

**different**
14:10 15:16
67:1
81:11 85:20
91:17

100:20

**digging** 71:20

**diligence**
76:16

**direct**
46:16 93:11

**directed**
46:15

**direction**
44:7 46:7
47:11
53:2 54:5
92:19

**disciplinary**
67:12

**disclose** 18:2

**disclosure**
33:2

**discriminated**
29:9 84:20

**discriminatio
n** 84:11
84:13 84:16
84:17 84:19
84:23 95:12
96:7

**discriminator
y** 85:15
86:15 86:19

**discussed**
88:17

**disparaging**
95:21

**disposition**
26:6

**disrespectful**
27:18



disruption
100:18
100:18
100:21
101:10
101:14

disruptive
39:25
40:2 40:4
40:20
41:1
42:23 99:16
99:16 99:25
100:3

DMV 10:25

document 33:1
36:13 36:18
36:25
37:2 37:4
37:5 37:9
37:11 37:16
37:21 37:23
38:2 38:4
38:12 38:14
38:16 38:22
39:2 39:7
39:9
39:21 41:12
43:11 43:14
43:16 43:19
43:21
49:5 49:6
49:9
51:15 51:17
51:20 51:24
52:4 52:8
56:20 56:23
57:5
57:20 57:24
58:2 58:7
58:7
58:13 58:15

58:18 58:20
58:25
59:3 59:4
59:17 65:11
65:12 97:11
97:25 98:15

documents
32:24
33:6 101:8

done 18:22
18:23 18:25
22:20
25:7
37:13 37:14
38:23 38:24
58:21 58:23
67:15
68:2 70:3
76:19 86:12
93:22

draft 37:9
46:1
58:15
62:2 62:8

drafted 35:16
38:16 61:18
61:25
62:3
98:22 99:2

driver
10:16 16:11
68:20 68:25
69:2

driver's 11:5

Driving 10:6

drugs 8:1

due 76:16

duly 6:1

during 16:8

23:9
30:22 63:17
67:19 96:14
96:23

_____
E

earlier 64:22
68:1
68:19
79:7
83:22 88:24
90:14
100:13

education
11:19

effect
46:24 86:4

efficiently
6:14

eight 66:24

either 8:22
59:15 60:7

else 12:24
20:19
22:2
29:19 55:15
64:3 65:4
66:10
69:9 75:4
82:21
95:2 95:25

email 23:4
29:25 55:13
57:11 71:18
74:24 75:13
98:9 101:21

emailed 56:23
79:19

emails

78:16 78:16
79:2 79:8
82:20

employed
12:15 12:16
12:17 12:18
13:4
15:19 15:21

employee
16:17 20:22
25:4 25:7
45:7
45:20
54:1
56:17
59:8 84:2
86:5

employees
20:9
20:20
21:1 21:2
21:18 21:19
22:10 26:14
68:14 71:25
72:2 72:4
72:19 80:25
81:9 82:1
82:2 82:3
85:6

employee's
52:23

employers
17:24 18:3

employment
14:10 15:17
18:4 23:9
27:12 62:13

encounter
31:7

engage 95:11

engages 96:7

enrolled
  12:10

ensure 30:7
  102:16

ensuring 81:5
  83:2

entire 39:1
  52:4 58:25

entirely
  87:12

entirety
  37:16 51:23

equal 45:21

Eric 5:20
  22:23 22:25
  45:9
  45:24
  46:7 47:1
  47:11 49:21
  54:4
  63:20
  65:7
  65:22
  66:4
  71:18 72:22
  82:5
  90:12 92:19
  95:10 95:14
  95:18 95:20
  95:25 96:20

Erics 48:1

Eric's
  52:22 53:12

escalate
  94:17

escalated
  100:24

ESI 36:19
  37:16
  38:6 39:2
  43:14
  57:1 59:1

essentially
  49:21 99:1

ethic 18:16

Ethical 18:14

ethics
  18:17 19:14
  19:17 19:20

eventually
  27:11

everything
  6:19 6:19
  6:24
  53:11 53:17
  67:17
  70:3 73:1
  88:15

evidence
  42:13 42:19
  42:21 64:21
  65:16 65:23
  66:11 102:4

exact 19:2
  19:24 25:17

exactly 45:15
  61:15 69:23
  73:19 74:23
  80:6 86:3
  87:2 89:3
  99:14

EXAMINATION
  6:4 90:7
  100:11

examined 6:2

excuse
  92:14 98:23

exhibit 35:25
  36:2
  36:22
  37:1
  37:18
  38:8 38:9
  39:4 43:6
  43:9
  43:16 56:22
  56:23 56:24
  56:24
  57:2
  90:19 91:19
  97:1
  98:14 98:14

exhibits
  57:12

expect 66:13

experience
  81:3

explain
  21:9 65:2
  69:21
  70:9 72:9
  73:10
  78:9
  80:16 93:2

explained
  64:21
  65:1
  65:15 80:24
  100:19

explaining
  73:18

Express 44:10

extent 30:12

### F

Facility
  13:17 13:20
  14:6 14:7

fact 30:20
  46:14 67:15

factor 99:12

factual 52:3

failed 8:4

fair 41:10
  42:6
  69:18 95:15
  96:4 96:10

fairly
  96:18 96:23

falsely 71:15

falsification
  71:17

fast 50:17

fear 56:10
  56:17
  59:8 60:1
  60:21

Federal 5:22

FedEx 5:20
  10:13 10:18
  10:21 13:13
  13:15 13:16
  13:23
  14:1
  16:13 16:16
  16:17 17:25
  17:25
  18:4 18:6
  18:7 18:9
  19:4
  19:18 23:10
  24:8

24:12 24:14
25:4 25:7
27:7
40:22
42:4
44:10
45:3 45:7
45:20 49:16
49:18 53:25
54:14 54:17
62:13 62:16
62:23
70:3 80:8
80:12 80:14
82:21 82:25
83:8
83:13 83:17
84:7
84:11
87:4 87:6
87:8
87:20 90:11
95:8

**feel** 19:16
69:24 69:25
72:6

**feeling** 6:12

**felony** 9:13

**felt** 80:17

**female** 31:21

**fewer** 81:24
82:1

**filed** 31:16
35:2
38:19 41:14

**files** 32:11

**final** 43:2

**findings** 52:3
91:7 91:8

91:9 92:5
92:6

**fine** 7:7 7:14
7:16
57:17 72:8

**finish**
57:14 61:16
77:21 77:23
78:21 100:3
102:12

**first** 6:1
16:25 18:23
22:11 35:17
75:2
79:17 83:11
89:20
100:24
101:2

**five** 14:23
15:13

**fix** 55:7

**flag** 76:11

**floor** 63:24

**footage** 34:23
42:20
44:1
49:11 102:5

**form** 19:21
23:18
34:1
34:12
35:3
39:14 40:10
42:10 44:14
47:18
48:5
48:15 49:23
49:25
50:2 50:5
50:11 52:12

53:7
53:15 53:22
54:11 54:18
55:3 55:9
55:16 60:22
61:1 68:4
68:6
69:11 70:11
80:10 80:19
80:23 86:17
86:24
88:4
88:10 88:13
92:23 99:1

**forth** 94:16
102:8
102:23

**forward** 46:21

**fraudulent**
20:4

**Frederick**
8:14 63:3

**free** 41:3
41:5

**freeze** 97:12

**Freight** 13:11
15:11 17:9

**front** 39:2
57:5

**froze** 97:15
97:17

**frozen** 97:18

**fully** 7:21
58:14

_____

G

**Gabe** 90:10

**Gabriel**

5:19 30:3

**gather**
31:25 32:11

**gathered** 32:9

**gender** 32:5

**general** 100:1
100:4

**gestures** 6:22
6:22

**getting** 10:25
49:11

**GF** 98:22

**GFT** 31:12
31:14 31:16
31:18
32:8
32:11
35:2
38:19 41:15
62:7 62:9
66:17 66:22
67:9
67:10 67:18
69:19 69:21
82:9
85:17
88:2 88:9
88:12 88:16
96:10 96:14
96:18 96:21
96:24 98:23
99:2

**GFT-ed** 67:7
69:16

**gist** 76:7

**given** 67:17
94:10

**giving** 49:15

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

**God** 86:2

**Gotcha** 93:6

**Gotham** 13:8
13:9
13:10
15:5 17:8

**gotten** 72:7

**great** 5:25
6:10
25:21 51:8

**Greens** 13:8
13:9
13:10
15:5 17:8

**groceries**
12:22

**ground** 6:17

**grounds** 67:13
67:16

**group** 21:18

**guess** 28:25
36:2 52:7
68:23 71:20
73:4
83:10
85:5
85:18 97:3

**guessing** 23:4
31:24 71:13
71:18

**guy** 26:10

**Guyana** 8:10

**guys** 20:11
85:4

――――――
H
――――――
**half** 11:22

**hand** 5:9
65:11
102:24

**handicap**
84:19

**hands** 102:10

**happen**
21:23
30:9
47:17
65:9 65:13

**happened**
32:17 34:24
35:10 35:12
35:22 42:20
45:4
47:24
49:8
49:13 53:11
53:18 63:24
67:25 70:24
72:12 80:25
81:23 102:7

**happens** 82:19

**harassed**
93:18

**hard** 26:3
26:4

**haven't** 7:3
7:5 51:9

**having** 6:1
79:1 87:9

**head** 72:21
72:23
73:5
73:11 73:22
76:22 77:1

**headed** 93:23

**heading** 51:24
52:9

**headquarters**
73:3

**health** 62:19

**hear** 28:1
28:7
28:10 28:12
30:22
50:7
50:13 50:17
51:2 70:8
84:22
85:2 98:2
98:3

**heard** 29:2
68:16
69:9
84:24 85:17
95:20

**heart** 67:22

**held** 16:12

**Hello** 25:24

**helps** 16:7

**he's** 26:20
26:22
29:9 62:6
62:9 77:2
89:12 89:23

**Hey** 48:12
55:1 55:6
73:23 83:4

**Hi** 25:24

**hide** 82:13
82:15

**hiding**
20:12 20:13
20:16

**highest** 11:19

**hired** 87:21

**hit** 102:2
102:4 102:5
102:23
102:24

**holiday**
20:3
21:15 68:22
69:4 69:4
79:15 79:25

**holidays**
24:23 24:23
68:20 69:2

**home** 63:11
63:14
64:2 64:8

**hopefully**
67:10

**hopes** 67:21

**host** 97:4

**hours** 8:2

**House** 8:25

**HR** 32:13
45:25 46:19
47:4 48:3
52:22
54:3 93:25

――――――
I
――――――
**I'd** 89:11
89:11

**ID** 22:17
22:18 71:14

**idea** 85:21

**identificatio
n** 36:23



| | | | |
|---|---|---|---|
| 38:10 | 50:1 50:4 | 102:12 | 82:25 |
| 43:7 57:3 | 50:11 50:17 | **imagine** | **incomplete** |
| **I'm** 6:16 | 50:21 51:15 | 102:15 | 53:5 53:9 |
| 8:6 8:22 | 52:7 | **immediately** | **incorrect** |
| 9:3 9:8 | 53:10 53:23 | 13:13 | 21:4 53:5 |
| 9:18 10:1 | 53:24 54:12 | **imminent** | 55:8 |
| 10:10 11:14 | 54:14 56:20 | 56:10 56:17 | 55:21 63:8 |
| 12:3 | 56:21 56:22 | 59:8 60:1 | **Indeed** 16:5 |
| 12:11 12:16 | 56:23 | **improper** | **indicated** |
| 12:16 12:18 | 57:8 58:4 | 76:17 | 68:1 68:7 |
| 13:10 15:20 | 58:23 59:11 | **improperly** | 68:8 |
| 17:19 | 59:11 59:14 | 71:9 | **indicating** |
| 19:5 | 60:6 | **incident** | 68:1 |
| 19:19 19:24 | 61:10 61:24 | 22:13 | **information** |
| 21:24 21:24 | 62:15 | 31:4 | 7:16 23:2 |
| 23:3 23:3 | 63:1 63:7 | 31:13 32:17 | 31:25 32:10 |
| 23:19 23:23 | 64:13 64:24 | 33:15 33:20 | 32:11 32:14 |
| 26:24 | 65:1 | 33:24 34:22 | 32:17 33:10 |
| 27:2 28:2 | 65:16 68:17 | 34:24 | 33:10 33:13 |
| 28:9 28:9 | 68:23 71:13 | 35:9 | 37:20 |
| 28:20 | 71:18 | 35:12 35:22 | 39:6 55:2 |
| 29:8 29:8 | 72:6 | 35:23 41:25 | 55:14 |
| 31:24 | 72:25 72:25 | 49:8 | 59:4 |
| 32:1 | 73:9 | 55:25 | 61:13 61:19 |
| 32:23 | 73:25 73:25 | 56:2 56:4 | 71:19 99:6 |
| 34:3 36:9 | 74:1 74:1 | 56:7 | **initially** |
| 36:15 37:14 | 74:2 | 56:14 | 65:9 98:14 |
| 38:1 38:3 | 74:17 74:22 | 83:8 94:8 | **initiated** |
| 38:24 | 75:17 | **incidents** | 94:15 98:22 |
| 40:3 | 76:2 76:4 | 85:20 85:22 | 98:23 |
| 40:15 | 76:5 | 86:9 | 99:3 100:23 |
| 41:2 | 76:20 76:21 | 86:11 86:21 | 101:1 |
| 41:10 41:11 | 76:25 | **incited** 33:15 | **instance** 78:5 |
| 42:16 42:18 | 77:3 | 33:20 | **instances** |
| 43:9 | 77:22 77:24 | **include** 61:13 | 78:6 |
| 43:10 43:24 | 78:9 | 61:19 | **instead** 46:24 |
| 44:2 | 78:12 78:19 | **included** | **institution** |
| 44:15 45:11 | 87:11 87:11 | 61:14 | 11:23 |
| 47:11 47:14 | 87:11 | **including** | |
| 47:15 47:19 | 88:5 88:5 | | |
| 48:6 48:9 | 97:4 97:18 | | |
| 49:15 49:18 | | | |

insurance
  62:19

interact
  95:17

interaction
  39:20

interoffice
  32:18 32:21
  33:11 35:17
  41:14 41:18

interrupt
  74:1

interviews
  56:4

investigated
  22:19

investigates
  71:12

investigation
  31:18 41:25
  42:3 42:5
  59:19
  61:3 61:5
  61:6
  64:25 65:18
  72:16 76:18
  78:10

investigative
  42:25
  43:3
  43:20 44:18
  45:5
  45:14
  46:2 46:5
  46:10
  47:6 47:9
  49:1
  51:20
  52:2 61:20

involved
  32:16

Island
  13:17 13:20

isn't 48:4

issue 22:13
  30:15 70:24
  79:2
  79:19 81:22
  83:24

issued 65:8
  67:12 83:21

issues
  20:10 25:22
  54:24 84:24
  85:2

issuing 43:22
  48:21
  49:1
  51:21 51:24
  52:4 52:10

I've 7:9 9:10
  22:20 27:19
  30:3
  55:17 55:17
  56:19 56:22
  67:17
  70:3 72:7
  76:19 84:20
  84:24

_____

        J
James 42:4
  42:24 52:20
  60:16 101:6

Jessica 5:17

job 13:1 16:3
  16:8
  16:13 16:17

20:21 66:23
  102:15

jobs 16:7
  16:12 87:14

joining 90:10

June 14:2
  14:3 18:8
  18:10
  22:1 58:8
  61:18 63:20
  64:16 64:17
  71:3 71:6
  72:11 72:14
  78:9
  78:10 98:16

justified
  95:8

justify 46:18

_____

        K
Kelvin 81:17

Kevin 5:18
  25:12 25:13
  25:20
  26:4
  26:14 26:18
  26:21 26:23
  27:1 27:4
  27:14 27:17
  27:21
  29:4 29:7
  31:7
  31:16 33:15
  33:19 33:23
  34:6
  34:10 34:24
  35:2
  35:21 37:23
  38:19 39:9

41:14 42:22
  42:25
  43:4
  43:22 45:13
  47:2 58:4
  58:9 61:7
  62:2 64:7
  85:14 85:23
  86:23
  87:1 88:1
  88:15 88:24
  93:12 93:15
  93:17
  94:1 94:3
  94:4 94:7
  94:10 94:12
  94:15 94:24
  96:11
  100:14
  100:16
  101:1 101:8
  101:15
  102:2
  102:14
  102:17
  102:19
  102:21
  102:23
  103:4 103:5

Kevin's 26:25
  27:1 56:9
  56:16
  59:7 100:23
  102:9
  102:24

kid's 33:4

knew 17:5
  66:15 67:23
  68:11 68:12
  82:18

knife 94:12

**knowledge**
  21:21
  47:1 74:3

**known** 95:10

---
L
---

**lack** 21:21

**Lane** 8:14
  63:3

**language**
  85:12 85:16
  92:23

**last** 6:7
  8:2 28:21
  28:22
  44:3 44:5
  53:10 60:7

**late** 20:17
  20:18 21:13
  21:16 25:23
  74:7
  79:23 79:23
  80:3 80:3

**later** 17:6
  34:22 39:13
  40:9
  40:11 40:23
  79:3

**lates** 73:24
  73:24
  74:8
  74:25 74:25
  75:2 75:4
  75:10 76:10
  76:11 76:13
  76:13
  79:9
  79:12 79:20
  82:13 82:16

**lawsuit**

8:18 29:5
29:17
30:2 30:5
30:6 31:1
82:22 82:22
83:1 83:14

**learn** 22:11

**learned** 24:21
  68:20 68:24
  95:24

**learning**
  81:14

**least** 91:8

**leave** 16:20
  16:22 16:24
  17:8 17:22

**leaving** 16:16

**led** 94:11

**length** 72:10

**less** 81:23
  81:23

**Let's** 28:14
  89:22 97:1

**letter**
  32:12 32:16
  37:7
  38:15 40:19
  43:22 45:23
  46:2
  46:23 48:22
  49:2
  51:21 51:25
  52:5
  52:11 61:12
  61:18
  62:2 62:5
  62:8
  83:21
  98:5 98:5

98:8
98:13 98:16
98:22
99:1 99:8

**level** 11:19
  27:12

**LGA** 75:9
  87:17

**LGAA** 74:5

**license**
  10:5 10:6
  10:19 10:23
  11:2 11:5
  11:8 83:21

**life** 66:24

**line** 44:5

**lines** 86:6

**listen** 56:3

**listened**
  70:13

**little** 81:11

**live** 8:13
  8:14

**load** 98:1

**Logistics**
  12:19 12:20
  13:3
  13:22
  14:4
  14:13 14:22
  14:24 15:24
  16:1

**long** 9:1
  13:17 13:20
  14:7
  14:21
  15:1
  15:12 70:20

70:21
86:3 89:19

**longer** 21:22

**lot** 20:9
  20:10 20:10
  81:1 81:4
  81:4

**luck** 12:12

**lying** 80:9
  88:8 89:8
  89:12

---
M
---

**ma'am** 36:14
  51:5
  51:10 56:21

**mail** 65:12

**main** 102:17

**male** 60:15
  60:17 60:19

**Malebranche**
  31:19 31:20
  31:22
  33:9
  33:14 69:18
  95:11
  96:3 96:4
  96:6
  96:10 96:13

**man** 32:4 86:2

**management**
  82:15

**manager** 10:17
  24:22 24:25
  25:16 25:18
  26:25
  27:1 27:9
  44:21
  45:4 54:2

59:14
60:2 60:6
67:20
74:4 75:8
81:13
85:1 86:9
87:21 87:24
95:15

**managers**
27:18
81:8
81:11 81:23
81:24
87:9 87:16

**manager's**
60:5
98:17 99:10

**Manhattan**
11:25

**manner** 26:7

**March** 5:4
22:3 22:4
22:5 22:5
70:24 71:22
72:12 72:14
75:9
75:22 76:18
76:20 77:15
77:16 77:16
77:17 77:20
78:5 78:6
78:8
78:11 78:13
78:16
79:1 91:1

**mark** 38:7
56:24

**marked**
36:22 37:17
38:9 39:3

43:6 57:2
90:17 98:14

**marking** 36:25
43:15

**married** 9:7
9:9 9:10

**Maryland** 8:15
15:7 15:9
17:10 63:4

**Massimi**
5:17 5:17
5:22 5:25
6:5 20:6
23:16 23:21
28:20 28:25
29:3 33:3
33:5 34:2
34:5
34:13 34:17
35:7
35:25
36:6 36:8
36:24
38:7
38:11 39:16
40:12 42:11
42:15
43:8
44:16 47:22
48:8
48:19
50:1 50:4
50:7 50:9
50:12 50:16
50:23
51:1 51:4
51:8
51:14 52:17
53:13 53:19
54:6
54:15 54:20

54:22
55:5
55:11 55:19
56:21
57:4
57:13 57:17
57:19 57:22
57:23 60:24
61:4 68:9
69:12 70:18
74:16 74:18
74:19 76:21
76:25
77:3 77:6
77:8
77:11 77:13
80:13 80:20
81:7
86:22
87:3 88:5
88:7
88:11 89:15
89:18
90:1
91:13 91:23
92:1
92:11 92:25
93:9 97:5
97:9
97:12 97:20
97:22
98:7
98:10 99:19
99:23
100:10
100:12
103:6 103:8
103:10
103:12

**may** 22:1 31:3
40:6 44:6
52:16

54:7 71:3
78:7 78:8

**maybe** 9:22
14:9
14:23
22:3 27:2
29:1
30:19 47:14
47:21 87:21

**McGaha** 5:19
5:19 5:24
8:17
19:21 23:15
23:18
28:8
28:13
30:2 30:5
30:18
34:1
34:12
35:3
39:14 40:10
42:10 44:14
47:18
48:5
48:15 49:23
49:25
50:2 50:5
50:7
50:11 50:13
50:14 50:16
50:17 50:21
50:23 50:24
51:3 51:9
51:13 52:12
53:7
53:15 53:22
54:11 54:18
55:3 55:9
55:16
57:9
57:11 57:14



57:18  57:20
57:21  60:22
61:1  68:4
68:6
69:11  70:11
76:21  76:24
77:1  77:5
77:7
77:10  80:10
80:19  80:23
82:21  82:25
83:7
83:14  86:17
86:24
88:4
88:10  88:13
89:17
90:8
90:10  91:15
91:24
92:3
92:13
93:5
93:10
97:7
97:10  97:18
97:23  97:24
98:11  98:12
99:21  99:24
100:8
100:19
103:7
103:13
103:15
**MD** 96:4
**mean** 31:6
40:1
41:11
49:4
52:19  57:19
65:20  67:24
70:21  73:10

73:17
85:3
89:20  99:17
101:11
**meaning** 7:9
7:15
**means** 20:8
20:11  55:18
82:12  82:15
**meant** 92:7
**medication**
7:23  8:4
8:6
**meetings** 83:3
**member** 16:16
**memo** 40:6
41:13  41:21
**memorandum**
32:19  35:17
41:14  41:18
**memorandums**
32:21  33:11
**memos** 56:14
**Memphis**
71:4  71:8
72:22  72:24
73:1  73:2
73:6
73:11  73:23
74:20  74:22
75:13  76:14
78:19
**mental** 7:19
**mention** 6:16
**messages**
82:24
**messing** 20:11

**met** 24:2
**Michael**
60:9  60:10
**Mike** 59:15
60:7  60:13
**mind** 67:23
76:22  76:23
**mine** 25:14
**minute** 28:15
**misdemeanor**
9:16  9:21
11:7
**misdemeanors**
11:11
**missed** 83:3
**missing**
55:2  55:14
**mistake** 63:8
**mistaken** 12:3
27:3  27:9
29:8  58:5
59:15
**mistreated**
95:25
**moment** 30:16
**moments** 59:6
**Monday** 5:4
64:14
**month** 22:1
**months** 14:9
14:23
15:2  15:3
15:6  15:7
15:13
17:2  17:6
**Monty** 5:2  6:1

28:8  103:18
**morning** 6:6
25:22  40:16
**mortgage**
63:16
**move** 9:4
**moved** 8:23
8:24  15:7
15:8
**moves** 46:20
**multiple** 21:1
21:6  21:7
77:20
78:5  78:7
84:18  84:18
**Music** 12:3

_____

N

**Nan** 31:19
31:20  31:22
32:7  32:7
33:9
33:14  33:17
66:25  69:18
82:9
85:18  95:11
96:3  96:4
96:6  96:9
96:13
**necessarily**
54:16  91:19
99:8  99:11
**neither** 30:15
**neutral** 24:14
24:15
**newer** 20:20
20:22
21:1  21:1
21:18  21:19

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

22:9 72:19

**news** 64:19
66:5

**nice** 26:10
26:10

**nicknames** 8:7

**nodding** 76:22

**nondisclosure**
62:22

**none** 86:9
88:17

**Nonetheless**
6:13

**nonmanagers**
87:10

**normal**
78:22 78:22

**normally** 8:5

**notebook**
101:19

**nothing** 5:12

**noticed** 72:22
73:11 95:24

**notify**
74:13 74:20

———————

O

**object**
19:21 23:15
23:18
34:1
34:12
35:3
39:14 40:10
42:10 44:14
47:18
48:5
48:15 49:23

49:25
50:2 50:5
50:22 52:12
53:7
53:15 53:22
54:11 54:18
55:3 55:9
55:16 60:22
61:1 68:4
68:6
69:11 70:11
80:10 80:19
80:23 86:17
86:24
88:4
88:10 88:13

**objecting**
50:11

**objection**
50:13 50:19
50:20 51:10
51:12 91:13
91:13 91:23
92:1
92:11 92:25
93:9
99:19 99:23

**observation**
35:5

**obtain** 12:7
13:1
14:10 15:16
16:3

**occasions**
10:9
10:11 77:20

**office**
22:16 22:23
23:1
63:20 65:15
72:21 72:23

73:6
73:11 73:23

**Officer** 42:4

**oh** 13:10
19:23 28:25
34:3 37:5
46:10 46:23
67:16 77:22
78:18 86:13
93:23

**okay** 5:25
6:10 6:15
7:2 8:7
8:11 9:1
9:20 9:23
10:3
10:13
11:2
11:10 11:23
12:5
12:12 12:24
13:12 14:18
14:20
15:8
15:15 15:25
17:2 17:8
17:19 17:19
19:6
19:10
24:2
24:18
27:4
28:11 28:18
28:20 28:25
30:13 30:25
32:7 36:6
36:9
36:12 36:18
38:1 38:3
41:7 43:9
43:10 43:14
43:24 45:16

46:10
49:4
51:19 54:16
56:20 56:20
57:22 59:12
62:8
63:10 63:10
66:8 67:7
68:10 68:18
69:8
69:13 69:21
72:6
73:12 73:16
73:19
77:3 77:5
77:11 77:25
79:22
80:7
81:18 81:21
82:20
83:6
83:13
84:3 85:9
87:8
87:13 87:15
88:1
89:14 89:18
90:2 92:7
92:16 93:11
94:13 94:23
97:9
97:16 97:19
97:23 98:11
99:5
99:15 99:22
100:3 100:7
101:7
101:25
103:6 103:8
103:10
103:13
103:16



omit 53:21

one-on 33:17

one-on-one
59:21

one-page
36:18

ongoing 7:14

online 16:5
16:6

onto 102:17

operating
70:15

operation
81:10

opportunity
39:1
58:24 96:14

order
103:11
103:14

original
103:11

Otherwise
78:24

outcome 67:1

overnight
30:21

overturned
67:14

overweight
85:5 85:5

owned 63:13

—————————
P
—————————
p.m 90:2 90:6
103:17

103:19

package 20:17
81:3

packages 20:1
21:8
21:12 21:16
21:22 68:21
69:3 69:4
72:18 73:21
74:9
74:10 76:17
102:16

page 44:3

paid 65:17

paper 66:12

parole 11:13

participated
96:21

particular
76:8 82:8

particularly
72:17

Pasqualicchio
60:8

Pasqualicchio
's 60:18

past 49:15
70:9 74:10

peer 25:14

peers 27:5
27:10

penalty 5:10

pending 7:8
63:17 64:25
65:17

Penske
12:18 12:20

13:3
15:24 16:1

people 78:1
87:6

per 19:18
94:9 101:12

percent 95:16

perhaps
68:2 72:8
74:25 99:17

period 15:6
62:20 72:14
75:3

perjury 5:10

permissible
69:6 69:7

person 19:3
23:13
26:9 65:4
68:2
74:14
80:9 84:5
99:17

personable
26:6 26:8

personal
56:11 56:18
59:9 60:1
60:21
87:5 101:18

personally
80:17 84:20
85:21

person's 32:5
95:22 96:1

pertinent
61:13

phone 30:23

65:3
65:12 65:22

phrase 100:17

physical 7:19
100:24
101:2

picked 102:13

piece 51:16
51:16

placed
56:10 56:17
59:8 60:1
65:17
71:5 71:9
71:15 76:16

plaintiff
5:18
25:11 96:11

Plaintiff's
37:1
37:17
38:8 39:3
43:16 90:19
91:19

plan 9:1

plans 9:4
12:7
62:12 62:14

please 5:9
5:15 5:21
6:7 21:9
28:6
35:25
37:4
37:11 38:22
57:12 58:20
63:2
63:23 74:15
77:6 103:12

point 7:6
13:23 38:20
40:13 58:10
66:13
75:7 77:8
88:9

policy
19:18 40:22
44:10
45:3 45:6
45:8
45:19 45:20
54:1
54:14 54:17
70:16 70:16
87:8
87:20 87:24
100:5
101:12

portion
7:13
44:17 51:20
51:23
52:4
92:16 101:2

position
13:16 16:21
17:6 17:9
25:24

positive
24:15

possibility
66:16

possible
76:13
79:9
79:20 79:23
91:3

possibly
52:10

60:2 93:4

preparation
32:25 33:7

pretty
61:10
70:5 85:8

previously
17:25
27:4 59:6

prior 13:3
13:7 13:9
13:21 18:25
22:20 24:24
35:20
37:9
42:25
43:3
43:21
47:6
48:21
49:1
51:20 51:24
52:4
52:10
69:8
73:21
82:6
85:16 90:21
91:20 102:7

probably
25:25
29:2 49:15

probation
11:13

problem
30:9 36:6
58:22 63:10

procedure
75:19 75:20
75:21 79:24

103:2

procedures
80:2

proceed 5:21

process
16:9 32:8
62:10 73:14
88:12 96:24

prohibited
87:17 87:18

promoted
27:11

pronounce 6:7

proper
66:20 69:14
79:24 80:2

provide
8:17
19:11 19:12
24:12 24:14
33:9
62:16 62:19

provided
16:17 42:13
42:16 42:19
63:5

pull 36:7

pulling 94:12

purely 76:4

purpose 58:12
67:9 67:10

purposes 37:1
37:17
38:8 39:3
43:15

pushed
102:6 102:9

102:23

pushing
61:7 102:6

putting 19:25
58:18 72:16

───────────
Q
Queensborough
11:24

question
7:8 7:9
19:16
28:3
28:21 28:22
34:4
50:25 61:16
72:7
72:10 77:21
78:15 78:15
78:21 83:11
89:7 100:10

questioning
57:15

questions
6:23
50:15 89:16
89:17 89:19
97:6 97:8
100:9 103:6

quickly 6:14

quite 80:8

───────────
R
race 8:11
31:20 60:14
60:16 60:18
84:18 93:19
94:2
95:11 95:22
96:1 96:7

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

**raise** 5:9

**raised** 76:11

**rationale**
93:14 98:17
99:10

**reach** 95:2

**reached** 95:3

**reading** 52:10
52:14 59:11

**really**
20:17 22:15
30:19 30:23
85:23

**reapply** 62:12

**re-ask** 51:1

**reason** 18:3
22:21 24:11
30:23
67:3
69:23
70:7 72:8
82:8
85:19 88:16

**reasoning**
72:21

**reasons** 18:14

**recall**
22:15 22:25
30:13 31:12
48:22
49:2 56:1
58:14
61:8
61:11 62:16
74:23 83:20
90:15
94:5 98:4
98:13

**receive** 64:19
83:16

**received**
82:20 82:24

**recess**
28:17 90:4

**recognize**
37:2
38:12 57:24

**recommendatio**
**n** 16:18
24:15

**record** 5:8
28:14 28:16
28:19 89:22
89:25
90:3 90:6
103:17

**recorded**
18:21

**red** 76:11

**reference**
16:18 24:15

**references**
16:8 16:14

**referring**
18:19 22:23
32:18 38:17
60:10
71:9
72:24 73:9

**reflect** 54:8

**reflective**
54:17

**regard** 79:18

**regards**
70:1 70:3

85:19

**registered**
80:4

**rehash** 77:12

**related** 31:13
33:24 41:25
56:14 62:23
75:21
79:3
82:21 82:22
82:25 83:8

**relations**
87:9

**relationship**
25:19 25:21

**relationships**
87:5 87:16

**relied** 91:7
91:9 92:9
99:6

**remember**
19:24
20:5
21:25 24:10
25:17 59:12
60:7 85:1
86:1 86:2
92:19 92:21
98:20 102:3

**remembered**
27:6

**REMOTE** 5:1

**rent** 63:12

**repeat**
13:19
28:6 34:3

**repeatedly**
50:18

**rephrase** 89:4

**report**
10:18 10:21
21:13 42:25
43:3
43:20 44:18
44:23 44:24
45:6
45:14 45:18
46:3 46:6
46:11
47:6
47:10 47:21
47:23 48:13
48:17 48:21
49:1
54:13 54:24
55:2 55:7
55:13 55:21
61:21 73:22
74:12 74:24
75:1 75:5
75:6
75:12
76:9
76:13
89:1
90:15 90:21
90:25
91:6
91:18 91:20
92:8
92:10 92:17
93:17

**reported**
79:11
86:9
86:11 93:21

**reporter**
5:7 5:14
5:21 6:18
6:23 28:1

28:3 28:6
28:11 28:14
28:18 28:22
36:4 51:6
51:11 61:17
74:14
78:1
78:23 89:24
90:2 90:5
97:14 97:16
97:19 97:21
103:10
103:13
103:16

**reporting**
79:8
79:19 79:23

**reports** 92:24

**represent**
5:16

**represented**
23:22 23:24

**reprimanded**
22:12

**reprimanding**
82:6

**required** 79:2

**reside** 9:1

**respect** 91:10
96:10

**respectful**
27:14

**respond** 65:19
65:20 65:20

**response** 51:5
51:7 66:5
70:1 70:2

**responsible**

76:15 81:18

**rest** 52:8

**restate** 91:16

**result** 99:18

**retaliation**
95:12

**review** 33:6
35:20 37:11
42:24
43:2
45:17 45:17
48:16 49:10
51:19 51:23
52:3
58:24 59:13
59:13 94:10
102:25

**reviewed**
32:24 34:23
35:5
35:11 38:17
42:22 43:21
45:14 48:21
48:25
49:4 49:6
59:16 59:18
60:4
90:20
91:6 91:7

**reviewing**
34:14 34:15
34:18 35:17
45:18

**reviews** 45:4

**revisit**
7:12 7:15

**Ricio** 81:17

**ropes** 81:15

**rules** 6:17

**run** 49:21
69:23

**running** 25:23
81:4

─────────
S
─────────

**safety**
56:11 56:18
59:9 60:1
60:21

**Saturday**
72:18
75:9 76:8

**Saturdays**
72:17 73:20
81:10 81:19
81:24

**save** 83:6
83:9

**saw** 71:13
79:15 89:11
92:4 92:8
95:2
102:1 102:5

**scan** 20:1
20:4
20:16
21:4 21:7
21:14 21:15
21:23 22:18
24:18 68:21
69:4 71:5
71:8
71:13 71:13
71:21 76:16
76:17 77:16
77:17 79:15
79:15 79:23
79:24 79:25

**scans** 21:6
24:22 70:24
71:12 71:15
72:17 75:22
77:15 77:18
78:5
78:13 78:16
79:1 79:3
79:18 82:19
83:18

**school**
12:10 33:4

**screen** 36:5
97:3 97:4
98:6

**scroll** 44:3

**search** 16:6

**seasonal** 17:1
17:23

**second**
17:22
33:4
74:18
97:2 98:15

**security**
34:15 34:18
34:23 41:24
42:4
42:24
43:3
44:17 45:14
45:18
46:2 46:5
46:10
47:6 47:9
47:21 47:23
48:7
48:10 48:12
48:17 48:21
49:1

59:13 59:19
59:19 59:24
61:16 61:20
90:14 90:20
90:25
91:6
91:18 91:20
92:8
92:10 92:17
92:24
93:4 101:6

**security's**
43:20
45:5 45:5
61:3 61:5
61:6 91:7
92:5

**seeing** 98:13

**seem** 67:24
67:25

**seen** 22:17
22:18 61:7

**semesters**
11:21

**send** 32:13
32:14
45:9
45:24 46:18
46:22
54:3
55:13
62:2 62:2
73:22 74:23
75:1 75:6
75:12 78:16
79:2

**sense** 6:25
97:6

**sent** 10:25
71:18 71:18

76:9 79:8

**sentence**
52:19 53:10
53:14

**separating**
18:3

**September**
13:2

**service** 76:15

**seven** 14:9
15:2 15:3
17:2 17:6

**severance**
24:12 62:17

**sexual** 87:9
87:16

**shake** 76:24

**shaking** 76:22

**share** 36:5
97:3 97:3

**sharing** 36:15

**shock** 85:22
88:23

**shortly**
8:23 27:8
27:8

**shoulder**
94:11 94:14

**should've**
52:21

**showed** 30:7
65:16 71:20
78:11 94:10
101:5

**showing**
38:3
43:10 56:20

56:22 56:23

**shown** 22:19
90:14 91:18
97:2 98:4
98:16 101:3

**shows** 21:13
58:8

**sign** 24:9
62:22 66:12

**signing** 24:10

**silently**
37:12 58:20

**simply**
53:21 100:4

**sir** 10:10
41:3 41:5
42:11 48:20
50:1 50:4
50:10 51:11
61:17 73:25
74:18 78:20
88:5

**situation**
100:25

**six** 14:9

**skipped** 56:22

**slew** 80:25
100:20

**slide** 102:18

**slow** 50:15
85:6 85:7

**snitch**
86:23 86:25
87:2

**snitching**
87:2

**Solution**

13:17 13:20
14:6

**Solutions**
14:8

**somebody**
103:4

**somehow** 74:13

**someone** 20:19
29:18 55:22
66:25 67:21
71:4 71:7
71:8
71:13 72:21
72:23
73:5
73:10 73:15
75:13
76:7
76:12
80:7
84:19 95:25
95:25
99:7
99:13 99:16
99:17
100:15
101:8
101:16

**sometime**
63:19

**sorry** 9:18
10:1
10:10 13:10
14:19 17:19
28:2
28:20
30:1 33:3
34:3 36:9
42:16 42:17
42:18 44:15
45:11

50:1 50:4
56:21
57:8
62:15
63:2 63:7
63:9 72:6
73:25 73:25
74:16 74:17
75:17 76:21
77:22 77:24
78:20
88:5 88:5
102:12

**sort** 26:1

**South** 8:10

**span** 23:12

**speak** 6:21
55:24 58:17
59:20
95:1 96:14

**speaking** 28:8
40:15
56:2 78:1

**specific**
22:13

**specifically**
19:6
19:10 19:15
19:19

**split** 102:20

**spoke** 25:22
25:22 30:24
33:17 59:21
83:22 88:25

**spoken** 24:5
29:24
30:2 30:3
30:17 83:13
87:19

**stamp** 36:16
36:19 37:16
38:6 39:2
57:1 58:25

**stamps** 43:14

**standard**
26:10

**started**
14:5 17:5
85:20

**starts** 52:16

**state** 5:15
11:11 37:23
37:25
39:9
39:11 47:10
59:3

**stated**
68:19 90:20

**statement**
32:12 32:15
52:15 52:21
53:4 53:8
54:7
88:19 93:23
103:3

**statements**
56:6

**states** 92:17

**stating** 73:23

**station** 67:20
74:5 75:9
87:17

**step** 7:7
7:8 7:10
35:2
38:19 41:15
45:21 46:25

62:7 62:9
74:2 74:3

**steps** 53:24
54:8

**Steve** 59:15
60:18

**Steven** 60:8

**stips** 5:22

**stop** 14:1
18:9 52:14

**stopped** 52:10

**straight**
93:25

**STREAMING** 5:1

**strict** 73:20

**stuff** 32:13
59:10 84:21
86:14

**subordinates**
87:17

**subpoena**
29:18 29:18
29:22

**subsequent**
16:13 18:2

**sued** 11:15
11:16 11:17
11:18

**summarize**
53:20

**summarizing**
53:17

**summary** 47:14
47:16 47:20
51:20 53:11
99:11

**summed** 93:4

**Supermarket**
12:23

**supervisors**
27:18

**suppose** 30:15

**supposed**
30:10 30:14
54:13 79:25

**sure** 8:22 9:3
16:11
19:5 23:3
23:19 32:23
47:15
48:6
53:23 54:12
60:6
61:10 61:24
64:13 72:25
74:22 87:12
95:6

**suspended**
10:5 10:6
10:19 10:23
11:1 11:3
11:8
34:21 35:24
64:7
64:12 64:13
64:18 65:11
66:1 83:22

**suspending**
35:21

**suspension**
37:6 37:6
64:22
65:7
65:17 66:12

**system**

49:16 49:18
64:7 80:4

_____
T

**table** 85:23

**taking** 6:18
62:6 62:9
93:24

**talk** 25:25
87:5

**talked** 89:1

**talking** 67:19
70:6
70:23 73:13
85:9
85:23 102:8

**target** 85:15

**team** 31:19
31:23 31:23
32:1 71:11

**terminal**
71:12

**terminate**
45:13
58:4 58:4
90:21 91:21
93:7
93:12
99:7
99:13
100:14

**terminated**
18:12 18:13
19:14 19:18
22:21 24:11
25:8
29:10 31:17
40:20
44:7 46:6

47:10 52:24
53:1 58:9
63:21 64:11
66:14
67:5
69:24
70:1 70:2
70:7 72:3
72:5
85:19 88:17
92:18
94:2 94:3
94:5 94:7
99:15
100:16

**terminating**
42:25
43:3 54:1
93:15

**termination**
29:9
32:12 32:15
38:15
40:6
40:19 41:12
41:13 43:22
45:9
45:21 45:23
46:1
46:15 46:16
46:18 46:24
47:2
48:22
49:2
49:17 51:21
51:25
52:5
52:11
54:3
62:17 62:20
62:24
64:4 64:6

66:17 66:19
67:11 67:14
69:14 70:17
71:23 85:16
91:11
95:7 96:15

**terms** 70:9

**terribly**
76:23

**testified** 6:2
7:4 98:21

**testify**
7:24 59:6

**testifying**
7:20 76:23

**testimony**
5:11 25:6
89:5

**text** 82:24
83:4

**texts** 83:2

**thank** 5:14
5:21 7:12
12:14 12:14
14:18
51:8
51:13
90:9 103:7

**there's** 66:15

**thorough** 42:6
76:18

**threw**
102:14
103:4

**throughout**
77:9

**thrown** 103:5

**timeline**
45:12 75:6

**TNT** 27:8

**today** 6:13
7:21
23:22 23:25
37:1 38:8
39:3
43:15 90:10
94:6

**today's** 32:25
37:17

**towards**
34:7
34:11 40:16
52:14
61:7
92:17
102:19

**trained** 53:25

**training** 20:9
81:12 87:22

**transcript**
103:11
103:14

**treat** 96:23

**treated** 93:18
96:18

**trouble** 21:20
76:3 79:3

**trucking**
12:21 12:21

**truth** 5:11
5:12 5:12
6:2 88:2

**truthfully**
7:21
73:18 78:25

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

**try** 6:13  97:4

**trying** 74:1
74:2  76:4
76:5  78:9
93:1  93:3
98:1

**Tuesday** 64:15

**turn** 67:11

**turns** 76:10

**twice** 9:22

**type** 8:6  20:4
20:4  67:1
68:21

**typical** 92:23
103:1  103:2

**typically**
81:18

———————
U
———————

**Uh-huh**
25:10  26:11
73:7

**ultimately**
64:22  66:24
70:14  70:16
71:11  71:22
72:20  73:21
94:15

**understand**
30:25
31:2
49:20  50:14
74:2  76:5
76:6  89:2
89:2

**understanding**
21:3
45:11  47:13
52:7

68:23
73:8  76:2
79:7  82:14

**understood**
7:1  7:11
7:18  11:2
15:25  70:14

**unfair** 67:24

**unfairly**
93:19

**unless** 20:2
21:15

**unprofessiona
l** 27:20
27:23  28:24
85:10  85:11

**untruthful**
88:9

**upon** 45:17
102:25

**UPS** 13:7  13:7
14:25
15:1  15:2
15:18  15:19
16:1
16:21  16:24
16:25
17:5
17:20  17:22

**uttered** 88:18

———————
V
———————

**verbal**
83:17  94:16

**verbally** 65:3
65:5  88:18

**verbiage**
19:25

**video** 34:15
34:18
35:5
35:11  35:18
35:20
37:9
38:17  43:25
94:9
94:20  94:22
101:3  101:5
102:5

**viewing** 37:9

**violate** 87:23

**violated** 45:7
45:20  70:16
100:5

**violation**
44:8

**voices** 6:20

**voluntarily**
16:22

———————
W
———————

**wait** 76:20
78:19

**walls** 81:4

**warn** 87:4

**Warnders** 5:20
22:23
23:1  44:7
45:10
46:7
46:14
47:1
47:11  49:21
53:2
63:20  65:22
66:4
90:12  92:19

95:11  95:15
96:20

**Warners** 65:8

**warning** 46:23
83:21

**warnings**
83:17

**warranted**
46:20
47:3  71:22

**warranting**
70:17

**wasn't** 26:8
26:9  46:9
48:17  52:14
70:1
82:17  88:22
89:13
102:12
102:13

**ways** 24:8

**weather** 6:13

**we'd** 45:17
45:17

**week** 64:14
64:14  64:15

**we're** 6:13
36:25  36:25
38:7
43:15  53:25
53:25  78:20

**we've** 37:17
39:3

**whatever** 30:8
30:8
32:16  32:16
45:4
49:11  49:12

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

49:12 64:14
67:11
100:17

**whenever**
30:20

**WHEREUPON**
28:17 36:22
38:9 43:6
57:2 90:4
103:18

**whether**
25:7
26:13 26:22
28:23 31:12
41:24
62:9 72:2
85:14 92:22
101:25

**white** 31:21
60:15 60:17
60:19

**whoever**
23:4
44:21 76:14

**whole** 5:12

**whom** 5:16
13:9
15:23 39:15
81:1

**who's** 31:23

**window** 73:20

**witness** 27:17
50:8
50:18 76:23
84:11 102:1

**witnessed**
27:19 84:13
84:21 89:11
94:20 94:21

94:21

**witness's**
51:4 51:6

**woman** 32:4
32:6

**work** 13:12
13:15
14:7
14:22 14:24
15:9
15:12 15:25
18:21
26:7
30:21
31:3
31:10 63:24
65:10 83:25
84:1 103:2

**worked**
13:23 17:25
27:5

**worker** 26:3
26:4

**working** 10:13
13:3
13:13
14:1 14:3
14:6
16:13
17:5 18:6
18:7 18:9
25:19
26:2 74:4
75:8
81:13
102:18
102:22

**works** 21:10
32:10
45:1 45:2

45:3
49:16 49:19
73:19 75:15

**wrapping**
78:20

**write** 37:8
55:12 56:13
101:7
101:15
101:18

**writing**
65:3 65:5

**written**
47:7 56:6
56:19 83:17
93:24

**wrong** 48:13
65:24 67:15

**wrongfully**
31:17 71:6

**wrote** 32:21
41:13 52:21
88:19

---

**Y**

**Yellow**
13:11 13:12
15:10 15:10
17:9
17:11 17:14
17:20

**yet** 20:21
41:15

**York** 11:11
30:10 30:11
30:14

**you'll** 43:11

**yourself**
37:12 37:12

38:23 58:21
94:20 95:3

**you've**
24:19 24:24
83:7
83:18 95:5

**YRC** 13:11
15:10 15:10
17:9

---

**Z**

**Zavodny** 36:1

**ZIP** 63:4

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM