# EXHIBIT 9
# REYES TRANSCRIPT

February 7, 2024

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-----------------------------------------x

KEVIN CAMPBELL,

                          Plaintiff,

            -against-      Index No:

                        22-CV-7662

FEDERAL EXPRESS CORPORATION a/k/a

FEDEX EXPRESS, and ERIC WANDERS,

INDIVIDUALLY,

                        Defendants.

-----------------------------------------x

        VIDEOCONFERENCE EXAMINATION BEFORE TRIAL of

a non-party witness, LANCE REYES, taken by the

Plaintiff, pursuant to Court Order, on February 7,

2024, at 10:13 a.m., taken before Gina Strippoli, a

shorthand reporter and Notary Public within and for

the State of New York.

(1)

(2)      **A P P E A R A N C E S:**

(3)

(4)      MASSIMI LAW, PLLC
                    Attorneys for Plaintiff
(5)              KEVIN CAMPBELL
                    99 Wall Street, Suite 1264
(6)              New York, New York 10005
(7)      BY:    JESSICA S. MASSIMI, ESQ.
                    Jessica.massimi@gmail.com

(8)

(9)

         MORRISON MAHONEY, LLP
(10)              Attorneys for Defendants
                    FEDERAL EXPRESS CORPORATION
(11)              And ERIC WANDERS
                    88 Pine Street, Suite 1900
(12)              New York, New York 10005
(13)      BY:    GABRIEL PAUL MCGAHA, ESQ.
                    Gabriel.mcgaha@fedex.com

(14)

(15)

(16)

         ALSO PRESENT:

(17)

             SHARON DANIEL, with Federal Express Corporation

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)
(2)              S T I P U L A T I O N S
(3)     IT IS HEREBY STIPULATED AND AGREED by and between
        the attorneys for the respective parties herein,
(4)     that filing, sealing and certification be and the
        same are hereby waived.
(5)
(6)     IT IS FURTHER STIPULATED AND AGREED that all
        objections, except as to the form of the question
        shall be reserved to the time of the trial.
(7)
(8)     IT IS FURTHER STIPULATED AND AGREED that the within
        deposition may be signed and sworn to before any
(9)     officer authorized to administer an oath, with the
        same force and effect as if signed and sworn to
(10)    before the Court and that a copy of this examination
        shall be furnished without charge to the attorney
        representing the witness testifying herein.
(11)
(12)    IT IS HEREBY STIPULATED AND AGREED by and between
        counsel for all parties present that pursuant to
(13)    CPLR section 3113(d) this deposition is to be
        conducted by video conference, that the court
        reporter, all counsel, and the witness are all in
(14)    separate remote locations and participating via
        videoconference (LegalView/Zoom) meeting under the
(15)    control of Lexitas Court Reporting Service, that the
        officer administering the oath to the witness need
(16)    not be in the place of the deposition and the
        witness shall be sworn in remotely by the court
(17)    reporter after confirming the witness's identity,
        that this videoconference will not be recorded in
(18)    any manner and that any recording without the
        express written consent of all parties shall be
(19)    considered unauthorized, in violation of law, and
        shall not be used for any purpose in this litigation
(20)    or otherwise.
(21)
(22)
(23)
(24)
(25)

(1)

(2)　　IT IS FURTHER STIPULATED that exhibits may be marked
　　　by the attorney presenting the exhibit to the
(3)　　witness, and that a copy of any exhibit presented to
　　　a witness shall be Emailed to or otherwise in
(4)　　possession of all counsel prior to any questioning
　　　of a witness regarding the exhibit in question.  All
(5)　　parties shall bear their own costs in the conduct of
　　　this deposition by video conference, notwithstanding
(6)　　the obligation by CPLR to supply a copy of the
　　　transcript to the deposed party by the taking party
(7)　　in civil litigation matters.

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)   L A N C E   R E Y E S, the witness herein, having

(3)   been first duly sworn by a Notary Public of the

(4)   State of New York, was examined and testified as

(5)   follows:

(6)   EXAMINATION BY

(7)   **MS. MASSIMI:**

(8)   Q.      State your name for the record, please.

(9)   **A.      Lance Reyes.**

(10)  Q.      State your address for the record, please.

(11)  **A.      285 East First Street, Deer Park, New York**

(12)  **11729.**

(13)  Q.      Good morning, Mr. Reyes.

(14)  **A.      Good morning.**

(15)  Q.      My name is Jessica Massimi, I'm an attorney,

(16)  I represent the plaintiff, Kevin Campbell, in the

(17)  case that we're here to discuss today.

(18)        The purpose of this deposition is for me to

(19)  ask you questions about the incidents giving rise to

(20)  this lawsuit.  I'll ask a series of questions, and

(21)  the court reporter will take down my questions, your

(22)  answers, and anything else that gets said on the

(23)  record.

(24)  **A.      (No audible response.)**

(25)  Q.      Because the court reporter has to take down

February 7, 2024

```
(1)                    L. REYES

(2)    everything that we're saying, it's not like a normal

(3)    conversation, so there can't be any crosstalk.  You

(4)    have to let me finish my complete question before

(5)    you begin to answer, and I will let you finish your

(6)    complete answer before I ask my next question.  The

(7)    reason is because the court reporter cannot take

(8)    down two people speaking at once.

(9)            Do you understand?

(10)   A.      Yes.

(11)   Q.      For the same reason, you have to speak up

(12)   and you can't answer questions using nods or shakes

(13)   of the head or gestures because the court reporter

(14)   can't interpret that for the record.

(15)           Does that make sense?

(16)   A.      Yes, ma'am.

(17)   Q.      If you don't understand a question that I

(18)   ask, let me know.  I will attempt to rephrase it.

(19)   If you don't hear part of a question that I ask, let

(20)   me know, I will restate the question or I will ask

(21)   the court reporter to read it back.

(22)           If you realize during the course of the

(23)   deposition that an earlier answer that you gave is

(24)   incomplete or you want to revisit it for any reason

(25)   at all, please let me know.  We can revisit the
```

(1)                    L. REYES

(2)    question.

(3)            If you need a break at any point, that is

(4)    fine.  I just ask that you answer any pending

(5)    question; meaning if I asked a question, you answer

(6)    the question before you step out for the break.

(7)            Does that make sense?

(8)    **A.      Yes.**

(9)    Q.      Is there any reason you cannot testify

(10)   truthfully, fully, and accurately here today?

(11)   **A.      No.**

(12)   Q.      Do you understand that you've taken an oath

(13)   to tell the truth?

(14)   **A.      Yes.**

(15)   Q.      Do you understand that even though we are

(16)   here on Zoom, you are in a conference room, that the

(17)   oath that you've taken to tell the truth here today

(18)   is the same oath you would take as if we were in a

(19)   courtroom in front of a judge?

(20)   **A.      Yes.**

(21)   Q.      Do you have any physical or mental condition

(22)   that might prevent you from testifying here today?

(23)   **A.      No.**

(24)   Q.      Have you taken any medication that could

(25)   impact your ability to testify?

February 7, 2024

```
(1)                    L. REYES

(2)    A.        No.

(3)    Q.        Have you failed to take any medication that

(4)    you normally take?

(5)    A.        No.

(6)    Q.        Have you consumed any alcohol or drugs in

(7)    the last 24 hours?

(8)    A.        No.

(9)    Q.        Are you represented by an attorney today?

(10)   A.        Yes.

(11)   Q.        What's your attorney's name?

(12)   A.        Gabriel McGaha.

(13)   Q.        Have you ever been deposed before?

(14)   A.        No.

(15)   Q.        Have you ever testified in court?

(16)   A.        No.

(17)   Q.        Do you have any nicknames?

(18)   A.        No.

(19)   Q.        Have you ever been known by any name, other

(20)   than the name that you gave here today?

(21)   A.        No.

(22)   Q.        Where were you born?

(23)   A.        I was born Brooklyn, New York.

(24)   Q.        Where in Brooklyn?

(25)   A.        Hospital?  Or just the --
```

```
(1)                    L. REYES

(2)   Q.      The location and neighborhood.

(3)   A.      Bedford Stuyvesant.

(4)   Q.      Were you raised in Bed Stuy?

(5)   A.      Yes.

(6)   Q.      From what ages?

(7)   A.      From the time I was born till about 20 --

(8)   26, so.

(9)   Q.      What is your race?

(10)  A.      African-American and Puerto Rican.

(11)  Q.      Okay.  Do you have any disabilities of which

(12)  FedEx is aware?

(13)  A.      No.

(14)  Q.      Has FedEx ever made any disability or

(15)  religious accommodations for you?

(16)  A.      No.

(17)  Q.      Have you ever complained of any type of

(18)  discrimination at FedEx?

(19)  A.      No.

(20)  Q.      You said you currently reside in what area

(21)  of New York State?

(22)  A.      Deer Park.

(23)  Q.      Where is that?

(24)  A.      Long Island.

(25)  Q.      Do you have any kids?
```

```
(1)                    L. REYES

(2)    A.      Yes.

(3)    Q.      How many?

(4)    A.      One.

(5)    Q.      Are you currently married?

(6)    A.      No.

(7)    Q.      Have you ever been arrested before?

(8)    A.      No.

(9)    Q.      So you've never been convicted of a felony,

(10)   correct?

(11)   A.      No.

(12)   Q.      Do you owe child support?

(13)   A.      No.

(14)   Q.      Have you ever sued anyone before?

(15)   A.      No.

(16)   Q.      Have you ever filed a claim against any

(17)   entity before?

(18)   A.      No.

(19)   Q.      Have you ever settled out of court,

(20)   regarding any claim, that was not filed as a

(21)   lawsuit?

(22)   A.      Not that I recall.

(23)   Q.      Have you ever been sued before?

(24)   A.      No.

(25)   Q.      Have you ever paid any money to anyone to
```

(1)                    L. REYES

(2)    resolve any claims out of court?

(3)    **A.       No.**

(4)    Q.       What is your highest level of education?

(5)    **A.       Bachelor's degree.**

(6)    Q.       From which institution?

(7)    **A.       John Jay University.**

(8)    Q.       What area is that a degree in?

(9)    **A.       Forensic psychology.**

(10)   Q.       When did you obtain that degree?

(11)   **A.       2019 of December.**

(12)   Q.       Are you currently employed?

(13)   **A.       Yes.**

(14)   Q.       Do you have any other degrees or

(15)   certificates?

(16)   **A.       No.**

(17)   Q.       And I'm sorry, you said you are currently

(18)   employed, correct?

(19)   **A.       Yes.**

(20)   Q.       Who's your employer?

(21)   **A.       FedEx Express.**

(22)   Q.       How long have you been employed by FedEx

(23)   Express?

(24)   **A.       8 years.**

(25)   Q.       What's your job title?

(1)                    L. REYES

(2)  **A.        Human resources representative.**

(3)  Q.       How long have you held that title?

(4)  **A.        4 years.  Well, going on 4 years.**

(5)  Q.       What was your title before you were a human

(6)  resources representative?

(7)  **A.        A package hander.**

(8)  Q.       You were a package handler and then you

(9)  received a promotion to human resources

(10)  representative; is that correct?

(11)  **A.        Correct.  Well, there's a set below human**

(12)  **resources representative, which is associate**

(13)  **resources rep.  So I would say the last**

(14)  **position/title I held was associate HR rep.**

(15)  Q.       So you went from package handler to

(16)  associate HR rep to human resources representative?

(17)  **A.        Yes.**

(18)  Q.       When did you receive your promotion from

(19)  package handler to assistant human resources

(20)  representative?

(21)  **A.        March 1, 2020.**

(22)  Q.       How did you obtain that promotion; did you

(23)  request it, did someone recommend you for it?  Or

(24)  something else?

(25)  **A.        I applied for the position.**

(1)                         **L. REYES**

(2)  Q.      How many times did you apply for the

(3)  position?

(4)  **A.      One time.**

(5)  Q.      Did you have to take any tests?

(6)  **A.      No.  But an interview.**

(7)  Q.      Who did you interview with?

(8)  **A.      Steve Wassermann.**

(9)  Q.      At some point, you received a promotion from

(10) assistant human resources representative to human

(11) resources representative, correct?

(12) **A.      Correct.**

(13) Q.      When did you receive that promotion?

(14) **A.      Maybe March, 2022.**

(15) Q.      March, 2022?

(16) **A.      Yes.**

(17)             **MR. MCGAHA:  Jessica?**

(18)             **MS. MASSIMI:  Yes.**

(19)             **MR. MCGAHA:  Can you give us a**

(20)     **couple of moments if you don't mind?**

(21)             **MS. MASSIMI:  Yes.  No problem.**

(22)             **Off the record.**

(23)             **(Whereupon, a discussion was held**

(24)     **off the record.)**

(25)             **MS. MASSIMI:  Back no the record.**

(1)                         **L. REYES**

(2)                 **Can you read back the last question**

(3)         **and answer.**

(4)                 **(Whereupon, the record was read by**

(5)         **the reporter.)**

(6)  Q.        Other than package handler, associate HR

(7)  representative and human resources representative,

(8)  have you held any other job titles at FedEx?

(9)  **A.        No.**

(10) Q.        Do you have any upcoming promotions that

(11) you're aware of?

(12) **A.        No.**

(13) Q.        Is there a particular location you work out

(14) of at FedEx?

(15) **A.        Yes.  I'm domiciled at the HTO station in**

(16) **Jamaica, Queens.**

(17) Q.        What is that again?

(18) **A.        HTO station in Jamaica, Queens.**

(19) Q.        What does HTO stand for?

(20) **A.        Honestly I don't know.  It's just the -- the**

(21) **station identifier.**

(22) Q.        How long have you been domiciled at that

(23) station?

(24) **A.        For the last 3 years and 11 months.**

(25) Q.        Where were you domiciled in May of 2021?

(1)                          L. REYES

(2)    **A.        The same place.**

(3)    Q.        Your title in May of 2021 was associate HR

(4)    representative?

(5)    **A.        Correct.**

(6)    Q.        Are you currently in a union?

(7)    **A.        No.**

(8)    Q.        During your time with FedEx, have you been a

(9)    member of any union?

(10)   **A.        No.**

(11)   Q.        Have you ever been a member of any union?

(12)   **A.        Have I ever?**

(13)   Q.        Yes.

(14)   **A.        Not that I recall.**

(15)   Q.        During your time with FedEx, did they ever

(16)   offer training to you regarding employment

(17)   discrimination?

(18)   **A.        Yes.**

(19)   Q.        What training have you received regarding

(20)   employment discrimination?

(21)   **A.        Well, there's the online training that**

(22)   **everybody typically goes through, and it basically**

(23)   **goes over employment discrimination.  That's --**

(24)   **that's the best way I can put it.**

(25)   Q.        What is employment discrimination?

(1)                        L. REYES

(2)    A.       You're asking me to define employment

(3)    discrimination --

(4)    Q.       Yes.

(5)    A.       -- when it comes to my --

(6)             Employment discrimination is any -- if -- if

(7)    one feels they're not being treated right in the

(8)    workplace, based on different factors.

(9)    Q.       What are those different factors?

(10)   A.       It could be race, it could be sex, it could

(11)   be disability.

(12)   Q.       What is retaliation?

(13)   A.       Retaliation is some form of, I guess,

(14)   getting back at someone for something.

(15)   Q.       Can jokes constitute workplace racial

(16)   discrimination?

(17)   A.       It could.

(18)   Q.       Have you ever experienced any type of racial

(19)   discrimination?

(20)   A.       In my life?  Or at work?

(21)   Q.       At work.

(22)   A.       No.

(23)   Q.       Have you ever experienced any racial

(24)   discrimination in your life?

(25)   A.       Yes.

(1)                          **L. REYES**

(2)    Q.      How many times?

(3)    **A.      I don't know.**

(4)    Q.      Can you give me an estimate?

(5)    **A.      Maybe two times.**

(6)    Q.      When were each of those two instances of

(7)    racial discrimination that you you experienced?

(8)    **A.      Maybe when I was a little younger when I was**

(9)    **18, 19ish, when the stop-and-frisk laws were here in**

(10)   **New York.**

(11)   Q.      Were each of those two instances of racial

(12)   discrimination that you say you've experienced in

(13)   your lifetime a result of the stop-and-frisk --

(14)   **A.      Yes.**

(15)   Q.      -- by the NYPD?

(16)   **A.      Yes.**

(17)   Q.      Okay.

(18)   **A.      Sorry.**

(19)   Q.      It's okay.

(20)           Have you ever experienced racial

(21)   discrimination from anyone, at any point in your

(22)   life, other than those two instances where you were

(23)   illegally stopped by the NYPD?

(24)   **A.      Not that I could recall.**

(25)   Q.      Have you ever experienced racism?

(1)                    L. REYES

(2)    A.        No.

(3)    Q.        Do you believe that those two instances

(4)    where you were illegally stopped by the NYPD when

(5)    you were younger were instances of racism?

(6)    A.        Yes.

(7)    Q.        Well, other than those two instances, have

(8)    you ever experienced racism in your life?

(9)    A.        Not that I recall, other than those two.

(10)   Q.        Do you believe that workplace racism is

(11)   real?

(12)   A.        Yes.

(13)   Q.        Have you ever witnessed workplace racism?

(14)   A.        No.

(15)   Q.        Have you ever heard about workplace racism?

(16)   A.        Yes.

(17)   Q.        Have you heard about workplace racism

(18)   related to FedEx?

(19)   A.        Allegedly.  Never anything substantiated.

(20)   Q.        What have you heard, allegedly?

(21)                    MR. MCGAHA:  Note my objection to

(22)             the form.

(23)                    You can answer.

(24)   A.        Well, certain situations where somebody

(25)   would say he thinks I'm late or -- or he's picking

(1)                          **L. REYES**

(2)    **on me because of my race, or they're doing this**

(3)    **because, you know, I'm a black man, but that --**

(4)    **that's never really true to the case.  It's more so**

(5)    **following policy than anything.**

(6)    Q.      Does FedEx have a policy against race

(7)    discrimination?

(8)    **A.      I'm sure they do.**

(9)    Q.      What is their policy against race

(10)   discrimination?

(11)                    **MR. MCGAHA:  Note my objection to**

(12)           **the form.**

(13)                    **You can answer.**

(14)   **A.      Well, I'm not really required to memorize**

(15)   **policies, so I couldn't tell you exactly what it --**

(16)   **what it says, so.**

(17)   Q.      Are employees required to memorize policies?

(18)   **A.      No.**

(19)   Q.      Does FedEx have a handbook for associate

(20)   human resource representatives?

(21)   **A.      Do they have a handbook for us?  No.**

(22)   Q.      Does FedEx have any handbook that applies

(23)   generally to your class of title?

(24)   **A.      No.**

(25)   Q.      Does FedEx have handbooks?

L. REYES

A.        Yes, they do have handbooks.

Q.        Who do those handbooks apply to?

A.        The handbooks really apply to every -- every employee that kind of walks in currier and handler.

Q.        Does it apply to human resource representatives?

A.        Yes.

Q.        What does the handbook say?

A.        I don't know off the top of my head.  But there's a bunch of lists of policies and I guess where the company started, and yeah.

Q.        When you say there's a list of policies, what policies are you referring to?

A.        Generalized things.  I couldn't tell you off the top of my head.  I haven't seen it in a while.

Q.        When's the last time when you looked at this handbook?

A.        Oh, man.  Maybe 8 years.

Q.        Do you currently have a copy of the handbook?

A.        No.

Q.        If you wanted to access the handbook, how would you do that?

A.        I'm actually not sure.  Maybe I could get it

(1)                           **L. REYES**

(2)     **off the FedEx internet, or I'd probably have to ask**

(3)     **my manager.**

(4)     Q.     Does FedEx have directions that guide

(5)     employees on how to complain of discrimination?

(6)     **A.     Can you repeat that?**

(7)             **MS. MASSIMI:  Gina, could you please**

(8)             **read that back.**

(9)                 (Whereupon, the record was read by

(10)            the reporter.)

(11)    **A.     Oh.  Yes.**

(12)    Q.     Where are those policies contained?

(13)    **A.     It's more word of mouth than anything --**

(14)    Q.     Oh.  I can't hear you.  I'm sorry.  Just

(15)    give me a second.

(16)            **MS. MASSIMI:  Can you hear me?**

(17)            **THE WITNESS:  Yes.**

(18)            **MR. MCGAHA:  Yes.**

(19)    Q.     I'm sorry.  Did you answer the last

(20)    question?  Because I couldn't hear you.

(21)    **A.     Not fully.**

(22)            **MS. MASSIMI:  Gina, could you please**

(23)            **read that back.**

(24)                (Whereupon, the record was read by

(25)            the reporter.)

(1)                         **L. REYES**

(2)     **A.       Okay.  So you have a policy, I guess,**

(3)     **browser where you can go, it's called People; and**

(4)     **those policies are contained in that -- in that**

(5)     **area.**

(6)     Q.       What do those policies say?

(7)                         MR. MCGAHA:  Note my objection to

(8)                 the form.

(9)     **A.       I couldn't tell you.**

(10)    Q.       Why not?

(11)    **A.       I'm not required to memorize it.  We can go**

(12)    **to it and, you know, we can read through it.  But**

(13)    **that's only as needed.**

(14)    Q.       Is anyone required to memorize those

(15)    policies?

(16)    **A.       No.**

(17)    Q.       Do you know what those policies say about

(18)    how an employee is to complain of discrimination?

(19)    **A.       I could probably generalize it for you.  I**

(20)    **couldn't give you verbatim each word that it says.**

(21)    Q.       Generalize to the extent that you can, yeah,

(22)    that's fine.

(23)    **A.       Okay.  So, I guess if somebody wanted to**

(24)    **file an EEO, they would have to go onto the FedEx**

(25)    **website and search for a particular -- a particular**

(1)                              **L. REYES**

(2)     **screen that they would have to fill they're**

(3)     **grievance out in.**

(4)     Q.      Can an employee complain of discrimination

(5)     without filing an EEO?

(6)     **A.      Yes.**

(7)     Q.      How do they do that?

(8)     **A.      Typically they would call either their --**

(9)     **they -- they would tell their manager or they would**

(10)    **call HR.**

(11)    Q.      They could just tell their manager verbally,

(12)    right?

(13)    **A.      Mm-hmm.**

(14)    Q.      Is that a yes?

(15)                    **MR. MCGAHA:  Make sure you answer**

(16)           **the question with a verbal --**

(17)                    **THE WITNESS:  Oh.  Sorry.**

(18)    **A.      Yes.**

(19)    Q.      So, if someone wanted to complain of

(20)    discrimination, they could just tell their manager

(21)    verbally?

(22)    **A.      Yes.**

(23)    Q.      And do managers have an obligation to report

(24)    discrimination?

(25)    **A.      Yes.**

[Page 24]
February 7, 2024

(1)                          **L. REYES**

(2)    Q.      Do managers have an obligation to report

(3)    discrimination that they are aware of, even when

(4)    there is no complaint?

(5)    **A.      I'm not sure what you mean.  Like, if**

(6)    **somebody did not complain to them, but they -- they**

(7)    **see it happening?**

(8)    Q.      Yes.

(9)    **A.      Yes.**

(10)   Q.      To be clear.  A FedEx manager has an

(11)   obligation to report discrimination, even if there

(12)   is no complaint?

(13)   **A.      Yes.**

(14)   Q.      Have you ever been suspended from FedEx?

(15)   **A.      No.**

(16)   Q.      Have you ever been reprimanded or written up

(17)   or subject to any disciplinary proceeding at FedEx?

(18)   **A.      Yes.  I have been written up, actually.**

(19)   Q.      Okay.  What have you been written up for?

(20)   **A.      As -- as a package handler we left -- we**

(21)   **left some freight behind and I -- and I was in**

(22)   **charge of making sure that freight got out, and I**

(23)   **didn't, so.**

(24)   Q.      How long ago was that?

(25)   **A.      Oh, man.  I would say about 5 years ago.**

**L. REYES**

(1)

(2)  Q.      Was that the last time that you were written

(3)  up for anything at FedEx?

(4)  **A.      Yes.**

(5)  Q.      Have you ever been suspended from your job

(6)  at FedEx?

(7)  **A.      No.**

(8)  Q.      Okay.  Have you ever heard anyone at FedEx

(9)  say inappropriate things?

(10)                **MR. MCGAHA:  Note my objection to**

(11)          **the form.**

(12) **A.      Not to my knowledge.**

(13) Q.      Have you ever heard anyone at FedEx say

(14) racily inappropriate things?

(15) **A.      Not to my knowledge.**

(16) Q.      Have you ever heard anyone at FedEx make a

(17) racial joke?

(18) **A.      Not to my knowledge.**

(19) Q.      Have you ever heard anyone at FedEx make a

(20) gender or sex-based joke?

(21) **A.      Not to my knowledge.**

(22) Q.      Do you know the name of the plaintiff in

(23) this case?

(24) **A.      Kevin Campbell.**

(25) Q.      How do you know Kevin Campbell?

```
(1)                    L. REYES

(2)  A.      Through FedEx.

(3)  Q.      What was the nature of your relationship at

(4)  FedEx?

(5)  A.      He was an hourly employee courier at LGA;

(6)  and I was his human resources rep.

(7)  Q.      You were the human resources representative

(8)  for LGA station, in May of 2021?

(9)  A.      Yes --

(10) Q.      I'm sorry.  May of 2022?

(11) A.      Yes.

(12)              MR. MCGAHA:  I believe May of 2021.

(13)              MS. MASSIMI:  Yes.  In May of 2021.

(14) Q.      You were the human resources manager for the

(15) LGA station in May of 2021, correct?

(16) A.      Not the manager, but the rep.

(17) Q.      Got it.  Okay.

(18)         Were you Mr. Campbell's supervisor?

(19) A.      No.

(20) Q.      Who was his supervisor in May of 2021?

(21) A.      I don't want to guess.  I don't know.  It

(22) was -- it was a long time ago.

(23) Q.      Did you have supervisory authority over Mr.

(24) Campbell?

(25) A.      No.
```

(1)                          **L. REYES**

(2)    Q.      Do you know what Kevin Campbell looks like?

(3)    **A.      Maybe.  I -- if I've seen him, maybe.  But I**

(4)    **couldn't tell you now what he looks like.**

(5)    Q.      Are you able to describe any aspect of his

(6)    physical appearance?

(7)    **A.      I guess what I could remember is he's a**

(8)    **black man just like me, and I -- yeah.  I can't**

(9)    **remember if he's tall or short.  That's it.**

(10)   Q.      Okay.  Anything else that you recall about

(11)   his physical appearance?

(12)   **A.      No.**

(13)   Q.      Do you have any understanding of Mr.

(14)   Campbell's allegations in this case?

(15)   **A.      Yeah.**

(16)   Q.      What is Mr. Campbell alleging?

(17)   **A.      I guess racial discrimination.  And that's**

(18)   **kind of what I understand.**

(19)   Q.      Have you reviewed the complaint in this

(20)   case?

(21)   **A.      Not fully.**

(22)   Q.      Did you review any aspect of the complaint?

(23)   **A.      No.**

(24)   Q.      Do you know what Mr. Campbell is

(25)   specifically alleging regarding racial

```
(1)                     L. REYES

(2)  discrimination?

(3)  A.       No.

(4)  Q.       Do you believe Mr. Campbell is lying about

(5)  his allegations of racial discrimination?

(6)  A.       Yes.

(7)  Q.       What specifically do you believe he's lying

(8)  about?

(9)  A.       I -- I don't think the members of management

(10) did anything as far as racial discrimination.  My

(11) stations are pretty good with that kind of thing, we

(12) don't -- we don't care about racial discrimination

(13) in my station.  So if it was happening, it wasn't

(14) brought to my attention until, you know, a certain

(15) time, so.

(16) Q.       The question was, what specifically do you

(17) believe Mr. Campbell is lying about?

(18) A.       The racial discrimination part.  Whatever

(19) that may be, I don't think that was going on, as far

(20) as the management was concerned.  The managers are

(21) concerned.

(22) Q.       What do you mean?

(23)                 MR. MCGAHA:  Note my objection to

(24)         the form.

(25)                 You can answer.
```

(1)                      L. REYES

(2)  A.      If there was any allegations regarding the

(3)  management team and the racial allegations, I don't

(4)  believe they had any part in that.

(5)  Q.      What are his racial allegations?

(6)                  MR. MCGAHA:  Note my objection to

(7)          form.

(8)  A.      I don't know.  That's why I said if there is

(9)  anything that is alleged against the management

(10) team, I don't think they had any part in it.

(11) Q.      So you believe Mr. Campbell is lying about

(12) the racial discrimination, but you don't know what

(13) his allegations are; is that correct?

(14) A.      Correct.

(15) Q.      Why would Mr. Campbell lie about racial

(16) discrimination?

(17)                 MR. MCGAHA:  Note my objection to

(18)         the form.

(19) A.      I have no clue.

(20) Q.      You don't know why someone would lie about

(21) that?

(22)                 MR. MCGAHA:  Note my objection to

(23)         the form.

(24) A.      I don't know.

(25) Q.      Who is he lying about?

(1)                           L. REYES

(2)                    MR. MCGAHA:  Note my objection to

(3)          the form.

(4)     A.      I don't know.

(5)     Q.      But you believe he's lying, correct?

(6)                    MR. MCGAHA:  Note my objection to

(7)          the form.

(8)     A.      Yes.

(9)     Q.      What are some of the stories that you

(10)    believe Mr. Campbell has told about racial

(11)    discrimination at FedEx?

(12)                   MR. MCGAHA:  Note my objection to

(13)         the form.

(14)    A.      Can you repeat the question?

(15)    Q.      What are some of the stories you believe Mr.

(16)    Campbell has told about racial discrimination at

(17)    FedEx?

(18)                   MR. MCGAHA:  Note my objection to

(19)         the form.

(20)    A.      I can't really remember any stories offhand

(21)    that he told.  I know there was inner investigation

(22)    done, but I -- I don't remember offhand what was the

(23)    specific allegations of around those times.

(24)    Q.      Well, when did you first learn about those

(25)    allegations?

(1)                          L. REYES

(2)    **A.        In our GFT, guarantee fair process --**

(3)    **treatment process.**

(4)    Q.        Before Mr. Campbell filed his complaint,

(5)    correct?

(6)    **A.        This was -- this was before his EEO filing,**

(7)    **yes.**

(8)    Q.        So, before even his EEO filing, you were

(9)    directed allegations of racial discrimination,

(10)   correct?

(11)               **MR. MCGAHA:  Note my objection to**

(12)          **the form.**

(13)   **A.        Yes.  But this was also in our meeting after**

(14)   **he was terminated, where he was fighting for his**

(15)   **employment.**

(16)   Q.        Okay.  Do you believe that it is possible

(17)   for a former FedEx employee to complain of racial

(18)   discrimination after they've been terminated?

(19)   **A.        Yes.**

(20)   Q.        In fact, the termination could be

(21)   discriminatory, correct?

(22)   **A.        Could be.**

(23)   Q.        Did Mr. Campbell ever mention anything to

(24)   you about the discrimination he was experiencing?

(25)   **A.        Not until after he was terminated.**

**L. REYES**

Q.       What did he say to you?

A.       **Well, it was a meeting that was held and in that meeting is when he was speaking to -- actually, not even me, he was speaking to the managing director, at the time.  So I was in the meeting, it was just -- it wasn't directly to me.**

Q.       So, the first time you ever heard Mr. Campbell personally speak of racial discrimination was in a meeting that you were present for?

A.       **Yes.**

Q.       And what is the name of that meeting?

A.       **GFTP.**

Q.       Where was that meeting?

A.       **That meeting, if I could recall, probably was at our district headquarters.**

Q.       Where is that located?

A.       **In Garden City, New York.**

Q.       Who was present for that meeting?

A.       **It was myself, Kevin Campbell, Eric Wanders, senior manager, managing director, Nan Malebranche, and manager or former manager, Monty.**

Q.       Do you wish that Kevin Campbell had complained to you about the discrimination he was experiencing prior to his termination?

(1)                    L. REYES

(2)  **A.        Of course.**

(3)  Q.        Would you have believed him?

(4)  **A.        It would've been investigated.  I'll tell**

(5)  **you that.**

(6)  Q.        As you sit here today, however, you believe

(7)  his allegations are lies; is that correct?

(8)  **A.        Well, nothing was substantiated at the time,**

(9)  **so.**

(10) Q.        But you personally believe that Kevin

(11) Campbell is lying about his allegations, correct?

(12)            **MR. MCGAHA:  Note my objection to**

(13)            **the form.**

(14) **A.        I can only give you my -- my professional**

(15) **opinion about that.  While we were doing the**

(16) **interviews nothing was substantiated.**

(17) Q.        I'm asking if you believe that he was lying,

(18) that he's now lying about his allegations about

(19) racial discrimination?

(20)            **MR. MCGAHA:  Note my objection to**

(21)            **the form.**

(22)            **You can answer.**

(23) **A.        Yes.**

(24) Q.        But had he made these same allegations

(25) during his employment you would have done what,

(1)                          L. REYES

(2)  offered him support?

(3)  **A.       We would have investigated the allegations.**

(4)  Q.       So you wouldn't have offered him support?

(5)             **MR. MCGAHA:  Note my objection to**

(6)      **form.**

(7)  **A.       That is me offering my support.**

(8)  Q.       That would be the extent of the support that

(9)  you would offer, had he complained, correct?

(10)             **MR. MCGAHA:  Note my objection to**

(11)      **the form.**

(12) **A.       Correct.**

(13) Q.       If Kevin Campbell told you during his

(14) employment that other employees refer to him as a

(15) monkey in a cage, the extent of your response would

(16) be to tell him that you would investigate it?

(17) **A.       Yes.  We would -- well, what would happen is**

(18) **we would file an EEO, and from that point on, we**

(19) **would investigate the allegations, yes.**

(20) Q.       How would you have conducted that

(21) investigation?

(22) **A.       Well, the EEO process is, either myself or**

(23) **the -- or the complainant files the EEO with the --**

(24) **with said complaint, and the managing director and**

(25) **human resources will fill the bunch of questions, we**

(1)                          L. REYES

(2)   will interview the complainant.  Based on what he

(3)   said in that complaint is the direction that we will

(4)   go.  If there is any follow-up interviews, if

(5)   there's any witnesses that we have to interview, if

(6)   there's any -- if the person that he complained on

(7)   is mentioned we would interview those people.

(8)          So, we would follow the process until we

(9)   came up with either a substantiated or

(10)  unsubstantiated evidence of --

(11)  Q.      And --

(12)                MR. MCGAHA:  Go ahead.  Finish.

(13)  A.      Of -- of the allegations.

(14)  Q.      If there were no witnesses, and if the

(15)  perpetrator denied making those comments, would you

(16)  substantiate or not substantiate the allegations?

(17)                MR. MCGAHA:  Note my objection to

(18)          the form.

(19)  A.      That really depends on what -- I guess, what

(20)  is -- what is said.  I -- I mean, normally it's

(21)  unsubstantiated.

(22)  Q.      In the meeting that you mentioned where you

(23)  first heard about Mr. Campbell's allegations of

(24)  discrimination, what was said?  What happened at

(25)  that meeting?

(1)                    L. REYES

(2)  A.       Well, that meeting is normally a meeting

(3)  where an employee fights some form of discipline.  I

(4)  couldn't tell you verbatim what happened in the

(5)  meeting or what was said exactly.  But I know that

(6)  was the first time that we've heard of anything

(7)  pertaining to those allegations with Kevin Campbell.

(8)  Q.       Who's "we"?

(9)  A.       Me, Nan, Eric, and Monty.

(10) Q.       And you guys chose not to substantiate his

(11) allegations, correct?

(12)                   MR. MCGAHA:  Note my objection to

(13)          the form.

(14) A.       We didn't choose not to unsubstantiate the

(15) allegations, not just outright.  We did an

(16) investigation.

(17) Q.       What was the investigation that you did?

(18) A.       It was -- it was an EEO.

(19) Q.       What was the investigation that you did?

(20) Did you conduct the investigation?

(21) A.       I helped; yes.

(22) Q.       What did you do?

(23) A.       We asked for more details from Kevin

(24) Campbell, and then the people that he did mention,

(25) we brought in and spoke with them.

(1)                        **L. REYES**

(2)    Q.        And they denied it?

(3)    **A.        I don't have the report in front of me, I**

(4)    **couldn't tell you what was done.  It was -- this was**

(5)    **a while ago.**

(6)    Q.        Well, what was the date of this meeting?

(7)    **A.        I don't know.**

(8)    Q.        You're referring to the first GFT meeting,

(9)    correct?

(10)   **A.        The first GFT meeting where we first heard**

(11)   **about the allegations, yes.**

(12)   **        The second meeting was another meeting**

(13)   **entirely different, it had nothing to do with the**

(14)   **GFT.**

(15)   Q.        Right.  No.  I'm still talking about the

(16)   first GFT.

(17)   **A.        Okay.**

(18)   Q.        It was the first GFT that led you all to

(19)   investigate Mr. Campbell's allegations, right?

(20)   **A.        Correct.**

(21)   Q.        And did you commence an EEO as a result of

(22)   what he said during that first GFT?

(23)   **A.        Yes.**

(24)   Q.        Did Mr. Campbell state during that first GFT

(25)   meeting that an employee asked Mr. Campbell, "how is

(1)                      L. REYES

(2)    your new TV"?

(3)    A.      I can recall that, yes.

(4)    Q.      And to your knowledge Mr. Campbell said to

(5)    this employee, "what do you mean," and this other

(6)    employee said, "you and your sister stole -- the TV

(7)    you and your sister stole this weekend while you

(8)    were riding."  Does that sound like one of the

(9)    allegations Mr. Campbell made?

(10)   A.      Yes.

(11)   Q.      Did you perform an investigation into that

(12)   allegation?

(13)   A.      We should have; yes.

(14)   Q.      How did you perform that investigation?

(15)   A.      Well, it was during the second EEO meeting

(16)   that we did have.  So if he mentioned it at that

(17)   point as well, we would have investigated it.

(18)   Q.      I'm still at the first GFT meeting.

(19)   A.      Well --

(20)   Q.      At the first GTT meeting, did Mr. Campbell

(21)   tell you about that?

(22)   A.      He did tell us about that.  But my point is,

(23)   we can't --we can't really talk about these

(24)   investigations without the EEO investigation,

(25)   because that's how our process works.  So if

(1)                        **L. REYES**

(2)    **somebody at a GFT mentions something that we need to**

(3)    **take into another investigation, that's the only**

(4)    **time that we're going to go over those -- those**

(5)    **specific allegations.  We're going to --**

(6)    Q.        But why you didn't --

(7)    **A.        We're going to formally file it into an EEO.**

(8)    **The GFT is for the the matter at hand.  So, the**

(9)    **matter at hand was him being terminated, and that**

(10)   **was the point of that meeting.**

(11)          **So at that point in the GFT, we did take the**

(12)   **notes and we heard what he said and we filed an EEO**

(13)   **as a result of it, and then investigated those**

(14)   **points that he made.**

(15)   Q.        I understand.  That is not lost on me.  I --

(16)   **A.        Okay.**

(17)   Q.        -- am saying the same thing as you.

(18)          There was a GFT, the first GFT meeting,

(19)   correct?

(20)   **A.        Yes.**

(21)   Q.        Correct?

(22)   **A.        Yes.**

(23)   Q.        As a result of that GFT meeting, you and

(24)   others commenced the EEO, correct?

(25)   **A.        Correct.**

[Page 40]
February 7, 2024

(1)                          **L. REYES**

(2)   Q.       One of the allegations that he made at that

(3)   GFT meeting, which was then put into the EEO

(4)   complaint, was his, Mr. Campbell's, allegation that

(5)   another employee had said to him, "how is your new

(6)   TV that you and your sister stole this weekend while

(7)   you were riding", correct?

(8)   **A.       Correct.**

(9)   Q.       My question was, did you all investigate

(10)  that allegation?

(11)  **A.       We should have.  If that's in the EEO**

(12)  **packet, we should have.**

(13)  Q.       How did you investigate it?

(14)  **A.       He said it, we brought the person in that**

(15)  **said it.  If there was any witness to it that --**

(16)  **that he said was there, we asked those people as**

(17)  **well.**

(18)  Q.       Were there any witnesses to that complaint?

(19)  **A.       I have no clue.  I would have to look at the**

(20)  **report.**

(21)  Q.       If I told you that Henry Núñez was a

(22)  witness, alleged to be a witness, does that sound

(23)  right?

(24)  **A.       I couldn't tell you.**

(25)  Q.       Do you remember speaking to Henry Núñez

(1)                        L. REYES

(2)  about that allegation?

(3)  A.        I remember speaking to him, not what about

(4)  specifically.

(5)  Q.        Who spoke to Henry Núñez about this

(6)  allegation from Mr. Campbell regarding the TV and

(7)  the riding?

(8)  A.        If that was the allegation that he was

(9)  supposedly witnessing, it would've been me and Nan

(10)  Malebranche.

(11)  Q.        And do you recall whether you kept any

(12)  record of that meeting?

(13)  A.        I don't recall.

(14)  Q.        Have you ever attended any protest?

(15)  A.        No.

(16)  Q.        What are your opinions on the Black Lives

(17)  Matter movement?

(18)  A.        It's a great meeting -- I mean, a great --

(19)  it's for a great cause.

(20)  Q.        Do you support it?

(21)  A.        Of course.

(22)  Q.        How would you describe what happened in New

(23)  York City following the murder of George Floyd?

(24)  A.        What exactly happened?  I'm sorry.  Is it

(25)  the rioting and everything?

(1)                    **L. REYES**

(2)  Q.      Do you believe that there were riots in New

(3)  York City following the murder of George Floyd?

(4)  **A.      Well, there were, I mean, it's nothing you**

(5)  **could really say, it's black and white, they were --**

(6)  **they were rioting in the city.**

(7)  Q.      Do you believe there were protests in the

(8)  city?

(9)  **A.      Yes.**

(10) Q.      Are you aware of any lawsuits, or have you

(11) heard about any lawsuits stemming from the NYPD's

(12) conduct around those protests following George

(13) Floyd's murder?

(14) **A.      No.**

(15) Q.      You don't know whether there have been

(16) multimillion dollar class action settlements --

(17) **A.      I don't --**

(18) Q.      -- as a result of the NYPD's conduct

(19) following George Floyd's murder?

(20) **A.      I -- I don't know.**

(21) Q.      You don't know anything about that?

(22) **A.      I don't remember, even if I did know.  I**

(23) **don't -- I don't now.**

(24) Q.      Do you read the news?

(25) **A.      Honestly, no.**

(1)                              **L. REYES**

(2)    Q.       Do you consume news, in any form?  Do you

(3)    listen to the news or read newspapers or anything

(4)    like that?

(5)    **A.       If you want to say NBA news is news, then I**

(6)    **-- that's probably yeah, and probably the weather.**

(7)    **But the news is very depressing for me so I don't**

(8)    **typically indulge.**

(9)    Q.       Understood.

(10)            Do you believe the demonstrations in New

(11)   York City following George Floyd's murder were

(12)   legitimate and had merit to them?

(13)   **A.       Me personally -- I mean, people do what they**

(14)   **want to do.  Me personally I -- I just wouldn't put**

(15)   **myself in that situation, so.**

(16)   Q.       You would characterize what happened as

(17)   rioting?  Is that your testimony?  Or --

(18)   **A.       Yes.**

(19)   Q.       Or a mixture of riot and protests?  How

(20)   would you describe what was going on with

(21)   demonstrations in New York City following George

(22)   Floyd's murder?

(23)   **A.       Well, I mean, that's what you said.  So I**

(24)   **just --**

(25)   Q.       What do you mean?  Because I want to be

[Page 44]
February 7, 2024

```
(1)                    L. REYES

(2)    clear.  What do you think I said?

(3)    A.      You said that they were rioting, and I --

(4)    Q.      I don't believe I said that, only because I

(5)    know I don't believe that.

(6)    A.      Oh.

(7)    Q.      So I don't believe I did say that.

(8)    A.      All right.  I --

(9)    Q.      So just to be clear --

(10)   A.      They -- they --

(11)   Q.      Go ahead.

(12)   A.      I was going to say, it is a form of protest,

(13)   yes.

(14)   Q.      What is --

(15)   A.      It --

(16)   Q.      -- a -- what is a form of protest?

(17)   A.      What commenced in Manhattan.

(18)   Q.      Okay.

(19)   A.      In New York City, rather.

(20)   Q.      And in the Bronx, correct?

(21)   A.      Yes.

(22)   Q.      So when Mr. Campbell said or he told you

(23)   all, that someone said to him, "how is the TV that

(24)   you and your sister stole this weekend when you were

(25)   rioting," what did you understand that to mean?
```

(1)                    L. REYES

(2)   **A.       I guess, I -- at the moment, I couldn't even**

(3)   **tell you what I was thinking.   I would have assumed**

(4)   **that it would have been based more on what was**

(5)   **taking place at the time.**

(6)   Q.       What do you mean?

(7)   **A.       As far as the George Floyd protest.**

(8)   Q.       Can you give me any other information about

(9)   the investigation that you recall taking place into

(10)  that allegation from Mr. Campbell regarding the TV

(11)  comment?

(12)  **A.       Not offhand.   No.**

(13)  Q.       Understood.

(14)          During that first GFT meeting, Mr. Campbell

(15)  also said something about -- or do you recall during

(16)  that first GFT meeting whether Mr. Campbell alleged

(17)  that someone else had said to him, "you look like a

(18)  person who would steal a radio and try to sell it"?

(19)  Do you recall him saying that?

(20)  **A.       I don't -- I -- I don't recall that.   It's**

(21)  **possible.   But I don't recall.**

(22)  Q.       Mr. Campbell alleges that someone at work

(23)  said to him, or said to someone else in front of Mr.

(24)  Campbell, "doesn't he," referring to Kevin Campbell,

(25)  "doesn't he look like a person who would steal your

(1)                      L. REYES

(2) radio and try to sell it to you"?

(3) A.        **Now that kind of resembles, that -- that --**

(4) **yeah.  I heard that.**

(5) Q.        The quote that Mr. Campbell reported, and

(6) tell me if I'm wrong, was someone else saying to a

(7) third party about Kevin Campbell, in front of Kevin

(8) Campbell, "doesn't he look like a person who would

(9) steal your radio and try to sell it to you"?

(10) A.        **I did hear that, yes.**

(11) Q.        Now, that comment to you, does that kind of

(12) fall into the same category of the TV/rioting

(13) comment that we were just discussing?

(14) A.        **Well, it was a separate allegation.  I mean,**

(15) **for me, we take things allegation at a time.**

(16) **There's one allegation, two allegations, three**

(17) **allegations.  So, he said it in a separate -- like a**

(18) **separate sentence.  So we didn't necessarily put it**

(19) **with it.**

(20) Q.        I guess my question what I'm saying is, that

(21) comment, "doesn't he look like a person who would

(22) steal your radio and try to sell it back to you,"

(23) that sounds like a reference to the protests for the

(24) riots following George Floyd's murder, correct?

(25)                      **MR. MCGAHA:  Note my objection to**

```
(1)                          L. REYES
(2)         the form.
(3)    A.        It could sound like that.  That doesn't mean
(4)    that that's necessarily what it was.
(5)    Q.        What do you believe, assuming the truth of
(6)    that statement, that someone actually said that
(7)    about Mr. Campbell, what do you think that refers
(8)    to?
(9)                   MR. MCGAHA:  Note my objection to
(10)        the form.
(11)   A.        I -- I don't know.
(12)   Q.        Do you believe that that comment could be
(13)   racial discrimination?
(14)   A.        I don't know.
(15)   Q.        Well, let me put it this way.  If someone at
(16)   work said to you, doesn't Mr. Reyes look -- and this
(17)   is a hypothetical, if someone made that statement
(18)   about you, "doesn't he look like a person who would
(19)   steal your radio and try to sell it to you," would
(20)   you find that offensive?
(21)   A.        I would rather not answer hypotheticals.
(22)   Q.        I understand.  But it is a fair question
(23)   because it goes to your state of mind.  So unless
(24)   your attorney is instructing you not to answer it,
(25)   then you do have to answer the question.
```

(1)                       L. REYES

(2)  **A.      I --**

(3)  Q.      So the question --

(4)  **A.      Can I hear the question again?**

(5)              **MS. MASSIMI:  Gina, can you repeat**

(6)          **the question, please.**

(7)              (Whereupon, the record was read by

(8)          the reporter.)

(9)  **A.      I wouldn't find it racially offensive, I --**

(10) **I mean, I don't know what the person's thought is in**

(11) **the moment.  I -- I don't know.**

(12) Q.      Well, if a white man said that about you,

(13) would you consider that to be racily offensive or

(14) no?

(15)             **MR. MCGAHA:  Note my objection to**

(16)         **the form.**

(17) **A.      I don't know.  In the moment, I wouldn't**

(18) **know.  Unless I -- unless I was really placed in**

(19) **that situation, I really wouldn't know.**

(20) Q.      Would you report that statement if someone

(21) said it to you?

(22)             **MR. MCGAHA:  Note my objection to**

(23)         **the form.**

(24) **A.      Possibly.**

(25) Q.      Do you recall whether you or anyone else

```
(1)                    L. REYES
(2)  performed an investigation into Mr. Campbell's
(3)  allegations that someone said, "doesn't he look like
(4)  a person who would steal your radio and try to sell
(5)  it to you"?
(6)  A.      If it was brought up during the EEO, yes, we
(7)  would have.
(8)  Q.      Well, we're not at the EEO meeting yet.
(9)          Did you all perform these investigations
(10) prior to the EEO meeting or after the EEO meeting?
(11) A.      The EEO is a whole process, so.
(12) Q.      Okay.
(13) A.      So, like everything would've been considered
(14) the EEO process.
(15) Q.      Okay.  Now, do you recall whether Mr.
(16) Campbell ever said, and really, you know, just
(17) excuse my language I'm just trying to make the
(18) record clear.  So I'm just going to repeat verbatim
(19) what this says.  But, do you recall whether Mr.
(20) Campbell ever alleged that two employees called him
(21) a gorilla in a cage?
(22) A.      I do remember hearing that.
(23) Q.      When was the first time when you heard that,
(24) that he was --
(25) A.      At the --
```

**L. REYES**

(2)  Q.       -- alleging that?

(3)  **A.       -- GFT meeting.**

(4)  Q.       The first GFT meeting?

(5)  **A.       Yes.**

(6)  Q.       Assuming the truth of that allegation, do

(7)  you consider that to be discriminatory?

(8)          **MR. MCGAHA:  Note my objection to**

(9)          **the form.**

(10) **A.       It can be taken that way, I guess.**

(11) Q.       Is there an interpretation that doesn't

(12) involve considering race in this context related to

(13) this comment?

(14) **A.       Can you repeat that?**

(15) Q.       I will rephrase it.

(16)          Isn't it objectively racily offensive to

(17) refer to a black person as a gorilla in a cage?

(18)          **MR. MCGAHA:  Note my objection to**

(19)          **the form.**

(20) **A.       It could be, yeah.  It could be.**

(21) Q.       Okay.  I'll just move on from that for now.

(22)          Do you know whether you or anyone else

(23) performed an investigation into that specific

(24) allegation?

(25) **A.       It was brought up in the EEO.  Yes.**

(1)                        **L. REYES**

(2)    Q.      Okay.  Do you recall what investigation was

(3)    performed?

(4)    **A.      I'm going to keep saying it, I'm sorry, but**

(5)    **the EEO investigation is probably where that would**

(6)    **have taken place in.**

(7)    Q.      You did not speak directly with Mr. Campbell

(8)    at the GTT meeting, correct?

(9)    **A.      Normally 15 minutes prior, HR has a step to**

(10)   **do before the GFT actually starts.**

(11)   Q.      And what is that step?

(12)   **A.      So it's basically a step where we go through**

(13)   **the process, and we let them know what's going to**

(14)   **happen in the meeting, what the three decisions that**

(15)   **are typically made in the meeting, and when they**

(16)   **probably would receive some kind of notification of**

(17)   **what the outcome of the meeting is, and then I guess**

(18)   **the steps after the meeting, and then who would be**

(19)   **in the room.  And then --**

(20)   Q.      Are you saying --

(21)           Go ahead.

(22)   **A.      And then we would go over whatever they may**

(23)   **want to go through in the meeting that they -- they**

(24)   **may forget.**

(25)   Q.      Are you saying that you spoke to Mr.

(1)                      L. REYES

(2)   Campbell before the GFT meeting and told him that?

(3)   **A.      Yes.  We went through the process; yes.**

(4)   Q.      Was anyone else present for that

(5)   conversation?

(6)   **A.      No.  Typically it's just me and the**

(7)   **complainant.**

(8)   Q.      Well, do you recall having that conversation

(9)   with Mr. Campbell prior to the first GFT meeting?

(10)  **A.      I do so many of these, I really don't**

(11)  **recall.  But I'm pretty sure it happened.**

(12)  Q.      Do you know whether at the time Mr. Campbell

(13)  had a girlfriend or a partner?

(14)  **A.      I don't know.**

(15)  Q.      Well, did anyone ever tell you that Mr.

(16)  Campbell had a girlfriend or a partner?

(17)  **A.      Not that I know of.  It's none of my**

(18)  **business.**

(19)  Q.      Did you ever hear him talk about his partner

(20)  or girlfriend?

(21)  **A.      No, not that I recall.  I don't know.**

(22)  Q.      Did you recall anything that was said during

(23)  that conversation with Mr. Campbell prior to the

(24)  first GFT meeting?

(25)  **A.      No.**

**L. REYES**

(2) Q.    And you have no independent recollection of

(3) having had that conversation, other than your

(4) knowledge that that is something that you usually

(5) do; is that correct?

(6) **A.    Correct.**

(7) Q.    Did you actually speak to Mr. Campbell in

(8) the first GFT meeting?

(9) **A.    Did I actually speak to him during the**

(10) **meeting?  No.**

(11) Q.    Did he speak during the meeting?

(12) **A.    Typically they would speak during the**

(13) **meeting.  So, yes.**

(14) Q.    Who else spoke during that meeting?

(15) **A.    Nan Malebranche.**

(16) Q.    Who was present for that meeting, other than

(17) yourself, Mr. Campbell and Nan Malebranche?

(18) **A.    Eric Wanders and Monty.**

(19) Q.    Did Eric Wanders or Monty speak during that

(20) meeting?

(21) **A.    Not that I'm aware of, not that I remember.**

(22) **Sorry.**

(23) Q.    Do you remember if anyone told Mr. Campbell

(24) to file the GFT?

(25) **A.    I don't know.**

(1)                            **L. REYES**

(2)    Q.       Do you know whether Monty Bovell told Mr.

(3)    Campbell or encouraged Mr. Campbell to file the GFT?

(4)    **A.       I don't know.**

(5)    Q.       Does Monty Bovell still work for FedEx?

(6)    **A.       No.**

(7)    Q.       Why not?

(8)    **A.       He was terminated on a -- and then I believe**

(9)    **he left the company.  I don't know.**

(10)   Q.       Why was he terminated?

(11)   **A.       I can't remember.**

(12)   Q.       Do you recall what was said during this

(13)   first GFT meeting?

(14)   **A.       I don't recall what was said, I just know**

(15)   **that during that process is when I first heard about**

(16)   **the allegations of, you know, that he brought up.  I**

(17)   **don't -- I don't remember anything else.**

(18)   Q.       Was that meeting recorded?

(19)   **A.       No.**

(20)   Q.       Was it supposed to be recorded?

(21)   **A.       No; it's against FedEx policy to record.**

(22)   Q.       Why is that?

(23)                     **MR. MCGAHA:  Note my objection to**

(24)            **the form.**

(25)   **A.       I don't know.  I'm not the policy maker.**

(1)                          **L. REYES**

(2)    **I'm sorry.**

(3)    Q.      Okay.  Did you record that meeting?

(4)    **A.      No.**

(5)    Q.      Is there anything that you could refer to

(6)    that would refresh your recollection in more detail

(7)    about what was said at that first GFT meeting?

(8)    **A.      No, I mean, unless there's like a report.**

(9)    **Maybe the report.  But other than that, no.**

(10)   Q.      Okay.  The GFT meeting was about Mr.

(11)   Campbell's termination, correct?

(12)   **A.      Correct.**

(13)   Q.      Do you know what the circumstances were of

(14)   his termination?

(15)   **A.      Yes.**

(16)   Q.      What were the circumstances of his

(17)   termination?

(18)   **A.      Well, I know -- I know there was a little**

(19)   **scuffle with them two.  Yes.  There was a little**

(20)   **scuffle that, I guess, took place, from what I**

(21)   **remember.  So, yes.  And he --**

(22)   Q.      How did you --

(23)           Go ahead.

(24)   **A.      I was done.  Go ahead.  I'm sorry.**

(25)   Q.      Okay.  How did you learn about that scuffle?

(1)                      L. REYES

(2)  A.      Usually what will happen is a manager would

(3)  let me know about what was happening, if they want

(4)  to issue discipline.  But if there's an

(5)  investigation that's about to happen, normally they

(6)  would -- they would let me know.  But I -- yeah.

(7)                  MR. MCGAHA:  Will you give me one

(8)          second, please?

(9)                  MS. MASSIMI:  Of course.

(10)                  Off the record.

(11)                  (Whereupon, a discussion was held

(12)          off the record.)

(13)                  MS. MASSIMI:  Back on.

(14)                  Can I have the last question and

(15)          answer, please?

(16)                  (Whereupon, the record was read by

(17)          the reporter.)

(18)  Q.      Okay.  I guess what I'm saying here is, did

(19)  someone tell you about this confrontation that

(20)  precipitated Mr. Campbell's termination?

(21)  A.      Yeah.  I'm sure they would have.  I don't

(22)  know exactly who.  But that's -- I wasn't there so I

(23)  would of had to find out through somebody else.

(24)  Q.      But, do you recall when you first learned

(25)  about this, what you're referring to as a scuffle?

(1)                    L. REYES

(2) **A.       I don't recall when.**

(3) Q.       Did you ever see any video related to this?

(4) **A.       Yes, I did.**

(5) Q.       Okay.  When did you last review this video?

(6) **A.       I last reviewed the video yesterday.**

(7) Q.       What's your understanding of what happened

(8) in this incident that is depicted in the video?

(9) **A.       My understanding is the person that was**

(10) **upset with Kevin Campbell hit a box that may of hit**

(11) **Kevin Campbell, Kevin Campbell aggressively lunged**

(12) **forward, and the guy pulled out a box cutter and**

(13) **they were basically trying to take the box cutter**

(14) **out of his hand.**

(15) Q.       When you say, "Kevin Campbell aggressively

(16) lunged forward," what do you mean?

(17) **A.       He aggressively walked forward into the**

(18) **guy's face.**

(19) Q.       Did he lunge forward, or did he walk

(20) forward?

(21) **A.       I mean, I -- whatever the movement you want**

(22) **to describe it as was aggressive.**

(23) Q.       I am not describing it in any way.  I am

(24) asking you to describe your understanding of what

(25) happened.  You used the word "lunged forward."

(1)                          L. REYES

(2)    **A.        Okay.  So, he aggressively walked forward.**

(3)    Q.      Okay.  And where did you get that

(4)    characterization from, that he aggressively walked

(5)    forward?  Is this based on what someone told you,

(6)    based on your own observations, or something else?

(7)    **A.        Based on the video.**

(8)    Q.      So only based on the video?

(9)    **A.        Yes.**

(10)   Q.      Okay.  Is it your understanding that this

(11)   incident started when the other individual pushed a

(12)   box towards Mr. Campbell, correct?

(13)   **A.        Correct.**

(14)   Q.      Is it also your understanding that this box

(15)   hit Mr. Campbell?

(16)   **A.        Correct.**

(17)   Q.      Is that aggressive?

(18)   **A.        Yes.**

(19)   Q.      Do you know the name of this other person?

(20)   **A.        Alzate.**

(21)   Q.      Okay.  So is it fair to say to say that

(22)   Alzate aggressively pushed a box towards Kevin

(23)   Campbell?

(24)   **A.        Yes.**

(25)   Q.      And the box hit Kevin Campbell?

(1)                    L. REYES

(2)  **A.        Yes.**

(3)  Q.        Is that against FedEx policy?

(4)  **A.        Yes.**

(5)  Q.        Did Mr. Campbell do anything to deserve that

(6)  action from Alzate with him pushing the box

(7)  aggressively?

(8)              **MR. MCGAHA:  Note my objection to**

(9)         **the form.**

(10) **A.        No, he didn't.**

(11) Q.        Do you know why Alzate did that?

(12)             **MR. MCGAHA:  Note my objection to**

(13)        **the form.**

(14) **A.        I guess because he was missing freight**

(15) **according to -- according to my remembrance of the**

(16) **case.**

(17) Q.        Even if that were true, does that justify

(18) Alzate's actions in aggressively pushing the box

(19) towards Campbell and hitting him with a box?

(20) **A.        No.**

(21) Q.        You also said that you believe the video

(22) depicts Kevin Campbell, according to you,

(23) aggressively walking towards Alzate?

(24) **A.        Yes.**

(25) Q.        Specifically what did you observe that leads

(1)                          L. REYES

(2)    you to believe that Kevin Campbell was doing that

(3)    aggressively?

(4)    **A.        Him, his body, walking forward.  He -- the**

(5)    **video was kind of clear about that.**

(6)    Q.        Other than Mr. Campbell walking forward, is

(7)    there anything else he did that leads you to believe

(8)    that he was behaving aggressively?

(9)    **A.        The body language said it at all.**

(10)   Q.        What specifically about his body language?

(11)   **A.        It -- it was the manner in which he walked**

(12)   **forward.  I mean, there's nothing else I could**

(13)   **really describe about it.**

(14)   Q.        You've reviewed this video yesterday,

(15)   correct?

(16)   **A.        Correct.**

(17)   Q.        Can you provide any specifics about his body

(18)   language that leads you to the use of the word

(19)   aggressively to describe his actions?

(20)   **A.        Well, his arm's straight down, he's looking**

(21)   **down at the guy, and you could see he's moving --**

(22)   **his walking rather swiftly to -- to approach the**

(23)   **guy.**

(24)   Q.        The guy had just pushed a box into him,

(25)   correct?

(1)                         L. REYES

(2)  **A.      Correct.**

(3)  Q.      His arms were down, correct?

(4)  **A.      Correct.**

(5)  Q.      You couldn't see his face, correct?

(6)  **A.      Correct.**

(7)  Q.      How fast was he walking?

(8)          **MR. MCGAHA:  Note my objection to**

(9)          **the form.**

(10)  **A.      I can't tell you.**

(11)  Q.      Okay.  Anything else that you can tell me

(12)  about Mr. Campbell's actions in approaching Alzate

(13)  that leads you to believe that he was being

(14)  aggressive?

(15)  **A.      No.  That's it.**

(16)  Q.      What, if anything, do you believe Mr.

(17)  Campbell should have done after Alzate hit him with

(18)  the box?

(19)  **A.      He should have called the manager.**

(20)  Q.      What manager?

(21)  **A.      Any manager he could find.**

(22)  Q.      What manager was there at that time?

(23)          **MR. MCGAHA:  Note my objection to**

(24)          **the form.**

(25)  **A.      I don't know.**

(1)                          **L. REYES**

(2)   Q.      Who was the manager for that station?

(3)   **A.      I don't know if they have a management**

(4)   **change.  You have a senior manager, then you have**

(5)   **managers.  So I don't remember who exactly was there**

(6)   **at --**

(7)   Q.      When you say --

(8)   **A.      -- the time.**

(9)   Q.      When you say, "he should have called a

(10)  manager," you mean he should have left his post to

(11)  go find a manager, correct?

(12)  **A.      Correct.**

(13)  Q.      Where was the manager, at that time?

(14)                  **MR. MCGAHA:  Note my objection to**

(15)          **the form.**

(16)  **A.      I don't know.  I wasn't in the building.**

(17)  Q.      So, Mr. Campbell should have gone to find

(18)  his manager, correct?  That's what you're saying?

(19)  **A.      Correct.**

(20)  Q.      What else, if anything, should he have done

(21)  at that point?

(22)  **A.      I would think that's the clearest thing he**

(23)  **could have done that, I mean, he could have**

(24)  **deescalated the situation right then and there,**

(25)  **which he didn't.**

(1)                          **L. REYES**

(2)    Q.      Is it your testimony that simply by

(3)    approaching Alzate Mr. Campbell escalated the

(4)    situation?

(5)    **A.      Yes.**

(6)    Q.      His presence was escalation, right?

(7)                    **MR. MCGAHA:  Note my objection to**

(8)              **the form.**

(9)    **A.      Not his presence, his actions.**

(10)   Q.      Those actions were what, him walking towards

(11)   Alzate?

(12)   **A.      Correct.**

(13)   Q.      What distance do you believe Mr. Campbell

(14)   should have kept in order to keep from being

(15)   perceived as aggressive?

(16)                   **MR. MCGAHA:  Note my objection to**

(17)             **the form.**

(18)   **A.      He could of either stayed in his spot,**

(19)   **called his manager, or walked away and called his**

(20)   **manager.**

(21)   Q.      Stayed in his spot where he had been hit

(22)   with the box?

(23)   **A.      Yes.**

(24)   Q.      Is workplace violence illegal, or is

(25)   workplace violence against FedEx policy?

(1)                            L. REYES

(2)    **A.        Yes.**

(3)    Q.        Is assault illegal?

(4)    **A.        Yes.**

(5)    Q.        Was Mr. Campbell assaulted?

(6)                        **MR. MCGAHA:  Note my objection to**

(7)            **the form.**

(8)    **A.        He was definitely hit with the box -- I**

(9)    **don't know if that was supposed to happen.  But,**

(10)   **yeah.**

(11)   Q.        What do you mean you don't know if that was

(12)   supposed to happen?

(13)   **A.        Well, I don't know.  But the fact of the**

(14)   **matter is he was hit with the box.  So, yes.**

(15)   Q.        After this first GFT meeting, did you meet

(16)   with Mr. Campbell again, at any other point?

(17)   **A.        Yes.  For the EEO meeting, yes.**

(18)   Q.        That was the next time when you met with

(19)   him, correct?

(20)   **A.        Correct.**

(21)   Q.        Who was present for that meeting?

(22)   **A.        That meeting would've been me and -- me and**

(23)   **Nan Malebranche.**

(24)   Q.        Did you speak with Mr. Campbell prior to Nan

(25)   Malebranche joining that meeting?

(1)                    L. REYES

(2)    **A.        Not that I recall.**

(3)    Q.        Do you recall speaking with Mr. Campbell

(4)    that day, at any point, outside the presence of Nan

(5)    Malebranche?

(6)    **A.        No.**

(7)    Q.        Do you recall speaking to Mr. Campbell in a

(8)    parking lot?

(9)    **A.        Yes, actually after the GFT.**

(10)   Q.        After the GFT?

(11)             What was said during that conversation?

(12)   **A.        Well, I told him that he would receive a**

(13)   **decision, and I told him as his HR rep at the time,**

(14)   **that he should have came to us and told us about his**

(15)   **allegations prior to --**

(16)   Q.        What --

(17)   **A.        Prior to his termination.**

(18)             **I'm sorry.**

(19)   Q.        What else, if anything, did you say to Mr.

(20)   Campbell in the parking lot?

(21)   **A.        That was it.**

(22)   Q.        You approached Mr. Campbell in the parking

(23)   lot, and the only things you said to him were that

(24)   he should receive a decision, and as his HR rep he

(25)   should have complained to you?

(1)                          L. REYES

(2)              MR. MCGAHA:  Objection to form.  He

(3)         didn't say he approached.  For the record.

(4)              MS. MASSIMI:  Okay.  Sorry.

(5)    A.      So, what happened --

(6)    Q.      Tell me what happened in the parking lot.

(7)    A.      So what happens is, normally after the GFT

(8)    process is over, I typically am the person that

(9)    walks the complainant out.  So as the HR personnel,

(10)   there are things that I would probably say to them

(11)   in confidence just -- just, you know -- just as

(12)   their HR rep I would normally say.  Because he

(13)   posted those concerns in that meeting, I told him

(14)   that he should have -- he should have came to me or

(15)   his senior manager for that matter and expressed

(16)   what was allegedly going on, because then it

(17)   would've been investigated, and we would have seen

(18)   if anything was substantiated or not, but --

(19)   Q.      You -- and you would have performed the same

(20)   investigation that was performed after he was

(21)   terminated?

(22)   A.      Correct.

(23)   Q.      When you say that there are things that you

(24)   say to them in confidence, those things are

(25)   truthful, right?

(1)                    L. REYES

(2) **A.      Yes; correct.**

(3) Q.      Are you supposed to be on their side as the

(4) HR rep?

(5) **A.      You are supposed to be neutral as the HR**

(6) **rep.**

(7) Q.      But you do have conversations with the

(8) workers in confidence, correct?

(9) **A.      Yes.  I'm supposed to keep things**

(10) **confidential, yes.**

(11) Q.      And during the time when you walked Mr.

(12) Campbell out of the building after the GFT, your

(13) testimony is that you said to him, "you should

(14) receive a decision, and as your HR rep you should

(15) have complained to us"?

(16) **A.      Yes.  He should -- he should have definitely**

(17) **said something because we would have investigated,**

(18) **yes.**

(19)                     **MR. MCGAHA:  Can you give us a**

(20)          **second, please?**

(21)                     **MS. MASSIMI:  Yes.**

(22)                     **Off the record.**

(23)                     **(Whereupon, a discussion was held**

(24)          **off the record.)**

(25)                     **MS. MASSIMI:  Back on.**

(1)                          **L. REYES**

(2)    Q.      So, during the time when you walked Mr.

(3)    Campbell out of the building to his car --

(4)    **A.      Well, I didn't walk him -- I'm sorry.  Go**

(5)    **ahead.**

(6)    Q.      Sorry.  I guess I'm not understanding.  You

(7)    just walked him out of the parking lot and then

(8)    parted ways?  Is that what happened?

(9)    **A.      I walked him to the door and I said what I**

(10)   **said, and then -- then we parted ways, that was it.**

(11)   Q.      Did you actually go into the parking lot

(12)   with him?

(13)   **A.      No.**

(14)   Q.      Okay.  So you didn't actually leave the

(15)   building, you just walked him out of the meeting to

(16)   the door, and then he was going to leave?

(17)   **A.      Right.  It was -- it was, we were at the**

(18)   **entrance of the door, and that was it.**

(19)   Q.      How much time passed between the time that

(20)   you walked with him alone out of the meeting to the

(21)   door to exit the building?

(22)   **A.      Maybe 2, 3 minutes, if that.**

(23)   Q.      And your testimony is, that during that

(24)   conversation you said to him, "you should receive a

(25)   decision, and as your HR rep you should have

(1)                    L. REYES

(2)  complained to us," essentially; is that correct?

(3)  A.       Correct.

(4)  Q.       Had you ever spoken alone with Mr. Campbell

(5)  before --

(6)  A.       No.

(7)  Q.       -- that?

(8)  A.       No.  No.  This was the first time I've ever

(9)  met him.

(10)  Q.       And did you ever speak with him again?

(11)  A.       Other than the EEO meeting, not that I

(12)  remember.

(13)  Q.       Other than the what?  Oh, other than the

(14)  EEO --

(15)  A.       Yes.

(16)  Q.       Okay.  During that conversation during the

(17)  GFT meeting, did you say anything else to Mr.

(18)  Campbell?

(19)  A.       No.

(20)  Q.       Did you ever tell Mr. Campbell what

(21)  neighborhood in Brooklyn you were from?

(22)  A.       No.

(23)  Q.       Do you know neighborhood in Brooklyn

(24)  Mr. Campbell is from?

(25)  A.       No.

(1)                          **L. REYES**

(2)    Q.      You never learned that the two of you were

(3)    from the same neighborhood?

(4)    **A.      No.**

(5)    Q.      How would Mr. Campbell know that you're from

(6)    Bed Stuy?

(7)    **A.      I have no clue.  I mean, it wasn't -- if**

(8)    **there was a moment where we probably were waiting**

(9)    **for Nan to come in the room I would probably ask,**

(10)   **"how was the ride up, and where were you coming**

(11)   **from."  But other than that, there wouldn't be any**

(12)   **-- there wouldn't be any, you know, conversations**

(13)   **about the whereabouts.  I -- I definitely don't**

(14)   **remember that.**

(15)   Q.      Well, did Mr. Campbell tell you he currently

(16)   lives in Bed Stuy?

(17)   **A.      No.  I -- not that I remember; no.**

(18)   Q.      Did Mr. Campbell ever tell you he was from

(19)   Bed Stuy?

(20)   **A.      Not that I remember.**

(21)   Q.      Like in the same way that you're from Bed

(22)   Stuy, but you don't currently live there?

(23)   **A.      Yeah; not that I remember.**

(24)   Q.      And when you say that you were talking

(25)   before Nan came in, that's a reference to the EEO

(1)                      L. REYES

(2) meeting, correct?

(3) **A.       Correct.**

(4) Q.       Okay.  Well, I'm just talking about the GFT

(5) meeting where you walked him out of the meeting to

(6) the door of the building.  So I'm not yet at EEO.

(7)           But it's your testimony that during that

(8) conversation where you walked Mr. Campbell out of

(9) the GFT meeting, you never said to him, "I'm from

(10) Bed Stuy," and there was no acknowledgement that the

(11) two of you were raised in the same neighborhood?

(12) **A.       No.**

(13) Q.       And did you ever tell Mr. Campbell that you

(14) had experienced some racial issues at the job?

(15) **A.       Not at all.**

(16) Q.       If Mr. Campbell were to say that you told

(17) him that, would that be a lie?

(18) **A.       Yes.**

(19) Q.       Okay.  Do you know why he would say such a

(20) thing?

(21) **A.       I have no clue.**

(22) Q.       Do you know why he would say that you're

(23) from Bed Stuy, that you told him you were from Bed

(24) Stuy?

(25) **A.       Well, that conversation probably could have**

(1)                        **L. REYES**

(2)    **happened, but it wasn't -- I don't think it was in**

(3)    **that moment that we were discussing that.  If it had**

(4)    **been --**

(5)    Q.      How close --

(6)    **A.      -- I --**

(7)    Q.      -- were you two raised away from each other

(8)    in Bed Stuy?

(9)    **A.      I don't know.**

(10)   Q.      You don't recall discussing that it was like

(11)   a matter of blocks?

(12)   **A.      No.  I don't.**

(13)            **MS. MASSIMI:  Off the record.**

(14)            **(Whereupon, a discussion was held**

(15)        **off the record.)**

(16)            **MS. MASSIMI:  Back on the record.**

(17)            **Gina, can you please read back the**

(18)        **last question and answer.**

(19)            **(Whereupon, the record was read by**

(20)        **the reporter.)**

(21)   Q.      Did you tell Mr. Campbell anything else

(22)   personal about yourself during this one-on-one

(23)   conversation with him?

(24)   **A.      No, not that I remember.**

(25)   Q.      Do you recall telling him that you had just

```
(1)                      L. REYES

(2)   purchased a house?

(3)   A.        Not that I remember.

(4)   Q.        Is that, in fact, true?

(5)   A.        At the time, maybe.

(6)   Q.        Well, did you purchase a house in 2021?

(7)   A.        Yeah.  I did.  Actually.  Yeah.

(8)   Q.        Wuss there anything else said between you

(9)   and Mr. Campbell as you walked him out of that first

(10)  GFT meeting, that you have not already testified to?

(11)  A.        No, not that I recall.  I believe it was --

(12)  that it was, and that was it.

(13)  Q.        When was the next time that you spoke to Mr.

(14)  Campbell?

(15)  A.        When was the next time that I spoke to him?

(16)  I guess at the EEO meeting.  I mean, normally --

(17)  technically normally we would setup the meeting so

(18)  if there was like a phone call that happened prior

(19)  to us setting up the meeting, that probably would've

(20)  been the next time that I spoke to him.

(21)  Q.        Do you know if you two had a conversation on

(22)  the phone prior to the EEO meeting?

(23)  A.        If it wasn't to setup a -- the call, no.

(24)  Q.        Okay.  How long after that first GFT

(25)  meeting, was the EEO meeting?
```

```
(1)                    L. REYES

(2)    A.        I don't recall.

(3)    Q.       Did you all show the video of this incident

(4)    to Mr. Campbell in that first GFT meeting?

(5)    A.        I don't recall.

(6)    Q.       Would it have been policy to show him the

(7)    video?

(8)    A.        There's nothing in our policy to show videos

(9)    or not.   I guess it's up to the discretion of the

(10)   managing director.

(11)   Q.       Okay.   The managing director?   Who was the

(12)   managing director related to the GFT?

(13)   A.        Nan Malebranche.

(14)   Q.       Do you know whether Nan Malebranche made the

(15)   decision to show the video to Mr. Campbell as part

(16)   of the GFT process?

(17)   A.        I don't recall if we saw the video or not.

(18)   Q.       I'm asking whether it was shown to Mr.

(19)   Campbell.

(20)   A.        Yeah, I'm not -- I don't recall whether that

(21)   happened or not.

(22)   Q.       Do you know whether the video was shown to

(23)   Mr. Campbell as part of the EEO process?

(24)   A.        I don't recall that either.

(25)   Q.       That would --
```

(1)                          L. REYES

(2)    **A.        That --**

(3)    Q.        Sorry, go ahead.

(4)    **A.        It wasn't necessarily the matter at hand, so**

(5)    **I -- I don't remember.**

(6)    Q.        The video wasn't necessarily the matter at

(7)    hand, as part of the EEO.  Is that your testimony?

(8)    **A.        Yes.**

(9)    Q.        Who was present for the EEO?

(10)   **A.        Me, Nan Malebranche, and Kevin Campbell.**

(11)   **That's probably it.  That is it.**

(12)   Q.        Did you speak with Kevin Campbell alone,

(13)   prior to Nan Malebranche joining the conversation at

(14)   the EEO?

(15)   **A.        I don't remember.  If -- if I did, it was**

(16)   **small talk, until she came out of the meeting or**

(17)   **something.  But I don't recall.**

(18)   Q.        What happened, or did there come a time that

(19)   Nan Malebranche came into the conversation with you

(20)   and Kevin Campbell related to the EEO?

(21)   **A.        She would of had to come into the room, if**

(22)   **she wasn't in the room, and we conducted the**

(23)   **meeting.  So, yeah.**

(24)   Q.        Do you have a recollection of that

(25)   happening?

```
(1)                         L. REYES
(2)     A.        No.
(3)     Q.        Do you have a recollection of anything that
(4)     happened at that EEO meeting?
(5)     A.        Not necessarily.  It was a long while ago.
(6)     Q.        You don't remember -- did you review
(7)     anything that refreshed your recollection about what
(8)     happened at that meeting?
(9)     A.        I -- I couldn't tell you exactly what
(10)    happened verbatim in the meeting, I don't recall.
(11)    Q.        Is there anything you could refer to that
(12)    would refresh your recollection about what happened
(13)    at that meeting with Nan Malebranche and Kevin
(14)    Campbell?
(15)    A.        No.
(16)    Q.        There's nothing you had refer to?
(17)    A.        I mean, yeah.  There -- the -- there's the
(18)    report.  But I still wouldn't know what took place
(19)    in the actual meeting.  It's just we would see the
(20)    findings of whatever happened in the --
(21)    Q.        Was there --
(22)    A.        As a result of the meeting.
(23)    Q.        Was that meeting recorded?
(24)    A.        No.
(25)    Q.        Why not?
```

```
(1)                    L. REYES
(2)   A.      It's against or policy to record.
(3)   Q.      It's against FedEx policy to record EEO
(4)   meetings?
(5)   A.      Yes.
(6)   Q.      Who was representing Mr. Campbell's interest
(7)   in that meeting?
(8)   A.      We were by -- by investigating the claims.
(9)   Q.      You and --
(10)  A.      Yes.  So it really -- really we are
(11)  neutral -- we were a neutral ground at that point.
(12)  Nobody was really necessarily representing in that
(13)  term -- in that form.  But we don't necessarily do
(14)  that at FedEx.
(15)  Q.      Don't do what?
(16)  A.      Normally when there's a -- an EEO, there's
(17)  no other party representing anybody except for
(18)  yourself.
(19)  Q.      Well, Mr. Campbell was accusing FedEx of
(20)  discrimination, correct?
(21)  A.      He wasn't necessarily accusing FedEx, he was
(22)  accusing some people that were apart of FedEx.  But
(23)  not necessarily FedEx.  So he was apart of FedEx
(24)  while those alleged accusations were going on, but
(25)  we wanted to do our due diligence to actually
```

(1)                         **L. REYES**

(2) **investigate the claims that he said happened while**

(3) **he was a part of FedEx, so.**

(4) Q.      Mr. Campbell can was alleging employment

(5) discrimination at FedEx, correct?

(6) **A.      Correct.**

(7) Q.      You and Nan Malebranche were FedEx

(8) employees, correct?

(9) **A.      Correct.**

(10) Q.      You and Nan Malebranche were responsible for

(11) the investigation, correct?

(12) **A.      Correct.**

(13) Q.      As FedEx employees, you and Nan Malebranche

(14) were investigating Kevin Campbell's allegations of

(15) discrimination against FedEx, correct?

(16) **A.      Correct.**

(17) Q.      Can you give me any other information about

(18) anything else that transpired during that EEO

(19) meeting with Kevin Campbell and Nan Malebranche?

(20) **A.      No.**

(21) Q.      You don't remember anything else that

(22) happened?

(23) **A.      No.**

(24) Q.      Can you describe the general tone or general

(25) content of anything that was said or how it was said

(1)                          L. REYES

(2)   during that meeting?

(3)   A.        On who's part?  Nan or --

(4)   Q.        Anyone.  Just the general sum and substance

(5)   of the meeting.  I'm not asking you for a

(6)   transcript.

(7)   A.        Okay.  So, I mean, just there was

(8)   conversation, like the conversation we're having

(9)   today.  She would ask the question, he would answer

(10)  the question, she would expand on it, he would talk

(11)  about a particular situation, she would ask

(12)  questions about it.  If I had a question I would

(13)  probably ask a question.  But it was -- it was

(14)  something like this, you know?  It was he asked a

(15)  question -- or she asked a question and he gave an

(16)  answer.

(17)  Q.        Had you viewed the video, at that point?

(18)  A.        Had I viewed the video, at that point?  Yes.

(19)  Because this was after he was terminated.  So I had

(20)  seen the video way -- well before this.

(21)  Q.        Did you guys show it to him, to Mr.

(22)  Campbell?

(23)  A.        I don't recall.

(24)  Q.        You don't recall if you asked him questions

(25)  about the video as part of the EEO investigation?

(1)                    L. REYES

(2)    A.      The EEO investigation wasn't going over that

(3)    portion of it.  So I -- I highly doubt it.  We were

(4)    going over the investigation -- well, the claims

(5)    that he brought into the GFT.

(6)    Q.      He had told you that he believed his

(7)    termination was discriminatory, correct?

(8)    A.      Not to my knowledge.

(9)    Q.      He never said that his termination was

(10)   discriminatory?

(11)   A.      Not to my knowledge.  If it's in the report,

(12)   then maybe.  But I don't -- I don't remember that.

(13)   Q.      What report are you referring to?

(14)   A.      The EEO.

(15)   Q.      During the GFT process, Mr. Campbell said

(16)   that he was subjected to racism and discrimination,

(17)   isn't that correct?

(18)   A.      Yes.

(19)   Q.      As part of the incident with Alzate,

(20)   correct?

(21)   A.      Correct.

(22)   Q.      And you all did not make that allegation

(23)   part of the EEO investigation, correct?

(24)   A.      I'm not sure as to what the EEO -- what was

(25)   said in the EEO.  But if he -- if he had said -- if

(1)                    **L. REYES**

(2)     **he said it that he put it in his investigation, then**

(3)     **yeah, it probably would've been investigated.  But**

(4)     **it was up to him to give us a summary of the things**

(5)     **that he wanted to go over and the things he wanted**

(6)     **us to investigate in the EEO.**

(7)     Q.      Well, he did, didn't it?  He gave you a list

(8)     of the instances of discrimination, correct?

(9)     **A.      Correct.  But in order for us to actually**

(10)    **properly go over things, we didn't want to miss**

(11)    **anything, we wanted him to give us a summary so that**

(12)    **we could file it -- either he filed the EEO or we**

(13)    **did.  But being that he was probably outside of the**

(14)    **company, we probably filed it for him.**

(15)    Q.      Right.  That's my point.  You filed his EEO

(16)    for him, correct?

(17)    **A.      Possibly; yes.**

(18)    Q.      Based on what he had told you, correct?

(19)    **A.      Correct.**

(20)    Q.      Part of what he told you is that his

(21)    determination was discriminatory and racist,

(22)    correct?

(23)    **A.      Correct.**

(24)    Q.      And you all did not put that in the EEO

(25)    complaint, correct?

(1)                       L. REYES

(2)  **A.       I don't know.**

(3)  Q.       Well, I've asked you a couple times now

(4)  whether the circumstances of his termination were

(5)  part of the EEO investigation and I believe you said

(6)  that they weren't.  Am I correct about that?

(7)  **A.       Well, given the situation -- the situation**

(8)  **wasn't necessarily where that interaction happened.**

(9)  **That was not part of the EEO investigation because**

(10) **that was already investigated.**

(11) Q.       Investigated by who?

(12) **A.       Well, there was a security investigation**

(13) **afterwards that did take place and the --**

(14) Q.       By who?

(15) **A.       By James Cahill.**

(16) Q.       By FedEx?

(17) **A.       Yes.**

(18) Q.       Have you ever heard anyone curse at the LGA

(19) station?

(20) **A.       Not to my knowledge.**

(21) Q.       Have you ever heard anyone curse or swear on

(22) the job at FedEx?

(23) **A.       Possibly.  I mean, not that I remember.**

(24) Q.       Have you ever known or heard about Eric

(25) Wanders cursing or swearing at employees?

```
(1)                    L. REYES

(2)   A.      No.

(3)   Q.      Do managers and employees frequently curse

(4)   at each other at --

(5)   A.      No.

(6)   Q.      -- FedEx?

(7)   A.      I'm sorry.

(8)           No.

(9)   Q.      Do they do that at the LGA station?

(10)  A.      No; not to my knowledge.

(11)  Q.      Well, how often were you at the LGA station

(12)  in 2021?

(13)  A.      I couldn't tell you how often I was there.

(14)  I know things were a little bit restricted because

(15)  of the environment we were in.  But I -- yeah, I

(16)  couldn't give you a number as to how many times I

(17)  was there.  But I know when I'm normally there

(18)  people are normally respectful around me.  So I

(19)  don't know if that's a title thing, but things are a

(20)  little different, I guess, or may not -- they may

(21)  not curse around me if they do curse.

(22)  Q.      How long did that EEO meeting last?

(23)  A.      I don't know.

(24)  Q.      Do you recall the date of that meeting?

(25)  A.      No.
```

(1)                        **L. REYES**

(2)    Q.        Do you think Nan Malebranche was impartial

(3)    and neutral towards Kevin Campbell as part of the

(4)    GFT process?

(5)    **A.        From my professional standpoint, no.  I**

(6)    **think she was very professional.**

(7)                        **MR. MCGAHA:  I think you messed**

(8)                **up --**

(9)    Q.        So that was my question.  Do you believe

(10)   that she was neutral --

(11)   **A.        Yeah.  I -- yeah.**

(12)   Q.        Did Ms. Malebranche ever tell Kevin Campbell

(13)   that Mr. Alzate was trying to push the box across

(14)   the belt?

(15)   **A.        I don't recall that.**

(16)   Q.        Do you know if Ms. Malebranche ever told Mr.

(17)   Campbell that Mr. Alzate, in fact, did not

(18)   intentionally push the box toward him and into him?

(19)   **A.        I don't recall that.**

(20)   Q.        You believe that Mr. Alzate intentionally

(21)   hit Kevin Campbell with the box, correct?

(22)                        **MR. MCGAHA:  Note my objection to**

(23)                **the form.**

(24)   **A.        I don't think I ever said that.  I said that**

(25)   **he did push the box and it hit him -- I don't know**

(1)                          **L. REYES**

(2)   **if he intentionally did that to hit him or not,**

(3)   **I don't know, I --**

(4)   Q.      Well, he intentionally pushed the box,

(5)   correct?

(6)   **A.      He intentionally pushed the box.  But**

(7)   **whether it was to hit him or not, I don't know.**

(8)   Q.      For what other reason would he have pushed

(9)   the box?

(10)                  **MR. MCGAHA:  Note my objection to**

(11)          **the form.**

(12)  **A.      I don't know.**

(13)  Q.      Well, you had saw the video, correct?

(14)  **A.      Correct.**

(15)  Q.      And that is how you know that Alzate pushed

(16)  the box, correct?

(17)  **A.      Correct.**

(18)  Q.      From watching the video?

(19)  **A.      Yes; correct.**

(20)  Q.      Based on your observation of the video, your

(21)  position as a human resources manager, you're level

(22)  of education, your experience level, everything you

(23)  know about how the belt is operated, for what

(24)  purpose, if any, would Alzate have pushed the box in

(25)  that manner, if not to hit Kevin Campbell?

(1)                    L. REYES

(2)          **MR. MCGAHA:  Note my objection to**

(3)          **the form.**

(4)  **A.      Well, one, I'm a human resources rep, but I**

(5)  **don't know what his intent was, I couldn't tell you**

(6)  **that.  I'm not Alzate.  Sorry.**

(7)  Q.      But you do understand the importance of

(8)  using common sense in your role as a human resources

(9)  representative, correct?

(10) **A.      Correct.**

(11) Q.      So I'm asking you based on what was going on

(12) at the time of what is depicted in the video, can

(13) you offer any other reason that Alzate would have

(14) pushed the box toward Mr. Campbell?

(15)          **MR. MCGAHA:  Note my objection to**

(16)          **the form.**

(17) **A.      He could have pushed the box out of**

(18) **frustration, not necessarily meant to hit him.  If**

(19) **you don't know your own power, anything could**

(20) **happen.  I mean, it was wrong I'm not saying it was**

(21) **write right.  But I don't know if he intended to hit**

(22) **Kevin Campbell.**

(23) Q.      But he intended to hit the box, correct?

(24) **A.      Yeah, I guess so.**

(25) Q.      Well, did he or didn't he?

```
(1)                    L. REYES

(2)               MR. MCGAHA:  Note my objection to

(3)          the form.

(4)  A.       He did.

(5)  Q.       How long had Alzate been working for FedEx?

(6)  A.       I don't know.

(7)  Q.       How long had Ms. Nan Malebranche been

(8)  working for FedEx?

(9)  A.       I don't know.

(10) Q.       Is she still there?

(11) A.       Yes.

(12) Q.       You said Monty Bovell was terminated,

(13) correct?

(14) A.       Correct.

(15) Q.       Why was he terminated?

(16) A.       I can't remember.  This is a while ago.

(17) Q.       Did he get fired for changing the time in

(18) CPU for packages?

(19)               MR. MCGAHA:  Note my objection to

(20)          the form.

(21) A.       I really couldn't -- I don't remember

(22) exactly what the situation was.

(23) Q.       What race is Monty Bovell?

(24) A.       A black man as far as I know.

(25) Q.       What does it mean to change the time in the
```

(1)                    L. REYES

(2)  CPU for packages?

(3)              MR. MCGAHA:  Note my objection to

(4)         the form.

(5)  A.       Classification.

(6)  Q.       Specifically with regard to what?

(7)              MR. MCGAHA:  Note my objection to

(8)         the form.

(9)  A.       Trying to, as far as I understand it, make

(10) the numbers look better than what they actually are.

(11) Q.       What specifically do you mean?  Numbers

(12) regarding what?

(13)             MR. MCGAHA:  Note my objection to

(14)        the form of the question.

(15) A.       So at first you have a different service

(16) levels and it -- there may be a situation where

(17) you're not going to make service one day, and

(18) somebody may decide that they can skew the numbers

(19) some kind of way and get around the -- get around it

(20) and, you know, make it look better than what it is.

(21) Q.       People do that, right?

(22)             MR. MCGAHA:  Note my objection to

(23)        the form.

(24) A.       They have.

(25) Q.       It happens, right?

L. REYES

(2)   A.        It happens.

(3)   Q.        And people don't get fired for it, right?

(4)            MR. MCGAHA:  Note my objection to

(5)        the form.

(6)   A.        That's not necessarily true.

(7)   Q.        People don't always get fired for what you

(8)   just described, correct?

(9)            MR. MCGAHA:  Note my objection to

(10)       the form.

(11)  A.        As far as I know, as far as I'm concerned

(12)  everybody that does that typically gets fired.

(13)  Q.        So it's not a common thing that gets

(14)  overlooked from time to time?

(15)  A.        It's never really overlooked.  If -- if

(16)  somebody knows about it, it's going to be addressed.

(17)  Q.        But not necessarily terminations, correct?

(18)           MR. MCGAHA:  Note my objection to

(19)       the form.

(20)  A.        It depends on everybody's situation.

(21)  Q.        Right.  Okay.

(22)           Did there come a time after the EEO meeting

(23)  when you all met again with Mr. Campbell?

(24)  A.        After the EEO?  Not that I remember.  I

(25)  don't know -- if there was a -- sorry.  If there was

(1)                          **L. REYES**

(2)     **a follow-up where we had more questions, maybe.  But**

(3)     **not that I remember.  I don't remember us meeting**

(4)     **with him again.**

(5)     Q.      Who made the decision to terminate his

(6)     employment?

(7)     **A.      If I remember correctly, the manager.**

(8)     Q.      What's the manager's name?

(9)     **A.      I don't know -- if it was Monty, it was**

(10)    **Monty.**

(11)    Q.      Oh.  It was Monty that made the decision to

(12)    terminate Kevin Campbell?

(13)    **A.      If he was the manager at the time, but I**

(14)    **don't believe so.  But if he was the supervisor at**

(15)    **the time, yes, he would have made that decision.**

(16)    Q.      He would have made the decision to terminate

(17)    Kevin Campbell's employment?  Is that your

(18)    testimony?

(19)    **A.      If he was the manager at the time, yes.**

(20)    Q.      Well, who was the manager at the time?

(21)    **A.      I don't remember.  But I know Monty was in**

(22)    **the meeting with us.  Because normally it's the**

(23)    **manager.  But if a manager was out, if the manager**

(24)    **had just left, those things happen, you need**

(25)    **somebody to step in.**

(1)                              **L. REYES**

(2)    Q.      Are you aware that the name of person who

(3)    made the ultimate decision to terminate Kevin

(4)    Campbell's employment is contained in the documents

(5)    exchanged in this case?

(6)    **A.      I am -- yeah, I guess, okay.**

(7)    Q.      Well, did the papers identify Monty Bovell

(8)    as being the person who made the decision to

(9)    terminate his employment?

(10)                   **MR. MCGAHA:  Note my objection to**

(11)            **the form.**

(12)   **A.      I haven't been able to know that portion of**

(13)   **it.**

(14)   Q.      Well, were you asked for any input on

(15)   whether FedEx should terminate Kevin Campbell?

(16)   **A.      It's normal processes.  So, yes.**

(17)   Q.      And what input did you give?

(18)   **A.      I agreed with the termination.**

(19)   Q.      Well, who was recommending the termination?

(20)   **A.      At the time -- honestly, at the time, I**

(21)   **don't remember exactly how those conversations went.**

(22)   Q.      Well, when you say that you agreed with the

(23)   termination, what are you referring to?

(24)   **A.      I mean, based on what had transpired at the**

(25)   **time, I'm referring to, I guess, the situation that**

[Page 92]
February 7, 2024

(1)                          **L. REYES**

(2)  **had happened.  I -- I --**

(3)  Q.       What situation that had happened?

(4)  **A.       I guess the scuffle, for lack of better**

(5)  **words.**

(6)  Q.       When you say "the scuffle", you're referring

(7)  to the incident where Alzate pulled the box cutter?

(8)  **A.       Yes.**

(9)  Q.       Did Alzate ever approach Mr. Campbell?

(10)                     **MR. MCGAHA:  Note my objection to**

(11)              **the form.**

(12) **A.       Can you clarify?  I'm not understand what**

(13) **you mean.  Are you talking about in that current**

(14) **situation?**

(15) Q.       Yes.

(16) **A.       I guess, yes, because he ended up in his**

(17) **area, so yes.**

(18) Q.       Alzate ended up in Campbell's area, correct?

(19) **A.       Yes.**

(20) Q.       Do you know whether James Cahill's

(21) investigation revealed that the video showed Alzate

(22) approaching Kevin Campbell's work area in a clearly

(23) agitated state flailing his arms and pushing several

(24) packages in Campbell's possession?

(25) **A.       I guess it did say it, yes.  If that's what**

Lexitas Court Reporting
800-678-0166

(1)                          **L. REYES**

(2)    **you're reading.**

(3)    Q.       Well, do you recall if that's what the

(4)    investigation showed?

(5)    **A.       I don't -- what [sic] you mean?  As far as**

(6)    **the report itself?  Or as far as what happened in**

(7)    **the video?**

(8)    Q.       Who approached who first.

(9)    **A.       Alzate approached Kevin Campbell first.**

(10)   Q.       Who made the ultimate decision to terminate

(11)   Kevin Campbell's employment?

(12)                      MR. MCGAHA:  Note my objection to

(13)              the form.

(14)   **A.       It would've been the station manager at the**

(15)   **time.**

(16)   Q.       Who is that?

(17)   **A.       I couldn't tell you.  I don't know.  This is**

(18)   **happened over 2 years ago, so I couldn't tell you**

(19)   **who made the report was.**

(20)   Q.       But you're represented by an attorney today,

(21)   correct?

(22)   **A.       Yes.**

(23)   Q.       Who's your attorney?

(24)   **A.       Gabriel McGaha.**

(25)   Q.       Did you meet with Mr. McGaha in preparation

```
(1)                    L. REYES

(2)    for today's deposition?

(3)    A.       Yes.

(4)    Q.       How many times?

(5)    A.       Twice.

(6)    Q.       When was the first meeting?

(7)    A.       Last week; Wednesday.

(8)    Q.       Was that over the phone, in person, over

(9)    Zoom?  Something else?

(10)   A.       You know, over -- over Teams.

(11)   Q.       How long did that meeting last?

(12)   A.       About 45 minutes.  Maybe.

(13)   Q.       When was the next meeting?

(14)   A.       Yesterday.

(15)   Q.       How long did that meeting last?

(16)   A.       About an hour and a half.  An hour and 45.

(17)   Maybe.

(18)   Q.       Was that in person, or something else?

(19)   A.       Person.

(20)   Q.       During yesterday's meeting, did you review

(21)   any documents in preparation for today's deposition?

(22)   A.       Yes.

(23)   Q.       What documents did you review?

(24)   A.       We reviewed the security investigation,

(25)   and -- and that's all I can remember.  Really, that
```

(1)                          **L. REYES**

(2)    **was the only document that we went over.**

(3)    Q.      Anything else?

(4)    **A.      No.  That was -- that was really it.**

(5)    Q.      During the first meeting, did you review any

(6)    documents in preparation for the deposition?

(7)    **A.      No.**

(8)    Q.      Have you spoken to anyone about this

(9)    deposition, other than your attorney?

(10)   **A.      No.**

(11)   Q.      Did your review of the documents yesterday

(12)   refresh your recollection about the incident that

(13)   we're here to discuss today?

(14)   **A.      Not necessarily, but --**

(15)   Q.      Well, are there things that you did not

(16)   recall prior to reviewing those documents, that

(17)   those documents reminded you of?

(18)   **A.      No.  Actually, you kind of refreshed my**

(19)   **memory to some of the allegations today, so.**

(20)   Q.      Okay.  Is it your testimony that Mr.

(21)   Campbell was terminated by the station manager?

(22)                  **MR. MCGAHA:  Note my objection to**

(23)          **the form.**

(24)   **A.      So, it doesn't necessarily work like that.**

(25)   **You have the station -- you have station managers,**

(1)                          **L. REYES**

(2)    **you have a senior manager, who is the head of that**

(3)    **station, and then you have work group managers, but**

(4)    **they're called operation managers.  So it would've**

(5)    **been his reporting operation manager that made the**

(6)    **decision to terminate.**

(7)    Q.      That made the ultimate decision to terminate

(8)    him?

(9)    **A.      Correct.**

(10)   Q.      Who was the senior manager of the LGA

(11)   station, at that time?

(12)   **A.      Eric Wanders.**

(13)   Q.      Did Eric Wanders have any role in making the

(14)   decision to terminate Mr. Campbell's employment?

(15)   **A.      I'm sure they had to review it with him.**

(16)   **But I can't remember if he made a decision.**

(17)   Q.      Is there anything else that you recall about

(18)   the video of this incident?

(19)   **A.      No.  Not that -- not that we went over.**

(20)   Q.      Alzate pulled a box cutter, correct?

(21)   **A.      Correct.**

(22)   Q.      At that point, what did Kevin Campbell do?

(23)   **A.      Tried to restrain him and get it away it**

(24)   **seems like.**

(25)   Q.      Did he do the right thing, at that point?

(1)                    L. REYES

(2)              MR. MCGAHA:  Note my objection to

(3)         the form.

(4)    A.      I mean, what would anybody do if somebody

(5)    pulled a knife out on them, I mean?

(6)    Q.      Do you know if Eric Wanders is the one who

(7)    made the ultimate decision to terminate Kevin

(8)    Campbell's employment?

(9)              MR. MCGAHA:  Note my objection to

(10)        the form.

(11)   A.      I don't know.

(12)   Q.      Have you spoken with Eric Wanders?

(13)   A.      I speak to him often.  He's a -- he's one of

(14)   the stations that I support.

(15)   Q.      Okay.  And have you ever received any

(16)   complaints about Mr. Wanders?

(17)   A.      Actually, no.

(18)   Q.      No one's ever said to you anything about the

(19)   language he uses or the way he speaks to workers?

(20)   A.      No.

(21)   Q.      What race is Eric Wanders?

(22)   A.      I believe he's a white male.  Male.  Yup.

(23)   Q.      Was anyone injured as a result of Alzate's

(24)   use of the box cutter during this incident?

(25)   A.      No.

(1)                          **L. REYES**

(2)    Q.       Was Alzate interviewed as a result of this

(3)    incident?

(4)    **A.       I believe he was interviewed by security.**

(5)    **When it came to -- when it came to us, no.**

(6)    Q.       Do you know whether his statement was found

(7)    to be credible?

(8)    **A.       Security just reports their findings.  I --**

(9)    **I -- they -- they report what they were told, and**

(10)   **that's really it.  They don't substantiate or**

(11)   **unsubstantiate.**

(12)   Q.       Did you review any photographs in

(13)   preparation for today?

(14)   **A.       No.**

(15)   Q.       Did you review any audio recordings in

(16)   preparation for today?

(17)   **A.       No.**

(18)   Q.       Do you know whether Kevin Campbell's

(19)   statements as part of his investigation into his

(20)   termination were truthful or untruthful?

(21)   **A.       You're talking about this particular case or**

(22)   **the ones that we conducted?**

(23)   Q.       Well, I'm specifically referring to the

(24)   investigation that was conducted related to the

(25)   altercation with Alzate.  A statement was taken from

[Page 99]
February 7, 2024

(1)                    L. REYES

(2)    Kevin Campbell, right?

(3)    A.       Mm-hmm.  Yes.

(4)    Q.       Is that a yes?

(5)    A.       Yes.  Sorry.  Sorry.

(6)    Q.       Do you know whether his statement was found

(7)    to be consistent with the other evidence?

(8)    A.       At the time, I really -- I don't know.  I

(9)    would have to see what the statement said.  But I

(10)   know it did show -- it did -- it did get used when I

(11)   guess Nan was forming the questions and asking --

(12)   and asking him, I guess at the GFT, what was going

(13)   on.

(14)   Q.       Well, do you recall anyone questioning Mr.

(15)   Campbell's truthfulness?

(16)   A.       At the time, no.  Not necessarily.

(17)   Q.       Well, at any time?

(18)   A.       Not that I could recall.  I don't think

(19)   nobody -- I know I didn't -- I didn't question

(20)   his -- his truthfulness.  We wanted it investigated

(21)   and we wanted to know exactly what was being said,

(22)   we wanted to know if there was any merit to it or,

(23)   you know, they could be substantiated or

(24)   unsubstantiated, and that was it.  Nobody

(25)   said, "you're lying or not lying."

(1)                          **L. REYES**

(2) Q.      Well, as you sit here today, do you

(3) understand Mr. Campbell's statements about the

(4) interaction with Alzate to be truthful?

(5)              **MR. MCGAHA:  Note my objection to**

(6)         **the form.**

(7) **A.      From what I understand, it was more so just**

(8) **the incident that had occurred during the video.  I**

(9) **mean, it was kind of clear as day as far as what was**

(10) **going on in the video, as far as I can understand.**

(11) Q.      What was going on in the video that was

(12) clear as day to you?

(13) **A.      One person was agitated, the other person**

(14) **didn't back down, and it escalated from that point**

(15) **that somebody took out a box cutter, and then they**

(16) **had to take --**

(17) Q.      Who was --

(18) **A.      -- the --**

(19) Q.      -- the person that was agitated?

(20) **A.      Alzate.**

(21) Q.      Who was the person that took out the box

(22) cutter?

(23) **A.      Alzate.**

(24) Q.      When you say that someone didn't back down,

(25) who are you referring to?

(1)                          L. REYES

(2)  A.        Kevin Campbell didn't deescalate the

(3)  situation.

(4)  Q.        Did you give him training on deescalation?

(5)                  MR. MCGAHA:  Note my objection to

(6)          the form.

(7)  A.        Everybody goes through training in the

(8)  beginning, I don't know particularly what he went

(9)  over and what was the curriculum at the time,

(10) because those things change.  But I know he did go

(11) through training and he knew who his resources -- he

(12) should have known who his resources were.

(13) Q.        Mr. Campbell did deescalate Mr. Alzate's use

(14) of the box cutter, correct?

(15)                 MR. MCGAHA:  Note my objection to

(16)         the form.

(17) A.        If that's what you want to call it.  Yes.  I

(18) guess.

(19) Q.        Well, what would you call it?

(20) A.        I think he could have took another step

(21) prior to the box cutter coming out, to deescalate,

(22) that's what I -- that's what I think.

(23) Q.        I'm asking, once the book cutter came out,

(24) that was a very dangerous situation, correct?

(25) A.        Correct.

(1)                              **L. REYES**

(2)    Q.        Kevin Campbell restrained Mr. Alzate as he

(3)    was holding the box cutter, correct?

(4)    **A.        Correct.**

(5)    Q.        Arguably, that situation went as well as it

(6)    did because Kevin Campbell was able to restrain this

(7)    other employee who had a box cutter, isn't that

(8)    correct?

(9)                  **MR. MCGAHA:  Note my objection to**

(10)                 **the form.**

(11)   **A.        He played a part in it, yes.**

(12)   Q.        What do you mean by that?

(13)   **A.        There were more people that actually came to**

(14)   **separate the both of them.**

(15)   Q.        Well, you yourself said that the video was

(16)   clear as day, right?

(17)   **A.        (No audible response.)**

(18)   Q.        Correct?

(19)   **A.        Yes.**

(20)   Q.        Certainly you would agree that there any

(21)   number of employees who might not have been able to

(22)   respectfully restrain Alzate, correct?

(23)                 **MR. MCGAHA:  Note my objection to**

(24)                 **the form.**

(25)   **A.        Yes.**

(1)                          **L. REYES**

(2)    Q.       Kevin Campbell was able to restrain him, and

(3)    there were no serious injuries, correct?

(4)    **A.       Correct.**

(5)    Q.       Okay.  Now, is there anything else that you

(6)    think that you want to mention right now, about your

(7)    involvement --

(8)    **A.       No.**

(9)    Q.       -- or anything you know about this, that you

(10)   feel hasn't come up?

(11)   **A.       No.**

(12)   Q.       Do you believe that Kevin Campbell was

(13)   treated fairly?

(14)   **A.       Yes.**

(15)   Q.       Do you belief that FedEx could have handled

(16)   this differently with regard to Kevin Campbell?

(17)                    **MR. MCGAHA:  Note my objection to**

(18)            **the form.**

(19)   **A.       Actually, I believe that they handled it the**

(20)   **right way.**

(21)   Q.       By terminating him?

(22)   **A.       Yes.**

(23)   Q.       You had never heard anything about Kevin

(24)   Campbell being threatening or aggressive to people

(25)   before, right?

(1)                        L. REYES

(2)  **A.     No.**

(3)  Q.     He wasn't known as a violent person?

(4)  **A.     Not to my knowledge.  That was my first time**

(5)  **ever hearing about the guy.**

(6)  Q.     And it's your testimony that the way he was

(7)  terminated meets FedEx's standards?

(8)  **A.     Yes.**

(9)  Q.     Okay.

(10)               **MS. MASSIMI:  I have no further**

(11)        **questions.**

(12)               **I'm done.**

(13)               **MR. MCGAHA:  No questions.**

(14)               **MS. MASSIMI:  Okay.  I appreciate**

(15)        **your time, Mr. Reyes.**

(16)               **Okay.  Thank you, everyone.**

(17)               **MS. MCGAHA:  Thank you.**

(18)               **(Continued on next page to**

(19)        **accommodate Jurat.)**

(20)

(21)

(22)

(23)

(24)

(25)

(1)                          L. REYES

(2)

(3)              **THE WITNESS:  Thank you.**

(4)              **THE COURT REPORTER:  Mr. McGaha,**

(5)       **would you like a copy of the transcript?**

(6)              **MR. MCGAHA:  Yes.**

(7)              **(Time Noted:  12:49 p.m.)**

(8)

(9)                          LANCE REYES

(10)

(11)    Subscribed and sworn to before me

(12)    this        day of            2024.

(13)

(14)

(15)            Notary Public

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)                        I N D E X

(3)

(4)   WITNESS                EXAMINATION BY              PAGE

(5)   Lance Reyes            Ms. Massimi                  7

(6)

(7)

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)                 C E R T I F I C A T E

(3)

(4)          I, GINA MARIE STRIPPOLI, hereby certify

(5)   that the Examination Before Trial of LANCE REYES was

(6)   held before me on the 7th day of February, 2024;

(7)   that said witness was duly sworn before the

(8)   commencement of his testimony; that the testimony

(9)   was taken stenographically by myself and then

(10)  transcribed by myself; that the party was

(11)  represented by counsel as appears herein; That the

(12)  within transcript is a true record of the

(13)  Examination Before Trial of said witness;

(14)          That I am not connected by blood or

(15)  marriage with any of the parties; that I am not

(16)  interested directly or indirectly in the outcome of

(17)  this matter; that I am not in the employ of any of

(18)  the counsel.

(19)          IN WITNESS WHEREOF, I have hereunto set my

(20)  hand this 11th day of February, 2024.

(21)

(22)  _____

(23)          GINA MARIE STRIPPOLI

(24)

(25)

```
(1)    ERRATA SHEET FOR: LANCE REYES

         LANCE REYES, being duly sworn, deposes and
(2)    says: I have reviewed the transcript of my
       proceeding taken on 02/07/2024. The following
(3)    changes are necessary to correct my testimony.
(4)    _____
(5)    PAGE LINE     CHANGE                REASON
(6)    ----|----|--------------------|--------------
(7)    ----|----|--------------------|--------------
(8)    ----|----|--------------------|--------------
(9)    ----|----|--------------------|--------------
(10)   ----|----|--------------------|--------------
(11)   ----|----|--------------------|--------------
(12)   ----|----|--------------------|--------------
(13)   ----|----|--------------------|--------------
(14)   ----|----|--------------------|--------------
(15)   ----|----|--------------------|--------------
(16)   ----|----|--------------------|--------------
(17)   ----|----|--------------------|--------------
(18)   ----|----|--------------------|--------------
(19)   ----|----|--------------------|--------------
(20)   ----|----|--------------------|--------------
(21)   ----|----|--------------------|--------------
(22)   ----|----|--------------------|--------------
(23)        Witness Signature:_____
       Subscribed and sworn to, before me
(24)   this ___ day of _____, 20 ___.
       _____     _____
(25)   (NOTARY PUBLIC)          MY COMMISSION EXPIRES
```

February 7, 2024

[Page 109]

| A |
| --- |

**a.m (1)**
1:15

**a/k/a (1)**
1:8

**ability (1)**
7:25

**able (5)**
27:5 91:12
102:6,21
103:2

**access (1)**
20:23

**accommodat...**
104:19

**accommodat...**
9:15

**accurately (1)**
7:10

**accusations (1)**
77:24

**accusing (3)**
77:19,21,22

**acknowledge...**
71:10

**action (2)**
42:16 59:6

**actions (5)**
59:18 60:19
61:12 63:9,10

**actual (1)**
76:19

**address (1)**
5:10

**addressed (1)**
89:16

**administer (1)**
3:8

**administerin...**
3:15

**African-Ame...**
9:10

**against- (1)**
1:6

**ages (1)**
9:6

**aggressive (5)**
57:22 58:17
61:14 63:15
103:24

**aggressively ...**
57:11,15,17
58:2,4,22
59:7,18,23
60:3,8,19

**agitated (3)**
92:23 100:13
100:19

**ago (7)**
24:24,25 26:22
37:5 76:5
87:16 93:18

**agree (1)**
102:20

**agreed (6)**
3:3,5,7,11
91:18,22

**ahead (7)**
35:12 44:11
51:21 55:23
55:24 68:5
75:3

**alcohol (1)**
8:6

**allegation (13)**
38:12 40:4,10
41:2,6,8
45:10 46:14
46:15,16 50:6
50:24 80:22

**allegations (...**
27:14 28:5
29:2,3,5,13
30:23,25 31:9
33:7,11,18,24
34:3,19 35:13
35:16,23 36:7
36:11,15

**37:11,19 38:9
39:5 40:2
46:16,17 49:3
54:16 65:15
78:14 95:19

**alleged (5)**
29:9 40:22
45:16 49:20
77:24

**allegedly (3)**
18:19,20 66:16

**alleges (1)**
45:22

**alleging (4)**
27:16,25 50:2
78:4

**altercation (1)**
98:25

**Alzate (31)**
58:20,22 59:6
59:11,23
61:12,17 63:3
63:11 80:19
84:13,17,20
85:15,24 86:6
86:13 87:5
92:7,9,18,21
93:9 96:20
98:2,25 100:4
100:20,23
102:2,22

**Alzate's (3)**
59:18 97:23
101:13

**answer (20)**
6:5,6,12,23 7:4
7:5 14:3
18:23 19:13
21:19 23:15
28:25 33:22
47:21,24,25
56:15 72:18
79:9,16

**answers (1)**

**5:22**

**anybody (2)**
77:17 97:4

**apart (2)**
77:22,23

**appearance (2)**
27:6,11

**appears (1)**
107:11

**applied (1)**
12:25

**applies (1)**
19:22

**apply (4)**
13:2 20:3,4,6

**appreciate (1)**
104:14

**approach (2)**
60:22 92:9

**approached ...**
65:22 66:3
93:8,9

**approaching...**
61:12 63:3
92:22

**area (6)**
9:20 11:8 22:5
92:17,18,22

**Arguably (1)**
102:5

**arm's (1)**
60:20

**arms (2)**
61:3 92:23

**arrested (1)**
10:7

**asked (9)**
7:5 36:23
37:25 40:16
79:14,15,24
82:3 91:14

**asking (9)**
16:2 33:17
57:24 74:18

**79:5 86:11
99:11,12
101:23

**aspect (2)**
27:5,22

**assault (1)**
64:3

**assaulted (1)**
64:5

**assistant (2)**
12:19 13:10

**associate (6)**
12:12,14,16
14:6 15:3
19:19

**assumed (1)**
45:3

**assuming (2)**
47:5 50:6

**attempt (1)**
6:18

**attended (1)**
41:14

**attention (1)**
28:14

**attorney (8)**
3:10 4:2 5:15
8:9 47:24
93:20,23 95:9

**attorney's (1)**
8:11

**attorneys (3)**
2:4,10 3:3

**audible (2)**
5:24 102:17

**audio (1)**
98:15

**authority (1)**
26:23

**authorized (1)**
3:8

**aware (6)**
9:12 14:11
24:3 42:10

February 7, 2024

[Page 110]

53:21 91:2

**B**

**Bachelor's (1)**
11:5
**back (13)**
6:21 13:25
14:2 16:14
21:8,23 46:22
56:13 67:25
72:16,17
100:14,24
**based (11)**
16:8 35:2 45:4
58:5,6,7,8
81:18 85:20
86:11 91:24
**basically (3)**
15:22 51:12
57:13
**bear (1)**
4:5
**Bed (9)**
9:4 70:6,16,19
70:21 71:10
71:23,23 72:8
**Bedford (1)**
9:3
**beginning (1)**
101:8
**behaving (1)**
60:8
**belief (1)**
103:15
**believe (39)**
18:3,10 26:12
28:4,7,17
29:4,11 30:5
30:10,15
31:16 33:6,10
33:17 42:2,7
43:10 44:4,5
44:7 47:5,12
54:8 59:21

60:2,7 61:13
61:16 63:13
73:11 82:5
84:9,20 90:14
97:22 98:4
103:12,19
**believed (2)**
33:3 80:6
**belt (2)**
84:14 85:23
**best (1)**
15:24
**better (3)**
88:10,20 92:4
**bit (1)**
83:14
**black (6)**
19:3 27:8
41:16 42:5
50:17 87:24
**blocks (1)**
72:11
**blood (1)**
107:14
**body (4)**
60:4,9,10,17
**book (1)**
101:23
**born (3)**
8:22,23 9:7
**Bovell (5)**
54:2,5 87:12
87:23 91:7
**box (36)**
57:10,12,13
58:12,14,22
58:25 59:6,18
59:19 60:24
61:18 63:22
64:8,14 84:13
84:18,21,25
85:4,6,9,16
85:24 86:14
86:17,23 92:7

96:20 97:24
100:15,21
101:14,21
102:3,7
**break (2)**
7:3,6
**Bronx (1)**
44:20
**Brooklyn (4)**
8:23,24 69:21
69:23
**brought (7)**
28:14 36:25
40:14 49:6
50:25 54:16
80:5
**browser (1)**
22:3
**building (6)**
62:16 67:12
68:3,15,21
71:6
**bunch (2)**
20:11 34:25
**business (1)**
52:18

**C**

**C (4)**
2:2 5:2 107:2,2
**cage (3)**
34:15 49:21
50:17
**Cahill (1)**
82:15
**Cahill's (1)**
92:20
**call (6)**
23:8,10 73:18
73:23 101:17
101:19
**called (7)**
22:3 49:20
61:19 62:9

63:19,19 96:4
**Campbell (1...**
1:3 2:5 5:16
25:24,25
26:24 27:2,16
27:24 28:4,17
29:11,15
30:10,16 31:4
31:23 32:9,20
32:23 33:11
34:13 36:7,24
37:24,25 38:4
38:9,20 41:6
44:22 45:10
45:14,16,22
45:24,24 46:5
46:7,8 47:7
49:16,20 51:7
52:2,9,12,16
52:23 53:7,17
53:23 54:3,3
57:10,11,11
57:15 58:12
58:15,23,25
59:5,19,22
60:2,6 61:17
62:17 63:3,13
64:5,16,24
65:3,7,20,22
67:12 68:3
69:4,18,20,24
70:5,15,18
71:8,13,16
72:21 73:9,14
74:4,15,19,23
75:10,12,20
76:14 77:19
78:4,19 79:22
80:15 84:3,12
84:17,21
85:25 86:14
86:22 89:23
90:12 91:15
92:9 93:9

95:21 96:22
99:2 101:2,13
102:2,6 103:2
103:12,16,24
**Campbell's (...**
26:18 27:14
35:23 37:19
40:4 49:2
55:11 56:20
61:12 77:6
78:14 90:17
91:4 92:18,22
92:24 93:11
96:14 97:8
98:18 99:15
100:3
**car (1)**
68:3
**care (1)**
28:12
**case (8)**
5:17 19:4
25:23 27:14
27:20 59:16
91:5 98:21
**category (1)**
46:12
**cause (1)**
41:19
**certain (2)**
18:24 28:14
**Certainly (1)**
102:20
**certificates (1)**
11:15
**certification ...**
3:4
**certify (1)**
107:4
**change (4)**
62:4 87:25
101:10 108:5
**changes (1)**
108:3

February 7, 2024

[Page 111]

**changing (1)**
87:17
**characteriza...**
58:4
**characterize ...**
43:16
**charge (2)**
3:10 24:22
**child (1)**
10:12
**choose (1)**
36:14
**chose (1)**
36:10
**circumstanc...**
55:13,16 82:4
**city (8)**
32:18 41:23
42:3,6,8
43:11,21
44:19
**civil (1)**
4:7
**claim (2)**
10:16,20
**claims (4)**
11:2 77:8 78:2
80:4
**clarify (1)**
92:12
**class (2)**
19:23 42:16
**Classificatio...**
88:5
**clear (8)**
24:10 44:2,9
49:18 60:5
100:9,12
102:16
**clearest (1)**
62:22
**clearly (1)**
92:22
**close (1)**

72:5
**clue (4)**
29:19 40:19
70:7 71:21
**come (5)**
70:9 75:18,21
89:22 103:10
**comes (1)**
16:5
**coming (2)**
70:10 101:21
**commence (1)**
37:21
**commenced ...**
39:24 44:17
**commencem...**
107:8
**comment (6)**
45:11 46:11,13
46:21 47:12
50:13
**comments (1)**
35:15
**COMMISSI...**
108:25
**common (2)**
86:8 89:13
**company (3)**
20:12 54:9
81:14
**complain (6)**
21:5 22:18
23:4,19 24:6
31:17
**complainant ...**
34:23 35:2
52:7 66:9
**complained (7)**
9:17 32:24
34:9 35:6
65:25 67:15
69:2
**complaint (10)**
24:4,12 27:19

27:22 31:4
34:24 35:3
40:4,18 81:25
**complaints (1)**
97:16
**complete (2)**
6:4,6
**concerned (3)**
28:20,21 89:11
**concerns (1)**
66:13
**condition (1)**
7:21
**conduct (4)**
4:5 36:20
42:12,18
**conducted (5)**
3:13 34:20
75:22 98:22
98:24
**conference (3)**
3:13 4:5 7:16
**confidence (3)**
66:11,24 67:8
**confidential ...**
67:10
**confirming (1)**
3:17
**confrontatio...**
56:19
**connected (1)**
107:14
**consent (1)**
3:18
**consider (2)**
48:13 50:7
**considered (2)**
3:19 49:13
**considering (1)**
50:12
**consistent (1)**
99:7
**constitute (1)**
16:15

**consume (1)**
43:2
**consumed (1)**
8:6
**contained (3)**
21:12 22:4
91:4
**content (1)**
78:25
**context (1)**
50:12
**Continued (1)**
104:18
**control (1)**
3:15
**conversation...**
6:3 52:5,8,23
53:3 65:11
68:24 69:16
71:8,25 72:23
73:21 75:13
75:19 79:8,8
**conversation...**
67:7 70:12
91:21
**convicted (1)**
10:9
**copy (5)**
3:9 4:3,6 20:20
105:5
**Corporation ...**
1:8 2:10,17
**correct (112)**
10:10 11:18
12:10,11
13:11,12 15:5
26:15 29:13
29:14 30:5
31:5,10,21
33:7,11 34:9
34:12 36:11
37:9,20 39:19
39:21,24,25
40:7,8 44:20

46:24 51:8
53:5,6 55:11
55:12 58:12
58:13,16
60:15,16,25
61:2,3,4,5,6
62:11,12,18
62:19 63:12
64:19,20
66:22 67:2,8
69:2,3 71:2,3
77:20 78:5,6
78:8,9,11,12
78:15,16 80:7
80:17,20,21
80:23 81:8,9
81:16,18,19
81:22,23,25
82:6 84:21
85:5,13,14,16
85:17,19 86:9
86:10,23
87:13,14 89:8
89:17 92:18
93:21 96:9,20
96:21 101:14
101:24,25
102:3,4,8,18
102:22 103:3
103:4 108:3
**correctly (1)**
90:7
**costs (1)**
4:5
**counsel (5)**
3:12,13 4:4
107:11,18
**couple (2)**
13:20 82:3
**courier (1)**
26:5
**course (4)**
6:22 33:2
41:21 56:9

February 7, 2024

[Page 112]

**court (15)**
1:2,14 3:9,13
3:15,16 5:21
5:25 6:7,13
6:21 8:15
10:19 11:2
105:4
**courtroom (1)**
7:19
**CPLR (2)**
3:12 4:6
**CPU (2)**
87:18 88:2
**credible (1)**
98:7
**crosstalk (1)**
6:3
**current (1)**
92:13
**currently (8)**
9:20 10:5
11:12,17 15:6
20:20 70:15
70:22
**curriculum (1)**
101:9
**currier (1)**
20:5
**curse (5)**
82:18,21 83:3
83:21,21
**cursing (1)**
82:25
**cutter (12)**
57:12,13 92:7
96:20 97:24
100:15,22
101:14,21,23
102:3,7

**D**

**D (1)**
106:2
**dangerous (1)**

101:24
**DANIEL (1)**
2:17
**date (2)**
37:6 83:24
**day (9)**
65:4 88:17
100:9,12
102:16
105:12 107:6
107:20
108:24
**December (1)**
11:11
**decide (1)**
88:18
**decision (17)**
65:13,24 67:14
68:25 74:15
90:5,11,15,16
91:3,8 93:10
96:6,7,14,16
97:7
**decisions (1)**
51:14
**Deer (2)**
5:11 9:22
**deescalate (3)**
101:2,13,21
**deescalated (1)**
62:24
**deescalation ...**
101:4
**Defendants (2)**
1:10 2:10
**define (1)**
16:2
**definitely (3)**
64:8 67:16
70:13
**degree (3)**
11:5,8,10
**degrees (1)**
11:14

**demonstrati...**
43:10,21
**denied (2)**
35:15 37:2
**depends (2)**
35:19 89:20
**depicted (2)**
57:8 86:12
**depicts (1)**
59:22
**deposed (2)**
4:6 8:13
**deposes (1)**
108:1
**deposition (10)**
3:8,12,16,4 4:5
5:18 6:23
94:2,21 95:6
95:9
**depressing (1)**
43:7
**describe (8)**
27:5 41:22
43:20 57:22
57:24 60:13
60:19 78:24
**described (1)**
89:8
**describing (1)**
57:23
**deserve (1)**
59:5
**detail (1)**
55:6
**details (1)**
36:23
**determinatio...**
81:21
**different (5)**
16:8,9 37:13
83:20 88:15
**differently (1)**
103:16
**diligence (1)**

77:25
**directed (1)**
31:9
**direction (1)**
35:3
**directions (1)**
21:4
**directly (3)**
32:7 51:7
107:16
**director (6)**
32:6,21 34:24
74:10,11,12
**disabilities (1)**
9:11
**disability (2)**
9:14 16:11
**disciplinary ...**
24:17
**discipline (2)**
36:3 56:4
**discretion (1)**
74:9
**discriminati...**
9:18 15:17,20
15:23,25 16:3
16:6,16,19,24
17:7,12,21
19:7,10 21:5
22:18 23:4,20
23:24 24:3,11
27:17 28:2,5
28:10,12,18
29:12,16
30:11,16 31:9
31:18,24 32:9
32:24 33:19
35:24 47:13
77:20 78:5,15
80:16 81:8
**discriminato...**
31:21 50:7
80:7,10 81:21
**discuss (2)**

5:17 95:13
**discussing (3)**
46:13 72:3,10
**discussion (4)**
13:23 56:11
67:23 72:14
**distance (1)**
63:13
**district (3)**
1:2,2 32:16
**document (1)**
95:2
**documents (7)**
91:4 94:21,23
95:6,11,16,17
**doing (3)**
19:2 33:15
60:2
**dollar (1)**
42:16
**domiciled (3)**
14:15,22,25
**door (5)**
68:9,16,18,21
71:6
**doubt (1)**
80:3
**drugs (1)**
8:6
**due (1)**
77:25
**duly (3)**
5:3 107:7
108:1

**E**

**E (8)**
2:2,2 5:2,2,2
106:2 107:2,2
**earlier (1)**
6:23
**East (1)**
5:11
**EASTERN (1)**

February 7, 2024

[Page 113]

1:2
**education (2)**
11:4 85:22
**EEO (56)**
22:24 23:5
31:6,8 34:18
34:22,23
36:18 37:21
38:15,24 39:7
39:12,24 40:3
40:11 49:6,8
49:10,10,11
49:14 50:25
51:5 64:17
69:11,14
70:25 71:6
73:16,22,25
74:23 75:7,9
75:14,20 76:4
77:3,16 78:18
79:25 80:2,14
80:23,24,25
81:6,12,15,24
82:5,9 83:22
89:22,24
**effect (1)**
3:9
**either (6)**
23:8 34:22
35:9 63:18
74:24 81:12
**Emailed (1)**
4:3
**employ (1)**
107:17
**employed (3)**
11:12,18,22
**employee (11)**
20:5 22:18
23:4 26:5
31:17 36:3
37:25 38:5,6
40:5 102:7
**employees (9)**

19:17 21:5
34:14 49:20
78:8,13 82:25
83:3 102:21
**employer (1)**
11:20
**employment ...**
15:16,20,23,25
16:2,6 31:15
33:25 34:14
78:4 90:6,17
91:4,9 93:11
96:14 97:8
**encouraged (1)**
54:3
**ended (2)**
92:16,18
**entirely (1)**
37:13
**entity (1)**
10:17
**entrance (1)**
68:18
**environment...**
83:15
**Eric (12)**
1:9 2:11 32:20
36:9 53:18,19
82:24 96:12
96:13 97:6,12
97:21
**ERRATA (1)**
108:1
**escalated (2)**
63:3 100:14
**escalation (1)**
63:6
**ESQ (2)**
2:7,13
**essentially (1)**
69:2
**estimate (1)**
17:4
**everybody (3)**

15:22 89:12
101:7
**everybody's ...**
89:20
**evidence (2)**
35:10 99:7
**exactly (9)**
19:15 36:5
41:24 56:22
62:5 76:9
87:22 91:21
99:21
**examination ...**
1:12 3:9 5:6
106:4 107:5
107:13
**examined (1)**
5:4
**exchanged (1)**
91:5
**excuse (1)**
49:17
**exhibit (3)**
4:2,3,4
**exhibits (1)**
4:2
**exit (1)**
68:21
**expand (1)**
79:10
**experience (1)**
85:22
**experienced ...**
16:18,23 17:7
17:12,20,25
18:8 71:14
**experiencing...**
31:24 32:25
**EXPIRES (1)**
108:25
**express (7)**
1:8,9 2:10,17
3:18 11:21,23
**expressed (1)**

66:15
**extent (3)**
22:21 34:8,15
**ez (3)**
40:21,25 41:5

**F**

**F (1)**
107:2
**face (2)**
57:18 61:5
**fact (4)**
31:20 64:13
73:4 84:17
**factors (2)**
16:8,9
**failed (1)**
8:3
**fair (3)**
31:2 47:22
58:21
**fairly (1)**
103:13
**fall (1)**
46:12
**far (11)**
28:10,19 45:7
87:24 88:9
89:11,11 93:5
93:6 100:9,10
**fast (1)**
61:7
**February (3)**
1:14 107:6,20
**Federal (3)**
1:8 2:10,17
**FedEx (55)**
1:9 9:12,14,18
11:21,22 14:8
14:14 15:8,15
18:18 19:6,19
19:22,25 21:2
21:4 22:24
24:10,14,17

25:3,6,8,13
25:16,19 26:2
26:4 30:11,17
31:17 54:5,21
59:3 63:25
77:3,14,19,21
77:22,23,23
78:3,5,7,13
78:15 82:16
82:22 83:6
87:5,8 91:15
103:15
**FedEx's (1)**
104:7
**feel (1)**
103:10
**feels (1)**
16:7
**felony (1)**
10:9
**fighting (1)**
31:14
**fights (1)**
36:3
**file (6)**
22:24 34:18
39:7 53:24
54:3 81:12
**filed (7)**
10:16,20 31:4
39:12 81:12
81:14,15
**files (1)**
34:23
**filing (4)**
3:4 23:5 31:6,8
**fill (2)**
23:2 34:25
**find (6)**
47:20 48:9
56:23 61:21
62:11,17
**findings (2)**
76:20 98:8

February 7, 2024

[Page 114]

**fine (2)**
7:4 22:22
**finish (3)**
6:4,5 35:12
**fired (4)**
87:17 89:3,7
89:12
**first (38)**
5:3,11 30:24
32:8 35:23
36:6 37:8,10
37:10,16,18
37:22,24
38:18,20
39:18 45:14
45:16 49:23
50:4 52:9,24
53:8 54:13,15
55:7 56:24
64:15 69:8
73:9,24 74:4
88:15 93:8,9
94:6 95:5
104:4
**flailing (1)**
92:23
**Floyd (3)**
41:23 42:3
45:7
**Floyd's (5)**
42:13,19 43:11
43:22 46:24
**follow (1)**
35:8
**follow-up (2)**
35:4 90:2
**following (9)**
19:5 41:23
42:3,12,19
43:11,21
46:24 108:2
**follows (1)**
5:5
**force (1)**

3:9
**Forensic (1)**
11:9
**forget (1)**
51:24
**form (67)**
3:6 16:13
18:22 19:12
22:8 25:11
28:24 29:7,18
29:23 30:3,7
30:13,19
31:12 33:13
33:21 34:6,11
35:18 36:3,13
43:2 44:12,16
47:2,10 48:16
48:23 50:9,19
54:24 59:9,13
61:9,24 62:15
63:8,17 64:7
66:2 77:13
84:23 85:11
86:3,16 87:3
87:20 88:4,8
88:14,23 89:5
89:10,19
91:11 92:11
93:13 95:23
97:3,10 100:6
101:6,16
102:10,24
103:18
**formally (1)**
39:7
**former (2)**
31:17 32:22
**forming (1)**
99:11
**forward (11)**
57:12,16,17,19
57:20,25 58:2
58:5 60:4,6
60:12

**found (2)**
98:6 99:6
**freight (3)**
24:21,22 59:14
**frequently (1)**
83:3
**front (4)**
7:19 37:3
45:23 46:7
**frustration (1)**
86:18
**fully (3)**
7:10 21:21
27:21
**furnished (1)**
3:10
**further (4)**
3:5,7 4:2
104:10

_____

**G**

**Gabriel (3)**
2:13 8:12
93:24
**Gabriel.mcg...**
2:13
**Garden (1)**
32:18
**gender (1)**
25:20
**general (3)**
78:24,24 79:4
**generalize (2)**
22:19,21
**Generalized ...**
20:15
**generally (1)**
19:23
**George (8)**
41:23 42:3,12
42:19 43:11
43:21 45:7
46:24
**gestures (1)**

6:13
**getting (1)**
16:14
**GFT (47)**
31:2 37:8,10
37:14,16,18
37:22,24
38:18 39:2,8
39:11,18,18
39:23 40:3
45:14,16 50:3
50:4 51:10
52:2,9,24
53:8,24 54:3
54:13 55:7,10
64:15 65:9,10
66:7 67:12
69:17 71:4,9
73:10,24 74:4
74:12,16 80:5
80:15 84:4
99:12
**GFTP (1)**
32:13
**Gina (7)**
1:15 21:7,22
48:5 72:17
107:4,23
**girlfriend (3)**
52:13,16,20
**give (14)**
13:19 17:4
21:15 22:20
33:14 45:8
56:7 67:19
78:17 81:4,11
83:16 91:17
101:4
**given (1)**
82:7
**giving (1)**
5:19
**go (20)**
22:3,11,24

35:4,12 39:4
44:11 51:12
51:21,22,23
55:23,24
62:11 68:4,11
75:3 81:5,10
101:10
**goes (4)**
15:22,23 47:23
101:7
**going (21)**
12:4 28:19
39:4,5,7
43:20 44:12
49:18 51:4,13
66:16 68:16
77:24 80:2,4
86:11 88:17
89:16 99:12
100:10,11
**good (3)**
5:13,14 28:11
**gorilla (2)**
49:21 50:17
**great (3)**
41:18,18,19
**grievance (1)**
23:3
**ground (1)**
77:11
**group (1)**
96:3
**GTT (2)**
38:20 51:8
**guarantee (1)**
31:2
**guess (28)**
16:13 20:11
22:2,23 26:21
27:7,17 35:19
45:2 46:20
50:10 51:17
55:20 56:18
59:14 68:6

February 7, 2024

[Page 115]

73:16 74:9
83:20 86:24
91:6,25 92:4
92:16,25
99:11,12
101:18
**guide (1)**
21:4
**guy (5)**
57:12 60:21,23
60:24 104:5
**guy's (1)**
57:18
**guys (2)**
36:10 79:21

**H**

**half (1)**
94:16
**hand (6)**
39:8,9 57:14
75:4,7 107:20
**handbook (7)**
19:19,21,22
20:9,18,21,23
**handbooks (4)**
19:25 20:2,3,4
**hander (1)**
12:7
**handled (2)**
103:15,19
**handler (6)**
12:8,15,19
14:6 20:5
24:20
**happen (8)**
34:17 51:14
56:2,5 64:9
64:12 86:20
90:24
**happened (27)**
35:24 36:4
41:22,24
43:16 52:11

57:7,25 66:5
66:6 68:8
72:2 73:18
74:21 75:18
76:4,8,10,12
76:20 78:2,22
82:8 92:2,3
93:6,18
**happening (4)**
24:7 28:13
56:3 75:25
**happens (3)**
66:7 88:25
89:2
**head (4)**
6:13 20:10,16
96:2
**headquarter...**
32:16
**hear (7)**
6:19 21:14,16
21:20 46:10
48:4 52:19
**heard (20)**
18:15,17,20
25:8,13,16,19
32:8 35:23
36:6 37:10
39:12 42:11
46:4 49:23
54:15 82:18
82:21,24
103:23
**hearing (2)**
49:22 104:5
**held (9)**
12:3,14 13:23
14:8 32:3
56:11 67:23
72:14 107:6
**helped (1)**
36:21
**Henry (3)**
40:21,25 41:5

**hereunto (1)**
107:19
**highest (1)**
11:4
**highly (1)**
80:3
**hit (16)**
57:10,10 58:15
58:25 61:17
63:21 64:8,14
84:21,25 85:2
85:7,25 86:18
86:21,23
**hitting (1)**
59:19
**holding (1)**
102:3
**honestly (3)**
14:20 42:25
91:20
**Hospital (1)**
8:25
**hour (2)**
94:16,16
**hourly (1)**
26:5
**hours (1)**
8:7
**house (2)**
73:2,6
**HR (14)**
12:14,16 14:6
15:3 23:10
51:9 65:13,24
66:9,12 67:4
67:5,14 68:25
**HTO (3)**
14:15,18,19
**human (18)**
12:2,5,9,11,16
12:19 13:10
13:10 14:7
19:20 20:6
26:6,7,14

34:25 85:21
86:4,8
**hypothetical ...**
47:17
**hypothetical...**
47:21

**I**

**identifier (1)**
14:21
**identify (1)**
91:7
**identity (1)**
3:17
**illegal (2)**
63:24 64:3
**illegally (2)**
17:23 18:4
**impact (1)**
7:25
**impartial (1)**
84:2
**importance (1)**
86:7
**inappropriat...**
25:9,14
**incident (10)**
57:8 58:11
74:3 80:19
92:7 95:12
96:18 97:24
98:3 100:8
**incidents (1)**
5:19
**incomplete (1)**
6:24
**independent ...**
53:2
**Index (1)**
1:6
**indirectly (1)**
107:16
**individual (1)**
58:11

**INDIVIDUA...**
1:9
**indulge (1)**
43:8
**information ...**
45:8 78:17
**injured (1)**
97:23
**injuries (1)**
103:3
**inner (1)**
30:21
**input (2)**
91:14,17
**instances (7)**
17:6,11,22
18:3,5,7 81:8
**institution (1)**
11:6
**instructing (1)**
47:24
**intended (2)**
86:21,23
**intent (1)**
86:5
**intentionally...**
84:18,20 85:2
85:4,6
**interaction (2)**
82:8 100:4
**interest (1)**
77:6
**interested (1)**
107:16
**internet (1)**
21:2
**interpret (1)**
6:14
**interpretatio...**
50:11
**interview (5)**
13:6,7 35:2,5,7
**interviewed (...**
98:2,4

**interviews (2)**
33:16 35:4
**investigate (7)**
34:16,19 37:19
  40:9,13 78:2
  81:6
**investigated ...**
33:4 34:3
  38:17 39:13
  66:17 67:17
  81:3 82:10,11
  99:20
**investigating...**
77:8 78:14
**investigation...**
30:21 34:21
  36:16,17,19
  36:20 38:11
  38:14,24 39:3
  45:9 49:2
  50:23 51:2,5
  56:5 66:20
  78:11 79:25
  80:2,4,23
  81:2 82:5,9
  82:12 92:21
  93:4 94:24
  98:19,24
**investigation...**
38:24 49:9
**involve (1)**
50:12
**involvement ...**
103:7
**Island (1)**
9:24
**issue (1)**
56:4
**issues (1)**
71:14

**J**

**Jamaica (2)**
14:16,18

**James (2)**
82:15 92:20
**Jay (1)**
11:7
**Jessica (3)**
2:7 5:15 13:17
**Jessica.massi...**
2:7
**job (5)**
11:25 14:8
  25:5 71:14
  82:22
**John (1)**
11:7
**joining (2)**
64:25 75:13
**joke (2)**
25:17,20
**jokes (1)**
16:15
**judge (1)**
7:19
**Jurat (1)**
104:19
**justify (1)**
59:17

**K**

**keep (3)**
51:4 63:14
  67:9
**kept (2)**
41:11 63:14
**Kevin (52)**
1:3 2:5 5:16
  25:24,25 27:2
  32:20,23
  33:10 34:13
  36:7,23 45:24
  46:7,7 57:10
  57:11,11,15
  58:22,25
  59:22 60:2
  75:10,12,20

76:13 78:14
  78:19 84:3,12
  84:21 85:25
  86:22 90:12
  90:17 91:3,15
  92:22 93:9,11
  96:22 97:7
  98:18 99:2
  101:2 102:2,6
  103:2,12,16
  103:23
**kids (1)**
9:25
**kind (10)**
20:5 27:18
  28:11 46:3,11
  51:16 60:5
  88:19 95:18
  100:9
**knew (1)**
101:11
**knife (1)**
97:5
**know (116)**
6:18,20,25
  14:20 17:3
  19:3 20:10
  22:12,17
  25:22,25
  26:21 27:2,24
  28:14 29:8,12
  29:20,24 30:4
  30:21 36:5
  37:7 42:15,20
  42:21,22 44:5
  47:11,14
  48:10,11,17
  48:18,19
  49:16 50:22
  51:13 52:12
  52:14,17,21
  53:25 54:2,4
  54:9,14,16,25
  55:13,18,18

56:3,6,22
  58:19 59:11
  61:25 62:3,16
  64:9,11,13
  66:11 69:23
  70:5,12 71:19
  71:22 72:9
  73:21 74:14
  74:22 76:18
  79:14 82:2
  83:14,17,19
  83:23 84:16
  84:25 85:3,7
  85:12,15,23
  86:5,19,21
  87:6,9,24
  88:20 89:11
  89:25 90:9,21
  91:12 92:20
  93:17 94:10
  97:6,11 98:6
  98:18 99:6,8
  99:10,19,21
  99:22,23
  101:8,10
  103:9
**knowledge (...**
25:12,15,18,21
  38:4 53:4
  80:8,11 82:20
  83:10 104:4
**known (4)**
8:19 82:24
  101:12 104:3
**knows (1)**
89:16

**L**

**L (102)**
3:2 5:2 6:1 7:1
  8:1 9:1 10:1
  11:1 12:1
  13:1 14:1
  15:1 16:1

17:1 18:1
19:1 20:1
21:1 22:1
23:1 24:1
25:1 26:1
27:1 28:1
29:1 30:1
31:1 32:1
33:1 34:1
35:1 36:1
37:1 38:1
39:1 40:1
41:1 42:1
43:1 44:1
45:1 46:1
47:1 48:1
49:1 50:1
51:1 52:1
53:1 54:1
55:1 56:1
57:1 58:1
59:1 60:1
61:1 62:1
63:1 64:1
65:1 66:1
67:1 68:1
69:1 70:1
71:1 72:1
73:1 74:1
75:1 76:1
77:1 78:1
79:1 80:1
81:1 82:1
83:1 84:1
85:1 86:1
87:1 88:1
89:1 90:1
91:1 92:1
93:1 94:1
95:1 96:1
97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1

February 7, 2024

[Page 117]

105:1
**lack (1)**
92:4
**Lance (7)**
1:13 5:9 105:9
106:5 107:5
108:1,1
**language (5)**
49:17 60:9,10
60:18 97:19
**late (1)**
18:25
**law (2)**
2:4 3:19
**laws (1)**
17:9
**lawsuit (2)**
5:20 10:21
**lawsuits (2)**
42:10,11
**leads (4)**
59:25 60:7,18
61:13
**learn (2)**
30:24 55:25
**learned (2)**
56:24 70:2
**leave (2)**
68:14,16
**led (1)**
37:18
**left (5)**
24:20,21 54:9
62:10 90:24
**LegalView/Z...**
3:14
**legitimate (1)**
43:12
**level (3)**
11:4 85:21,22
**levels (1)**
88:16
**Lexitas (1)**
3:15

**LGA (7)**
26:5,8,15
82:18 83:9,11
96:10
**lie (3)**
29:15,20 71:17
**lies (1)**
33:7
**life (4)**
16:20,24 17:22
18:8
**lifetime (1)**
17:13
**LINE (1)**
108:5
**list (2)**
20:13 81:7
**listen (1)**
43:3
**lists (1)**
20:11
**litigation (2)**
3:19 4:7
**little (5)**
17:8 55:18,19
83:14,20
**live (1)**
70:22
**lives (2)**
41:16 70:16
**LLP (1)**
2:9
**located (1)**
32:17
**location (2)**
9:2 14:13
**locations (1)**
3:14
**long (13)**
9:24 11:22
12:3 14:22
24:24 26:22
73:24 76:5
83:22 87:5,7

94:11,15
**look (10)**
40:19 45:17,25
46:8,21 47:16
47:18 49:3
88:10,20
**looked (1)**
20:17
**looking (1)**
60:20
**looks (2)**
27:2,4
**lost (1)**
39:15
**lot (6)**
65:8,20,23
66:6 68:7,11
**lunge (1)**
57:19
**lunged (3)**
57:11,16,25
**lying (11)**
28:4,7,17
29:11,25 30:5
33:11,17,18
99:25,25

---

**M**

**ma'am (1)**
6:16
**MAHONEY ...**
2:9
**maker (1)**
54:25
**making (3)**
24:22 35:15
96:13
**male (2)**
97:22,22
**Malebranch...**
32:21 41:10
53:15,17
64:23,25 65:5
74:13,14

75:10,13,19
76:13 78:7,10
78:13,19 84:2
84:12,16 87:7
**man (6)**
19:3 20:19
24:25 27:8
48:12 87:24
**management...**
28:9,20 29:3,9
62:3
**manager (37)**
21:3 23:9,11
23:20 24:10
26:14,16
32:21,22,22
56:2 61:19,20
61:21,22 62:2
62:4,10,11,13
62:18 63:19
63:20 66:15
85:21 90:7,13
90:19,20,23
90:23,23
93:14 95:21
96:2,5,10
**manager's (1)**
90:8
**managers (8)**
23:23 24:2
28:20 62:5
83:3 95:25
96:3,4
**managing (6)**
32:5,21 34:24
74:10,11,12
**Manhattan (1)**
44:17
**manner (3)**
3:18 60:11
85:25
**March (3)**
12:21 13:14,15
**MARIE (2)**

107:4,23
**marked (1)**
4:2
**marriage (1)**
107:15
**married (1)**
10:5
**Massimi (22)**
2:4,7 5:7,15
13:18,21,25
21:7,16,22
26:13 48:5
56:9,13 66:4
67:21,25
72:13,16
104:10,14
106:5
**matter (9)**
39:8,9 41:17
64:14 66:15
72:11 75:4,6
107:17
**matters (1)**
4:7
**McGaha (77)**
2:13 8:12
13:17,19
18:21 19:11
21:18 22:7
23:15 25:10
26:12 28:23
29:6,17,22
30:2,6,12,18
31:11 33:12
33:20 34:5,10
35:12,17
36:12 46:25
47:9 48:15,22
50:8,18 54:23
56:7 59:8,12
61:8,23 62:14
63:7,16 64:6
66:2 67:19
84:7,22 85:10

February 7, 2024

[Page 118]

86:2,15 87:2
87:19 88:3,7
88:13,22 89:4
89:9,18 91:10
92:10 93:12
93:24,25
95:22 97:2,9
100:5 101:5
101:15 102:9
102:23
103:17
104:13,17
105:4,6
**mean (36)**
24:5 28:22
35:20 38:5
41:18 42:4
43:13,23,25
44:25 45:6
46:14 47:3
48:10 55:8
57:16,21
60:12 62:10
62:23 64:11
70:7 73:16
76:17 79:7
82:23 86:20
87:25 88:11
91:24 92:13
93:5 97:4,5
100:9 102:12
**meaning (1)**
7:5
**meant (1)**
86:18
**medication (2)**
7:24 8:3
**meet (2)**
64:15 93:25
**meeting (104)**
3:14 31:13
32:3,4,6,10
32:12,14,15
32:19 35:22

35:25 36:2,2
36:5 37:6,8
37:10,12,12
37:25 38:15
38:18,20
39:10,18,23
40:3 41:12,18
45:14,16 49:8
49:10,10 50:3
50:4 51:8,14
51:15,17,18
51:23 52:2,9
52:24 53:8,10
53:11,13,14
53:16,20
54:13,18 55:3
55:7,10 64:15
64:17,21,22
64:25 66:13
68:15,20
69:11,17 71:2
71:5,5,9
73:10,16,17
73:19,22,25
73:25 74:4
75:16,23 76:4
76:8,10,13,19
76:22,23 77:7
78:19 79:2,5
83:22,24
89:22 90:3,22
94:6,11,13,15
94:20 95:5
**meetings (1)**
77:4
**meets (1)**
104:7
**member (2)**
15:9,11
**members (1)**
28:9
**memorize (4)**
19:14,17 22:11
22:14

**memory (1)**
95:19
**mental (1)**
7:21
**mention (3)**
31:23 36:24
103:6
**mentioned (3)**
35:7,22 38:16
**mentions (1)**
39:2
**merit (2)**
43:12 99:22
**messed (1)**
84:7
**met (3)**
64:18 69:9
89:23
**mind (2)**
13:20 47:23
**minutes (3)**
51:9 68:22
94:12
**missing (1)**
59:14
**mixture (1)**
43:19
**Mm-hmm (2)**
23:13 99:3
**moment (5)**
45:2 48:11,17
70:8 72:3
**moments (1)**
13:20
**money (1)**
10:25
**monkey (1)**
34:15
**months (1)**
14:24
**Monty (13)**
32:22 36:9
53:18,19 54:2
54:5 87:12,23

90:9,10,11,21
91:7
**morning (2)**
5:13,14
**MORRISON...**
2:9
**mouth (1)**
21:13
**move (1)**
50:21
**movement (2)**
41:17 57:21
**moving (1)**
60:21
**multimillion ...**
42:16
**murder (7)**
41:23 42:3,13
42:19 43:11
43:22 46:24

———————
**N**
**N (7)**
2:2 3:2 5:2
40:21,25 41:5
106:2
**name (10)**
5:8,15 8:11,19
8:20 25:22
32:12 58:19
90:8 91:2
**Nan (24)**
32:21 36:9
41:9 53:15,17
64:23,24 65:4
70:9,25 74:13
74:14 75:10
75:13,19
76:13 78:7,10
78:13,19 79:3
84:2 87:7
99:11
**nature (1)**
26:3

**NBA (1)**
43:5
**necessarily (...**
46:18 47:4
75:4,6 76:5
77:12,13,21
77:23 82:8
86:18 89:6,17
95:14,24
99:16
**necessary (1)**
108:3
**need (4)**
3:15 7:3 39:2
90:24
**needed (1)**
22:13
**neighborhoo...**
9:2 69:21,23
70:3 71:11
**neutral (5)**
67:5 77:11,11
84:3,10
**never (8)**
10:9 18:19
19:4 70:2
71:9 80:9
89:15 103:23
**new (19)**
1:2,17 2:6,6,12
2:12 5:4,11
8:23 9:21
17:10 32:18
38:2 40:5
41:22 42:2
43:10,21
44:19
**news (6)**
42:24 43:2,3,5
43:5,7
**newspapers (...**
43:3
**nicknames (1)**
8:17

February 7, 2024

[Page 119]

**nods (1)**
6:12
**non-party (1)**
1:13
**normal (2)**
6:2 91:16
**normally (13)**
8:4 35:20 36:2
51:9 56:5
66:7,12 73:16
73:17 77:16
83:17,18
90:22
**Notary (4)**
1:16 5:3
105:15
108:25
**Note (59)**
18:21 19:11
22:7 25:10
28:23 29:6,17
29:22 30:2,6
30:12,18
31:11 33:12
33:20 34:5,10
35:17 36:12
46:25 47:9
48:15,22 50:8
50:18 54:23
59:8,12 61:8
61:23 62:14
63:7,16 64:6
84:22 85:10
86:2,15 87:2
87:19 88:3,7
88:13,22 89:4
89:9,18 91:10
92:10 93:12
95:22 97:2,9
100:5 101:5
101:15 102:9
102:23
103:17
**Noted (1)**

105:7
**notes (1)**
39:12
**notification (1)**
51:16
**notwithstand...**
4:5
**number (2)**
83:16 102:21
**numbers (3)**
88:10,11,18
**NYPD (3)**
17:15,23 18:4
**NYPD's (2)**
42:11,18

___

**O**

**O (1)**
3:2
**oath (5)**
3:8,15 7:12,17
7:18
**objection (60)**
18:21 19:11
22:7 25:10
28:23 29:6,17
29:22 30:2,6
30:12,18
31:11 33:12
33:20 34:5,10
35:17 36:12
46:25 47:9
48:15,22 50:8
50:18 54:23
59:8,12 61:8
61:23 62:14
63:7,16 64:6
66:2 84:22
85:10 86:2,15
87:2,19 88:3
88:7,13,22
89:4,9,18
91:10 92:10
93:12 95:22

97:2,9 100:5
101:5,15
102:9,23
103:17
**objections (1)**
3:6
**objectively (1)**
50:16
**obligation (4)**
4:6 23:23 24:2
24:11
**observation (...**
85:20
**observations...**
58:6
**observe (1)**
59:25
**obtain (2)**
11:10 12:22
**occurred (1)**
100:8
**offensive (4)**
47:20 48:9,13
50:16
**offer (3)**
15:16 34:9
86:13
**offered (2)**
34:2,4
**offering (1)**
34:7
**offhand (3)**
30:20,22 45:12
**officer (2)**
3:8,15
**Oh (8)**
20:19 21:11,14
23:17 24:25
44:6 69:13
90:11
**okay (43)**
9:11 17:17,19
22:2,23 24:19
25:8 26:17

27:10 31:16
37:17 39:16
44:18 49:12
49:15 50:21
51:2 55:3,10
55:25 56:18
57:5 58:2,3
58:10,21
61:11 66:4
68:14 69:16
71:4,19 73:24
74:11 79:7
89:21 91:6
95:20 97:15
103:5 104:9
104:14,16
**once (2)**
6:8 101:23
**one's (1)**
97:18
**one-on-one (1)**
72:22
**ones (1)**
98:22
**online (1)**
15:21
**operated (1)**
85:23
**operation (2)**
96:4,5
**opinion (1)**
33:15
**opinions (1)**
41:16
**order (3)**
1:14 63:14
81:9
**outcome (2)**
51:17 107:16
**outright (1)**
36:15
**outside (2)**
65:4 81:13
**overlooked (2)**

89:14,15
**owe (1)**
10:12

___

**P**

**P (3)**
2:2,2 3:2
**p.m (1)**
105:7
**package (6)**
12:7,8,15,19
14:6 24:20
**packages (3)**
87:18 88:2
92:24
**packet (1)**
40:12
**page (3)**
104:18 106:4
108:5
**paid (1)**
10:25
**papers (1)**
91:7
**Park (2)**
5:11 9:22
**parking (6)**
65:8,20,22
66:6 68:7,11
**part (18)**
6:19 28:18
29:4,10 74:15
74:23 75:7
78:3 79:3,25
80:19,23
81:20 82:5,9
84:3 98:19
102:11
**parted (2)**
68:8,10
**participating...**
3:14
**particular (5)**
14:13 22:25,25

February 7, 2024

[Page 120]

79:11 98:21
**particularly ...**
101:8
**parties (5)**
3:3,12,18 4:5
107:15
**partner (3)**
52:13,16,19
**party (5)**
4:6,6 46:7
77:17 107:10
**passed (1)**
68:19
**PAUL (1)**
2:13
**pending (1)**
7:4
**people (13)**
6:8 22:3 35:7
36:24 40:16
43:13 77:22
83:18 88:21
89:3,7 102:13
103:24
**perceived (1)**
63:15
**perform (3)**
38:11,14 49:9
**performed (5)**
49:2 50:23
51:3 66:19,20
**perpetrator (...**
35:15
**person (22)**
35:6 40:14
45:18,25 46:8
46:21 47:18
49:4 50:17
57:9 58:19
66:8 91:2,8
94:8,18,19
100:13,13,19
100:21 104:3
**person's (1)**

48:10
**personal (1)**
72:22
**personally (4)**
32:9 33:10
43:13,14
**personnel (1)**
66:9
**pertaining (1)**
36:7
**phone (3)**
73:18,22 94:8
**photographs...**
98:12
**physical (3)**
7:21 27:6,11
**picking (1)**
18:25
**Pine (1)**
2:11
**place (8)**
3:16 15:2 45:5
45:9 51:6
55:20 76:18
82:13
**placed (1)**
48:18
**plaintiff (5)**
1:4,14 2:4 5:16
25:22
**played (1)**
102:11
**please (10)**
5:8,10 6:25
21:7,22 48:6
56:8,15 67:20
72:17
**PLLC (1)**
2:4
**point (18)**
7:3 13:9 17:21
34:18 38:17
38:22 39:10
39:11 62:21

64:16 65:4
77:11 79:17
79:18 81:15
96:22,25
100:14
**points (1)**
39:14
**policies (10)**
19:15,17 20:11
20:13,14
21:12 22:4,6
22:15,17
**policy (12)**
19:5,6,9 22:2
54:21,25 59:3
63:25 74:6,8
77:2,3
**portion (2)**
80:3 91:12
**position (3)**
12:25 13:3
85:21
**position/title ...**
12:14
**possession (2)**
4:4 92:24
**possible (2)**
31:16 45:21
**Possibly (3)**
48:24 81:17
82:23
**post (1)**
62:10
**posted (1)**
66:13
**power (1)**
86:19
**precipitated ...**
56:20
**preparation ...**
93:25 94:21
95:6 98:13,16
**presence (3)**
63:6,9 65:4

**present (8)**
2:16 3:12
32:10,19 52:4
53:16 64:21
75:9
**presented (1)**
4:3
**presenting (1)**
4:2
**pretty (2)**
28:11 52:11
**prevent (1)**
7:22
**prior (14)**
4:4 32:25
49:10 51:9
52:9,23 64:24
65:15,17
73:18,22
75:13 95:16
101:21
**probably (17)**
21:2 22:19
32:15 43:6,6
51:5,16 66:10
70:8,9 71:25
73:19 75:11
79:13 81:3,13
81:14
**problem (1)**
13:21
**proceeding (2)**
24:17 108:2
**process (15)**
31:2,3 34:22
35:8 38:25
49:11,14
51:13 52:3
54:15 66:8
74:16,23
80:15 84:4
**processes (1)**
91:16
**professional ...**

33:14 84:5,6
**promotion (5)**
12:9,18,22
13:9,13
**promotions (1)**
14:10
**properly (1)**
81:10
**protest (4)**
41:14 44:12,16
45:7
**protests (4)**
42:7,12 43:19
46:23
**provide (1)**
60:17
**psychology (1)**
11:9
**Public (4)**
1:16 5:3
105:15
108:25
**Puerto (1)**
9:10
**pulled (4)**
57:12 92:7
96:20 97:5
**purchase (1)**
73:6
**purchased (1)**
73:2
**purpose (3)**
3:19 5:18
85:24
**pursuant (2)**
1:14 3:12
**push (3)**
84:13,18,25
**pushed (10)**
58:11,22 60:24
85:4,6,8,15
85:24 86:14
86:17
**pushing (3)**

February 7, 2024

[Page 121]

59:6,18 92:23
**put (7)**
15:24 40:3
43:14 46:18
47:15 81:2,24
_____
**Q**
**Queens (2)**
14:16,18
**question (34)**
3:6 4:4 6:4,6
6:17,19,20
7:2,5,5,6 14:2
21:20 23:16
28:16 30:14
40:9 46:20
47:22,25 48:3
48:4,6 56:14
72:18 79:9,10
79:12,13,15
79:15 84:9
88:14 99:19
**questioning (2)**
4:4 99:14
**questions (11)**
5:19,20,21
6:12 34:25
79:12,24 90:2
99:11 104:11
104:13
**quote (1)**
46:5
_____
**R**
**R (3)**
2:2 5:2 107:2
**race (8)**
9:9 16:10 19:2
19:6,9 50:12
87:23 97:21
**racial (25)**
16:15,18,23
17:7,11,20
25:17 27:17
27:25 28:5,10

28:12,18 29:3
29:5,12,15
30:10,16 31:9
31:17 32:9
33:19 47:13
71:14
**racially (1)**
48:9
**racily (3)**
25:14 48:13
50:16
**racism (8)**
17:25 18:5,8
18:10,13,15
18:17 80:16
**racist (1)**
81:21
**radio (6)**
45:18 46:2,9
46:22 47:19
49:4
**raised (3)**
9:4 71:11 72:7
**read (14)**
6:21 14:2,4
21:8,9,23,24
22:12 42:24
43:3 48:7
56:16 72:17
72:19
**reading (1)**
93:2
**real (1)**
18:11
**realize (1)**
6:22
**really (21)**
19:4,14 20:4
30:20 35:19
38:23 42:5
48:18,19
49:16 52:10
60:13 77:10
77:10,12

87:21 89:15
94:25 95:4
98:10 99:8
**reason (7)**
6:7,11,24 7:9
85:8 86:13
108:5
**recall (49)**
10:22 15:14
17:24 18:9
27:10 32:15
38:3 41:11,13
45:9,15,19,20
45:21 48:25
49:15,19 51:2
52:8,11,21,22
54:12,14
56:24 57:2
65:2,3,7
72:10,25
73:11 74:2,5
74:17,20,24
75:17 76:10
79:23,24
83:24 84:15
84:19 93:3
95:16 96:17
99:14,18
**receive (7)**
12:18 13:13
51:16 65:12
65:24 67:14
68:24
**received (4)**
12:9 13:9
15:19 97:15
**recollection (...**
53:2 55:6
75:24 76:3,7
76:12 95:12
**recommend ...**
12:23
**recommendi...**
91:19

**record (28)**
5:8,10,23 6:14
13:22,24,25
14:4 21:9,24
41:12 48:7
49:18 54:21
55:3 56:10,12
56:16 66:3
67:22,24
72:13,15,16
72:19 77:2,3
107:12
**recorded (4)**
3:17 54:18,20
76:23
**recording (1)**
3:18
**recordings (1)**
98:15
**refer (5)**
34:14 50:17
55:5 76:11,16
**reference (2)**
46:23 70:25
**referring (10)**
20:14 37:8
45:24 56:25
80:13 91:23
91:25 92:6
98:23 100:25
**refers (1)**
47:7
**refresh (3)**
55:6 76:12
95:12
**refreshed (2)**
76:7 95:18
**regard (2)**
88:6 103:16
**regarding (9)**
4:4 10:20
15:16,19
27:25 29:2
41:6 45:10

88:12
**related (6)**
18:18 50:12
57:3 74:12
75:20 98:24
**relationship ...**
26:3
**religious (1)**
9:15
**remember (37)**
27:7,9 30:20
30:22 40:25
41:3 42:22
49:22 53:21
53:23 54:11
54:17 55:21
62:5 69:12
70:14,17,20
70:23 72:24
73:3 75:5,15
76:6 78:21
80:12 82:23
87:16,21
89:24 90:3,3
90:7,21 91:21
94:25 96:16
**remembranc...**
59:15
**reminded (1)**
95:17
**remote (1)**
3:14
**remotely (1)**
3:16
**rep (13)**
12:13,14,16
26:6,16 65:13
65:24 66:12
67:4,6,14
68:25 86:4
**repeat (5)**
21:6 30:14
48:5 49:18
50:14

February 7, 2024

[Page 122]

**rephrase (2)**
6:18 50:15
**report (14)**
23:23 24:2,11
37:3 40:20
48:20 55:8,9
76:18 80:11
80:13 93:6,19
98:9
**reported (1)**
46:5
**reporter (15)**
1:16 3:13,17
5:21,25 6:7
6:13,21 14:5
21:10,25 48:8
56:17 72:20
105:4
**reporting (2)**
3:15 96:5
**reports (1)**
98:8
**represent (1)**
5:16
**representati...**
12:2,6,10,12
12:16,20
13:10,11 14:7
14:7 15:4
26:7 86:9
**representati...**
19:20 20:7
**represented ...**
8:9 93:20
107:11
**representing...**
3:10 77:6,12
77:17
**reprimanded...**
24:16
**request (1)**
12:23
**required (4)**
19:14,17 22:11

22:14
**resembles (1)**
46:3
**reserved (1)**
3:6
**reside (1)**
9:20
**resolve (1)**
11:2
**resource (2)**
19:20 20:6
**resources (19)**
12:2,6,9,12,13
12:16,19
13:10,11 14:7
26:6,7,14
34:25 85:21
86:4,8 101:11
101:12
**respectful (1)**
83:18
**respectfully (...**
102:22
**respective (1)**
3:3
**response (3)**
5:24 34:15
102:17
**responsible (1)**
78:10
**restate (1)**
6:20
**restrain (4)**
96:23 102:6,22
103:2
**restrained (1)**
102:2
**restricted (1)**
83:14
**result (8)**
17:13 37:21
39:13,23
42:18 76:22
97:23 98:2

**retaliation (2)**
16:12,13
**revealed (1)**
92:21
**review (10)**
27:22 57:5
76:6 94:20,23
95:5,11 96:15
98:12,15
**reviewed (5)**
27:19 57:6
60:14 94:24
108:2
**reviewing (1)**
95:16
**revisit (2)**
6:24,25
**Reyes (110)**
1:13 5:9,13 6:1
7:1 8:1 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1,16
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1

58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1,15
105:1,9 106:5
107:5 108:1,1
**Rican (1)**
9:10
**ride (1)**
70:10
**riding (3)**
38:8 40:7 41:7
**right (22)**
16:7 23:12
37:15,19
40:23 44:8
62:24 63:6
66:25 68:17
81:15 86:21
88:21,25 89:3
89:21 96:25
99:2 102:16
103:6,20,25
**riot (1)**

43:19
**rioting (5)**
41:25 42:6
43:17 44:3,25
**riots (2)**
42:2 46:24
**rise (1)**
5:19
**role (2)**
86:8 96:13
**room (5)**
7:16 51:19
70:9 75:21,22

_____
**S**

**S (5)**
2:2,7 3:2,2 5:2
**saw (2)**
74:17 85:13
**saying (11)**
6:2 39:17
45:19 46:6,20
51:4,20,25
56:18 62:18
86:20
**says (4)**
19:16 22:20
49:19 108:2
**screen (1)**
23:2
**scuffle (6)**
55:19,20,25
56:25 92:4,6
**sealing (1)**
3:4
**search (1)**
22:25
**second (5)**
21:15 37:12
38:15 56:8
67:20
**section (1)**
3:12
**security (4)**

February 7, 2024

[Page 123]

82:12 94:24
98:4,8
**see (6)**
24:7 57:3
60:21 61:5
76:19 99:9
**seen (4)**
20:16 27:3
66:17 79:20
**sell (6)**
45:18 46:2,9
46:22 47:19
49:4
**senior (5)**
32:21 62:4
66:15 96:2,10
**sense (3)**
6:15 7:7 86:8
**sentence (1)**
46:18
**separate (5)**
3:14 46:14,17
46:18 102:14
**series (1)**
5:20
**serious (1)**
103:3
**service (3)**
3:15 88:15,17
**set (2)**
12:11 107:19
**setting (1)**
73:19
**settled (1)**
10:19
**settlements (1)**
42:16
**setup (2)**
73:17,23
**sex (1)**
16:10
**sex-based (1)**
25:20
**shakes (1)**

6:12
**SHARON (1)**
2:17
**SHEET (1)**
108:1
**short (1)**
27:9
**shorthand (1)**
1:16
**show (6)**
74:3,6,8,15
79:21 99:10
**showed (2)**
92:21 93:4
**shown (2)**
74:18,22
**sic (1)**
93:5
**side (1)**
67:3
**Signature (1)**
108:23
**signed (2)**
3:8,9
**simply (1)**
63:2
**sister (4)**
38:6,7 40:6
44:24
**sit (2)**
33:6 100:2
**situation (16)**
43:15 48:19
62:24 63:4
79:11 82:7,7
87:22 88:16
89:20 91:25
92:3,14 101:3
101:24 102:5
**situations (1)**
18:24
**skew (1)**
88:18
**small (1)**

75:16
**somebody (10)**
18:24 22:23
24:6 39:2
56:23 88:18
89:16 90:25
97:4 100:15
**sorry (21)**
11:17 17:18
21:14,19
23:17 26:10
41:24 51:4
53:22 55:2,24
65:18 66:4
68:4,6 75:3
83:7 86:6
89:25 99:5,5
**sound (3)**
38:8 40:22
47:3
**sounds (1)**
46:23
**speak (12)**
6:11 32:9 51:7
53:7,9,11,12
53:19 64:24
69:10 75:12
97:13
**speaking (7)**
6:8 32:4,5
40:25 41:3
65:3,7
**speaks (1)**
97:19
**specific (3)**
30:23 39:5
50:23
**specifically (9)**
27:25 28:7,16
41:4 59:25
60:10 88:6,11
98:23
**specifics (1)**
60:17

**spoke (7)**
36:25 41:5
51:25 53:14
73:13,15,20
**spoken (3)**
69:4 95:8
97:12
**spot (2)**
63:18,21
**stand (1)**
14:19
**standards (1)**
104:7
**standpoint (1)**
84:5
**started (2)**
20:12 58:11
**starts (1)**
51:10
**state (8)**
1:17 5:4,8,10
9:21 37:24
47:23 92:23
**statement (7)**
47:6,17 48:20
98:6,25 99:6
99:9
**statements (2)**
98:19 100:3
**STATES (1)**
1:2
**station (17)**
14:15,18,21,23
26:8,15 28:13
62:2 82:19
83:9,11 93:14
95:21,25,25
96:3,11
**stations (2)**
28:11 97:14
**stayed (2)**
63:18,21
**steal (6)**
45:18,25 46:9

46:22 47:19
49:4
**stemming (1)**
42:11
**stenographic...**
107:9
**step (6)**
7:6 51:9,11,12
90:25 101:20
**steps (1)**
51:18
**Steve (1)**
13:8
**STIPULAT...**
3:3,5,7,11 4:2
**stole (4)**
38:6,7 40:6
44:24
**stop-and-fris...**
17:9,13
**stopped (2)**
17:23 18:4
**stories (3)**
30:9,15,20
**straight (1)**
60:20
**Street (3)**
2:5,11 5:11
**Strippoli (3)**
1:15 107:4,23
**Stuy (9)**
9:4 70:6,16,19
70:22 71:10
71:23,24 72:8
**Stuyvesant (1)**
9:3
**subject (1)**
24:17
**subjected (1)**
80:16
**Subscribed (2)**
105:11 108:23
**substance (1)**
79:4

February 7, 2024

[Page 124]

substantiate ...
35:16,16 36:10
  98:10
substantiate...
18:19 33:8,16
  35:9 66:18
  99:23
sued (2)
10:14,23
Suite (2)
2:5,11
sum (1)
79:4
summary (2)
81:4,11
supervisor (3)
26:18,20 90:14
supervisory (...
26:23
supply (1)
4:6
support (7)
10:12 34:2,4,7
  34:8 41:20
  97:14
supposed (6)
54:20 64:9,12
  67:3,5,9
supposedly (1)
41:9
sure (9)
19:8 20:25
  23:15 24:5,22
  52:11 56:21
  80:24 96:15
suspended (2)
24:14 25:5
swear (1)
82:21
swearing (1)
82:25
swiftly (1)
60:22
sworn (8)

3:8,9,16 5:3
  105:11 107:7
  108:1,23

————
T
————
T (4)
3:2,2 107:2,2
take (13)
5:21,25 6:7
  7:18 8:3,4
  13:5 39:3,11
  46:15 57:13
  82:13 100:16
taken (10)
1:13,15 7:12
  7:17,24 50:10
  51:6 98:25
  107:9 108:2
talk (4)
38:23 52:19
  75:16 79:10
talking (5)
37:15 70:24
  71:4 92:13
  98:21
tall (1)
27:9
team (2)
29:3,10
Teams (1)
94:10
technically (1)
73:17
tell (34)
7:13,17 19:15
  20:15 22:9
  23:9,11,20
  27:4 33:4
  34:16 36:4
  37:4 38:21,22
  40:24 45:3
  46:6 52:15
  56:19 61:10
  61:11 66:6

69:20 70:15
  70:18 71:13
  72:21 76:9
  83:13 84:12
  86:5 93:17,18
telling (1)
72:25
term (1)
77:13
terminate (11)
90:5,12,16
  91:3,9,15
  93:10 96:6,7
  96:14 97:7
terminated (...
31:14,18,25
  39:9 54:8,10
  66:21 79:19
  87:12,15
  95:21 104:7
terminating ...
103:21
termination ...
31:20 32:25
  55:11,14,17
  56:20 65:17
  80:7,9 82:4
  91:18,19,23
  98:20
terminations...
89:17
testified (3)
5:4 8:15 73:10
testify (2)
7:9,25
testifying (2)
3:10 7:22
testimony (12)
43:17 63:2
  67:13 68:23
  71:7 75:7
  90:18 95:20
  104:6 107:8,8
  108:3

tests (1)
13:5
Thank (3)
104:16,17
  105:3
thing (7)
28:11 39:17
  62:22 71:20
  83:19 89:13
  96:25
things (17)
20:15 25:9,14
  46:15 65:23
  66:10,23,24
  67:9 81:4,5
  81:10 83:14
  83:19 90:24
  95:15 101:10
think (15)
28:9,19 29:10
  44:2 47:7
  62:22 72:2
  84:2,6,7,24
  99:18 101:20
  101:22 103:6
thinking (1)
45:3
thinks (1)
18:25
third (1)
46:7
thought (1)
48:10
threatening (1)
103:24
three (2)
46:16 51:14
till (1)
9:7
time (55)
3:6 9:7 13:4
  15:8,15 20:17
  25:2 26:22
  28:15 32:6,8

33:8 36:6
  39:4 45:5
  46:15 49:23
  52:12 61:22
  62:8,13 64:18
  65:13 67:11
  68:2,19,19
  69:8 73:5,13
  73:15,20
  75:18 86:12
  87:17,25
  89:14,14,22
  90:13,15,19
  90:20 91:20
  91:20,25
  93:15 96:11
  99:8,16,17
  101:9 104:4
  104:15 105:7
times (7)
13:2 17:2,5
  30:23 82:3
  83:16 94:4
title (6)
11:25 12:3,5
  15:3 19:23
  83:19
titles (1)
14:8
today (14)
5:17 7:10,17
  7:22 8:9,20
  33:6 79:9
  93:20 95:13
  95:19 98:13
  98:16 100:2
today's (2)
94:2,21
told (21)
30:10,16,21
  34:13 40:21
  44:22 52:2
  53:23 54:2
  58:5 65:12,13

February 7, 2024

[Page 125]

65:14 66:13
71:16,23 80:6
81:18,20
84:16 98:9
**tone (1)**
78:24
**top (2)**
20:10,16
**training (6)**
15:16,19,21
101:4,7,11
**transcribed (1)**
107:10
**transcript (5)**
4:6 79:6 105:5
107:12 108:2
**transpired (2)**
78:18 91:24
**treated (2)**
16:7 103:13
**treatment (1)**
31:3
**trial (4)**
1:12 3:6 107:5
107:13
**Tried (1)**
96:23
**true (5)**
19:4 59:17
73:4 89:6
107:12
**truth (4)**
7:13,17 47:5
50:6
**truthful (3)**
66:25 98:20
100:4
**truthfully (1)**
7:10
**truthfulness ...**
99:15,20
**try (6)**
45:18 46:2,9
46:22 47:19

49:4
**trying (4)**
49:17 57:13
84:13 88:9
**TV (6)**
38:2,6 40:6
41:6 44:23
45:10
**TV/rioting (1)**
46:12
**Twice (1)**
94:5
**two (15)**
6:8 17:5,6,11
17:22 18:3,7
18:9 46:16
49:20 55:19
70:2 71:11
72:7 73:21
**type (2)**
9:17 16:18
**typically (5)**
15:22 23:8
43:8 51:15
52:6 53:12
66:8 89:12

_____

**U**

**U (1)**
3:2
**ultimate (4)**
91:3 93:10
96:7 97:7
**unauthorize...**
3:19
**understand (...**
6:9,17 7:12,15
27:18 39:15
44:25 47:22
86:7 88:9
92:12 100:3,7
100:10
**understandi...**
27:13 57:7,9

57:24 58:10
58:14 68:6
**Understood (...**
43:9 45:13
**union (3)**
15:6,9,11
**UNITED (1)**
1:2
**University (1)**
11:7
**unsubstantia...**
36:14 98:11
**unsubstantia...**
35:10,21 99:24
**untruthful (1)**
98:20
**upcoming (1)**
14:10
**upset (1)**
57:10
**use (3)**
60:18 97:24
101:13
**uses (1)**
97:19
**usually (2)**
53:4 56:2

_____

**V**

**verbal (1)**
23:16
**verbally (2)**
23:11,21
**verbatim (4)**
22:20 36:4
49:18 76:10
**video (32)**
3:13 4:5 57:3,5
57:6,8 58:7,8
59:21 60:5,14
74:3,7,15,17
74:22 75:6
79:17,18,20
79:25 85:13

85:18,20
86:12 92:21
93:7 96:18
100:8,10,11
102:15
**videoconfere...**
1:12 3:14,17
**videos (1)**
74:8
**viewed (2)**
79:17,18
**violation (1)**
3:19
**violence (2)**
63:24,25
**violent (1)**
104:3

_____

**W**

**waiting (1)**
70:8
**waived (1)**
3:4
**walk (2)**
57:19 68:4
**walked (14)**
57:17 58:2,4
60:11 63:19
67:11 68:2,7
68:9,15,20
71:5,8 73:9
**walking (6)**
59:23 60:4,6
60:22 61:7
63:10
**walks (2)**
20:5 66:9
**Wall (1)**
2:5
**Wanders (12)**
1:9 2:11 32:20
53:18,19
82:25 96:12
96:13 97:6,12

97:16,21
**want (11)**
6:24 26:21
43:5,14,25
51:23 56:3
57:21 81:10
101:17 103:6
**wanted (10)**
20:23 22:23
23:19 77:25
81:5,5,11
99:20,21,22
**wasn't (14)**
28:13 32:7
56:22 62:16
70:7 72:2
73:23 75:4,6
75:22 77:21
80:2 82:8
104:3
**Wassermann...**
13:8
**watching (1)**
85:18
**way (10)**
15:24 47:15
50:10 57:23
70:21 79:20
88:19 97:19
103:20 104:6
**ways (2)**
68:8,10
**we're (8)**
5:17 6:2 39:4,5
39:7 49:8
79:8 95:13
**we've (1)**
36:6
**weather (1)**
43:6
**website (1)**
22:25
**Wednesday (1)**
94:7

February 7, 2024

[Page 126]

**week (1)**
94:7
**weekend (3)**
38:7 40:6
44:24
**went (7)**
12:15 52:3
91:21 95:2
96:19 101:8
102:5
**weren't (1)**
82:6
**When's (1)**
20:17
**whereabouts...**
70:13
**WHEREOF ...**
107:19
**white (3)**
42:5 48:12
97:22
**wish (1)**
32:23
**witness (20)**
1:13 3:10,13
3:15,16 4:3,3
4:4 5:2 21:17
23:17 40:15
40:22,22
105:3 106:4
107:7,13,19
108:23
**witness's (1)**
3:17
**witnessed (1)**
18:13
**witnesses (3)**
35:5,14 40:18
**witnessing (1)**
41:9
**word (4)**
21:13 22:20
57:25 60:18
**words (1)**

92:5
**work (9)**
14:13 16:20,21
45:22 47:16
54:5 92:22
95:24 96:3
**workers (2)**
67:8 97:19
**working (2)**
87:5,8
**workplace (8)**
16:8,15 18:10
18:13,15,17
63:24,25
**works (1)**
38:25
**would've (9)**
33:4 41:9
49:13 64:22
66:17 73:19
81:3 93:14
96:4
**wouldn't (8)**
34:4 43:14
48:9,17,19
70:11,12
76:18
**write (1)**
86:21
**written (5)**
3:18 24:16,18
24:19 25:2
**wrong (2)**
46:6 86:20
**Wuss (1)**
73:8

**X**

**x (3)**
1:3,11 106:2

**Y**

**Y (1)**
5:2
**yeah (22)**

20:12 22:21
27:8,15 43:6
46:4 50:20
56:6,21 64:10
70:23 73:7,7
74:20 75:23
76:17 81:3
83:15 84:11
84:11 86:24
91:6
**years (7)**
11:24 12:4,4
14:24 20:19
24:25 93:18
**yesterday (4)**
57:6 60:14
94:14 95:11
**yesterday's (1)**
94:20
**York (17)**
1:2,17 2:6,6,12
2:12 5:4,11
8:23 9:21
17:10 32:18
41:23 42:3
43:11,21
44:19
**younger (2)**
17:8 18:5
**Yup (1)**
97:22

**Z**

**Zoom (2)**
7:16 94:9

**0**

**02/07/2024 (1)**
108:2

**1**

**1 (1)**
12:21
**10:13 (1)**
1:15

**10005 (2)**
2:6,12
**11 (1)**
14:24
**11729 (1)**
5:12
**11th (1)**
107:20
**12:49 (1)**
105:7
**1264 (1)**
2:5
**15 (1)**
51:9
**18 (1)**
17:9
**1900 (1)**
2:11
**19ish (1)**
17:9

**2**

**2 (2)**
68:22 93:18
**20 (2)**
9:7 108:24
**2019 (1)**
11:11
**2020 (1)**
12:21
**2021 (9)**
14:25 15:3
26:8,12,13,15
26:20 73:6
83:12
**2022 (3)**
13:14,15 26:10
**2024 (4)**
1:15 105:12
107:6,20
**22-CV-7662 ...**
1:6
**24 (1)**
8:7

**26 (1)**
9:8
**285 (1)**
5:11

**3**

**3 (2)**
14:24 68:22
**3113(d) (1)**
3:12

**4**

**4 (2)**
12:4,4
**45 (2)**
94:12,16

**5**

**5 (1)**
24:25

**6**

**7**

**7 (2)**
1:14 106:5
**7th (1)**
107:6

**8**

**8 (2)**
11:24 20:19
**88 (1)**
2:11

**9**

**99 (1)**
2:5