UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X    22 CV 7662 (DLI)(MMH)

KEVIN CAMPBELL,

                                     Oral Argument Requested

                            Plaintiff,

**PLAINTIFF'S 56.1 IN SUPPORT
OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

        -against-

FEDERAL EXPRESS CORPORATION A/K/A FEDEX
EXPRESS, AND ERIC WARNDERS, *INDIVIDUALLY*,

                            Defendants.

-------------------------------------------------------------------------X

## I.    NAMES AND RACES OF FEDEX EMPLOYEES AND MANAGERS

1.    Plaintiff Kevin Campbell began working for Defendant Federal Express Corporation A/K/A FedEx Express ("FedEx") on April 1, 2017 as a courier non-driver. Exhibit ("Ex.") 1, Deposition Transcript of Plaintiff Kevin Campbell ("Campbell Tr.") 8:18-20, 14:7-9.

2.    In 2021, Defendant Eric Warnders was Mr. Campbell's Senior Manager at the FedEx LGA Station. Ex. 2, Deposition Transcript of Defendant Eric Warnders ("Warnders Tr.") 50:16-51:20.

3.    Defendant Warnders' race is "Caucasian." Ex. 2, Warnders Tr. 30:18-19.

4.    In 2021, Nanette Malebranche was the Managing Director of FedEx. Ex. 3, Deposition Transcript of Nanette Malebranche ("Malebranche Tr.") 18:5.

5.    In 2021, Ms. Malebranche was responsible for supervising Defendant Warnders who reported directly to her. Ex. 3, Malebranche Tr. 18:10-15, 62:20.

6.    Ms. Malebranche's race is "Spanish, Irish, and German." Ex. 3, Malebranche Tr. 9:16.

7.    James Cahill is FedEx's Senior Security Specialist and has worked for FedEx for approximately 13 years. Ex. 4, Deposition Transcript of James Cahill ("Cahill Tr.") 55:14-56:11.

8.    Mr. Cahill's race is white. Ex. 4, Cahill Tr. 51:22-24.

9.    Henry Nunez has been a FedEx Operations Manager for 7 years. Ex. 5, Deposition Transcript of Henry Nunez ("Nunez Tr.") 57:10-20.

10.     Mr. Nunez's race is Puerto Rican and Hispanic. Ex. 5, Nunez Tr. 51:10-11.

11.     Mr. Nunez was Plaintiff's manager from April 2, 2017 to June 15, 2020. Ex. 5, Nunez Tr. 11:8-19; Ex. 1, Campbell Tr. 73:20-74:8.

12.     Defendant Eric Warnders is Mr. Nunez's current supervisor and was his supervisor in May 2021. Ex. 5, Nunez Tr. 59:24-60:8.

13.     Henry Nunez testified that Peter Lorenzi is Hispanic. Ex. 5, Nunez Tr. 113:12-17.

14.     Steve Pasqualicchio testified that Peter Lorenzi is white. Ex. 6, Deposition Transcript of Steven Pasqualicchio ("Pasqualicchio Tr.") 75:4-5.

15.     Pasqualicchio's race is white. Ex. 6, Pasqualicchio Tr. 23:25-24:2.

16.     Eric Warnders has been Pasqualicchio's supervisor since 2019. Ex. 6, Pasqualicchio Tr. 30:6-13.

17.     Pasqualicchio has been a FedEx Operations Manager since 2018. Ex. 6, Pasqualicchio Tr. 27:14-22.

18.     Pasqualicchio has been assigned to the LGA station since 2013. Ex. 6, Pasqualicchio Tr. 32:13-24.

19.     Michael Bradley is a FedEx manager. Ex. 6, Deposition Transcript of Michael Bradley ("Bradley Tr.") 19:12-19.

20.     Michael Bradley's race is white. Ex. 7, Bradley Tr. 12:6-7.

21.     Eric Warnders was Mr. Bradley's supervisor in 2020 and 2021. Ex. 7, Bradley Tr. 20:17-24.

22.     Monty Bovell was Plaintiff's manager from June 16, 2020 to May 25, 2021. Ex. 1, Campbell Tr. 74:11-75:8.

23.     Monty Bovell no longer works for FedEx because FedEx fired him in June 2021 for falsifying documents and for falsifying service to FedEx customers several times over months prior. Ex. 3, Malebranche Tr. 72, 110:21-111:7; Warnders 95:5-20.

24.     Bovell had been engaging in this falsification for several months prior to his termination. Ex. 2, Warnders Tr. 96:4-11; Ex. 8, Deposition Transcript of Monty Bovell ("Bovell Tr.") 76:2-78:11.

25.     Bovell was engaging in this falsification to "make the numbers look better than what they actually are" regarding service. Ex. 9, Deposition Transcript of Lance ("Reyes Tr.") 87:12-89:21.

26.    Frank Ontaneda is Hispanic and has been an Operations Manager at FedEx in the LGA Station for 9 years. Ex. 10, Deposition Transcript of Frank Ontaneda ("Ontaneda Tr.") 16:9-10; 23:17-25.

27.    "Rob the Mechanic," discussed below, is white and his full name is Rob Riley. Ex. 5, Nunez Tr. 119:10-17; Ex. 6, Pasqualicchio Tr. 87:7-11; Ex. 7, Bradley Tr. 47:9-13.

28.    Jeffrey Durante is white and is a courier at FedEx. Ex. 5, Nunez Tr. 124:8-12; Ex. 6, Pasqualicchio 88:4-7.

29.    In 2021, there were ten managers at the FedEx LGA station. Two of the managers at the time were Black. Ex. 7, Bradley Tr. 48.

30.    In May 2021, Lance Reyes was an Assistant Human Resources Manager at FedEx. Ex. 9, Reyes Tr. 15:3-5.

31.    Mr. Reyes's race is "African-American and Puerto Rican." Ex. 9, Reyes Tr. 9:9-10.

32.    Aldemel Spencer is a FedEx employee. Ex. 11, Deposition Transcript of Aldamel Spencer ("Spencer Dep. Tr.") 10:13-21.

33.    Aldamel Spencer's race is African American. Ex. 11, Spencer Dep. Tr. 31:10-11.

## II.    KEVIN CAMPBELL WAS A GOOD EMPLOYEE

34.    Kevin Campbell was a good employee and worker. Ex. 2, Warnders Tr. 68:7-15; Ex. 8, Bovell Tr. 25:19-26:10.

35.    "Kevin was definitely a hard worker." Ex. 8, Bovell Tr. 26:3-4. Bovell also describes Mr. Campbell as "Personable. He was not – he wasn't aggressive – he wasn't an aggressive person. Very nice. Cordial. Just a, yea, standard nice guy." Ex. 8, Bovell Tr. 26:5-10.

36.    Mr. Campbell was a good employee. Ex. 10, Ontaneda Tr. 40:17-20.

37.    Mr. Campbell "was a good worker." Ex. 5, Nunez Tr. 78:10-12.

38.    Mr. Campbell is "a good guy" and does not know him to be easily upset by things. Ex. 5, Nunez Tr. 127:17-128:2.

39.    Mr. Campbell would joke at work with others, but he never made offensive jokes because he does not believe a joke is a joke unless everyone finds it funny. Ex. 1, Campbell Tr. 194:21-195:9.

## III.    RACIAL DISCRIMINATION AND HARASSMENT AT FEDEX.

40. Mr.  Campbell experienced and witnessed racial discrimination from FedEx employees and managers daily. Ex. 1, Campbell Tr. 139:11-140:5.

41. Mr. Campbell continuously experienced racial discrimination, and nothing was resolved. Ex. 1, Campbell Tr. 141:15-17.

42. Nunez would often say things on the belt about Black people in front of other FedEx workers such as Enrique Navas, Johnny December, Corredo (last name unknown), and Aldamel Spencer. Ex. 1, Campbell Tr. 104:21-106:11.

43. Enrique Navas is Italian and possibly of Latino descent; Johnny December is white; Corredo is Filipino; and Aldamel Spencer is Black. Ex. 1, Campbell Tr. 107:8-12; 225:13-19.

44. Mr. Nunez would make comments targeting Black people a few times per week. Ex. 1, Campbell Tr. 107:16-19.

45. An example of one of Mr. Nunez's comments was that "Black people are lazy, y'all don't like working," and things of that nature. Ex. 1, Campbell Tr. 107:13-108:2.

46. Henry Nunez called Mr. Campbell "lazy" because Mr. Campbell's job title was "courier" and "he wanted to do courier job." Ex. 5, Nunez Tr. 108:2-109:9.

47. At work, people would "make racist statements about George Floyd and the riots. And calling black people monkeys and thieves and things of that nature." Ex. 1, Campbell Tr. 142:15-19.

48. These types of comments were made a few times per week. Ex. 1, Campbell Tr. 145:16-18.

49. As a result of these racist comments, Mr. Campbell often did not want to go to work because he knew he would have to deal with it in some way. Ex. 1, Campbell Tr. 144:6-8.

50. Mr. Nunez testified that he has never participated in any racial jokes at FedEx, nor does he know anyone who has. Ex. 5, Nunez Tr. 67:2-6.

51. Mr. Nunez testified that people at work never say racially inappropriate things. Ex. 5, Nunez Tr. 67:15-17.

52. Nunez has engaged in the following behavior at work when he didn't know it was being recorded. Ex. 5, Nunez Tr. 130:8-131:6, 150:21-151:9.

53. Mr. Nunez has said to a Black employee named Steve Blaise "I'll smack the shit out of you." Ex. 5, Nunez Tr. 135:16-135:23 (Mr. Nunez also confirming the video

depicted him making that statement); Ex. 12, First Video Depicting Henry Nunez and Steven Blaise at Plaintiff's Production Number 70 ("First Nunez Video) at 00:17.

54.    Mr. Nunez has referred to this same Black employee's hair as "peasy ass fucked up hair" and told this same employee to "get his peasy ass hair done." Ex. 5, Nunez Tr. 139:6-16; Ex.12 First Nunez Video at 00:20.

55.    According to Mr. Nunez "peasy" means "It looks like little peas. I guess the corn rows look like little peas. They're braided into looks like little peasy." Ex. 5, Nunez Tr. 140:2-5.

56.    Mr. Nunez has called a Black employee named Steve Blaise "a bitch" and "a motherfucking bitch." Ex. 5, Nunez Tr. 128:11-129:5, 146:17-24 Mr. Nunez also confirming the video depicted him making that statement); Ex. 13, Second Video Depicting Henry Nunez and Steven Blaise at Plaintiff's Production Number 72 ("Second Nunez Video"), Second Nunez Video at 00:20-00:40.

57.    Mr. Nunez does not believe it is a form of anti-Black bias to negatively comment on a Black person's natural hairstyle, nor does he know whether such discrimination is prohibited by the New York City Human Rights Law. FedEx has never educated him on this. Ex. 5, Nunez Tr. 136:14-140:9.

58.    Mr. Nunez testified that Kevin Campbell accused him in his Complaint of "something about Blacks." Ex. 5, Nunez Tr. 31:2-12.

59.    The words "Blacks" does not appear in Mr. Campbell's Complaint. Ex. 5, Nunez Tr. 50:18-21.

60.    At least one FedEx employee named "Mike" commented to Mr. Spencer about "fried chicken", "basketball", and "watermelon." Ex. 14, Transcript of Phone Call Between Plaintiff and Aldamel Spencer ("Spencer Tel. Tr.") 48:3-49:17; *see also* Declaration of Plaintiff Kevin Campbell ("Campbell Dec."), attached to the Declaration of Jessica Massimi as Ex. 38, ¶¶ 32-37.

61.    Henry Nunez tried to turn employees and managers against Mr. Spencer. Ex. 14, Spencer Tel. Tr. 61:13-23, 90:12-93:11.

62.    Nunez has made racist comments such as "I can't stand Black people." Ex. 14, Spencer Tel. Tr. 64-65.

63.    Henry Nunez does not like Black people. Ex. 14, Spencer Tel. Tr. 65:16-17; 66:2-3.

64.    At the FedEx LGA station, Black workers are treated worse than workers from other racial groups. Ex. 14, Spencer Tel. Tr. 83:22-84:13.

65.    "Mike" often made comments to black employees about "Kool-Aid and grape soda and watermelon, chicken." Ex. 14, Spencer Tel. Tr. 131:23-132:13.

66.    Eddie Meyers is another FedEx employee who often made Black jokes in the LGA station. Ex. 14, Spencer Tel. Tr. 133:22-25.

67.    Monty Bovell heard about issues of discrimination at FedEx when he was a courier. Ex. 8, Bovell Tr. 84:23-85:13.

68.    In the Summer of 2020, many of my white and Latino co-workers began coming to work expressing blatantly racist views in the wake of George Floyd's murder and the protests that followed. Ex. 38, Campbell Dec. ¶ 4.

69.    FedEx employees made racist statements "about George Floyd and the riots, and calling Black people monkeys and thieves and things of that nature." Ex. 1, Campbell Tr. 141:23-142:19.

70.    Henry Nunez cut Mr. Campbell's hours by removing him from his delivery route. Ex. 1, Campbell Tr. 92:24-99:21.

71.    Nunez would pick Mr. Campbell up from his truck route. Ex. 5, Nunez Tr. 105:25-106:4.

72.    Henry Nunez cut Mr. Campbell's hours because he is Black. Ex. 1, Campbell Tr. 104:15-19.

73.    Mr. Campbell wanted to work his delivery route with the other driver because he was getting a lot more hours on that assignment. Warnders 71:16-18.

74.    Campbell was not making the same amount of hours working in the station as he was making out on the road. Ex. 5, Nunez Tr. 106:8-13.

75.    After Mr. Nunez switched Mr. Campbell to work in the station, "he was making about 40, 45 hours a week compared to 50, 55, 60 hours he was doing daily before that." Ex. 5, Nunez Tr. 110:5-7.

76.    Henry Nunez cut Mr. Campbell's hours during two time periods and Monty Bovell told Mr. Campbell that cutting his hours had been Henry Nunez's decision. Ex. 1, Campbell Tr. 263:12-266:3.

77.    In the Summer of 2018, Mr. Nunez said "Black people are always making excuses why they can't do things. This is why I hate working with Black people." Ex. 1, Campbell Tr. 130:23-131:2.

78.    On June 1, 2020, Peter Lorenzi, Campbell's co-worker, loudly yelled out to Campbell calling him "Trayvon." Ex. 1, Campbell Tr. 146:12-19.

79.  Campbell ignored this comment from Lorenzi. Ex. 1, Campbell Tr. 146:20-23.

80.  Peter Lorenzi then followed Mr. Campbell into the kitchen as Mr. Lorenzi continued to call him "Trayvon." Campbell Tr. 147:25-148:10.

81.  Peter Lorenzi's reference to "Trayvon" pertained to "racism" and "something that was going on recently." Ex. 10, Ontaneda Tr. 54:7-14.

82.  Ontaneda understood the reference to "Trayvon" to be regarding "a teenager who was shot." Ex. 10, Ontaneda Tr. 54:24-55:3.

83.  When Lorenzi saw Campbell washing his hands, Lorenzi stated "Why are you washing your hands for so long? Is it because you are not used to having running water in the projects?" Ex. 38, Campbell Dec. ¶ 10; *See also* Campbel Tr. 398:3-6 (Mr. McGaha reading this statement into the record).

84.  Henry Nunez believes the statement "Why are you washing your hands for so long? Is it because you're not used to having running water in the projects" is racist. Ex. 5, Nunez Tr. 115:11-22.

85.  Rob Riley, a mechanic for Defendant FedEx, said to Campbell "Kevin, how is your new TV?" Ex. 1, Campbell Tr. 192:20-3, 195:15-22.

86.  "Rob" is known as "Rob the Mechanic" and is Caucasian. Ex. 1, Campbell Tr. 193:6-9.

87.  Campbell asked Rob to explain what he meant by this comment, and Rob explained "the TV that you stole during the riots." Ex. 1, Campbell Tr. 195:15-196:6.

88.  At the time of Rob's comments, there were protests taking place in New York related to George Floyd. Ex. 1, Campbell Tr. 199:2-6.

89.  Henry Nunez was present with Mr. Campbell for Rob's statements, and Nunez witnessed and heard Rob's comments but did nothing to reprimand or report Rob. Ex. 1, Campbell Tr. 196:7-13.

90.  In or around July 2020, "JC" and Jeffrey Durante, Plaintiff's co-workers, walked over to Campbell who was standing near a cage where packages are stored. Durante said to Campbell "How about I put you in that cage like the gorilla you are." Ex. 38, Campbell Dec. ¶¶ 21-23; *See also* Ex. 1, Campbell Tr. 209:4-209:13 (Mr. McGaha reading this statement into the record).

91.  A few days after the "cage" comment from Jeffrey Durante, David Almeda, another courier for Defendant, walked over to where Campbell was standing with two

managers, Michael Bradley and Pasqualicchio. Ex. 38, Campbell Dec. ¶ 24; *See also* Ex. 1, Campbell Tr. 252:7-12 (Mr. McGaha reading this into the record).

92. In front of these two managers, Almeda said of Campbell "Doesn't this guy look like someone who would steal your car radio and then try to sell it back to you." Ex. 38, Campbell Dec. ¶ 25; *See also* Ex. 1, Campbell Tr. 252:16-25 (Mr. McGaha reading this statement into the record).

93. David Almeda is Hispanic. Ex. 1, Campbell Tr. 253:17-19.

94. Mr. Campbell usually "split the belt" as part of his responsibilities at work. Ex. 1, Campbell Tr. 17:5-6.

95. To do this, Mr. Campbell would be assigned to stand next to the belt line to separate the boxes based on where they needed to go. Ex. 1, Campbell Tr. 17:15-21.

96. "Splitting the belt is separating the boxes, to make sure they get to the right belt so they can get to the drivers." Ex. 1, Campbell Tr. 17:7-10.

97. A few people, including Augusto Alzate, do the recycle function on the belt. Ex. 1, Campbell Tr. 353:8-12. This means Mr. Alzate is supposed to pull freight off the belt if a splitter misses the boxes. Ex. 1, Campbell Tr. 353:18-20.

98. Mangers would sit and watch Augusto Alzate curse Plaintiff out every morning. Ex. 1, Campbell Tr. 362:2-11.

99. Mr. Alzate is extremely disrespectful and abusive and frequently bumped into Mr. Campbell during work, which Mr. Campbell always ignored. Ex. 1, Campbell Tr. 401:3-25.

100. Mr. Campbell made managers, including Henry Nunez, aware Alzate was verbally abusing him every morning over boxes that everyone missed countless times. Ex. 1, Campbell Tr. 358:8-18, 363:21-25.

101. Alzate cursed and yelled at Campbell all the time. Ex. 1, Campbell Tr. 356:2-8.

102. Everyone in the station on the LGA belt and higher knew that Alzate did not like Mr. Campbell. Ex. 14, Spencer Tel. Tr. 69:10-13.

103. Defendant Warnders testified that Mr. Campbell should have reported that Alzate was cursing at him continuously day after day. Ex. 2, Warnders Tr. 92:12-93:4.

104. Yet, Alzate himself admitted that he would tell the FedEx managers every day that he did not want to work with Mr. Campbell because, according to Alzate, Mr. Campbell was "lazy." Ex. 15, Deposition Transcript of Augusto Alzate ("Alzate Tr.") 16:9-17:6.

105.    Alzate would tell all of his coworkers and managers that Campbell was lazy. Ex. 15, Alzate Tr. 17:19-18:7.

106.    Mr. Alzate usually made racist remarks towards Mr. Campbell in Spanish. Ex. 1, Campbell Tr. 356:13-357:17.

107.    Splitting the belt is hard work and it's easy to get injured. Ex. 5, Nunez Tr. 74:9-18.

108.    During the course of his FedEx career, Mr. Nunez split the belt. Ex. 5, Nunez Tr. 73:14-15.

109.    Mr. Nunez has missed freight while splitting the belt. Ex. 5, Nunez Tr. 73:19-75:15.

110.    Defendants never wrote Mr. Campbell up for missing freight because missing freight is "part of the job" since "a lot of freight comes down. You have no choice, but to let the freight go down the belt. You can't grab everything. Especially if it's heavy boxes and stuff like. And it's overwhelming. You can't." Ex. 5, Nunez Tr. 98:17-99:10.

111.    Defendant Warnders never received any complaints from Alzate or anyone else alleging Mr. Campbell did not do his job or that he was missing freight on the belt. Ex. 2, Warnders Tr. 69:10-16, 123:6-12.

## IV.   ALZATE'S MAY 18, 2021 ATTACK ON MR. CAMPBELL

112.    On May 18, 2021, Mr. Campbell was assigned to split the belt. Ex. 1, Campbell Tr. 353:14-17. Augusto Alzate was assigned to work the recycle. Ex. 1, Campbell Tr. 353:14-22.

113.    That day, Mr. Alzate, approached Campbell unprovoked and began aggressively cursing and swearing at Campbell.  Ex. 1, Campbell Tr. 352:21-354:6.

114.    Alzate was screaming "motherfucking Kevin, always missing boxes, piece of shit" which is what he would normally say to Mr. Campbell. Ex. 1, Campbell Tr. 356:12-22.

115.    Mr. Campbell usually ignored Mr. Alzate's verbal attacks, and managers were aware that Alzate treated Mr. Campbell this way. Ex. 1, Campbell Tr. 356:18-22.

116.    Alzate was mad, so he came over to Mr. Campbell, yelling, screaming, cursing at him, and kicking boxes in Mr. Campell's direction. Ex. 1, Campbell Tr. 368:17-20.

117.    Mr. Campbell initially responded by ignoring Mr. Alzate. Ex. 1, Campbell Tr. 353:14-25.

118.    Mr. Campbell was ignoring Mr. Alzate on purpose because he wanted Alzate to leave him alone but Alzate kept escalating the situation. Ex. 1, Campbell Tr. 374:3-18.

119.    Alzate then pushed a large box toward Mr. Campbell, hitting Mr. Campbell's hand with the box, which hurt. Ex. 1, Campbell Tr. 354:2-6, 367:7-25.

120.    Prior to Alzate doing this, there was about a five-foot distance between Mr. Alzate and Mr. Campbell. Ex. 1, Campbell Tr. 366:3-7.

121.    Mr. Campbell turned to face Mr. Alzate and asked him why he hit Mr. Campbell with the box. Ex. 1, Campbell Tr. 354:2-6.

122.    Alzate did not respond, so Mr. Campbell asked Alzate a second time why he hit him with the box. Ex. 1, Campbell Tr. 354:7-10.

123.    Alzate responded by pulling out his box cutter with a fully extended blade toward Mr. Campbell in a menacing way, waiving the boxcutter at him. Ex. 1, Campbell Tr. 354:11-21.

124.    Mr. Campbell then grabbed Mr. Alzate's arm to get him to drop the boxcutter. Ex. 1, Campbell Tr. 354:18-21.

125.    Mr. Alzate refused to drop the boxcutter until several other coworkers intervened and got the boxcutter out of Alzate's hand. Ex. 1 Campbell Tr. 355:5-11.

126.    The May 18th incident began when Alzate approached Campbell's work area in a clearly agitated state, flailing his arms, while pushing several packages in Campbell's direction. Ex. 4, Cahill Tr. 139:21-142:5.

127.    Mr. Reyes testified that the incident started when Alzate aggressively pushed a box toward Mr. Campbell, hitting Mr. Campbell with the box. Ex. 9, Reyes Tr. 58:10-20.

128.    According to Reyes, Alzate approached Mr. Campbell first. Ex. 9, Reyes Tr. 93:8-9.

129.    Mr. Campbell was "definitely hit with the box." Ex. 9, Reyes Tr. 64:8.

130.    "The fact of the matter is he was hit with the box." Ex. 9, Reyes Tr. 64:13-14.

131.    These actions by Alzate are against FedEx policy and Mr. Campbell did nothing to deserve this. Ex. 9, Reyes Tr. 58:21-59:20.

132.    According to Lance Reyes, Mr. Alzate was the one person who was agitated. Ex. 9, Reyes Tr. 100:11-23.

133.    Reyes was unable to identify any de-escalation training provided by FedEx. Ex. 9, Reyes Tr. 101:4-12.

134. Despite this lack of de-escalation training, Mr. Campbell was able to safely prevent Mr. Alzate from injuring anyone with his boxcutter. Ex. 9, Reyes Tr. 101:13-103:4.

135. On May 25, 2021, Defendant FedEx issued a Security Investigative Report stating that Defendant Eric Warnders directed that Plaintiff be terminated. Ex. 16, James Cahill's Security Investigative Report ("Security Report") at ESI 0000966; *See also* Ex. 9, Reyes Tr. 93:10-19 (testifying that "the station manager" made the ultimate decision to terminate Kevin Campbell's employment); *See also* Ex. 2, Warnders Tr. 50:16-51:20 ("In 2021, Defendant Eric Warnders was Mr. Campbell's Senior Manager at the FedEx LGA Station").

136. Defendant Warnders believes Mr. Cahill's Security Report is accurate. Ex. 2, Warnders Tr. 119:14-16.

137. Mr. Cahill found Mr. Campbell's statements to be consistent with the video. Ex. 4, Cahill Tr. 80:4-5.

138. Lance Reyes testified that Mr. Campbell was terminated for "a little scuffle." Ex. 9, Reyes Tr. 55:10-21.

139. Monty Bovell told Mr. Campbell that his termination was "bullshit" and that he should "GFT" the termination. Ex. 1, Campbell Tr. 387:4-388:13; *See also* Ex. 17, FedEx Guaranteed Fair Treatment Procedure Section 5-5 ("GFT Procedure Section 5-5"), FEC 1031-1040.

140. On May 25, 2021, Defendant FedEx issued Plaintiff a termination letter claiming that, following their investigation, they determined that he engaged in "disruptive behavior with another co-worker." Ex. 18, May 25, 2021 Termination Letter ("Termination Letter"), ESI0000049.

141. In this letter, Defendants do not accuse Mr. Campbell of engaging in any more specific or severe behavior warranting his termination. *Id*.; see also Ex. 3, Malebranche Tr. 111-112.

142. Monty Bovell never told Nan Malebranche that "Kevin Campbell incited the incident with Augusto Alzate." Ex. 8, Bovell 33:14-18.

143. Monty Bovell never determined that Kevin's action placed any employee in imminent fear for their personal safety. Ex. 8, Bovell Tr: 56:16-19.

144. Defendant Warnders testified that Mr. Campbell was terminated because he was "the aggressor . . . You know with Kevin Campbell when you see him become the aggressor in the situation and to shoulder bump him . . .it was determined that, you know, he was in violation of the workplace violence." Ex. 2, Warnders Tr. 94:13-17.

145. According to Defendant Warnders, Mr. Campbell was terminated because they "all saw the aggression. . . He put himself in an aggressive state." Ex. 2, Warnders Tr. 99:23-100:13.

146. Prior to working for FedEx, Mr. Cahill was a member of the New York City Police Department ("NYPD"). Ex. 4, Cahill Tr. 13:22-14:7.

147. During his time with FedEx, James Cahill has received training on the importance of truthfulness and recordkeeping similar to the investigatory training he received with the NYPD. Ex. 4, Cahill Tr. 60:10-24.

148. As FedEx Senior Security Specialist, Mr. Cahill must draft his reports completely truthfully. Ex. 4, Cahill Tr. 99:15-18.

149. Mr. Cahill is not permitted to omit facts from his reports based on what he believes the outcome of the investigation should be. Ex. 4, Cahill Tr. 99:19-23.

150. The purpose of Mr. Cahill's investigations is to gather as much information properly and submit it to operations for them to decide what should be done about an incident. Ex. 4, Cahill Tr. 103:21-104:5.

151. Mr. Cahill understands that the findings from his security investigations and what he puts into his reports could be used by other members of management to make decisions. Ex. 4, Cahill Tr. 113:21-114:3.

152. During his investigation into the incident, Mr. Cahill interviewed Aldamel Spencer who told Mr. Cahill that he saw Alzate smack a box, hitting Campbell with the box. Ex. 4, Cahill Tr. 72:4-16; *See also* Ex. 19, Recording of Security Interview of Aldamel Spencer ("Spencer Security Recording"), FEC 1497, at 02:30; *See also* Spencer Dep. Tr. 5:11-6:21 (Aldemel Spencer confirming his voice on the recorded interview, and the substance of the recording).

153. Mr. Cahill found Mr. Spencer to be truthful. Ex. 4, Cahill Tr. 72:20-23.

154. Spencer's interview was audio recorded. Ex. 19, Spencer Security Recording, FEC 1497; *See also* Spencer Dep. Tr. 5:11-6:21; 39:3-21(Aldemel Spencer confirming his voice on the recorded interview, and the substance of the recording).

155. Mr. Spencer confirmed this observation, that Alzate "smacked the box" and the box hit Kevin during his sworn testimony at his deposition. Ex. 11, Spencer Dep. Tr. 5:11-6:21; 39:3-21.

156. During Mr. Cahill's interview of Mr. Campbell, Mr. Campbell informed him that the box Alzate pushed hit Campbell. Ex. 4, Cahill Tr. 74:22-24.

157. Following Mr. Cahill's investigation, he drafted a Security Investigative Report. Ex. 4, Cahill Tr. 95:11-21; Ex. 16, Security Report.

158. Mr. Cahill omitted from his report Adamel Spencer's witness statement that Alzate "smacked the box, and the box hit Kevin." Ex. 4, Cahill Tr. 96:8-17.

159. One of the conclusions reached by FedEx following their investigation was that "A review of Alzate's written statement was not consistent with the VSS [video] review." Ex. 16, Security Report at ESI0000963.

160. James Cahill informed Mr. Warnders that the incident started when Alzate approached Campbell's work area in a clearly agitated state, and Warnders believes that to be true. Ex. 2, Warnders Tr. 100:14-23.

161. Alzate approached Campbell's work area in a clearly agitated state flailing his arms and pushing several packages in Campbell's direction, and at least one of those boxes hit Mr. Campbell. Ex. 2, Warnders Tr. 101:2-12; Ex. 11, Spencer Dep. Tr. 40:10-41:4.

162. Warnders believes Alzate started the altercation and that Alzate initially made contact with Mr. Campbell. Ex. 2, Warnders Tr. 103:23-25, 142:11-14, 145:5-12.

163. Defendants told that EEOC that "the video footage showed Campbell . . . made physical contact with Alzate in the chest area." Ex. 37, Defendants' EEOC Position Statement, p. 4.

164. Yet, according to the Defendants, the security videos do not show Mr. Campbell making physical contact with Mr. Alzate. Ex. 3, Malebranche Tr. 75:15-17, 122:16-18.

165. Nan Malebranche believes the Defendants' video recording is "evidence" though according to her "it really doesn't have much." Ex. 3, Malebranche Tr. 122:2-25.

166. Defendants have claimed that their videos did not capture a side angle. Ex. 4, Cahill Tr.79:7-15 ("[T]here was no side angle that could actually show the two together.").

## V.    MR. CAMPBELL'S PRE-GFT COMPLAINTS OF DISCRIMINATION

167. Mr. Campbell complained about Mr. Nunez's comments to Defendant Warnders, who told Mr. Campbell not to write a statement. Ex. 1, Campbell Tr. 109:4-14, 117:11-13, 119:19-25.

168. Eric Warnders never spoke to Henry Nunez about complaints from Mr. Campbell that Mr. Nunez had made racially offensive remarks to Mr. Campbell. Ex. 5, Nunez Tr. 107:24-108:7.

169.    Eric Warnders handled this situation with Mr. Nunez's comments about Black people by doing what he needed to make it go away so that Mr. Campbell would not cause any issues for the station. Ex. 1, Campbell Tr. 112:16-20.

170.    Mr. Nunez continued making racist comments at times in front of other managers, who did nothing to correct his behavior. Ex. 1, Campbell Tr. 115:22-117:3.

171.    Prior to Mr. Campbell filing his lawsuit, he told Mr. Nunez that he was upset about his hours getting cut. Ex. 5, Nunez Tr. 15:17-21.

172.    Kevin Campbell never lied to Mr. Nunez about anything. Ex. 5, Nunez Tr. 77:25-78:6.

173.    Following the incident where Peter Lorenzi followed Mr. Campbell while disparaging Mr. Campbell for allegedly not having running water in the projects, Campbell immediately went on break and complained of Lorenzi's discrimination to his manager Ontaneda, because he wanted those comments to stop. Ex. 1, Campbell Tr. 148:9-25.

174.    Frank Ontaneda initially refused to allow Mr. Campbell to write a statement about Lorenzi's racial harassment instead telling Campbell "Let's not try to – let's not escalate this," because the FedEx managers at the station do not want you to write statements. Ex. 1, Campbell Tr. 150:17-152:11.

175.    Frank Ontaneda does not recall what Kevin Campbell said to him when Mr. Campbell initially complained about Peter Lorenzi's statements. Ex. 10, Ontaneda Tr. 60:22-63:10.

176.    Campbell had to ask Warnders and Ontaneda several times to file a written statement regarding the incident described above involving Lorenzi before Defendants actually permitted him to do so. Ex. 1, Campbell Tr. 157:25-158:25.

177.    After writing his statement against Lorenzi, no one at FedEx spoke to Campbell about the incident with Lorenzi to inform Campbell about the outcome nor to interview Campbell. Ex. 1, Campbell Tr. 161:8-11.

178.    Mr. Lorenzi found to violate Policy 2-5 (Acceptable Conduct) and was only suspended from work for 5 days. Ex. 20, Peter Lorenzi Corrective Action Document ("Lorenzi Corrective Action"), FEC 0979-0980.

179.    Lorenzi was suspended for violating the same policy for which Mr. Campbell was terminated for allegedly violating. *See Id*. and compare with Ex. 18, Plaintiff's Termination Letter.

180.    FedEx is aware that Peter Lorenzi engaged in racial discrimination by referring to Mr. Campbell as "Trayvon Martin" and making comments about Mr. Campbell washing his hands and allegedly being from the projects. Ex. 2, Warnders Tr. 79:17-82:8.

181.    Mr. Lorenzi still works at the FedEx LGA Station despite Defendant Warnders' belief in the truthfulness of Mr. Campbell's complaints regarding Lorenzi. *Id.*; Ex. 5, Nunez Tr. 113:18-19.

182.    Regarding this incident, Frank Ontaneda consulted with Eric Wanders and "Peter Lorenzi was suspended and he received a warning letter." Ex. 10, Ontaneda Tr. 50:6-13.

183.    Immediately following the "car radio" incident, Campbell turned to Bradley and Pasqualicchio, two managers, and said "do you see what I have to deal with on a regular basis." Ex. 1, Campbell Tr. 254:13-18.

184.    Pasqualicchio looked at Bradley and sighed, but did nothing further. Ex. 1, Campbell Tr. 254:19-21.

### VI.    DEFENDANTS WOULD HAVE TAKEN NO FURTHER ACTIONS REGARDLESS OF THE TIMING OR FREQUENCY OF MR. CAMPBELL'S COMPLAINTS BECAUSE DEFENDANTS DO NOT BELIEVE THERE WAS DISCRIMINATION

185.    Nan Malebranche, is unable to assess whether an employee intentionally pushing a box into another employee can be considered an altercation. Ex. 3, Malebranche Tr. 89:2-7.

186.    Nan Malebranche, as the FedEx district manager, is unable to assess whether it is workplace violence for an employee to push a box into another employee. Ex. 3, Malebranche Tr. 89:19-90:4.

187.    Nan Malebranche is unable to assess whether it is workplace violence for one employee to angrily push a box into another employee. Ex. 3, Malebranche Tr. 90:5-10.

188.    Mr. Alzate's job does not involve pushing boxes up the belt, but rather involves removing boxes from the belt. Ex. 1, Campbell Tr. 371:9-14. At the end of the split, the belt gets reversed for a reverse split so that the boxes can go right into the vans and trucks. Ex. 1, Campbell Tr. 371:9-18.

189.    Had Kevin Campbell reported to management Augusto Alzate intentionally hitting him with a box, FedEx would not have considered it an altercation. Ex. 3, Malebranche Tr. 90:24-91:7.

190.    If an employee were to complain about another worker approaching their work area in a clearly agitated state flailing his arms and pushing several packages in the other individual's direction, the complaining employee could be removed from his assignment. Ex. 3, Malebranche Tr. 98:8-25.

191.    According to Nan Malebranche "an individual approaching another individual's work area in a clearly agitated state flailing his arms and pushing several packages in the other individual's direction" is not "any type of violence." Ex. 3, Malebranche Tr. 94:24-95:9.

192.    During her deposition, Nan Malebranche demonstrated resistance to acknowledging Security Director James Cahill's finding that video footage at "0823:40 shows Alzate approaching Campbell's work area in a clearly agitated state, flailing his arms, and pushing several packages in Campbell's direction." Ex. 3, Malebranche Tr. 102-109.

193.    James Cahill was unable to answer definitively as to whether he believed Alzate hitting Mr. Campbell with the box would have been considered workplace violence by FedEx.  Ex. 4, Cahill Tr. 148:14-149:11.

194.    Mr. Cahill is unable to speak to whether management would "deem a discipline" for Mr. Alzate hitting Mr. Cambpell with a box. Ex. 4, Cahill Tr. 149:8-11.

195.    Reyes testified that while it was clear to him from the video that Alzate intentionally pushed the box, possibly even "out of frustration," and that the box did hit Mr. Campbell, Reyes cannot assess whether Alzate intentionally struck Mr. Campbell with the box. Ex. 9, Reyes Tr. 84:24-87:4.

196.    Mr. Bovell testified that he is not able to assess the veracity of Mr. Campbell's allegations of discrimination because he did not personally witness them. Ex. 8, Bovell Tr. 89:7-13.

197.    Steven Pasqualicchio was asked about the following quote from Henry Nunez, and Pasqualicchio testified that he is unable to assess whether the following statement is factual or not: "Black people are always making excuses about why they can't do things. This is why I hate working with Black people." Ex. 6, Pasqualicchio Tr. 95:16-96:11.

198.    Given his testimony that he could not determine whether this statement is "factual or not" Mr. Pasqualicchio refused to answer to whether he believes this is an acceptable statement for the workplace. *Id.* ("I can't comment on quotes because you don't know if that if [sic] factual or not").

199.    Mr. Pasqualicchio was unable to state "yes" or "no" as to whether he believed this statement is against Fedex employment policies. Ex. 6, Pasqualicchio Tr. 96:12-17.

200.   As a FedEx Operations Manager, Steven Pasqualicchio is unable to assess whether it is racist for a person who is not Black to refer to a Black person as Trayvon when that person's name is not Trayvon. Ex. 6, Pasqualicchio Tr. 79:8-15.

201.   Mr. Pasqualicchio understands that "Trayvon" is a reference to "Trayvon Martin." Ex. 6, Pasqualicchio Tr. 79:19-80:12.

202.   Pasqualicchio does not believe racism exists. Ex. 6, Pasqualicchio Tr. 85:6-18.

203.   Frank Ontaneda testified that he is unable to state whether the phrase "Why are you washing your hands for so long? Is it because you're not used to having running water in the projects." Is offensive because he doesn't know the context of it. Ex. 10, Ontaneda Tr. 58:17-59:18.

204.   Mr. Ontaneda does not know whether it is offensive to joke about whether someone has running water. Ex. 10, Ontaneda Tr. 59:13-18.

205.   Michael Bradley testified that he is unable to state whether the statement "why are you washing your hands for so long, is it because you're not used to having running water in the projects" is racist because he was not there. Ex. 7, Bradley Tr. 67:4-22.

206.   Mr. Nunez does not believe it is racist for someone to refer to a Black man as Trayvon when that is in fact not that Black man's correct name. Ex. 5, Nunez Tr. 116:5-14.

207.   Mr. Campbell also respectfully incorporates the citations contained in Sections Pl. 56.1 ¶¶ 294-358, 379-395 below for a further list of things the Defendants would have never considered racist or discriminatory regardless of when they were reported, and for examples of their lack of knowledge regarding their own antidiscrimination policies.

## VII.    FEDEX CONTINUOUSLY RETALIATES AGAINST MR. CAMBELL

### A.   MANAGEMENT FAILS TO PROTECT THE CONFIDENTIALITY OF MR. CAMPBELL'S COMPLAINT OF DISCRIMINATION AGAINST PETER LORENZI, AND LABELS PLAINTIFF A "SNITCH"

208.   After Campbell submitted his written statement regarding Lorenzi's threatening discrimination and harassment, Defendants continued to discriminate and retaliate against Campbell. Ex. 38, Campbell Dec. ¶¶ 13; See Ex. 1, Campbell Tr.163:2-16.

209.   Defendants did not like Mr. Campbell because he reported Peter Lorenzi for racial discrimination. Ex. 14, Spencer Tel. Tr. 6:9-14.

210.   Defendants informed other workers that Campbell had filed a complaint of racial discrimination against Lorenzi, further contributing to the racially hostile work

environment in which Campbell was forced to work. Ex. 38, Campbell Dec. ¶¶ 13-14; Ex. 1, Campbell Tr. 163:17-164:7.

211. FedEx employees would come up to Mr. Campbell saying "oh, I heard you told on Pete." Ex. 1, Campbell Tr. 164:6-7.

212. FedEx employees would call Mr. Campbell a "snitch." Ex. 1, Campbell Tr. 169:9-13; 170:6-13; 174:16-20; Spencer Tel. Tr. 16:3-11.

213. One FedEx employee stopped speaking to Mr. Campbell. Ex. 1, Campbell Tr. 170:14-16.

214. Other workers and managers isolated Mr. Campbell and gave him the cold shoulder. Ex. 1, Campbell Tr. 339:2-24.

215. Michael Bradley started requiring Mr. Campbell to relabel packages though that was function performed by other workers designated to handle that. Ex. 1, Campbell Tr. 284:12-18, 300:2-301:10.

216. Michael Bradley would "start screaming, 'you better label the boxes.'" Ex. 1, Campbell Tr. 310:3-10.

217. Campbell did not tell anyone about Lorenzi's racist comments other than Ontaneda and Defendant Warnders. Ex. 1, Campbell Tr. 162:21-25.

218. Frank Ontaneda testified that he only told Eric Warnders about Mr. Campbell's complaint of discrimination against Lorenzi and that he was otherwise required to keep it confidential. Ex. 10, Ontaneda Tr. 63:15-65:20.

219. When asked directly whether he knows whether other employees began referring to Campbell as a snitch in the wake of his complaints about Lorenzi, Ontaneda was unable to answer with a "yes" or "no" but instead stated that he "was not there." Ex. 10, Ontaneda Tr. 64:23-65:12.

220. One of these employees who confronted Mr. Campbell about filing a complaint against Lorenzi was manager Michael Bradley who testified that he somehow knew about Campbell's Complaint against Lorenzi, and was speaking to Mr. Campbell about the "comment by Pete Lorenzi calling him Trayvon." Ex. 7, Bradley Tr. 38:15-19.

221. Mr. Bradley was not present for the comment, he was not Plaintiff's manager, and he was not Peter Lorenzi's manager, but nonetheless heard about Mr. Campbell's complaints against Lorenzi in a manager's meeting. Ex. 7, Bradley Tr. 38:20-39:18.

222. Michael Bradley acted this way toward Mr. Campbell because Mr. Campbell wrote a complaint about Bradley's friend, Peter Lorenzi, and Michael Bradley is a racist. Ex. 1, Campbell Tr. 315:7-320:2.

223. In About July 2020, Michael Bradley confronted Campbell in Bradley's office about Campbell's prior complaint of racial discrimination against Lorenzi, demanding of Campbell "Do you and Pete joke like this all the time?" and "Pete has a dark sense of humor, and some people just don't get it." Ex. 1, Campbell Tr. 277:9-278:24.

224. Mr. Bradley testified that he "wouldn't know" if he ever heard anyone at FedEx joke inappropriately. Ex. 7, Bradley Tr. 34:19-23.

225. Bradley testified that following the incident with Peter Lorenzi, he spoke to Mr. Campbell in his office and told him "I heard what happened, you know, people trying to be funny, they try to joke around with stupid jokes. You know people have a stupid sense of humor." Ex. 7, Bradley Tr. 37:13-38:5.

226. Bradley acknowledged that he might have closed the door to his office during this conversation with Mr. Campbell. Ex. 7, Bradley Tr. 38:3-11.

227. Mr. Bradley testified that he does not know whether Lorenzi's statements to Mr. Campbell were offensive or racist since Mr. Bradley personally was not there. Ex. 7, Bradley Tr. 40:3-8; 43:4-16.

228. Mr. Bradley understands that Trayvon Martin is "the young boy that was killed by a security guard walking . . . and the man shot him." Ex. 7, Bradley Tr. 41:24-42:4.

229. Frank Ontaneda was unable to state whether he believes that someone is a snitch if they complain of workplace discrimination, stating that it "depends on the context." Ex. 10, Ontaneda Tr. 44:5-8.

230. Michael Bradley testified that "snitch is if you report something . . . more or less why did you say anything." Ex. 7, Bradley Tr. 63:24-64:4.

231. Peter Lorenzi's wife, Angela, worked in the office at FedEx, and Nan Malebranche knew Peter Lorenzi as "Angela's husband." Ex. 21, June 21, 2021 Email From Nan Malebranche to Samuel Rodriguez, FEC 0723.

232. Augusto Alzate, Michael Bradley, Henry Nunez, and Eric Warnders are friends with Peter Lorenzi. Ex. 1, Campbell Tr. 282:15-283:8, 363:19-20.

233. Angela Lorenzi personally retaliated against Plaintiff by giving him broken package scanners and by ignoring him when he needed work-related information. Ex. 1, Campbell Tr. 174:25-180:2.

234.    When Campbell called the office to provide work-related information to Angela, she often hung up the phone on him. Ex. 1, Campbell Tr. 180:22-181:13.

235.    Frank Ontaneda was unable to state whether he believes that someone is a snitch if they complain of workplace discrimination, stating that it "depends on the context." Ex. 10, Ontaneda Tr. 44:5-8.

236.    Michael Bradley testified that "snitch is if you report something . . . more or less why did you say anything." Ex. 7, Bradley Tr. 63:24-64:4.

### B. RETALIATION BY LORENZI'S FRIENDS CONTINUES AND ESCALATES TO PROPERTY DESTRUCTION

237.    In February 2021, a co-worker named Arietti stated to Campbell "Wow you really are a Black person who buys a BMW." Ex. 1, Campbell Tr. 321:20-324:21.

238.    Without any grounds or justification, Arietti informed Campbell "When I become a manager, I am going to fire you." Ex. 1, Campbell Tr. 326:2-328:6.

239.    At about this same time, James, whose last name is currently unknown to Campbell and who is one of Lorenzi's friends, began asking Campbell questions about his BMW, and memorizing Campbell's license plate number. Ex. 1, Campbell Tr. 328:7-329:20.

240.    A few weeks later, Campbell noticed that someone had keyed his car. Ex. 1, Campbell Tr. 328:7-331:6.

241.    James is friends with Angela and Peter Lorenzi. Ex. 1, Campbell Tr. 331:7-8.

242.    The person who vandalized Mr. Campbell's vehicle was upset that Mr. Campbell wrote a statement about Peter Lorenzi. Ex. 1, Campbell Tr. 343:2-345:8

### VIII.   RETALIATION AT THE GUARANTEED FAIR TREATMENT PROCESS

### A.  MR. CAMPBEL FILES HIS GFT FORM DETAILING SEVERAL INSTANCES OF DISCRIMINATION AND RETALIATION

243.    As noted above, on May 25, 2021, Defendant FedEx issued Plaintiff a termination letter claiming that, following their investigation, they determined that he engaged in "disruptive behavior with another co-worker." Ex. 18, Termination Letter.

244.    In this letter, Defendants do not accuse Mr. Campbell of engaging in any more specific or severe behavior warranting his termination. *Id*.; see also Ex. 3, Malebranche Tr. 111-112.

245.   On May 26, 2021, Plaintiff filed a Step 1 GFT Form detailing several instances of discrimination against Defendants, including his termination. Ex. 22, Plaintiff's GFT Step I Form ("GFT Form"), ESI0000041-0000045.

246.   On May 27, 2021, Defendants stamped Plaintiff's GFT Form as "received." *Id.* at ESI0000041.

247.   In his GFT Form, Mr. Campbell detailed the May 18, 2021 encounter with Mr. Alzate, and also described the following:

   a.   "Augusto verbally abused me and created a hostile work environment on multiple occasions and in full view of managers." *Id.* at ESI0000044.

   b.   "I was told that I was terminated because I 'bumped into' Augusto prior to him pulling out the box cutter. However, that did not happen. I did not hit into or touch Augusto in any way." *Id.* at ESI0000044.

   c.   "I feel that my wrongful termination is part of a pattern of discrimination and retaliation against me." *Id.* at ESI0000045.

   d.   "After the death of George Floyd and the protests in the summer of 2020, the work environment became more tense and hostile. One employee called me a 'gorilla in a cage.'" *Id.* at ESI0000045.

   e.   "Another employee asked me in front of management if I was out during the protests stealing TVs and looting." *Id.* at ESI0000045.

   f.   "I felt that this hostile environment was condoned by management because they were often present for these incidents and did nothing about them." *Id.* at ESI0000045.

   g.   "Also around the time of the protests last summer, an employee called me Trayvon Martin, even though he knows that is not my name, and asked 'Why are you washing your hands for so long? Is it because you're not used to having running water in the projects?' I wrote a statement about this racially discriminatory incident but the employee was able to keep his job." *Id.* at ESI0000045.

   h.   "My work situation escalated after I reported the incident. Many employees stopped speaking to me and when I would walk past groups of employees they would mutter 'snitch' under their breath." *Id.* at ESI0000045.

   i.   "The other employee involved in the incident is married to a woman who works in the office of my station. She would often give me broken Leos and when I called the office to call out sick one morning she hung up on me." *Id.* at ESI0000045.

j.  "Although racist comments and mistreatment continued, I didn't feel like writing a statement would make the situation better. Because of that, I tried to just ignore Augusto when he would often curse me out or hit into me. I feel that the May 18th situation is a continuation of the constant discrimination and retaliation I faced. I am not accepted or liked by other employees and management because I do not drive and because I am a young black man." *Id.* at ESI0000045.

k.  I would appreciate if Fedex Express would reconsider my termination, as I did nothing to violate Fedex policy and was actually the victim of a very dangerous situation related to a pattern of discrimination and retaliation from other employees. *Id.* at ESI0000045.

## B. DEFENDANTS CHANGE THEIR ALLEGATIONS AFTER MR. CAMPBELL FILES HIS GFT FORM

248. On June 1, 2021, following Mr. Campbell's GFT document submission where he accused Defendants of discrimination, and in preparation for the GFT Step I meeting, Eric Warnders sent an email to Nan Malebranche (the "June 1st Email") referring her to the attached video and stills, telling Ms. Malebranche "As you can see there was initial contact on Kevin's part." Ex. 3, Malebranche Tr. 114:21-115:15; Ex. 23, June 1, 2021 Email from Eric Warnders to Nan Malebranche ("June 1st Warnders Email") ESI0000481.

249. However, Warnders actually believed Alzate started the altercation and that Alzate initially made contact with Mr. Campbell. Ex. 2, Warnders Tr. 103:23-25, 142:11-14, 145:5-12.

250. Mr. Warnders further stated in that email that "one employee clearly states that Kevin threw his shoulder into Alzate and got right into his face." Ex. 23, June 1st Warnders Email.

251. However, Warnders does not state who made this statement. *Id.*

252. Warnders' statement to Malebranche in his June 1, 2021 email is not contained in Defendant's Security Report. Ex. 16, Security Report, at ESI0000963.

253. One of the conclusions reached by FedEx following their investigation was that "A review of Alzate's written statement was not consistent with the VSS [video] review." Ex. 16, Security Report, at ESI0000963.

254. In the June 1 Email, Defendant Warnders omitted the information from James Cahill that Alzate approached Campbell's work area in a clearly agitated state flailing his arms and pushing several boxes in Campbell's direction. Ex. 2, Warnders Tr. 147:24-151:19.

255. On June 4, 2021, Defendants issued a letter to Mr. Campbell lodging the following *new* allegations, accusing Mr. Campbell of: (1) being "involved in a verbal and physical altercation with another employee;" (2) placing "another employee in imminent fear for his personal safety"; and (3) being "aggressive." Ex. 24, June 4th Letter from Monty Bovell to Kevin Campbell ("June 4th Letter"), ESI0000046.

256. On June 8, 2024, as part of the GFT Step I, Mr. Campbell met with Defendant Warnders, Lance Reyes, Monty Bovell, and Nan Malebranche, during which Monty Bovell and Eric Warnders lied. Ex. 1, Campbell Tr. 389:17-390:24.

257. Monty Bovell had previously told Mr. Campbell to file a GFT related to his termination, but in the GFT meeting "he couldn't make eye contact with [Mr. Campbell], and he changed the things that he knew to be true." Ex. 1, Campbell Tr. 391:2-10.

258. Mr. Reyes spoke to Mr. Campbell alone for 15 minutes, prior to the GFT meeting. Ex. 9, Reyes Tr. 51:7-52:7.

259. After the first GFT meeting, Mr. Reyes had a conversation with Mr. Campbell that Mr. Reyes believed to be "in confidence." Ex. 9, Reyes Tr. 66:11. [1]

260. This conversation took place during the 2-3 minutes that Mr. Reyes and Mr. Campbell were alone following the first GFT meeting. Ex. 9, Reyes Tr. 68:19-22.

261. This was the first time Mr. Reyes had ever met or spoken to Mr. Campbell. Ex. 9, Reyes Tr. 69:4-9.

262. Mr. Reyes testified that during this conversation, he probably told Mr. Campbell that they were from the same neighborhood, Bedford Stuyvesant. Ex. 9, Reyes Tr. 8:22-9:8; 71:22-72:12; *See also* ¶ 315 below; and Plaintiff's Declaration ¶¶ 28-31 stating that he is from Bedford Stuyvesant.

263. Mr. Reyes acknowledged that at the time Mr. Campbell alleges this conversation to have taken place, he had just purchased a house. Ex. 9, Reyes Tr. 72:21-73:7.

264. On June 10, 2021, Nan Malebranche sent Mr. Campbell a letter upholding his termination and listing new reasons for his termination. Ex. 25, June 10, 2021 Letter from Nan Malebranche to Kevin Campbell (the "June 10th Letter"), FEC 0736.

265. Ms. Malebranche claims that she made this decision because of an alleged statement from Jose Moreno that Mr. Campbell "shoulder-bumped" Mr. Alzate. Ex. 3, Malebranche Tr. 74:5-75:10.

---

[1] As noted below at ¶¶ 311-320, Mr. Campbell recalls this conversation as having taken place following the IEEO meeting.

266. Nan Malebranche testified that the basis for her assertion that Mr. Campbell made physical contact with Mr. Alzate is solely the statement of Jose Moreno. Ex. 3, Malebranche Tr. 73:21-74:75:14.

267. Nan Malebranche testified that her review of "the statement from Jose Moreno" contained in the security report led her to conclude that Mr. Campbell "incited" Mr. Alzate to pull a box cutter on him. Ex. 3, Malebranche Tr. 55:14-59:17.

268. Malebranche chose to form this conclusion despite her understanding that the incident began when "Alzate approached Campbell's work area in a clearly agitated state." Ex. 3, Malebranche Tr. 62:4-7.

269. Defendants' have not produced any sworn statement or testimony from Mr. Moreno.

270. Defendants never listed Mr. Moreno in their Rule 26(a) Disclosures. Ex. 26, Defendants' Rule 26(a) Disclosures.

271. In the June 10th Letter, Ms. Malebranche now accused Mr. Campbell of "trigger[]ing the physical altercation." Ex. 25, June 10th Letter, FEC 0736.

272. In that same letter, Ms. Malebranche also assigned responsibility for the altercation to Mr. Campbell, now stating that "A close look at the actions that led to the altercation, as well as the statements from witnesses, indicates your responsibility for inciting the other employee." Ex. 25, June 10th Letter, FEC 0736.

273. On August 10, 2021, Defendant Warnders sent an email to FedEx Executive Ops Administrator Stephanie Reycraw as part of the Step II GFT process informing Ms. Rycraw that Mr. Campbell's "aggressive actions incited the physical altercation." Ex. 27, August 10, 2021 Email from Defendant Warnders to Stephanie Rycraw ("August 10th Email"), ESI0000485-ESI0000488.

274. Mr. Campbell was truthful during the GFT process. Ex. 3, Malebranche Tr. 72:22-24, 99:13-15.

275. He was not threatening or aggressive, he was professional, respectful of Ms. Malebranche's authority, and cooperative. Ex. 3, Malebranche Tr. 99:16-100:2.

276. In 2021, Malebranche was responsible for reviewing the propriety of employee terminations as part of the GFT Step I Process. Ex. 3, Malebranche Tr. 49:13-20.

277. Malebranche would then upload her findings to the system would be used during the GFT Step II process. Ex. 3, Malebranche Tr. 49:21-50:11.

278. Malebranche would then upload these written findings and letters to FedEx's system knowing that those written findings would be used during GFT Step 2 to uphold an employee's termination. Ex. 3, Malebranche Tr. 50:12-15.

279. The purpose of Mr. Campbell commencing the GFT process was to get his job back. Ex. 3, Malebranche Tr. 72:25-73:4.

280. Following GFT Step I, it would have been within FedEx guidelines for Defendant Warnders and Nan Malebranche to reinstate Mr. Campbell's employment. Ex. 2, Warnders Tr. 120:4-21, 122:17-19.

281. One of the outcomes of the GFT process could be for Mr. Campbell to get his job back. Ex. 3, Malebranche Tr. 73:5-15.

282. Nan Malebranche and Eric Warnders were the highest-ranking FedEx employees tasked with the authority to decide whether Mr. Campbell would get his job back during the GFT process. Ex. 3, Malebranche Tr. 73:9-20.

283. Malebranche acknowledged that Mr. Campbell informing her during the GFT process that he was threatened by Alzate prior to the sort or that Augusto did something else to him, would have been a basis for FedEx to reconsider its decision to terminate his employment. Malebranche Tr: 98:18-99:12.

284. During the GFT meeting, Mr. Campbell told Ms. Malebranche that Alzate "had been very, you know, had always been yelling at him about the freight missing and telling him he is not doing his job." Ex. 3, Malebranche Tr. 113:21-25.

285. As noted above at ¶¶ 94-110 Alzate's treatment of Mr. Campbell was known by the managers.

286. Defendants did not provide Mr. Campbell with a copy of their video or otherwise show it to him during the GFT process because the video is "FedEx property." Ex. 3, Malebranche Tr. 120:19-121:3.

287. In her 27 years of employment with FedEx, Nan Malebranche has never shown video evidence in FedEx possession during the GFT. Ex. 3, Malebranche Tr. 121:5-12.

288. Nan Malebranche is not able to point to a specific reason or rationale as to why she withholds video evidence during the GFT process. Ex. 3, Malebranche Tr. 121:13-17.

289. According to Nan Malebranche, on FedEx's video you "can't see much of what transpired . . . it really doesn't have much." Ex. 3, Malebranche Tr. 122:2-12.

290. Defendants did not allow Mr. Campbell to view the videos of the incident at any point – including during the GFT process and Federal EEOC proceeding – until they provided it to his attorney during this litigation. Ex. 1, Campbell Tr. 408:10-409:19; Ex. 28, Plaintiff's EEOC Rebuttal Letter (informing the EEOC that Defendants were in possession of a video related to this incident which they were refusing to provide).

291.     Defendants did not allow Mr. Campbell to provide his side of the story during the GFT process and they had their minds made up before he got to the meeting. Ex. 1, Campbell Tr. 402:15-23.

292.     Mr. Campbell filed a request for GFT Step II and III, and both upheld his termination without meeting with him. Ex. 1, Campbell Tr. 407:2-410:20.

293.     No one spoke to Mr. Campbell directly as part of these steps and he felt cheated out of someone hearing his story. Ex. 1, Campbell Tr. 411:21-412:7.

## IX.    FEDEX INTERNAL EEO ("IEEO") PROCESS

294.     Nan Malebranche testified that in the GFT meeting "understanding what [Mr. Campbell] wrote in here, and that he was noting discrimination and retaliation, I requested HR to open up an EEOC to keep those issues independent of what actually happened." Ex. 3, Malebranche Tr. 113:11-17.

295.     In 2021, the local Human Resources "advisor" would be responsible for the preparation and investigation of FedEx Internal IEEO complaints. Ex. 3, Malebranche Tr. 23:5-24:9, 32:23-33:3 (stating that in 2021 "the local HR person is the one who conducted the investigation, and that was Lance Reyes"); *See also* Ex. 29, FedEx Equal Employment Opportunity/Affirmative Action Section 4-55 ("EEO Section 4-55"), FEC 1025-1026, (stating that the corporate Human Resources Support Manager was tasked with investigating complaints).

296.     According to the FedEx written policies in effect at the time, the corporate Human Resources Support Manager was tasked with investigating complaints. *Id.*

297.     In 2021, the "HR advisor" was "Lance Reyes." Ex. 3, Malebranche Tr. 73:17.

298.     Nan Malebranche is not the local HR advisor, and is not a member of Human Resources. Ex. 3, Malebranche Tr. 18:5 (stating that in 2021, Nanette Malebranche was the Managing Director of FedEx and was responsible for supervising Defendant Warnders who reported directly to her).

299.     In 2021, Ms. Malebranche testified that her role in the FedEx Internal EEO ("IEEO") process was just to sit in the meeting and "take notes" and that "HR" was supposed to "make[] the conclusion." Ex. 3, Malebranche Tr. 26:19-30:2.

300.     However, Ms. Malebranche interviewed Mr. Campbell and conducted the IEEO investigation into Mr. Campbell's complaints of discrimination about the three specific allegations as described in more detail below. Ex. 1, Campbell Tr. 420:2-12; Ex. 30, Defendants' Internal EEO Complaint Investigative Report ("Malebranche IEEO Report"), FEC 937-938; Ex. 3, Malebranche Tr. 26-28.

301.    Nan Malebranche signed the contents of Defendant FedEx's Internal EEO complaint indicating that she purports to have conducted interviews. Ex. 30, Malebranche EEO Report, FEC 937-938.

302.    Malebranche's report does not contain the allegation regarding the discriminatory nature of Mr. Campbell's termination and it was never investigated as part of the EEO allegations. Ex. 30, Malebranche IEEO Report, FEC 937-938.

303.    Malebranche did not investigate Mr. Campbell's allegation that his termination was discriminatory, as part of the IEEO investigation. Ex. 30, Malebranche EEO Report, FEC 937-938.

304.    In her form, Nan Malebranche indicated that she performed an investigation, that all allegations could not be substantiated, and then she signed the form. Ex. 30, Malebranche IEEO Report, FEC 937-938.

305.    Mr. Reyes testified that he "can't really remember any stories offhand that [Mr. Campbell] told" but that "there was an inner investigation done" and that he doesn't "remember offhand what was the specific allegations of around those times." Ex. 9, Reyes Tr. 30:15-23.

306.    Mr. Reyes "helped" with the EEO investigation but when asked whether people Mr. Campbell mentioned had "denied it" Mr. Reyes testified that "I couldn't tell you what was done." Ex. 9, Reyes Tr. 36:21-37:7.

307.    Mr. Reyes testified that he has "no clue" whether there were any witnesses to Mr. Campbell's Internal EEO allegations. Ex. 9, Reyes Tr. 40:9-20.

308.    At her deposition in 2024, Nan Malebranche testified that "Currently, our human resources department handles all cases of discrimination." Ex. 3, Malebranche Tr. 22:17-21.

309.    According to Nan Malebranche, the FedEx Internal EEO ("IEEO") investigation process changed since 2021, now IEEO investigations are done "independently" and that was not the case in 2021. Ex. 3, Malebranche Tr. 22:20-23:18.

310.    Ms. Malebranche does not know why or when the IEEO process changed to become "independent." Ex. 3, Malebranche Tr. 23:13-18.

311.    After Mr. Campbell's GFT failed, and as part of the IEEO process Lance Reyes asked Mr. Campbell to meet with him. Mr. Campbell met Reyes at FedEx headquarters in Long Island. Ex. 1, Campbell Tr. 415:13-20.

312.    Reyes wanted to speak to Mr. Campbell without Ms. Malebranche present. Ex. 1, Campbell Tr. 415:21-22.

313.  Reyes spoke to Campbell for about 10 minutes in the conference room with the door locked. Ex. 1, Campbell Tr. 415:22-416:2.

314.  During this conversation, Mr. Reyes told Mr. Campbell that what happened to him was "bullshit and unfair." Ex. 1, Campbell Tr. 423:17-20.

315.  During this conversation, Mr. Reyes told Mr. Campbell that they grew up in the same neighborhood. Ex. 1, Campbell Tr. 418:5-6.

316.  Reyes also confided in Campbell that Reyes was having racial issues at the job, and was trying to leave the job. Ex. 1, Campbell Tr. 418:8-419:7.

317.  Reyes had this conversation with Campbell behind Ms. Malebranche's back and when Ms. Malebranche joined them she said that she did not know Reyes would be speaking to Campbell alone. Ex. 1, Campbell Tr. 417:22-418:2.

318.  Ms. Malebranche appeared shocked and upset that Mr. Campbell and Mr. Reyes were in the conference room speaking without her. Ex. 1, Campbell Tr. 419:16-21.

319.  Defendants then conducted the interview. Ex. 1, Campbell Tr. 416:3-5.

320.  As Mr. Campbell was leaving, walking to his car, Mr. Reyes came outside and told him that Mr. Campbell did not deserve what was happening. Ex. 1, Campbell Tr. 416:8-23.

321.  Defendants ruled Mr. Campbell's IEEO allegations unsubstantiated. Ex. 30, Malebranche IEEO Report, FEC 937-938.

322.  Had Mr. Campbell complained of these incidents prior to his termination, Defendants would have performed the same investigation. Ex. 9, Reyes Tr. 66:7-21.

## A. EMPLOYEE SPECIFIC ALLEGATION #1 OF PLAINTIFF'S IEEO COMPLAINT

323.  Under Employee's Specific Allegation #1, Malebranche noted that "Complainant stated an employee asked him how is your new T.V., Complainant asked what he meant, Complainant explained the employee stated the T.V. you and your sister stole this weekend while you were rioting. Complainant claimed Operations Manager Henry Nunez (#531100, Hispanic) witnessed it." Ex. 30, Malebranche IEEO Report, FEC 937.

324.  Malebranche noted in her report that these allegations couldn't be substantiated because "Nunez stated he would never allow someone to speak that way to another

individual. He would immediately pull the employee to the side and explain why this is unacceptable behavior."[2] Ex. 30, Malebranche IEEO Report, FEC 937.

325.    However, Nan Malebranche nor anyone else spoke to Mr. Nunez about Employee's Specific Allegation #1. Ex. 5, Nunez Tr. 99:11- 104:5.

326.    Lance Reyes assumed this comment regarding "rioting" was based on what was taking place at the time "as far as the George Floyd protest." Ex. 9, Reyes Tr. 44:22-45:7.

327.    Lance Reyes was not able to confirm whether Henry Nunez was alleged to have been a witness to this allegation. Ex. 9, Reyes Tr. 40:21-24.

328.    Reyes does not recall speaking to Nunez about anything specifically. Ex. 9, Reyes Tr. 40:25-41:4

329.    Reyes did not keep any record of having spoken to Nunez as part of this investigation. Ex. 9, Reyes Tr. 41:11-13.

330.    Reyes was not able to provide any other information about the investigation he and Ms. Malebranche claim to have performed into this allegation. Ex. 9, Reyes Tr. 45:8-12.

331.    At his deposition, Steven Pasqualicchio reviewed IEEO Employee Allegation #1 as paragraphs 42 and 43 in Plaintiff's Complaint, and stated that he does not know whether these statements are against FedEx's workplace policies or if there is even a FedEx policy pertaining to these statements. Ex. 6, Pasqualicchio Tr. 96:25-98:4.

332.    Mr. Pasqualicchio was unable to answer these questions at his deposition even after the policies were placed in front of him and his attorney. Ex. 6, Pasqualicchio Tr. 98:23-103:213.

333.    Mr. Pasqualicchio then took a break with his attorney and returned to the deposition, at which point he reaffirmed his testimony that he does not believe the above statements violate FedEx policies. Paqualicchio Tr. 103:15-104:15.

334.    Mr. Pasqualicchio personally does not believe these statements are racist. Ex. 6, Pasqualicchio Tr. 100:8-18.

335.    Frank Ontaneda does not believe these statements, made at work from a white man to a Black man, are racist. Ex. 10, Ontaneda Tr. 66:2-67:20.

336.    Frank Ontaneda said he is unable to assess these statements because he was not personally present for them. Ex. 10, Ontaneda Tr. 68:5-72:20.

---

[2] However, as noted above, Nunez himself engaged in this behavior which Malebranche claims Nunez denied. Pl. 56.1 ¶¶ 42-59,61-63.

337. Mr. Bradley testified that these statements which also appear at paragraphs 42 and 43 of Mr. Campbell's complaint are not racist. Ex. 7, Bradley Tr. 68:3-69:3.

## B. EMPLOYEE SPECIFIC ALLEGATIONS #2

338. <u>Under Employee's Specific Allegation #2</u>, Malebranche noted that "Complainant stated another employee asked Operations Manager Michael Bradley (#104644, White) and Operations Manager Steve Pasqualicchio (#781248, White) doesn't Complainant 'look a like a person who would steal your radio and try to sell it back to you?'" Ex. 30, Malebranche IEEO Report, FEC 937.

339. This statement was made by David Almeda. Ex. 7, Bradley Tr. 79:3-23.

340. David Almeda is Hispanic. Ex. 5, Nunez Tr. 126:10-14; Ex. 6, Pasqualicchio Tr. 88:16-19.

341. Nan Malebranche investigated this allegation by calling Mr. Bradley and asking him if it was true. Ex. 7, Bradley Tr. 79:15-22.

342. Pasqualicchio does not believe this statement is racist. Ex. 6, Pasqualicchio Tr. 87:12-88:3.

343. Pasqualicchio testified that he believes he only must report these types of statements when he receives a complaint from the employee. Ex. 6, Pasqualicchio Tr. 88:20-89:10, 90:5-91:21.[3]

344. Steve Pasqualicchio could not point to any instance where he believes he would have an obligation to take action regarding discrimination without an employee complaint. Ex. 6, Pasqualicchio Tr. 91:22-92:3.

345. Pasqualicchio testified that Nan Malebranche never spoke to him about this allegation. Ex. 6, Pasqualicchio Tr. 77:5-8.

346. Mr. Bradley testified that he does not know whether this statement is racist. Ex. 7, Bradley Tr. 55:19-58:24.

347. Michael Bradley was unable to answer yes or no as to whether people ever say inappropriate things at work, instead stating "Well, matters what the context is, you know. I couldn't tell you, you know, like I said, if somebody is talking, I don't really hear much." Ex. 7, Bradley Tr. 33:21-34:2.

---

[3] But see Pl. 56.1 ¶¶ 370-374 noting that managers must report discrimination even where no complaint is made.

348.  This statement "could sound" like a reference to the protests following George Floyd's murder. Ex. 9, Reyes Tr. 46:20-47:3.

349.  Lance Reyes does not know whether the above statement is racist, and it unable to determine whether this statement is racist unless he was personally placed in that situation. Ex. 9, Reyes Tr. 47:12-19.

350.  Nunez does not believe the statement "does this guy look like someone who would steal your car radio and then try to sell it back to you" is racist. Ex. 5, Nunez Tr. 126:15-24.

351.  Frank Ontaneda does not know whether this statement, also contained at paragraph 51 of Plaintiff's Complaint, constitutes racial discrimination. Ex. 10, Ontaneda Tr. 74:23-75:11.

## C. EMPLOYEE SPECIFIC ALLEGATION #3

352.  Under Employee's Specific Allegation #3, Malebranche noted that "Complainant stated two employees called Complainant a gorilla in a cage because he was helping out in the DEX cage." Ex. 30, Malebranche IEEO Report, FEC 938.

353.  Mr. Nunez does not believe the comment "How about I put you in a cage like the gorilla you are" is racist. Nunez Tr: 124:21-125:9.

354.  Mr. Pasqualicchio does not believe this statement is racist, or was otherwise unable to answer this question because according to Mr. Pasqualicchio he did not know the context and the context, according to Mr. Pasqualicchio, could have been that Durante made this statement to Campbell while they were "reading a book." Ex. 6, Pasqualicchio Tr. 105:20-113.

355.  Mr. Pasqualicchio testified that he does not believe it is racist or racial harassment for a white person to say to a Black person "How about I put you in that cage like the gorilla you are." Ex. 6, Pasqualicchio Tr. 122:7-15.

356.  Mr. Ontaneda was unable to assess whether the statement "How about I put you in that cage like the gorilla you are" as contained at paragraph 50 of Plaintiff's Complaint, is a racist statement. Ex. 10, Ontaneda Tr. 72:21-74:18.

357.  Mr. Bradley testified that he does not believe this "cage" statement, which also appears at paragraph 50 of Plaintiff's Complaint, to be racist. Ex. 7, Bradley Tr. 69:7-16.

358.  Mr. Bradley also testified that this comment is not a fireable offense. Ex. 7, Bradley Tr. 80:6-14.

## X.    FEDEX POLICIES

359.    FedEx Acceptable Conduct Policy 2-5 ("Section 2-5") states, *inter alia,* as follows:

"FedEx Express expects all employees to demonstrate the highest degree of integrity, responsibility and professional conduct at all times." Ex. 31, FedEx Policy Section 2-5, at FEC 1048.

360.    "Acceptable conduct requires sincere respect for the rights and feelings of others." *Id* at FEC1048.

361.    "Violent or threatening behavior is not tolerated in the workplace. Workplace Violence is any behavior or action that puts someone in a state of fear or concern for their safety or the safety of other team members. Workplace violence can be physical, verbal, or emotional in nature." *Id.* at FEC1048.

362.    "FedEx Express requires a high degree of personal integrity and responsibility of its employees." Ex. 31, FedEx Policy 2-5 Acceptable Conduct, at FEC 1048.

363.    According to Ms. Malebranche, discrimination at FedEx is "absolutely not allowed." Ex. 3, Malebranche Tr. 19:23-20:2.

364.    FedEx has written policies that state it is "committed to maintaining a work environment that is free from any and all forms of unlawful discrimination and harassment." Ex. 29, IEEO Section 4-55, FEC 1025-1026.

365.    FedEx written policies claim to "prohibit discrimination and harassment" pursuant to "federal, state, or local law." *Id.*

366.    Defendant Warnders has an obligation to ensure that his workplace is free from emotional violence such as bullying. Ex. 2, Warnders Tr. 57:15-58:5.

367.    Part of Defendant Warnders' job responsibilities are "creating a culture of excellence" and "taking care of [his] people." Ex. 2, Warnders Tr. 59:6-60:16.

368.    Jokes can constitute racial discrimination. Ex. 9, Reyes Tr. 16:15-17.

369.    Mr. Campbell complained to Eric Warnders about inappropriate jokes from other workers. Ex. 2, Warnders Tr. 79:17-20.

370.    "Any employee who observes conduct that could be perceived as sexual or other harassment should immediately report that conduct to management or HR." Ex. 32, FedEx Anti-Harassment Policy Section 5-55, FEC1029.

371.    "Any member of management who receives a report or complaint of sexual or other harassment must immediately report the complaint to HR even if the complaining

employee asks that no action be taken. Any manager who fails to take action upon receiving a complaint of harassment may be subject to discipline, up to and including discharge." *Id.*

372.   If a manager observes discrimination taking place between workers they are required to report it. Ex. 2, Warnders Tr. 91:21-92:4.

373.   FedEx managers have an obligation to report discrimination of which they are aware, even where there is no complaint. Ex. 9, Reyes Tr. 24:2-13.

374.   Mr. Nunez testified that he must report racist comments he witnesses even where no complaint is made. Ex. 5, Nunez Tr. 120:17-122:4.

375.   Employees can complain to discrimination by verbally alerting their managers. Ex. 9, Reyes Tr. 23:4-22.

376.   It is permissible for a former FedEx employee to complain of racial discrimination after they've been terminated because the termination itself could be discriminatory. Ex. 9, Reyes Tr. 31:16-22.

377.   There is no handbook for managers. Ex. 2, Warnders Tr. 87:4-8.

378.   Plaintiff was only permitted to complain to Defendant Warnders as an "only hope." Ex. 2, Warnders Tr. 93:5-15.

379.   Mr. Reyes received training regarding employment discrimination which consisted of "the online training that everybody typically goes through." Ex. 9, Reyes Tr. 15:19-24.

380.   Mr. Reyes was unable to testify about FedEx's policies regarding race discrimination. Ex. 9, Reyes Tr. 19:6-16, 20:13-18.

381.   There is a FedEx handbook that applies to human resources representatives but Mr. Reyes does not know what it says, he does not have a copy of it, he last looked at it 8 years ago, and he does not know how to access it. Ex. 9, Reyes Tr. 20:2-21:3.

382.   Reyes testified that FedEx directions that guide employees on how to complain of discrimination are "word of mouth." Ex. 9, Reyes Tr. 21:4-13.

383.   There are some policies that are contained on a browser but Mr. Reyes cannot testify about what those policies say because he is not required to memorize them. Ex. 9, Reyes Tr. 22:2-16.

384.   Manager Steven Pasqualicchio is not aware of his obligation to report discrimination he witnesses and does not practice it, as he testified that "I can't just take action on

anything that you hear unless he or she employee comes and complains to me." Ex. 6, Pasqualicchio Tr. 59:18-20.

385.  Mr. Reyes did not review this Complaint filed in this case and does not know what Mr. Campbell is alleging regarding racial discrimination. Ex. 9, Reyes Tr. 27:22-28:3.

386.  Mr. Reyes testified that "we don't care about racial discrimination in my station." Ex. 9, Reyes Tr. 28:12-13.

387.  When an employee makes a complaint of racial discrimination, and there are no witnesses and the perpetrator denies making racist comments, the allegations would be found unsubstantiated. Ex. 9, Reyes Tr. 34:13-35:21.

388.  Findings of racial discrimination do not necessarily result in termination of the offender. Ex. 6, Pasqualicchio Tr. 43:11-21.

389.  Pasqualicchio testified that the FedEx discrimination training consists of the yearly obligation to watch a 40-minute video. Ex. 6, Pasqualicchio Tr. 44:13-45-9.

390.  There are no handbooks, policies, or procedures governing the FedEx Operations Manager position. Ex. 6, Pasqualicchio Tr. 45:13-46:12; Ex. 7, Bradley Tr. 29:15-30:8.

391.  Steven Pasqualicchio refused to answer "yes" or "no as to whether he has an obligation to report discrimination that he witnesses at FedEx. Ex. 6, Pasqualicchio Tr.: 58:2-59:3.

392.  Mr. Pasqualicchio refused to answer "yes" or "no" as to whether he has an obligation to report other employees using racial slurs. Ex. 6, Pasqualicchio Tr. 59:4-20.

393.  Mr. Pasqualicchio testified that even when he hears a racial slur from a white person to a Black person, he does not have an obligation to report this. Ex. 6, Pasqualicchio Tr. 92:7-25.

394.  Mr. Nunez has never consulted the written FedEx policy and procedure regarding race discrimination or retaliation. Ex. 5, Nunez Tr. 66:21-25.

395.  Mr. Nunez's training regarding discrimination consisted of watching the same 1.5-2-hour video every year. Ex. 5, Nunez Tr. 62:8-24.


## XI.    PROGRESSIVE DISCIPLINE FOR ALLEGED POLICY VIOLATIONS

396.  FedEx claims to have a "zero tolerance" policy for race discrimination. Ex. 4, Cahill Tr. 62:17-63:2; Ex. 7, Bradley Tr. 24:10-13; Ex. 10, Ontaneda Tr. 31:16-20; Ex. 5, Nunez Tr. 122:5-123:20.

397.  If an employee is found to have participated in racial discrimination, they are not automatically terminated but may be suspended. Ex. 10, Ontaneda Tr. 33:6-10; Ex. 5, Nunez Tr. 122:5-123:20.

398.  A finding of "workplace violence" in violation of FedEx policy does not warrant automatic termination. Ex. 4, Cahill Tr. 149:16-25.

399.  Management makes the decision regarding what level of discipline is applied to allegations of workplace violence, and it is not always automatic termination. Ex. 4, Cahill Tr. 156:12-21.

400.  Not all violations of Section 2-5 are considered a "Discharge Offense" which are separately described. *Id.* at FEC1050.

401.  Section 2-5 specifically emphasizes that "Falsification of any FedEx Express document or record is a serious offense that can result in the issuance of a Warning Letter." *Id.* at FEC1049.

402.  Section 2-5 describes a progressive discipline procedure including "Disciplinary Suspensions" which states that "If a manager decides not to terminate an employee for a serious policy violation, the manager may issue a Warning Letter and a disciplinary suspension without pay." *Id.* at FEC1051.

403.  Managers are also permitted to issue "Documented Counselings" where a manager has concluded that a policy violation does not warrant discipline but rather counseling of the employee about acceptable conduct. *Id.* at FEC1051.

404.  Section 2-5 makes clear that "Recurrent patterns of misconduct cannot be tolerated. Normally, a recurrent pattern of misconduct consists of at least two occurrences of the same or similar conduct in the past five years." *Id.* at FEC1051.

405.  Section 2-5 also discusses "Discharge Approval" making clear that "two levels of management and a matrix HR Advisor/Representative or HR Manager must approve all terminations based on misconduct when the individual holds a managing director or below position." *Id.* at FEC1052.

Massimi Law PLLC

By:  *Jessica Massimi*
     _____
     Jessica Massimi
     *Attorney for Plaintiff Kevin Campbell*
     99 Wall Street, Suite 1264
     NY, NY 10005