UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
KEVIN CAMPBELL,

                Plaintiff,

                                        **PLAINTIFF'S RESPONSE TO**
                                        <u>DEFENDANTS' 56.1 STATEMENT</u>

    -against-

FEDERAL EXPRESS CORPORATION a/k/a        Civil Action No. 22-cv-7662
FEDEX EXPRESS, and ERIC WARNDERS,
INDIVIDUALLY,

                Defendants.
------------------------------------------------------------------X

      Plaintiff, Kevin Campbell, by and through his counsel, hereby submits the following

Response to Defendants' 56.1 Statement, pursuant to Rule 56 of the Federal Rules of Civil

Procedure, Rule 56.1 of the Local Rules for the Eastern District of New York, and pursuant to

this Court's Individual Rules. This is not an exhaustive list of objections to Defendants 56.1

Statement and Plaintiff reserves the right to raise further objections at trial.

### **<u>FedEx and Its Policies</u>**

  **1.)** FedEx is a global transportation company with facilities located throughout the world.

    [Sharon Daniel Dec. ¶ 1, Defs.' Exhibit A.]

    **<u>Plaintiff's Response</u>**: **Objection.** Ms. Sharon Daniel's Declaration, to which the

Defendants cite, purports to authenticate various exhibits which she did not draft regarding events

of which she has no knowledge. As such reliance on her declaration is not proper.

  **2.)** FedEx employs a diverse workforce, including at its LGA station, where, as of November

    14, 2024, the racial demographic makeup was as follows:

                <u>LGA total employees - 243</u>
                      Hispanic - 100
                      African American- 74

White - 41
Asian - 15
Two or More Races - 6
Not Specified - 5
Native Hawaiian or Other Pacific Islander - 1
Indian or Alaska Native - 1

[Eric Warnders Dec. ¶ 10, Defs.' Exhibit B; Campbell Tr. 131:20-25 - Pl.'s Exhibit 1.]

**Plaintiff's Response**: **Disputed.**

a.  Black employees are the minority at the FedEx LGA Station. Ex. 1, Campbell Tr. 132:5-12.

b.  In 2021, there were ten managers at the FedEx LGA station. Two of the managers at the time were Black. Ex. 7, Bradley Tr. 48.

c.  At the FedEx LGA station, Black workers are treated worse than workers from other racial groups. Ex. 14, Spencer Tel. Tr. 83:22-84:13.

d.  Mr. Campbell incorporates the citations contained in Pl. 56.1 ¶¶ 10, 44-166, 185-207 for examples of discrimination which refute Defendants; assertion that they maintained anti-discrimination policies.

e.  Mr. Campbell incorporates the citations contained in Pl. 56.1 ¶¶ 208-293 for a description of Defendants' retaliation which Plaintiff refers to further dispute Defendants' assertion that they maintained anti-discrimination policies.

f.  Mr. Campbell also incorporates the citations contained in Pl. 56.1 ¶¶ 294-358, 379-395 in his 56.1 Statement for a further list of things the Defendants would have never considered racist or discriminatory regardless of when they were reported, and for examples of their lack of knowledge regarding their own antidiscrimination policies.

**3.)** FedEx prohibits discrimination and harassment against any applicant or employee on the basis of race.  [4-55 Equal Employment Opportunity/Affirmative Action Policy (FEC 1457), Pl.'s Exhibit 29.]

**Plaintiff's Response**: **Disputed** for the reasons set forth in Plaintiff's response to paragraph 2, above.

**4.)** Any employee who "believes that he or she has been subjected to harassment by anyone, including supervisors [or] coworkers . . . must immediately report [it] to management, HR, or the HR Compliance Department in Memphis, Tennessee." [Anti-Harassment Policy (FEC 1469), Pl.'s Exhibit 32.]

**Plaintiff's Response**: **Objection.** This quotation is incomplete and the document speaks for itself and also states that "Any employee who observes conduct that could be perceived as sexual or other harassment should immediately report that conduct to management or HR." *Id*. FedEx managers have an obligation to report discrimination of which they are aware, even where there is no complaint. Ex. 9, Reyes Tr. 24:2-13. Without waiving any objection, it is undisputed that the cited document states this, in part.

**5.)** FedEx's Anti-Retaliation policy states:

> There will be no retaliation against any employee who reports a claim or incident of sexual or other harassment or against any employee who participates as a witness in a harassment investigation. Any employee who feels that he or she has been subjected to retaliation must immediately make a report to management, HR, or the HR Compliance Department in Memphis, Tennessee.

[*Id.*

**Plaintiff's Response**: **Undisputed** that this is what Defendants' policy says.

**6.)** FedEx's Acceptable Conduct policy prohibits the following and provides that such conduct can result in termination:

- **Workplace Violence.** Violent or threatening behavior is not tolerated in the workplace. Workplace Violence is any <u>behavior or action that puts someone in a state of fear or concern for their safety</u> or the safety of other team members. Workplace violence can be physical, verbal, or emotional in nature. Workplace violence can include, but is not limited to: <u>aggressive</u>, sexual, <u>or other unwelcome and offensive physical contact</u>, bullying, threats, <u>threatening gestures</u>, stalking, or any verbal or physical act of hostility or aggression that is perceived to put anyone's safety at risk.

- <u>Disruptive conduct</u>, including fighting, while on duty or while on FedEx Express property or at company functions.

- Using violent, threatening, intimidating, coercive, or abusive language; <u>engaging in violent, threatening, intimidating,</u> coercive, or abusive <u>behavior</u>; or displaying blatant or public disrespect toward or about any employee, customer, vendor, or member of the public while on duty, on FedEx Express property, or at off-site Company meetings and functions.

[Acceptable Conduct Policy (FEC 1447-1448), Pl.'s Exhibit 31.] (emphasis added)

**Plaintiff's Response**: **Undisputed** that this is what Defendants' policy says.

**7.)** Upon hiring, Plaintiff Kevin Campbell received a copy of the handbook containing FedEx policies and acknowledged that he understood the policies. [Campbell Tr. 46:25-47:10, Pl.'s Exhibit 1.]

**Plaintiff's Response**: **UNDISPUTED.**

**8.)** Campbell had access to FedEx's handbook throughout his employment with FedEx. [*Id.* at 47:11-16; 63:17-20; 64:10-13.]

**Plaintiff's Response**: **UNDISPUTED.**

**9.)** Campbell received Equal Employment Opportunity and Affirmative Action Overview training on 3/15/18, 2/19/19, 1/16/20, 5/26/20, 6/3/20, and 4/16/21. [Campbell Training History, Defs.' Exhibit C**.]**

**Plaintiff's Response**: **UNDISPUTED.**

4

**10.)**    Campbell received Workplace Violence Prevention training on 3/15/18, 3/13/19, 1/16/20, 5/15/20, 6/1/20, and 4/15/21. [*Id*.]

**Plaintiff's Response**: **Objection.** This is immaterial since Campbell never engaged in workplace violence. Pl. 56.1 ¶ 247.b., ¶¶164, 266-260; *see also* Second Declaration of Kevin Campbell. Otherwise, **undisputed.**

**11.)**    Campbell read the entire Acceptable Conduct policy when he was hired at FedEx and understood that workplace violence and disruptive conduct were prohibited. [Campbell Tr. 70:11-22; 71:17-72:2, Pl.'s Exhibit 1.]

**Plaintiff's Response**: **Objection.** This is immaterial since Campbell never engaged in workplace violence or disruptive conduct. Pl. 56.1 ¶ 247.b., ¶¶164, 266-260. Otherise, undisputed**.**

### Campbell's Employment

**12.)**    Plaintiff Kevin Campbell was hired as a Courier/Non-driver at FedEx's LGA station on or around April 1, 2017 after FedEx acquired TNT USA, a company where Campbell had been employed. [Campbell Tr. 8:18-25; 14:7-9, Pl.'s Exhibit 1; Campbell Offer Letter/Employment Agreement (FEC 0598 – 0601), Defs.' Exhibit D.]

**Plaintiff's Response**: **UNDISPUTED.**

**13.)**    Campbell did not have a license when he was hired as a courier with FedEx. [Campbell Tr. 102:7-9, Pl.'s Exhibit 1.]

**Plaintiff's Response**: **UNDISPUTED.**

**14.)**    Campbell was the only courier at FedEx's LGA station who did not have a driver's license. [Warnders Dec. ¶ 6, Defs.' Exhibit B; Campbell Tr. 104:3-7, Pl.'s Exhibit 1.]

**Plaintiff's Response**: **UNDISPUTED.**

**15.)**    Because Campbell did not have a license, he would ride along with other couriers to assist with deliveries. [Campbell Tr. 103:22-2, Pl.'s Exhibit 1.]

<u>Plaintiff's Response</u>: **UNDISPUTED.**

**16.)**    Early on in Campbell's employment with FedEx, he would ride with another courier to assist with deliveries at a mall. [*Id.*]

<u>Plaintiff's Response</u>: **UNDISPUTED.**

**17.)**    The mall deliveries included approximately 120 stops, which took approximately three to four hours to complete. [Campbell Tr. 95:23 – 96:9, Pl.'s Exhibit 1.]

<u>Plaintiff's Response</u>: **UNDISPUTED.**

**18.)**    Campbell wanted to remain on the road with the other driver for his entire shift, but it became inefficient to have two couriers in one truck, so eventually, FedEx arranged for Campbell to return to the station to complete the rest of his shift after the mall deliveries. [Warnders Tr. 62:4-13, 63:19 – 64:5, Pl.'s Exhibit 2.]

<u>Plaintiff's Response</u>: **Disputed.** The mall was a big job, so taking Mr. Campbell off the route early affected him and his co-worker Nico because Nico then had more work to do himself. Ex. 1, Campbell Tr. 93:21-94:3.

**19.)**    Henry Nunez (Hispanic) was Campbell's direct manager from his start date (April 2, 2017) to approximately June 15, 2020. [Campbell Tr. 74:11 – 75:18, Pl.'s Exhibit 1]

<u>Plaintiff's Response</u>: **UNDISPUTED.**

**20.)**    Monty Bovell (Black) was Campbell's direct manager from approximately June 16, 2020 to May 25, 2021, the date he was terminated. [Campbell Tr. 75:19-25, Pl.'s Exhibit 1.]

<u>Plaintiff's Response</u>: **UNDISPUTED.**

**21.)**    Bovell and Nunez (an approximately eight other Operations Managers) reported to Senior Manager Eric Warnders (White), who was responsible for between 250 and 300 employees at LGA. [Warnders Tr. 30:18-19; 66:8 – 67:8, Pl.'s Exhibit 2; Warnders Dec. ¶ 3, Defs.' Exhibit B.]

**Plaintiff's Response**: **UNDISPUTED.**

**22.)**    Warnders reported to Managing Director, Nan Malebranche, who testified that her race is Spanish, Irish, and German. [Warnders Tr. 121:7-8, Pl.'s Exhibit 2; Malebranche Tr. 15-16, Pl.'s Exhibit 3.]

**Plaintiff's Response**: **UNDISPUTED.**

**23.)**    The manager in charge of the LGA station when Warnders was away was Michael Christophe (Black). [Campbell Tr. 292:15-19; 293:20-22; 295:5-7, Pl.'s Exhibit 1.]

**Plaintiff's Response**: **UNDISPUTED.**

**24.)**    Lance Reyes (Black) was the HR representative for the LGA station beginning in March 2020. [Reyes Tr. 12:18-21, 26:5-16, Pl.'s Exhibit 9; Campbell Tr. 66:20-22, Pl.'s Exhibit 1.]

**Plaintiff's Response**: **UNDISPUTED.**

**Alleged 2018 Nunez Comments**

**25.)**    After Nunez allegedly made the comments set forth in Paragraph 24 of the Complaint, Campbell reported it to Warnders, who had Nunez apologize. [Campbell Tr. 108:3-9; 109:20 – 110:21, Pl.'s Exhibit 1.]

**Plaintiff's Response**: **Disputed** for the following reasons:

a. Eric Warnders never spoke to Henry Nunez about complaints from Mr. Campbell that Mr. Nunez had made racially offensive remarks to Mr. Campbell. Ex. 5, Nunez Tr. 107:24-108:7.

b. Additionally, at these citations, Mr. Campbell is referring to statements from Mr. Nunez beyond what is contained in Paragraph 24 of the Complaint (one example of Mr. Nunez's comments was that "Black people are lazy, y'all don't like working," and things of that nature. Ex. 1, Campbell Tr. 107:13-108:2), and Mr. Nunez himself admitted to making these statements, testifying that Henry Nunez called Mr. Campbell "lazy" because Mr. Campbell's job title was "courier" and "he wanted to do courier job." Ex. 5, Nunez Tr. 108:2-109:9.

c. Further **disputed** to the extent that Warnders merely had Nunez apologize. Mr. Campbell testified that in response to his complaint to Defendant Warnders about Mr. Nunez, Warnders and Nunez told Mr. Campbell not to write a statement. Ex. 1, Campbell Tr. 109:12-14.

d. Otherwise, **undisputed** that Mr. Campbell complained to Defendant Warnders of racist comments from Henry Nunez.

26.) In response to Nunez's apology, Campbell expressed to Nunez that "everybody makes mistakes" and acknowledged that while Nunez "might have been joking," he found the comment "highly offensive." [*Id.* at 110:24 – 111:5.]

**Plaintiff's Response**: UNDISPUTED.

27.) At the time, Campbell believed the alleged incident was handled "appropriately" and in a "professional manner" and thought Warnders "did what he needed to do to make it go away." [*Id.* at 112:7-17; 112:24 - 113:5; 141:9-13.]

**Plaintiff's Response**: **Undisputed** that Plaintiff maintained that belief at the time, but in hindsight, Mr. Campbell recognizes that Defendant Warnders did what he needed to do to protect the station. Ex. 1, Campbell Tr. 112:16-113:4.

**Campbell's Hours**

**28.)**    Hours fluctuate at FedEx because the freight is very unpredictable, so some days couriers work more hours than others. [*Id.* at 129:16-24; 130:7-9.]

**Plaintiff's Response**: **Disputed.**

a.  Henry Nunez had discretion to assign hours to Mr. Campbell. Ex. 1, Campbell Tr. 129:25-130:3.

b.  Henry Nunez cut Mr. Campbell's hours by removing him from his delivery route. Ex. 1, Campbell Tr. 92:24-99:21.

c.  Nunez would pick Mr. Campbell up from his truck route. Ex. 5, Nunez Tr. 105:25-106:4.

d.  Henry Nunez cut Mr. Campbell's hours because he is Black. Ex. 1, Campbell Tr. 104:15-19.

e.  Mr. Campbell wanted to work his delivery route with the other driver because he was getting a lot more hours on that assignment. Warnders 71:16-18.

f.  Campbell was not making the same amount of hours working in the station as he was making out on the road. Ex. 5, Nunez Tr. 106:8-13.

g.  After Mr. Nunez switched Mr. Campbell to work in the station, "he was making about 40, 45 hours a week compared to 50, 55, 60 hours he was doing daily before that." Ex. 5, Nunez Tr. 110:5-7.

h. Henry Nunez cut Mr. Campbell's hours during two time periods and Monty Bovell told Mr. Campbell that cutting his hours had been Henry Nunez's decision. Ex. 1, Campbell Tr. 263:12-266:3.

**29.)** The hours Campbell worked while employed with FedEx are reflected in his earnings statements. [Campbell's Earnings (FEC 0050-0121), Defs.' Exhibit E.]

<u>**Plaintiff's Response**</u>: **Objection.** Defendants' records are not authenticated and constitute inadmissible hearsay. **Substantively, Plaintiff disputes** Defendants' contentions that they did not cut Mr. Campbell's hours for the reasons set forth in Plaintiff's response to Paragraph 28 above.

**30.)** Campbell testified that Nunez retaliated against him by cutting his hours two years after Nunez made the statements alleged in Paragraph 24 of the Complaint. [Campbell Tr. 265:21-25, Pl.'s Exhibit 1.]

<u>**Plaintiff's Response**</u>: **Disputed.** This citation does not support the assertion. At Mr. Campbell's deposition, Defendants asked Mr. Campbell a hypothetical the invented to which Mr. Campbell responded:

<u>**Q**</u>: So if he did retaliate against you by cutting your hours, it would have been two years after you made this report, right, of him saying that black people were lazy.

<u>**A**</u>: Yes.

Defendants attempt to string this together with "Paragraph 24 of the Complaint." However, in Paragraph 22 of Plaintiff's Complaint, Plaintiff clearly alleges that "***In 2018***, Nunez began cutting Campbell's hours . . .". Further, Defendants admit that they cut Mr. Campbell's hours as set forth in Plaintiff's response to Paragraph 28 above.

## <u>Alleged Blatantly Racist Views Expressed Following George Floyd Murder</u>

**31.)**    At his deposition, Campbell could not identify any FedEx employee who expressed blatantly racist views in the wake of the George Floyd murder. [*Id.* at 141:22 – 143:6.]

<u>**Plaintiff's Response: Disputed.**</u>

a.    On June 1, 2020, Peter Lorenzi, Campbell's co-worker, loudly yelled out to Campbell calling him "Trayvon." Ex. 1, Campbell Tr. 146:12-19.

b.    Campbell ignored this comment from Lorenzi. Ex. 1, Campbell Tr. 146:20-23.

c.    Peter Lorenzi then followed Mr. Campbell into the kitchen as Mr. Lorenzi continued to call him "Trayvon." Campbell Tr. 147:25-148:10.

d.    Peter Lorenzi's reference to "Trayvon" pertained to "racism" and "something that was going on recently." Ex. 10, Ontaneda Tr. 54:7-14.

e.    Ontaneda understood the reference to "Trayvon" to be regarding "a teenager who was shot." Ex. 10, Ontaneda Tr. 54:24-55:3.

f.    When Lorenzi saw Campbell washing his hands, Lorenzi stated "Why are you washing your hands for so long? Is it because you are not used to having running water in the projects?" Ex. 38, Campbell Dec. ¶ 10; *See also* Campbel Tr. 398:3-6 (Mr. McGaha reading this statement into the record).

g.    Henry Nunez believes the statement "Why are you washing your hands for so long? Is it because you're not used to having running water in the projects" is racist. Ex. 5, Nunez Tr. 115:11-22.

h.    Rob Riley, a mechanic for Defendant FedEx, said to Campbell "Kevin, how is your new TV?" Ex. 1, Campbell Tr. 192:20-3, 195:15-22.

i.    "Rob" is known as "Rob the Mechanic" and is Caucasian. Ex. 1, Campbell Tr. 193:6-9.

j.    Campbell asked Rob to explain what he meant by this comment, and Rob explained "the TV that you stole during the riots." Ex. 1, Campbell Tr. 195:15-196:6.

k.    At the time of Rob's comments, there were protests taking place in New York related to George Floyd. Ex. 1, Campbell Tr. 199:2-6.

l.    Henry Nunez was present with Mr. Campbell for Rob's statements, and Nunez witnessed and heard Rob's comments but did nothing to reprimand or report Rob. Ex. 1, Campbell Tr. 196:7-13.

m.   In or around July 2020, "JC" and Jeffrey Durante, Plaintiff's co-workers, walked over to Campbell who was standing near a cage where packages are stored. Durante said to Campbell "How about I put you in that cage like the gorilla you are." Ex. 38, Campbell Dec. ¶¶ 21-23; *See also* Ex. 1, Campbell Tr. 209:4-209:13 (Mr. McGaha reading this statement into the record).

n.   A few days after the "cage" comment from Jeffrey Durante, David Almeda, another courier for Defendant, walked over to where Campbell was standing with two managers, Michael Bradley and Pasqualicchio. Ex. 38, Campbell Dec. ¶ 24; *See also* Ex. 1, Campbell Tr. 252:7-12 (Mr. McGaha reading this into the record).

o.   In front of these two managers, Almeda said of Campbell "Doesn't this guy look like someone who would steal your car radio and then try to sell it back to you." Ex. 38, Campbell Dec. ¶ 25; *See also* Ex. 1, Campbell Tr. 252:16-25 (Mr. McGaha reading this statement into the record).

p.   David Almeda is Hispanic. Ex. 1, Campbell Tr. 253:17-19.

q.   Mr. Campbell usually "split the belt" as part of his responsibilities at work. Ex. 1, Campbell Tr. 17:5-6.

r.   To do this, Mr. Campbell would be assigned to stand next to the belt line to separate the boxes based on where they needed to go. Ex. 1, Campbell Tr. 17:15-21.

s.   "Splitting the belt is separating the boxes, to make sure they get to the right belt so they can get to the drivers." Ex. 1, Campbell Tr. 17:7-10.

t.   A few people, including Augusto Alzate, do the recycle function on the belt. Ex. 1, Campbell Tr. 353:8-12. This means Mr. Alzate is supposed to pull freight off the belt if a splitter misses the boxes. Ex. 1, Campbell Tr. 353:18-20.

u.   Mangers would sit and watch Augusto Alzate curse Plaintiff out every morning. Ex. 1, Campbell Tr. 362:2-11.

v.   Mr. Alzate is extremely disrespectful and abusive and frequently bumped into Mr. Campbell during work, which Mr. Campbell always ignored. Ex. 1, Campbell Tr. 401:3-25.

w.   Mr. Campbell made managers, including Henry Nunez, aware Alzate was verbally abusing him every morning over boxes that everyone missed countless times. Ex. 1, Campbell Tr. 358:8-18, 363:21-25.

x.   Alzate cursed and yelled at Campbell all the time. Ex. 1, Campbell Tr. 356:2-8.

y.   Everyone in the station on the LGA belt and higher knew that Alzate did not like Mr. Campbell. Ex. 14, Spencer Tel. Tr. 69:10-13.

z.   Defendant Warnders testified that Mr. Campbell should have reported that Alzate was cursing at him continuously day after day. Ex. 2, Warnders Tr. 92:12-93:4.

aa.   Yet, Alzate himself admitted that he would tell the FedEx managers every day that he did not want to work with Mr. Campbell because, according to Alzate, Mr. Campbell was "lazy." Ex. 15, Deposition Transcript of Augusto Alzate ("Alzate Tr.") 16:9-17:6.

bb.   Alzate would tell all of his coworkers and managers that Campbell was lazy. Ex. 15, Alzate Tr. 17:19-18:7.

cc.   Mr. Alzate usually made racist remarks towards Mr. Campbell in Spanish. Ex. 1, Campbell Tr. 356:13-357:17.

dd.   Splitting the belt is hard work and it's easy to get injured. Ex. 5, Nunez Tr. 74:9-18.

ee.   During the course of his FedEx career, Mr. Nunez split the belt. Ex. 5, Nunez Tr. 73:14-15.

ff.   Mr. Nunez has missed freight while splitting the belt. Ex. 5, Nunez Tr. 73:19-75:15.

gg.   Defendants never wrote Mr. Campbell up for missing freight because missing freight is "part of the job" since "a lot of freight comes down. You have no choice, but to let the freight go down the belt. You can't grab everything. Especially if it's heavy boxes and stuff like. And it's overwhelming. You can't." Ex. 5, Nunez Tr. 98:17-99:10.

hh.   Defendant Warnders never received any complaints from Alzate or anyone else alleging Mr. Campbell did not do his job or that he was missing freight on the belt. Ex. 2, Warnders Tr. 69:10-16, 123:6-12.

**32.)**   Campbell never reported these racist views were being expressed. [*Id.* at 143:19 – 144:3; 145:21-24.]

**Plaintiff's Response: Disputed for the reasons set forth in Plaintiff's response to ¶90 below.**

**Lorenzi Incident**

**33.)**    After one of Campbell's co-workers, Peter Lorenzi, made the statements alleged in Paragraphs 28 and 32 of the Complaint, Campbell immediately reported it to the first manager he saw, Frank Ontaneda. [*Id.* at 147:11 – 148:13.]

**Plaintiff's Response: Disputed in part,** to the extent that Defendants have attempted to cabin description of this incident to two Paragraphs in Plaintiff's Complaint, as opposed to the sworn testimony cited at Paragraphs 78-84 of Plaintiff's 56.1 Statement which Plaintiff respectfully incorporates herein.

Otherwise, **admitted** that Mr. Campbell complained to Defendants of the racial harassment from Peter Lorenzi.

**34.)**    Ontaneda and Campbell went to Eric Warnders' office "to get a piece of paper for a statement." [*Id.* at 156:14-18.]

**Plaintiff's Response: Disputed as to the Defendants' sequencing of events.**

a. Frank Ontaneda initially refused to allow Mr. Campbell to write a statement about Lorenzi's racial harassment instead telling Campbell "Let's not try to – let's not escalate this," because the FedEx managers at the station do not want you to write statements. Ex. 1, Campbell Tr. 150:17-152:11.

b. Frank Ontaneda does not recall what Kevin Campbell said to him when Mr. Campbell initially complained about Peter Lorenzi's statements. Ex. 10, Ontaneda Tr. 60:22-63:10.

c. Campbell had to ask Warnders and Ontaneda several times to file a written statement regarding the incident described above involving Lorenzi before Defendants actually permitted him to do so. Ex. 1, Campbell Tr. 157:25-158:25.

**35.)**    Campbell subsequently "wrote a statement." [*Id.* at 158:7-11.]

**Plaintiff's Response: Undisputed** that Defendants eventually permitted Mr. Campbell to write a complaint about Peter Lorenzi's racial harassment of him.

**36.)**    Following an investigation, Ontaneda, in consultation with HR and Warnders, issued Lorenzi a Warning Letter and suspended him for five days without pay. [Lorenzi Suspension, Pl.'s Exhibit 20; Ontaneda Tr. 49:24 – 50:20, Pl.'s Exhibit 10.]

**Plaintiff's Response: UNDISPUTED.**

**37.)**    Campbell agreed Lorenzi's suspension was a fair resolution to this incident. [Campbell Tr. 162:7-15, Pl.'s Exhibit 1.]

**Plaintiff's Response: Disputed.** At Defendants' citation, Mr. Campbell testified that he "never worked in management" and that he believed "termination" would have been a fair resolution for Peter Lorenzi. Additionally, after writing his statement against Lorenzi, no one at FedEx spoke to Campbell about the incident with Lorenzi to inform Campbell about the outcome nor to interview Campbell. Ex. 1, Campbell Tr. 161:8-11.

### **"Snitch" Allegation**

**38.)**    At this deposition, Campbell could not name anyone who allegedly called him a "snitch." [*Id.* at 169:9-17; 174:8-15; 398:15-23.]

**Plaintiff's Response**: **Disputed.** Defendants' testimony contains admissions of Mr. Campbell's "snitch" allegations. *See* Pl. 56.1 Statement at ¶¶ 208-236.

a. Specifically, when asked directly whether he knows whether other employees began referring to Campbell as a snitch in the wake of his complaints about Lorenzi, Ontaneda was unable to answer with a "yes" or "no" but instead stated that he "*was not there*." Ex. 10, Ontaneda Tr. 64:23-65:12 (emphasis added).

b. Frank Ontaneda was unable to state whether he believes that someone is a snitch if they complain of workplace discrimination, stating that it "depends on the context." Ex. 10, Ontaneda Tr. 44:5-8.

c. One of the employees who confronted Mr. Campbell about filing a complaint against Lorenzi was manager Michael Bradley who testified that he somehow knew about Campbell's Complaint against Lorenzi, and was speaking to Mr. Campbell about the "comment by Pete Lorenzi calling him Trayvon." Ex. 7, Bradley Tr. 38:15-19.

d. Mr. Bradley was not present for the comment, he was not Plaintiff's manager, and he was not Peter Lorenzi's manager, but nonetheless heard about Mr. Campbell's complaints against Lorenzi in a manager's meeting. Ex. 7, Bradley Tr. 38:20-39:18.

e. Notably, manager Michael Bradley admitted to his belief that "snitch is if you report something . . . more or less why did you say anything." Ex. 7, Bradley Tr. 63:24-64:4.

f. In About July 2020, Michael Bradley confronted Campbell in Bradley's office about Campbell's prior complaint of racial discrimination against Lorenzi, demanding of Campbell "Do you and Pete joke like this all the time?" and "Pete has a dark sense of humor, and some people just don't get it." Ex. 1, Campbell Tr. 277:9-278:24.

g. Bradley testified that following the incident with Peter Lorenzi, he spoke to Mr. Campbell in his office and told him "I heard what happened, you know, people trying to be funny, they try to joke around with stupid jokes. You know people have a stupid sense of humor." Ex. 7, Bradley Tr. 37:13-38:5.

h. Bradley acknowledged that he might have closed the door to his office during this conversation with Mr. Campbell. Ex. 7, Bradley Tr. 38:3-11.

i.  Mr. Bradley testified that he does not know whether Lorenzi's statements to Mr. Campbell were offensive or racist since Mr. Bradley personally was not there. Ex. 7, Bradley Tr. 40:3-8; 43:4-16.

**39.)**    Campbell never reported that anyone called him a "snitch." [*Id.* at 171:5-7; 174:16-24.]

**Plaintiff's Response**: **Disputed**. In his GFT form, Mr. Campbell reported that people called him a snitch. Ex. 22, Plaintiff's GFT Step I Form ("GFT Form"), ESI0000045. Additionally, for the reasons set forth in Plaintiff's response to paragraph 38 above, Defendants were aware that people were referring to Mr. Campbell as a snitch.

### Broken Scanners and Hanging Up Allegation

**40.)**    Campbell is "pretty sure" Angela Lorenzi handed out broken package scanners to other couriers. [*Id.* at 179:12-21.]

**Plaintiff's Response**:

**Objection.** This selective citation is misleading for the reasons set forth below.

**Disputed.**

a.  If Angela Lorenzi liked a FedEx worker, she would give them better package scanners. Ex. 1, Campbell Tr. 177:14-16.

b.  Angela Lorenzi purposely gave Mr. Campbell broken package scanners a few times per week. Ex. 1, Campbell Tr. 177:5-14.

c.  While Angela Lorenzi might have given other workers broken package scanners, she consistently gave broken package scanners to Mr. Campbell. Ex. 1, Campbell Tr. 179:15-180:2.

d. Angela Lorenzi personally retaliated against Plaintiff by giving him broken package scanners and by ignoring him when he needed work-related information. Ex. 1, Campbell Tr. 174:25-180:2.

e. Mr. Campbell did not have this issue when receiving package scanners from other people. Ex. 1, Campbell Tr. 180:16-21.

**41.)** Campbell did not report that Angela Lorenzi gave him broken package scanners prior to his termination. [*Id.* at 399:13 – 400:11.]

**Plaintiff's Response**: **Undisputed,** though Mr. Campbell reported it during the GFT process. Ex. 1, Campbell Tr. 399:13-24.

**42.)** Prior to his termination, Campbell did not report that he believed Angela Lorenzi hung up on him because he reported her husband, Peter Lorenzi. [*Id.* at 191:22-25.]

**Plaintiff's Response**: **Undisputed,** though Mr. Campbell reported it during the GFT process. Ex. 1, Campbell Tr. 399:13-24.

## Stolen TV Allegation

**43.)** When "Rob the Mechanic" allegedly made the statements set forth in Paragraphs 42 and 43 of the Complaint, Campbell did not tell him that he found the statements to be offensive. [*Id.* at 196:14-18.]

**Plaintiff's Response**: **Objection.** It is immaterial whether Mr. Campbell told "Rob the Mechanic" that his statements were offensive. **Disputed.** Plaintiff responded to "Rob the Mechanic" by asking him to explain what he meant. "Rob the Mechanic" responded by stating "the TV that you stole during the riots" but then walked away. Plaintiff immediately complained to Manager Henry Nunez, who had witnessed "Rob the Mechanic's" actions, and said "So am I

going to have to write a statement about that, too. What am I supposed to do?". Mr. Nunez knew that "Rob the Mechanic's" statements were offensive. Ex. 1, Campbell Tr. 195:20-196:13.

**44.)**    Campbell believes most African American people, including Monty Bovell, would have found "Rob the Mechanic's" alleged statements offensive. [*Id.* at 204:13-16.]

**Plaintiff's Response: Objection.** As set forth in Plaintiff's Memorandum of Law In Opposition and In Reply, this is impermissible speculation not permitted on summary judgment, and it is immaterial. Additionally, this assertion presents an issue of credibility since Monty Bovell no longer works for FedEx because FedEx fired him in June 2021 for falsifying documents and for falsifying service to FedEx customers several times over months prior. Ex. 3, Malebranche Tr. 72, 110:21-111:7; Warnders 95:5-20.

Bovell had been engaging in this falsification for several months prior to his termination. Ex. 2, Warnders Tr. 96:4-11; Ex. 8, Deposition Transcript of Monty Bovell ("Bovell Tr.") 76:2-78:11.

Bovell was engaging in this falsification to "make the numbers look better than what they actually are" regarding service. Ex. 9, Deposition Transcript of Lance ("Reyes Tr.") 87:12-89:21.

Otherwise, **undisputed** that most *people* would know Rob the Mechanic's statements to be offensive.

**45.)**    Bovell was Campbell's direct manager when "Rob the Mechanic" made these alleged statements. [*Id.* at 203:5-8.]

**Plaintiff's Response: Undisputed**, though Monty Bovell was not present for Rob the Mechanic's comments – Henry Nunez was, as described in Plaintiff's response to Paragraph 43 above.

**46.)** Campbell did not report "Rob the Mechanic's" alleged statements to Bovell or anyone else prior to being terminated. [*Id.* at 198:4-7; 200:18-25; 204:21-24.]

**Plaintiff's Response**: **Disputed** for the reasons set forth in Plaintiff's response to paragraph 43, above.

**47.)** In hindsight, Campbell wishes he had reported this alleged incident. [*Id.* at 248:21-25.]

**Plaintiff's Response**: **Disputed** for the reasons set forth in Plaintiff's response to paragraph 43, above. Plaintiff complained of the incident to Henry Nunez who was present and witnessed the incident. Plaintiff further objects as this proposition is not supported by the citation, which was specific to notifying human resources and refers to another incident.

## Gorilla in a Cage Allegation

**48.)** Campbell did not report the alleged comments made in Paragraph 50 of the Complaint to HR or any member of management prior to being terminated. [*Id.* at 210:11-6; 220:8 – 221:14; 397:4-7.]

**Plaintiff's Response**: **Disputed.** Immediately following this incident, Mr. Campbell reported it to Roberta who works in the office with Peter Lorenzi's wife. Roberta told Mr. Campbell to "just let it go, calm down." Ex. 1, Campbell Tr. 210:18-24.

**49.)** In hindsight, Campbell wishes he had reported this alleged incident. [*Id.* at 248:21-25; 249:17 – 250:11.]

**Plaintiff's Response**: **Disputed.** As set forth in Plaintiff's response to Paragraph 48, he reported the incident to Roberta. Prior to his termination, Mr. Campbell did not report the incident to Monty Bovell, Defendant Warnders, or HR, because he "didn't feel comfortable enough to tell them what was going on." Ex. 1, Campbell Tr. 250:9-11.

## Car Radio Allegation

**50.)** Campbell did not tell Bradley or Pasqualicchio that he believed the alleged comment made by David Almeda in Paragraph 51 of the Complaint were racially offensive. [*Id.* at 270:5-11; 274:23 – 275:6.]

**Plaintiff's Response**: **Disputed.**

a. Immediately following the "car radio" incident, Campbell turned to Bradley and Pasqualicchio, two managers, and said "do you see what I have to deal with on a regular basis." Ex. 1, Campbell Tr. 254:13-18.

b. Pasqualicchio looked at Bradley and sighed, but did nothing further. Ex. 1, Campbell Tr. 254:19-21. Plaintiff reported this incident to Bradley and Pasqualicchio. Ex. 1, Campbell Tr. 275:7-16.

c. In front of these two managers, Almeda said of Campbell "Doesn't this guy look like someone who would steal your car radio and then try to sell it back to you." Ex. 38, Campbell Dec. ¶ 25; *See also* Ex. 1, Campbell Tr. 252:16-25 (Mr. McGaha reading this statement into the record).

d. Defendants' Anti-Harassment Policy (FEC 1469), Pl.'s Exhibit 32, states that "Any employee who observes conduct that could be perceived as sexual or other harassment should immediately report that conduct to management or HR." *Id.*

e. FedEx managers have an obligation to report discrimination of which they are aware, even where there is no complaint. Ex. 9, Reyes Tr. 24:2-13.

**51.)** Campbell believed that Bradley and Pasqualicchio should have interpreted the comment to be racially offensive. [*Id.* at 275:3-6.]

**Plaintiff's Response**: **UNDISPUTED.**

**52.)**    Campbell did not report the alleged statements set forth in Paragraph 51 of the Complaint prior to being terminated. [*Id.* at 256:4-7.]

**Plaintiff's Response**: **Disputed** for the reasons set forth in Plaintiff's response to Paragraph 50, above.

**53.)**    Campbell never considered reporting these alleged statements to Bovell or to HR. [*Id.* at 257:15-21; 259:19-21.]

**Plaintiff's Response**: **Disputed.** Plaintiff's complete testimony on this point was that he did not consider reporting this to Monty Bovell because "two managers were present" for the incident. Ex. 1, Campbell Tr. 257:18-21. FedEx managers have an obligation to report discrimination of which they are aware, even where there is no complaint. Ex. 9, Reyes Tr. 24:2-13.

**54.)**    Campbell has no documentation that the incident alleged in Paragraphs 51 and 52 of the Complaint occurred other than his memory. [*Id.* at 276:16-19.]

**Plaintiff's Response**: **Disputed.**

a.   Plaintiff reported this incident to Defendants and they claim to have investigated it. Ex. 30, FEC937.

b.   Nan Malebranche investigated this allegation by calling Mr. Bradley and asking him if it was true. Ex. 7, Bradley Tr. 79:15-22.

c.   Mr. Bradley testified that he does not know whether this statement is racist. Ex. 7, Bradley Tr. 55:19-58:24.

d.   Pasqualicchio does not believe this statement is racist. Ex. 6, Pasqualicchio Tr. 87:12-88:3.

e. Pasqualicchio testified that Nan Malebranche never spoke to him about this allegation. Ex. 6, Pasqualicchio Tr. 77:5-8.

**55.)** Campbell acknowledges, in hindsight, he should have reported this statement and "every other racial statement that was said to [him]" "just to get it on record." [*Id.* at 276:23 – 277:7.]

**Plaintiff's Response**: **Disputed.** As set forth above in response to various paragraphs, and as set forth in Paragraphs 167-184, 243-147, Mr. Campbell reported multiple instances of discrimination and harassment to various managers. At the Defendants' citation, Mr. Campbell stated that he should have reported to "anyone who wasn't a manager in the station."

**Bradley Office Discussion**

**56.)** Campbell testified "[Bradley] came up to [Campbell] in a very sincere way and asked [Campbell] to come into his office to speak about the situation with [Peter Lorenzi]." [*Id.* at 277:25 - 278:4.]

**Plaintiff's Response**: **Disputed.** This is an incomplete account of Plaintiff's testimony. Mr. Campbell also testified that during this conversation, Michael Bradley "started to ask me these cryptic questions with his phone in his shirt pocket." Ex. 1, Campbell Tr. 278:10-12.

**57.)** "[Bradley] just wanted to check on [Campbell] to see how [he] was doing." [*Id.* at 279:23 – 280:4.]

**Plaintiff's Response**: **Disputed.** This is an incomplete account of Plaintiff's testimony. In July 2020, Michael Bradley confronted Campbell in Bradley's office about Campbell's prior complaint of racial discrimination against Lorenzi, demanding of Campbell "Do you and Pete joke like this all the time?" and "Pete has a dark sense of humor, and some people just don't get it." Ex. 1, Campbell Tr. 277:9-278:24. *See also* Ex. 1, Campbell Tr. p 279:23-25 (Q: "*Other than these*

*two quoted statements in paragraph 54*, do you remember anything else he said?") (emphasis added).

**58.)** Campbell did not report the incident alleged in Paragraph 54 prior to his termination. [*Id.* at 282:15-17; 290:14-17.]

**Plaintiff's Response**: **Objection.** This citation omits Plaintiff's testimony that he did not report this incident because Michael Bradley is a manager and was friends with Peter Lorenzi, and Mr. Campbell was therefore in fear of getting in more trouble. Ex. 1, Campbell Tr. 282:19-283:16; 315:2. Otherwise, **undisputed** that this citation reflects a partial account of Plaintiff's testimony.

**59.)** Campbell acknowledges, in hindsight, he would report "every single incident that was racial to someone." [*Id.* at 290:21 – 291:12.]

**Plaintiff's Response**: UNDISPUTED.

**Bradley Alleged "Discipline" and "Screaming"**

**60.)** The "disciplining" and "reprimanding" alleged in Paragraph 59 of the Complaint was Bradley telling Campbell's direct manager, Monty Bovell, that Campbell was not labeling packages, and Bovell calling Campbell to ask him "kindly to come back to the building" to do so. [*Id.* at 300:2 – 301:24.]

**Plaintiff's Response**: **Disputed.** Michael Bradley started requiring Mr. Campbell to relabel packages though that was function performed by other workers designated to handle that. Ex. 1, Campbell Tr. 284:12-18, 300:2-301:10. Michael Bradley would "start screaming, 'you better label the boxes.'" Ex. 1, Campbell Tr. 310:3-10.

**61.)** At his deposition, Campbell could not name anyone who Bradley knew was not labeling packages and who Bradley did not "reprimand." [*Id.* at 304:20-24.]

**Plaintiff's Response**: UNDISPUTED.

**62.)** No one witnessed Bradley allegedly screaming at Campbell to put labels on boxes. [*Id.* at 309:23 – 310:19; 313:20-25.]

**Plaintiff's Response**: **Undisputed** that Bradley engaged in this activity against Mr. Campbell ensuring there were no witnesses.

**63.)** Bradley never used profanity, called Campbell names, or said anything Campbell perceived to be racially motivated. [*Id.* at 314:2-11.]

**Plaintiff's Response**: **UNDISPUTED.**

**64.)** Campbell believes Bradley screamed at him, at least in part, because Campbell is "a Black man who is not commonly perceived as a victim wrote a statement about his friend [Lorenzi]," which Campbell believes "bothered [Bradley]."  [*Id.* at 315:7-15.]

**Plaintiff's Response**: **UNDISPUTED.**

**Alleged Vehicle Comments and Scratch**

**65.)** Campbell did not report the statements alleged in Paragraph 64 prior to being terminated. [*Id.* at 327:25 – 328:5.]

**Plaintiff's Response**: **UNDISPUTED.**

**66.)** Campbell has no evidence that the person who allegedly "vandalized [his] vehicle was someone that [sic] was upset that [Campbell] wrote a statement about Lorenzi." [*Id.* at 345:5-11.]

**Plaintiff's Response: Objection.** Whether Mr. Campbell has "evidence" is a legal conclusion not properly asserted in a Rule 56.1 Statement. Without waiving any objection, this assertion is **disputed** and may be proven with circumstantial evidence.

   a.  James, whose last name is currently unknown to Campbell and who is one of Lorenzi's friends, began asking Campbell questions about his BMW, and memorizing Campbell's license plate number. Ex. 1, Campbell Tr. 328:7-329:20.

   b.  A few weeks later, Campbell noticed that someone had keyed his car. Ex. 1, Campbell Tr. 328:7-331:6.

   c.  James is friends with Angela and Peter Lorenzi. Ex. 1, Campbell Tr. 331:7-8.

   d.  The person who vandalized Mr. Campbell's vehicle was upset that Mr. Campbell wrote a statement about Peter Lorenzi. Ex. 1, Campbell Tr. 343:2-345:8

**67.)** Campbell was not at work when he noticed the scratch on his car. [*Id.* at 329:24 – 330:2.]

     **Plaintiff's Response**: **UNDISPUTED.**

**68.)** Campbell does not know whether his car was keyed while he was at FedEx. [*Id.* at 331:19-22.]

     **Plaintiff's Response**: **UNDISPUTED.**

**69.)** Campbell's belief that his car was keyed at FedEx was based on a "gut feeling." [*Id.* at 333:11-17.]

     **Plaintiff's Response**: **Disputed** for the reasons set forth in Plaintiff's response to Paragraph 66 above.

**70.)** While Campbell told Nunez that he believed his car was keyed at FedEx, he did not tell Nunez that he believed it was done because of his race. [*Id.* at 332:8-21; 335:17 – 336:2.]

     **Plaintiff's Response**: **Objection.** This is an incomplete account of Mr. Campbell's testimony. He testified that he did not report that this was based on his race at the time because he "didn't trust" Henry Nunez and Mr. Campbell was "always scared to report anything at that job." Ex. 1, Campbell Tr. 335:25-336:10.

**Alzate Incident and Termination**

**71.)** On May 18, 2021, Campbell and Augusto Alzate (Hispanic) were working adjacent to each other (about five feet distance) during the morning sort when packages are sorted on a conveyor belt.  [Campbell Tr. 353:3-22, 366:3-17, Pl.'s Exhibit 1; Warnders Dec.¶ 9, Defs.' Exhibit B; James Cahill Dec. (Exhs. A-C), Defs.' Exhibit F.]

**Plaintiff's Response: Objection.** Lack of testimonial support and authentication. As set forth in Section I.D.ii. of Plaintiff's Memorandum of Law In Support of Plaintiff's Motion for Summary Judgment, Defendants' Exhibits B-C are not admissible evidence and therefore cannot be considered. Defendants do not oppose Plaintiff's arguments regarding admissibility in their Memorandum of Law In Opposition to Plaintiff's motion. Otherwise it is undisputed that Mr. Campbell's testimony reflects that they were about five feet away before Alzate attacked Mr. Campbell.

**72.)** Campbell's job was to split the belt (move certain freight off the belt), and Alzate's job was to get the recycle (move the boxes Campbell missed).  [Campbell Tr. 353:13-22, Pl.'s Exhibit 1.]

**Plaintiff's Response**: **UNDISPUTED.**

**73.)** Alzate became was unhappy with Campbell because he believed Campbell was missing too many boxes. [*Id.*]

**Plaintiff's Response**: **Disputed.** This is a sanitized summary of Plaintiff's testimony, omitting key facts.

a.  That day, Mr. Alzate, approached Campbell unprovoked and began aggressively cursing and swearing at Campbell. Ex. 1, Campbell Tr. 352:21-354:6.

b. Alzate was screaming "motherfucking Kevin, always missing boxes, piece of shit" which is what he would normally say to Mr. Campbell. Ex. 1, Campbell Tr. 356:12-22.

c. Mr. Campbell usually ignored Mr. Alzate's verbal attacks, and managers were aware that Alzate treated Mr. Campbell this way. Ex. 1, Campbell Tr. 356:18-22.

d. Plaintiff further states that Defendants never wrote Mr. Campbell up for missing freight because missing freight is "part of the job" since "a lot of freight comes down. You have no choice, but to let the freight go down the belt. You can't grab everything. Especially if it's heavy boxes and stuff like. And it's overwhelming. You can't." Ex. 5, Nunez Tr. 98:17-99:10.

**74.)** Alzate kicked two boxes towards Campbell, which Campbell perceived as an attempt to intimidate or upset him, but Campbell ignored Alzate. [*Id.* at 372:21 – 373:8.]

**Plaintiff's Response**: **Disputed in part.** This is a sanitized summary of Plaintiff's testimony, omitting key facts.

a. Alzate was mad, so he came over to Mr. Campbell, yelling, screaming, cursing at him, and kicking boxes in Mr. Campell's direction. Ex. 1, Campbell Tr. 368:17-20.

b. Mr. Campbell initially responded by ignoring Mr. Alzate. Ex. 1, Campbell Tr. 353:14-25.

c. Mr. Campbell was ignoring Mr. Alzate on purpose because he wanted Alzate to leave him alone but Alzate kept escalating the situation. Ex. 1, Campbell Tr. 374:3-18.

Otherwise, **undisputed** that Alzate attempted to intimidate Mr. Campbell.

**75.)** Alzate then pushed a larger box towards Campbell, which hit Campbell's hand. [*Id.* at 371:19 – 372:4.]

**Plaintiff's Response**: **UNDISPUTED.**

**76.)** At no point before Alzate hit Campbell with the third box did Campbell consider notifying a member of management that Alzate was being aggressive towards him. [*Id.* at 375:4-18.]

**Plaintiff's Response**: **Disputed** in part. This is a sanitized summary of Plaintiff's testimony, omitting key facts. Mr. Campbell did not consider notifying a member of management specifically because managers were aware of the situation with Mr. Campbell and Mr. Alzate, with Mr. Alzate always getting upset with Mr. Campbell for things other splitters also did. Mr. Campbell's hand hurt, and Alzate was right there, so Mr. Campbell thought it best to ask Mr. Alzate why he would push a box and hurt his hand. *Id.*

**77.)** In the process of pushing the third box towards Campbell, Alzate closed the distance between him and Campbell from approximately five feet to two feet. [Campbell Tr. 377:14 – 378:19.]

**Plaintiff's Response**: **UNDISPUTED.**

**78.)** Campbell in turn approached Alzate closing the distance between the two men to approximately six inches. [Campbell Tr. 378:20 – 379:21, Pl.'s Exhibit 1; Cahill Dec. (Exhs. A-C), Defs.' Exhibit F.]

**Plaintiff's Response**:

**Objection.** As set forth in Section I.D.ii. of Plaintiff's Memorandum of Law In Support of Plaintiff's Motion for Summary Judgment, Defendants' Exhibits B-C are not admissible evidence and therefore cannot be considered. Defendants do not oppose Plaintiff's arguments regarding admissibility in their Memorandum of Law In Opposition to Plaintiff's motion.

**Disputed in part**. This is a sanitized summary of Plaintiff's testimony, omitting key facts. Plaintiff's testimony was that "I walked over to him and asked him, why would he hit me with the box." Ex.1, Campbell Tr. 378:22-24.

29

**79.)** Campbell acknowledges Alzate could have been intimated when Campbell closed the distance with him to half a foot and that Alzate could have perceived it as an act of aggression. [Campbell Tr. 379:22 – 380:21, Pl.'s Exhibit 1; Cahill Dec. (Exhs. A-C), Exhibit F.]

**Plaintiff's Response: Objection.** Misstates Mr. Campbell's testimony who was only asked to speculate about how Mr. Alzate "felt" or what he "perceived" in the absence of an actual accusation from any FedEx employee alleging that Mr. Campbell was "aggressive" or "intimidating." **Further,** as set forth in Plaintiff's Memorandum of Law In Opposition and In Reply, this is impermissible speculation not permitted on summary judgment. Additionally, this hypothetical is immaterial for the following reasons:

 f. Neither Mr. Alzate nor any other employee ever accused Mr. Campbell of being aggressive or intimidating. Ex. 16, Security Report.

 g. Even if Alzate had made such an accusation, Defendants found Mr. Alzate's version of events to be **not** credible. Ex. 16, Security Report at ESI0000963 ("A review of Alzate's written statement was not consistent with the VSS [video] review.").

 h. Defendants did not terminate Mr. Campbell for intimidating or being aggressive toward Mr. Alzate, but for their after-the-fact allegation that Mr. Campbell shoulder-bumped Alzate, which Mr. Campbell denies. Pl. 56.1 ¶ 144.

 i. This line of questioning was then met with a non-speaking, substantive objection.

**Disputed** for the following reasons:

    a.  This citation does not support the assertion. Instead, Plaintiff testified that "I felt like I could have been intimidated by [Alzate] kicking boxes and hitting my hand." Ex. 1, Campbell Tr. 379:22-380:3.

    b.  According to Nan Malebranche, even "an individual approaching another individual's work area in a clearly agitated state flailing his arms and pushing several packages in the other individual's direction" is not "any type of violence." Ex. 3, Malebranche Tr. 94:24-95:9.

    c.  *See also* Second Declaration of Kevin Campbell

**80.)** Alzate responded by pulling out a box cutter, causing Campbell to grab Alzate's arm in an attempt to push it away. [Campbell Tr. 380:16 – 381:2, Pl.'s Exhibit 1.]

    <u>**Plaintiff's Response**</u>: **Disputed in part.** This is a sanitized summary of Plaintiff's testimony, omitting key facts. Campbell grabbed Alzate's arm and pushed it away from him in an effort to protect him from getting slashed, and also repeatedly asked Alzate to drop the box cutter which Alzate refused to do. *Id.*

    Otherwise, **undisputed** that Alzate pulled out a box cutter.

**81.)** Co-workers who witnessed the incident intervened and wrestled the box cutter from Alzate. [*Id.* at Campbell Tr. 381:3-15.]

    <u>**Plaintiff's Response**</u>: **UNDISPUTED.**

**82.)** Both Campbell and Alzate were immediately suspended. [Monty Bovell Tr. 35:20-24, Pl.'s Exhibit 8.]

    <u>**Plaintiff's Response**</u>: **Undisputed.** Plaintiff further states that upon suspending Mr. Campbell, Defendants did not believe he had acted aggressively. Ex. 8, Bovell Tr. 35:20-25.

**83.)** The same day, Senior FedEx Security Specialist, James Cahill, opened an investigation into the incident. [Cahill Dec. (Exh. A), Defs.' Exhibit F.]

**Plaintiff's Response**: **UNDISPUTED.**

**84.)** As part of his investigation, Cahill conducted witness interviews (including interviews of Alzate and Campbell) and reviewed video surveillance footage from two different angles. [Cahill Dec. (Exh. A-C), Defs.' Exhibit F.]

**Plaintiff's Response**: **Objection.** As set forth in Section I.D.ii. of Plaintiff's Memorandum of Law In Support of Plaintiff's Motion for Summary Judgment, Defendants' Exhibits B-C are not admissible evidence and therefore cannot be considered. As set forth in Section I.D.i. of Plaintiff's Memorandum of Law In Support of Plaintiff's Motion for Summary Judgment, the unsworn witness interviews including that of Jose Moreno are not admissible and therefore cannot be considered. Defendants do not oppose Plaintiff's arguments regarding admissibility in their Memorandum of Law In Opposition to Plaintiff's motion.[1]

**Disputed,** as Defendants have not cited to any admissible evidence for this assertion. According to Defendants, on FedEx's video you "can't see much of what transpired . . . it really doesn't have much." Ex. 3, Malebranche Tr. 122:2-12. Defendants have acknowledged that their videos did not capture a side angle. Ex. 4, Cahill Tr.79:7-15 ("[T]here was no side angle that could actually show the two together."). According to the Defendants, the security videos do not show Mr. Campbell making physical contact with Mr. Alzate. Ex. 3, Malebranche Tr. 75:15-17, 122:16-18. Yet, Defendants claim the basis for Plaintiff's termination was physical contact:

- Defendant Warnders testified that Mr. Campbell was terminated because he was "the aggressor . . . You know with Kevin Campbell when you see him become the

---

[1] To the extent Defendants attempt to raise new arguments in their reply as a "last word" effort regarding the admissibility of their evidence, Plaintiff respectfully reserves the right to a seek leave to oppose any newly-raised arguments by Defendants.

aggressor in the situation and *to shoulder bump him* . . .it was determined that, you know, he was in violation of the workplace violence." Ex. 2, Warnders Tr. 94:13-17 (emphasis added).

- According to Defendants, Plaintiff's termination was upheld solely based on a statement from Jose Moreno that Mr. Campbell "*shoulder-bumped*" Mr. Alzate. Ex. 3, Malebranche Tr. 74:5-75:10 (emphasis added).

- Defendants have not produced any sworn statement or testimony from Mr. Moreno. Pl. 56.1 ¶269.

- Defendants never listed Mr. Moreno in the Rule 26(a) Disclosures. Pl. 56.1 ¶270.

**85.)** The results of the investigation determined, *inter alia*, "both Campbell and Alzate were in clear violation of the Workplace Violence Policy."[2] [Cahill Dec. (Exh. A), Defs.' Exhibit F.]

    <u>Plaintiff's Response</u>: **Objection and disputed** for the reasons set forth in response to ¶ 84, above.

**86.)** In a letter dated May 25, 2021, Monty Bovell notified Campbell he had been terminated for actively engaging in disruptive behavior with another co-worker, in violation of the Acceptable Conduct Policy (P2-5). [Campbell Termination Letter, Pl.'s Exhibit 18.]

    <u>Plaintiff's Response</u>: **Disputed.**

a. On May 25, 2021, Defendant FedEx issued a Security Investigative Report stating that Defendant Eric Warnders directed that Plaintiff be terminated. Ex. 16, James Cahill's Security Investigative Report ("Security Report") at ESI 0000966; *See also* Ex. 9, Reyes Tr. 93:10-19 (testifying that "the station manager" made the ultimate decision to terminate Kevin Campbell's employment); *See also* Ex. 2, Warnders Tr. 50:16-51:20 ("In 2021,

---

[2] FedEx's Workplace Violence Policy is subsumed within the Acceptable Conduct Policy.  *See* ¶ 6, *supra*.

Defendant Eric Warnders was Mr. Campbell's Senior Manager at the FedEx LGA Station").

b. Monty Bovell no longer works for FedEx because FedEx fired him in June 2021 for falsifying documents and for falsifying service to FedEx customers several times over months prior. Ex. 3, Malebranche Tr. 72, 110:21-111:7; Warnders 95:5-20.

c. Bovell had been engaging in this falsification for several months prior to his termination. Ex. 2, Warnders Tr. 96:4-11; Ex. 8, Deposition Transcript of Monty Bovell ("Bovell Tr.") 76:2-78:11.

d. Bovell was engaging in this falsification to "make the numbers look better than what they actually are" regarding service. Ex. 9, Deposition Transcript of Lance ("Reyes Tr.") 87:12-89:21.

Otherwise, **undisputed** that the termination letter accused him only of engaging in "disruptive behavior." In this letter, Defendants do not accuse Mr. Campbell of engaging in any more specific or severe behavior warranting his termination. *Id*.; see also Ex. 3, Malebranche Tr. 111-112.

**87.)** Augusto Alzate was also notified by a letter from his manager, Michael Bradley, that he had been terminated for actively engaging in disruptive behavior with another co-worker, in violation of the Acceptable Conduct Policy (P2-5). [Alzate's Station File 018, Defs.' Exhibit G.]

<u>**Plaintiff's Response**</u>: **UNDISPUTED.**

<u>**Guaranteed Fair Treatment Procedure**</u>

**88.)** Both Campbell and Alzate were advised that they could appeal their terminations through FedEx's Guaranteed Fair Treatment Procedure (GFTP). [Campbell Termination Letter, Pl.'s Exhibit 18; Alzate's Station File 018, Defs.' Exhibit G.]

   **Plaintiff's Response**: **UNDISPUTED.**

**89.)** Campbell chose to initiate the GFTP process. [GFT Form ESI, Pl.'s Exhibit 22.]

   **Plaintiff's Response**: **UNDISPUTED.**

**90.)** During Step 1 of the GFTP process, Campbell alleged for the first time that he had been a victim of a pattern of discrimination and retaliation, alleging various incidents he had not previously reported. [Campbell Tr. 392:13-23, Pl.'s Exhibit 1.]

   **Plaintiff's Response**: **Disputed.** Plaintiff never testified that this was the first time he had reported discrimination. Rather, referring to certain instances of discrimination, this citation clearly stands for the proposition that this was the first time Plaintiff had complained "in writing." Prior to Mr. Campbell's GFT filing, Mr. Campbell complained of discrimination multiple times, *including in writing* (i.e. the Peter Lorenzi incident), as follows:

   a. Mr. Campbell complained about Mr. Nunez's comments to Defendant Warnders, who told Mr. Campbell not to write a statement. Ex. 1, Campbell Tr. 109:4-14, 117:11-13, 119:19-25.

   b. Eric Warnders never spoke to Henry Nunez about complaints from Mr. Campbell that Mr. Nunez had made racially offensive remarks to Mr. Campbell. Ex. 5, Nunez Tr. 107:24-108:7.

   c. Eric Warnders handled this situation with Mr. Nunez's comments about Black people by doing what he needed to make it go away so that Mr. Campbell would not cause any issues for the station. Ex. 1, Campbell Tr. 112:16-20.

   d. Mr. Nunez continued making racist comments at times in front of other managers, who did nothing to correct his behavior. Ex. 1, Campbell Tr. 115:22-117:3.

   e. Prior to Mr. Campbell filing his lawsuit, he told Mr. Nunez that he was upset about his hours getting cut. Ex. 5, Nunez Tr. 15:17-21.

35

f.   Kevin Campbell never lied to Mr. Nunez about anything. Ex. 5, Nunez Tr. 77:25-78:6.

g.   Following the incident where Peter Lorenzi followed Mr. Campbell while disparaging Mr. Campbell for allegedly not having running water in the projects, Campbell immediately went on break and complained of Lorenzi's discrimination to his manager Ontaneda, because he wanted those comments to stop. Ex. 1, Campbell Tr. 148:9-25.

h.   Frank Ontaneda initially refused to allow Mr. Campbell to write a statement about Lorenzi's racial harassment instead telling Campbell "Let's not try to – let's not escalate this," because the FedEx managers at the station do not want you to write statements. Ex. 1, Campbell Tr. 150:17-152:11.

i.   Frank Ontaneda does not recall what Kevin Campbell said to him when Mr. Campbell initially complained about Peter Lorenzi's statements. Ex. 10, Ontaneda Tr. 60:22-63:10.

j.   Campbell had to ask Warnders and Ontaneda several times to file a written statement regarding the incident described above involving Lorenzi before Defendants actually permitted him to do so. Ex. 1, Campbell Tr. 157:25-158:25.

k.   After writing his statement against Lorenzi, no one at FedEx spoke to Campbell about the incident with Lorenzi to inform Campbell about the outcome nor to interview Campbell. Ex. 1, Campbell Tr. 161:8-11.

l.   Mr. Lorenzi found to violate Policy 2-5 (Acceptable Conduct) and was only suspended from work for 5 days. Ex. 20, Peter Lorenzi Corrective Action Document ("Lorenzi Corrective Action"), FEC 0979-0980.

m.   Lorenzi was suspended for violating the same policy for which Mr. Campbell was terminated for allegedly violating. *See Id.* and compare with Ex. 18, Plaintiff's Termination Letter.

n.   FedEx is aware that Peter Lorenzi engaged in racial discrimination by referring to Mr. Campbell as "Trayvon Martin" and making comments about Mr. Campbell washing his hands and allegedly being from the projects. Ex. 2, Warnders Tr. 79:17-82:8.

o.   Mr. Lorenzi still works at the FedEx LGA Station despite Defendant Warnders' belief in the truthfulness of Mr. Campbell's complaints regarding Lorenzi. *Id.*; Ex. 5, Nunez Tr. 113:18-19.

p.   Regarding this incident, Frank Ontaneda consulted with Eric Wanders and "Peter Lorenzi was suspended and he received a warning letter." Ex. 10, Ontaneda Tr. 50:6-13.

q. Immediately following the "car radio" incident, Campbell turned to Bradley and Pasqualicchio, two managers, and said "do you see what I have to deal with on a regular basis." Ex. 1, Campbell Tr. 254:13-18.

r. Pasqualicchio looked at Bradley and sighed, but did nothing further. Ex. 1, Campbell Tr. 254:19-21.

**91.)** As part of the GFTP process, Campbell met with Reyes, Bovell, Warnders, and Malebranche to discuss his termination. [Campbell Tr. 389:14-23, Pl.'s Exhibit 1; Reyes Tr. 55:10-12, Pl.'s Exhibit 9.]

**Plaintiff's Response: UNDISPUTED.**

**92.)** In this meeting, Campbell acknowledged that his actions towards Alzate could be intimidating. [GFTP Correspondence and Rationale (FEC 1339), Defs.' Exhibit H.]

**Plaintiff's Response: Objection.** This statement and cited document is hearsay and was not written by Plaintiff. **Disputed** to for the reasons set forth in Plaintiff's Response to ¶ 79, above and in the Second Declaration of Kevin Campbell.

**93.)** Campbell also stated that he did not walk away from the confrontation because he wanted management to see Alzate being angry. [*Id*.]

**Plaintiff's Response**: **Disputed.** The citation is to management's statement, not Mr. Campbell's. Rather, Mr. Campbell did not consider notifying a member of management specifically because managers were aware of the situation with Mr. Campbell and Mr. Alzate, with Mr. Alzate always getting upset with Mr. Campbell for things other splitters also did. Mr. Campbell's hand hurt, and Alzate was right there, so Mr. Campbell thought it best to ask Mr. Alzate why he would push a box and hurt his hand. Ex. 1, Campbell Tr., 375:4-18.

**94.)** Campbell's termination proceeded through Step 2 and Step 3 of the GFTP process in accordance with policy, and his termination was upheld. [*Id.* at FEC 1329 – 1352).]

**Plaintiff's Response: Disputed.** Defendants' action at Step 2 and Step 3 were based on Defendants' actions at Step 1, which are disputed.

a. Mr. Campbell filed a request for GFT Step II and III, and both upheld his termination without meeting with him. Ex. 1, Campbell Tr. 407:2-410:20.

b. No one spoke to Mr. Campbell directly as part of these steps and he felt cheated out of someone hearing his story. Ex. 1, Campbell Tr. 411:21-412:7.

c. On June 10, 2021, Nan Malebranche sent Mr. Campbell a letter upholding his termination and listing new reasons for his termination. Ex. 25, June 10, 2021 Letter from Nan Malebranche to Kevin Campbell (the "June 10th Letter"), FEC 0736.  Ms. Malebranche claims that she made this decision because of an alleged statement from Jose Moreno that Mr. Campbell "shoulder-bumped" Mr. Alzate. Ex. 3, Malebranche Tr. 74:5-75:10. Nan Malebranche testified that the basis for her assertion that Mr. Campbell made physical contact with Mr. Alzate is solely the statement of Jose Moreno. Ex. 3, Malebranche Tr. 73:21-74:75:14. Nan Malebranche testified that her review of "the statement from Jose Moreno" contained in the security report led her to conclude that Mr. Campbell "incited" Mr. Alzate to pull a box cutter on him. Ex. 3, Malebranche Tr. 55:14-59:17. Malebranche chose to form this conclusion despite her understanding that the incident began when "Alzate approached Campbell's work area in a clearly agitated state." Ex. 3, Malebranche Tr. 62:4-7.

d. Defendants' have not produced any sworn statement or testimony from Mr. Moreno. Defendants never listed Mr. Moreno in their Rule 26(a) Disclosures. Ex. 26.

e. In the June 10th Letter, Ms. Malebranche now accused Mr. Campbell of "trigger[]ing the physical altercation." Ex. 25, June 10th Letter, FEC 0736.

f.  In that same letter, Ms. Malebranche also assigned responsibility for the altercation to Mr. Campbell, now stating that "A close look at the actions that led to the altercation, as well as the statements from witnesses, indicates your responsibility for inciting the other employee." Ex. 25, June 10th Letter, FEC 0736.

g.  In 2021, Malebranche was responsible for reviewing the propriety of employee terminations as part of the GFT Step I Process. Ex. 3, Malebranche Tr. 49:13-20.

h.  Malebranche would then upload her findings to the system would be used during the GFT Step II process. Ex. 3, Malebranche Tr. 49:21-50:11.

i.  Malebranche would then upload these written findings and letters to FedEx's system knowing that those written findings would be used during GFT Step 2 to uphold an employee's termination. Ex. 3, Malebranche Tr. 50:12-15.

j.  Nan Malebranche and Eric Warnders were the highest-ranking FedEx employees tasked with the authority to decide whether Mr. Campbell would get his job back during the GFT process. Ex. 3, Malebranche Tr. 73:9-20.

k.  On August 10, 2021, Defendant Warnders sent an email to FedEx Executive Ops Administrator Stephanie Reycraw as part of the Step II GFT process informing Ms. Rycraw that Mr. Campbell's "aggressive actions incited the physical altercation." Ex. 27, August 10, 2021 Email from Defendant Warnders to Stephanie Rycraw ("August 10th Email"), ESI0000485-ESI0000488.

l.  Warnders' and Malebranche's statements are in direct contradiction to the findings from the Security Report, which stated that the May 18th incident began when Alzate approached Campbell's work area in a clearly agitated state, flailing his arms, while pushing several packages in Campbell's direction. Ex. 4, Cahill Tr. 139:21-142:5.

m.  Mr. Reyes testified that the incident started when Alzate aggressively pushed a box toward Mr. Campbell, hitting Mr. Campbell with the box. Ex. 9, Reyes Tr. 58:10-20.  According to Reyes, Alzate approached Mr. Campbell first. Ex. 9, Reyes Tr. 93:8-9. Mr. Campbell was "definitely hit with the box." Ex. 9, Reyes Tr. 64:8. "The fact of the matter is he was hit with the box." Ex. 9, Reyes Tr. 64:13-14.

**95.)** Campbell has no evidence that the GFTP process was not properly followed. [Campbell Tr. 412:8 – 413:7, Pl.'s Exhibit 1.]

**Plaintiff's Response: Objection.** Whether Mr. Campbell has "evidence" is a legal conclusion not properly asserted in a Rule 56.1 Statement.

**Disputed** for the reasons set forth in Paragraphs 248-293 of Plaintiff's 56.1 Statement, which Plaintiff respectfully incorporates herein in their entirety. As set forth therein, Defendant's engaged in discrimination and retaliation by falsifying their allegations after Mr. Campbell filed his GFT form, and by failing to correct ongoing discrimination against him.

## IEEO

**96.)** To address the various incidents of discrimination and harassment raised at the GFT meeting, Managing Director, Nan Malebranche, filed an internal equal employment opportunity (IEEO) Complaint on Campbell's behalf. [Campbell Tr. 46:5-19, Pl.'s Exhibit 1; IEEO Documents (FEC 1536-1537), Defs.' Exhibit I.]

**Plaintiff's Response: Disputed** for the reasons set forth in Paragraphs 294-358 of Plaintiff's 56.1 Statement, which Plaintiff respectfully incorporates herein in their entirety.

**97.)** Campbell's alleged incidents of racial discrimination and retaliation were investigated by Lance Reyes (HR) and Malebranche, who, after interviewing several witnesses (including Campbell) determined Campbell's allegations could not be substantiated. [Campbell Tr.

415:7-11, Pl.'s Exhibit 1; IEEO Documents (FEC 1534-1550, FEC 1512-1514), Defs.' Exhibit I.]

**Plaintiff's Response: Disputed** for the reasons set forth in Paragraphs 294-358 of Plaintiff's 56.1 Statement, which Plaintiff respectfully incorporates herein in their entirety.

**98.)** FedEx provides employees with a multitude of ways to report discriminatory, harassing, or threatening conduct, including by notifying a member of manager or HR, submitting an Internal IEEO packet, or calling the FedEx Alert Line. [Internal EEO Complaint Process, Defs.' Exhibit N; Acceptable Conduct Policy, Pl.'s Exhibit 31.]

**Plaintiff's Response: Disputed** for the reasons set forth in Paragraphs 294-358 of Plaintiff's 56.1 Statement, which Plaintiff respectfully incorporates herein in their entirety.

## MR CAMPBELL'S COUNTERSTATEMENT OF FACTS

Mr. Campbell respectfully incorporates the statements from his 56.1 Statement of Undisputed Facts, and respectfully submits that Plaintiff's 56.1 warrants summary judgment in his favor.  At the very least, Plaintiff's 56.1 warrants denial of Defendants' summary judgment motion.

Dated: January 6, 2024
New York, NY

Respectfully submitted,

/s/ Jessica Massimi_____
Jessica Massimi
**Massimi Law PLLC**
*Attorney for Plaintiff Kevin Campbell*
99 Wall Street, Suite 1264
NY, NY 10005
Jessica.Massimi@gmail.com

/s/ Remy Green_____

Remy Green
**COHEN&GREEN P.L.L.C.**
*Attorney for Plaintiff Kevin Campbell*
1639 Centre Street, Suite 216
Ridgewood, NY 11385
Remy@femmelaw.com

To:
Gabriel McGaha
FEDERAL EXPRESS CORPORATION
3620 Hacks Cross Rd, Bldg. B, 3rd Floor
Memphis, Tennessee 38125
Telephone: (901) 434-3131
Facsimile: (901) 434-9279
gabriel.mcgaha@fedex.com
Attorney for Defendants' Federal Express
Corporation and Eric Warnders