UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
KEVIN CAMPBELL,

                            Plaintiff,                    DEFENDANTS' STATEMENT OF
                                                                   UNDISPUTED MATERIAL FACTS
                                                                   IN SUPPORT OF MOTION FOR
                                                                   <u>SUMMARY JUDGMENT</u>

   -against-


FEDERAL EXPRESS CORPORATION a/k/a           Civil Action No. 22-cv-7662
FEDEX EXPRESS, and ERIC WARNDERS,
INDIVIDUALLY,
                            Defendants.
-----------------------------------------------------------------------X

      Defendants Federal Express Corporation ("FedEx") and Eric Warnders, by and through counsel, hereby submit the following Statement of Undisputed Material Facts in Support of Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Rules for the Eastern District of New York, and pursuant to this Court's Individual Rules.

**<u>FedEx and Its Policies</u>**

1.) FedEx is a global transportation company with facilities located throughout the world.

   [Sharon Daniel Dec. ¶ 1, Defs.' Exhibit A.]

2.) FedEx employs a diverse workforce, including at its LGA station, where, as of November 14, 2024, the racial demographic makeup was as follows:

    <u>LGA total employees - 243</u>
        Hispanic - 100
        African American- 74
        White - 41
        Asian - 15
        Two or More Races - 6
        Not Specified - 5
        Native Hawaiian or Other Pacific Islander - 1
        Indian or Alaska Native - 1

[Eric Warnders Dec. ¶ 10, Defs.' Exhibit B; Campbell Tr. 131:20-25 - Pl.'s Exhibit 1.]

3.) FedEx prohibits discrimination and harassment against any applicant or employee on the basis of race. [4-55 Equal Employment Opportunity/Affirmative Action Policy (FEC 1457), Pl.'s Exhibit 29.]

4.) Any employee who "believes that he or she has been subjected to harassment by anyone, including supervisors [or] coworkers . . . must immediately report [it] to management, HR, or the HR Compliance Department in Memphis, Tennessee." [Anti-Harassment Policy (FEC 1469), Pl.'s Exhibit 32.]

5.) FedEx's Anti-Retaliation policy states:

> There will be no retaliation against any employee who reports a claim or incident of sexual or other harassment or against any employee who participates as a witness in a harassment investigation. Any employee who feels that he or she has been subjected to retaliation must immediately make a report to management, HR, or the HR Compliance Department in Memphis, Tennessee.

[*Id.*]

6.) FedEx's Acceptable Conduct policy prohibits the following and provides that such conduct can result in termination:

- **Workplace Violence.** Violent or threatening behavior is not tolerated in the workplace. Workplace Violence is any <u>behavior or action that puts someone in a state of fear or concern for their safety</u> or the safety of other team members. Workplace violence can be physical, verbal, or emotional in nature. Workplace violence can include, but is not limited to: <u>aggressive</u>, sexual, <u>or other unwelcome and offensive physical contact</u>, bullying, threats, <u>threatening gestures</u>, stalking, or any verbal or physical act of hostility or aggression that is perceived to put anyone's safety at risk.

- <u>Disruptive conduct</u>, including fighting, while on duty or while on FedEx Express property or at company functions.

- Using violent, threatening, intimidating, coercive, or abusive language; <u>engaging in violent, threatening, intimidating</u>, coercive, or abusive <u>behavior</u>; or displaying blatant or public disrespect toward or about any employee, customer,

2

> vendor, or member of the public while on duty, on FedEx Express property, or at off-site Company meetings and functions.

[Acceptable Conduct Policy (FEC 1447-1448), Pl.'s Exhibit 31.] (emphasis added)

7.) Upon hiring, Plaintiff Kevin Campbell received a copy of the handbook containing FedEx policies and acknowledged that he understood the policies. [Campbell Tr. 46:25-47:10, Pl.'s Exhibit 1.]

8.) Campbell had access to FedEx's handbook throughout his employment with FedEx. [*Id.* at 47:11-16; 63:17-20; 64:10-13.]

9.) Campbell received Equal Employment Opportunity and Affirmative Action Overview training on 3/15/18, 2/19/19, 1/16/20, 5/26/20, 6/3/20, and 4/16/21. [Campbell Training History, Defs.' Exhibit C.**]**

10.) Campbell received Workplace Violence Prevention training on 3/15/18, 3/13/19, 1/16/20, 5/15/20, 6/1/20, and 4/15/21. [*Id.*]

11.) Campbell read the entire Acceptable Conduct policy when he was hired at FedEx and understood that workplace violence and disruptive conduct were prohibited. [Campbell Tr. 70:11-22; 71:17-72:2, Pl.'s Exhibit 1.]

**Campbell's Employment**

12.) Plaintiff Kevin Campbell was hired as a Courier/Non-driver at FedEx's LGA station on or around April 1, 2017 after FedEx acquired TNT USA, a company where Campbell had been employed. [Campbell Tr. 8:18-25; 14:7-9, Pl.'s Exhibit 1; Campbell Offer Letter/Employment Agreement (FEC 0598 – 0601), Defs.' Exhibit D.]

13.) Campbell did not have a license when he was hired as a courier with FedEx. [Campbell Tr. 102:7-9, Pl.'s Exhibit 1.]

14.) Campbell was the only courier at FedEx's LGA station who did not have a driver's license. [Warnders Dec. ¶ 6, Defs.' Exhibit B; Campbell Tr. 104:3-7, Pl.'s Exhibit 1.]

15.) Because Campbell did not have a license, he would ride along with other couriers to assist with deliveries. [Campbell Tr. 103:22-2, Pl.'s Exhibit 1.]

16.) Early on in Campbell's employment with FedEx, he would ride with another courier to assist with deliveries at a mall. [*Id.*]

17.) The mall deliveries included approximately 120 stops, which took approximately three to four hours to complete. [Campbell Tr. 95:23 – 96:9, Pl.'s Exhibit 1.]

18.) Campbell wanted to remain on the road with the other driver for his entire shift, but it became inefficient to have two couriers in one truck, so eventually, FedEx arranged for Campbell to return to the station to complete the rest of his shift after the mall deliveries. [Warnders Tr. 62:4-13, 63:19 – 64:5, Pl.'s Exhibit 2.]

19.) Henry Nunez (Hispanic) was Campbell's direct manager from his start date (April 2, 2017) to approximately June 15, 2020. [Campbell Tr. 74:11 – 75:18, Pl.'s Exhibit 1]

20.) Monty Bovell (Black) was Campbell's direct manager from approximately June 16, 2020 to May 25, 2021, the date he was terminated. [Campbell Tr. 75:19-25, Pl.'s Exhibit 1.][1]

21.) Bovell and Nunez (an approximately eight other Operations Managers) reported to Senior Manager Eric Warnders (White), who was responsible for between 250 and 300 employees at LGA. [Warnders Tr. 30:18-19; 66:8 – 67:8, Pl.'s Exhibit 2; Warnders Dec. ¶ 3, Defs.' Exhibit B.]

---

[1] Transcript contains a typographical error and should state "June 16, 2020" instead of "June 6, 2020."

4

22.) Warnders reported to Managing Director, Nan Malebranche, who testified that her race is Spanish, Irish, and German. [Warnders Tr. 121:7-8, Pl.'s Exhibit 2; Malebranche Tr. 15-16, Pl.'s Exhibit 3.]

23.) The manager in charge of the LGA station when Warnders was away was Michael Christophe (Black). [Campbell Tr. 292:15-19; 293:20-22; 295:5-7, Pl.'s Exhibit 1.]

24.) Lance Reyes (Black) was the HR representative for the LGA station beginning in March 2020. [Reyes Tr. 12:18-21, 26:5-16, Pl.'s Exhibit 9; Campbell Tr. 66:20-22, Pl.'s Exhibit 1.]

**Alleged 2018 Nunez Comments**

25.) After Nunez allegedly made the comments set forth in Paragraph 24 of the Complaint, Campbell reported it to Warnders, who had Nunez apologize. [Campbell Tr. 108:3-9; 109:20 – 110:21, Pl.'s Exhibit 1.]

26.) In response to Nunez's apology, Campbell expressed to Nunez that "everybody makes mistakes" and acknowledged that while Nunez "might have been joking," he found the comment "highly offensive." [*Id.* at 110:24 – 111:5.]

27.) At the time, Campbell believed the alleged incident was handled "appropriately" and in a "professional manner" and thought Warnders "did what he needed to do to make it go away." [*Id.* at 112:7-17; 112:24 - 113:5; 141:9-13.]

**Campbell's Hours**

28.) Hours fluctuate at FedEx because the freight is very unpredictable, so some days couriers work more hours than others. [*Id.* at 129:16-24; 130:7-9.]

29.) The hours Campbell worked while employed with FedEx are reflected in his earnings statements. [Campbell's Earnings (FEC 0050-0121), Defs.' Exhibit E.]

30.) Campbell testified that Nunez retaliated against him by cutting his hours two years after Nunez made the statements alleged in Paragraph 24 of the Complaint. [Campbell Tr. 265:21-25, Pl.'s Exhibit 1.]

**Alleged Blatantly Racist Views Expressed Following George Floyd Murder**

31.) At his deposition, Campbell could not identify any FedEx employee who expressed blatantly racist views in the wake of the George Floyd murder. [*Id.* at 141:22 – 143:6.]

32.) Campbell never reported these racist views were being expressed. [*Id.* at 143:19 – 144:3; 145:21-24.]

**Lorenzi Incident**

33.) After one of Campbell's co-workers, Peter Lorenzi, made the statements alleged in Paragraphs 28 and 32 of the Complaint, Campbell immediately reported it to the first manager he saw, Frank Ontaneda. [*Id.* at 147:11 – 148:13.]

34.) Ontaneda and Campbell went to Eric Warnders' office "to get a piece of paper for a statement." [*Id.* at 156:14-18.]

35.) Campbell subsequently "wrote a statement." [*Id.* at 158:7-11.]

36.) Following an investigation, Ontaneda, in consultation with HR and Warnders, issued Lorenzi a Warning Letter and suspended him for five days without pay. [Lorenzi Suspension, Pl.'s Exhibit 20; Ontaneda Tr. 49:24 – 50:20, Pl.'s Exhibit 10.]

37.) Campbell agreed Lorenzi's suspension was a fair resolution to this incident. [Campbell Tr. 162:7-15, Pl.'s Exhibit 1.]

**"Snitch" Allegation**

38.) At this deposition, Campbell could not name anyone who allegedly called him a "snitch." [*Id.* at 169:9-17; 174:8-15; 398:15-23.]

6

39.) Campbell never reported that anyone called him a "snitch." [*Id.* at 171:5-7; 174:16-24.]

**Broken Scanners and Hanging Up Allegation**

40.) Campbell is "pretty sure" Angela Lorenzi handed out broken package scanners to other couriers. [*Id.* at 179:12-21.]

41.) Campbell did not report that Angela Lorenzi gave him broken package scanners prior to his termination. [*Id.* at 399:13 – 400:11.]

42.) Prior to his termination, Campbell did not report that he believed Angela Lorenzi hung up on him because he reported her husband, Peter Lorenzi. [*Id.* at 191:22-25.]

**Stolen TV Allegation**

43.) When "Rob the Mechanic" allegedly made the statements set forth in Paragraphs 42 and 43 of the Complaint, Campbell did not tell him that he found the statements to be offensive. [*Id.* at 196:14-18.]

44.) Campbell believes most African American people, including Monty Bovell, would have found "Rob the Mechanic's" alleged statements offensive. [*Id.* at 204:13-16.]

45.) Bovell was Campbell's direct manager when "Rob the Mechanic" made these alleged statements. [*Id.* at 203:5-8.]

46.) Campbell did not report "Rob the Mechanic's" alleged statements to Bovell or anyone else prior to being terminated. [*Id.* at 198:4-7; 200:18-25; 204:21-24.]

47.) In hindsight, Campbell wishes he had reported this alleged incident. [*Id.* at 248:21-25.]

**Gorilla in a Cage Allegation**

48.) Campbell did not report the alleged comments made in Paragraph 50 of the Complaint to HR or any member of management prior to being terminated. [*Id.* at 210:11-6; 220:8 – 221:14; 397:4-7.]

49.) In hindsight, Campbell wishes he had reported this alleged incident. [*Id.* at 248:21-25; 249:17 – 250:11.]

**Car Radio Allegation**

50.) Campbell did not tell Bradley or Pasqualicchio that he believed the alleged comment made by David Almeda in Paragraph 51 of the Complaint were racially offensive. [*Id.* at 270:5-11; 274:23 – 275:6.]

51.) Campbell believed that Bradley and Pasqualicchio should have interpreted the comment to be racially offensive. [*Id.* at 275:3-6.]

52.) Campbell did not report the alleged statements set forth in Paragraph 51 of the Complaint prior to being terminated. [*Id.* at 256:4-7.]

53.) Campbell never considered reporting these alleged statements to Bovell or to HR. [*Id.* at 257:15-21; 259:19-21.]

54.) Campbell has no documentation that the incident alleged in Paragraphs 51 and 52 of the Complaint occurred other than his memory. [*Id.* at 276:16-19.]

55.) Campbell acknowledges, in hindsight, he should have reported this statement and "every other racial statement that was said to [him]" "just to get it on record." [*Id.* at 276:23 – 277:7.]

8

**Bradley Office Discussion**

56.)     Campbell testified "[Bradley] came up to [Campbell] in a very sincere way and asked [Campbell] to come into his office to speak about the situation with [Peter Lorenzi]." [*Id.* at 277:25 - 278:4.]

57.)     "[Bradley] just wanted to check on [Campbell] to see how [he] was doing." [*Id.* at 279:23 – 280:4.]

58.)     Campbell did not report the incident alleged in Paragraph 54 prior to his termination. [*Id.* at 282:15-17; 290:14-17.]

59.)     Campbell acknowledges, in hindsight, he would report "every single incident that was racial to someone." [*Id.* at 290:21 – 291:12.]

**Bradley Alleged "Discipline" and "Screaming"**

60.)     The "disciplining" and "reprimanding" alleged in Paragraph 59 of the Complaint was Bradley telling Campbell's direct manager, Monty Bovell, that Campbell was not labeling packages, and Bovell calling Campbell to ask him "kindly to come back to the building" to do so. [*Id.* at 300:2 – 301:24.]

61.)     At his deposition, Campbell could not name anyone who Bradley knew was not labeling packages and who Bradley did not "reprimand." [*Id.* at 304:20-24.]

62.)     No one witnessed Bradley allegedly screaming at Campbell to put labels on boxes. [*Id.* at 309:23 – 310:19; 313:20-25.]

63.)     Bradley never used profanity, called Campbell names, or said anything Campbell perceived to be racially motivated. [*Id.* at 314:2-11.]

64.) Campbell believes Bradley screamed at him, at least in part, because Campbell is "a Black man who is not commonly perceived as a victim wrote a statement about his friend [Lorenzi]," which Campbell believes "bothered [Bradley]." [*Id.* at 315:7-15.]

**Alleged Vehicle Comments and Scratch**

65.) Campbell did not report the statements alleged in Paragraph 64 prior to being terminated. [*Id.* at 327:25 – 328:5.]

66.) Campbell has no evidence that the person who allegedly "vandalized [his] vehicle was someone that [sic] was upset that [Campbell] wrote a statement about Lorenzi." [*Id.* at 345:5-11.]

67.) Campbell was not at work when he noticed the scratch on his car. [*Id.* at 329:24 – 330:2.]

68.) Campbell does not know whether his car was keyed while he was at FedEx. [*Id.* at 331:19-22.]

69.) Campbell's belief that his car was keyed at FedEx was based on a "gut feeling." [*Id.* at 333:11-17.]

70.) While Campbell told Nunez that he believed his car was keyed at FedEx, he did not tell Nunez that he believed it was done because of his race. [*Id.* at 332:8-21; 335:17 – 336:2.]

**Alzate Incident and Termination**

71.) On May 18, 2021, Campbell and Augusto Alzate (Hispanic) were working adjacent to each other (about five feet distance) during the morning sort when packages are sorted on a conveyor belt. [Campbell Tr. 353:3-22, 366:3-17, Pl.'s Exhibit 1; Warnders Dec.¶ 9, Defs.' Exhibit B; James Cahill Dec. (Exhs. A-C), Defs.' Exhibit F.]

72.)  Campbell's job was to split the belt (move certain freight off the belt), and Alzate's job was to get the recycle (move the boxes Campbell missed). [Campbell Tr. 353:13-22, Pl.'s Exhibit 1.]

73.)  Alzate became was unhappy with Campbell because he believed Campbell was missing too many boxes. [*Id.*]

74.)  Alzate kicked two boxes towards Campbell, which Campbell perceived as an attempt to intimidate or upset him, but Campbell ignored Alzate. [*Id.* at 372:21 – 373:8.]

75.)  Alzate then pushed a larger box towards Campbell, which hit Campbell's hand. [*Id.* at 371:19 – 372:4.]

76.)  At no point before Alzate hit Campbell with the third box did Campbell consider notifying a member of management that Alzate was being aggressive towards him. [*Id.* at 375:4-18.]

77.)  In the process of pushing the third box towards Campbell, Alzate closed the distance between him and Campbell from approximately five feet to two feet. [Campbell Tr. 377:14 – 378:19.]

78.)  Campbell in turn approached Alzate closing the distance between the two men to approximately six inches. [Campbell Tr. 378:20 – 379:21, Pl.'s Exhibit 1; Cahill Dec. (Exhs. A-C), Defs.' Exhibit F.]

79.)  Campbell acknowledges Alzate could have been intimated when Campbell closed the distance with him to half a foot and that Alzate could have perceived it as an act of aggression. [Campbell Tr. 379:22 – 380:21, Pl.'s Exhibit 1; Cahill Dec. (Exhs. A-C), Exhibit F.]

80.)  Alzate responded by pulling out a box cutter, causing Campbell to grab Alzate's arm in an attempt to push it away. [Campbell Tr. 380:16 – 381:2, Pl.'s Exhibit 1.]

11

81.)   Co-workers who witnessed the incident intervened and wrestled the box cutter from Alzate. [*Id.* at Campbell Tr. 381:3-15.]

82.)   Both Campbell and Alzate were immediately suspended. [Monty Bovell Tr. 35:20-24, Pl.'s Exhibit 8.]

83.)   The same day, Senior FedEx Security Specialist, James Cahill, opened an investigation into the incident. [Cahill Dec. (Exh. A), Defs.' Exhibit F.]

84.)   As part of his investigation, Cahill conducted witness interviews (including interviews of Alzate and Campbell) and reviewed video surveillance footage from two different angles. [Cahill Dec. (Exh. A-C), Defs.' Exhibit F.]

85.)   The results of the investigation determined, *inter alia*, "both Campbell and Alzate were in clear violation of the Workplace Violence Policy."[2] [Cahill Dec. (Exh. A), Defs.' Exhibit F.]

86.)   In a letter dated May 25, 2021, Monty Bovell notified Campbell he had been terminated for actively engaging in disruptive behavior with another co-worker, in violation of the Acceptable Conduct Policy (P2-5). [Campbell Termination Letter, Pl.'s Exhibit 18.]

87.)   Augusto Alzate was also notified by a letter from his manager, Michael Bradley, that he had been terminated for actively engaging in disruptive behavior with another co-worker, in violation of the Acceptable Conduct Policy (P2-5). [Alzate's Station File 018, Defs.' Exhibit G.]

---

[2] FedEx's Workplace Violence Policy is subsumed within the Acceptable Conduct Policy.  *See* ¶ 6, *supra*.

**Guaranteed Fair Treatment Procedure**

88.) Both Campbell and Alzate were advised that they could appeal their terminations through FedEx's Guaranteed Fair Treatment Procedure (GFTP). [Campbell Termination Letter, Pl.'s Exhibit 18; Alzate's Station File 018, Defs.' Exhibit G.]

89.) Campbell chose to initiate the GFTP process. [GFT Form ESI, Pl.'s Exhibit 22.]

90.) During Step 1 of the GFTP process, Campbell alleged for the first time that he had been a victim of a pattern of discrimination and retaliation, alleging various incidents he had not previously reported. [Campbell Tr. 392:13-23, Pl.'s Exhibit 1.]

91.) As part of the GFTP process, Campbell met with Reyes, Bovell, Warnders, and Malebranche to discuss his termination. [Campbell Tr. 389:14-23, Pl.'s Exhibit 1; Reyes Tr. 55:10-12, Pl.'s Exhibit 9.]

92.) In this meeting, Campbell acknowledged that his actions towards Alzate could be intimidating. [GFTP Correspondence and Rationale (FEC 1339), Defs.' Exhibit H.]

93.) Campbell also stated that he did not walk away from the confrontation because he wanted management to see Alzate being angry. [*Id.*]

94.) Campbell's termination proceeded through Step 2 and Step 3 of the GFTP process in accordance with policy, and his termination was upheld. [*Id.* at FEC 1329 – 1352).]

95.) Campbell has no evidence that the GFTP process was not properly followed. [Campbell Tr. 412:8 – 413:7, Pl.'s Exhibit 1.]

**IEEO**

96.) To address the various incidents of discrimination and harassment raised at the GFT meeting, Managing Director, Nan Malebranche, filed an internal equal employment opportunity

(IEEO) Complaint on Campbell's behalf. [Campbell Tr. 46:5-19, Pl.'s Exhibit 1; IEEO Documents (FEC 1536-1537), Defs.' Exhibit I.]

97.) Campbell's alleged incidents of racial discrimination and retaliation were investigated by Lance Reyes (HR) and Malebranche, who, after interviewing several witnesses (including Campbell) determined Campbell's allegations could not be substantiated. [Campbell Tr. 415:7-11, Pl.'s Exhibit 1; IEEO Documents (FEC 1534-1550, FEC 1512-1514), Defs.' Exhibit I.]

98.) FedEx provides employees with a multitude of ways to report discriminatory, harassing, or threatening conduct, including by notifying a member of manager or HR, submitting an Internal IEEO packet, or calling the FedEx Alert Line. [Internal EEO Complaint Process, Defs.' Exhibit N; Acceptable Conduct Policy, Pl.'s Exhibit 31.]

Dated: November 18, 2024.

Respectfully submitted,

*/s/ Gabriel P. McGaha*
Gabriel P. McGaha
(seeking *pro hac vice* admission)
Federal Express Corporation – Legal Litigation
3620 Hacks Cross Road
Building B, Third Floor
Memphis, TN  38125
(901) 434-3131 telephone
(901) 434- 9279 facsimile

*Counsel for Defendants*
*Federal Express Corporation and*
*Eric Warnders*

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on this 18th day of November 2024, the foregoing document was served via electronic mail to:

Jessica Massimi
Massimi Law PLLC
99 Wall Street, Suite 1264
New York, NY 10005
jessica.massimi@gmail.com

                                                              */s/ Gabriel P. McGaha*_____
                                                              Gabriel P. McGaha